UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

CAROL PETRARCA,

Plaintiff,

v.

SOUTHERN UNION COMPANY, et al.,

Defendants.

C.A. No. 04-310-S

## MOTION FOR PROTECTIVE ORDER

Pursuant to Fed. R. Civ. P. 26(c), Defendants Southern Union Gas Co. et al. move for a Protective Order pertaining to the nature and extent of Plaintiff's deposition examination of former and current employees and agents of the Defendants, insofar as such deposition examination is anticipated to be irrelevant, in violation of Fed. R. Civ. P. 26(b)(1), and causes annoyance and oppression under Fed. R. Civ. P. 26(c). In support of this motion, Defendants rely on the attached memorandum of law relating to *Lynore Horn v. Southern Union Co.*, C.A. No. 04-434-S, which is also before this Court. This motion is based on the same facts and law as the motion filed in the *Horn* case.

Counsel for Plaintiff also represents two other former employees of Defendants who are also pursuing lawsuits against the Defendants. In deposition questioning of a former employee of the Defendants in the Lynore Horn case, Plaintiff's counsel repeatedly inquired into completely irrelevant issues and persons that instead pertain to this case and another case pending in state court. Counsel

for Plaintiff stated explicitly and on the record that she intends to use further discovery in each case, particularly deposition questioning, as a means to conduct discovery for her other two cases. While Defendant recognizes that there is a degree of factual overlap in these three cases, Plaintiff's deposition questioning has, on several occasions, related to topics solely relevant to another proceeding. It is clear that Plaintiff intends to continue this practice, which certainly violates both Fed. R. Civ. P. 26(b)(1) and 26(c).

For the foregoing reasons, Defendant requests that this Court issue an Order protecting against deposition examination by the Plaintiff that is irrelevant to the instant case and instead intended solely to develop facts for other cases.

Respectfully submitted,

DEFENDANT,
SOUTHERN UNION COMPANY,

By its attorney,

HOLLAND & KNIGHT LLP

Neal J. McNamara, Esq. (#4249)
Robert J. Crohan Jr., Esq. (#6516)
One Financial Plaza – Suite 1800
Providence, RI 02903
Tel. (401) 751-8500
Fax. (401) 553-6850

Dated: 10/3, 2005

**CERTIFICATION OF GOOD FAITH ATTEMPT TO RESOLVE DISPUTE UNDER FED. R. CIV. P. 26(c)**

I hereby certify that I have in good faith attempted to confer with the affected party in an effort to resolve this dispute without court action. My unsuccessful attempt to address this issue at the deposition of Edward Bolduc is evident from the transcript of that deposition, attached as Exhibit A. I also sent a letter to Plaintiff's counsel on or about September 2, 2005, regarding this issue, to which I received no reply.

Neal J. McNamara, Esq. (#4249)
Robert J. Crohan Jr., Esq. (#6516)
Holland & Knight LLP
One Financial Plaza – Suite 1800
Providence, RI 02903
Tel. (401) 751-8500
Fax. (401) 553-6850

Dated: October 3, 2005

CERTIFICATE OF SERVICE

The undersigned hereby certifies that on October 3, 2005 a copy of the foregoing was mailed and faxed to: Patricia E. Andrews, Esq. and Carly B. Iafrate, Esq., 170 Westminster Street, Suite 601, Providence, RI 02903.

Marilyn Lowly

# 3268943_v1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| LYNORE I. HORN,<br>Plaintiff,<br>V.<br>SOUTHERN UNION COMPANY and NEW ENGLAND GAS COMPANY<br>Defendants. | C.A. No. 04-434-S |
| CAROL PETRARCA,<br>Plaintiff,<br>v.<br>SOUTHERN UNION COMPANY, et al.,<br>Defendants. | C.A. No. 04-310-S |

# MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTIONS FOR PROTECTIVE ORDER

## I. Factual Background

Plaintiff's counsel represents three former employees of Defendant England Gas Company (New England Gas), each of whom have asserted discrimination claims in three separate lawsuits pending in either Rhode Island Federal District Court or Superior Court. In the instant case, Plaintiff Lynore Horn sought the deposition testimony of Edward Bolduc (Bolduc), her former supervisor at

Providence Gas Company, the corporate successor of the Defendants. At Bolduc's deposition, Plaintiff's counsel, on several occasions, engaged in improper and irrelevant questioning geared toward eliciting Bolduc's impressions regarding the cases of her other two clients, Carol Petrarca and Christine Stamp. *See* Deposition of Edward Bolduc (Bolduc Deposition), attached as Exhibit A[1], at 34:2-9, 39:16-20, 55:1-8, 67:24 – 68:6, 73:23 – 74:6, 78:14-20, 80:3 – 81:24, 82:12 – 87:5, 93:4 – 94:8, 99:15 – 101:6, 102:9 – 104:14, 124:5-12, 130:21 – 131:15.

