UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| CAROL PETRARCA,<br>Plaintiff<br><br>v.<br><br>SOUTHERN UNION CO. &<br>NEW ENGLAND GAS CO.,<br>Defendants. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>: | C.A. No. 04-310S |

**DEFENDANTS' OBJECTION TO**
**PLAINTIFF'S MOTION FOR PROTECTIVE ORDER**

Defendants Southern Union Co. and New England Gas Co. hereby object to the Motion for Protective Order filed by Plaintiff. Plaintiff moves for a protective order quashing the subpoena that was lawfully served on Plaintiff's former counsel, Patricia Andrews. The subpoena seeks written communications between Andrews and Plaintiff based on Plaintiff's voluntary waiver of any attorney-client privilege that may have otherwise protected such communications. Therefore, Plaintiff's Motion for Protective Order should be denied. In support of this objection, Defendants submit the accompanying memorandum of law.

Respectfully submitted,
DEFENDANTS SOUTHERN UNION CO. &
NEW ENGLAND GAS CO.

By their attorneys,

NIXON PEABODY LLP

Neal J. McNamara (#4249)
Matthew J. Frankel (#7293)
One Citizens Plaza, Suite 500
Providence, RI 02903
Tel: (401) 454-1000
Fax: (401) 454-1030
nmcnamara@nixonpeabody.com
mfrankel@nixonpeabody.com

CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that I sent, first class mail, postage prepaid, a true and accurate copy of the within Defendants' Objection to Plaintiff's Motion for Protective Order to the following persons this 12th day of May, 2006.

Noelle K. Clapham, Esq.
24 Salt Pond Road, Suite A8,
South Kingstown, RI 02879

Patricia E. Andrews, Esq.
129 Dyer Street
Providence, RI 02903

Stephen M. Robinson, Esq.
Vicki J. Bejma, Esq.
Law Offices of Stephen M. Robinson
155 South Main Street
Providence, RI 02903

M Frankel

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| CAROL PETRARCA, Plaintiff | : | |
| v. | : | C.A. No. 04-310S |
| SOUTHERN UNION CO. & NEW ENGLAND GAS CO., Defendants. | : | |

**DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR OBJECTION TO PLAINTIFF'S MOTION FOR PROTECTIVE ORDER AND THEIR MOTION TO COMPEL PRODUCTION OF SUBPOENAED DOCUMENTS**

In this employment discrimination suit, Defendants Southern Union Co. and New England Gas Co. ("Defendants") have subpoenaed documents in the possession of Plaintiff Carol Petrarca's former counsel, Patricia Andrews, Esq. ("Andrews"). See Ex. A, Subpoena served on Patricia Andrews, April 27, 2006 ("Andrews Subpoena"). The documents sought are relevant to Plaintiff's allegations of sex discrimination and harassment during her employment with Defendants.

The subpoenaed documents consist of written communications between Plaintiff and Andrews prior to or during Andrews' representation of Plaintiff. Plaintiff has filed a Motion for Protective Order on the grounds that the sought-after documents are protected from disclosure by Fed. R. Evid. 612 (when read in conjunction with Fed. R. Civ. P 30(c)) and the attorney-client privilege. As this Memorandum makes clear, however, Rule 612 is inapplicable and Plaintiff has waived the attorney-client privilege with respect to the subpoenaed documents. Defendants are therefore entitled to them.

## I. Facts and Travel

Defendants' counsel deposed Plaintiff on April 19, 2006. Shortly after beginning the deposition, Defendants' counsel asked Plaintiff if she had reviewed any documents prior to her deposition. Plaintiff responded that she had. See Ex. B, Deposition of Carol Petrarca, April 19, 2006 ("Petrarca Dep."), at 9:7-25. After stating that she had the documents with her, Plaintiff produced those documents to Defendants' counsel. Neither Plaintiff nor her attorney made any claim of privilege with respect to production of these documents. See Ex. B, Petrarca Dep., at 10:1–13:18. Defendants' counsel immediately copied the documents produced by Plaintiff, and submitted several of them as Exhibits during the course of the deposition. See Ex. B, Petrarca Dep., at 101:21-23, 108:5-6, 114:13-16.

One of the documents produced by Plaintiff was a five page, typewritten, informal memorandum discussing many of the alleged incidents comprising Plaintiff's claims against Defendants.[1] See Ex. C, Undated Memorandum from Carol Petrarca to Patricia Andrews ("Petrarca-Andrews Mem."). The handwritten words "gave Pat" appear at the top of the first page. See Ex. C, Petrarca-Andrews Mem., at 1. The document extensively describes the alleged incidents in the first person, and Plaintiff testified that it accurately describes her viewpoint. See Ex. C., Petrarca-Andrews Mem., at 1-5; Ex. B, Petrarca Dep., at 116:21-24.

Plaintiff gave confusing and possibly misleading deposition testimony when asked about the document's origins. See Ex. B, Petrarca Dep., at 114:13–116:24. Plaintiff's testimony may explain her counsel's confusion when it alleged that Plaintiff's "former attorney had prepared this document based upon information provided by Plaintiff" in the memorandum supporting

---

[1] Plaintiff describes the document as "a summary of the harassing behaviors that Plaintiff had been subjected to during her employment by the Defendants." Memorandum in Support of Plaintiff's Motion for Protective Order, May 5, 2006 ("Pl.'s Mem."), at 2.

Plaintiff's motion for protective order. See Memorandum in Support of Plaintiff's Motion for Protective Order ("Pl.'s Mem." or "Plaintiff's Memorandum"), at 1-2. Contrary to this representation, it was later established by Plaintiff's current counsel that Plaintiff had, in fact, authored the document. See Ex. D, Affidavit of Neal J. McNamara ("McNamara Aff."). Additionally, Defendants note that the document is likely identified in Plaintiff's privilege log as having been authored by Petrarca.[2] See Ex. E, Plaintiff's Privilege Log, April 15, 2005. Thus, there is no dispute that Plaintiff authored the document and gave it to her then-attorney, Andrews.

Defendants, believing that Plaintiff's voluntary production of the Petrarca-Andrews Memorandum resulted in waiver of all communications related to the same subject matter, then subpoenaed all such written communications in Andrews' possession. Plaintiff moved for a protective order to which Defendants object. Defendants now move to compel Andrews to produce the subpoenaed documents.

## II. Legal Argument

As an initial matter, Plaintiff's Memorandum focuses primarily on Fed. R. Evid. 612, which is not germane to this dispute. Fed. R. Evid. 612, and the cases cited by Plaintiff, concern whether a party is entitled to production of a document that an opposing party has reviewed either prior to, or during, testimony. See Pl.'s Mem., at 2-4. Indeed, the cases cited by Plaintiff

[2] Defendants believe that the document is identified within the group of documents labeled "Notes to Attorney Andrews and Attorney Iafrate" dated "March 2004 –present." The privilege log asserts only attorney-client privilege. Thus, any claim to protection under work product privilege has been waived with respect to any notes composed by Plaintiff. Banks v. Office of the Senate Sergeant-At-Arms & Doorkeeper, 233 F.R.D. 1, 9 (D.D.C. 2005) (citing Carey-Canada v. California Union Ins. Co., 118 F.R.D. 242, 248-49 (D.D.C. 1986)); Heavin v. Owens-Corning Fiberglass, 2004 U.S. Dist. LEXIS 2265 (D. Kan. 2004); Bowne, Inc. v. AmBase Corp., 150 F.R.D. 465, 489-90 (S.D.N.Y. 1993); Carte Blanche PTE., Ltd. v. Diners Club Int'l, Inc., 130 F.R.D. 28, 32 (S.D.N.Y. 1990). With respect to any notes authored by Plaintiff that are not listed in the privilege log at all, Plaintiff has waived any possible claim to privilege. See, e.g., In re Grand Jury Subpoena., 274 F.3d 563, 575-576 (1st Cir. 2001); Banks, 233 F.R.D. at 9.

involve circumstances in which one party refuses to produce one or more documents that the party had reviewed prior to giving testimony, and the other party moves to compel production of the reviewed documents. See, e.g., Derderian v. Polaroid Corp., 121 F.R.D. 13, 14 (D. Mass. 1988) ("[The plaintiff] reviewed the notes prior to her deposition; Polaroid, relying on Rule 612, F.R. Evid., seeks to compel production of the notes and argues that any privilege has been waived."); In re Comair Air Disaster Litigation, 100 F.R.D. 350, 352 (D. Ky. 1983) ("In preparation for that deposition, Lawrence reviewed Piper's accident report. At the deposition, Piper's counsel instructed Lawrence not to produce the Piper report. This motion to compel followed.").

