UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| CAROL PETRARCA,<br>Plaintiff,<br><br>v.<br><br>SOUTHERN UNION CO. &<br>NEW ENGLAND GAS CO.,<br>Defendants. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>: | C.A. No. 04-310-S |

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Defendants Southern Union Co. and New England Gas Co. move pursuant to Fed. R. Civ. P. 56 for summary judgment with respect to all counts asserted in the Complaint of Plaintiff Carol Petrarca. In support of this Motion, Defendants rely upon the accompanying Local Rule 56(a) Statement of Undisputed Facts with attached exhibits, and Memorandum in Support of Motion for Summary Judgment.

Respectfully submitted,
DEFENDANTS SOUTHERN UNION CO. &
NEW ENGLAND GAS CO.

By their attorneys,

NIXON PEABODY LLP

Neal J. McNamara (#4249)
Matthew J. Frankel (#7293)
One Citizens Plaza, Suite 500
Providence, RI 02903
Tel: (401) 454-1000
Fax: (401) 454-1030
nmcnamara@nixonpeabody.com
mfrankel@nixonpeabody.com

Dated: July 21, 2006

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| CAROL PETRARCA, Plaintiff | : | |
| v. | : | C.A. No. 04-310S |
| SOUTHERN UNION CO. & NEW ENGLAND GAS CO., Defendants. | : | |

**DEFENDANTS' MEMORANDUM**
**IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Defendants Southern Union Co. and New England Gas Company ("Defendants" or the "Gas Company") have moved for summary judgment with respect to all three counts in the Complaint of Plaintiff Carol Petrarca ("Plaintiff" or "Petrarca"). Plaintiff asserts three separate causes of action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e et seq. Plaintiff's causes of action are (1) a hostile work environment during her employment with Defendants; (2) disparate treatment during her employment with Defendants; and (3) retaliation by Defendants after Plaintiff lodged her initial complaint with the Rhode Island Commission for Human Rights ("RICHR") in February 2000.

Defendants are entitled to summary judgment on all counts. Plaintiff cannot withstand summary judgment on Count I, because (a) most of Plaintiff's allegations constituting her hostile work environment claim are time-barred based on the 300-day deferral-state limitations period under Title VII and (b) the one allegation that is within the limitations period was not actionable sexual harassment. Plaintiff also cannot withstand summary judgment on Count II, because (a) Plaintiff's disparate treatment claims predating April 26, 1999 are time-barred; (b) Plaintiff suffered no actionable

adverse employment action within the limitations period; and (c) even if she did, she cannot show that Defendants' stated, legitimate reason for its action is pretextual. Lastly, Plaintiff cannot withstand summary judgment on Count III, her retaliation claim, because (a) she suffered no adverse employment action; (b) even if she did, Plaintiff has adduced no evidence connecting the alleged adverse action with the exercise of her rights under Title VII; and (c) she has no evidence of pretext. For these and other reasons discussed below, Plaintiff's claims should be dismissed in full.

## I. Facts and Travel[1]

A. Plaintiff Employment as Building Cleaner, 1988-91

Plaintiff is a female who began working for Defendants' predecessor, Providence Gas, in April 1988 as a spare building cleaner. Defendant's Local Rule 56(a) Statement of Undisputed Facts ("Stmt.") ¶ 11. She became a full-time, regular building cleaner in January 1989, and transferred into the facilities maintenance department in July 1991, where she remained until her retirement in 2000. Stmt. ¶¶ 12, 19, 22. Throughout her employment with the Gas Company, Plaintiff's direct supervisor was Ed Bolduc. Stmt. ¶ 14, 23.

When Plaintiff first began working under Bolduc, at the beginning of each shift, Plaintiff (and her coworkers) would meet with Bolduc in his office so that he could assign their tasks for the shift. Stmt. ¶ 14. During her time as a building cleaner through July 1991, Plaintiff alleges that Bolduc was "Very i[m]patient . . . . He had a tendency to yell at the women. I don't know. He just had no patience with the women. He didn't want women in the department. He made that perfectly clear." Plaintiff also allegedly

[1] For the sake of brevity and conciseness, Defendants recount only certain key facts material to the resolution of this case. For a complete recitation of all material undisputed facts, please refer to Defendant's Local Rule 56(a) Statement of Undisputed Facts.

remembers a "couple times" prior to July 1991 when Bolduc said that "if he had his way, there would not be any women in the department," and that "women are just troublemakers." Stmt. ¶ 15.

While Plaintiff was a building cleaner, she allegedly complained to Bolduc about night watchman Pat Domenicone's behavior. Plaintiff alleges that Domenicone followed her through the building for "two or three months," showing her pictures from Playboy magazine and making inappropriate comments about "big boobs, and big behinds." Stmt. ¶ 4. Plaintiff alleges that Bolduc "evidently put it down and wrote it in [Domenicone's] file and everything, but it didn't leave the sixth floor." After she allegedly complained to Bolduc, Domenicone's behavior "continued, but not as bad." Plaintiff cited Domenicone's alleged comment, "[I]f you come clean my house for a year, I'll get you your job. I can go to speak to Ed and get you in here ahead of everybody else." Stmt. ¶ 17. Domenicone retired on January 31, 1991. Stmt. ¶ 18.

In July 1991, the Gas Company put up a job posting for an opening in the building maintenance department, and Plaintiff applied for the position. Stmt. ¶ 19. Plaintiff alleges that Bolduc and Roy Heaton, another building maintenance employee, tried to keep her out of the maintenance department and made her do things that men did not have to do. Specifically, Plaintiff alleges that prior to joining building maintenance, Bolduc had her lift boxes in the basement every evening for a week, saying, "[T]hese are the types of boxes you're going to be lifting, and if you can't lift them, you can't come into the department." Plaintiff also stated that Heaton "made a remark that I was taking a job from a family man who had to support a family, and that's not a place for a woman to

be." Stmt. ¶ 21. It is undisputed that Plaintiff got the building maintenance job. Stmt. ¶ 22.

B. Plaintiff's Employment in Building/Facilities Maintenance, 1991-99

On or about July 15, 1991, Plaintiff's started her new position in building maintenance and she was given a substantial raise in pay. Plaintiff switched to a day shift and continued to work at Weybosset St. under Bolduc's supervision. Stmt. ¶ 23. As part of her job duties in building maintenance, Plaintiff had to deliver "tons of boxes . . . . every day to the stations," i.e., to various departments and people throughout the facility. Plaintiff testified, "[W]e were unloading . . . trucks of 250 boxes, and throwing them down the chute, and so someone had to be down there to catch them, and then when you got done throwing these 250 boxes, whoever was upstairs would have to go down now and help to . . . stack them on the shelves. That was like an all day job . . . ." Stmt. ¶ 24.

Plaintiff alleges that while she was in building maintenance (prior to it becoming facilities maintenance in 1992), Bolduc indicated "probably more than a couple of times" that if he had his way, there would not be women in the department. Plaintiff alleges that Bolduc "liked to yell a lot . . . just [at] us women," but admitted that Bolduc yelled at male supervisees such as Kenny Schiano and Bill Johnson. Stmt. ¶ 25.

When she started in building maintenance, Plaintiff worked with two other individuals, Jerry Porter and Joe Ianiello. Plaintiff had "no problem with" Porter; he never made inappropriate comments and Plaintiff thought he "was a very nice person." Stmt. ¶ 26. Plaintiff does, however, allege that she had "problems with" Ianiello. Plaintiff thought Ianiello was "nasty and controlling," and alleges that he would scream at her, "would disappear in the building," and would use the F-word toward her. Beyond

this, Ianiello never physically assaulted her or touched her in any threatening way, nor does Plaintiff have any recollection of Ianiello saying anything "sexually inappropriate." Plaintiff alleges that she complained to Bolduc about Ianiello "about three or four times," and that Bolduc would "say just go off somewhere, and he'll cool off." Plaintiff testified that the incidents involving Ianiello occurred in 1994 or 1995. Stmt. ¶¶ 27-28.

