UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| CAROL PETRARCA,<br>Plaintiff<br><br>v.<br><br>SOUTHERN UNION CO. &<br>NEW ENGLAND GAS CO.,<br>Defendants. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>: | C.A. No. 04-310S |

**DEFENDANTS' LOCAL RULE 56(a) STATEMENT OF UNDISPUTED FACTS**

Defendants Southern Union Co. and New England Gas Co. submit this Local Rule 56(a) statement of undisputed facts in support of their Motion for Summary Judgment filed pursuant to Federal Rule of Civil Procedure 56.

I. The Parties and Causes of Action

1. Plaintiff Carol Petrarca is a female who was a citizen of Rhode Island at all times relevant to this litigation.

2. Defendant Southern Union Co. is a Delaware corporation with its principle place of business in Pennsylvania.

3. Defendant New England Gas Co. is a d/b/a of Southern Union Co.

4. Defendants Southern Union Co. and New England Gas Co. ("Defendants") are the corporate successors to Providence Gas Co. ("Providence Gas") (collectively, "Gas Company"). Defendants acquired Providence Gas effective March 1, 2001.

5. At all times relevant to this litigation, Providence Gas or Defendants conducted the business of selling natural gas for home heating and other purposes within the State of Rhode Island.

6. Throughout all times relevant to this litigation, the Gas Company operated several facilities within the city of Providence, Rhode Island in connection with their business. Among these facilities were buildings on Dexter St. and Weybosset St.

7. Local 12431 of the United Steel Workers' Union ("Union") was Plaintiff's collective bargaining representative for all times relevant to this litigation.

8. On February 25, 2000, Plaintiff filed a charge of discrimination with the Rhode Island Commission for Human Rights ("RICHR") alleging that Defendants violated Title VII of the Civil Rights Act of 1964, as amended, by treating Plaintiff unfairly and otherwise harassing her because of her sex.

9. The RICHR notified the Gas Company of the charge of discrimination in a letter dated March 3, 2000. See Letter from the Rhode Island Commission for Human Rights, March 3, 2000 (attached as Exhibit W).

10. On or about July 22, 2004, Plaintiff filed a judicial complaint asserting three causes of action against Defendants under 42 U.S.C. §§ 2000e et seq. Count I of Plaintiff's complaint alleges that Defendants subjected her to a hostile work environment. Count II alleges that Plaintiff was the victim of disparate treatment on the part of Defendants. Count III alleges that Defendants retaliated against Plaintiff in violation of Title VII.

## II. Plaintiff's Employment as Spare Building Cleaner and Building Cleaner, April 1988 to July 1991

11. Plaintiff began her employment with Providence Gas in April 1988 as a spare building cleaner. See Occupational Classification Record of Carol Petrarca (attached as Exhibit A); Affidavit of Joan Chaffee, ¶ 2 (attached as Exhibit MM). Her duties included "vacuuming and dusting, and cleaning the bathrooms." See Deposition of

Carol Petrarca (attached as Exhibit B) at 17:22 – 18:2. At her deposition Plaintiff testified that when she began her employment, she was only supposed to work "two or three days a week" on a call-in basis. Ex. B at 23:19-24. Plaintiff testified, however, that she basically worked full time, putting in approximately 40 hours over five or six days each week. Ex. B at 18:10-12, 23:21-22. Plaintiff worked as a spare building cleaner from 4 p.m. to 10 p.m. during the week, and several hours each Saturday morning and early afternoon. Ex. B at 18:5-12. As a spare building cleaner, Plaintiff was entitled to regular pay, but not benefits or accrued seniority. Ex. B at 23:12-16.

12. On or about January 8, 1989, Plaintiff was hired for the full-time building cleaner position, and she became entitled to receive benefits and to accrue seniority. Ex. A; Ex. B at 24:17-19.

13. As spare building cleaner and building cleaner, Plaintiff worked at the Weybosset St. office building. Occasionally she would fill in at Dexter St. if the Dexter St. cleaning person was absent. Ex. B at 19:9-24.