After one particularly long line of questioning regarding Carol Petrarca, *see* Bolduc Deposition at 82:12 – 87:5, Defendant's counsel objected, and an on-record discussion about the propriety of such questions ensued. Defendants' counsel took exception to Plaintiff's counsel's attempt to conduct "two different depositions under one caption," noting that "it's going to be confusing" and suggesting that it would be "fine" for Plaintiff's counsel to issue "notice of deposition . . . for 9:00 in the morning for Lynore Horn's [case] and 1:00 in the afternoon for Carol Petrarca." *See* Bolduc Deposition at 87:6-22. After a brief digression into interrogatory responses, Defendants' counsel stated: "It seems to me that you're going to conduct depositions in three different cases, in [which] the questions will be interchangeable and the facts will be all mooshed [sic] together." *See id.* at 89:17-20.

Plaintiff's counsel's surprisingly candid response was: "Well, I mean, quite honestly, I don't know whether it was in this case, but I was encouraged to do exactly that. And it seems to me that it makes sense if I have cases to conduct, you

---

[1] Due to the page limit requirements of Amended General Order #2002-01, not all referenced deposition testimony is appended to this memorandum. If the Court requests a more complete exhibit pursuant to Order #2002-01, the Defendants would be happy to provide it with one.

know, as few depositions as possible." *See id.* at 89:21 – 90:1. After Defense counsel pointed out that Plaintiff's counsel had been given, and had rejected, the opportunity to consolidate discovery in all three matters in federal court, Plaintiff's counsel asserted: "There's nothing here that prevents me from using what I'm developing here . . . in my case in Superior Court." *See id.* at 90:14-18.

Defendants' counsel, in anticipation of further depositions saturated by irrelevant questions and continued abuse of the discovery process, now seeks a protective order limiting the Plaintiff to inquiries relevant to the claims of Lynore Horn only.

## II. Argument

Federal Rule of Civil Procedure 26(c) authorizes this Court to grant a protective order when "justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." The Plaintiff's inappropriate use of deposition questioning to conduct discovery for its other pending cases against the Defendants certainly constitutes the "annoyance" and "oppression" contemplated by the rule. Fed. R. Civ. P. 26(c).

Plaintiff's counsel has unabashedly stated that she is planning on conducting "as few depositions as possible" and using those depositions "in [her] case in Superior Court." Bolduc Deposition at 89:25 – 90:18. The Plaintiff's desire for economy, however, does not trump the Defendants' rights under Rules 26(b)(1) and 26(c) not to have its deponents be subjected to (a) questioning that is irrelevant to this case; (b) confusion caused by attempting to conduct discovery for three cases

under the auspices of a single case; and (c) prejudice resulting from the inability to properly prepare witnesses for deposition testimony when the subject matter of the deposition is constantly shifting. This is precisely the type of annoyance and oppression against which Rule 26(c) is meant to protect.

The fact that the Plaintiff's counsel admits, on the record, that she intends to conduct deposition discovery in this manner is sufficient "good cause" for this Court to issue a protective order. *See Baker v. Liggett Group, Inc.*, 132 F.R.D. 123, 25 (D. Mass. 1990). Plaintiff's counsel's three separate clients have each asserted separate claims, based on unique facts, in separate lawsuits in two different courts under various provisions of both state and federal law. Confusion – on the parts of both witnesses and counsel – will inevitably result if Plaintiff's counsel is allowed to conduct discovery for three cases under the auspices of this single case.

Moreover, Defendants' preparation of deponents will be greatly prejudiced if the subject matter of deposition questioning is determined on the whim of the Plaintiff's counsel at the time of the deposition. This will be particularly problematic in the likely event that the Plaintiff issues a Rule 30(b)(6) deposition notice, which will require extensive preparation of the designated corporate spokesperson. In the absence of any constraints on Plaintiff's counsel, any prospective 30(b)(6) deponent will be faced with the impossible task of preparing to answer questions regarding three discrete cases involving different matters of fact and law. Defendants' counsel cannot do its job preparing *any* deponent – especially a prospective 30(b)(6) corporate designee – if the case caption under which a

deposition is noticed is different from the one toward which the questions are geared.

Federal district courts that have faced similar situations have unequivocally ruled that discovery in one case cannot be used as a mere pretext for discovery relating to other pending cases. *See Wright & Miller, Federal Practice & Procedure* § 2040 (1994). In *Beard v. New York Central Railroad Co.*, 20 F.R.D. 607, 609 (N.D. Ohio 1957), the court first stated that the "discovery procedures of the federal rules are designed to be used solely for the purpose of obtaining information for use in the federal court action in which they are employed." It further held that "no plaintiff has a right to use a federal court as a mere auxiliary forum through which to obtain assistance in the preparation of a similar case pending in the state court." *Id.* at 619. The Court in *Beard* issued a protective order, finding it "apparent from the face of the record" that "such was the plaintiff's purpose." *Id.* Another more recent case, *Elm Energy & Recycling (U.K.) Ltd. v. Basic*, 1996 W.L. 596456 (N.D. Ill.), dealt with a similar issue. Although the court in *Basic* declined to issue a protective order, it stated plainly: "Although the federal rules allow for broad discovery, they do not sanction the use of discovery in one case as a sham for conducting discovery solely for a different case . . .." *Id.* at *7.