Here, there is no dispute over whether Plaintiff must produce documents that she reviewed prior to her deposition. Plaintiff voluntarily produced the Petrarca-Andrews Memorandum at issue, and no claim of privilege as to that document was made at, or since, that time.

Rather, the present issue before the Court is whether Plaintiff's voluntary disclosure of an otherwise privileged attorney-client communication, i.e., the Petrarca-Andrews Memorandum, resulted in waiver of the attorney-client privilege with respect to all communications about the same subject matter. Plaintiff's Memorandum does get to heart of the matter in the final two paragraphs of its legal argument. Plaintiff acknowledges that some disclosures result in a "ripple effect" whereby related communications are stripped of privilege under the doctrine of subject matter waiver. See Pl.'s Mem., at 5-6. Plaintiff argues, albeit briefly, that this is not one of those cases. See id. To the contrary, Defendants submit – and the remainder of this memorandum makes clear – that this is exactly the type of situation in which application of the doctrine of subject matter waiver is appropriate.

A. PLAINTIFF VOLUNTARILY DISCLOSED AN OTHERWISE PRIVILEGED COMMUNICATION IN THE COURSE OF A JUDICIAL PROCEEDING AND FAIRNESS CONSIDERATIONS REQUIRE PRODUCTION OF ALL COMMUNICATIONS REGARDING THE SAME SUBJECT MATTER.

"A disclosure of . . . [an otherwise privileged] communication may effect a waiver of privilege not only as to that communication, but also as to other communications . . . made at other times about the same subject. United States v. Aronoff, 466 F. Supp. 855, 862 (S.D.N.Y. 1979); see In re Keeper of Records, 348 F.3d 16, 23-24 (1st Cir. 2003). This principle, implied subject matter waiver, is premised upon concerns of fairness. See, e.g., In re Keeper of Records, 348 F.3d at 24; Aronoff, 466 F. Supp. at 862. Courts generally find implied subject matter waiver where "the party asserting the privilege placed protected information in issue for personal benefit through some affirmative act," and allowing the privilege to protect against disclosure of related communications would be unfair to the opposing party. In re Keeper of Records, 348 F.3d at 24.

Although the federal courts have not settled on a single test to determine whether subject matter waiver has occurred, most cases in which waiver has been found involve similar circumstances. As an initial matter, courts generally find implied subject matter waiver only where the disclosure is made during the course of a judicial proceeding. See id. ("Virtually every reported instance of an implied waiver extending to an entire subject matter involves a . . . disclosure made in the course of a judicial proceeding."). Beyond that, courts determine whether "(1) assertion of the privilege was a result of some affirmative act . . . by the asserting party; (2) through this affirmative act, the asserting party put the protected information at issue by making it relevant to the case; and (3) application of the privilege would have denied the opposing party access to information vital to his defense." Aronoff, 466 F. Supp. at 863 n. 9 (quoting Hearn v. Rhay, 68 F.R.D. 574, 581 (E.D. Wash. 1975)); see also State v. Von Bulow, 475 A.2d 995, 1007

(R.I. 1984). "Where these three conditions exist, a court should find that the party asserting a privilege has impliedly waived it through [her] own affirmative conduct." Hearn, 68 F.R.D. at 581.

1. PLAINTIFF'S DISCLOSURE OF THE OTHERWISE CONFIDENTIAL COMMUNICATION WAS MADE DURING THE COURSE OF A JUDICIAL PROCEEDING.

It appears that every court to have confronted the issue has ruled that a deposition is a "judicial proceeding." See, e.g., Whelchel v. Washington, 232 F.3d 1197, 1209 (9th Cir. 2000) (holding that a deposition is a judicial proceeding); Lutcher v. United States, 72 F. 968, 972 (5th Cir. 1896) ("In procedure, 'depositions,' in the most general sense of the word, are the written statements under oath of a witness in a judicial proceeding."); Loven v. Romanowski, 2005 U.S. Dist. LEXIS 41610, at *7 (W.D. Va. 2005) ("Since a deposition is a judicial proceeding . . .."); Alexander v. FBI, 186 F.R.D. 21, 52 (D.D.C. 1998) ("A deposition is an extension of a judicial proceeding."); Patania v. Silverstone, 415 P.2d 139, 143-144 (Ariz. Ct. App. 1966) ("A deposition is a judicial proceeding."). In fact, Defendants could not find any reported cases holding that the opposite was true. See EEOC v. Beauty Enters., 2002 U.S. Dist. LEXIS 13520, at *13 n. 8 (D. Conn. 2002) (disagreeing with party's argument that a civil deposition was not a "judicial proceeding" and noting that party had cited no authority to support its position).

Although courts are generally reluctant to find implied subject matter waiver when the disclosure at issue is extrajudicial, see In re Keeper of Records, 348 F.3d at 24, the disclosure at issue in this case was plainly within a judicial proceeding. Here, Plaintiff produced an otherwise privileged communication touching on almost every aspect of her case against Defendants during the course of her deposition. She testified that she relied on the document when preparing for her testimony and that it accurately reflected her version of events. The Petrarca-Andrews

Memorandum, through its disclosure, became competent evidence in this litigation bearing on key issues in this case, namely, Plaintiff's memory, her subjective interpretation of the alleged workplace incidents, and the credibility of her testimony at large. Therefore, her disclosure was clearly made within a litigation context, i.e., during a judicial proceeding. Cf. In re Von Bulow, 828 F.2d 94, 102 (2d Cir. 1987) (drawing distinction between disclosures made inside and outside of a litigation context).

2. PLAINTIFF'S DISCLOSURE WAS THE RESULT OF AN AFFIRMATIVE, VOLUNTARY ACT.

Courts have consistently held that subject matter waiver is appropriate where, *inter alia*, a party has taken the affirmative step of placing an otherwised privileged communication in issue during the course of litigation. See, e.g., Aronoff, 466 F. Supp. at 862; Hearn, 68 F.R.D. at 581. Here, Plaintiff freely chose to put the otherwise privileged Petrarca-Andrews Memorandum in issue. Neither she nor her attorney attempted to prevent disclosure by invoking attorney-client privilege. Plaintiff testified that she used the Petrarca-Andrews Memorandum to "refresh [her] memory." See Ex. B., Petrarca Dep., at 9:18-25. Thus, the decision to inject the communication into evidence in this case was Plaintiff's alone, and the first condition of the laid out in Hearn has been met in this case. 68 F.R.D. at 581.