Also in 1994 and 1995, Plaintiff alleges that she had problems with another co-worker, Richard Kala. Plaintiff alleges that Kala inappropriately asked Plaintiff if she wanted to have an affair on three separate occasions: the first and second nights they worked together and at an on-the-job New Year's Eve "party" several months later. In between the second alleged incident and the third alleged incident Kala did not say anything to Plaintiff. Stmt. ¶ 29.

In or about 1995, Plaintiff allegedly complained to Bolduc about Kala's behavior. Plaintiff alleges that she and Bolduc, in turn, met with Director of Labor Relations Bud Butler and, a short time later, Alycia Goody, in house attorney for Providence Gas. Goody and Butler conducted an investigation into the complaint, and it was determined that Kala should be separated from Plaintiff. Stmt. ¶¶ 30, 32.

Kala had already signed a posting to be transferred to the position of Garage Helper at Dexter St., within Fleet Services, a different facility from the one where Plaintiff worked. He left Facilities Maintenance on January 2, 1996, and Plaintiff and Kala were separated and never worked together again. Kala took a pay cut upon joining Fleet Services. Stmt. ¶¶ 33-34. Although Plaintiff alleges that she would occasionally run into Kala at Dexter St., she no longer had any problems with him, testifying, "he'd

more or less come through, and he'd smile at me and say, 'How are you today,' or 'what's going on,' and then he'd go out the door." Stmt. ¶ 35.

Once Kala left facilities maintenance in early January 1996, Jerry Porter was Plaintiff's only male co-worker at Weybosset St. Ex. B at 65:1-6. Between January 1996 and the so-called "locker room incident" on August 20, 1999, discussed infra, Plaintiff does not allege any incidents of harassment.

Plaintiff does allege that on two occasions in 1998 she was denied the opportunity for overtime work to which she was entitled. Bolduc allegedly called in Jerry Porter for overtime rather than Plaintiff, even though she was "low" on the overtime list. On one such occasion, Plaintiff lodged a grievance and was eventually paid for the alleged missed time. On the other occasion, Plaintiff was given alternative overtime work in lieu of the alleged missed time. Stmt. ¶ 38.

Plaintiff also took exception to the fact that Bolduc had a better relationship with Porter than he did with Plaintiff, ceased giving Plaintiff work instructions, and, if he did, would do so through Porter. Plaintiff alleges that Bolduc told his supervisees, "Well, you don't need to go up to my office in the morning anymore. You guys got different jobs every day. You know what to do, so you're all right, so do them." Plaintiff also alleges that Bolduc reprimanded her on one occasion for "joking and laughing" with the night crew during the last half-hour of Plaintiff's shift, but did not do the same when Porter was allegedly engaged in similar behavior. It is undisputed that Porter was senior to Plaintiff, and that Bolduc believed Porter was a better worker than Plaintiff. Stmt. ¶¶ 40-41.

C. The "Locker Room Incident" and Its Resolution, August-December 1999

Plaintiff normally took her break at 9:30 or 9:45 a.m., but sometimes Plaintiff would work through her normal break period and take one at a different time. Plaintiff would often take her break in a small, windowless room in the basement, where Plaintiff and other women would keep a change of clothes, their pocketbooks, and their lunches. Stmt. ¶ 42.

On August 20, 1999, Plaintiff and co-worker Christine Stamp were taking a break in that room at the somewhat unusual time of 2:30 to 2:40 p.m. Just prior to their break, Plaintiff had been delivering boxes, and Stamp had been painting on the roof. Stamp was tired from painting and had put all the materials away before taking her break. Bolduc, who had been at Dexter St. and, according to Plaintiff, "had had a problem with Kenny [Schiano] and Bill [Johnson]," returned to Weybosset St., "went out on the roof and saw all the equipment had been put away." Bolduc became angry and looked for Stamp, before hearing Plaintiff's and Stamp's voices outside of the basement room where they were taking their break. According to Plaintiff, Bolduc "flings the door open, and he starts screaming at us, and telling us we're not supposed to be on our break . . . and how dare us, you know, be sitting here." Stmt. ¶¶ 43-45.

That same day, August 20, 1999, Plaintiff and Stamp complained about the incident to Union President Ray Conroy and Union Steward Paul Cardin. Also that same day, Frank Devlin, Union Vice President, informed Henry Butler, the Gas Company's Director of Labor Relations, of Plaintiff's complaint. On August 31, 1999, Plaintiff and Stamp also wrote a letter complaining about the incident to Royalynne Hourihan, the Gas Company's Vice President of Human Resources. On September 1, 1999, Henry Butler,

Director of Labor Relations, sent a letter to Plaintiff and Stamp in connection with Plaintiff's complaint. Butler's letter stated that the Gas Company was investigating the matter and that it had not "forgotten about the incident." Stmt. ¶¶ 46-47.

Stamp went out on medical leave in early September 1999, and did not return until December 1, 1999. Bud Butler and Bolduc attempted to meet with Plaintiff to discuss her complaint in September 1999, but she refused to meet without Stamp being present. Plaintiff went out on leave because of a bad back on October 15, 1999, thus no meeting took place. On December 6, 1999, however, Plaintiff's Union filed a grievance regarding the August 20 incident. The Union demanded an investigation and an apology. Stmt. ¶¶ 49-49.

On December 13, 1999, Bolduc issued a memorandum to Plaintiff and Stamp in which he recounted his version of the incident and then stated: "In retrospect, it would have been appropriate for me to knock on the door before entering. I offer my apology to you for my action and in the future I will knock." The memorandum was sent to Plaintiff, who testified that she could not recall receiving it, but "probably did."[2] Bolduc reiterated these sentiments in a formal letter to Plaintiff and Stamp dated December 15, 1999. Stmt. ¶ 50. Prior to the August 20, 1999 incident, Bolduc had never entered the room without knocking. After the incident, Bolduc "never came down to the room" again. Stmt. ¶ 51.

---

[2] Plaintiff did, however, clearly testify that she had seen an undated, unaddressed "statement" from Bolduc in which he wrote, "[T]he proper thing for me to do should have been to knock on the door and announce my presence. I did not and therefor[e] I offer my apology to each of you and state that in the future I will knock on the door if I require your services." Stmt. ¶ 50.

D. <u>Plaintiff's Medical Leave, Violation of the CBA, and Period of Termination</u>

Plaintiff fell down the stairs at her home on October 15, 1999 and immediately went out on medical leave. Stmt. ¶ 52. Under the collective bargaining agreement ("CBA") in effect at the time, Plaintiff, while on medical leave, was entitled to receive the difference between her regular salary and any benefits received from Rhode Island Temporary Disability Insurance ("TDI"). To the extent that Plaintiff was ineligible for TDI, she was entitled, under the CBA, to receive her gross pay for a maximum of 130 regularly scheduled workdays. Stmt. ¶ 53.

Upon commencing her medical leave, Plaintiff received TDI payments, which were exhausted on or about November 20, 1999. After Plaintiff informed the Gas Company that her TDI had been exhausted, the Gas Company paid Plaintiff her gross sick pay benefits. Stmt. ¶ 55.

By notice dated February 10, 2000, the Rhode Island Department of Labor and Training Temporary Disability Insurance Division notified the Gas Company that Plaintiff had reapplied for TDI benefits due to the new benefit year. Stmt. ¶ 14. By letter dated March 3, 2000, Henry Butler alerted Plaintiff that the Gas Company had been notified of Plaintiff's reapplication for TDI. Butler's March 3 letter requested that Plaintiff "provide Human Resources with documentation" showing the status of her TDI application. Stmt. ¶ 57. Unbeknownst to the Gas Company, however, Plaintiff had been receiving weekly payments of $487.00 for the period effective from January 8, 2000 through July 15, 2000. Stmt. ¶ 56.

By letter dated April 13, 2000, Butler notified Plaintiff that her sick pay allowance under the CBA would expire effective April 18, 2000. (Plaintiff received no

pay from the Gas Company after that date. Defendants paid Plaintiff a total of $11,944.08 in sick pay for the period from January 1, 2000 through April 15, 2000.) Butler's April 13 letter also noted that Plaintiff had not responded to the March 3 request, and again requested that Plaintiff "provide . . . documentation indicating the status of your [TDI] claim." Stmt. ¶ 58.