14. During the period between April 1988 and July 1989 when Plaintiff worked as either a spare building cleaner or building cleaner, Ed Bolduc was her direct supervisor. Ex. B at 24:20-22. Bolduc worked the day shift, and his shift at the Gas Company would generally overlap with Plaintiff's shift from approximately 4 p.m. to 5 p.m. Ex. B at 25:10-19. Plaintiff testified at her deposition that she would "really hardly see[] him." Ex. B at 24:24-25. Plaintiff would see Bolduc at the beginning of her shift, when she (and other employees) would report to Bolduc's office to be told their tasks for the shift. Ex. B at 24:25 – 25:7.

15. When asked at her deposition how she would characterize Bolduc as a boss, Plaintiff stated, "Very i[m]patient. . . . He had a tendency to yell at the women. I don't know. He just had no patience with the women. He didn't want women in the department. He made that perfectly clear." Ex. B at 25:20 – 26:3. Plaintiff also stated that Bolduc said that "if he had his way, there would not be any women in the department," and that "women are just troublemakers." Ex. B at 26:5-10. Plaintiff stated that while she was in building cleaning, Bolduc said this "a couple times." Ex. B at 26:20-21. Plaintiff could not recall any other such statements made by Bolduc between April 1988 and July 1991. Ex. B at 29:23 – 30:2.

16. Plaintiff complained about night watchman Pat Domenicone's behavior during the period when she was a building cleaner. Plaintiff alleges that Domenicone followed her through the building for "two or three months," showing her pictures from Playboy magazine and making inappropriate comments about "big boobs, and big behinds." Ex. B at 38:16 – 39:4.

17. Plaintiff stated at her deposition that she complained about Domenicone to Bolduc, who "evidently put it down and wrote it in [Domenicone's] file and everything, but it didn't leave the sixth floor." Ex. B at 39:23 – 40:4. Plaintiff testified that after she complained to Bolduc, Domenicone's behavior "continued, but not as bad." Ex. B at 40:8-9. Plaintiff cited Domenicone's alleged comment, "[I]f you come clean my house for a year, I'll get you your job. I can go to speak to Ed and get you in here ahead of everybody else." Ex. B at 40:12-15.

18. Domenicone retired on January 31, 1991. See Occupational Classification Record of Pat Domenicone, (attached as Exhibit JJ); Ex. MM, ¶ 2.

III. Plaintiff Applies for Building Maintenance Position

19. In July 1991, the Gas Company put up a job posting for an opening in the maintenance department, and Plaintiff applied for the position. Ex. B at 20:2-8, 21:9-11.

20. Prior to joining the maintenance department, Plaintiff underwent a physical examination by a doctor on Reservoir Avenue. Ex. B at 28:6-7. Although the record is unclear as to whether this was required, it is undisputed that at least one man underwent a physical as well. At her deposition, Plaintiff testified that her co-worker Bob Biber stated, "I can't believe you passed that physical because I didn't even pass it." Ex. B at 61:7-8.

21. Plaintiff alleges that building maintenance employee Roy Heaton and Bolduc tried to keep her out of the maintenance department. Plaintiff stated at her deposition, "things that they did to me, they did not do to men." Ex. B at 61:13-14. Plaintiff stated that prior to joining building maintenance, Bolduc had her lift boxes in the basement every evening for a week. Ex. B at 61:24 – 62:8. Plaintiff testified that Bolduc said, "Because these are the types of boxes you're going to be lifting, and if you can't lift them, you can't come into the department." Ex. B at 61:20-23. Plaintiff also stated at her deposition that she believed Heaton did not want her in the maintenance department. She stated that Heaton "made a remark that I was taking a job from a family man who had to support a family, and that's not a place for a woman to be." Ex. B at 60:14-19.

22. It is undisputed that Plaintiff got the building maintenance job. Ex. B at 27:10-11.

III. Plaintiff's Employment in Building/Facilities Maintenance, 1991-99

23. On or about July 15, 1991, Plaintiff started her new position in building maintenance and she was given a substantial raise in pay. Ex. A. Plaintiff switched to a day shift, Monday through Friday from 7:30 a.m. to 4 p.m., and continued to work at Weybosset St. under Bolduc's supervision. Ex. B at 30:9-20. The department was renamed "facilities maintenance" in 1992. Ex. A.