The Defendants readily acknowledge that there is a degree of factual overlap between this case involving Lynore Horn and the other cases, and that litigants in other forums may use the fruits of discovery in this case. *See Macario v. Pratt & Whitney Can.*, 1990 U.S. Dist. LEXIS 17411 (E.D. Pa.), at *8-9. But what Plaintiff's

counsel is attempting to do goes beyond mere use of discovery in this case *to aid in other cases*; it is, instead, the use of this case to conduct discovery *for other cases*. Given Plaintiff's counsel's recorded statements, it is clear that Plaintiff has begun, and intends to continue, to "exploit[] the litigation solely to assist in other litigation before a foreign forum." *Id.* at *8. A Rule 26(c) protective order that prohibits deposition questioning that is not relevant to this case, but intended solely to develop other pending cases, is required.

## III. Conclusion

For the foregoing reasons, the Defendants hereby request that its motion for a protective order under Federal Rule of Civil Procedure 26(c) be GRANTED.

Respectfully submitted,

DEFENDANT,
SOUTHERN UNION COMPANY,

By its attorney,

HOLLAND & KNIGHT LLP

Neal J. McNamara, Esq. (#4249)
Robert J. Crohan Jr., Esq. (#6516)
One Financial Plaza – Suite 1800
Providence, RI 02903
Tel. (401) 751-8500
Fax. (401) 553-6850

Dated: October 3, 2005

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on October 3, 2005 a copy of the foregoing was mailed and faxed to: Patricia E. Andrews, Esq. and Carly B. Iafrate, Esq., 170 Westminster Street, Suite 601, Providence, RI 02903.

Marilyn Lowely

# 3253782_v2

A. That's correct.
Q. And the women could not use it; correct?
A. No.
Q. They were supposed to use the one on the third floor?
A. That's correct.
Q. Who cleaned the shower room, the men's locker room, on the second floor?
THE WITNESS: In what period?
MS. ANDREWS: At any period?
A. At one point in time, Tony Cesario, it was his responsibility to clean that area. At another point in time later on, I believe Lynore Horn, that it was her responsibility to clean that area.
Q. Now, when Lynore Horn had a responsibility to clean that area, was anything done to prevent men from coming in while she was there?
A. There was a sign on the door, the main entrance to that area, informing personnel, the men going into that area, that a woman was in there cleaning. She had a specific time of day that she was supposed to go in there to clean. I believe it was some time in the morning in the a.m.



Q. Did you ever hear that Carol Petrarca cleaned that room?
A. She may have. Again, because they were transferring back and forth between the office building and Dexter Street, so it's possible that that may have been their responsibility, because they also filled in for each other on vacation periods between the two facilities.
Q. Was there ever a time when there was no sign indicating that a female was cleaning the locker room. Do you understand my question?
A. I do. I'm not aware of that, no. If they were in there cleaning, they had to put the sign up when they went in there.
Q. Did the sign always reflect females were in there cleaning as opposed to men in there cleaning?
A. I believe it did.
Q. Do you remember any female asking you for a sign that said females were working in there as opposed to men were working in there?
A. I believe Lynore did, but she had the sign there saying a woman, a female. I believe she put the sign up. She made the sign.
Q. When you say, "She made the sign," what sign did



she make?
A. A woman working -- I think it already said something about somebody working in there, and with a black marker, I believe, put in woman.
Q. Do you remember -- strike that. Did you ever have any talks with Lynore Horn about her need for a sign that reflected that it was a woman working inside the locker room?
A. I don't recall any specific conversation with her about that, other than the fact that she had that sign that she made, which was adequate at the time, I thought.
Q. Now, you say you don't remember any specific conversation. Do you remember any discussion at all with Lynore Horn, or any other person, about the need for a sign that reflected that females were working inside the locker room?
A. I guess I don't remember any conversation, again, knowing that there was a sign already there stating that fact.
Q. You don't remember any issues about that?
A. I don't.
Q. There weren't any issues about that as far as you're concerned?
A. No. There was no issues about the sign.



The sign said, "Female worker."
Q. Are you aware of any female being inside that locker room while men were showering --
A. No.
Q. -- or going to the bathroom?
A. Yes.
Q. You did hear that?
A. I heard one instance of that, yes.
Q. What did you hear?
A. I don't remember the person's name, but I heard that while she was cleaning in there, I think she was in the shower area cleaning, I believe a gentleman went in and used the urinal.
Q. How did you know that?
A. I believe from her, from Lynore.
Q. What did you do, if anything?
A. I spoke to the supervisor of that department, because I didn't know who the person was. I spoke to the supervisor of the department and made him aware that there was a female working in there, and the sign was there, and it pertains to everyone.
Q. And who was that supervisor that you told that to?
A. Walter Zamoida.

Page 66

about it over the course of the years?
A. It was often. I can't put a number on it. I don't know how to put a number on it.
Q. Was it more than ten times; do you think?
A. Yes.
Q. Was it more than 20?
A. Through the years, yes.
Q. More than 50, through the years?
A. It was more than 20, I know that, based upon the years that we worked together and the various incidents that took place. A number beyond that, I don't know how to calculate it.
Q. And why can't you calculate it? If you know it was at least 20, why can't you say whether it was more than that or not?
A. In those years that we worked together, I don't know the number of years it was, but there were a number of years that she reported to me, and it wasn't every day, but I would say the number was in excess of 20. How much beyond that, I can't put a number on it.
Q. Did you ever raise your voice with Lynore?
A. I would say, no, because that was not my style. I'm not a yeller. I'm an explainer and corrector.