3. PLAINTIFF PUT THE OTHERWISE PRIVILEGED COMMUNICATION AT ISSUE BY MAKING IT RELEVANT TO THIS CASE.

A court should also find subject matter waiver where, *inter alia*, a party's disclosure has made an otherwise privileged communication relevant to the case. See Hearn, 68 F.R.D. at 581; see also In re Keeper of Records, 348 F.3d at 24 (noting that the most common instance is when an attorney's advice has been placed in issue). Here, Plaintiff's voluntary disclosure of the Petrarca-Andrews Memorandum unleashed otherwise privileged information that is germane to

this case in myriad ways. First, the communication was essentially a missive recounting virtually all of the Plaintiff's complaints against Defendants. Her representation of the various alleged incidents in the Petrarca-Andrews Memorandum clearly has relevance with regard to how those representations compare to previous and later testimony and evidence relating to the same alleged incidents. Second, the Petrarca-Andrews Memorandum is highly relevant with respect to how it affected Plaintiff's deposition testimony, i.e., whether Plaintiff testified based on her independent recollection of the events or based on what she had read beforehand. Third, the Petrarca-Andrews Memorandum is important because it will no doubt serve as an important piece of evidence that Plaintiff will use (1) to support her claims that the alleged incidents did, in fact, occur, and (2) to bolster her credibility with regard to the accuracy of her recollection of those alleged incidents. In short, there is no question that Plaintiff's "affirmative act put the protected information at issue by making it relevant to the case." Hearn, 68 F.R.D. at 581.

4. PLAINTIFF'S INVOCATION OF THE PRIVILEGE TO SHIELD RELATED COMMUNICATIONS WILL DENY DEFENDANTS INFORMATION VITAL TO THEIR DEFENSE.

Courts also look to, *inter* alia, whether a party will be prejudiced in presenting its defense if the disclosing party is able to invoke privilege as to related, but as yet undisclosed, communications. See Aronoff, 466 F. Supp. at 862-63; Hearn, 68 F.R.D. at 581. Plaintiff has selectively disclosed one privileged communication that she can now use to her advantage, and this Court should not allow Plaintiff to prevent disclosure of other communications regarding the same subject matter. Plaintiff has already used the otherwise privileged communication to her advantage by "refresh[ing her] recollection" prior to her deposition testimony. There is little doubt Plaintiff will use the Petrarca-Andrews Memorandum in the future, as well, to support her claims and bolster her credibility as described supra.

Plaintiff cannot now claim that other communications relating to the same subject matter are beyond Defendants' reach. Defendants will be seriously prejudiced if they cannot ascertain whether other related communications are consistent with the one that Plaintiff selectively disclosed. In particular, Defendants seek to determine whether other communications are consistent with the Petrarca-Andrews Memorandum with respect to the lack of any reference to either Mr. Domenicone or Mr. Ianniello – two of the four persons who Plaintiff claims harassed her during her employment with Defendants. See Ex. B, Petrarca Dep., at 115:10–116:6. If other communications between Plaintiff and her former attorney also fail to mention any incidents involving Mr. Domenicone or Mr. Ianniello, Defendants would have strong evidence that those alleged incidents were (a) not as serious as Plaintiff would now have us believe and/or (b) did not occur at all. This Court should not allow Plaintiff to disclose a one-sided, self-serving memorandum summarizing her claims against Defendants while simultaneously preventing disclosure of communications that might undermine those very claims. Plaintiff's attempt to use the privilege as both a "sword" and "shield" should be denied. See In re Keeper of Records, 348 F.3d at 24; In re Von Bulow, 828 F.2d at 103.

## III. Conclusion

For the foregoing reasons, Defendants respectfully request that the Court deny Plaintiff's motion for protective order and compel production of subpoenaed documents along with such other and further relief as the Court deems just and proper.

Respectfully submitted,
DEFENDANTS SOUTHERN UNION CO. &
NEW ENGLAND GAS CO.

By their attorneys,

NIXON PEABODY LLP

Neal J. McNamara (#4249)
Matthew J. Frankel (#7293)
One Citizens Plaza, Suite 500
Providence, RI 02903
Tel: (401) 454-1000
Fax: (401) 454-1030
nmcnamara@nixonpeabody.com
mfrankel@nixonpeabody.com

CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that I sent, first class mail, postage prepaid, a true and accurate copy of the within Defendants' Memorandum in Support of Their Objection to Plaintiff's Motion for Protective Order and Their Motion to Compel Production of Subpoenaed Documents to the following persons this 12th day of May, 2006.

Noelle K. Clapham, Esq.
24 Salt Pond Road, Suite A8,
South Kingstown, RI 02879

Patricia E. Andrews, Esq.
129 Dyer Street
Providence, RI 02903

Stephen M. Robinson, Esq.
Vicki J. Bejma, Esq.
Law Offices of Stephen M. Robinson
155 South Main Street
Providence, RI 02903

AO88 (Rev. 1/94) Subpoena in a Civil Case

**Issued by the**

# UNITED STATES DISTRICT COURT

DISTRICT OF RHODE ISLAND

Carol Petrarca

V.

Southern Union Co. and
New England Gas Co.

**SUBPOENA IN A CIVIL CASE**

Case Number:[1] 04-310-S

TO: Patricia Andrews, Esq.
129 Dyer Street
Providence, RI 02903

YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | DATE AND TIME |

☐ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|
| | |

☒ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):
All written communications between Carol Petrarca and Patricia Andrews and/or Carly Iafrate regarding the facts of the above-captioned case.

| PLACE | DATE AND TIME |
|---|---|
| Nixon Peabody LLP, One Citizens Plaza, Providence, RI 02903 | Wednesday, May 10, 2006 |

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
| | |

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
| Neal J McNamara Attorney for Defendants | 4/26/06 |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
Neal J. McNamara, Nixon Peabody LLP, One Citizens Plaza, Providence, RI 02903
(401) 454-1000

(See Rule 45, Federal Rules of Civil Procedure, Parts C & D on next page)

[1] If action is pending in district other than district of issuance, state district under case number.

71.00 #2032

AO88 (Rev. 1/94) Subpoena in a Civil Case

## PROOF OF SERVICE

| | DATE | PLACE |
|---|---|---|
| SERVED | 4/27/06 | 139 Dyer St. Providence RI |

SERVED ON (PRINT NAME): Patricia Andrews Esq.

MANNER OF SERVICE: Personally To Witness

SERVED BY (PRINT NAME): Thomas Noury, 41 N. Elmore Ave., P.O. Box 114026, North Providence, RI 02911

TITLE:

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on 4/27/06
DATE

SIGNATURE OF SERVER

ADDRESS OF SERVER: Thomas Noury, 41 N. Elmore Ave., P.O. Box 114026, North Providence, RI 02911

**Rule 45, Federal Rules of Civil Procedure, Parts C & D:**

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction which may include, but is not limited to, lost earnings and reasonable attorney's fee.

(2) (A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d) (2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to comply production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3) (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance,

(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c) (3) (B) (iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held, or

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies, or

(iv) subjects a person to undue burden.

(B) If a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena, or, if the party in who behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA.

(1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

MS. CLAPHAM: Objection. I believe she's testifying as to things we discussed, so if we can strike that.
MR. MCNAMARA: Yes.
MS. CLAPHAM: The question that he asked you was what documents, if any, that you and I reviewed together, but I'm going to instruct you not to discuss or testify as to anything that you and I discussed together.
MR. MCNAMARA: Certainly I don't want any discussion that you had with Ms. Clapham. All I want to know is what documents did you look at in your four-hour preparation session with Ms. Clapham, if any.
THE WITNESS: Okay.
Q. You were referring a minute ago to records regarding Mr. Bolduc coming into the room where you and Mrs. Stamp were?
A. Yes.
Q. Okay. What records did you review with respect to that?
A. How he came through the door, the way he treated us, the way he talked to us, disrespectful.
MS. CLAPHAM: Objection. Move to



strike as nonresponsive.
Q. Did you review any documents that you signed or submitted to New England Gas?
A. No.
MS. CLAPHAM: Papers.
Q. Okay. Any papers that you reviewed?
A. No.
Q. When you were referring to those records a minute ago, what were you referring to?
A. I was referring to notes that had been taken, that I had given on what had happened to me.
Q. Notes that you had taken. Were these handwritten notes?
A. Notes that I had given to the attorney. Notes that had happened to me, that I had explained to the attorney that she had written.
Q. Which attorney are you talking about?
A. Noelle.
Q. So these were notes that you -- when did you prepare these notes?
A. After the incident with Ed Bolduc and --
Q. And again, were these handwritten notes?
A. Yes.
Q. And you gave them to Ms. Clapham?
A. Yes.