By letter dated April 24, 2000, Butler notified Plaintiff once again that she had not responded to his requests for TDI documentation. Butler's April 24 letter stated, "Should you continue to fail to respond I will refer the matter to our legal department for appropriate disposition of the matter." Stmt. ¶ 59.

By letter dated May 17, 2000, Butler notified Plaintiff that the Gas Company had received documentation indicating that Plaintiff had been receiving TDI benefits since February 14, 2000, despite collecting full gross pay benefits from the Gas Company from February 14 to April 18, when the Gas Company-paid benefits expired. Butler's May 17 letter further stated: "It would appear that you intentionally failed to inform the company when you were notified your claim had been approved and you subsequently began receiving RITDI benefits when also receiving full sick benefits in the amount equal to 100% of your basic hourly earnings from the company." Butler further informed Plaintiff that her employment was suspended pending completing of an investigation into the matter. Stmt. ¶ 60. Plaintiff does not dispute that she was overpaid. Stmt. ¶ 61.

Butler, Bolduc, Union President Ray Conroy, Union Steward Paul Cardin, and Plaintiff met on June 6, 2000 to discuss the matter. Thereafter, by letter dated June 8, 2000, Butler wrote to Plaintiff: "As a result of an investigation, an interview with you and review of available documents, the Company has decided that you knew or should have

known that you were improperly receiving sick leave benefits in excess of those to which you were entitled under the Collective Bargaining agreement. Your actions in this matter are just cause to <u>terminate your employment effective immediately.</u>" Stmt. ¶ 62.

By letter dated July 10, 2000, Crosby Benefit Systems informed Plaintiff that she was eligible to elect continuing health benefits under COBRA as of July 1, 2000, based on a qualifying event date of June 30, 2000. The monthly premium for continuation of Plaintiff's health and dental insurance benefits was $224.49. Stmt. ¶ 63.

E. <u>Plaintiff's Grievance, Settlement Agreement, and Retirement</u>

Plaintiff's Union filed a grievance on June 12, 2000, protesting the decision of the Gas Company and demanding Plaintiff's immediate reinstatement. Stmt. ¶ 64. The Gas Company denied the grievance and, pursuant to the CBA, a date was set for arbitration on or about September 13, 2000. Stmt. ¶ 65.

The Union hired Robert Savage, a duly licensed Rhode Island attorney, to represent Plaintiff with respect to her grievance arbitration. Plaintiff spoke or met with Savage in August 2000 prior to the arbitration. Plaintiff did not object to Savage representing her, and, indeed, had consulted him previously on another matter. Stmt. ¶ 66.

Plaintiff and Savage met again on the date of the arbitration, September 13, 2000, at the Days Inn arbitration location. Savage represented Plaintiff in the negotiation session prior to the scheduled arbitration. According to Savage's deposition testimony, "it was [Plaintiff's] decision whether to go to arbitration or not. It was our recommendation that she not go, but [Ray Conroy] was ready to go to arbitration if she wanted to. We were not preventing her. It was not a situation where the union said that

we have done the research in this case and we have determined that you don't have a chance, so we decline to represent you in this arbitration. If she wanted to go forward with the arbitration, the union was ready to go forward and give her the arbitration if she wanted it." Stmt. ¶¶ 67-68.

However, because "[t]here was no disagreement that she did receive the TDI checks . . . and the full pay," Savage "thought it was a huge risk for her to go forward with the arbitration." Savage testified that although the subject of Plaintiff making repayment came up during the pre-arbitration negotiations, "I think she told me she did not have the money . . . . I thought we asked her if she could return the money and I thought she said she did not have the money to return." Stmt. ¶ 69.

Savage advised Plaintiff that losing the arbitration "could have resulted in her not getting a pension. Included in the pension at that time was health care benefits. So it was a huge risk. I think . . . my recommendation was I don't think the risk is worth it. You have a good chance of losing the arbitration, and if you lose the arbitration . . . it could affect your pension and future medical benefits. I recommend that you take the settlement. She would be allowed to [retire] and get her pension and her health care benefits." Stmt. ¶ 70.

Plaintiff agreed to settle the grievance. She was reinstated on the condition that she tender her application for retirement. The settlement allowed Plaintiff to retain her pension and related health benefits. Stmt. ¶ 71. By letter dated September 13, 2000, Plaintiff tendered her retirement from the Gas Company effective September 30, 2000. Plaintiff acknowledged in her letter that her health care and dental benefits had been reinstated retroactive to July 1, 2000. Stmt. ¶ 72. On November 15, 2000, Plaintiff

submitted an application for retirement benefits, which was approved. She has received a monthly pension check in the amount of $429.00 since that time. Stmt. ¶ 75.

F. Plaintiff's Legal Action

On February 25, 2000, Plaintiff filed a charge of discrimination with the RICHR alleging that Defendants violated Title VII of the Civil Rights Act of 1964, as amended, by treating Plaintiff unfairly and otherwise harassing her because of her sex. Stmt. ¶ 8. The RICHR notified the Gas Company of the charge of discrimination in a letter dated March 3, 2000. Stmt. ¶ 9.

On or about July 22, 2004, Plaintiff filed a judicial complaint in this Court asserting three causes of action against Defendants under 42 U.S.C. §§ 2000e et seq. Count I of Plaintiff's complaint alleges that Defendants subjected her to a hostile work environment. Count II alleges that Plaintiff was subjected to disparate treatment by Defendants. Count III alleges that Defendants retaliated against Plaintiff in violation of Title VII. Stmt. ¶ 10.

## II. Summary Judgment Standard

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; Lee-Crespo v. Schering-Plough Del Caribe, Inc., 354 F.3d 34, 43 (1st Cir. 2003). "A fact is 'material' if it has the 'potential to affect the outcome of the suit under the applicable law.'" Randall v. Potter, 366 F. Supp. 2d 104, 112 (D. Me. 2005) (quoting Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 52 (1st Cir. 2000)). An issue is "genuine" only if the evidence relevant to that issue is "sufficiently open ended to permit a rational factfinder to resolve the issue in favor of either side." Id. (quoting

National Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 735 (1st Cir. 1995) (subsequent history omitted)). The non-moving party "may not rest upon the mere allegations or denials of the adverse party's pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); Rodriguez v. Potter, 419 F. Supp. 2d 58, 63 (D.P.R. 2006). Conclusory assertions and unsupported speculation do "not meet a party's burden of producing some defense to a summary judgment motion." Hedberg v. Indiana Bell Tel. Co., 47 F.3d 928, 931-32 (7th Cir. 1995).

## III. Legal Argument

Each of Plaintiff's claims suffers from at least one fatal defect. With respect to Count I, Plaintiff's hostile work environment claim, virtually all of the alleged incidents comprising that claim occurred prior to or during 1995, well outside the limitations period. Plaintiff's only real allegation occurring within the limitations period, the so-called "locker room" incident, see Stmt. § IV, was a one-time event that (a) had never happened previously, (b) never happened again, and (c) was resolved after an investigation by the Gas Company when Bolduc apologized.

With respect to Count II, Plaintiff's disparate treatment claim, Plaintiff cannot establish the occurrence of any discrete, discriminatory act within the limitations period. Plaintiff's claims based on two alleged instances where she was "passed over" for overtime work occurred in 1998 and are thus time-barred. Nor can Plaintiff plausibly claim that she was demoted, denied promotion, unfavorably transferred, or ultimately terminated by the Gas Company. Moreover, even if Plaintiff could state a prima facie case of discriminatory termination, she has no evidence that Defendants' legitimate

reason for her discharge is pretextual. Therefore, Plaintiff cannot state a viable cause of action under a disparate treatment theory.

With respect to Count III, Plaintiff's retaliation claim, Plaintiff faces a similar problem: she cannot establish that the Gas Company subjected her to an adverse employment action. Plaintiff will undoubtedly argue that the Gas Company's termination of her employment after it determined that she deceptively received TDI benefits and full sick pay simultaneously constituted an adverse employment action. However, the undisputed facts show that, after her Union filed a grievance regarding the termination, Plaintiff conferred with her counsel and voluntarily retired from her employment with the Gas Company in order to preserve her pension and health benefits, and was not in any way adversely affected by the temporary period of termination. In any event, Plaintiff does not have any evidence connecting her alleged termination to her protected activity, nor any evidence of pretext. These facts are fatal to her retaliation claim.