24. As part of her job duties in building/facilities maintenance, Plaintiff testified that she had to deliver "tons of boxes . . . . every day to the stations," i.e., to various departments and people throughout the facility. Ex. B at 32:10-16. Plaintiff also testified, "[W]e were unloading . . . trucks of 250 boxes, and throwing them down the chute, and so someone had to be down there to catch them, and then when you got done throwing these 250 boxes, whoever was upstairs would have to go down now and help to . . . stack them on the shelves. That was like an all day job . . . ." Ex. B at 33:11-18.

25. At her deposition, Plaintiff stated that while she was in building maintenance, i.e., prior to July 15, 1991, Bolduc indicated "probably more than a couple of times" that if he had his way, there would not be women in the department. Ex. B at 26:2-3. Plaintiff alleges that Bolduc "liked to yell a lot . . . just [at] us women," Ex. B at 62:9-18, but admitted that Bolduc yelled at male supervisees such as Kenny Schiano and Bill Johnson. Ex. B at 62:24 – 63:25.

26. When she started in building maintenance, Plaintiff worked with two other individuals, Jerry Porter and Joe Ianiello. Plaintiff testified that she had "no problem with [Porter]," that he never made inappropriate comments, and that he "was a very nice person." Ex. B at 33:20 – 34:1.

27. At her deposition, Plaintiff stated that she had "problems with" Ianiello. Ex. B at 34:6-11. Plaintiff stated that Ianiello was "nasty and controlling," would scream at her, "would disappear in the building," and would use the F-word toward her. Ex. B at 34:12 – 36:2. Plaintiff testified that Ianiello never physically assaulted her or touched her in any threatening way, Ex. B at 38:2-5, and she had no recollection of Ianiello saying anything sexually inappropriate to her. Ex. B at 35:7-9.

28. Plaintiff stated at her deposition that she complained to Bolduc about Ianiello "about three or four times" because she was "quite upset." Ex. B at 34:23 – 35:2. Plaintiff stated that Bolduc would "say just go off somewhere, and he'll cool off." Ex. B at 34:10-11. Plaintiff testified that these incidents occurred in 1994 or 1995. Ex. B at 37:20.

29. Also in 1994 and 1995, Plaintiff allegedly had problems with her co-worker, Richard Kala. At her deposition, Plaintiff stated that Kala inappropriately asked Plaintiff if she wanted to have an affair on three separate occasions: the first and second nights they worked together and at an on-the-job New Year's Eve "party" several months later. Ex. B at 46:4 – 47:17, 47:19 – 48:6, 49:1-24. In between the second alleged incident and the third alleged incident Kala did not say anything to Plaintiff. Ex. B at 48:7-24.

30. In or about 1995, Plaintiff complained to Bolduc about Kala's behavior. Plaintiff and Bolduc, in turn, met with Director of Labor Relations Bud Butler. They also met with Alycia Goody, in house attorney for Providence Gas, regarding alleged harassment by Kala. Ex. B. at 50:2-25.

31. Plaintiff alleges that after meeting with Goody, Kala said to her, "You better drop the charges. . . . I'm warning you. If you don't drop them, you're going to be sorry, because this is going to be in my files for the rest of my life . . . You better go up there and tell Al[y]cia you made a mistake." Ex. B at 51:2-12. Plaintiff's deposition testimony continued, "And then all of a sudden, things started happening." Plaintiff alleges that her car was tampered with,[1] and that Kala "continued to make his little remarks," that he said "Carol, Carol" while Plaintiff was on the phone with her son-in-law in the basement of the building, and that he put his hand on her shoulder and said "How are you feeling tonight." Ex. B at 51:16 – 53:19.

32. Goody and Butler conducted an investigation into the complaint. Goody interviewed Kala about Petrarca's allegations against Kala. Although Kala denied the allegation, it was determined that Kala should be separated from Petrarca. See Defendants' Third Supplemental Response to Interrogatory No. 9 (attached as Exhibit S).