Page 67

Q. I said, "Did you raise your voice," I didn't necessarily say did you yell at her. Did you raise your voice to her?
MR. MCNAMARA: Objection.
THE WITNESS: Raise it to what?
MS. ANDREWS: More than your normal tone.
A. I think perhaps in explaining something with some enthusiasm, some emphasis, if that's called raising your voice, then that's what I did.
Q. Were you critical of her work?
MR. MCNAMARA: Objection.
THE WITNESS: Critical of all her work?
Q. In that area? When you say that you spoke to her about her being deficient in the mechanical area, correct, you had those conversations?
A. Yes.
Q. Were you criticizing her work, or were you trying to tell her what she should do?
A. I was trying to correct her and educate her in how she should have done it, and how it needed to be done.
Q. You said that Carol Petrarca was inadequate in some areas, as well; correct?

Page 68

A. That's correct.
Q. In what areas was she inadequate in, same area?
A. As I stated earlier, in the same areas, mechanicals.
Q. And Christine Stamp, as well?
A. That's correct.
Q. Can you identify for me any males who were deficient in the mechanical area the way that you claim those three were?
A. Probably Joe Ianniello in some of those areas. Again, he did have an understanding of the way the mechanicals worked. He understood when I tried to explain something, how the process worked. But there was room for improvement with him, yes.
Q. But do you put him into the same category that you put the other three?
MR. MCNAMARA: Objection.
THE WITNESS: What category is that?
Q. You said that the three woman that we just talked about were deficient in the mechanical area, and I asked you to identify any male who was deficient in that same area. You mentioned Joe Ianniello. Are you saying that he was

Page 69

deficient in the same manner of those three?
A. He was not deficient to the same degree.
Q. But to some degree he was?
A. Some degree he was.
Q. Any other male?
A. To be exact, Jerry was deficient to some extent, very little, because he was a very good mechanic, and with the mechanicals of the buildings and how they worked. But there was room for improvement, as well.
Q. In that same area?
A. Yes.
Q. Anyone else?
A. No.
Q. So did you ever talk to Joe Ianniello about his deficiency?
A. Yes.
Q. He's retired?
A. Yes.
Q. How many times did you talk to him?
A. Again, Joe Ianniello worked for me for many, many years. I can't put a number on that.
Q. As many as Lynore?
A. Again, I can't put a number on it. He was there for so many years prior to the three

about females working in the maintenance department.
(WITNESS PERUSING DOCUMENT)
MR. MCNAMARA: Objection.
A. I'd have to answer the same thing, I don't recall.
Q. You're not denying it, you're just saying you don't remember one way or the other?
A. That's correct.
Q. Do you know the name, Richard Kala?
A. Yes.
Q. How do you know Richard Kala?
A. He worked for me for a short period of time.
Q. Did he overlap with either, Carol Petrarca, Lynore Horn, or Christine Stamp?
A. I believe he did, yes.
Q. Which ones did he overlap with?
A. I want to say Carol and Lynore. I'm not certain about Christine. I don't recall the overlap.
Q. Using your definition of crude, did you ever hear Richard Kala use any crude words in the workplace?
A. No.
Q. Are you saying no, or you don't remember one way



or the other?
A. No, I didn't hear it.
Q. Did you ever hear from any source that he had used crude words in the workplace?
A. Not that I recall.
Q. Are you aware of any problems that Richard Kala had on the job?
MR. MCNAMARA: Objection.
A. I'm not sure.
THE WITNESS: What kind of problems?
Q. Any problems that he had on the job?
MR. MCNAMARA: Objection.
THE WITNESS: When you say problems, problems with what?
Q. Misconduct on his part.
THE WITNESS: While he worked for me?
Q. While he worked at the Providence Gas Company?
A. I don't know.
Q. You don't know of any misconduct on his part?
A. Not that I'm aware of.
Q. You never heard anything about that?
A. Not that I recall.
Q. So you're not denying it, you just don't



remember one way or the other?
A. No.
Q. Do you remember any problems that Carol Petrarca had with Richard Kala?
MR. MCNAMARA: Objection.
A. No.
Q. You never heard anything about any issues between Richard Kala and Carol Petrarca?
MR. MCNAMARA: Objection.
A. Not that I recall.
Q. Did you ever hear that Carol Petrarca had complained about the manner in which she was being treated by Richard Kala?
THE WITNESS: Repeat the question, please.
MS. ANDREWS: Could you read that, please.
(Question on Page 80, Line 11 read.)
A. Yes.
Q. What did you hear?
A. It was to the extent -- and I don't, I should have said no, because I don't remember exactly. I know she didn't like the way he treated her, bossy, if you will.
Q. That's what you remember hearing?