MR. MCNAMARA: Well, I've never seen any handwritten notes from Mrs. Petrarca.
MS. CLAPHAM: Actually, I haven't either. So we need to take a moment to clarify this, and let's just stay on the record here.
MR. MCNAMARA: Sure.
MS. CLAPHAM: Carol, when you met with me in my office, we didn't review any documents to the best of my recollection. We didn't review your Complaint. We didn't review any Interrogatory Answers. We didn't have any documents. We just talked; okay?
THE WITNESS: Okay.
MS. CLAPHAM: If you reviewed something yourself before coming here today, then you need to tell Mr. McNamara what that is, and we need to actually give that to him, so he can see it, too.
THE WITNESS: In other words, the documents I reviewed last night and everything?
MS. CLAPHAM: He's entitled to see things that you reviewed in preparation for your depo. Particularly documents that we didn't review together, he's entitled to that.
THE WITNESS: Okay.



MS. CLAPHAM: So you need to tell him what those are and actually show them to him.
Q. Okay. Is it accurate that in your four-hour preparation session with Ms. Clapham that you, in fact, did not look at any documents?
A. No.
Q. But did you look at documents --
A. That I had, right.
Q. -- that you had?
A. Yes.
MR. MCNAMARA: And, again, another ground rule. Again, I will try not to interrupt you. You try not to interrupt me because for the court reporter, it's hard to take down. So let's try not to anticipate each other. I know I do that sometimes, and I always try to stop myself.
THE WITNESS: Okay.
Q. So you looked at some documents on your own?
A. To refresh my memory.
Q. And what documents were they?
A. They were documents that -- what happened to me with Richard Kala, and about our boss coming into our room, and just to refresh my memory on what had happened, and how it was handled, and who I had gone to see and everything.

Page 10

Q. Okay. And do you have those documents with you?
A. Yes.
MR. MCNAMARA: Okay.
A. I have the first document of when I went to Human Resources, way back.
(PAUSE)
Q. Is that a document that has anything to do --
MS. CLAPHAM: I do think the record should reflect that that's a letter from me advising her of her depo, and including the depo notice.
A. And all the numbers written down, her cell phone, for me to contact her. I just had numbers written on it.
MR. MCNAMARA: That's fine. I don't need to see that.
THE WITNESS: Okay.
(OFF THE RECORD)
THE WITNESS: This is just like going back to when I was hired as a cleaning woman and everything, all these papers. So I don't know if you want to see these, to refresh my memory.
MR. MCNAMARA: Yes.
THE WITNESS: I'm just telling you what it's about.

Page 11

Q. And did you give these to Attorney Andrews?
A. Yes, she had copies of them.
MR. MCNAMARA: She never gave them to me.
THE WITNESS: Oh, I don't know.
MR. MCNAMARA: Because I have never seen anything like this.
THE WITNESS: It says here, "Give to Pat," and I made copies for myself.
MR. MCNAMARA: Okay.
THE WITNESS: And that's what, you know, these are all about.
MR. MCNAMARA: What I'd like to do right now is take them and have my secretary make copies, and then give you back the originals.
THE WITNESS: Now, this is the charge to the Human Rights.
MS. CLAPHAM: Charge of discrimination.
THE WITNESS: Yes, this is my charge to the Human Rights Commission.
MS. CLAPHAM: You have to, if you reviewed it prior to coming to your depo.
MR. MCNAMARA: I've seen it before, but just so we have a full record of what it is

Page 12

you reviewed beforehand.
THE WITNESS: Well, these are just --
MS. CLAPHAM: Mr. McNamara wants to see what you're testifying to from your own memory, and if you reviewed documents before coming, he wants to see what it is that you reviewed, so that he can get a clear understanding of your testimony.
THE WITNESS: Okay. I studied this.
MR. MCNAMARA: Okay.
THE WITNESS: Because it's been a few years ago. There's a lot of things I remember, but there are things that are brought back to me, like I forgot I was a night watchman, and it was -- it brought that back to me that I was a night watchman.
MR. MCNAMARA: Certainly, Mrs. Petrarca, by asking for these, I don't mean to imply that you shouldn't have looked at anything. Certainly, this goes back a long time, and you are well within your rights to look at documents, but by the same token, I am well within my rights, as Ms. Clapham just said, to see what it is you looked at. So please don't think that I'm implying that you did anything improper

Page 13

because you did not.
THE WITNESS: Okay. And this is just a few notes I had written down on sexual harassment and women treated different.
MR MCNAMARA: Okay.
THE WITNESS: And this is just things I outlined, that maintenance had been consistent with men jobs in the company all along, which I outlined that. I have some things that are outlined, like Carol and I both felt that I made it -- you know, just for me to study and to refresh my memory.
Q. I understand. This latest document you showed me is dated October 14. I have seen this before. This looks like a letter that you and Mrs. Stamp wrote together to the Rhode Island Commission.
A. Yes. A lot of that I had forgotten, and I just wanted to refresh my memory on it.
MR. MCNAMARA: I understand. As I said, I don't mean to imply that you did anything wrong because you did not by looking at anything. So we'll finish with the ground rules now while copies are being made. If you want to take a break at any time, please let me know, whether to use the facilities or if you just want to talk to

Page 98

with Richard Kala. I'm not sure of the date.
Q. So that was around 1995, we agreed, based on the documents?
A. I went to see him because he was on Jefferson Boulevard.
Q. Why were you going to see him?
A. I wasn't getting anywhere with the gas company, and I needed to see a lawyer, and he would take the case, but he needed Maureen and Lynore to come forward, and with Alicia Goody taking so long to contact them and speak to them, that they didn't seem to have a problem with Richard anymore.
Q. Why is it you went to Mr. Savage, because the company wasn't getting back to you?
A. They weren't helping me.
Q. And what were you hoping to come out of your contacting Mr. Savage?
A. I was looking for help for what this gentleman was doing to me and continued to be happening, and no one was doing anything about it. I couldn't deal with it. I didn't want to go to work. It was stressful, anxiety. It was awful working under those conditions.
Q. So nothing came out of your contacting Mr. Savage because –

Page 99

A. He needed the other two women.
Q. And they did not come forward?
A. Right.
Q. When was the next time you went to see a lawyer?
A. That was Pat.
Q. And when did you first see Pat Andrews regarding New England Gas company?
A. Maybe a year and a half ago.
Q. Did you ever see an attorney named Charles DiLuglio?
A. Oh, yes, that was for the Human Rights.
MR. MCNAMARA: Okay.
A. Okay. I'm sorry about that.
Q. That's okay. When did you see him first?
A. That was when we had filed with the Human Rights Commission. We needed an attorney, I believe, for the paperwork or something.
Q. So did you see him before your letter to the Commission that we talked about earlier?
A. I can't remember if we seen him before the letter or after.
Q. The letter was dated --
A. It might have been before -- it might have been after we sent the letter.
Q. October 14, 1999, was the letter.