A. PLAINTIFF'S HOSTILE WORK ENVIRONMENT CLAIM IS TIME-BARRED AND OTHERWISE NOT VIABLE.

It is widely recognized that statutes of limitations are "designed to keep stale claims out of court." Muniz-Cabrero v. Ruiz, 23 F.3d 607, 611 n.6 (1st Cir. 1994). In employment discrimination actions, the limitations period "protects the accused by guaranteeing that they receive sufficient notice of the alleged violations to adequately investigate the claims while those claims are still reasonably susceptible to investigation." Place v. California Webbing Indus., Inc., 249 F. Supp. 2d 157, 161 (D.R.I. 2003). Furthermore, the limitations period is "designed to provide [defendants] with adequate time for such matters as scheduling witnesses, hiring lawyers, and gathering and compiling evidence of the alleged violations before witnesses' memories of the incidents

become too obscure." Rathbun v. Autozone, Inc., 253 F. Supp. 2d 226, 232 (D.R.I. 2003) (subsequent history omitted) (quoting Ferguson Perforating & Wire Co. v. Rhode Island Comm'n for Human Rights, 415 A.2d 1055, 1056 (R.I. 1980)).

Plaintiff has asserted her hostile environment claim under Title VII, and in Rhode Island – a "deferral state" – the applicable limitations period is three hundred (300) days. See 42 U.S.C. § 2000e-(5)(e). Plaintiff filed her charge of discrimination with the Rhode Island Commission for Human Rights on February 25, 2000. Stmt. ¶ 8. Therefore, her hostile environment claims predating April 26, 1999, are per se time-barred absent some equitable exception. See, e.g., Mercado v. Ritz-Carlton San Juan Hotel, Spa & Casino, 410 F.3d 41, 46 (1st Cir. 2005); Crowley v. L.L. Bean, Inc., 303 F.3d 387, 405 (1st Cir. 2002).

Under the United States Supreme Court's decision in National R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 116-18 (2002), and its progeny, a plaintiff can recover for a hostile work environment occurring outside the limitations period so long as one act contributing to the claim occurs within the filing period. See id. at 117; see also Crowley, 303 F.3d at 395-96; Randall v. Potter, 366 F. Supp. 2d 104, 114-15 (D. Me. 2005). Not every hostile work environment amounts to a "continuing violation" for the purposes of bringing otherwise untimely incidents into the limitations period under Morgan. See Randall, 366 F. Supp. 2d at 115. In determining whether harassment within and without the limitations period is part of the same actionable hostile environment claim, courts look to, inter alia, the nature, frequency, and continuity of the alleged harassing conduct. See id. at 116 (citing Morgan, 536 U.S. at 120); see also Garrison v. Burke, 165 F.3d 565, 570 (7th Cir. 1999) (rejecting application of continuing violation

doctrine where alleged harassing behaviors did not "reinforce each other" and "could not be linked together"); Konstantopolous v. Westvaco Corp., 112 F.3d 710, 715-16 (3d Cir. 1997) (no continuing violation where hostile environment "dissipated" over seven-month period without incident).

1. PLAINTIFF HAS NOT ALLEGED A HOSTILE ENVIRONMENT FROM APRIL 26, 1999 FORWARD.

Plaintiff's allegations constituting her claim of a hostile work environment within the limitations period, i.e., from April 26, 1999 forward, are insufficient as a matter of law to establish a hostile environment. In order to establish a hostile work environment, Plaintiff "must show that she was subjected to severe or pervasive harassment that materially altered the conditions of her employment." Noviello v. City of Boston, 398 F.3d 76, 93 (1st Cir. 2005) (citing Faragher v. City of Boca Raton, 524 U.S. 775, 786 (1998)). The harassment must be "objectively . . . offensive, one that a reasonable person would find hostile or abusive" Id. (quoting Faragher, 524 U.S. at 787). In determining whether a reasonable person would find particular conduct hostile or abusive, a court must examine the totality of the circumstances, including factors such as the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Id. (quoting Faragher, 524 U.S.at 787-88). "The thrust of this inquiry is to distinguish between the ordinary, if occasionally unpleasant, vicissitudes of the workplace and actual harassment." Id.

Title VII "does not guarantee a utopian workplace, or even a pleasant one," Vore v. Indiana Bell Tel. Co., 32 F.3d 1161, 1162 (7th Cir. 1994), and is not a "general civility code." Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80 (1998). "Stepping

out of one's home into the working world means, to some extent, subjecting oneself to the slings and arrows of daily life. Title VII does not codify Emily Post's rules of etiquette." Feliciano v. Alpha Sector, Inc., 2002 WL 1492139, at *8 (S.D.N.Y. July 12, 2002). As the Seventh Circuit has aptly stated, "The workplace that is actionable is one that is hellish." Perry v. Harris Chernin, Inc.,126 F.3d 1010, 1013 (7th Cir. 1997).

Plaintiff's allegations within the limitations period amount to complaints that (a) Bolduc ceased giving Plaintiff work instructions, and, if he did, would do so through Porter; (b) Plaintiff was unfairly reprimanded on one occasion (with no consequences whatsoever) for "joking and laughing" on the job while Porter was not; and (c) the so-called "locker room incident," in which Bolduc entered a room where she and a co-worker were taking a break, and angrily yelled at Plaintiff because he believed that she had been on break for too long.[3] Plaintiff complained about the incident, the Company investigated, and Bolduc apologized. It never happened again. Stmt. ¶¶ 40, 45-46.

Simply put, these allegations do not come close to establishing a hostile environment as a matter of law. Plaintiff's complaint that Bolduc stopped meeting with her to give instructions offers absolutely no support for, and is not an act contributing to, Plaintiff's hostile environment claim. Plaintiff plainly admitted that Bolduc stopped the meetings because he believed Plaintiff "kn[e]w what to do" and was "all right" performing "different jobs every day." Stmt. ¶ 40. If anything, Bolduc's decision to stop the daily meetings with Plaintiff was a show of confidence in Plaintiff's performance rather than any act of harassment. Furthermore, even if Bolduc's decision to stop the daily meetings with Plaintiff did have a negative motive, it is well established that mere

[3] It is unclear from Plaintiff's testimony and pleadings whether allegations (a) and (b) fell within the limitations period, or occurred sometime earlier. Defendants assume, for the purposes of this Motion, that these allegations did occur within the limitations period.

ostracism is not sufficient to establish a hostile work environment. Noviello, 398 F.3d at 92; (1st Cir. 2005) ("rudeness or ostracism, standing alone, usually is not enough to support a hostile work environment claim"); Patton v. Indianapolis Pub. Sch. Bd., 276 F.3d 334, 339 (7th Cir. 2002) (no hostile work environment where Plaintiff's supervisor "treated her in a rude, abrupt, and arrogant manner, ignored her work-related suggestions and failed to keep her informed about changes at work"); Manning v. Metropolitan Life Ins. Co., 127 F.3d 686, 693 (8th Cir. 1997) (holding that disrespect and ostracism did not rise to the level of actionable adverse employment action because there was no tangible change in duties or working conditions); see also Bishop v. Bell Atl. Corp., 299 F.3d 53, 59 (1st Cir. 2002) ("Work places are rarely idyllic retreats, and the mere fact that an employee is displeased by an employer's act . . . does not elevate that act . . . to the level of a materially adverse employment action."); Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985) ("[C]ourts must refrain from intruding into an employer's policy apparatus or second-guessing a business's decisionmaking process.").