33. Kala had, on September 28, 1995, already signed a posting to be transferred to the position of Garage Helper at Dexter Street, within Fleet Services, a different facility from the one where Petrarca worked. Kala had joined the facilities maintenance department on March 6, 1994, and he left the department permanently on January 2, 1996. Kala's transfer separated Kala from Plaintiff, and the two never worked together after January 2, 1996. Ex. B at 64:7-9; Ex. S.

34. Kala's final rate of pay in Facilities Maintenance was $19.79 per hour, and his initial rate of pay as a Garage Helper was $18.31 per hour. He did not achieve a rate of pay in excess of his final rate at Facilities Maintenance until January 1997. See

[1] There is no competent evidence – only Plaintiff's unbridled conjecture – that Kala or anyone else associated with the Gas Company were responsible for Plaintiff's alleged car problems.

Occupational Classification Record of Richard Kala (attached as Exhibit C); Ex. MM, ¶ 2; Ex. S.

35. Plaintiff alleges that despite her complaints about Kala, "nothing would get done." Ex. B at 53:17. However, it is undisputed that the Gas Company *did* transfer Kala after Plaintiff's complaint, that the transfer included a pay cut, and that Petrarca never complained about Kala again after the transfer. Ex. B at 55:20-23, 56:17-21. Plaintiff testified that she would occasionally run into Kala at Dexter St., where "he'd more or less come through, and he'd smile at me and say, 'How are you today,' or 'what's going on,' and then he'd go out the door." Ex. B at 64:15-25.

36. Once Kala left facilities maintenance in January 1996, Jerry Porter was Plaintiff's only male co-worker at Weybosset St. Ex. B at 65:1-6.

37. In 1994 or 1995, Plaintiff also took exception to two alleged instances where men entered the men's room to use the urinal while she was doing cleaning work in one of the stalls. Ex. B at 58:12 – 60:8.

38. Plaintiff alleges that on two occasions in 1998, she was denied the opportunity for overtime work to which she was entitled. Ex. B at 45:15-17. Plaintiff stated at her deposition that Bolduc called in Jerry Porter for overtime rather than Plaintiff, even though she was "low" on the overtime list. On one such occasion, Plaintiff lodged a grievance and was eventually paid for the alleged missed time. Ex. B at 44:2-12. One the other occasion, Plaintiff was given alternative overtime work in lieu of the alleged missed time. Ex. B at 44:12-20.

39. Plaintiff testified that when she approached Bolduc about the overtime, Bolduc stated that "he didn't realize I was low on the overtime sheet." Ex. B at 86:25-1.

Plaintiff also testified that Porter was called in rather than Plaintiff because Bolduc would give Porter's phone number to the nighttime security guard, with instructions to call Porter if any problems occurred in the maintenance department. Ex. B at 87:1-11.

40. Plaintiff took exception to the fact that Bolduc had a better relationship with Porter than he did with Plaintiff, ceased giving Plaintiff work instructions, and, if he did, would do so through Porter. Plaintiff alleges that Bolduc told his supervisees, "Well, you don't need to go up to my office in the morning anymore. You guys got different jobs every day. You know what to do, so you're all right, so do them." Ex. B at 84:17 – 85:16. Plaintiff also alleges that Bolduc reprimanded her on one occasion for "joking and laughing" with the night crew during the last half-hour of Plaintiff's shift, but did not do the same when Porter was allegedly engaged in similar behavior. Ex. B at 91:22 – 93:20.

41. It is undisputed that Porter was senior to Plaintiff, see Occupational Classification Record of Gerald Porter (attached as Exhibit KK) and Ex. MM, ¶ 2, and that Bolduc believed Porter was a better worker than Plaintiff. See Deposition of Edward Bolduc, August 12, 2005 (attached as Exhibit D) at 39:10-20.

IV. The "Locker Room" Incident

42. Plaintiff normally took her break at 9:30 or 9:45 a.m. Plaintiff would sometimes work through her normal break period and take one at a different time. Ex. B at 70:8-15. Plaintiff would often take her break in a small, windowless room in the basement, where Plaintiff and other women would sometimes keep a change of clothes, their pocketbooks, and their lunches. Ex. B at 69:23 – 70:7, 73:5-7.