A. Yes.
Q. Who did you hear that from?
A. I believe from Carol.
Q. And you're saying that Carol came to you and complained about Richard Kala?
A. About that incident, yes.
Q. About what incident?
A. That they weren't getting along and that he was bossing her around, I guess.
Q. Did she ever tell you that he had done anything that offended her or scared her?
A. Not that I recall.
Q. Did she ever tell you that he had essentially propositioned her?
A. Not that I recall.
Q. Did she ever tell you about an incident that happened on New Year's Eve one night, one year?
A. Not that I recall.
Q. Where he threw down some money on the table and essentially asked her to have sex with him. Do you remember anything like that?
THE WITNESS: On New Year's Eve?
Q. On any night.
A. Not that I recall. I don't remember.
Q. Do you remember Richard Kala having -- strike

Page 82

that. Any customers complain about Richard Kala --
MR. MCNAMARA: Objection.
Q. -- a female customer, at any time, did you ever hear that?
A. No.
Q. He was transferred from your department; correct?
A. He bid out of my department.
Q. Do you know why he bid out?
A. I think he went to customer service.
Q. Tell me why Carol Petrarca was fired, if you know?
MR. MCNAMARA: Objection.
Q. Carol Petrarca stopped working for your department; correct?
A. That's correct.
Q. Tell me how it was that came about?
A. I believe she was collecting, I don't know if it was TDI or Workman's Comp. She was collecting from two different sources. I don't have all the facts. I guess it was illegal. Whatever the sources was, she should not have been collecting from the gas company, whether it was TDI or Workman's Comp. I believe that was

Page 83

the reason.
Q. Do you know for sure that that is the reason that she ceased working for the gas company?
A. I believe that was the reason.
Q. Is there any doubt in your mind, is what I'm asking you?
A. I guess there is. That's my understanding of why she was fired.
Q. But is there any doubt in your mind that that's the reason she was fired, is my question?
MR. MCNAMARA: Objection.
A. No. That's my understanding of why she was fired.
Q. Were you involved in that at all, involved in anything related to her determination?
A. I was aware of the investigation that was taking place prior to her separation, because she did report to me.
Q. What investigation was that?
A. I guess the fact that she was receiving money from the gas company that she should not have been receiving, and there was an investigation on that to ascertain the facts.
Q. And who conducted that investigation, do you know?

Page 84

A. HR.
Q. Who in HR?
A. Bud Butler.
Q. Do you know that for sure?
A. I don't know.
Q. Did you give any statement at all?
A. She was out on Workman's Comp, I believe, I think it was Workman's Comp, at the time. So there was an investigation going on about whether she was able to come back to work or not. So I was involved in that portion of it.
Q. What did that involve, whether or not she could come back to work?
A. Whether she was physically able to come back to do the work that was required.
Q. Are you aware of any persons working for the gas company who stole gas?
THE WITNESS: Am I aware?
MS. ANDREWS: Yes.
A. No. I heard rumors, but I'm not aware.
Q. What have you heard?
A. That people steal gas from the gas company.
Q. Who have you heard rumors about?
A. I don't have any names. I don't know.
Q. How about the name, John Britto?

Page 85

A. I don't remember.
Q. You don't remember hearing anything?
A. I remember hearing rumors of people stealing gas, whether it was John Britto stealing gas, I don't remember that.
Q. So you did hear rumors about employees stealing gas, but sitting here today, you can't remember who those employees were?
A. Because those rumors went on through the years.
Q. But I just want to make sure that when you heard the rumors, they were about specific employees, but you just don't remember their names right now?
A. That's correct.
Q. And you would hear these rumors, yourself, correct?
A. Yes.
Q. When you heard these rumors, what did you do in your capacity as a supervisor to find out whether or not this was going on?
A. Nothing.
Q. Did you report it?
A. It was a rumor that I had heard through the company. So if I heard it, I'm sure those

Page 86

officials who were responsible for that area of responsibility would be doing something about it.
Q. Are you aware of anyone being fired for stealing gas?
A. No, I'm not.
Q. Are you aware of anyone being disciplined for stealing gas?
A. No, I'm not.
Q. You're not aware of anyone actually getting caught?
A. No, I'm not.
Q. Are you aware of any other person who received monies from the gas department that they weren't entitled to?
MR. MCNAMARA: Objection.
MS. ANDREWS: Do you understand my question?
THE WITNESS: Say it again, please.
Q. Are you aware of any employees, who say, for example, in their paychecks, had received money that they weren't entitled to? Do you understand what I'm saying?
MR. MCNAMARA: Objection.
A. Not that I recall.

Page 87

Q. Now, is it possible that that happened, but you just couldn't recall, sitting here today?
MR. MCNAMARA: Objection.
A. Yes. It's possible. I just don't recall it.
MR. MCNAMARA: Pat, I'm going to have to object, because we're in an area now where there really is no overlap. I mean, I can understand Christine Stamp and Carol Petrarca coming up today and questions being asked in certain venues of vulgar words, things like that. But when we're talking an area that has nothing to do with Lynore Horn, absolutely nothing to do with her, and as far as I understand, any relevance to the Carol Petrarca case, I have to object that you're conducting two different depositions under one caption. And it's going to be confusing. If you want to have issue of notice of deposition one day for 9:00 in the morning for Lynore Horn's deposition and 1:00 in the afternoon for Carol Petrarca, that's fine.
MS. ANDREWS: If you've got any cases that say that I'm not entitled to do this, then tell me. But part of the problem is that I