Page 100

A. Yes.
Q. So, I'm sorry, did you say it was before or after you sent this letter to the Commission that you first contacted Mr. DiLuglio?
A. I think that was after.
Q. How long after?
A. Shortly after, because we needed an attorney to go to the Human Rights, the meeting that we had down there, or the arbitration or whatever we had down at Human Rights with Bolduc and Butler, and we had gone for a meeting.
Q. So did you hire him before you went to the meeting?
A. Yes.
Q. Okay. And when do you think the meeting was?
A. It was trying to settle this and what was going on.
Q. When do you think that meeting was?
THE WITNESS: Well, when were the papers filed? What did you say, in '95, '94?
Q. You sent the letter to the Commission in October of 1999, and then your charge was filed, I think, in February of 2000. Let me ask this question first. Did you contact Mr. DiLuglio prior to February 25 of 2000, which is the date stamped on

Page 101

your charge of discrimination or was it after that?
A. I think it was after we filed at Human Rights. I could be wrong, but I think it was.
Q. Okay. And you mentioned a meeting at the Commission?
A. Yes.
Q. How long after February of 2000 do you think that meeting was?
A. About a couple of months.
Q. Okay. And you went to see Mr. DiLuglio before that meeting?
A. Yes.
Q. And so he accompanied you to that meeting?
A. Christine and I.
Q. So Mrs. Stamp hired him as well?
A. Yes.
MR. MCNAMARA: Okay.
(DEFENDANTS' EXHIBIT K MARKED FOR IDENTIFICATION)
Q. Mrs. Petrarca, Exhibit K is one of the documents you handed me this morning which you said you reviewed before coming here; is that right?
THE WITNESS: Pardon?
Q. I said Exhibit --

Page 106

A. And then it came up again. Well, that's when they refused to pay me, so Ed said I could come in on a Saturday and work all day. So he gave me that kind of job to do, that job cleaning the air condition vents, and another job he gave me was doing the kitchen floor when that was a two-person job, strip it and clean it all by myself.
Q. How do you know that he never had one person do that kind of job?
A. I was told by the men.
Q. Which men?
A. Jerry, Pat. He never did that. They never did it alone. There was always two men doing it at night.
Q. Did he ever -- to your knowledge, did he ever give that kind of a job to Lynore Horne?
A. I don't know, to tell you the truth.
Q. To your knowledge, did he ever give that kind of a job to Mrs. Stamp?
A. I can't answer. I really don't know.
Q. Okay. It says below that, "What is sexual harassment? Women treated differently"; what is that?
A. That was at -- do I know what, you know, sexual harassment means.

Page 107

Q. So this is Mrs. Stamp's writing about --
A. Asking me if I recall what -- you know, do I know what sexual harassment means.
Q. And it's her writing that says women treated differently and disrespect?
A. Yes, which I didn't need her to write that, but I -- you know.
(DEFENDANTS' EXHIBIT L MARKED FOR IDENTIFICATION)
Q. Okay. Have you talked to Mrs. Stamp about your deposition since she gave you that document?
A. No.
Q. Prior to her giving you that document, were there occasions when you talked to Mrs. Stamp about the case -- your case and her case?
A. No.
Q. Never?
A. We talk, but I mean, we don't get into details.
MR. MCNAMARA: Okay.
A. I mean, I talk to Christine almost every day, but we don't talk about the case. I don't know what's going on with her, and she really just knows bits and pieces about mine.
Q. But you had told her your deposition was coming up?

Page 108

A. Yes.
Q. And then she gave you that document, Exhibit K?
A. Yes, in fact, it was supposed to have been last week.
Q. Right. Exhibit L is another document that you gave me today. Whose handwriting is this?
A. That's mine, just asking questions that I thought you would be asking me.
Q. But at the top it says, "Carol, Questions they ask you."
A. Yes, I wrote that. What are you looking at me like --
Q. Didn't Lynore Horne give this to you?
A. To tell you the truth, I haven't seen Lynore since the day we walked out of Pat Andrews' office. I don't even know how to get in touch with her. I've never been that friendly with Lynore. I couldn't even tell you how to get in touch with her now.
Q. On the second page, it says, "Please try to remember - me trying to become night watchman - working first shift, boxes flying down chute - tough for Lynore."
A. This is when I was the night watchman, as I told you.

Page 109

Q. Why does this document say, "Tough for Lynore"?
A. Well, she was also complaining about how the men looked at her and treated her and everything. So I wrote down it was tough for Lynore.
Q. On the first page, on the top right, it says please do not show to Pat or take to deposition.
A. Because I've had this for a while. I've had this since Pat was my lawyer.
Q. Why did you write down, "Please do not show to Pat"?
A. Pat would get upset if we had any papers on us. So I've had this for quite a while. I probably should not have even taken these papers with me this morning. I was studying them on the way down here, and I studied them last night, and I studied them this morning.
Q. Where it says, "Carol, Questions they ask you, where born, siblings, names, where lived," why did you write those things down?
A. Well, because I figured you were going to ask me where I was born, siblings, names, where I lived.
Q. Why did you figure that?
A. I thought that's how it started off at.
Q. Why did you think that?

alley to the recycle buckets and empty the cardboard or the paper, whatever they had, and we would have to reach over the top of the recycle thing, and our shirts would come up, and men would be standing at the top of the stairs.
Q. When you say "we," who was that?
A. Sometimes it was me and Joe; sometimes it was me and Lynore, depended on what day the trash thing would come, in that who was working.
(PAUSE)
(DEFENDANTS' EXHIBIT M MARKED FOR IDENTIFICATION)
Q. This is Exhibit M, Mrs. Petrarca. It's another document you gave me today you said you reviewed. When did you create this document -- or let me back up. Did you create this document?
A. I've had this for a while.
Q. Is this a document that you created? Is it your writing or did somebody else create it?
A. No, it was created by someone else.
Q. By who?
A. I don't know if it Christine gave it to me or Pat. I'm not sure.
Q. It says, "I was originally hired as a fill-in cleaning lady."



A. Yes.
Q. So you're saying to me that you didn't prepare this?
A. No, I don't know if I told Pat about it, and she wrote it out.
Q. Okay. In any event, this information --
A. This information is for me.
MR. MCNAMARA: Okay. That's fine.
A. Yes.
Q. I looked through this during the lunch break, Mrs. Petrarca, and I didn't see any reference to Mr. Domenicone or Mr. Ianniello. Can you tell me why there's no reference to them? And when I say no reference to Mr. Ianniello, there's a reference there, but there's no reference to the comments there that you were complaining about with respect to him.
A. Because I just came out with those comments about Mr. Ianniello towards the end before he retired to Mr. Bolduc, two years before he retired.
Q. Right. But why isn't that in this document?
A. I don't know to tell you the truth. I don't know if it was because I was upset because of the incident with Richard Kala, that that was really



what was on my mind, that I wasn't thinking. Because I didn't say anything in here about Pat Domenicone either.
MR. MCNAMARA: Right.
A. And it happened with Pat Domenicone, because it is on file when I first went to work there.
Q. Okay. Just so we're clear on the record, and I want to make sure you're clear on this, Mrs. Petrarca, you -- am I correct that you believe that this is information provided by you that was then written up by Pat Andrews' office?
A. Yes, it is information for me. I know that.
MR. MCNAMARA: Okay. I understand that.
A. Because I spent a lot of hours in Pat's office, and she took a lot of writing, and I know she put a lot into the computer, because I was down there days by myself with her.
Q. And when do you think this was created?
A. I really don't know. It had to be last year.
Q. Okay. And is it your testimony that everything in here is accurate as you provided it to Ms. Andrews?
A. Yes.
Q. If you look on Page 3, this is under a heading



for -- on Page 1, there is a heading for Richard Kala, and it appears that information regarding him goes over a couple of pages. On Page 3, third paragraph from the top, it says, "The company did start having sexual harassment classes. I didn't want to go to the class, but the company insisted that I had to. Royalynne Hourihan taught the class that I attended." Now, Royalynne Hourihan, was she in charge of Human Resources at the gas company at that time?
A. She was one of them that I had gone to see.
Q. And when you say, "The company did start having sexual harassment classes," based on this document, can you tell me when -- to the best of your memory, when that was?
A. That was after the incident with Richard.
Q. Was it shortly after the incident with Richard?
A. Yes. And I did go to them, but I couldn't sit through them. I did go to the classes, but I couldn't sit through them. I was crying too bad. I ended up in the ladies' room?
Q. What do you remember from those classes?
A. It was just talking about sexual harassment, what it is, and, you know, how to know when you are being sexually harassed, like a man is not

Gaven Pat

I was originally hired as a fill-in cleaning lady. The cleaning positions were all filled by females. The fill-in position was a temporary position. I was the next in line to get the permanent cleaning job but they gave the opening to Barbara Alderman. When I asked Ed Bolduc why I did not get the job, he said "we aren't doing it that way any more." I got the next permanent opening. After that it always went by the old original way, so I was the exception.