Nor can the one occasion where Plaintiff alleges she, but not Porter, was unfairly reprimanded (without consequence) for "joking" be considered an act contributing to her hostile environment claim. Stmt. ¶ 40. Courts have routinely rejected hostile environment claims where allegedly unfair treatment and criticism were far more pervasive and coupled with other offensive behavior. See, e.g., Fitzer v. Chevron Corp., 2006 U.S. Dist. LEXIS 9593, at *17-19 (E.D. Cal. Feb. 27, 2006) (complaints of rude behavior, unfair treatment, and criticisms of work performance, in addition to the use of racial slurs on two separate occasions, insufficient to establish hostile environment); Grosenick v. SmithKline Beecham Corp., 2005 U.S. Dist. LEXIS 14836, at *8 (D. Minn.

July 22, 2005) (citing Scusa v. Nestle U.S.A. Co., 181 F.3d 958, 967 (8th Cir. 1999)) (rejecting hostile environment claim where plaintiff alleged supervisor failed to promote her, criticized and disciplined her, issued unnecessarily harsh reprimands, treated her unfairly, and demoted her).

Plaintiff's primary allegation within the limitations period, the August 20, 1999 "locker room incident," does not, as a matter of law, constitute an act contributing to a hostile environment. It was, as Plaintiff clearly admitted, an isolated incident that resulted in an investigation by the Gas company and, ultimately, an apology by Bolduc. Stmt. ¶¶ 50-51; see Williams v. Russell Corp., 218 F. Supp.2d 1283, 1293 (M.D. Ala. 2002) (single incident of male employee going into women's bathroom while female employee was using it did not rise to the level of a sexual hostile environment, and the employer investigated and documented the incident). Plaintiff does not allege that the incident was in any way connected to her earlier allegations. See Garrison, 165 F.3d at 570 (no hostile environment where alleged incidents of harassment "could not be linked together"). Nor does she allege that Bolduc flung the door open and yelled at her for any reason other than that he was genuinely upset because he believed that Plaintiff and Stamp were taking an improper, extended break. See Thomas v. New York City Health & Hosps. Corp., 2004 U.S. Dist. LEXIS 17694, at *51 (S.D.N.Y. Sept. 2, 2004) (allegations that supervisor is rude or unfair to employee are, standing alone, not sufficient to establish a hostile environment).

Moreover, after the incident, Plaintiff (a) pursued an avenue of complaint provided by the Gas Company, which investigated the matter, and (b) received an apology from Bolduc. Stmt. ¶¶ 46-50. Plaintiff clearly testified that no similar incident

had happened previously, and that nothing similar ever happened again. Stmt. ¶ 51. These undisputed facts completely undermine any claim that this single incident contributed to an alleged hostile environment. See, e.g., McNichols v. Miami-Dade County, 2006 U.S. Dist. LEXIS 30381, at *51-53 (S.D. Fla. Mar. 24, 2006) (no hostile environment where there was no evidence of further incidents after the resolution of plaintiff's written complaint to human resources); Matlosz v. J.P. Morgan Chase, 2005 U.S. Dist. LEXIS 20157, at *27-29 (S.D.N.Y. Sept. 3, 2005) (no hostile environment where "single incident . . . was addressed promptly by senior management and ended in an apology to the plaintiff"); Samborski v. West Valley Nuclear Servs., 2002 U.S. Dist. LEXIS 12745, at *27 (W.D.N.Y. June 25, 2002) (hostile environment claim not viable because employer "provided a reasonable avenue of complaint and responded to [plaintiff's] complaints" by, inter alia, requiring apologies).

Moreover, Plaintiff does not have any evidence that Bolduc's entry into the locker room and his subsequent yelling amounted to discrimination "because of sex." Cardona v. Aramark Servs., 9 F. Supp. 2d 92, 99 (D.P.R. 1998) (citing Oncale, 523 U.S. at 79). "The law does not prohibit all physical or verbal harassment in the workplace; rather, it prohibits harassment which is motivated by sex-based discrimination." Id. Plaintiff has presented no evidence to show that Bolduc's treatment of her, even if hostile, was based on her gender. See Patton v. Indianapolis Pub. Sch. Bd., 276 F.3d 334, 339 (7th Cir. 2002) (no hostile work environment where Plaintiff's supervisor "treated her in a rude, abrupt, and arrogant manner," but not because of sex). This is fatal to her claim. Id. Plaintiff does not allege that anything Bolduc said during the "locker room incident" concerned, or even alluded to, Plaintiff's gender. Cf. Dykstra v. First Student, Inc., 324

F. Supp. 2d 54, 67-68 (D. Me. 2004) (no hostile work environment where the only statement that arguably humiliated plaintiff "did not even concern her sex").

Taken together, Plaintiff's post-April 25, 2006 allegations are completely insufficient to establish "severe or pervasive harassment that materially altered the conditions of her employment." Faragher, 524 U.S. at 786; see also; Paquin v. MBNA Marketing Sys., Inc., 233 F. Supp. 2d 58, 64 (D. Me. 2002) (although perhaps creating an unpleasant working environment, five instances of inappropriate conduct falls "well short of the frequency required to amount to an abusive working environment"). "[P]laintiff, who does not otherwise have an actionable hostile work environment claim, cannot manufacture one out of the mere fact that she complained . . . during the statutory filing period." Costanzo v. United States Postal Serv., 2003 WL 1701998, at *11 n.12 (S.D.N.Y. March 31, 2003). Given that the "episodic acts" of which Plaintiff complains were "neither continuous nor concerted," there is no reasonable basis for Plaintiff to claim that she experienced a hostile work environment for more than three years before the statutory cut-off date, i.e., since Kala's departure from the department. Id. (rejecting application of continuing violation doctrine where plaintiff could not claim that she experienced hostile environment for more than a year before statutory cut-off date). Therefore, Plaintiff cannot establish that a hostile environment existed within the limitations period.

2. PLAINTIFF'S PRE-APRIL 26,1999 HOSTILE ENVIRONMENT CLAIM IS TIME-BARRED UNDER MORGAN'S CONTINUING VIOLATION DOCTRINE.

In order to recover for the alleged hostile environment that existed prior to the limitations cut-off of April 26, 1999, Plaintiff must show that her otherwise untimely

allegations are part of the same actionable hostile environment as her timely allegations. Plaintiff simply cannot do so.

As discussed in section III-A-1, supra, Plaintiff has not made a minimal showing that the complained-of post-April 26, 1999 "act contribut[ed] to the [hostile environment] claim" as is required under Morgan. 536 U.S. at 117. Since Plaintiff one timely harassment allegations cannot, as a matter of law, support her hostile environment claim, Plaintiff cannot "anchor" her untimely claims within the limitations period. Marrero v. Goya of P.R., Inc., 304 F.3d 7, 17 (1st Cir. 2002); see Costanzo, 2003 WL 1701998, at *11 (rejecting application of Morgan's continuing violation doctrine where supervisor did not create post-limitations hostile environment).

In Paquin v. MBNA Marketing Systems, 233 F. Supp. 2d 58 (D. Me. 2002), the court analyzed the plaintiff's contention that Morgan "allow[ed] her to reach back to events that occurred before [the limitations cut-off], because those acts comprise[d] part of the overall hostile work environment and relate[d] to events that occurred within the limitations period." Id. at 62-63. "In an effort to anchor her untimely allegations," the plaintiff in Paquin pointed to numerous timely allegations, including (1) her supervisor's favoritism of attractive women; (2) his inappropriate behavior towards various female employees on his team; (3) his mistreatment of Plaintiff after she complained to the employer about his conduct; (4) the employer's refusal to allow Plaintiff to switch managers; (5) the supervisor's decision to move Plaintiff to a new seat; (6) the employer's labeling of Plaintiff as a "complainer"; and (7) the employer's casual dismissal of Plaintiff's complaints. Id. at 63. In rejecting application of the continuing violation doctrine to save the plaintiff's otherwise untimely claims, the court stated:

> Morgan, however, does not stand for the proposition that any timely allegation can properly anchor untimely allegations. Rather, pursuant to Morgan, a plaintiff's untimely allegations may be considered for the purposes of determining liability only if an act contributing to the hostile environment claim occurs within the filing period . . . . Here, none of the alleged anchoring acts, even if timely, constitute instances of harassing conduct sufficient to support a sexual harassment claim. Only those allegations that took place before [the limitations cut-off], can fairly be argued to contribute to a claim for hostile work environment sexual harassment. As such, Plaintiff's entire claim is time-barred.