43. On August 20, 1999, Plaintiff and Christine Stamp were taking a break in that room at the somewhat unusual time of 2:30 to 2:40 p.m. Ex. B at 70:24 – 75:1. Just

prior to their break, Plaintiff had been delivering boxes, and Stamp had been painting on the roof. Stamp was tired from painting and had put all the materials away before taking her break. Ex. B at 71:3-9.

44. Plaintiff testified that Bolduc "had had a problem with Kenny [Schiano] and Bill [Johnson]" at Dexter St. just prior to returning to Weybosset St. Ex. B at 63:22-25. Bolduc returned to Weybosset St., "went out on the roof and saw all the equipment had been put away . . . ." Ex. B at 71:10-12.

45. Bolduc became angry and looked for Stamp. He heard Plaintiff's and Stamp's voices outside of the basement room where they were taking their break. Ex. B at 72:13-14. According to Plaintiff, Bolduc "flings the door open, and he starts screaming at us, and telling us we're not supposed to be on our break . . . and how dare us, you know, be sitting here." Ex. B at 71:14-18.

46. That same day, August 20, 1999, Plaintiff and Stamp complained about the incident to Union President Ray Conroy and Union Steward Paul Cardin. Ex. B at 76:7 -19. Also that same day, Union Vice President Frank Devlin informed Henry Butler, the Gas Company's Director of Labor Relations, of Plaintiff's complaint. See Letter from Henry Butler to Carol Petrarca and Christine Stamp, September 1, 1999 (attached as Exhibit E); Ex. B at 78:13-23.

47. On August 31, 1999, Plaintiff and Stamp also wrote a letter complaining about the incident to Royalynne Hourihan, the Gas Company's Vice President of Human Resources. Ex. B at 77:23 – 78:5; Letter from Carol Petrarca and Christine Stamp, August 31, 1999 (attached as Exhibit F). On September 1, 1999, Butler sent a letter to Plaintiff and Stamp in connection with Plaintiff's complaint. Butler's letter stated that

the Gas Company was investigating the matter and that it had not "forgotten about the incident." Ex. E; Ex. B at 78:13-23.

48. Stamp went out on medical leave in early September 1999, and did not return until December 1, 1999. Bud Butler and Bolduc attempted to meet with Plaintiff to discuss her complaint in September 1999, but she refused to meet without Stamp being present. Ex. B at 79-80; See Letter from Henry Butler to Christine Stamp and Carol Petrarca, September 21, 1999 (attached as Exhibit T); Memorandum from Bud Butler to File, December 15, 1999 (attached as Exhibit V). Plaintiff went out on leave because of a bad back on October 15, 1999, and no meeting took place.

49. On December 6, 1999, plaintiff's union filed a grievance regarding the August 20 incident. The union demanded an investigation and an apology. See Grievance Report, December 6, 1999 (attached as Exhibit U).

50. On December 13, 1999, Bolduc issued a memorandum to Plaintiff and Stamp in which he recounted his version of the incident and then stated: "In retrospect, it would have been appropriate for me to knock on the door before entering. I offer my apology to you for my action and in the future I will knock." See Memorandum from Edward Bolduc to Christine Stamp and Carol Petrarca, December 13, 1999 (attached as Exhibit G). The memorandum was sent to Plaintiff, who testified that she could not recall receiving it, but "probably did." Ex. B at 82:9-12. Plaintiff also testified that she had seen an undated, unaddressed "statement" from Bolduc in which he wrote, "[T]he proper thing for me to do should have been to knock on the door and announce my presence. I did not and therefor[e] I offer my apology to each of you and state that in the future I will knock on the door if I require your services." See Undated Statement of

Edward Bolduc (attached as Exhibit H); Ex. B at 80:25 – 81:12. Bolduc reiterated these sentiments in a formal letter to Plaintiff and Stamp dated December 15, 1999. See Letter from Edward Bolduc to Christine Stamp and Carol Petrarca, December 15, 1999 (attached as Exhibit I).

51. Prior to the August 20, 1999 incident, Bolduc had never entered the room without knocking. After the incident, Bolduc "never came down to the room" again. Ex. B at 75:23 – 76:6.