Page 88

sent out discovery. And, you know, I got only objectioned to things that are obviously relevant, and perhaps if I'd gotten even some answers to even some of the interrogatories --
MR. MCNAMARA: You should be getting those at the beginning of next week. We've been working on them, and you'll get them next week.
MS. ANDREWS: That's a big part of the problem. I'm sitting here in the dark, because I sent that, and you made representations to the judge that you would be getting to us right away, and the only thing that we've gotten are objections. Carly has tried to work this out, and we don't have anything.
MR. MCNAMARA: I won't deal with the objections, but a lot of the questions were difficult to answer because of the matter in which they're asked. We've done our best. You're going to be getting answers to interrogatories on Monday, as well as additional documents, Monday or Tuesday. But I'll make the representation that they've not been the easiest questions to answer.

Page 89

MS. ANDREWS: But we're going to be going through this a lot, so if you do want to show me --
MR. MCNAMARA: Pat, I don't understand what the relevance is even in seeking admissible evidence. Anything that you're asking him to do with Carol Petrarca is not admissible with respect to why Carol Petrarca was fired. It has nothing to do with Lynore Horn, absolutely nothing.
MS. ANDREWS: Absolutely. The manner in which other females are being treated is clearly relevant. It's one of the most relevant things in these kinds of cases, to show it's because of their sexes.
MR. MCNAMARA: Then make this a class action. It seems that you're going to conduct depositions in three different cases, in where the questions will be interchangeable and the facts will be all mooshed together.
MS. ANDREWS: Well, I mean, quite honestly, I don't know whether it was in this case, but I was encouraged in one case to do exactly that. And it seems to me that it makes sense if I have cases to conduct, you know, as

few depositions as possible.

MR. MCNAMARA: Well, I remember when we had the discussion and the argument in front of Judge Lisi on the Stamp case on whether it would stay in federal court or not. You weren't there, but Carly was. And Judge Lisi pointed out to Carly that one of the advantages in being in federal court would be that you could consolidate everything for discovery and that there would be times to scale, et cetera, et cetera. And Carly made the explicit choice, saying, no, we don't want to do that. So I didn't make that choice.

MS. ANDREWS: There's nothing here that prevents me from using what I'm developing here in Superior Court. I can use the deposition, sworn testimony here, in my case in Superior Court. We'll talk it about it at a later time.

Q. Tell me, in order to become a facility maintenance person, was there any test that was administered?

A. Yes.

Q. And what were those tests?

A. Some basic test to show whether or not the



person had any mechanical abilities and capabilities at all. It's something that I had written up to test everyone coming into the department to become a facility maintenance person.

Q. And if they didn't show the requisite skills, they wouldn't get the job?

A. That was the intent, yes.

Q. Would they not get the job if they didn't have their requisite skills?

A. We never crossed that border with the union, because the people who took the test did in fact pass it.

Q. So Lynore Horn passed that test?

A. Yes.

Q. And that was a test that was administered by you?

A. That's correct.

Q. And she had to demonstrate that she had mechanical ability?

A. Some very basic mechanical ability; cut some wood, use a drill, a saw, square something, screw or bolt it together, very simple things to see if in fact this person has ever held hand tools before.



Q. So to get the job, you didn't have to demonstrate -- strike that. You're saying Lynore Horn -- strike that. You spoke to Lynore Horn on a number of occasions, at least 20, by your own admission, about her deficiencies regarding mechanical abilities; correct?

A. The mechanicals of the building; boilers, generators.

Q. Was that something that she had to have in order to get the facility maintenance job, those capabilities that you're saying that she lacked?

A. She did not require those to get the job, that's correct.

Q. Was there any training on the job when someone became a facility maintenance person?

A. Yes.

Q. And what did that entail?

A. It was a hands-on demonstration by me on an ongoing basis every time we had an opportunity to go over the mechanicals in the boiler room, the generators. I had written up many procedures that were required to be done in certain circumstances, a copy given to each new employee.



Q. And are you saying that you, yourself, trained Lynore Horn?

A. That's correct.

Q. And you trained Carol Petrarca?

A. That's correct.

Q. And you trained Christine Stamp?

A. That's correct.

Q. And did that training take place on any particular shift? Was it your shift or their shift?

A. It was both.

Q. And was there more training before they became facility maintenance persons and then it was follow-up later on, or did you do the same amount of training all along?

MR. MCNAMARA: Objection.

MS. ANDREWS: Do you understand what I'm saying?

THE WITNESS: No.

Q. Did they undergo more training at the beginning right after they got the job than they did later on?

MR. MCNAMARA: Objection.