Approximately 1992- I applied for the facility maintenance job. The company required that I go for a very strenuous physical.. Men that I worked with told me that they never went for this physical exam. Even after passing the physical, Ed Bolduc also had me lift heavy boxes in front of him.

The standard trial period for the job was ninety days and then you had the job permanently. Roy Heaton (my boss under Ed Bolduc), told me that I had to do an additional thirty day trial period because I had not learned everything the job entailed. I was the only one working days, so there had been no one available to teach me all the aspects of the job.

After the one hundred and twenty days, I did get the job permanently.

I started at the lowest tier in the pay scale. Other men in the company have started this same position at higher pay levels.

After I became permanent Roy Heaton came down into the basement and said to me "Do you know you took that job away from a family man? This job should have gone to a man with a family." I responded that I had a family to support and that I had passed the test.

WORKERS' COMPENSATION- BROKEN TOE INCIDENT

I broke my baby toe at work on a Friday night. I didn't inform the company until the next Monday. When I told Ed, he sent me to the emergency room. The toe was broken and I was taken out of work.

I filed for T.D.I. They wouldn't pay me because they said the injury was work related. The company didn't have to pay it as a workers' compensation injury because I couldn't prove it had happened at work. Per my union contract I am guaranteed a full pay. I did not know this and I lost two weeks pay. The company should have paid me if neither T.D.I. nor Workers' Compensation did.

RICHARD KAYLA

Richard Kayla took the facility maintenance job. He started working in the department nights, cleaning. I believe he did not start at the lowest rate of pay, as I had. Each night cleaning person worked with him a couple of nights to teach him the cleaning job.

One of the nights that I was training him, he said to me "we could have an affair and no one would know about it."

The next day when I was sitting with Maureen Morancy, Richard came up to us and commented that I was quiet. I said that I did not like what he had said the night before. He apologized to me in front of Maureen.

NEW YEAR'S EVE- APPROXIMATELY 1996

Jerry Porter and Richard Kayla brought liquor in. They were drinking in the smoking room in the basement. I decided to go up to the cafeteria because of the drinking and Richard came up after me. He sat across from me and took a folded $100.00 bill and put it on the table. He said "money's no problem, if you want more, I have it." I was afraid, so I got my things and left the building. I was so upset I couldn't stop crying.

I told Joe Ianniello and he told Ed Bolduc the next day. Ed then called me at home and told me to see him in his office the next day, before starting work. I went to Ed's office and the two of us went to talk to Bud Butler. Bud said, "we won't have any of that here." After this talk I really thought they were going to take care of Richard's behavior.

I also told what happened to Alicia Goody (the company lawyer) and Grant Keith (worked in Human Resources).

The night I met with Alicia, she called Richard into her office right after me. When Richard came downstairs later he said to me "you'd better drop the charges if you know what's good for you. You're gonna be sorry."

The next day I told Ed Bolduc what Richard threatened. Ed said not to worry about it and to let him know everything that Richard said.

Richard continued this treatment, no one put a stop to it. One night I was on the phone talking to my son-in-law and Richard was behind me saying softly "Carol, Carol." My son and law heard him and told me that I should leave the building.

During this time, I spoke with Maureen Morancy about what Richard was doing to me. She told me that Richard had bothered her also. I stayed late with her one night so that we could leave together because she was afraid.

Maureen had called Lynore Horne and I spoke to Lynore. She told me that she was having trouble with Richard also.

The company did nothing to stop Richard nd I kept working nights with him there also. Alicia Goody (the company lawyer) didn't meet with Maureen and Lynore until one month later. By that time neither one of them would come forward.

Different bad things kept happening to me at work. We used to park our cars in the company garage. Only Maintenance Employees and Management had access to this area. One night my car was keyed. Another time, the screws on the outside were loosened.

Richard had said "If you don't go up there and tell her you drop the charges, you'll be sorry."

I had been abused as a child and I had always told myself that I'd never let myself be a victim again. I couldn't put a stop to Richard's tormenting and all I did was cry all the time.

I decided to see Dr. Ruggiano and he took me out of work. While I was out, the company called me at home and told me that Richard was out of the department. I called Ruggiano to tell him about Richard so that I could go back to work and Dr. Riggiano told me that the company just called him and told him Richard was still there.

The doctor released me back to work when Richard bid on a job at Allens Avenue and started his probationary period there. He did not keep the job, however, and then I had to work with him again in maintenance.

No representative of the company ever got back to me about Richard bothering me. Things went on as if nothing had ever happened.

The company did start having sexual harassment classes. I didn't want to go to the class but the company insisted that I had to. Royalyn Hourihan taught the class that I attended. I had to leave during the class because I started crying. Lynore Horne saw me crying in the ladies' room.

After the class Royalyn Hourihan spoke to me and told me that she was gonna take care off the situation, not to worry.

Richard continued to bother me. Before we started our shift each day the entire department would meet in Ed's office. I refused to attend these meetings because Richard was there. The company allowed me not to attend.

Finally, Richard bid on another job at Dexter Street and he left the department.

Much later in time when I filled in for someone at Dexter Street, Richard approached me in the kitchen area there. He touched me on the shoulder and said "how are you feeling tonight, Carol?"

Richard later got in trouble with the company for bothering a female customer while he was on the job in Customer Service. I have heard that there were two such incidences but I don't have proof of this. My understanding is that the company worked a deal with the union to move Richard into the street department so that he wouldn't be going to customers homes alone.

As I explained to you, I saw Bob Savage during this time to see if I could file against Richard.

JERRY PORTER WORKING INTOXICATED

Jerry also worked nights cleaning at this time. He would be drunk at work. Christine Stamp, John Britto and Lynore Horne can verify this.

Our boss Ed Bolduc was aware of Jerry's condition. One time, I went in early at 6:00 a.m. because Jerry hadn't cleaned the fourth floor (where the company President and Vice Presidents are located). Ed found me in work early and he asked me why I was there. I told him that Jerry hadn't done his job, that he had left work early and never came back. I was never paid for the hours I went in early.

Jerry would often call one of us just before we were supposed to be into work and ask if we'd work for him that night. He wouldn't come in. We would go up to Ed's office and tell Ed that Jerry wasn't coming in. Jerry didn't have to check with Ed.

Jerry would come into work drunk quite often. At meetings with Ed, we could all smell liquor on his breath. Ed never mentioned anything to him in front of us.

Christine Stamp and John Britto took his keys away from him one night because he was going to leave work early and drive home and he was so drunk that he couldn't walk straight.

My understanding is that Jerry was finally suspended when someone found him sleeping in a small closet room off the cafeteria, the morning after his shift. Ed and Bud Butler are the two that supposedly were brought there by another employee and found him in the room.