Id. at 63 (internal citations omitted). Here, Plaintiff's post-limitations allegation falls far short of those alleged in Paquin, and is likewise insufficient to revive Plaintiff's untimely hostile environment claims.

The legal insufficiency of Plaintiff's post-limitations "anchor" allegation is also buttressed by the fact that nearly three-and-a-half years passed between Plaintiff's final allegation of the pre-limitation period – the alleged harassment by Kala, which ended in 1995 – and the only post-limitation harassment allegation, the "locker room incident."[4] This significant gap between allegations of harassment dispositively dispatches any claim that Plaintiff was the victim of a continuing violation. See, e.g., Garrison, 165 F.3d at 570 (affirming trial court's holding that no continuing violation occurred where "there was a two-year gap between, on the one hand, the encounters which took place outside the statute of limitations, and, on the other hand, the encounters which fall within the statute of limitations"); Konstantopolous, 112 F.3d at 715-16 (seven months between allegations of harassment precluded plaintiff from claiming a continuing violation covering alleged acts before the seven month interruption); Gipson v. KAS Snacktime Co., 171 F.3d 574, 579-80 (8th Cir. 1999) (three incidents after 21-month gap in alleged

[4] The "locker room incident" occurred on August 20, 1999. Defendants consider Plaintiff's other allegations, regarding Bolduc's decision to stop meeting with her and his reprimand of her for "joking" on the job, to be of such a de minimis nature as to provide Plaintiff no support with respect to the continuing violation analysis.

harassment insufficient to revive untimely, pre-gap allegations of harassment, which included racial slurs).

In sum, Plaintiff's post-April 26, 1999 allegation is so far removed in time, seriousness, and (needless to say) frequency from her pre-1996 allegations that they cannot, as a matter of law, be considered part of a single actionable hostile environment. Defendants are therefore entitled to summary judgment on Count I of Plaintiff's Complaint.

B. DEFENDANTS ARE ENTITLED SUMMARY JUDGMENT ON PLAINTIFF'S DISPARATE TREATMENT CLAIMS.

In Morgan, the United States Supreme Court reaffirmed the notion that a discrete discriminatory act "occur[s]" on the day it "happen[s]." 536 U.S. at 110. If a party does not file suit (or a proper administrative charge) within the limitations period following the act, that party "lose[s] the ability to recover for it." Id.

Plaintiff does not specify what "adverse employment actions" she is referring to in Count II of her Complaint alleging disparate treatment. At no time during her entire tenure at the Gas Company was Plaintiff ever demoted, unfavorably transferred, or denied promotion. Thus, the only allegedly discriminatory discrete acts that could possibly support Plaintiff's claim are (a) two instances in 1998 in which she alleges she was denied overtime to which she was entitled; and (b) her June 2000 termination. Stmt. ¶¶ 38, 62; see Morgan, 536 U.S. at 112 (quoting Bazemore v. Friday, 478 U.S. 385, 395 (1986)) ("[E]ach week's paycheck that deliver[ed] less to a black than to a similarly situated white is a wrong actionable under Title VII . . . ."); Adair v. Charter County of Wayne, 2006 U.S. App. LEXIS 15497, at *17 (6th Cir. June 22, 2006) (employment actions qualifying as materially adverse include, inter alia, termination of employment);

see also Kaplan v. City of Chicago, 2004 U.S. Dist. LEXIS 22339, at *21 (N.D. Ill. Nov. 2, 2004) (finding two denials of overtime constituted discrete acts); Shaw v. Potter, 2002 U.S. Dist. LEXIS 21057, at *10 (S.D. Ind. Oct. 24, 2002) ("Each denial of overtime constitutes a discrete discriminatory act . . . .").

1. PLAINTIFF'S DISPARATE TREATMENT CLAIMS BASED ON DENIAL OF OVERTIME, OR ANY OTHER DISCRETE ACTS PRIOR TO APRIL 26, 1999, ARE TIME-BARRED.

There is no dispute that both instances where Plaintiff believed she was denied overtime to which she was entitled occurred during 1998, prior to the limitations cut-off date of April 26, 1999. Stmt. ¶ 38. Therefore, Plaintiff cannot recover for those acts even if she can prove they were discriminatory. The same analysis applies to any other discrete, discriminatory adverse employment actions that Plaintiff alleges occurred before April 26, 1999. Defendants are entitled to summary judgment on all such time-barred claims.

2. PLAINTIFF CANNOT ESTABLISH A PRIMA FACIE CASE OF DISCRIMINATORY TERMINATION, BECAUSE SHE WAS NOT SUBJECTED TO AN ULTIMATE ADVERSE EMPLOYMENT ACTION.

Because Plaintiff is unable to offer direct proof of that the Gas Company discriminated against her with respect to her termination, this Court must employ the familiar framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05 (1973), which requires that Plaintiff first establish a prima facie case of sex discrimination. Smith v. Stratus Computer, 40 F.3d 11, 15 (1st Cir. 1994). In order to establish a prima facie case of disparate treatment with respect to her termination, Plaintiff must show (1) that she was a member of a protected class; (2) that she was qualified for the employment she held; (3) that the Gas Company took an adverse

employment action against her; and (4) that her position remained open for (or was filled by) a person whose qualifications were similar to hers. See Conward v. Cambridge Sch. Comm., 171 F.3d 12, 19 (1st Cir. 1999) (citing St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506 (1993)); Stratus Computer, 40 F.3d at 15.[5]

Plaintiff cannot establish the third prong of her prima facie case because Plaintiff did not suffer any tangible harm as a result the brief period in which her termination was effective. An adverse employment action is a "materially adverse change in the terms and conditions of employment." Richardson v. New York State Dep't of Corr. Serv., 180 F.3d 426, 446 (2d Cir. 1999) (internal quotes omitted). Courts have routinely held that "when an otherwise adverse employment action is rescinded before the employee suffers a tangible harm, the employee has not suffered an adverse employment action." See Keeton v. Flying J, Inc., 429 F.3d 259, 263-64 (6th Cir. 2005); see also Pennington v. City of Huntsville, 261 F.3d 1262, 1267 (11th Cir. 2001) (collecting cases). Even when an employee temporarily loses an employment benefit as a result of an adverse action, courts have held that such action becomes non-adverse once the back-benefit is restored. See Godoy v. Habersham County, 2006 U.S. Dist. LEXIS 23332, at *43-46 (N.D. Ga. Feb. 8, 2006) (quoting Pennington, 261 F.3d at 1267), adopted by, 2006 U.S. Dist. LEXIS 23270, at *1-3 (N.D. Ga. Mar. 21, 2006).

Here, it is undisputed that at the time of her termination on June 8, 2000, Plaintiff was (1) permanently disabled;[6] (2) no longer working at the Gas Company; and (3) no longer entitled to sick pay benefits, which had expired on April 18, 2000. Stmt. ¶¶ 52,

---

[5] Defendants concede for the purposes of this Motion only that Plaintiff can likely establish the first, second, and fourth prongs of her prima facie case.

[6] Indeed, Plaintiff has remained permanently disabled up to the present time.

58. Therefore, Plaintiff's termination did not have an "materially adverse" effect on Plaintiff's job duties or pay. The only "benefit" that was temporarily affected by her termination was health insurance, which was retroactively restored to the original cut-off date (July 1, 2000) after Plaintiff entered into the grievance settlement on September 13, 2000. Stmt. ¶ 72. Once Plaintiff's health insurance was retroactively restored per the September 13 settlement, her termination ceased to be materially adverse in any respect whatsoever. It is undisputed that Plaintiff's retirement, effective September 30, 2000, was the result of Plaintiff's own voluntary and knowledgeable decision. Stmt. ¶ 75.

In similar circumstances, several courts have denied disparate treatment termination claims because the respective plaintiffs were unable to show that a termination had a materially adverse effect on them. In Tatum v. City of Berkeley, 408 F.3d 543, 552-553 (8th Cir. 2005), a firefighter was terminated after several incidents of poor performance. After an appeal, the firefighter's termination was reversed and he was reinstated without any loss of pay or rank. Id. at 553. The court held that these circumstances were inadequate to support a claim of racial discrimination. Id.