V. Plaintiff's Medical Leave, Violation of the CBA, and Period of Termination

52. Plaintiff fell down the stairs at her home on October 15, 1999 and immediately went out on medical leave. Ex. B at 122:4-10.

53. Under the collective bargaining agreement ("CBA") between the Union the Gas Company in effect at the time, Plaintiff, while on medical leave, was entitled to receive the difference between her regular salary and any benefits received from Rhode Island Temporary Disability Insurance ("TDI"). To the extent that Plaintiff was ineligible for TDI, she was entitled, under the CBA, to receive her gross pay for a maximum of 130 regularly scheduled workdays. See 1996-99 Agreement between Providence Gas Company and United Steelworkers of America, at 47 (attached as Exhibit X). The provisions of the 1996-99 Agreement were extended until 2002 by a Memorandum of Understanding dated April 20, 1998. See Memorandum of Understanding, April 20, 1998 (attached as Exhibit Y). The above-referenced provisions regarding sick pay benefits and TDI insurance were contained in the Collective Bargaining Agreements for the periods 1991-93. See 1991-93 Agreement between Providence Gas Company and United Steelworkers of America, at 34 (attached as

Exhibit Z); 1992-96 Agreement between Providence Gas Company and United Steelworkers of America, at 34 (attached as Exhibit AA).

54. On or about October 14, 2005, Defendants' counsel issued a subpoena to the Rhode Island Department of Labor and Training for all documents pertaining to Plaintiff's applications for temporary disability insurance benefits for the period from 4/15/1988 to the present. See Subpoena, October 14, 2005 (attached as Exhibit BB). In response the Department produced responsive records, including a payment history for Plaintiff for the periods from October 16, 1999 to November 20, 1999, and from January 8, 2000 through July 15, 2000. See Certification of Records and Attached Payment Histories (attached as Exhibit CC).

55. After commencing her medical leave, Plaintiff received TDI payments, which were exhausted on or about November 20, 1999. Ex. CC. On November 23, 1999 Plaintiff informed the Gas Company that her TDI had been exhausted. From that date, the Gas Company paid Plaintiff her gross sick pay benefits. See Letter from Henry Butler to Carol Petrarca, March 3, 2000 (attached as Exhibit J); Letter from Henry Butler to Carol Petrarca, April 13, 2000 (attached as Exhibit K); and Letter from Henry Butler to Carol Petrarca, May 17, 2000 (attached as Exhibit L).

56. By notice dated February 10, 2000, the Rhode Island Department of Labor and Training Temporary Disability Insurance Division notified Providence Gas that Plaintiff had applied for TDI benefits. See Notice (attached as Exhibit DD). Providence Gas received that notice on or about February 16, 2000. Documents subpoenaed from the Department in 2005 demonstrate that Plaintiff received weekly payments of $487.00 for the period effective from January 8, 2000 through July 15, 2000. Ex. CC.

57. By letter dated March 3, 2000, Henry Butler notified Plaintiff that TDI had notified the Gas Company that Plaintiff had reapplied for TDI benefits in February 2000 due to the new benefit year. Butler's March 3 letter requested that Plaintiff "provide Human Resources with documentation" showing the status of her TDI application. Ex. J.

58. By letter dated April 13, 2000, Butler notified Plaintiff that her sick pay allowance under the CBA would expire effective April 18, 2000. Therefore, Plaintiff received no pay from defendants from that date forward. Butler's April 13 letter, noting that Plaintiff had not responded to the March 3 request, again requested that Plaintiff "provide . . . documentation indicating the status of your [TDI] claim." Ex. K. Providence Gas paid Plaintiff a total of $11,944.08 in sick pay for the period from January 1, 2000 through April 15, 2000. See Payroll record for Carol Petrarca, April 20, 2000 (attached as Exhibit LL); Ex. MM, ¶ 3.

59. By letter dated April 24, 2000, Butler notified Plaintiff once again that she had not responded to his requests for TDI documentation. Butler's April 24 letter stated, "Should you continue to fail to respond I will refer the matter to our legal department for appropriate disposition of the matter." See Letter from Henry Butler to Carol Petrarca, April 24, 2000 (attached as Exhibit M).