A. It was an ongoing thing. When they first came into the department as facility maintenance

persons, it was explained to them what the job was and shown to them what the various mechanicals and the responsibilities were in the building. The documentation that I had created, a copy was given to them. We went over those, just in written form, discussing them. And on a day-to-day basis, continuous basis, on the job hands-on type of training.
Q. Was there any overtime that was in your department for the facility maintenance people?
A. Yes.
Q. Was there any procedure to giving out the overtime?
A. Yes.
Q. Was that procedure the same the entire time that you worked for the gas company?
A. No. Well, no, the way you posed the question.
Q. During the time that Lynore Horn worked as a facility maintenance person, can you tell me what the procedure was for giving out overtime?
A. There were two time frames, and two, basically the same, but slight difference, in the process. There was always the low capable overtime person, that was always the case, that



was called in to do whatever the assignment was. At the beginning, don't ask me the time frame, it was that way for many, many years. If the low overtime person refused overtime, that person was charged on the overtime list for those hours that were worked by whomever came in. At some point in time, I don't remember the time frame, that was changed, so that if a low overtime person was asked to work overtime, if they refused the overtime, they were not charged for that overtime that was worked by another person.
Q. I don't understand this low capable overtime person. What do you mean by that?
A. There was a list of all the people in the department at 100 Weybosset Street.
Q. A rotation list?
A. Rotation list, if you will. And as you worked the hours, overtime hours, the hours were added on a weekly basis to that list. The list was updated weekly.
Q. So let me ask you this. People were put on the list, everybody in the department was put on the list?
A. That's correct.



Q. Was that by seniority?
A. Yes.
Q. So people were placed on the list by seniority date?
A. That's correct.
Q. And then the person with the most seniority was called first?
A. That's correct.
Q. If that person did not take the overtime for whatever reason, the next person would be called?
A. That's correct.
Q. And who would do the calling?
A. More than likely, me.
Q. So you did the calling, and you had the list?
A. At work. Yeah, I had the list at work.
Q. And you would start at the point -- strike that. Overtime came up, you would select the person whose name was after the person who had just worked overtime or refused it?
A. That's correct.
Q. Did you ever deviate from that?
A. You use the word, "Deviate." Mistakes were made at times. If the next low overtime person, for whatever person, a mistake was made that the



next low overtime person was called with less hours on the time than that person, if that happened, and it happened because mistakes get made for a variety of reasons, then when it was pointed out to the supervisor that the mistake was made, then it was looked into. And if it was determined, per the agreement, with the union that the person making the charge should have been called, then it was corrected.
Q. So you're saying that mistakes were made, but then corrected?
A. That's correct.
Q. Were they only corrected after union involvement?
A. I guess I would say, yes, because that was the process. The union person being grieved that when called would go to their steward, "I should have been called and Mary Jane was called. Why wasn't I called." So they would notify their union representative, and either singly or together, they would come to me and explain the facts. And my response would be, okay, we'll look into it, and if that's true, we'll correct it.
Q. Did you ever have occasion to have the

complaining person come to you directly before going to a union official?
A. It could have happened.
Q. Do you remember that happening?
A. I remember a specific case that happened.
Q. When you say, "It could have happened," are you saying it did happen, or you just can't remember the particular circumstances?
A. Correct.
Q. So it did happen. And you consider these to be complaints by the employees if they weren't selected; right?
MR. MCNAMARA: Objection.
A. When you say, "Complaint," they brought to me --
Q. They were complaining about the fact that they didn't get the overtime that they were supposed to?
MR. MCNAMARA: Objection.
A. I guess you could call it a complaint.
Q. Can you identify for me the people who have complained to you or complained about not getting overtime when they thought they were supposed to?
A. Probably everyone in the department, because



through the years, it happened. It happened many times. It happened occasionally for a variety of reasons. It was a small department, so at various points, with illness and vacations, there was a lot of overtime, so it was impossible to keep the overtime list up to date perfectly, and it was a weekly thing that was updated. But when it happened and pointed out and proven that that person should have been called, it was corrected. It had to be, because that was on the union contract agreement.
Q. Do you remember Lynore Horn complaining about that?
A. She would have been one.
Q. And do you remember Carol Petrarca complaining?
A. Same response.
Q. She complained, yes?
MR. MCNAMARA: Objection.
A. Yes.
Q. Christine Stamp complained?
A. Yes. Jerry Porter, Joe Ianniello.
Q. Anyone else that you can name?
A. No, I can't.
Q. Do you know on how many occasions Lynore Horn complained about that?



A. I don't know.
Q. Do you know whether she actually had to get union assistance for that?
A. Yeah. I would say, yeah, there may have been times, but that would be true for all of them.
Q. So that would be true for Carol Petrarca. She actually had to go to the union to get assistance?
A. Yes.
Q. Lynore Horn. Do you know whether she filed a grievance?
A. I don't remember.
Q. Carol Petrarca. Do you know whether she filed a grievance?
A. I don't remember that, either.
Q. What about Christine Stamp, she had to get union assistance?
A. Again, all three of these, I can't recall a particular instance that that was required to be done, because if the facts were pointed out and the company, HR, looked into the facts --
Q. I'm just simply trying to find out if sitting here today you remember Christine Stamp needing to get union assistance on an overtime issue



with review?
MR. MCNAMARA: Objection.
A. I guess I would say all three of those ladies. I don't recall a specific instance where they had to go to the union, or file a grievance, I mean.
Q. What about short of filing a grievance, but still getting assistance from the union. Did they have to do that, those three?
A. Again, I don't recall an instance where that happened. I recall that happening in cases. Whether or not it was specific to them, I don't recall.
Q. How about Jerry Porter. Do you remember him ever going to the union to get assistance on an overtime issue?
A. Again, same answer as the other three.
Q. Tell me, you primarily did the calling; correct?
A. That's correct.
Q. If someone was home, obviously, you'd ask them if they wanted the overtime; correct?
A. That's correct.
Q. What if they weren't home, what was your procedure?
A. Call the next overtime person.