Ed would call Jerry into work for overtime when I should have been called in because I was the low overtime person.

CALLING IN SICK

Originally when I started working in the maintenance department I was not required to call in and speak to Ed every week. After reporting Richard, everytime I was out sick I had to call Ed Bolduc on Fridays at twelve noon or I wouldn't be paid.

INCIDENT WHEN ED WALKED INTO THE LADIES' LOCKER ROOM ON CHRISTINE AND I

After this incident, while Christine was out of work, Bud Butler and Ed Bolduc wanted to talk to me upstairs in Ed's office. They offered me something to drop the charges against Ed coming into the locker room. I told them that I wouldn't talk to them about the incident until Christine was there with me.

I WAS TOLD TO STUDY THE PERSONNEL POLICY

Ed told me to study the Personnel Policy book. He said he was going to test me on it after I studied it for a week. I told Christine and she verified with the union that no employee is required to do any such thing.

MISC.

I believe that Barbara Alderman was given the cleaning position before I was because she was seeing Vinny (a fellow worker).

Several times when I was out of work with various injuries, I offered to come back to work on light duty. Ed always said there was no light duty for me.

I WAS FORCED TO RETIRE

The company paid me at the same time that T.D.I. paid me. The company claimed I was stealing. The union hired Bob Savage to represent me, he would have the records from this meeting. I presented envelopes with checks in them that I had never even opened.

When the company originally called me to ask me about the overpayments,I returned Bud Butler's calls and he never called me back. I ended up calling Ed and he put Bud on another phone line with us.

See Steve Stamp regarding my loss of pension benefits.

Examples of men stealing from the company:

John Britto was caught by the company filling his personal cars with company gasoline, he was not fired.

Ken Mace was accused of bypassing a gas meter, he was not fired.

John Britto took a company vacuum home without telling anyone, he was not fired.

RECOURSE AGAINST CHARLES DILUGLIO - Do I have any? I would have been able to file in State Court if he had done his job.

RECOURSE AGAINST THE UNION- Do I have any?

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| CAROL PETRARCA,<br><br>Plaintiff,<br><br>v.<br><br>SOUTHERN UNION COMPANY, et al,<br><br>Defendants. | : | C.A. No. 04-310S |

**AFFIDAVIT OF NEAL J. McNAMARA**

Neal J. McNamara being duly sworn deposes and says:

1. I am counsel for Defendants Southern Union Company and New England Gas Company in this matter. I submit this Affidavit in support of Defendants' Objection to Plaintiff's Motion for a Protective Order with respect to a subpoena served on plaintiff's former counsel.

2. The statements made herein are based upon my personal knowledge.

3. In a telephone conversation on May 10, 2006, plaintiff's current counsel, Noelle Clapham, informed me that she had determined that the notes plaintiff produced at her deposition, a copy of which is attached hereto as Exhibit 1, did not originate from the office of attorney Patricia Andrews. Rather, she confirmed that

the notes were prepared by plaintiff, Carol Petrarca, and then subsequently provided to attorney Andrews.

By: ______________________
Neal J. McNamara

STATE OF RHODE ISLAND
COUNTY OF PROVIDENCE

Subscribed and sworn to before me on this 12th day of May, 2006.

______________________
Notary Public
My Commission Expires: 6/2/09

MARILYN LOVELY
Notary Public of Rhode Island
My Commission Expires 6/2/09

CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that I sent by first class mail, postage prepaid, a true and accurate copy of the within Affidavit of Neal J. McNamara to Noelle K. Clapham, Esq., 24 Salt Pond Road, Suite A8, South Kingstown, RI 02879 and to Stephen M. Robinson, Esq., and Vicki J. Bejma, Esq., at the Law Offices of Stephen M. Robinson, 155 South Main Street, Providence, RI 02903 on this ___ day of May, 2006.

______________________________

Gave Pat.

I was originally hired as a fill-in cleaning lady. The cleaning positions were all filled by females. The fill-in position was a temporary position. I was the next in line to get the permanent cleaning job but they gave the opening to Barbara Alderman. When I asked Ed Bolduc why I did not get the job, he said "we aren't doing it that way any more." I got the next permanent opening. After that it always went by the old original way, so I was the exception.

Approximately 1992- I applied for the facility maintenance job. The company required that I go for a very strenuous physical.. Men that I worked with told me that they never went for this physical exam. Even after passing the physical, Ed Bolduc also had me lift heavy boxes in front of him.

The standard trial period for the job was ninety days and then you had the job permanently. Roy Heaton (my boss under Ed Bolduc), told me that I had to do an additional thirty day trial period because I had not learned everything the job entailed. I was the only one working days, so there had been no one available to teach me all the aspects of the job.

After the one hundred and twenty days, I did get the job permanently.

I started at the lowest tier in the pay scale. Other men in the company have started this same position at higher pay levels.

After I became permanent Roy Heaton came down into the basement and said to me "Do you know you took that job away from a family man? This job should have gone to a man with a family." I responded that I had a family to support and that I had passed the test.

WORKERS' COMPENSATION- BROKEN TOE INCIDENT

I broke my baby toe at work on a Friday night. I didn't inform the company until the next Monday. When I told Ed, he sent me to the emergency room. The toe was broken and I was taken out of work.

I filed for T.D.I. They wouldn't pay me because they said the injury was work related. The company didn't have to pay it as a workers' compensation injury because I couldn't prove it had happened at work. Per my union contract I am guaranteed a full pay. I did not know this and I lost two weeks pay. The company should have paid me if neither T.D.I. nor Workers' Compensation did.

RICHARD KAYLA

Richard Kayla took the facility maintenance job. He started working in the department nights, cleaning. I believe he did not start at the lowest rate of pay, as I had. Each night cleaning person worked with him a couple of nights to teach him the cleaning job.

One of the nights that I was training him, he said to me "we could have an affair and no one would know about it."

The next day when I was sitting with Maureen Morancy, Richard came up to us and commented that I was quiet. I said that I did not like what he had said the night before. He apologized to me in front of Maureen.

NEW YEAR'S EVE- APPROXIMATELY 1996

DEFENDANT'S EXHIBIT
M. Petronca
4/19/06 Justin

Jerry Porter and Richard Kayla brought liquor in. They were drinking in the smoking room in the basement. I decided to go up to the cafeteria because of the drinking and Richard came up after me. He sat across from me and took a folded $100.00 bill and put it on the table. He said "money's no problem, if you want more, I have it." I was afraid, so I got my things and left the building. I was so upset I couldn't stop crying.

I told Joe Ianniello and he told Ed Bolduc the next day. Ed then called me at home and told me to see him in his office the next day, before starting work. I went to Ed's office and the two of us went to talk to Bud Butler. Bud said, "we won't have any of that here." After this talk I really thought they were going to take care of Richard's behavior.

I also told what happened to Alicia Goody (the company lawyer) and Grant Keith (worked in Human Resources).

The night I met with Alicia, she called Richard into her office right after me. When Richard came downstairs later he said to me "you'd better drop the charges if you know what's good for you. You're gonna be sorry."

The next day I told Ed Bolduc what Richard threatened. Ed said not to worry about it and to let him know everything that Richard said.

Richard continued this treatment, no one put a stop to it. One night I was on the phone talking to my son-in-law and Richard was behind me saying softly "Carol, Carol." My son and law heard him and told me that I should leave the building.

During this time, I spoke with Maureen Morancy about what Richard was doing to me. She told me that Richard had bothered her also. I stayed late with her one night so that we could leave together because she was afraid.

Maureen had called Lynore Home and I spoke to Lynore. She told me that she was having trouble with Richard also.