Likewise, in Powell v. Consolidated Edison Co., 2001 U.S. Dist. LEXIS 2706, at *24 n.9 (S.D.N.Y. Mar. 13, 2001), the plaintiff was fired because the employer determined that he was guilty of assault. The plaintiff pursued a grievance to arbitration, where the arbitrator overturned the termination and ordered reinstatement. Id. The court, rejecting the plaintiff's race discrimination claim, stated that "there would appear to be no adverse employment action to challenge." Id.

Similarly, in Sarko v. Henderson, 2004 U.S. Dist. LEXIS 22194, at *7-8 (E.D. Pa. Oct. 29, 2004), the court rejected the plaintiff's discriminatory termination claim because

the plaintiff was "reinstated by an arbitration award with back pay and benefits." The court stated that "[s]ubsequent to his reinstatement . . . Plaintiff can no longer lay claim to an adverse employment action." Id. at *8. The court held that the plaintiff could not establish a prima facie case because there was "no evidence that the terms and conditions of Plaintiff's employment have been altered – Plaintiff did not lose salary, benefits, or seniority rights, nor was he reinstated to a different position, demoted in title, or scheduled to work a different shift or fewer hours." Id.; see also Baxter v. Federal Express Corp., 2006 U.S. Dist. LEXIS 17539, *7-8 (D. Conn. Mar. 28, 2006); Godoy, 2006 U.S. Dist. LEXIS 23332, at *43-46.

The fact that this Plaintiff – unlike the plaintiffs in the above cases – did not pursue her grievance to arbitration does not alter the analysis. It is undisputed that Plaintiff had the option of going to arbitration, but voluntarily chose to forego arbitration based on her, and her counsel's, analysis of the potential costs and benefits of doing so. Stmt. ¶ 70. It is also undisputed that the settlement of the grievance, freely agreed-to by Plaintiff, fully and retroactively restored the only benefit – health insurance for July and August 2000 – of which Plaintiff had been temporarily deprived by her termination. Stmt. ¶¶ 71-72.

Given these undisputed facts, Plaintiff simply cannot show that she was subjected to a "materially adverse change in the terms and conditions of employment." Richardson, 180 F.3d at 446. Defendants are therefore entitled to summary judgment on Plaintiff's termination-based disparate treatment claim.

### 3. EVEN IF PLAINTIFF COULD ESTABLISH A PRIMA FACIE CASE OF DISCRIMINATORY DISCHARGE, SHE HAS ADDUCED NO EVIDENCE THAT DEFENDANTS' LEGITIMATE, NON-DISCRIMINATORY REASON FOR HER DISCHARGE IS PRETEXTUAL.

Assuming Plaintiff could establish a prima facie case of disparate treatment with respect to her termination, Defendants have clearly articulated a legitimate, nondiscriminatory reason for Plaintiff's termination in accordance with the burden-shifting framework of McDonnell Douglas Corp., 411 U.S. at 802-05. It is undisputed that Plaintiff improperly received payment from the Gas Company to which she was not entitled under the CBA then in effect. Stmt. ¶ 61. It is also undisputed that the Gas Company requested documentation regarding the status of Plaintiff's TDI application for over two months without receiving such documentation. Stmt. ¶¶ 57-59. It is further undisputed that at the time of her alleged termination, Plaintiff had failed to reimburse the Gas Company for the overpayments. Stmt. ¶ 74. Lastly, it is undisputed that the Gas Company informed Plaintiff that she was being terminated for the improper conduct outlined above. Stmt. ¶ 62.

Because Defendants have articulated this legitimate, non-discriminatory reason for its decision, the burden shifts back to the plaintiff, who must produce "sufficient evidence to support two additional findings: (1) that the employer's articulated reason for the job action is a pretext, and (2) that the true reason is discriminatory." Stratus Computer, 40 F.3d at 16. Plaintiff simply has no evidence for either contention. Defendants are therefore entitled summary judgment on Count II of Plaintiff's Complaint alleging disparate treatment.

C. DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S RETALIATION CLAIM.

Defendants assume that Plaintiff's retaliation claim is premised upon her belief that her termination was, in effect, retaliation by the Gas Company in response to Plaintiff filing a charge of discrimination with the RICHR.[7] Plaintiff has no evidence for her retaliation claim, only conclusory allegations of the Gas Company's retaliatory motives.

In order to withstand summary judgment, Plaintiff must (1) establish a prima facie case of retaliation and (2) show that Defendants' proffered legitimate reason is in fact a pretext and that the job action was the result of Defendants' retaliatory animus. Calero-Cerezo v. United States Dep't of Justice, 355 F.3d 6, 26 (1st Cir. 2004). Plaintiff cannot establish either.

1. PLAINTIFF CANNOT ESTABLISH A PRIMA FACIE CASE OF RETALIATORY DISCHARGE.

"To prove a claim of retaliation, a plaintiff must establish that (1) she engaged in protected conduct; (2) she experienced an adverse employment action; and (3) there was a causal connection between the protected conduct and the adverse employment action." See Calero-Cerezo, 355 F.3d at 25 (citing Gu v. Boston Police Dep't, 312 F.3d 6, 14 (1st Cir. 2002)). Plaintiff cannot establish the second or third prongs of her prima facie case.

a. Because Plaintiff Was Permanently Disabled, Not Working, and Not Being Paid, No Reasonable Employee in Her Position Would Have Found the Termination "Materially Adverse."

In its recent decision Burlington Northern & Santa Fe Railway Co. v. White, No. 05-259, slip op. at 12-15 (U.S. June 22, 2006), the United States Supreme Court

[7] Indeed, Plaintiff's June 2000 termination is the only potential "adverse employment action" that she can rely upon for her retaliation claim, since no other alleged adverse employment actions occurred within the limitations period.

addressed the issue of what constitutes an adverse employment action for the purposes of a Title VII retaliation claim. The Court, adopting the position taken by the Seventh and D.C. Circuits, held that for the purposes of retaliation, a plaintiff "must show that a reasonable employee would have found the challenged actions adverse," i.e., that the challenged action "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Id. at 13 (internal quotes and citations omitted).

In White, the Court upheld a jury verdict in favor of a plaintiff who had alleged her employer retaliated against her for filing an EEOC charge. Id. at 15. Subsequent to the plaintiff's charge, the employer (1) assigned the plaintiff to duties within her job description but that were widely considered unfavorable and (2) suspended the plaintiff for 37 days without pay, but later reinstated her and awarded her back pay. Id. at 16-18. Rejecting the employer's claims that the job actions complained of were not materially adverse as a matter of law, the Court held that the jury could, and did, find that both decisions constituted materially adverse actions. Id.

Here, Plaintiff's circumstances are clearly distinguishable from those in White. It is undisputed that Plaintiff was not working at the time of her termination. Stmt. ¶¶ 52-62. Thus, unlike the plaintiff in White, this Plaintiff was not, and could not possibly have been, subjected to a unfavorable change in work duties. Furthermore, this Plaintiff was not entitled to any payment from the Gas Company at the time of her termination. Stmt. ¶ 58. Therefore, unlike the Plaintiff in White, Plaintiff was not, and could not possibly have been, adversely impacted by a temporary suspension of wages.

Given Plaintiff's "particular circumstances," the "significance" of the actual consequences of her termination fails as a matter of law to establish the adverse

employment action prong of her prima facie case. See White, slip op. at 14. As discussed in section III-B-2, supra, Plaintiff's termination only affected her medical insurance coverage for two months time, after which it was retroactively restored. Beyond this, the undisputed fact that the Gas Company offered Plaintiff COBRA benefits at a reduced group rate of $222.49 per month further undermines the "significance" of the complained-of action. In sum, Plaintiff's virtual dearth of any involvement with the Gas Company renders her termination a de minimis act that is insufficient to buoy a prima facie case of retaliation.

b. The Gas Company Began Its Inquiry Into Plaintiff's TDI Documentation Prior to Receiving Notice of Her RICHR Charge, And Plaintiff Has No Evidence Establishing a Causal Connection Between Her RICHR Charge and Her Termination.