60. By letter dated May 17, 2000, Butler notified Plaintiff that the Gas Company had received documentation indicating that Plaintiff had been receiving TDI benefits since February 14, 2000, despite collecting full gross pay benefits from the Gas Company from February 14 to April 18, when the Gas Company-paid benefits expired. Butler's May 17 letter further stated: "It would appear that you intentionally failed to

inform the company when you were notified your claim had been approved and you subsequently began receiving RITDI benefits when also receiving full sick benefits in the amount equal to 100% of your basic hourly earnings from the company." Butler further informed Plaintiff that her employment was suspended pending completing of an investigation into the matter. Ex. L.

61. Plaintiff does not dispute that she was overpaid. Ex. B at 132:22 – 133:7.

62. Butler, Bolduc, Union President Ray Conroy, Union Steward Paul Cardin, and Plaintiff met on June 6, 2000 to discuss the matter. Ex. B. at 128:13-17. Thereafter, by letter dated June 8, 2000, Butler wrote to Plaintiff: "As a result of an investigation, an interview with you and review of available documents, the Company has decided that you knew or should have known that you were improperly receiving sick leave benefits in excess of those to which you were entitled under the Collective Bargaining agreement. Your actions in this matter are just cause to terminate your employment effective immediately." See Letter from Henry Butler to Carol Petrarca, June 8, 2000 (attached as Exhibit N) (emphasis in original).

63. By letter dated July 10, 2000, Crosby Benefit Systems informed Plaintiff that she was eligible to elect continuing health benefits under COBRA as of July 1, 2000, based on a qualifying event date of June 30, 2000. The monthly premium for continuation of Plaintiff's health and dental insurance benefits was $224.49. See Letter from Crosby Benefits Systems to Carol Petrarca, July 10, 2000 (attached as Exhibit EE).

V. Plaintiff's Grievance, Settlement Agreement, and Retirement

64. Plaintiff's Union filed a grievance on June 12, 2000, protesting the decision of the Gas Company and demanding Plaintiff's immediate reinstatement. See Grievance Report, June 12, 2000 (attached as Exhibit O); Ex. B at 137:7-15.

65. The Gas Company denied the grievance and, pursuant to the CBA, a date was set for arbitration on or about September 13, 2000. See Notice of Hearing, August 2, 2000 (attached as Exhibit P).

66. The Union hired Robert Savage, a duly licensed Rhode Island attorney, to represent Plaintiff with respect to her grievance arbitration. See Deposition of Robert Savage (attached as Exhibit Q) at 15:11-17, 15:23 – 16:2. Plaintiff spoke or met with Savage in August 2000 prior to the arbitration. Ex. B at 139:7-20. Plaintiff did not object to Savage representing her, and indeed had consulted him previously on another matter. Ex. B at 131:4-12.

67. Plaintiff and Savage met again on the date of the arbitration, September 13, 2000, at the Days Inn arbitration location. Ex. B at 143:24 – 144:5; Ex. Q at 25:5-6. Savage represented Plaintiff in the negotiation session prior to the scheduled arbitration. Ex. Q at 27:17 – 28:7.

68. At his deposition, Savage testified that "it was [Plaintiff's] decision whether to go to arbitration or not. It was our recommendation that she not go, but [Ray Conroy] was ready to go to arbitration if she wanted to. We were not preventing her. It was not a situation where the union said that we have done the research in this case and we have determined that you don't have a chance, so we decline to represent you in this

arbitration. If she wanted to go forward with the arbitration, the union was ready to go forward and give her the arbitration if she wanted it." Ex. Q at 32:5-20.

69. Savage also testified at his deposition that "[t]here was no disagreement that she did receive the TDI checks, that she did receive the checks and the full pay. I[t] was just whether it was intentional or not intentional. I thought it was a huge risk for her to go forward with the arbitration . . . ." Ex. Q at 35:6-12. When asked what Plaintiff had told Savage with respect to the possibility of returning the money, Savage testified, "I think she told me she did not have the money . . . . I thought we asked her if she could return the money and I thought she said she did not have the money to return." Ex. Q at 20:23 – 21:11.