something, moving something that someone had asked them to do. So he was the only one that came up to my office. So rather than have him sit down and do nothing while we were waiting for this other person, I gave him the assignment, and said, relay this to the person who you're working with and do the assignment.
Q. Well, if this was the beginning of the shift, how would they already be working? I'm talking about a situation in which they're both reporting to work and you are meeting with Jerry to give the assignments for that shift. How is it that the other person would already be working if that was the beginning of the shift?
A. Again, it wasn't so cut and dry that the two of you came up at the same time, every single morning. Someone may have stopped, and it wasn't always Jerry that was there, it could have been Lynore or Carol, whoever was on the shift at the time that Jerry, let's say, he's got someone with him walking by a desk coming upstairs, and they said, Jerry, can you set our clocks, the clocks are all wrong. They didn't require me to give them every single assignment for every single day. I allowed them to take



some liberty and take care of the people in the office. So he could have been there for a half an hour while the other person was up in my office.
Q. Is it your testimony that there were times when you had only a meeting with Lynore?
A. Probably.
Q. Do you remember that, sir, or is that a guess on your part?
A. It's a guess on my part, because it happened. They weren't always both there at the same time.
Q. I understand that they might not have been there. You say that you definitely had meetings with Jerry Porter, you remember that. My question to you is, sitting here today, do you specifically recall meeting only with Lynore Horn?
A. I guess I'm going to change my answer previously to Jerry and say the same thing about the two of them. That I don't remember, if one or the other was in my office at a particular time.
Q. So your five-minute explanation, you want that stricken. You're saying that the times when you



said -- strike that. You're saying now that there were no times that you can specifically recall when you met with Jerry Porter alone?
A. That's correct.
Q. And what about with Carol Petrarca. Can you ever remember meeting with her alone?
A. I'm going to have to give the same answer. I don't remember a particular meeting with her alone.
Q. And I take it Christine Stamp, you can't remember that either?
A. That's correct.
Q. Did you ever meet with all of the facility -- I guess they worked two together, was that the way that it worked, or did it depend on the shift?
A. At one point, I had three on the first shift. It was Jerry, Carol -- I'm not sure, now, they kept changing. But I had three at one time on the first shift in the office building.
Q. And there were times when you would meet with whoever was working as a facility maintenance person, you would have meetings with all of them?
A. There were times that I did, yes.
Q. Did you ever work with Maureen Morencey?



A. Yes.
Q. Who is she?
A. She was a building cleaner in my department.
Q. Did you ever have any problems with Maureen Morencey?
MR. MCNAMARA: Objection.
A. Not that I recall.
Q. Is it possible that you did, but you just can remember right now?
MR. MCNAMARA: Objection.
A. I don't remember any problems that I had with Maureen.
Q. What about Denise Cherry, did you work with her?
A. The name rings a bell, but it's very, very vague.
Q. What about Roberta Faria?
A. I know Roberta Faria.
Q. Did you ever work with her?
A. She worked in meter reading.
Q. How about Cindy Radican, did you work with her?
A. I don't think so, no.
Q. How about Nikla Ricci?
A. No.
Q. Concetta Orlando?
A. Yes. She was one of the building cleaners.

doing that?
A. No.
Q. So you heard rumors that the office staff were leaving things behind doors to see whether or not things were getting cleaned?
A. Correct.
Q. And did you ever tell anyone that you thought it was the office staff?
A. I believe it was something that was brought to my attention by some of my staff.
Q. Who brought it to your attention?
A. I don't remember.
Q. And you remember telling them that you believed that it was the office staff that was doing it?
A. That's correct. And this goes back to the days when we had building cleaners on the second shift, not after the transition was made.
Q. Did you ever get angry with Lynore Horn?
MR. MCNAMARA: Objection.
A. No.
Q. Carol Petrarca?
A. No.
Q. Christine Stamp?
A. No.
Q. And it's your testimony that you never yelled at



any of those individuals?
A. That's correct.
Q. You never yelled at any of your workers; correct?
A. Not that I recall.
Q. Is it possible that you did, but you just don't remember sitting here, or you're going to continue to maintain that that's not in your nature?
A. That's not in my nature. My nature was to instruct rather than to lose my temper and yell.
Q. Did you ever lose your temper with Lynore Horn?
A. Not that I recall.
Q. What about Carol Petrarca or Christine Stamp?
A. Same answer. Not that I recall.
Q. You're not denying it, you're just saying you don't remember one way or the other?
MR. MCNAMARA: Objection.
A. I don't remember it ever happening.
MS. ANDREWS: It's 4:00. I'm not going to finish with him today.
THE REPORTER: Neal, would like a copy of the deposition?
MR. MCNAMARA: Please.
(DEPOSITION ADJOURNED AT 4:00 P.M.)