The company did nothing to stop Richard nd I kept working nights with him there also. Alicia Goody (the company lawyer) didn't meet with Maureen and Lynore until one month later. By that time neither one of them would come forward.

Different bad things kept happening to me at work. We used to park our cars in the company garage. Only Maintenance Employees and Management had access to this area. One night my car was keyed. Another time, the screws on the outside were loosened.

Richard had said "If you don't go up there and tell her you drop the charges, you'll be sorry."

I had been abused as a child and I had always told myself that I'd never let myself be a victim again. I couldn't put a stop to Richard's tormenting and all I did was cry all the time.

I decided to see Dr. Ruggiano and he took me out of work. While I was out, the company called me at home and told me that Richard was out of the department. I called Ruggiano to tell him about Richard so that I could go back to work and Dr. Riggiano told me that the company just called him and told him Richard was still there.

The doctor released me back to work when Richard bid on a job at Allens Avenue and started his probationary period there. He did not keep the job, however, and then I had to work with him again in maintenance.

No representative of the company ever got back to me about Richard bothering me. Things went on as if nothing had ever happened.

The company did start having sexual harassment classes. I didn't want to go to the class but the company insisted that I had to. Royalyn Hourihan taught the class that I attended. I had to leave during the class because I started crying. Lynore Horne saw me crying in the ladies' room.

After the class Royalyn Hourihan spoke to me and told me that she was gonna take care off the situation, not to worry.

Richard continued to bother me. Before we started our shift each day the entire department would meet in Ed's office. I refused to attend these meetings because Richard was there. The company allowed me not to attend.

Finally, Richard bid on another job at Dexter Street and he left the department.

Much later in time when I filled in for someone at Dexter Street, Richard approached me in the kitchen area there. He touched me on the shoulder and said "how are you feeling tonight, Carol?"

Richard later got in trouble with the company for bothering a female customer while he was on the job in Customer Service. I have heard that there were two such incidences but I don't have proof of this. My understanding is that the company worked a deal with the union to move Richard into the street department so that he wouldn't be going to customers homes alone.

As I explained to you, I saw Bob Savage during this time to see if I could file against Richard.

JERRY PORTER WORKING INTOXICATED

Jerry also worked nights cleaning at this time. He would be drunk at work. Christine Stamp, John Britto and Lynore Horne can verify this.

Our boss Ed Bolduc was aware of Jerry's condition. One time, I went in early at 6:00 a.m. because Jerry hadn't cleaned the fourth floor (where the company President and Vice Presidents are located). Ed found me in work early and he asked me why I was there. I told him that Jerry hadn't done his job, that he had left work early and never came back. I was never paid for the hours I went in early.

Jerry would often call one of us just before we were supposed to be into work and ask if we'd work for him that night. He wouldn't come in. We would go up to Ed's office and tell Ed that Jerry wasn't coming in. Jerry didn't have to check with Ed.

Jerry would come into work drunk quite often. At meetings with Ed, we could all smell liquor on his breath. Ed never mentioned anything to him in front of us.

Christine Stamp and John Britto took his keys away from him one night because he was going to leave work early and drive home and he was so drunk that he couldn't walk straight.

My understanding is that Jerry was finally suspended when someone found him sleeping in a small closet room off the cafeteria, the morning after his shift. Ed and Bud Butler are the two that supposedly were brought there by another employee and found him in the room.

Ed would call Jerry into work for overtime when I should have been called in because I was the low overtime person.

CALLING IN SICK

Originally when I started working in the maintenance department I was not required to call in and speak to Ed every week. After reporting Richard, everytime I was out sick I had to call Ed Bolduc on Fridays at twelve noon or I wouldn't be paid.

INCIDENT WHEN ED WALKED INTO THE LADIES' LOCKER ROOM ON CHRISTINE AND I

After this incident, while Christine was out of work, Bud Butler and Ed Bolduc wanted to talk to me upstairs in Ed's office. They offered me something to drop the charges against Ed coming into the locker room. I told them that I wouldn't talk to them about the incident until Christine was there with me.

I WAS TOLD TO STUDY THE PERSONNEL POLICY

Ed told me to study the Personnel Policy book. He said he was going to test me on it after I studied it for a week. I told Christine and she verified with the union that no employee is required to do any such thing.

MISC.

I believe that Barbara Alderman was given the cleaning position before I was because she was seeing Vinny (a fellow worker).

Several times when I was out of work with various injuries, I offered to come back to work on light duty. Ed always said there was no light duty for me.

I WAS FORCED TO RETIRE

The company paid me at the same time that T.D.I. paid me. The company claimed I was stealing. The union hired Bob Savage to represent me, he would have the records from this meeting. I presented envelopes with checks in them that I had never even opened.

When the company originally called me to ask me about the overpayments,I returned Bud Butler's calls and he never called me back. I ended up calling Ed and he put Bud on another phone line with us.

See Steve Stamp regarding my loss of pension benefits.

Examples of men stealing from the company:

John Britto was caught by the company filling his personal cars with company gasoline, he was not fired.

Ken Mace was accused of bypassing a gas meter, he was not fired.

John Britto took a company vacuum home without telling anyone, he was not fired.

RECOURSE AGAINST CHARLES DILUGLIO - Do I have any? I would have been able to file in State Court if he had done his job.

RECOURSE AGAINST THE UNION- Do I have any?

**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **CAROL A. PETRARCA,**<br>**Plaintiff**<br><br>**vs.**<br><br>**SOUTHERN UNION COMPANY and NEW ENGLAND GAS COMPANY,**<br><br>**Defendants** | ) | **C.A. No.: 04-310S** |

## PRIVILEGE LOG

| Author | Document | Time[1] | Privilege |
|---|---|---|---|
| Attorney Iafrate | Notes of Conversations with Carol Petrarca and/or Related to her case | March 2004 - present | Attorney-Client & Work-Product Privileges |
| Attorney Andrews | Same | Same | Same |
| Attorney Andrews | Notes of Conversations with Christine Stamp and/or Related to her case | March 2004 - present | Same |
| Attorney Iafrate | Same | Same | Same |
| Attorney Andrews | Notes of Conversation with Christine Stamp and Carol Petrarca | March 2004- present | Same |
| Attorney Andrews | Notes of Conversation with Christine Stamp and Steve Stamp | March 2004- present | Work-Product Privilege |
| Attorney Andrews | Notes of Conversations with Lynore Horn and/or Related to her case. | May 2004-present | Attorney-Client & Work-Product Privileges |

[1]The document(s) noted were made during these time periods.

| | | | |
|---|---|---|---|
| Attorney Iafrate | Same | Same | Same |
| Attorney Andrews | Notes of Conversation with Roberta Faria | Summer 2004 | Same |
| Plaintiff Carol Petrarca | Notes to Attorneys Andrews And Attorney Iafrate | March 2004-present | Attorney-Client Privilege |
| Lynore Horn | Notes to Attorney Andrews And Attorney Iafrate | May 2004-present | Attorney-Client Privilege |
| Christine Stamp | Notes to Attorney Andrews And Attorney Iafrate | March 2004-present | Attorney-Client Privilege |
| Attorney Iafrate | Notes of Conversation with Barbara Alderman | June 2004 | Attorney-Client Privilege |
| Attorney Andrews | Same | Same | Same |
| Attorney Iafrate | Notes of Conversation with Miriam Comeau | Same | Attorney-Client Privilege |
| Attorney Iafrate | Notes of Conversation with Wendy Smith | Summer 2004 | Attorney-Client Privilege |

## CERTIFICATION

I hereby certify that on the 15th day of April 2005, I mailed a copy of the within to Neal J. McNamara, Esquire, and Robert J. Crohan, Jr., Esquire, Holland & Knight LLP, One Financial Plaza, Suite 1800, Providence, Rhode Island 02903.