Even if Plaintiff could establish that her termination was an adverse employment action, she has no evidence supporting a causal connection between her protected activity and her termination as is required to state a prima facie case of retaliation. See Calero-Cerezo, 355 F.3d at 25. First, it is undisputed that the Gas Company initiated its inquiry into Plaintiff's TDI documentation prior to receiving notice of her RICHR charge. Stmt. ¶ 56-57; see Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 272 (U.S. 2001) ("Employers need not suspend previously planned [actions] upon discovering that [plaintiff has engaged in protected activity], and their proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality."). Butler's first request for documentation from Plaintiff was dated March 3, 2000, the same day, incidentally, that the RICHR mailed its letter apprising the Gas Company of Plaintiff's complaint. Stmt. ¶ 57. Thus, there is no way that Butler or anyone at the Gas Company could have known about Plaintiff's charge prior to the first

inquiry into Plaintiff's TDI benefits. See Breeden, 532 U.S. at 273 (no indication that supervisor knew about EEOC complaint when she proposed adverse employment action against plaintiff); cf. Pomales v. Celulares Telefonica, Inc., 447 F.3d 79, 85 (1st Cir. 2006) (no evidence that decision maker knew of plaintiff's protected conduct when deciding to take adverse employment action).

In any event, Plaintiff has absolutely no evidence that her termination was the result of her decision to file her RICHR charge rather than her simultaneous receipt of full sick pay benefits and TDI benefits. Plaintiff's likely reliance on merely the temporal proximity between the filing of the charge and her termination is insufficient to withstand summary judgment. "[C]ases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close.'" Calero-Cerezo, 355 F.3d at 25 (quoting Breeden, 532 U.S. at 273-74).

Here, approximately three months passed between the time the Gas Company was apprised of Plaintiff's RICHR charge in the first week of March 2000 and Plaintiff's termination on June 8, 2000. Stmt. ¶¶ 56, 62. During that three month period, the Company made repeated attempts to obtain information from Plaintiff, and did not receive such information for two months. Stmt. ¶¶ 57-59. Even then, the Company waited another month, until after it met with Plaintiff and her Union representative in an effort to seek a satisfactory explanation for Plaintiff's actions, before terminating. Stmt. ¶¶ 60-62. That demonstrated reticence by the Company to terminate underscores Plaintiff's inability to demonstrate any causal connection between her filing of a charge

of discrimination and her temporary termination. Courts have held that a period of this length, standing alone, is insufficient to establish a causal connection based on temporal proximity. See Trammel v. Simmons First Bank of Searcy, 345 F.3d 611, 618 (8th Cir. 2003) ("[A] time interval of more than two months is too long to support an inference of causation."); Richmond v. Oneok, Inc., 120 F.3d 205, 209 (10th Cir. 1997) (three-month period of time between plaintiff's protected activity and termination was insufficient to establish a causal connection); Hughes v. Derwinski, 967 F.2d 1168, 1174 (7th Cir. 1992) (four months insufficient).

Because Plaintiff has no evidence of a causal connection between her filing of her RICHR charge and her termination, she cannot establish a prima facie case of retaliation. Defendants are therefore entitled to summary judgment on Count III of Plaintiff's Complaint.

2. EVEN IF PLAINTIFF COULD ESTABLISH A PRIMA FACIE CASE OF RETALIATORY DISCHARGE, SHE HAS ADDUCED NO EVIDENCE THAT DEFENDANTS' LEGITIMATE, NON-DISCRIMINATORY REASON FOR HER DISCHARGE IS PRETEXTUAL.

In order to establish pretext in a retaliation claim, plaintiff must show that the articulated reason for the employment decision was not the genuine motivating reason, but rather was false, and that discrimination was the real reason for the decision. See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 507-08, 515 (1993). Title VII does not permit courts "to substitute for the required finding that the employer's action was the product of unlawful discrimination, the much different (and much lesser) finding that the employer's explanation of its action was not believable." Id. at 514-15.

As discussed in section III-B-3, supra, Defendants have articulated a legitimate, nondiscriminatory reason for Plaintiff's termination, i.e., that she improperly accepted payment from the Gas Company when she knew or should have known that doing so violated her CBA. Plaintiff, as also discussed supra, has no evidence that this reason is mere pretext to cover up the Gas Company's allegedly retaliatory motives. In short, "the evidence as a whole is [in]sufficient to make out a question for a factfinder as to pretext and discriminatory animus." Calero-Cerezo, 355 F.3d at 26 (citing Fennell v. First Step Designs, Ltd., 83 F.3d 526, 535-36 (1st Cir. 1996)).

Plaintiff's likely invocation, at this stage of the McDonnell Douglas Corp. analysis, of the temporal proximity of the RICHR charge and the termination is once again insufficient. See Skrjanc v. Great Lakes Power Serv. Co., 272 F.3d 309, 317 (6th Cir. 2001) ("[T]emporal proximity is insufficient in and of itself to establish that the employer's nondiscriminatory reason for discharging an employee was in fact pretextual."); Conner v. Schnuck Mkts., 121 F.3d 1390, 1397 (10th Cir. 1997) (in FLSA retaliation case, temporal proximity alone insufficient to survive summary judgment); Soileau v. Guilford of Maine, 105 F.3d 12, 16 (1st Cir. 1997) (narrow focus on temporal proximity improper where "larger picture undercuts any claim of causation"); Morgan v. Hilti, Inc., 108 F.3d 1319, 1324 (10th Cir. 1997) (finding temporal proximity insufficient to establish pretext when disciplinary action had begun prior to the protected activity because the subsequent adverse employment acts "simply completed the disciplinary process already set in motion").

Moreover, Plaintiff cannot prove that defendants did not act reasonably and in good faith based on their investigation of Plaintiff's receipt of full sick pay benefits and

TDI benefits. See, e.g., Laosebikan v. Coca-Cola Co., 167 Fed. Appx. 758 (11th Cir. 2006) (terminated employee failed to show that employer's good faith belief, following investigation, that employee had threatened his supervisor was a pretext for retaliation); Euerle-Wehle v. United Parcel Service, 181 F.3d 898, 900 (8th Cir. 1999) ("Whether UPS correctly concluded that [plaintiff] had committed serious violations of company policy that warranted her termination is not material, because UPS acted reasonably and in good faith in its investigation."); Elrod v. Sears, Roebuck & Co., 939 F.2d 1466, 1470 (11th Cir. 1991) (noting that inquiry is not whether employee was guilty of misconduct but whether employer in good faith believed employee had done wrong and whether this belief was the reason for the termination).

As Plaintiff has adduced no evidence whatsoever that Defendants stated reasons for her discharge are pretextual, her retaliation claim must fail. Defendants are therefore entitled to summary judgment on Count III of Plaintiff's Complaint.

## IV. Conclusion

For the foregoing reasons, Defendants respectfully request that the Court grant their motion for summary judgment with respect to all counts in Plaintiff's Complaint, along with such other and further relief as the Court deems just and proper.

Respectfully submitted,
DEFENDANTS SOUTHERN UNION CO.
& NEW ENGLAND GAS CO.

By their attorneys,

NIXON PEABODY LLP

Neal J. McNamara (#4249)
Matthew J. Frankel (#7293)
One Citizens Plaza, Suite 500
Providence, RI 02903
Tel: (401) 454-1000
Fax: (401) 454-1030
nmcnamara@nixonpeabody.com
mfrankel@nixonpeabody.com

Dated: July 21, 2006

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that I sent a true and accurate copy of the within Defendants' Memorandum in Support of Motion for Summary Judgment to the following persons this 21st day of July, 2006.

Via Regular Mail, Postage Prepaid

Noelle K. Clapham, Esq.
24 Salt Pond Road, Suite A8,
South Kingstown, RI 02879

Via Hand Delivery

Stephen M. Robinson, Esq.
Vicki J. Bejma, Esq.
Law Offices of Stephen M. Robinson
155 South Main Street
Providence, RI 02903