70. When describing the advice he had given Plaintiff in connection with the negotiation/mediation session, Savage testified that he told Plaintiff that losing the arbitration "could have resulted in her not getting a pension. Included in the pension at that time was health care benefits. So it was a huge risk. I think . . . my recommendation was I don't think the risk is worth it. You have a good chance of losing the arbitration, and if you lose the arbitration . . . it could affect your pension and future medical benefits. I recommend that you take the settlement. She would be allowed to [retire] and get her pension and her health care benefits." Ex. Q at 33:5-18.

71. Plaintiff agreed to settle the grievance. Ex. Q at 37:5-9. She was reinstated on the condition that she tender her application for retirement. Ex. B at 140:10-19. The settlement allowed Plaintiff to retain her pension and related health benefits. Ex. Q at 36:20-24.

72. By letter dated September 13, 2000, Plaintiff tendered her retirement from the Gas Company effective September 30, 2000. Plaintiff acknowledged in her letter that her health care and dental benefits were reinstated retroactive to July 1, 2000. See Letter from Carol Petrarca to Brian Rhynard, September 13, 2000 (attached as Exhibit R).

73. At her deposition, Plaintiff testified that she retired on the advice of her attorney. Ex. B at 140-143. Savage testified that Plaintiff "agreed to" the negotiated retirement resolution, that he believed that Plaintiff understood the risks of going through an arbitration, and that he and Plaintiff discussed those risks. Ex. Q at 37:5-24.

74. Defendants withheld Plaintiff's accrued vacation and holiday pay of 184 hours at the time of her retirement. Defendants withheld that amount, $4303.00, in order to repay the $4383.00 overpayment of sick benefits Plaintiff had received earlier in the year. See E-mail from Bud Butler, Director of Labor Relations, September 14, 2000 (attached as Exhibit FF); Ex. MM, ¶ 4. It is undisputed that Plaintiff never paid the overpayment amount prior to that date.

75. On November 15, 2000, Plaintiff submitted an application for retirement benefits. See Application for Retirement Benefits (attached as Exhibit GG). That application was approved. She has received a monthly pension check in the amount of $429.00 since that time. Ex. B at 153:25 – 154:5.

76. Plaintiff also applied for Long Term Disability Benefits from UNUM Life Insurance pursuant to a group policy held by Providence Gas because she was disabled from working. Her application was approved. Her disability commenced on October 15, 1999, the date that she went out on medical leave as a result of a fall at home. See Letter

from UNUM Life Insurance to Carol Petrarca, November 2, 2000 (attached as Exhibit HH); supra, ¶ 50; Ex. B at 147:3 – 148:21.

77. Plaintiff also applied for Social Security Disability Insurance (SSDI) benefits because she was disabled from working, which application was approved. Plaintiff commenced receiving SSDI benefits effective April 1, 2000. See Letter from UNUM Provident to Carol Petrarca, March 17, 2004 (attached as Exhibit II); Ex. B at 148:22 – 150:14, 151:4 – 153:4 .

Respectfully submitted,
DEFENDANTS SOUTHERN UNION CO.
& NEW ENGLAND GAS CO.

By their attorneys,

NIXON PEABODY LLP

Neal J. McNamara (#4249)
Matthew J. Frankel (#7293)
One Citizens Plaza, Suite 500
Providence, RI 02903
Tel: (401) 454-1000
Fax: (401) 454-1030
nmcnamara@nixonpeabody.com
mfrankel@nixonpeabody.com

Dated: July 21, 2006

CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that I sent a true and accurate copy of the within Defendants' Local Rule 56(a) Statement of Undisputed Facts to the following persons this 21st day of July, 2006.

Via Regular Mail, Postage Prepaid

Noelle K. Clapham, Esq.
24 Salt Pond Road, Suite A8,
South Kingstown, RI 02879

Via Hand Delivery

Stephen M. Robinson, Esq.
Vicki J. Bejma, Esq.
Law Offices of Stephen M. Robinson
155 South Main Street
Providence, RI 02903

Paula K Sardan