**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **CAROL PETRARCA** | : | |
| | : | |
| **v.** | : | **C.A. No: 04-310(S)** |
| | : | |
| **SOUTHERN UNION COMPANY and NEWENGLAND GAS COMPANY** | : | |

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF HER OBJECTION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

## I. INTRODUCTION

This matter comes before this Honorable Court on the Defendants' Motion for Summary Judgment on Plaintiff's complaints that she had been subjected to disparate treatment, a hostile working environment, and, ultimately, retaliation for having objected to sexually harassing and discriminatory behaviors. Defendants primarily base their motion on the argument that Plaintiff's claims are largely time-barred, in that many of the actions that contributed to the hostile environment and disparate treatment took place prior to the limitations period. Furthermore, Defendants argue that Plaintiff's disparate treatment and retaliation claims cannot survive summary judgment, because Plaintiff did not suffer any adverse employment action. Defendants also allege that Plaintiff cannot establish a causal nexus between the adverse employment action and her complaints of discrimination.

Plaintiff, however, takes the position that the discriminatory treatment that she suffered over the course of her employment constituted a "continuing violation," and is therefore actionable in its entirety. *See* O'Rourke v. City of Providence, 235 F.3d 713 (1st Cir. 2001). Furthermore, Plaintiff did suffer an "adverse employment action," as that term is defined in both disparate treatment and retaliatory claims, in that she was terminated from her employment.

Finally, Plaintiff can produce sufficient evidence to show a causal nexus between the termination and her complaints of discrimination. For these reasons, Defendants' motion for summary judgment must fail, and Plaintiff should be allowed to take her claims to a jury.

## II. FACTS

The facts of this case were developed through discovery. The parties exchanged interrogatories and production of documents. Furthermore, a number of depositions were taken. The Defendants deposed the Plaintiff on or about April 19, 2006, and her former legal counsel on May 9, 2006. (Ex. 1 and 12.) The Plaintiffs, in turn, deposed D'Anna Soenghe, the Gas Company's Vice-President of Human Resources. The Plaintiffs also deposed Ms. Soenghe's predecessor, Royalynne Hourihan, who left the Gas Company in or about 2000. The Plaintiffs also deposed Alycia Goody, the Gas Company's former counsel, who left the Gas Company in or about 1999. (Ex. 55, 8:2-3.) The Plaintiffs also deposed Richard Kala and Maureen Morancey, currently employed in Defendants' Customer Service Department.[1] In addition, the parties refer to depositions of Edward Bolduc and Kenneth Schiano conducted in other gender discrimination cases brought against the Defendants.[2]

Plaintiff began her employment with the Gas Company on or about April 15, 1988, in the capacity of Spare Building Cleaner. (Def. Ex. A.) As Spare Building Cleaner, Plaintiff was expected to work part-time to fill in for other cleaners. However, as Plaintiff explained at her deposition, she filled in so frequently for others to the extent that she essentially worked full time, but received no seniority or benefits. (Ex. 1, 23:19-25.) On or about January 8, 1989, Plaintiff officially became a full-time employee of the Gas Company when she took the position of

---

[1] Defendants' counsel asserted that they represented not only Soenghe, but also Goody, and Hourihan, but also Kala and Morancey. (Ex. 4, 5:8; Ex. 54, 4:17-24; Ex. 60; Ex. 61.)

Building Cleaner. (Ex. 1, 24:5-15.) At all times during her employment by Defendants, Plaintiff's supervisor was Edward Bolduc. (Ex. 1, 24:20-24.) At all times during her employment, Plaintiff's primary assignment was at Defendants' Weybosset Street facility, although she occasionally filled in at the Dexter Street facility. (Ex. 1, 19:11-24.) Although Plaintiff initially worked evenings, and did not have much contact with Mr. Bolduc initially, Plaintiff began working days at various points from about 1991, when she took the Building Maintenance position. (Ex. 1, 19:25-20:2.)

From the beginning of her employment, Plaintiff experienced discriminatory behaviors from her supervisor and her co-workers. As Plaintiff testified, on several occasions during Plaintiff's employment, both before and after she ultimately proceeded to the Building Maintenance position in July, 1991, Edward Bolduc remarked to co-workers that if he had his way, there would be no women in his department. (Ex. 1, 26:5-27:8) Mr. Bolduc also remarked to co-workers that women were "troublemakers," and that he "couldn't wait for women to get out of the department," and that women were "more [trouble] than what they're worth." (Ex. 1, 29:1-8.) Plaintiff’s testimony regarding Bolduc’s remarks was corroborated by Kenneth Schiano, another maintenance employee. Mr. Schiano has testified that he had heard Edward Bolduc remark of female employees: "These girls are nothing but pains in the ass." (Ex. 2, 44:22-45:25.)

Mr. Bolduc’s resentment at being saddled with female employees was echoed and reinforced by other supervisory employees when Plaintiff attempted to obtain a higher-paying Building Maintenance position in or about 1991. At the time, Building Maintenance and Cleaners were separate departments. (Ex. 1, 20:9-15, 27:25-28:4.) Even more significantly, Mr. Bolduc testified himself that females were Cleaners, while Building Maintenance employees were male.

[2] Counsel for the Defendants similarly asserted that he represented Kenneth Schiano, and asserted privilege as to

(Ex. 52, 27:23-28:9.) Plaintiff did ultimately obtain this traditionally "male" position, but not until she had run a gamut of hostile and discriminatory treatment. Mr. Roy Heaton, another supervisory employee, indicated to Plaintiff that she was taking the position from a family man who had to support a family, and that maintenance was "not a place for a woman to be." (Ex. 1, 60:14-19.) Plaintiff was also required to undergo a so-called "fitness for duty" evaluation that tested her ability to lift 100 pounds or more.[3] (Ex. 3, 3.) However, as another Building Maintenance employee, Richard Kala, testified, he had not been required to lift 100 pounds on a regular basis when he worked in Building Maintenance, and that his regular duties in Building Maintenance were not physically strenuous. (Ex. 4, 18:3-14; 35:15-20.) Kala testified that the heaviest thing that he had to lift on that job was a box of copier paper. (Ex. 4, 82:8-15.)

Even though Plaintiff passed the physical examination (albeit "with reservations") Mr. Biber, one of the maintenance employees, along with Mr. Heaton, still attempted to dissuade Plaintiff from taking the position. They approached Plaintiff and indicated their belief that the test results showed she might injure herself. (Ex. 5.) In fact, it would appear that the test was administered with the expectation that Plaintiff would not pass, as Mr. Biber remarked: "I don't know how you passed that physical because I didn't even pass it."[4] (Ex. 1, 60:20-61:8)

Requiring a physical examination of Plaintiff itself was a deviation from typical procedures. Richard Kala testified that he did not recall having to take a physical examination when he transferred into Building Maintenance. Even when he first began working for the company and took a pre-employment physical, he did not have to demonstrate that he could lift

---

his conversations with Edward Bolduc. (Ex. 2, 5:12-20; Ex. 6, 5:16-18.)

[3] Plaintiff, during the course of her employment, was also known as Carol Wiberg.

[4] Defendants attempt to use Mr. Biber's remark as evidence that male employees were administered the same physical examination as Plaintiff. Defendants, however, read far too much in this remark. Even if Mr. Biber had

weights. (Ex. 4, 19:2-21.) Mr. Bolduc, through his deposition testimony, would corroborate Kala's testimony when he admitted that he knew of nobody who had had to take a physical examination to transfer into the maintenance department. (Ex. 6, 39:4-24.) Nevertheless, Mr. Bolduc developed his own "test" of Plaintiff's ability to serve in Building Maintenance -- by requiring her to meet him in the basement every night for a week to lift boxes. (Ex. 1, 61:11-62:2) It is certainly significant that in his deposition testimony, Bolduc would acknowledge that he could not recall that anybody had had to lift boxes in order to qualify for a maintenance position, and could not even think of a reason why that would be part of any test. (Ex. 6, 43:6-44:3.)

Mr. Bolduc's discriminatory animus continued even after Plaintiff received the Building Maintenance position. When Plaintiff first received the position, Mr. Bolduc openly commented that the job was for men. (Ex. 57, ¶ 4.) Between the time that Plaintiff received the position and 1992, when the Cleaning and Maintenance departments were merged, Mr. Bolduc and Mr. Heaton would make comments to the Plaintiff regarding her breast size, indicating that her breasts would get even bigger as a result of lifting boxes, or that her breasts would get in the way of her doing things. (Ex. 57, ¶ 2.) Furthermore, when Plaintiff received the maintenance position, she was to receive a 90-day probationary period, during which she was to be trained. (Ex. 1, 30:24-32:3.) Because Plaintiff did not receive this training, her 90-day probationary period was extended 30 days. (Ex. 7.) Although several employees were assigned to the Weybosset Street facility and would have been in the position to provide said training, Mr. Bolduc apparently failed to assign anybody to the task. (Ex. 1, 33:1-7.) Additionally, from the time that Plaintiff began the Building Maintenance job until about 1998, Mr. Bolduc would belittle the Plaintiff's mechanical

---

been administered that physical at one point or another, Defendants have not established that it was for the same

abilities at least twice a month in front of her male co-workers, asking if she knew what a wrench or a Phillips-head screwdriver were. (Ex. 57, ¶ 3.) Upon discovering that the Plaintiff could fulfill her tasks faster and more easily using a smaller vacuum cleaner, he took it from her. (Ex. 57, ¶ 16.)

Mr. Bolduc openly offered males in his department more favorable treatment than females. Mr. Bolduc consistently followed a pattern and practice of bypassing female employees when it was their turn for overtime, and giving it to a male employee. The established procedure required that the individual who had worked the lowest amount of overtime would receive the "first right of refusal" for available overtime. (Ex. 1, 89:11-12; Ex. 4, 22:2-12; Ex. 62, ¶ 9.) Pursuant to the collective bargaining agreement, lists of overtime were maintained. (Ex. 11, p. 12.) However, on numerous occasions, Plaintiff would learn that she had missed an overtime opportunity that instead went to a male employee. When confronted, Mr. Bolduc would indicate that he "didn't realize" that Plaintiff was low on the overtime sheet. (Ex. 1, 43:20-45:14; 86:25-87:2) Another female employee, Christine Stamp, similarly missed overtime opportunities in favor of a male employee under Mr. Bolduc's administration, with Mr. Bolduc making the same threadbare excuses. (Ex. 62, ¶ 8, 9, 10, 12.)

Plaintiff suffered this type of disparate treatment at least 10-20 times over the course of her employment, including two occasions in 1998, and once in 1994. (Ex. 57, ¶ 17; Ex. 58-59.). On the 1998 occasions, Edward Bolduc had called Gerald Porter, a male, for overtime instead of Plaintiff. (Ex. 1, 45:15-17.) Plaintiff was paid for the missed overtime on that occasion. Shortly thereafter, Edward Bolduc again bypassed Plaintiff in favor of Mr. Porter. On this occasion, Defendants refused to pay Plaintiff for the missed overtime. Mr. Bolduc instead offered her the

---

position as Plaintiff.

opportunity to come in and clean the cafeteria floor all by herself. Typically, the cafeteria floor was a two-person job. (Ex. 1, 44:5-20.) Also in lieu of missed overtime, Bolduc also offered Plaintiff the assignment of cleaning air conditioning vents on a Saturday, when she would be alone in the building. Bolduc would typically assign two men to the same task on the grounds that it was too dangerous to clean the vents alone. (Ex. 1, 105:7-106:8.)

On other occasions, Mr. Bolduc changed the overtime distribution rules outright. Roughly around New Year's Eve, 1998, Bolduc made a rule that the two most senior people would work overtime. (Ex. 1, 89:4-12.) The effect of this rule was to deprive a female of an overtime opportunity in favor of their male co-worker. (Ex. 1, 89:4-12, Ex. 62, ¶ 8-9.) Bolduc also permitted Mr. Porter to tell building security to call him if there was a problem in the building overnight. This had the effect of giving Mr. Porter the first opportunity at overtime, rather than the female next on the list. (Ex. 57, ¶ 18.)

Bolduc also subjected the females to a more stringent set of rules and harsher treatment than he did the other male employees. For example, in or about October, 1999, Mr. Bolduc ordered Plaintiff to study the Defendants' personnel policy, and told her there would be a test. (Ex. 1, 87:20-88:12; Ex. 57, ¶ 24.) Plaintiff later discovered that there was no required "test" on the contents of the policy manual. (Ex. 1, 88:1-12.) At his deposition on April 24, 2006, Kala testified that he had not been required to study the Defendants' personnel policy and be tested on it. (Ex. 4, 44:3-5.) Similarly, Mr. Bolduc would shout at the Plaintiff for parking in the garage before 5:00, but did not shout at male employees Joseph Ianiello and Gerald Porter for doing the same. (Ex. 1, 103:17-104:3.) For another example, Mr. Bolduc had ordered Plaintiff and Christine Stamp not to talk to second-shift employees when they arrived at 3:30, a half-hour before Plaintiff and Christine Stamp's shift ended. (Ex. 1, 91:22-92:16; Ex. 62, ¶ 5.) On or about

September 24, 1999, Bolduc entered a room where Mr. Porter was talking to the second-shift employees, as Plaintiff and Stamp had been forbidden to do, but said nothing to Porter. (Ex. 1, 91:22-92:16; Ex. 62, ¶ 5) For yet another example, during 1997 through the time that Plaintiff left, Mr. Bolduc required her to report to him directly when she was to be out sick. Plaintiff's male co-worker, on the other hand, was repeatedly permitted to relay his "call-ins" to Mr. Bolduc through other employees. (Ex. 57, ¶ 5.) Mr. Bolduc also shouted at female employees far more than he did male employees. (Ex. 1, 25:25-26:3.) Mr. Bolduc also consistently gave Plaintiff more difficult tasks than her male co-workers. (Ex. 57, ¶ 14, 16.) Mr. Bolduc also isolated himself from the female employees by meeting only with Mr. Porter, and having him give Plaintiff and her female co-workers instructions.[5] (Ex. 1, 84:20-85:16.)

Mr. Bolduc continually harangued the Plaintiff about the quantity and quality of her work to a far greater extent than her male counterparts. (Ex. 57, ¶ 6-12.) Mr. Bolduc would scrutinize Plaintiff's work areas on a daily basis, while never doing the same on Mr. Porter or Mr. Kala's. (Ex. 57, ¶ 8.) Mr. Bolduc would repeatedly ask Plaintiff what she was working on, or complain that she was taking too long to complete the task, or set an explicit time limit on completing the task. (Ex. 57, ¶ 6.) On at least a daily basis, Plaintiff would find Mr. Bolduc sneaking up behind her and demanding to know what she was doing. (Ex. 57, ¶ 7.) Plaintiff never witnessed this treatment of male employees. (Ex. 57, ¶ 8.)

While Mr. Bolduc closely scrutinized Plaintiff, Mr. Bolduc tolerated a great deal of slacking on the part of Plaintiff's male employees. Mr. Bolduc admitted to knowing that Billy Johnson and Kenneth Schiano, male employees who worked over at the Dexter Street facility,

[5] Mr. Bolduc's penchant for leaving female employees out of the loop took on a literally toxic turn in the case of Christine Stamp. In May, 2001, Mr. Bolduc informed Ms. Stamp's male co-worker, Tony Cesario, that he and Ms.

were leaving work early without permission. Mr. Bolduc also admitted that he took no immediate action against Mr. Johnson and Mr. Schiano, despite repeatedly finding them missing from the work site. (Ex. 6, 91:21-98:24.) Similarly, when Mr. Bolduc gave the Plaintiff and Joseph Ianiello a task to perform together, Mr. Ianiello would routinely disappear. Mr. Bolduc did nothing about this. (Ex. 1, 34:12-24.) Mr. Bolduc even ignored the visible intoxication of Plaintiff's male co-worker, Gerald Porter. (Ex. 57, ¶ 13; Ex. 62, ¶ 4.) Mr. Bolduc also permitted Mr. Porter to take cigarette breaks *ad lib*.[6] (Ex. 6, 174:18-177:16) While ignoring all this conduct on the part of the male employees, Mr. Bolduc not only subjected Plaintiff to greater scrutiny, but would even berate Plaintiff for having failed to do tasks that her male co-workers ought to have done.[7] (Ex. 57, ¶ 9-11.)

In addition to dishing out discriminatory treatment himself, Mr. Bolduc also tolerated sexually harassing behaviors by Plaintiff's co-workers. From the time that Plaintiff began working for Defendants as Spare Building Cleaner, Pasquale "Pat" Domenicone, a male co-worker, followed Plaintiff through the building showing her pictures of nude women and making sexual remarks. (Ex. 1, 38:24-39:4.) Domenicone engaged in unwanted sexual behaviors towards the Plaintiff as referenced above on an almost nightly basis. (Ex. 1, 42:16.) During the time that Plaintiff worked as a Spare Building Cleaner, Domenicone also indicated to Plaintiff that he could

---

Stamp had been assigned to the task of scraping lead paint, but did not see fit to similarly inform Ms. Stamp of the paint's contents. (Ex. 62, ¶ 15.)

[6] At his deposition, Mr. Bolduc claimed that there was no policy on when employees were permitted to go outside for cigarette breaks; it was discretionary with the supervisor. (Ex. 6, 176:21-177:3.) This claim is hardly consistent with his testimony given when the conversation turned to the Plaintiff and Ms. Stamp's break times. Then, he testified that employees had established breaks of ten minutes. (Ex. 6, 80:22-81:21.)

[7] Ms. Stamp similarly experienced an episode of being singled out for discipline that should have gone to her male co-worker. In or about May, 2001, Mr. Bolduc required her to leave her assignment at Dexter Street to clean up paint spills left by her male co-worker, Tony Cesario, at the Weybosset Street garage. Mr. Porter, who was already assigned to Weybosset Street, was not required to do so. Furthermore, Ms. Stamp, who did not even work in the area where the paint had been spilled, received a written warning for having spilled the paint. (Ex. 62, ¶ 15.)

get her a full-time position with Defendants if she would come and clean his house for a year. (Ex. 1, 40:11-15.)

Plaintiff reported Domenicone's unwanted sexual behaviors to Edward Bolduc on approximately four or five occasions. (Ex. 1, 42:10) Nevertheless, Bolduc conducted no investigation into the matter. (Ex. 1, 40:1-42:19.) Mr. Bolduc instead limited his actions to indicating that he would “reexplain” the sexual harassment policy to the staff. (Ex. 8.) Mr. Bolduc took this passive approach despite the fact that the Defendants’ policies specifically required that such complaints be investigated. (Ex. 9, p. 3.) Domenicone continued his unwanted sexual behaviors towards the Plaintiff until such time as he retired on or about January 31, 1991. (Ex. 1, 40:11-17; Def. Ex. JJ, p. 2.)

Mr. Bolduc also refused to remediate other offensive behaviors and conditions that Plaintiff encountered in her day-to-day work. On two occasions in or about 1994 or 1995, when Plaintiff was assigned to clean the men's room, men would enter and use the facilities, and fail to leave because a woman was present. (Ex. 1, 58:12-19; 59:16-17.) Plaintiff would remain in a stall on those occasions. (Ex. 1, 58:12-19.) Plaintiff complained about this situation to Mr. Bolduc, but was never told that anything was done. (Ex. 1, 58:12-19) At the time in 1994 or 1995 when Plaintiff was assigned to clean the men’s room, Gerald Porter was assigned to clean the ladies’ room. Plaintiff requested that she be permitted to switch assignments with Gerald Porter, so that she would be cleaning the ladies’ room and he would be cleaning the men’s room, and there would be no further problems with men using the men’s room while Plaintiff was cleaning it. Plaintiff was denied permission to switch assignments with Porter. (Ex. 1, 59:23-60:8.)

Plaintiff encountered other problems of a similar nature throughout her employment. Throughout her employment, the Weybosset Street facility's men's locker room had a calendar with naked women. The door to the men's locker room was left open quite often so that this calendar was visible. Men would exit the shower room with only their towels wrapped around them, and not shut the door. Plaintiff would also be required to clean the locker room while it was in use, so she was subjected to these behaviors on a daily basis. When Plaintiff occasionally filled in at Dexter Street, there were also calendars containing pictures of naked women, one in the gym and one in the garage. Plaintiff was required to work in both rooms. Furthermore, when Plaintiff was required to work in the maintenance department at Dexter Street, the men would use crude language and make remarks about her chest. Plaintiff complained to Mr. Bolduc about these conditions, but nothing was done. (Ex. 57, ¶ 21-22.)

Also, during the period of 1997-1999, Plaintiff would be assigned to the task of putting recycled paper in the dumpster. When she was assigned to this task with a male employee, the dumpster was left open. When she was assigned to this task with a female employee, the dumpster would be kept closed so that Plaintiff and her female co-worker had to throw the trash bags up. This was harder work, and would cause the women's shirts to ride up. Male employees would gather around the windows making remarks. The Plaintiff and her female co-worker were unable to open the dumpster themselves. Mr. Bolduc was responsible for telling the people who delivered the dumpster to leave it open, but repeatedly failed to follow through despite Plaintiff's complaints. (Ex. 57, ¶ 15.)

Mr. Bolduc's condonation of sexually harassing behaviors was also mirrored and reinforced by upper-level management. On or about March 6, 1994, Richard Kala began his maintenance position at the Defendants' Weybosset Street facility. (Ex. 1, 46:4-6, Def. Ex. C, p.

1.) Plaintiff was required to provide Kala with training for his maintenance position for three nights. (Ex. 1, 46:6.) On Kala's first night of training with Plaintiff, Kala began to make unwanted sexual advances towards the Plaintiff. (Ex. 1, 46:9-24.) On Kala's first night of training with Plaintiff, Kala asked Plaintiff if they could have an affair, and said that nobody would know about it. (Ex. 1, 46:9-24.) Plaintiff initially laughed off Kala's remarks. (Ex. 1, 46:9-24.) When Kala continued to press Plaintiff, she expressly indicated that she was not interested, and that she was seeing somebody. Plaintiff then left Kala with an area to work on by himself and then left the area to complete other tasks. (Ex. 1, 46:9-24.)

On the second evening on which Kala was to train with the Plaintiff, when Plaintiff arrived at work and went to the cafeteria to put her lunch in the refrigerator, Kala asked how she was doing. Plaintiff said to Kala that she was not talking to him. When Kala asked why, Plaintiff indicated that Kala had spoken to her inappropriately the night before, and that Kala owed her an apology. Kala apologized, and said that he would not speak to her that way again. (Ex. 1, 46:25:47:15.) Later that evening, after the conversation in the cafeteria, Kala resumed making unwanted advances to her again that night. Once again, Plaintiff dealt with Kala's unwanted advances by giving Kala jobs to do on his own while she went to work in another area of the building. (Ex. 1, 47:16.)

Plaintiff dealt with Kala largely by avoiding him as much as possible. (Ex. 1, 48:13-21.) However, on or about December 31, 1994, Plaintiff was scheduled to work at the Weybosset Street facility with Kala and Gerald Porter. (Ex. 1, 47:19-25.) Plaintiff, Kala, and Porter had agreed to bring in refreshments to work for the evening of December 31, 1994. (Ex. 1, 47:23.) When Plaintiff, Kala, and Porter were in the basement of the Weybosset Street facility, taking their refreshments, Plaintiff discovered that Porter had brought a cooler containing alcoholic

beverages. Plaintiff grew uncomfortable about being in the basement with two men and liquor, particularly considering what Kala had said to her in the past, so she went upstairs to the cafeteria. (Ex. 1, 49:1-5.) Kala followed Plaintiff to the cafeteria and once again asked if they could have an affair. Plaintiff indicated to Kala that she was seeing somebody, that Kala was married, and that she did not like that kind of talk. Kala then took out his wallet and began taking out one hundred dollar bills and throwing them on the table. He told Plaintiff that money was no object, and he would pay whatever she wanted. Plaintiff became upset and left the building. (Ex. 1, 49:5-24.)

In short, Plaintiff was solicited for prostitution by a co-employee, in an office building at night, on a holiday. This conduct was blatantly harassing, intimidating, and even criminal. Defendants appear to have been completely nonplussed, and once again failed to take appropriate remedial action. Plaintiff called Mr. Bolduc on the next Monday morning after December 31, 1994, and told him of the incident with Kala on New Year's Eve. She was so upset that she began crying during the telephone conversation. (Ex. 1, 50:3-6.) Bolduc told Plaintiff to report to his office when she came to work on that Monday after December 31, 1994. (Ex. 1, 50:7.) When Plaintiff reported to Bolduc, he took her to Henry Butler. (Ex. 1, 50:10) Plaintiff reported Kala's unwanted sexual advances behavior to Henry Butler. (Ex. 1, 50:12-13) Henry Butler took Plaintiff to Alicia Goody, Defendants' in-house counsel. (Ex. 1, 50:15.) Plaintiff informed Alicia Goody of Kala's behavior. (Ex. 1, 50:15-20) Alicia Goody told Plaintiff that there would be a note in Kala's file, and that she would talk to him and this would not happen again. (Ex. 1, 50:17.)

For all of Ms. Goody's assurances, there was no follow-through. Kala continued to harass Plaintiff after she had spoken to Alicia Goody. (Ex. 1, 52:9, 24.) Kala's conduct even became

threatening. Shortly after Plaintiff spoke to Alicia Goody, Kala approached Plaintiff and told her to drop the charges. When Plaintiff refused, Kala told her that if she did not drop the charges, she would be "sorry." Kala ordered Plaintiff to go to Alicia Goody and tell her that Plaintiff had been mistaken. Plaintiff once again told Kala that she would not drop the charges. (Ex. 1, 51:2-15.) On several occasions after Plaintiff told Kala that she would not drop the charges, Plaintiff found that her car had been vandalized, apparently while parked in the company garage. This vandalism included the loosening of various nuts and bolts, and could have caused a serious accident. (Ex. 1, 51:16-52:13.)

Plaintiff repeated her entreaties for assistance, but to no avail. Plaintiff went to Mr. Bolduc about Kala's continued harassment on a daily basis, but Mr. Bolduc did nothing, and the harassment continued. (Ex. 1, 52:7-13.) In fact, Mr. Bolduc would choose this time to tell Plaintiff that there were discipline notes in her file, and that if she received one more, she would be fired. Up until this time, Plaintiff had been made aware of no such notices. (Ex. 57, ¶ 19.) Plaintiff had also discovered that Kala had made unwanted advances to Maureen Morancey and Lynore Horne. (Ex. 1, 50:20-21.) Plaintiff approached Alicia Goody on a daily basis regarding Kala's behavior, and to see if Goody had spoken to Maureen Morancey or Lynore Horne. (Ex. 1, 52:14-17.) On each such occasion, Goody told Plaintiff that she was "busy" and she was going to take care of it. (Ex. 1, 52:16-17.) Plaintiff discussed Kala's behavior with Grant Keith, a Human Resources official. (Ex. 1, 52:19-24.) Grant Keith indicated to the Plaintiff that he would address the situation, but did nothing. In fact, when Plaintiff saw Mr. Keith the next day, he "totally ignored" Plaintiff. (Ex. 1, 52:22-23.) Plaintiff discussed Kala's behavior with Royalynne Hourihan. Royalynne Hourihan was Defendants' Vice-President of Human Resources. During the sexual harassment training session arranged by Hourihan, Plaintiff began to cry and left the

room. (Ex. 1, 117:12-20.) Royalynne Hourihan followed Plaintiff into the ladies room. Plaintiff told her of the troubles that she was having with Kala, and Hourihan promised that she would help. (Ex. 1, 118:11-20.)

Apparently, Hourihan took no action, because Kala still continued his remarks after Plaintiff spoke to Keith and Hourihan. (Ex. 1, 52:24.) Kala also continued to intimidate the Plaintiff. On one occasion, when Plaintiff was alone in the basement of the Weybosset Street building, talking to her son-in-law on the phone, Kala kept calling out to her. (Ex. 1, 52:25-53:12:.) On another occasion, Kala put his hand on Plaintiff's shoulder and asked him how she was feeling. (Ex. 1, 53:13-19.) On other occasions, Kala followed Plaintiff around the building. (Ex. 1, 54:25-55:1.) Kala even engaged in workplace sabotage, filling the dumpster but not running it, so that trash would fall out when Plaintiff opened it. (Ex. 1, 55:1-4.)

Kala’s conduct took a serious toll on Plaintiff’s well-being. Plaintiff began to see a psychiatrist, John Ruggiano, due to Kala's behavior. (Ex. 1, 56:26, 119:21-120:22.) For a period extending from on or about June 19, 1995 through January, 1996, under the direction of Dr. Ruggiano, Plaintiff went on sick leave due to anxiety caused by Kala's conduct. (Ex. 1, 55:5-7; Ex. 10.) This fact appeared to have not encouraged Defendants to act. On one occasion, Defendants’ employee told Dr. Ruggiano’s office that Kala had been transferred to Allens Avenue and that Plaintiff could therefore return to work, but Plaintiff later discovered that Kala was still at Weybosset Street. (Ex. 1, 56:6:9.) Although Kala eventually did transfer to Dexter Street, Plaintiff would encounter Kala when she filled in there. Kala would come into the kitchen to see Plaintiff and ask how she was doing or what was going on. (Ex. 1, 64:19-25.) Kala had no work-related reason to be in the kitchen on the occasions. (Ex. 1, 64:20-21.) Plaintiff complained of these episodes to Mr. Bolduc, but, again, no action was taken. (Ex. 57, ¶ 20.)

It is significant that the Defendants themselves have given highly incoherent and inconsistent accounts of their actions in this matter. In their First Supplemental Answers to Interrogatories, filed on or about November 3, 2005, Defendants give the following account:

> Carol Petrarca made an internal complaint regarding Richard Kala in 1995. That complaint was investigated by Bud Butler and, as a result, Kala was transferred on January 2, 1996 from Facilities Maintenance to Fleet Services, and his hourly pay rate was reduced from $19.79 to $18.31. . . . (Ex. 13.)

Later, in their Second Supplemental Answers to Interrogatories, filed on or about May 19, 1996, Defendants gave another account:

> Petrarca also complained to Bud Butler about harassment by Kala. Petrarca alleged that Kala propositioned her. Although Kala denied the allegation, Butler found Petrarca to be credible, and thus transferred Kala from Facilities Maintenance to Fleet Services, with a reduction in his hourly pay rate. Kala was demoted to laborer after he was found to have made inappropriate comments to a customer, and subsequently received a Last Chance Agreement based on the Petrarca and customer complaints. (Ex. 51.)

On or about May 24, 2006, Plaintiffs deposed Mr. Kala, who denied ever having harassed the Plaintiff or Ms. Morancey, or having any conflicts with Plaintiff except for a dispute about who ought to be able to collect soda cans discarded by other employees and obtain the deposits. (Ex. 4, 39:1-23; 52:16-24.) Mr. Kala also testified that Ms. Goody told him after a meeting that Mr. Kala “should not worry too much” about Ms. Petrarca’s allegation. (Ex. 4, 57:8-15.) On the other hand, during her deposition, taken directly after Kala’s deposition on the same day, Ms. Morancey indicated that Kala had made harassing remarks to her. (Ex. 54, 9:18-10:19.) Also, Kala also denied having received a transfer as the result of having harassed Petrarca, or having been forced to bid out. (Ex. 4, 62:8-9.) Kala testified that he had disliked the maintenance position. (Ex. 4, 17:17-24.)

Two days later, on May 26, 2006, the Defendants filed their Third Supplemental Answers to Interrogatories, which gave yet another edition of what had taken place:

> In or about 1995, Petrarca complained to Alycia Goody and Bud Butler regarding harassment by Richard Kala. Goody and Butler conducted an investigation into the complaint. Although Kala denied the allegation, it was determined that Kala should be separated from Petrarca. *Upon information and belief, Kala had already signed a posting to be transferred to the position of Garage Helper at Dexter Street, a different facility from the one where Petrarca worked.* Kala signed the posting on September 28, 1995. Upon further information and belief, Kala was the only employee to sign the posting. Kala had indeed signed a number of job postings during his tenure in Facilities Maintenance. Kala had joined Facilities Maintenance on March 6, 1994. He left Facilities Maintenance on January 2, 1996. Kala's transfer separated Kala from Petrarca. Kala's final rate of pay in Facilities Maintenance was $19.79 per hour, and his initial rate of pay as a Garage Helper was $18.31 per hour. He did not achieve a rate of pay in excess of his final rate at Facilities Maintenance until January 1997. (Exhibit 56.) (Emphasis added.)

In the progression from one interrogatory answer to another, the Defendants changed their stories as to whether they had ever made a determination as to Petrarca's credibility. They also retreated from their story as to whether Kala had received a disciplinary transfer, or went to the Garage Helper position voluntarily. For that matter, they even change their story as to whether Kala ultimately suffered financial loss, as the transfer to the Garage Helper position made him eligible for a higher rate of pay. This change came after Kala testified that the chance to attain a higher rate of pay had been a motivating factor for his applying for the Garage Helper position. (Ex. 4, 27:7-15.)

The final incident of sexually harassing behavior and discriminatory treatment, the one which culminated in Plaintiff's termination, took place on or about August 20, 1999, with the so-called "locker room" incident. On or about August 20, 1999, at approximately 2:30-2:45 p.m., Bolduc entered the women's locker room, located in the basement of Weybosset Street without knocking, while Christine Stamp and Plaintiff were in said room. (Ex. 1, 68:24:69:4.) Mr.

Bolduc flung the door open and began shouting at Christine Stamp and Plaintiff for not painting. (Ex. 1, 72:12-18.) Plaintiff was in the basement room on break, because she had worked through it earlier. (Ex. 1, 69:20-21.) When Plaintiff attempted to inform Bolduc that she had worked through her break and was taking it at the time Bolduc entered the basement room, and in any case had not even been assigned to painting, Bolduc insisted that she had exceeded her break. (Ex. 1, 71:19-22; 72:9-12.) Mr. Bolduc persisted in this position even though he would testify at his deposition that it was a common and accepted practice for employees to work through a scheduled break in order to complete a task, and take the break once they had finished. (Ex. 6, 83:4-15.) Mr. Bolduc remained in the women's locker room for five to ten minutes, and continued his tirade. (Ex. 1, 72:4-6.)

There is no question that Mr. Bolduc knowingly entered the women's locker room, and knowingly entered it when Plaintiff and Christine Stamp were present. Prior to August 20, 1999, Bolduc had always knocked before entering said locker room. (Ex. 1, 75:23-76:1.) In his deposition testimony, Mr. Bolduc himself referred to the room in question as a women's locker room, and that acknowledged he knew it was being used to change clothes. (Ex. 6, 111:4-112:8.) Mr. Bolduc also authored several written statements wherein he acknowledged that the room in question was a women's locker room. (Ex. 14; Ex. 15; Ex. 16.) Furthermore, during the exchange in the locker room itself, Bolduc said that he had heard Plaintiff and Christine Stamp laughing and talking in that room, and therefore knew that it was occupied. (Ex. 1, 72:13-14.)

It is also beyond cavil that Mr. Bolduc had no legitimate reason for bursting into the women's locker room. Defendants attempt to characterize the incident wherein a supervisor was justifiably piqued at goldbricking employees. This characterization is not borne out by Mr. Bolduc's testimony, wherein he admitted that it was an entirely common and acceptable practice

for employees to be on break at that particular hour, especially if they worked through their break to complete a task. (Ex. 6, 83:4-15.) In any case, knocking is always a far more acceptable alternative to intruding on a dressing and changing room utilized by persons of the opposite sex in the workplace.

Plaintiff and Christine Stamp promptly reported the locker room incident August 20, 1999 to officials of their union. Ray Conroy, a union official, told Plaintiff and Christine Stamp that the best that could be done in response to their complaints about the August 20, 1999 incident was a note in Bolduc's file. (Ex. 1, 76:8-19.) Plaintiff and Christine Stamp felt that a note in Bolduc's file was not a sufficient response to the August 20, 1999 incident, and that an apology was in order. (Ex. 1, 76:18-19.) By August 31, 1999, neither Plaintiff nor Stamp had been informed of any action by Human Resources, and therefore wrote to Royalynne Hourihan. (Ex. 17.) Not only did the letter address Mr. Bolduc's barging into the women's locker room, but also raised the issue of Bolduc's harassing and discriminatory treatment on other occasions.

Defendants, chiefly through Mr. Butler, appear to have gone to great pains to avoid dealing with the matter. The August 31, 1999 letter did produce a response from Mr. Butler on September 1, 2000. (Ex. 18.) However, for whatever reason, Mr. Butler chose to delay an investigation in this matter until one Union representative, Mr. Devlin, had returned from vacation. Mr. Butler offered no explanation as to why Mr. Conroy or other union officials could not deal with this matter. By September 21, 2000, no investigation had yet been performed. Mr. Butler wrote that he was waiting for Ms. Stamp to return to work from sick leave. (Ex. 19.) However, on September 19, 2000, Ms. Stamp had offered to come in from sick leave to be interviewed. (Ex. 62, ¶ 6.) Mr. Butler later attempted to question Plaintiff about the incident in front of Mr. Bolduc, with no Union representative present. (Ex. 57, ¶ 23.)

Finally, Plaintiff and Ms. Stamp filed a formal grievance through their Union. (Ex. 20.) Defendants give an entirely incorrect account of the results of this grievance. No apology was ever given by the Defendants. (Ex. 1, 77:3; Ex. 62, ¶ 7.) Instead, Mr. Butler appears to have completely whitewashed Mr. Bolduc's behavior. As we mentioned, Mr. Bolduc authored several statements indicating that he had knowingly entered the women's locker room, and heard Plaintiff and Ms. Stamp inside. (Ex. 14, 15, and 16.) Despite Bolduc's manifestly inappropriate behavior, Butler took the position that no apology was in order. (Ex. 21.) Later, Defendants even denied that the room was a locker room at all. (Ex. 22; Ex. 23, p. 2.) Most tellingly, Mr. Butler's own notes indicate that he had been told that a Human Rights Commission complaint was in the offing. (Ex. 53.)

In the meantime, on about October 15, 1999 Petrarca herself had taken a sick leave. Under the terms of the collective bargaining agreement governing her employment, Plaintiff was entitled to "sick leave benefits" consisting of her regular salary, minus any TDI benefits, for a period of 130 scheduled work days. (Ex. 11, 32-33.) As the Defendants' Responses to Interrogatories indicate, the Defendants' practice had been to automatically deduct the maximum amount for TDI benefits from employee's sick leave benefits upon receipt of an employment verification report. (Ex. 24, 7-8.) In or about November 20, 1999, Plaintiff received the maximum amount permitted on her TDI claim. She notified Defendants of this, and they began to give her the "sick leave benefit" pursuant to the collective bargaining agreement. (Ex. 25.) In or about January, 2000, Plaintiff began a new benefit year for the purposes of TDI, and therefore became eligible for TDI benefits once more. (Ex. 26.) Defendants, however, strangely deviated from their procedures regarding payment. On or about February 10, 2000, Defendants, through their employee, Lorraine Cipriano, received an Employment Verification Report dated February

10, 2000 from the Rhode Island Department of Labor and Training Temporary Disability Insurance Division. This was filled out and submitted to TDI. (Ex. 26.) According to Defendants' own Interrogatory answers, the automatic deductions from Plaintiff's "sick leave benefit" should have begun immediately.

However, several days before Defendants responded to Plaintiff's complaint before the Human Rights Commission, Butler wrote to Plaintiff. Mr. Butler indicated that Plaintiff had been receiving her gross pay since her TDI had expired on November 20, 1999, and that Human Resources had been notified by TDI that on February 10, 2000, Plaintiff had filed a new claim due to a new benefit year. This letter requests documentation regarding the status of Plaintiff's re-application for TDI. (Ex. 28, 29, 30.) When Plaintiff received that letter, she called Butler and left him a message. Butler did not return Plaintiff's phone call. (Ex. 1, 123:20-124:3.)

Mr. Butler instead wrote to Plaintiff again on or about April 13, 2000. This letter also asked for the status of her re-application. (Ex. 31.) When Plaintiff received that, she called Butler's office again and left another message on his extension for him to call her. (Ex. 1, 124:13-19.) Plaintiff also called Human Resources and indicated that she was trying to get in touch with Butler, but they gave her his extension again. (Ex. 1, 125:5-10.) Plaintiff also called her union for advice. (Ex. 1, 125:12-24.)

Instead of returning the call, Mr. Butler once again wrote to Plaintiff on or about April 24, 2000, requesting that Plaintiff notify him of the status of her re-application for TDI benefits. (Ex. 32.) When Plaintiff received this letter, she called Edward Bolduc and told him she had been trying to get in touch with Butler. (Ex. 1, 127:3-9.) Plaintiff, Edward Bolduc, and Butler then engaged in a three-way conference call. (Ex. 1, 127:5-21.) Plaintiff was then informed that she

had violated company policy by having simultaneously received sick leave benefits at the same time as she was receiving TDI. (Ex. 1, 127:24.)

Mr. Butler then moved for Plaintiff's termination. On or about May 17, 2000, Mr. Butler sent Ms. Petrarca yet another letter. Said letter accused her of having willfully intentionally failed to notify the Gas Company that her TDI claim had been approved, and placed Plaintiff on suspension. (Ex. 33.) Plaintiff then consulted an attorney to attempt to resolve matters. As Mr. Butler's notes indicate, on or about May 23, 2000, Plaintiff's attorney, Mr. Van Deusen, contacted Mr. Butler, indicating that Plaintiff was willing to make restitution. Mr. Butler indicated that the only thing that would resolve the situation was Plaintiff's resignation. (Ex. 34.)

Another week later, Mr. Butler followed through on Plaintiff's termination. On or about June 6, 2000, Mr. Butler met with the Plaintiff, Mr. Bolduc, Ms. Hourihan, and union officials. At that meeting, Plaintiff once again stressed that she had tried to contact Mr. Butler from the beginning, and offered to make restitution. Plaintiff also indicated that she had not immediately known that she was being overpaid because she did not review the direct deposit payroll statement, balance her checkbook or reconcile her bank statement, but kept the numbers in her head, and had in any case believed that TDI automatically notified the Company when employees were given benefits. (Ex. 1, 132:22-133; Ex. 35.) Plaintiff had a fund available through her employment by which to make immediate restitution, in the form of accumulated vacation and holiday time. (Ex. 36.) Nevertheless, by letter dated June 8, 2000, Mr. Butler terminated the Plaintiff. (Ex. 37.)

Plaintiff, through her union, filed a grievance regarding her termination. (Ex. 38.) The grievance proceeded to arbitration. On the date of said arbitration, before said arbitration, Plaintiff retired on the advice of her attorney, Robert Savage, who indicated that Defendants were

refusing to reinstate her unless she retired. (Ex. 1, 141:13-142:17.) Plaintiff's health care coverage had been taken away from her. (Ex. 1, 142:9-11.) Her retirement package would offer those benefits. (Ex. 39.) Her eligibility for long-term disability benefits had also been lost as the result of her termination. (Ex. 46b, 67:21-68:3.) Her pension itself was in jeopardy. (Ex. 12, 33:1-18.) Believing that retirement was her only way to be reinstated and get her health insurance, Plaintiff accepted the retirement. (Ex. 1, 141:13-17; 144:11-14.)

Plaintiff will add additional facts as necessary to develop her arguments.

## III. LEGAL ARGUMENT

Defendants face a formidable burden in obtaining summary judgment. Defendants must demonstrate that ". . . the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The reviewing court does not make factual determinations itself, or decide which edition of the facts to accept; it merely determines whether ". . . a fair-minded jury could return a verdict for the plaintiff on the case presented." ***See*** Lipsett v. University of Puerto Rico, 864 F.2d 881, 895 (1st Cir. 1988). The record is reviewed in the light most favorable to the non-moving party. ***See*** Rossy v. Roche Products, Inc., 880 F.2d 621, 623 (1st Cir. 1989). All factual inferences must be drawn in favor of the non-moving party. ***See*** Rossy at 623. Defendants' burden is particularly onerous in discrimination cases such as this. The First Circuit has counseled caution and restraint when deciding a summary judgment motion in a discrimination action because motion and intent play such a prominent role. ***See*** Oliver v. Digital Equipment Corp., 846 F.2d 103, 109 (1st Cir. 1988). Such questions of motive and intent are considered the realm of the jury. ***See*** Rossy, at 624.

When one examines the evidence in its totality – including that substantial amount of evidence that the Defendants omitted from their discussion – it is clear that Defendants cannot obtain summary judgment. The facts adduced, and the inferences that can be drawn therefrom, demonstrate a reasonable jury could conclude that Plaintiff had been subjected to a hostile working environment, disparate treatment from her male co-workers, and, finally, a retaliatory discharge when she banded together with another female co-worker and simply refused to accept these conditions any longer.

**A. DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S CLAIM OF HOSTILE ENVIRONMENT.**

The Defendants attack Plaintiff's hostile environment claims largely by invoking statutes of limitations on Title VII claims, and also by minimizing the impact of the conduct of Defendants' supervisory personnel. Both lines of attack are ineffective. As to the statute of limitations issue, it is true that in general, a plaintiff employee's recovery pursuant to Title VII is limited to the 300-day period. However, recovery may be had for incidents arising prior to the 300-day filing period under the "continuing violation" theory. *See* Provencher v. CVS Pharmacy, 145 F.3d 5, 14 (1st 1998). Under the "continuing violation" theory, if one component act of the hostile work environment falls within the statutory time period, the entire time period of the hostile environment may be considered by a court for the purposes of liability. *See* National Railroad Passenger Corp. v. Morgan, 536 U.S. 101, 118 122 S.Ct. 2061, 2064 (2002). A "continuing violation" may either be serial or systemic in nature. *See id.* A systemic violation is one which ". . . has its roots in a discriminatory policy or practice; so long as the policy or practice continues into the limitations period, a challenger may be deemed to have filed a timely complaint." *See id.*, *citing* Sabree v. United Bhd. Of Carpenters and Joiners Local No. 33, 921

F.2d 396, 400, n.7. A "serial violation" arises where there have been a number of discriminatory actions arising from the same discriminatory animus. The acts constituting a "serial violation" must have a substantial relationship to one another, that is, they must be sufficiently similar to one another. The acts must not be isolated and discrete, but must occur with frequency or repetitively or continuously.[8] *See* O'Rourke, 235 F.3d at 731. In this case, not only were the acts throughout the Plaintiff's employment related to one another, but also were of sufficient severity to create a hostile working environment.

In this instant case, there is ample evidence to demonstrate a policy or practice of discriminatory treatment of women in general by Mr. Bolduc, with condonation and reinforcement by Defendants' supervisory personnel, including Mr. Butler. Mr. Bolduc clearly was responsible for creating an atmosphere charged with gender-based animus from the beginning of Plaintiff's employment. Mr. Bolduc expressed this animus not only through his verbal remarks, but also his active participation in the campaign to discourage Plaintiff from obtaining the building maintenance position, and his later failure to provide training. (Ex. 1, 30:24-32:3, 33:1-7, 61:11-62:2; Ex. 7; Ex. 57, ¶ 2, 3.)

There is also more than ample evidence to support the conclusion that Mr. Bolduc also consistently subjected Plaintiff and her female co-workers to more arduous rules, supervision, and discipline than their male co-workers. The *O'Rourke* Court clearly identified this type of behavior as that which can contribute to a hostile environment. *Id*. at 729, n.4. Mr. Bolduc himself admitted that male employees left work early on repeated occasions without immediate censure, and took cigarette breaks whenever they liked. (Ex. 6, 91:21-98:24, 174:18-177:16) Mr. Bolduc

[8] We note here that the test of sufficiency of a serial continuing violation claim formerly included an inquiry into whether the acts were "of sufficient permanence that they should trigger an awareness of the need to assert one's

also tolerated shirking and insubordination on the part of Joseph Ianiello, when Mr. Ianiello would fail to report to work assignments that he was to perform with Plaintiff. (Ex. 1, 34:12-24.) Mr. Bolduc ordered Plaintiff and Ms. Stamp not to talk to the incoming second-shift workers, while saying nothing to Mr. Porter for doing the same thing. (Ex. 1, 91:22-92:16). Mr. Bolduc did not even intervene when male employees arrived at work obviously drunk. (Ex. 57, ¶ 13.) However, where Plaintiff was concerned, Mr. Bolduc would subject Plaintiff to arbitrary time limits on her work, inspections of her work areas, even going to the extent of repeatedly sneaking up behind her in an empty office building. This disparity in treatment existed for the Plaintiff on a ***daily*** basis. (Ex. 57, ¶ 6-8.) Worse, he would even reprimand her for not having completed tasks that had been assigned to her male counterparts. (Ex. 57, ¶ 10-12.)

Mr. Bolduc's discriminatory animus also showed itself in through other forms of differential treatment. Mr. Bolduc shouted at female employees far more than he did male employees. (Ex. 1, 84:20-85:16.) Mr. Bolduc gave Plaintiff more difficult tasks than her male co-workers on a routine basis. (Ex. 57, ¶ 14, 16.) Mr. Bolduc reprimanded Plaintiff for having parked in the company garage before 5:00 p.m., while ignoring male employees who did so. (Ex. 1, 103:17-104:3.) Mr. Bolduc also singled out Plaintiff for the "fool's errand" of memorizing the company personnel policy handbook for a test. (Ex. 1, 87:20-88:12.) Additionally, Mr. Bolduc also isolated himself from the female employees by meeting only with Mr. Porter, and having him give Plaintiff and her female co-workers instructions. (Ex. 1, 84:20-85:16.)

Furthermore, Mr. Bolduc also had an established practice of finding excuses to bypass female employees for overtime in favor of the male employees. Defendants attempt to carve these incidents out as "discrete episodes" of discriminatory conduct that must have been acted upon

---

rights." ***See*** O'Rourke, at 731. In the recent case of ***Morgan***, the U.S. Supreme Court specifically jettisoned this

within the 300-day period. This distinction is not supported by the law of this Circuit. A pattern of such discrete acts of discriminatory treatment, added together, can serve to create a hostile working environment. *See* Che v. Mass. Bay Trans. Authority, 342 F.3d 31, 40-41 (1st Cir. 2003) (finding that plaintiff's repeated receipts of undeserved or excessive discipline and/or scoldings were sufficient evidence for a reasonable jury to find that employee was subjected to a hostile work environment). Accordingly, this practice must also be considered as part of the pattern of behavior creating a hostile environment.

Mr. Bolduc's consistent undervaluing and discriminatory treatment of female employees could only serve as a message to his male supervisees that these sorts of behaviors would be tolerated. For that matter, there is substantial evidence demonstrating that he condoned the sexually harassing treatment of the Plaintiff. Mr. Bolduc failed to take any action against either Domenicone or Kala, despite Plaintiff's repeated complaints. As a result, these behaviors continued. (Ex. 1, 42:10, 52:7-13, Ex. 8.) In fact, when Plaintiff complained about Kala, Bolduc even appears to have decided to take this opportunity to tell the Plaintiff her job was in jeopardy due to repeated disciplines – which she herself had never seen or been made aware of. (Ex. 57, ¶ 19.). Mr. Bolduc also failed to respond to Plaintiff's complaints that male employees would use the bathroom facilities while she was attempting to clean them. (Ex. 1, 58:12-19, 59:23-60:8.) Similarly, Mr. Bolduc failed to remediate the conditions around the men's locker room at Weybosset – which Plaintiff was required to clean -- and at the Dexter facility. (Ex. 57, ¶ 21-22.) Mr. Bolduc even set up the Plaintiff for potential harassment by failing to ensure that the dumpster was kept open when she and her female co-workers had to put items in it. (Ex. 57, ¶

---

test. *Id.* at 117-118.

22.) In short, Mr. Bolduc, through his inaction, gave his male supervisees virtual permission to treat female employees in an abusive fashion.

Mr. Bolduc's tolerance of sexually harassing and discriminatory behavior was in turn reinforced by his superiors. With respect to the Kala matter, Plaintiff repeatedly approached various company officials. Again, no action was taken against Kala, even though his behavior towards the Plaintiff had become openly threatening. The Defendants' employees simply waited until such time as Kala himself elected to leave the Maintenance Department.

With the locker room incident, Mr. Bolduc not only continued his pattern of subjecting female employees to closer supervision, but himself engaged in sexually charged types of harassing behaviors. In this respect, he would be once again reinforced by upper management officials, especially Mr. Butler.[9] When the matter first arose, Plaintiff and Ms. Stamp promptly reported the incident to union officials, who relayed this information to Mr. Butler. Plaintiff and Ms. Stamp also turned to Royalynne Hourihan, Vice-President of the Human Resources Department. Nevertheless, Mr. Butler unreasonably delayed investigation of the complaint, and attempted to intimidate the Plaintiff. His explanations for having done so have little or no credence. First, he tried to excuse the neglect on the grounds that the Union representative was away. Later, he called Plaintiff to a meeting with himself – and Mr. Bolduc – and attempting to interrogate the Plaintiff regarding the matter – with *no* Union representative present. (Ex. 57, ¶ 23.) Plaintiff was plainly intimidated by this unreasonable style of questioning, and reasonably refused to discuss the matter. Ms. Stamp, who was on sick leave, offered to come in for the purposes of holding this discussion. (Ex. 62, ¶ 6). Mr. Butler, however, completely ignored this

reasonable accommodation, and then seized upon Ms. Stamp's absence as yet another reason for delay. (Ex. 19.)

In any case, it appears that Mr. Butler's need to investigate was simply another form of delay. Simply put, there was nothing that Ms. Stamp or Ms. Petrarca could have added to the investigation. There was more than ample information to show that Mr. Bolduc knowingly entered the women's locker room without any justification. Mr. Bolduc admitted to knowing that the room was a locker room when he entered it. (Ex. 14, 15, and 16.) That admission alone should have ended the inquiry. Even with this evidence, Mr. Butler took the position that no wrong had been committed by Mr. Bolduc. Furthermore, contrary to Defendants' claims, there was *never* an apology to either Plaintiff or Ms. Stamp.[10] (Ex. 1, 83:21-23; Ex. 62, ¶ 7.) Mr. Butler specifically indicated there would never be an apology. (Ex. 21.) Later, Mr. Butler apparently was actively involved in a cover-up of the situation, even going to the point of making false statements about the existence of a locker room to the Human Rights Commission. (Ex. 22; Ex. 23, p. 2.). Mr. Butler provided further reinforcement for Bolduc's behavior when it became apparent that Plaintiff was going to press a discrimination claim involving not only the locker room incident, but Bolduc's other behaviors. As we will explain in greater detail, Mr. Butler contrived an excuse for a retaliatory firing.

Predictably, Defendants attempt to minimize the ultimate effects of this course of conduct by Defendants' supervisory employees. Defendants misstate the law and facts when they claim

[10] Defendants claim that Plaintiff testified otherwise at her deposition, claiming that she admitted to receiving a memorandum from Mr. Bolduc. Defendants, however, read entirely too much into her response. Plaintiff emphatically qualified her response by indicating that she did not recall receiving Mr. Bolduc's December 13, 1999 memorandum, and explaining that she had seen a number of documents regarding this case over the years. (Ex. 1, 82:9-19.) In any case, Plaintiff had been absent from the workplace since October, and therefore could not have received a December 13 memorandum from Mr. Bolduc. Plaintiff also unequivocally testified that she did not

that Mr. Bolduc's behavior can only be construed as non-actionable rudeness. It is by now well-established that behavior that is not overtly based upon gender can be considered alongside behavior that is overtly based upon gender when evaluating a Title VII "hostile environment" claim. ***See*** O'Rourke, 235 F.3d at 729. Mr. Bolduc's behavior plainly encompassed that which was overtly and non-overtly based upon Plaintiff's gender. Mr. Bolduc's verbal remarks made no secret of his feelings towards women in his workplace. Mr. Bolduc reinforced that hostility on numerous occasions over the years, through his pattern of preferential treatment of male employees. The cumulative effect of this treatment goes far beyond mere rudeness; it can only be understood as harsh and punishing, and based solely upon Plaintiff's gender. Virtually every single day, Mr. Bolduc consistently gave the Plaintiff and her female co-workers the message that they were less capable of performing their jobs as their male co-workers, that their labor and contributions to the Gas Company simply were not as valuable as those of their male co-workers, that they somehow deserved less favorable terms and conditions of employment, and that they even needed to put up with unwanted advances in exchange for the privilege of working for the Gas Company's maintenance department.[11] This behavior goes far beyond "mere rudeness."

Defendants also try to excuse Mr. Bolduc's behavior by claiming that Mr. Bolduc had a non-discriminatory reason for his behaviors. Defendants try to minimize the impact of Mr. Bolduc's pattern of meeting only with Mr. Porter, and giving him instructions to relay orders to the Plaintiff and her female co-workers. This behavior, however, can only be construed as Mr.

---

recall receiving the draft correspondence from Mr. Bolduc, or ever even seeing it at the office of her former counsel.

[11] Curiously, Defendants cite to Manning v. Metropolitan Life Ins. Co., 127 F.3d 686, 693 (8th Cir. 1997) in their bid to minimize the impact of the multiple acts of gender-based hostility suffered by the Plaintiff. That case did not make any holding as to whether a hostile environment existed; that case dealt only with the tort of outrage, and Title VII retaliation. In any case, even ***Manning***'s holding regarding retaliation has been overturned by the more recent case of Burlington Northern & Santa Fe Railway v. White, 126 S.Ct. 2405 (2006).

Bolduc's setting Mr. Porter up as a kind of a "leadman" over Plaintiff and her female co-workers, when they were supposed to be of coequal positions. Defendants also try to excuse Mr. Bolduc's behavior by claiming that Bolduc felt that Mr. Porter was a better worker. Given Mr. Porter's work history, there is sufficient evidence to create a reasonable dispute of fact as to whether Mr. Bolduc's statements are worthy of credence. Porter engaged in alcohol abuse that affected his ability to carry out his duties, in that he was frequently absent without authorization. (Ex. 43 and 44.) On numerous occasions, when he did report to work, Mr. Butler would be obviously intoxicated, but Mr. Bolduc would ignore it. (Ex. 57, ¶ 13; Ex. 62, ¶ 4.) Even after having entered into an agreement with the Company to get treatment, Porter would be discovered intoxicated on premises during non-work hours. (Ex. 45; Ex. 57, ¶ 13; Ex. 62, ¶ 4.) In any case, Mr. Bolduc's preferential treatment did not extend only to Mr. Porter; it also extended to all of the other males in the maintenance department. Under these circumstances, there is a triable issue of fact as to whether Mr. Bolduc's favoritism was or was not based on gender.

Defendants also appear to try to attempt to avoid the "continuing violation" rule by asserting that the "anchoring violation," the locker room incident, did not rise to the level of creating a hostile environment. We believe that the circumstances of this matter do create at least a triable issue of whether such a hostile environment was created by the locker room incident. We must remember that Mr. Bolduc was a supervisor, and was ostensibly acting in that capacity when he invaded the locker room to berate Plaintiff and Ms. Stamp. His intrusion in the locker room could certainly be construed as a statement that women under his command were to give up their entirely reasonable expectation of privacy in dressing areas. For that matter, Mr. Butler's response to this situation made it clear that the Company itself believed that this was acceptable

practice, and could be repeated in the future. Under these circumstances, a reasonable jury could find that a hostile and threatening working environment.

For that matter, the Defendants ignore the fact that other examples of maltreatment by Mr. Bolduc took place during the 300-day period. The "fool's errand" of studying the policy manual took place in October, 1999. (Ex. 1, 89:20-22, Ex. 57, ¶ 24.) Additionally, one specific incident in which Mr. Bolduc did not hold Mr. Porter to the "rule" against sitting and talking to the incoming second-shift employees took place in September, 1999. (Ex. 1, 91:22-92:16) Mr. Bolduc invented his new rule for overtime distribution in or about the fall of 1999. (Ex. 1, 89:4-12; Ex. 62, ¶ 8-9.) Mr. Bolduc's pattern of isolating himself from the female employees was ongoing. (Ex. 85:6-16.) Furthermore, the conditions at Weybosset Street and the Dexter Street facility continued to the end of the Plaintiff's employment. (Ex. 57, ¶ 21-22.) Additionally, the disparities in supervision continued to the end of Plaintiff's employment, as did the disparities in work assignments. (Ex. 57, ¶ 6-8, 12, 14.) All of these conditions and incidents, taken together, support a finding of a hostile work environment continuing through the 300 day period.

In any case, it is legally incorrect to claim that the "anchoring violation" must in and of itself be actionable. *Morgan* overturned the First Circuit's former holdings that required that the one act taking place within the 300-day limitation period in and of itself be sufficient to establish a hostile work environment; all that is required is that the act have contributed to that hostile environment. *See id*. at 2068. That the "anchoring act" need not be actionable in and of itself was more fully explicated by the First Circuit in the recent case of <u>Crowley v. L.L. Bean, Inc.</u>, 303 F.3d 387 (1st Cir. 2002). In the *Crowley* case, the plaintiff employee alleged that from a period beginning in 1996, her male co-worker had engaged in a pattern of stalking and harassing her. Although the plaintiff employee repeatedly reported this behavior to her superiors, her situation

was not remediated by her employer until July, 1998, after the plaintiff employee obtained a restraining order against the offending employee. *Id.* at 392. The plaintiff employee did not file a complaint with the appropriate administrative agency until December 21, 1998, alleging that she had been subjected to a hostile work environment. After trial, the jury concluded that the plaintiff's employer had engaged in sexual discrimination against her through acts occurring on or after February 24, 1998, that is, 300 days before she filed her charge. *See id*. at 392-93. The employer appealed, claiming that the plaintiff employee had failed to present sufficient evidence to support her finding. *See id.* at 394. In particular, the employer argued that the jury's verdict could only be supported by acts taking place after February 24, 1998. *See id*. at 395. The employer also argued that the encounters taking place after February 24, 1998 were not "severe and pervasive" enough to create a hostile work environment. *See id*. at 397. Those incidents consisted of the offending employee's giving the plaintiff employee a book, coming to the wrong building where she was working on three occasions, operating his machine in her vicinity, and coming out of a tunnel dancing. Accordingly, the employer argued that because these incidents did not, of themselves, rise to the level of creating a hostile claim, the plaintiff's claim must fail. *See id*. at 395.

The *Crowley* Court specifically rejected the proposition that the plaintiff employee's claim of hostile environment could only be judged by what had taken place after February 24, 1998:

> The Supreme Court's recent decision in *National Railroad Passenger Corp. v. Morgan,* 536 U.S. 101, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002), severely undermines L.L. Bean's argument. In *Morgan,* the Court held that "consideration of the entire scope of a hostile work environment claim, including behavior alleged outside the statutory time period, is permissible for the purposes of assessing liability, so long as any act contributing to that hostile environment takes place within the statutory time period." *Id.* 122 S.Ct. at 2068. The Court explained that a "hostile work environment claim is comprised of a series of separate acts that collectively constitute one 'unlawful employment practice.' " *Id.*

> 122 S.Ct. at 2074. Thus, "[p]rovided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by the court for the purposes of determining liability." *Id.*
>
> Therefore, in the wake of ***Morgan,*** the jury not only could consider Juhl's conduct prior to February 24, 1998, as "relevant background evidence," *United Air Lines, Inc. v. Evans,* 431 U.S. 553, 558, 97 S.Ct. 1885, 1889, 52 L.Ed.2d 571 (1977), but also could hold L.L. Bean liable for the alleged acts of harassment that fell outside the 300-day period for filing an EEOC charge of sexual discrimination provided that it found that there was an act ***contributing*** to the hostile environment within the 300-day filing period. Notwithstanding the thrust of L.L. Bean's argument that Crowley's allegations of harassment included only "a few brief encounters" between her and Juhl that were "scarcely threatening," Br. of Appellant at 24, 31, Crowley offered evidence at trial establishing that Juhl's harassment began in the fall of 1996 and continued into July 1998, and thus L.L. Bean's argument is flawed. Consequently, we must review all such evidence offered at trial when determining whether the jury verdict is supported by the evidence.

*Id.* at 395-96. (Emphasis added.)

In short, the *entire* course of conduct – not just that which occurred within the 300-day limitation period – was relevant to determining whether there was a continuing violation of plaintiff's rights in the form of a hostile work environment. The *Crowley* Court even amplified this point later in its opinion:

> . . . *Morgan* fatally undermines this argument, for Crowley's allegations do not merely include eight incidents, but involve alleged acts of harassment and stalking that spanned nearly one and a half years. Accordingly, we will review evidence relating to all of Crowley's allegations – not just those of acts that occurred between February 24, 1998, and June 22, 1998 – to determine whether Juhl's conduct was sufficiently "severe or pervasive" to constitute actionable harassment.

*Id.* at 397. The Court then reviewed the litany of "stalking" behaviors that plaintiff employee had endured prior to February 24, 1998, and concluded that the Plaintiff had presented sufficient evidence to support her hostile work environment claim. *See id.* at 400-01.

In short, *Crowley* stands for the proposition that the final, "anchoring" acts creating a hostile work environment need not be actionable in and of themselves. Instead, the proper

approach is to examine the entire course of conduct. *See also* Marrero v. Goya of Puerto Rico, Inc., 304 F.3d 7, 18 (1st Cir. 2002) (". . . the statute of limitations is satisfied as long as the plaintiff files a charge within 300 days of one of the many acts that, ***taken together***, created the hostile work environment." [Emphasis added.]); Martin v. Nannie and the Newborns, 3 F.3d 1410, 1415, n.5 (10th Cir. 1993). For that reason, it is irrelevant whether Mr. Bolduc's invasion of the women's locker room was or was not independently actionable as a "hostile environment" claim; instead, that incident can be used as the "anchoring act" within the limitations period that supports a claim of serial violations stretching back to the beginning of her employment by the Defendants. Furthermore, the invasion of the locker room was sufficiently related to Mr. Bolduc's earlier conduct, in that it continued his established practice of subjecting female employees to closer supervision than male employees.

The Defendants also try to disaggregate the types of behavior that created the hostile environment in order to avoid the "continuing violation" claim. They then argue that the time span between the Kala incidents and the "locker room" incident works to obviate any claim of "continuing violation." Under *O'Rourke*, however, this type of disaggregation is invalid. *O'Rourke* instead teaches us that sexual and non-sexual behaviors can be traced back to the same gender-based animus. In the case of *O'Rourke*, both the sexual and non-sexual behaviors that the plaintiff endured were traceable to a general opposition to having females on a firefighting force, and reinforced one another. 235 F.3d at 731. As we are at the summary judgment, Plaintiff is entitled to have all reasonable inferences drawn in her favor. Rossy, 880 at 623. There is sufficient evidence upon which a jury could infer a similar link between the sexually charged behaviors and those of Mr. Bolduc and his superiors as reinforcing one another. Bolduc's resentment against female maintenance employees manifested itself daily. It could be inferred that

Mr. Bolduc, through his consistent discriminatory conduct of the Plaintiff and her female co-workers, created an atmosphere that virtually gave Plaintiff's male co-workers license to engage in abusive conduct as well. This inference is strengthened when it is considered the Bolduc largely ignored the Domenicone and Kala situations, even when Plaintiff was being physically threatened. When Plaintiff complained about these particularly acute episodes to upper management, she was met with indifference and retaliatory behavior, thus reinforcing Bolduc's message that gender-based discrimination was to be accepted as a condition of employment in the maintenance department.

Even if we disaggregate the claims into the categories of sexually harassing versus non-sexually harassing, the sexual harassment-type claims still can fall within the "continuing violation" rule. The facts surrounding those claims demonstrate that the Defendants had a policy and procedure of ignoring sexually harassing conduct. As this was the Defendants' policy and practice, the sexual harassment claims constitute a systemic violation. A systemic violation claim, however, requires no identifiable action of discrimination in the limitations period. *See* Sabree, at 400, n.7. All that requires is that the policy still exists. *See id.* Although we anticipate that the Defendants will protest that they had a policy against sexual harassment, it was simply not followed. No investigation was made of the Domenicone matter. Defendants waffle as to whether they ever found Kala credible. However, the Defendants are clearly being disingenuous when they suggest that Kala was transferred as a result of Plaintiff's complaints. As the "locker room" incident shows, that policy and practice of ignoring sexual harassment was firmly in place within the 300 day period.

Accordingly, Defendants are not entitled to summary judgment on either the pre-April 26, 1999 or post-April 1999 hostile environment claims. The behaviors that the Plaintiff endured

from her superiors and co-workers reinforced one another to create a virtually toxic environment for women that continued for many years. That violation of Plaintiff's rights persisted from the day she began her employment, to the date that she ended it. Therefore, the "continuing violation" theory should apply.

### B. DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S RETALIATION CLAIM.

The Plaintiff also alleges that she suffered retaliation for having complained of discrimination in violation of 42 U.S.C.A. § 2000(e)-3(a). That statute provides:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment, for an employment agency, or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs, to discriminate against any individual, or for a labor organization to discriminate against any member thereof or applicant for membership, because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

A *prima facie* case of retaliation requires only "a small showing that is not onerous and is easily made." *See* Che, 342 F.3d at 38. In order to establish a *prima facie* case pursuant to 42 U.S.C.A. § 2000e-3(a), the Plaintiff must be able to establish that 1) she engaged in the conduct protected by 42 U.S.C.A. § 2000e-3(a); 2) that she suffered an adverse employment action; and 3) that there was a causal nexus between the adverse employment action and the protected conduct. *See* Russell v. Enterprise Rent-a-Car Company of Rhode Island, 160 F.Supp.2d 239, 264 (D.R.I. 2001). Retaliation claims follow the *McDonnell Douglas* burden-shifting framework. *See id*. Once this is done, the defendant must articulate a legitimate, non-retaliatory reason for the employment action. If the defendant does so, the plaintiff must show that the proffered reason is pretextual. *See* Fennell v. First Step Designs, Ltd., 83 F.3d 526, 535 (1st Cir. 1996). On

summary judgment, the courts focus whether the evidence as a whole is sufficient to make out a jury question as to pretext and discriminatory animus. *See id*.

The Defendants apparently do not contest that the Plaintiff engaged in protected conduct, but argue that she cannot establish a *prima facie* case as to whether there was a causal nexus between that action and the protected conduct. Essentially, the Defendants argue that they have established a legitimate, non-retaliatory reason for Plaintiff's discharge. The Defendants also suggest to this Court that they were unaware of Plaintiff's protected conduct when the decision was made to terminate her. Defendants argue that they have asserted a legitimate, non-discriminatory reason for her termination. Finally, the Defendants suggest that the mere lapse of time between the termination and the protected conduct work to obviate her claim. These positions are only tenable if one ignores the facts and the law.

In the first instance, the Defendants would have this Court turn a blind eye to a great deal of the evidence on the record regarding precisely when the Plaintiff first engaged in protected conduct, and when the retaliatory termination occurred. The Gas Company would have it that the Plaintiff had been terminated for improper receipt of sick leave benefits while she was receiving TDI. The Defendant also argues that the ". . . Gas Company initiated its inquiry into Plaintiff's TDI documentation prior to receiving notice of her RICHR charge," and that therefore there was no way ". . . anyone at the Gas Company could have known about Plaintiff's charge prior to the first inquiry into Plaintiff's TDI benefits." (Memo, p. 33-34.) The Defendants therefore conclude that the decision to take employment action came before knowledge of the protected activity.

Defendants' position is incorrect. In the first instance, the filing of the RICHR charge in February, 2000 was not the first occasion upon which the Plaintiff engaged in protected activity. 42 U.S.C.A. § 2000e(3) does not only protect employees from adverse actions when they file

discriminatory charges with an administrative agency. The statute also protects those who have "opposed" discriminatory treatment. An internal grievance is sufficient *See* Russell, at 264. The Plaintiff had opposed discriminatory conduct by means of such internal proceedings well before the February, 2000 filing with the RICHR. Plaintiff and Ms. Stamp complained to their union steward regarding the locker room incident on August 20, 1999, the day that it took place. The union steward relayed those concerns to Henry Butler on the same date. (Defendant's Ex. E.) On or about August 31, 1999, Plaintiff and Ms. Stamp also complained about harassment to the Defendant's Vice-President of Human Resources, Royalynne Hourihan. (Defendant's Ex. F.) Not only did that correspondence reference the locker room incident as a "harassing" behavior, but also indicated that they felt that they had been subjected to sexual discrimination for some time: "We feel that at numerous times in the past he has harassed the two of us by making unnecessary comments about our job performance whereas he has never made these remarks to our male counterpart." (Defendant's Ex. F.) Finally, a note to the file prepared by Mr. Butler indicates that he had been told that Ms. Stamp intended to file with the Human Rights Commission. (Ex. 53.) In short, the Defendants – particularly Mr. Butler – had been put on notice well before receipt of the RICHR complaint that Plaintiff and Ms. Stamp were opposing discriminatory behavior. In any case, the March 3, 2000 letter from Mr. Butler referenced by Defendants could hardly have been a final decision on whether to take an adverse employment action against Plaintiff at all. (Ex. 30.) That did not come until June 8, 2000, when Plaintiff was terminated – well after the Defendants responded to the Human Rights Complaint. (Ex. 37.)

Also contrary to Defendants' argument, the Plaintiff depends upon far more than temporal proximity to show a nexus between her protected conduct and the adverse employment action that she suffered. It is also wrong to suggest, as Defendants seem to, Plaintiff's retaliation claim

must only stand or fall on temporal proximity between the protected conduct and the adverse action. Temporal proximity can be one factor to be considered in determining whether the proffered reason for job action is non-retaliatory, but it is not the only one. *See* Che, 342 F.3d at 38 ; Shirley v. Chrysler First, Inc., 970 F.2d 39, 44 (5th Cir. 1992). The Plaintiff may present evidence demonstrating that the employer's stated reason for terminating her was not worthy of credence. *See* Che at 39, *citing* Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143, 120 S.Ct. 2097 (2000). The Plaintiff may also demonstrate pretext through showing evidence of disparate treatment. *See id.* The Plaintiff may also demonstrate pretext by demonstrating that the decision was unreasonably or arbitrary. *See* Rossy, 880 F.2d at 625. At the summary judgment level, Plaintiff is entitled to have all reasonable inferences drawn in her favor. *See* Meiri v. Dacon, 759 F.2d 989, 997 (2d Cir. 1985).

Under the unique circumstances of this case, a reasonable jury could infer that Mr. Butler engaged in a deliberate "set up" of the Plaintiff in order to retaliate for her having complained of harassment and discriminatory treatment on behalf of Mr. Butler's fellow manager. Mr. Butler accused Plaintiff of having improperly accepted sick leave from the Gas Company while simultaneously receiving TDI benefits. Defendants' responses to interrogatories, however, are highly illuminating on this point:

> Since at least 1991, the governing collective bargaining agreements have required that employees will inform the employer when they are receiving TDI payments, and further provide that the employee will receive the difference between their regular pay and the TDI payments. When RITDI sent an employment verification report indicating that an employee had filed for TDI, Human Resources would notify payroll and the maximum TDI benefit would be deducted from an employee's pay. Prior to July 1, 2002, the amount allowed for dependents was not added into the maximum TDI amount. Adjustments would be made when an employee provided the TDI benefit statement or copies of the TDI checks. One employee, Keith Cotnoir, failed to provide the TDI statement for a prolonged period of time. (See TDI verification statement for him dated 6/25/02). Bud

> Butler sent an e-mail to Joan Chaffee, D'Anna Soehnge and Lynne Linden as a follow-up to a conversation on June 24, 2002 regarding this issue. Joan Chaffee sent Mr. Cotnoir a letter on 9/3/02 indicating that verification was required for payment of correct make-up pay. (See copy of the e-mail Joan sent to Lynne Linden on 9/3/03 regarding deducting the full amount of possible TDI payments from Mr. Cotnoir's pay if the proof of TDI amount was not sent.) Therefore, the policy reflected in the August 20, 2004 letter was in place since 2002.

(Ex. 24, p. 7-8.)

This explanation casts serious doubts on the legitimacy of Defendants' stated reason for terminating Plaintiff. First, the collective bargaining agreement does not impose any duty upon the employees to report when they receive TDI payments.[12] (Ex. 11, p. 31-34.) Instead, as the responses to interrogatories indicated, the Defendants automatically made those deductions. For that matter, the Defendants did not even wait for verification that the employee was actually receiving benefits. Instead, the Defendants began those deductions when they first learned that the employee had *filed* for benefits, and did not wait until such time as they learned whether or not the employee's application was actually approved. It is also significant that an employee's TDI benefit is readily calculated based upon an employee's wage history. R.I.G.L. § 28-41-5.

The evidence on record demonstrates that the Defendants were fully aware that the Plaintiff had filed for benefits, but had made a significant deviation from its usual practice in her case. On or about February 10, 2000, the Defendants had received a notice from the Rhode Island Department of Labor and Training's Temporary Disability Insurance Division informing them that the Plaintiff ". . . has filed a claim for Temporary Disability Insurance Benefits." The Defendants' employee, Lorraine Cipriano, supplied the required verification of the Plaintiff's

---

[12] This incorrect statement also casts serious doubt on the Defendants' credibility. Mr. Butler supplied the information used to respond to these interrogatories. (Ex. 46a, 39:4-7.) However, he was responsible for the day-to-day managing of the collective bargaining agreements, and grievances arising thereunder. (Ex. 46a, 40:20-41:5) Given Mr. Butler's position, it is surprising that he would not know the provisions of the collective bargaining agreement.

employment information on or about February 16, 2000. The Verification Report was then faxed out from the Defendants' Human Resources Department. (Ex. 26.) However, the Defendants did not simply deduct the maximum TDI benefits from their pay. Instead, a Gas Company employee's memo reflected that she intended to speak to Mr. Butler regarding "how to handle" this matter.[13] (Ex. 27.) Given that the TDI deductions were automatic, it is hard to fathom why Mr. Butler would need to have been consulted at all.

Furthermore, the evidence demonstrates that Mr. Butler avoided efforts on Plaintiff's behalf to resolve the situation. Plaintiff had been under the impression that TDI automatically notified the Company to let them know that an employee had received benefits. Plaintiff had received TDI benefits and "sick pay" in the past, and understood that the automatic deduction was ". . . the way it was always done." (Ex. 1, 126:3-7; Ex. 57, ¶ 25.) Plaintiff testified that she had nevertheless attempted to reach Mr. Butler by telephone on receiving the March 3, 2000 letter, and all the subsequent letters, but Butler never called her back. (Ex. 1, 123:20-124:19; 125:5-10.) Plaintiff also tried to reach Butler through Human Resources, but that was unsuccessful. (Ex. 1, 125:5-10.) Butler only spoke to Plaintiff when Plaintiff called Mr. Bolduc and told him she had been trying to get in touch with Butler, and Mr. Bolduc got through to Butler. (Ex. 1, 127:3-9.)

Mr. Butler, however, was clearly not interested in resolving the situation, but in terminating Plaintiff. Mr. Butler instead immediately began proceedings for her termination. Mr. Butler rejected Plaintiff's counsel offer of restitution, he rejected it, indicating that the only means by which the matter could be remedied would be through Plaintiff's resignation. (Ex. 34.) This itself was a form of disparate treatment, in that the testimony of Defendants' officials indicates

[13] The handwriting is much the same as that of Lorraine Cipriano's signature on the Verification Report.

that overpayments had been made to employees before, and that the employee had been permitted to pay them back. (Ex. 46a, 38:10-14.) For that matter, contrary to the Defendants' suggestions otherwise, there was a fund by which the Plaintiff and Defendant could have readily drawn upon in order to recoup their losses. Plaintiff was entitled to payment for accumulated vacation and holiday time.[14] At the time of her termination, that fund had swelled to $4,303.00. These monies were ultimately used and accepted by the Defendants as Petrarca's repayment. (Ex. 37.)

Based on these facts, a reasonable jury could find that Defendants, through Mr. Butler, had "set up" the Plaintiff. Defendants deviated from their typical procedures for ensuring that there was no "double-dip" of sick leave benefits and TDI, failed to respond to Plaintiff's attempts to resolve the matter, and then seized upon this situation as an excuse to fire her. We also observe that Plaintiff's treatment was far disproportionate to offense. Essentially, Plaintiff was terminated over a situation which the Defendants themselves had created. Plaintiff was a ten-year employee with a spotless disciplinary record.[15] Despite these mitigating factors, Mr. Butler made it clear from the very beginning that only her departure from the Company would satisfy him. (Ex. 34.) Most glaringly, according to Defendants' own interrogatory answers, a male employee, Keith Cotnoir, similarly failed to present documentation regarding his TDI benefits in 2002. (Ex. 24, p. 7-8.) However, Defendants did not terminate him; he was permitted to pay back the money and remain in the Defendants' employ. (Ex. 46b, 88:21-23.)

Furthermore, Plaintiff's discipline was disparate when compared to that which was meted out to other employees for similar infractions. Plaintiffs have also discovered through their own investigations another example of a similar overpayment that did not result in any discipline

[14] This fund did not require an employee to wait for retirement or termination to draw upon. (Ex. 11, p. 21; Ex. 62, ¶ 13.)
[15] Defendants have produced no records of discipline.

whatsoever. Carl Saccoccio, a Customer Service Representative, received "sick pay benefits" after being injured in a work-related injury. For some time, the Gas Company did not deduct the sums that Mr. Saccoccio received from Worker's Compensation, resulting in an overpayment of approximately $4,000-$5,000.00. These sums were merely deducted from Mr. Saccoccio's regular pay on his return to work. He received no discipline at all. (Ex. 40.)

The Gas Company's interrogatories identify only one other individual who was disciplined for having stolen from the Company or received property or benefits from the Company to which they were not entitled, a male service technician, Kenneth Mace. Mace had been terminated for having turned his residential gas meter backwards. The Defendants allege that Gas Company initially terminated him, but relented and permitted him to return after six months, albeit without back pay. (Ex. 24, p. 3-4.) However, there is testimony to the contrary; to the effect that the employee in question actually received a suspension. (Ex. 12, 35:23-36:7.)

Plaintiffs themselves have discovered other such instances of individuals who deliberately attempted to defraud the company that the Defendants failed to specifically identify in their interrogatories. For example, Mr. Bolduc admitted that when Billy Johnson and Kenneth Schiano were leaving work early, they were receiving money for time that they were not working. (Ex. 6, 91:7-92:12.) They were disciplined, but not terminated. (Ex. 6, 97:14-21) Similarly, Mr. Porter went out for unauthorized breaks with total impunity on a regular basis. (Ex. 6, 174:18-177:16) John McHugh and Dan Ford were discovered falsifying their time sheets, but only received three-day suspensions. (Ex. 41, 42.) Mr. Butler even reduced Mr. Ford's suspension to one day. (Ex. 41.) Mr. Butler's leniency in this regard is particularly interesting, given that McHugh and Ford's conduct was a willful and deliberate attempt to defraud the company, while Plaintiff's alleged wrongs, viewed even in the harshest light, were passive.

Male employees who engaged in different, but at least as serious infractions, also relatively lenient treatment. This type of evidence, too, can support a finding of pretext sufficient to pass the summary judgment hurdle. ***See*** Lipsett, at 910-11. ***See also*** Conward v. Cambridge Sch. Comm., 171 F.3d 12, 20 (1st Cir. 1999) (noting that exact correlation is not necessary). As we noted above, Gerald Porter frequently reported to work intoxicated. (Ex. 43, 44, 45; Ex. 57, ¶ 13; Ex. 62, ¶ 4.) While admittedly, Mr. Butler's misconduct is not precisely the same as Plaintiff's, it is of comparable seriousness. Appearing at work intoxicated itself can be construed as a form of theft, for one is not fully capable of performing. Furthermore, in determining the relative seriousness of a disciplinary infraction for purposes of establishing pretext on a summary judgment motion, it is entirely appropriate to consider the mission of the workplace in question itself. ***See*** Ezell v. Potter, 400 F.3d 1041, 1050 (7th Cir. 2005). Defendants are in the safety-sensitive business of delivering natural gas to residences and businesses throughout the state. In such a safety-sensitive business, on-the-job intoxication can only be considered an offense of the gravest sort. Nevertheless, Mr. Porter remains in Defendants' employ. (Def. Ex. KK.)

Mr. Kala also engaged in major infractions twice. Mr. Kala harassed Ms. Petrarca in the workplace. His actions towards her even rose to the level of solicitation for prostitution, itself a crime. Later, when he eventually became a Customer Service representative, he harassed a Gas Company customer during a service call to her home. This conduct similarly struck at the heart of the Gas Company's mission. An essential part of Mr. Kala's position required Mr. Kala to gain entry to private homes. Under these circumstances, the Defendants needed to have the utmost confidence that Mr. Kala would behave in an appropriate manner. Mr. Kala betrayed that trust, and abused his position to satisfy his personal agenda. (Ex. 47, 48.) Nevertheless, he was only demoted for having harassed a customer. Even then, Mr. Butler agreed that Mr. Kala would be

permitted to keep his higher pay rate. (Ex. 49.) Furthermore, Mr. Butler later championed Mr. Kala's cause when Mr. Kala wished to return to Customer Service – despite the fact that that course of action could potentially expose the Company to liability.[16] (Ex. 46a, 67:10-68:5; Ex. 50.)

Finally, there is no merit whatsoever to the Defendants' argument that later events relieves them from responsibility for its retaliatory conduct. The Defendants would apparently have it that because the Plaintiff was out on sick leave at the time of her termination, and was allegedly not entitled to any payment from the Gas Company, she could not have suffered any "adverse employment action" because she did not suffer any material harm. This position is legally and factually incorrect.

In the first instance, lack of economic harm is not sufficient to obviate the fact that an adverse employment action was taken against her. The recent Supreme Court case of Burlington Northern & Santa Fe Railway v. White, 126 S.Ct. 2405 (2006) specifically settled the question of whether an adverse employment action must be economic in nature in order to be cognizable. That question was answered firmly in the negative. The *Burlington* case involved a female employee who had complained to her employers of discriminatory and harassing behaviors. Shortly after, the employee was transferred to a less desirable assignment, and was also suspended for insubordination. After arbitration, the employee's suspension was overturned with backpay. *See id*. The employer attempted to make precisely the argument that the Defendants are attempting to make, that is, that the employee never suffered any economic harm, and therefore suffered no retaliation. The *Burlington* Court firmly disagreed, noting that the anti-retaliatory provisions were broader than the anti-discrimination provisions themselves. The *Burlington*

[16] Mr. Butler appears not to have even informed the decision-maker of the precise nature of Kala's misconduct.

Court noted that the anti-discrimination provisions contained language that limited itself to protecting individuals from discrimination in actions affecting one's employment, or the terms thereof. The retaliation provisions, however, contained no such limiting language. *Id.* at 2411-12. In fact, the Court noted, the protections from retaliation of necessity had to cover even conduct that did not necessarily affect the terms and conditions of employment – or even actions that did not affect the employee in the workplace:

> But one cannot secure the second objective [of preventing retaliation] by focusing only upon employer actions and harm that concern employment and the workplace. Were all such actions and harms eliminated, the anti-retaliation provision's objective would *not* be achieved. An employer can effectively retaliate against an employee by taking actions not directly related to his employment or by causing him harm *outside* the workplace. See, *e.g., Rochon v. Gonzales,* 438 F.3d, at 1213 (FBI retaliation against employee "took the form of the FBI's refusal, contrary to policy, to investigate death threats a federal prisoner made against [the agent] and his wife"); *Berry v. Stevinson Chevrolet,* 74 F.3d 980, 984, 986 (C.A.10 1996) (finding actionable retaliation where employer filed false criminal charges against former employee who complained about discrimination). A provision limited to employment-related actions would not deter the many forms that effective retaliation can take. Hence, such a limited construction would fail to fully achieve the anti-retaliation provision's "primary purpose," namely, "[m]aintaining unfettered access to statutory remedial mechanisms." *Robinson v. Shell Oil Co.,* 519 U.S. 337, 346, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997). Thus, purpose reinforces what language already indicates, namely, that the anti-retaliation provision, unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment. Cf. *Wachovia Bank, N.A. v. Schmidt,* 546 U.S. ----, 126 S.Ct. 941, 952, 163 L.Ed.2d 797 (2006) (rejecting statutory construction that would "trea[t] venue and subject-matter jurisdiction prescriptions as *in pari materia*" because doing so would "overloo[k] the discrete offices of those concepts").

*Id.* at 2412.

Accordingly, instead of focusing on the question of economic harm, or the impact upon employment, the *Burlington* Court instead adopted a functional approach to the question of whether an adverse employment action had taken place. Under the *Burlington* test, an adverse

---

(Ex. 46a, 67:13-25.)

employment action is any action that would dissuade a reasonable worker from making a complaint of discrimination. *Id*. at 2415. The Court also held that whether such action would so dissuade the reasonable worker was to be judged by the individual situation:

> Context matters. “The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed.” *Oncale, supra,* at 81-82, 118 S.Ct. 998. A schedule change in an employee's work schedule may make little difference to many workers, but may matter enormously to a young mother with school age children. Cf.*, e.g., Washington, supra,* at 662 (finding flex-time schedule critical to employee with disabled child). A supervisor's refusal to invite an employee to lunch is normally trivial, a nonactionable petty slight. But to retaliate by excluding an employee from a weekly training lunch that contributes significantly to the employee's professional advancement might well deter a reasonable employee from complaining about discrimination. See 2 EEOC 1998 Manual § 8, p. 8-14. Hence, a legal standard that speaks in general terms rather than specific prohibited acts is preferable, for an “act that would be immaterial in some situations is material in others.” *Washington, supra,* at 661.

*Id.* at 2415-16.

Under the circumstances here, it is apparent that the actions taken against the Plaintiff would dissuade a reasonable worker from pressing a complaint of discrimination. As we described above, Plaintiff was “set up.” As a result, Plaintiff was terminated from a position that she had held for over ten years. Given that she was charged with having improperly accepted money from the Defendants, her integrity has forever been called into question. Obviously, a discharge under these circumstances would dissuade an employee from pressing a complaint of discrimination – regardless of whether on sick leave or not.

Furthermore, Plaintiff suffered harm as the result of her loss of medical benefits for several months. Plaintiff’s pension was also in jeopardy. (Ex. 12, 33:1-18.) The Defendants attempt to negate this point by arguing that the Plaintiff’s medical benefits were retroactively restored with her retirement. *Burlington,* however, also specifically rejected the proposition that an adverse

employment action can be obviated simply because the worker is made whole later. As the *Burlington* Court poignantly recounted on this point:

> White did receive backpay. But White and her family had to live for 37 days without income. They did not know during that time whether or when White could return to work. Many reasonable employees would find a month without a paycheck to be a serious hardship. And White described to the jury the physical and emotional hardship that 37 days of having "no income, no money" in fact caused. 1 Tr. 154 ("That was the worst Christmas I had out of my life. No income, no money, and that made all of us feel bad. ··· I got very depressed"). Indeed, she obtained medical treatment for her emotional distress. A reasonable employee facing the choice between retaining her job (and paycheck) and filing a discrimination complaint might well choose the former. That is to say, an indefinite suspension without pay could well act as a deterrent, even if the suspended employee eventually received backpay Cf. *Mitchell*, 361 U.S., at 292, 80 S.Ct. 332 ("[I]t needs no argument to show that fear of economic retaliation might often operate to induce aggrieved employees quietly to accept substandard conditions"). Thus, the jury's conclusion that the 37-day suspension without pay was materially adverse was a reasonable one.

*Id.* at 2417-18. Under the *Burlington* standard, then, when determining whether the employee suffered an adverse employment action, one must also take into account the uncertainty and attendant emotional distress that the employee suffered until he or she was made whole.

Plaintiff's temporary denial of medical benefits, and the possibility of losing her pension, even if later remedied, certainly rose to that level of serious hardship described in *Burlington*. When Plaintiff was terminated in June, 2000, she was receiving medical treatment, but was without benefits until such time as she accepted retirement in September, 2000. It has been recognized by this Circuit in the past that the loss of medical benefits under these circumstances subjects the worker to the prospect of denial of medical treatment and/or economic ruin. *See* United Steelworkers v. America v. Textron, 836 F.2d 6 (1st Cir. 1987) (Breyer, J.). Similarly, the potential loss of a pension is nothing short of disaster. Plaintiff also would have lost eligibility for the long-term disability benefits that she ultimately received after her forced retirement. (Ex. 46b,

67:21-68:3) The Plaintiff faced these possibilities every single day during the approximately three-month period from her termination until the time that her benefits were retroactively reinstated. Defendants suggest that the Plaintiff could have continued these benefits through COBRA. However, COBRA is a very cold comfort indeed when one has no income to pay the premiums, and is physically incapable of earning such income. COBRA could not restore Plaintiff's long-term disability benefits. COBRA could not restore Plaintiff's pension, or the years that she had spent earning it. The temporary loss of Plaintiff's medical benefits and the risk to her long-term disability benefits and pension alone, then, certainly rose to the level of an adverse employment action, as both would be powerful disincentives to filing a discrimination charge.

Defendants' argument should also fail on public policy grounds. The Defendants would apparently have it that the fortuity of the Plaintiff's suffering an off-the-job injury should relieve them from responsibility for their conduct. Simply put, the Defendants ask this Court to avert its eyes and grant them permission to make an example of Plaintiff for the benefit of her co-workers who remain in Defendants' employ. To grant this permission is to eviscerate the protections of 42 U.S.C.A. § 2000e-3.

Accordingly, then, Plaintiff has produced sufficient evidence to create a material issue of fact as to whether or not she suffered retaliatory conduct. Defendants were fully aware that she had engaged in protected conduct at the time that they took the adverse action of terminating her from her employment. Defendants plainly manipulated Plaintiff into the overpayment situation, and then imposed the completely disproportionate penalty of termination. Finally, the fact that the Plaintiff ultimately became too ill to work is completely irrelevant to Defendants' liability for their retaliatory acts. If anything, her medical condition made that retaliatory act even more

intimidating to any other employee who contemplates filing her own discrimination complaint in the future. Therefore, Defendants should not receive summary judgment on this count.

### C. DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S CLAIM OF DISPARATE TREATMENT.

Defendants are also not entitled to summary judgment on the Plaintiff's claim of disparate treatment. Plaintiff bases her claim of disparate treatment on the discrete act of her termination. Plaintiff also relies upon a "continuing violation" theory in connection her overtime denials.

Whether Plaintiff received disparate treatment for her termination is governed by the same *McDonnell Douglas* framework as her retaliation claims. *See* Oliver, 846 F.2d at 107. As we have discussed above, Plaintiff has produced sufficient evidence that the stated reason for her termination is without credence, and that the discipline imposed upon her was far harsher than that imposed upon other male employees. Defendants, however, also claim that the Plaintiff cannot sustain a claim of disparate treatment because she allegedly did not suffer any material harm and therefore did not suffer any adverse employment action. In support of this claim, Defendants assert 1) that the Plaintiff was permanently disabled at the time of her termination on June 8, 2000; 2) that she was no longer entitled to sick pay benefits, which had expired on April 18, 2000. Defendants point out that the only "benefit" that was temporarily affected by her termination was her health insurance, which was retroactively restored after the settlement agreement.

Although the Defendants cite some cases supporting the proposition that the rescission of her termination obviates the adverse employment action, we urge this Court to recognize that the position of the courts on this point is not unanimous. Our own First Circuit has apparently yet to reach this question. The Seventh and Ninth Circuits have specifically rejected Defendants'

position. *See* Ezell v. Potter, 400 F.3d at 1049; Fonseca v. Sysco Food Services of Arizona, 374 F.3d 840, 848 (9th Cir. 2004). There are serious public policy concerns militating against Defendants' position. In the words of ***Fonseca***, ". . . it is an adverse employment action when an employer knows its employees are entitled to certain opportunities, but forces only employees of a certain race to use the grievance procedure to obtain them." ***Id***. at 848. If we accepted the Defendants' position, essentially grants a discriminating employer license to force employees of a disfavored class to perpetually jump through hoops to obtain equality in the terms and conditions of employment. Clearly, this was not the intention of the framers of Title VII had in mind.

Defendants in any case minimize the impact of termination on Plaintiff by asserting that she is "permanently disabled." As we discussed above, Plaintiff has ended a ten-year employment situation under a cloud, and accordingly suffered embarrassment and reputational harm. Even though Plaintiff is currently receiving Social Security benefits, that does not necessarily mean that her working days are completely over; Plaintiff's condition could possibly improve. Under those circumstances, retiring under a cloud would gravely hinder her ability to find another job.

Furthermore, although Defendants cite authority to support their argument that the "overtime" denials ought to be treated as "discrete incidents" of discrimination that must be addressed immediately, there are serious counter-arguments for permitting this to be treated as a continuing violation under the circumstances of this case. Essentially, Mr. Bolduc's ***modus operandi*** was to give the overtime opportunity to the male employee, and then claim that he made a mistake. Obviously, this would have to take place on a number of occasions before the employee could realize what was happening. Therefore, these should be considered a systemic type of continuing violation.

Accordingly, then, Defendants should not be permitted to take refuge behind a claim that Plaintiff's termination was rescinded, or that the statute of limitations on the seniority claims has run. Regardless of whether the Defendants, under Union pressure, agreed to permit Plaintiff to retire, she still suffered the severance of her employment relationship under circumstances that would harm her reputation. Furthermore, Mr. Bolduc's behavior regarding overtime has all the earmarks of a policy or practice, and therefore falls under the "continuing violation" rule. Therefore, summary judgment should be denied on this count as well.

## IV. CONCLUSION

For the above-referenced reasons, Defendants' Motion for Summary Judgment should be DENIED in its entirety.

Respectfully submitted,
Plaintiff,
By her attorneys,

/s/Stephen M. Robinson_____
Stephen M. Robinson #2103
The Law Offices of Stephen M. Robinson
155 South Main Street, Suite 402
Providence, RI 02903
(401) 331-6565
(fax) 331-7888
August 18, 2006
srobinson@smrobinsonlaw.com

/s/Vicki J. Bejma
Stephen M. Robinson #2103
The Law Offices of Stephen M. Robinson
155 South Main Street, Suite 402
Providence, RI 02903
(401) 331-6565
(fax) 331-7888
August 18, 2006
vbejma@smrobinsonlaw.com

**CERTIFICATE OF SERVICE**

I hereby certify that on this 18th day of August, 2006, a true and complete copy of the foregoing was mailed first class postage prepaid to counsel of record for the Defendants: Neal J. McNamara, Esquire and Matthew J. Frankel, Esquire, Nixon Peabody LLP, One Citizens Plaza, Suite 500, Providence, RI 02903.

/s/ Vicki J. Bejma

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

CAROL PETRARCA
Plaintiff,
VS.
SOUTHERN UNION COMPANY and
NEW ENGLAND GAS COMPANY,
Defendants.

C.A. NO. 04-310S

DEPOSITION OF CAROL PETRARCA, Plaintiff in the above-entitled cause, taken on behalf of the Defendants, before Jeannette A. Freelove, Notary Public, in and for the State of Rhode Island, at the offices of Nixon Peabody, LLP, One Citizens Plaza, Providence, Rhode Island, on April 19, at 9:30 a.m.

APPEARANCES:

For the Plaintiff:
LAW OFFICE OF NOELLE CLAPHAM
NOELLE K. CLAPHAM, ESQUIRE

For the Defendants:
NIXON PEABODY, LLP
NEAL J. MCNAMARA, ESQUIRE
MATTHEW FRANKEL, ESQUIRE

ALLIED COURT REPORTERS, INC.
115 PHENIX AVENUE
CRANSTON, R.I. 02920
(401) 946-5500

vacuuming and dusting, and cleaning the bathrooms. That's what I would do. It was evenings. We went in from 4:00 to midnight.
Q. What days of the week did you work?
A. We worked six days. When I first started, it was six days a week, Monday through Saturday, because we worked until 10:00. When I first started, we worked from 4:00 to 10:00, and Saturday would make up the extra hours to make it to 40. Saturday, we would go in until I think it was noon or 1:00 to make it to 40, 40 hours a week.
Q. Who were the other spare building cleaners or building cleaners you worked with initially at the Providence Gas Company?
A. I worked with Lynore, Barbara, Anna, Rose. There was a couple of other women. I can't remember their names.
Q. Lynore is Lynore Horne?
A. Yes.
Q. And Anna is Anna Collins?
A. Yes.
Q. Do you remember Barbara's last name?
A. Alderman.
Q. Barbara Alderman was a building cleaner?



A. Okay. She came in after me.
Q. Okay. And Rose, what's her last name?
A. I don't know. She's retired.
Q. Okay. And to your knowledge, did Ms. Horne, Ms. Alderman, Ms. Collins, and Rose perform the same essential job functions that you did at that time?
A. Yes.
Q. Did you all work at Weybosset Street?
A. Yes.
Q. Did you ever work on a regular basis at Dexter Street?
A. I went down Dexter Street to fill in a lot, like I'd go down for a week and clean if -- what's her name? If she was out. I can't think of the name of the girl who was out down there.
Q. Sue Green?
A. Yes, Sue Green. I would go down and fill in for Sue Green.
Q. But you were never assigned to Dexter Street?
A. No, no. I would just go down sometimes four hours in the afternoon, and then go over to downtown, Weybosset, and then I would fill in for a whole week sometimes at Dexter Street.
Q. At some point, did your hours change from evening



hours to daytime hours?
A. When I applied for the maintenance.
Q. And when was that? And if you want to look at Exhibit A, if that would help you, go right ahead.
A. Now they have two dates here. Facility maintenance 4/10/92, and facility maintenance person 7/11/93; building maintenance 7/14/91. I'm going to probably say 7/14/91.
Q. Was there a change at that time in how maintenance and cleaning was structured?
A. Not when I first went into maintenance.
MR. MCNAMARA: Right.
A. It was after I had -- I think it was like a year after they decided to bring everything together.
Q. Now, who were the people in maintenance when you first started?
A. There was Jerry, Jerry Porter, and Joe Ianniello, and I believe Lynore was still there in maintenance. I'm not sure. And Tony and Vinny had retired, and Pat Domenicone had retired. They were there when I started, but they retired. So we lost like three men.
Q. Do you remember about when they retired?
A. Well, when Tony retired -- when I took the job,



that's when Tony retired. So I took Tony's job.
Q. The building cleaner -- the spare building cleaner job?
A. No, the maintenance.
Q. The maintenance?
A. The maintenance job.
Q. So he retired when you became a maintenance person?
A. When his job went up on the board, that's when I put my name down for it, for building maintenance.
Q. And do you remember Tony's last name?
A. No, I don't.
Q. Okay. You also mentioned a Vinny a minute ago?
A. Yes, Vinny is retired, too. He was there.
Q. What is Vinny's last name, if you remember?
A. I can't remember last names. I know it was Vin.
Q. But you remember Pat Domenicone?
A. Yes.
Q. And he retired when?
A. Well, he was there for a while. He didn't retire right away. He probably retired -- I think he was still there when I put in for maintenance.
MR. MCNAMARA: Okay.

A. I could be wrong, but I think he was still there when I put in for maintenance.
Q. When you started as a building cleaner until you became building maintenance, and you worked from 4:00 to 10:00, and also on Saturday, were there any men who you worked with on a regular basis other than Ed Bolduc?
A. Yes, Pat Domenicone. There was always a night watchman on in case there was problems in the building, plus they had to do like the rounds around the clock every hour. So there was always a gentleman on at night with us.
Q. Was that usually Pat Domenicone during that period, say from '88 to '91?
A. Yes, it was Pat Domenicone.
Q. And when you were, again, a building cleaner, not building maintenance, were you assigned to a particular floor at Weybosset Street?
A. Then the building was being remodeled, so I had like part of the mezzanine, and some part of the second and third floor, because when I started there, they were like rebuilding, like tearing down and making the building -- adding on and all that. So we were like really at all different areas. We worked different areas, but I know one



part was the mezzanine. I had one part on the third, and I think I had a part on the second floor.
Q. And when you were working, were you for the most part working alone?
A. Yes.
MR. MCNAMARA: Okay.
A. There was actually -- I think there was like five of us on, five girls when I first went there. See, when I first started, I was hired as a spare. I came in as a spare.
Q. Right. And what does that mean, "a spare"?
A. In other words, you didn't get benefits or anything like that. They hired you as a spare. So, in other words, you just got a regular pay. You received no benefits or anything like that.
Q. Does that mean that you were called in when somebody else was out or --
A. Well, it started off I was only supposed to work like, you know, maybe two or three days a week, and, you know, just called in, but it got so I was working like I was a full-time person there. I was there every night, but it was a spare person. So you didn't get like the benefits, and that didn't count when you got hired either,



working all that spare time, and not being -- you know, so when -- I was like say almost a year, two years in there, before I got hired, and I couldn't put that towards being hired.
Q. Well, it says here on Exhibit A that January 8, '89, you became a building cleaner. Was that when you became full time? You were no longer a spare?
THE WITNESS: Where is that one?
MR. MCNAMARA: The second entry under Date. The first entry is 4/15/88, and the second one is 1/8/89.
A. Okay. Thank you. That's about a year later almost. I thought it was longer than that, but it probably was. Over here, the spare, and then over here, it says building cleaner. So it probably was.
Q. So 1/8/89 then would have been when you were hired full time and received benefits?
A. Yes.
Q. Okay. You said as a spare building cleaner and a building cleaner, you reported to Ed Bolduc?
A. Yes.
Q. What was his schedule during that period?
A. He was on days. He would work days. So we really hardly seen him. The only time we would go



up to his office -- when we first came in, we would go up to the office and sit down, and he would more or less give us our jobs, what we were going to do, and what floor we could work on because, like I said, there was people and construction and everything going on in the building.
MR. MCNAMARA: Right.
A. So there was certain areas we couldn't go into, and then he would be gone. He would leave for the night.
Q. Okay. And about what time would he leave?
A. Usually left about 5:00.
Q. And you got there about 4:00?
A. Yes, but there were times he would come back at night, if he had to come back. He would come back later in the night, and sometimes he did stay later to talk to the construction guys or whatever.
Q. During those first few years while you were building cleaner, not building maintenance, how would you characterize Ed Bolduc as a boss?
A. Very inpatient.
Q. What do you mean by that?
A. He had a tendency to yell at the women. I

don't know. He just had no patience with the women. He didn't want women in the department. He made that perfectly clear.
Q. How did he do that?
A. By saying that, you know, if he had his way, there would not be any women in the department.
Q. When did he say that?
A. Oh, he made that remark a couple times, that women are just troublemakers, and it causes more problems.
Q. Do you have a specific memory of a time when he said that?
A. Well, he made it one night upstairs in his office.
Q. Was this when you were a building cleaner or when you were building maintenance?
A. Building cleaner and building maintenance, because he said if he had his way, there wouldn't be any women at all.
Q. You said that he said that a couple times?
A. Yes.
Q. Were both of those times that he said it when you were in building cleaning or did he say it at all when you were in building maintenance?
A. He said it a couple of times when I was in



building cleaning, and he said it a couple of times -- probably more than a couple of times in building maintenance, because they weren't happy about me applying for the maintenance job. I know they did not want a woman in that department. In fact, when I told Tony, when he was going to retire, I was going to put my name in for his job, he said I'll never get it because Ed doesn't want women in maintenance.
Q. But you did get it?
A. Yes, I did.
Q. When you say they didn't want women in the department, who are you referring to?
A. Ed and Roy Heaton. Roy Heaton worked with Ed at the time, too.
Q. Now, correct me if I'm wrong, but it was my understanding that all the building cleaners were simply folded into building maintenance, and it wasn't a question of applying to be in building maintenance, that simply all those women, Lynore Horne, Anna Collins, you, at one point became building maintenance, and got a raise as a result, and your duties changed somewhat. Am I wrong about that?
A. I was put -- I was in building maintenance



before that happened. Before it was switched -- before cleaning and everything combined to building maintenance, I had already been in building maintenance.
MR. MCNAMARA: Okay.
A. I already had to go for the physical on Reservoir Avenue that took two hours, and I was the one that had go down into the basement and lift boxes in front of Ed to make sure I could lift them. Everyday, on a day-to-day basis, he would have me meet him down there in the basement.
Q. So you -- at that point, when you applied for that position, you did, in fact, get it?
A. After two weeks of them notifying -- letting me know after I went for the physical on Reservoir Avenue.
Q. Okay. Was there anything else -- now, again, during the period that you were in building cleaning, that Ed Bolduc said to women -- strike that. You've already told me that Ed Bolduc was inpatient with women, and on a couple times he said to you and others -- I assume were there -- that he didn't want women in the department. During that same period when you were in building cleaning, were there any other statements that



Mr. Bolduc made to you that you felt were inappropriate to be saying to women or treated women differently?
A. Well, when you make a statement that you can't wait for the women to get out of the department -- like I said, they're troublemakers, they're more than what they're worth, that -- you know, he just didn't want women in the department.
Q. I understand. And you've already testified that he said that a couple times. I'm asking now, while you were in building cleaning, were there any other statements that he made, not like the ones you just repeated, but any other statements about women or to women that you thought were inappropriate?
A. Well, he felt as if Anna couldn't do the job. Him and Anna used to go around a lot, because Anna would fight back with him, and tell him, "I'm not changing this light. I didn't want to be in this department. I was forced in this department," and the two of them would go back and forth, and she wouldn't do maintenance work.
Q. How -- well, strike that. Were there any other statements he made during that period when you were a building cleaner that you felt singled

women out or were inappropriate?
A. I can't recall right now.
Q. Okay. When you started in building maintenance, July of 1991, did your schedule change?
A. Yes.
Q. Okay. And this was before building maintenance and building cleaning had been merged?
A. Yes.
Q. What was your schedule as of July 1991 when you became part of building maintenance?
THE WITNESS: My hours?
MR. MCNAMARA: Yes.
A. I would go in from 7:30 in the morning until 4:00 in the afternoon.
Q. Okay. Monday though Friday?
A. Yes.
Q. Okay. And this was still at Weybosset Street?
A. Yes.
Q. You still reported to Mr. Bolduc?
A. Yes.
Q. Okay. What other people were in building maintenance at that time who had the same schedule as you?
A. When I first went into building maintenance, now, I went on a 90-day probation. I was supposed



to -- I was understanding that someone was going to work with me and train with me because I had never been in building maintenance before, and I was put on that job by myself from day one.
MR. MCNAMARA. Okay.
A. To work alone, and to do all the chores and everything.
MR. MCNAMARA: Okay.
A. And I really didn't know what I was doing. And the only person that worked with me was Roy Heaton, who was Ed's boss up on the sixth floor, and he would come down when there was furniture that needed to be moved that called for two people that I just could not move it myself. But if there was a desk or something that I could move myself, I would do it, but deliveries, I did all by myself. I did the paperwork all by myself. I did the deliveries in the morning up to the computer room by myself.
Now, I had gone into this job the first day with no training, with no one with me, and did this for 90 days, was unable to get any training whatsoever. That when my 90 days was up, I was told I was going to have to give another 30 days because I wasn't trained, and I didn't know the



job. So they hit me with another 30 days, and the other 30 days, it stayed the same way. No one still would not work with me.
Q. What did you do on a day-to-day basis when you went into building maintenance?
A. I would be cleaning the vacuums. Every Monday morning, the vacuums would get cleaned. If someone had a coat rack or something to be put together, I did that. If someone called for paper, I delivered the paper. When the mail was delivered, boxes were delivered on the side of the building on Weybosset -- as you come in Weybosset, that little hallway near where the elevator is, there would be tons of boxes. Those had to be delivered every day to the stations, to the people. And I was cleaning downstairs or upstairs. Like I said, cleaning air vents, and just everything; up on the Hitachi, running the Hitachis, checking them and everything; out on the roof, cleaning out there; getting it prepared for the day for the people to go up -- especially in the summer months, get it all washed down for them to go up there for cookouts on lunch hours or whatever; get the lawn chairs out for them and the grill, and all that.



Q. Did you work -- strike that. What other individuals were assigned to the building maintenance that you were aware of when you started in building maintenance?
A. Joe and Jerry Porter.
Q. Joe Ianniello?
A. Yes, and Jerry Porter.
Q. Did you ever work with either of them?
A. I worked with them -- like I said, if a delivery came in off a truck, that necessarily really needed two people, because we were unloading these trucks of 250 boxes, and throwing them down the chute, and so someone had to be down there to catch them, and then when you got done throwing these 250 boxes, whoever was upstairs would have to go down now and help the one that you threw them down to to stack them on the shelves. That was like an all day job, so you definitely needed two people for that.
Q. Did Mr. Porter, when you worked with him -- and this is at any point when you worked with Mr. Porter -- did he ever make any comments to you that were -- you determined were inappropriate or you deemed were inappropriate?
A. No, Jerry was a very nice person. I had no

problem with Jerry, working with him, or anything, except for one day he jammed my fingers in the dumpster thing, but I don't know if he did it on accident or he meant it, but my fingers almost like broke.
Q. How about Mr. Ianniello, did he ever say anything inappropriate to you?
A. I had problems with him. I went to Ed a few times on him crying, and Ed would just overlook it, and say just go off somewhere, and he'll cool off.
Q. Tell me what problems you had with Mr. Ianniello.
A. He was very nasty and controlling, and he would come down and tell me, you need to do this job, and you need to that job, and I would say you're not my boss, and he would start screaming at me, and at times, he would disappear in the building. I couldn't find him to go do -- you know, when there was a job for the two of us. Ed would give me a job, and I would go down and try to find him, and I couldn't find him. I don't know where he hid in the building, but he had a place where I could not find him, and I went to Ed a few times on him because I was quite upset.
Q. How many times do you think you went to Mr. Bolduc



about Mr. Ianniello?
A. About three or four times.
Q. And on each of those times that you went, were they because, as you just stated, Mr. Ianniello was nasty and controlling?
A. Yes.
Q. Did you ever complain that Mr. Ianniello had ever said anything sexually inappropriate to you?
A. I can't recall.
Q. Okay. Did you ever complain that Mr. Ianniello had ever used any vulgar language?
A. Yes, he did.
Q. And you complained to Mr. Bolduc about that?
A. Yes.
Q. You said you complained to Mr. Bolduc about Mr. Ianniello about three or four times altogether. How many of those times did you complain about vulgar language, among the other complaints that you had?
A. About a couple of times.
Q. Okay. And what did Mr. Ianniello say that you found objectionable?
A. He used the F word.
Q. Did he -- strike that. How did he use the F word?
A. Well, he'd either call me a F-ing bitch, or go



somewhere and F-ing mind your business, or F-ing leave me alone.
Q. And this was -- what time period -- strike that. Mr. Ianniello has retired?
A. Yes.
Q. When did he retire?
A. Five years ago, I believe, six years, seven. I'm not too sure. Five, six years -- seven years probably, I think.
Q. And do you know at what point during your employment at Providence Gas/New England Gas, Mr. Ianniello on these couple times used that language, and you complained to Mr. Bolduc?
A. I'm sorry. Pass that by me again.
Q. Let me try to rephrase it for you. You've mentioned that Mr. Ianniello used the F word a couple of times, and you went to Mr. Bolduc about it?
A. Yes.
Q. Was that while you were in the building cleaning or building maintenance?
A. Building maintenance.
Q. Okay. Was it while you were in the building maintenance before building maintenance and cleaning were joined or was it after?



A. It was before and after.
Q. Okay. Building maintenance and building cleaning were joined, I believe, in 1992. Can you give any approximation of the dates when these two incidents occurred that you're talking about?
A. Well, they would be in the daytime.
Q. Right. I'm talking a year, Mrs. Petrarca. Can you -- I know it's a long time ago, and I don't expect certainly a month or anything, but can you give me an approximation as to the year or years that these couple of incidents that you're talking about occurred?
A. Well, I'd say it was about two years before he retired, and I went to building maintenance. He just got very nasty towards the end of his retirement, very nasty and violent. So we went into facility maintenance in '92, you're saying?
MR. MCNAMARA: Well, that's what your sheet says, yes.
A. Okay. I would probably say '94, '95.
Q. Okay. And that's when you think that he used the F word a couple of times to you?
A. Yes, he got very nasty.
Q. You also used the word "violent." How did he become violent?

Page 38

A. He'd scream at me at the top of his lungs.
Q. Did he ever physically assault you?
A. No.
Q. Did he ever touch you in any threatening way?
A. No, it was just the verbal abuse.
Q. Okay. And you complained to Mr. Bolduc about this?
A. Yes.
Q. And you say Mr. Bolduc didn't do anything about it?
A. He would just tell me to just go off somewhere and do something, and let him cool off, and he would be all right, and I told him I can't work with him under these conditions anymore. He's upsetting me too much.
Q. During the period -- strike that. Were there any other employees other than Mr. Ianniello -- and now I'm talking about the entire time that you worked at the gas company, any other employees who used vulgar language such as the F word towards you?
A. Pat Domenicone.
Q. Okay. When was that?
A. When I was there as a spare, he was following me around with -- I don't know if it's Playboy or

Page 39

Playgirl. It has the naked women in it. Following me through the building, and showing me the pictures, and talking about big boobs, and big behinds and --
Q. And this was when you were a spare building cleaner?
A. Yes, and every night he would be there with these magazines and his remarks.
Q. Okay. How long did he do that for?
A. He did it for a good -- I'd say a good two or three months. I ended up going to Ed with it.
Q. And, again, that was when you were a spare building cleaner?
A. Yes.
Q. So that was between April of '88 and January of '89 that he did that?
A. In fact, I thought Ed had hired him to watch and make sure I was doing my job, but then he started with the magazines and the remarks, and everything. I was just very uncomfortable. I told him he just needed to leave and close the books, but he continued.
Q. And you say -- correct me if I'm wrong, did you just say you went to Mr. Bolduc about that?
A. Yes, I did.

Page 40

Q. And what happened?
A. Well, Ed evidently put it down and wrote it in his file and everything, but it didn't leave the sixth floor.
Q. Okay. Did Mr. Domenicone stop following you as you described?
A. No.
Q. He never stopped?
A. He continued, but not as bad.
Q. Okay. At what point, if any, did it stop?
A. It never stopped. From the day I started until he retired, he continued to make remarks; like he offered me, if you come and clean my house for a year, I'll get you your job. I can go and speak to Ed and get you in here ahead of everybody else.
Q. When did Mr. Domenicone retire?
A. I think he retired before Joe.
Q. Okay. Retired before Joe?
A. I'm sure he retired before Joe. I think maybe two years before him.
Q. Okay. And when you started working as building maintenance, did Mr. Domenicone -- strike that. When you were in building maintenance, what schedule did Mr. Domenicone have?
A. When I was -- when I went on days in building

Page 41

maintenance, he was -- I believe he was a night person. He was a night watchman.
Q. Did he always perform the functions of a night watchman?
A. Yes, that was his job.
Q. Okay. So when you went on days, he would come in at 4:00?
A. Yes.
Q. And you left at what time?
A. We left at -- no, they come in at 3:30. We'd leave at 4:00.
MR. MCNAMARA: Okay.
A. But, see, my job was a fill-in, so I did a lot of night work, too. I ended up working the cleaning crew at night and everything, too. So sometimes I would do a 12-hour shift. I would do my shift in the daytime, and then I would work the night shift. So I would be there until like -- I was still there around Pat.
Q. Okay. Okay. Did you complain to anyone other than Mr. Bolduc about Mr. Domenicone?
A. No, because when I went up to Ed, he had filled out a form, and I thought it was going to be pursued. I thought he was going to go further with it. I mean, I didn't know it was going to be

put in his file up on the sixth floor and just be left there.

MR. MCNAMARA: Okay.

A. So no action was ever taken.

Q. Did Mr. Bolduc ever get back to you about Mr. Domenicone?

A. No.

Q. How many times did you go to Mr. Bolduc about Mr. Domenicone?

A. I believe probably four or five times. I just didn't like the magazine part and the remarks that he would make to me. It made me very uncomfortable, and I would be cleaning, and he would just come out of nowhere.

Q. And how often did he show you these magazines?

A. It was almost every night. Every night he would have one in his hands, and he would show me the pictures of these girls, and he'd ask me what I think.

Q. Now, at that time, let's say in the early '90s, did you have your own conception of what sexual harassment was?

A. No.

Q. Had you ever heard the term at that point?

A. No, nothing was ever said to us.



Q. Well, did you read about it in the newspaper, sexual harassment?

A. No, to tell you the truth, I didn't.

Q. Did it ever occur to you to complain to anybody in the union about?

A. I didn't even know anything about our union. I didn't even know how to get in touch with our union because we never had a union rep come to Weybosset Street for us. The only time I realized about our union was when Christine came downtown, and that's when I realized that, you know, we have rights, and we can call our union steward, and this and that. Other than that, I was never told.

Q. Who was your union steward early on in your employment?

A. The only one I knew was Paul Cardin, and if you called him and complained to him, or said something to him, he would more or less be like just overlook it, let it go. Like I would call about Jerry getting the overtime. They were constantly calling Jerry in for the overtime, and I'd call Paul Cardin, and say, you know, my name was on that list for the overtime, and they called Jerry, and it was like -- you know, it was like the union just didn't want to -- you know, don't



fight, just let things go, ignore it.

Q. Did you ever file a grievance about overtime?

A. Yes, I did.

Q. Okay. What happened?

A. Well, it ended up that there was a big fight and everything, but I did end up getting the money. I did end up getting paid for it after a great big argument, and it went on -- I think it took a couple of weeks, but I had the right. I mean, it was my right because Ed made the mistake of bringing Jerry in when he should have called me. So after that was all straightened out, Ed turned around and did it again, called Jerry in on the overtime when it was my turn to come in on overtime, and again, I went and complained, but this time, they refused to pay me. They said what I could do is come in and do the cafeteria floor that day all by myself, the whole cafeteria, when it's a two-person job. One person has never done that floor by itself.

Q. When was this, these two complaints about overtime?

A. Probably seven years ago.

Q. So 1999?

A. Yes, around there.



Q. Because you didn't go back to work at the gas company after October 15 of '99; right, because you had that fall where you hurt your back?

A. Well, it was probably the year before then or shortly before that, because there was a lot of dispute about the overtime. Because Jerry would come in, and he would make remarks like, "Where were you last night? Ed had to call me in to do your job," and I said, "What are you talking about? Ed never called me." "Well, I came in, and I did your job." I mean, Jerry always made sure he let me know. If Jerry never said anything, I wouldn't even have known half the time.

Q. So you think these complaints about overtime were probably in 1998?

A. Probably 1998 then.

Q. Other than Jerry Porter, Joe Ianniello, once you were in facility maintenance, were there any other people who were assigned -- or any other males, let's put it that way, who were assigned to facility maintenance at Weybosset Street who you worked with?

A. Richard Kala.

Q. And did Mr. Kala ever say anything inappropriate

to you?
A. Most certainly did.
Q. What did he say?
A. When he first came into the maintenance, we had to train him, and his first night of training was with me. He worked three nights with me, and I took him up on the third floor and started to train him how to -- you know, the baskets to clean, and all that. And he started asking me if him and I could have an affair, and no one would have to know about it, and I just -- you know, just laughed it off, because I thought he was just joking. You know, we're working together. He's just making conversation and joking.
But as the night went on, and we were working together, he continued it, and said no one would have to know about it, and, you know, it could be our own little thing, and I said, "Well, I don't know if you know, but I'm seeing somebody, so I'm not really interested, and I don't like the way you're talking to me." So I just left him with an area to do, and I went off on my own and finished my work. Showed him what he had to do, and just left him instead of working with him.
So the next night when he came in, and we



were in the cafeteria -- I used to bring my lunch in and put it in the refrigerator -- he was on the other side of the cafeteria wall there, and he said, "Hi, Carol, how are you?" And I said, "I'm not talking to you," and he said, "Why aren't you talking to me?" I said, "The way you talked to me last night, it was very inappropriate, and you owe me an apology," and Maureen was standing there.
Q. Who's Maureen?
A. I'm not sure of her name, but she's still there. Maureen was standing there because she cleaned at night, too, with us, and he apologized to me. He said, "I'm sorry. I'll never talk to you like that again," and he said, "Are we still friends," and I said, "Okay."
So again, that night, he had to work with me, and he started again. So I just more or less gave him what jobs to do, and I went off on my own. And then it came to be around the holidays. It was like New Year's night, and it was him and I and Jerry who worked together, the New Year's Eve, that night it was the three of us, and we all agreed to bring in a little something. We were going to have a party, and I brought like sandwiches, and I don't remember what Richard



brought, but Jerry brought liquor.
So we were down in the basement. So I got a little uncomfortable with that, because being down in the basement with two men with liquor, and with what Richard Kala had done to me, I just -- I couldn't stay down there, so --
Q. Sorry to interrupt you, but how much time had it been between his making those suggestions to you and this party, quote/unquote, that you're talking about?
A. Probably a couple months.
Q. Okay. And --
A. Because he ended up getting his own floor after I trained him, and I tried to avoid him.
MR. MCNAMARA: Okay.
A. I didn't talk to him. I tried to avoid him as much as possible, so I really didn't see him that much.
Q. So after those first two times when he made that suggestion to you, you tried to avoid him and --
A. And I never said anything. I didn't go to Ed on it or anything.
Q. And he never said anything more to you?
A. No.
MR. MCNAMARA: Sorry I interrupted.



A. That's okay. So the night we're down in the basement, like I said, and when Jerry went outside and got the cooler and came in with it, I just couldn't stay there. I mean, I wasn't worried about Jerry. I just didn't trust Richard. So I ended up going upstairs to the cafeteria sitting in the cafeteria and reading the paper. I was up there for about 15, 20 minutes, and Richard come up, and I was like sitting here, and he sat like across from me, and he said, "You want to have an affair?" And I said, "Richard, you're married." I said, "And I'm seeing somebody." I said, "And I don't like that kind of talk."
So then he took out his wallet, and then the -- the compartments, like little side things in the wallet, he's taking out hundred dollar bills that were folded like in three's, and he's throwing them on the table, and he's telling me money is no object. No matter how much I want, he'll pay. He doesn't have a problem with it. I just got up from the table, and I went downstairs and got my belongings, and I left because I just -- I couldn't be in the building with him. I just had to get out of there.
Q. And did you complain to anybody about that?

A. I told Ed.
Q. And then what happened?
A. I told Ed -- I think it was -- this was on a Friday night, so that Monday, I had called Ed, and I was crying like anything Monday morning, and telling him about it and everything. He said, "When you come in, just come up to my office." So I went up to his office, and I had told him what had happened. I told him everything. So he said, "Well, we're going to go down to Bud Butler's office."
So we went down to Bud Butler's office, and I had to tell Bud Butler. So Bud Butler said, "We're not going to have any of that around here." Bud Butler took me to Alicia Goody. I went to Alicia Goody, and she spoke to me for a while, and she said there would be a note going in his file, and she was going to see him and talk to him, and this would not happen again, and come to find out I wasn't the only girl. There were two other girls involved, Lynore and Maureen. So I had told her Maureen and Lynore were involved, and that she needed to speak to them.
So she finished talking to me, and I left her office. She said she was going to speak to



Richard and get it straightened out and everything. So I guess she did call Richard up to her office after I left, because I was downstairs getting my cleaning stuff to go to work, and about half-hour later, he comes down, and he stands in the doorway, and he tells me, "You better drop the charges." And I said, "I'm not." He said, "I'm warning you. If you don't drop them, you're going to be sorry, because this is going to be in my files for the rest of my life," and he said, "You better go up there and tell Alicia you made a mistake." And I said, "I'm not." I said, "And you just better get away from me." So I like pushed him, and just got on the elevator and went up to my floor.
And then all of a sudden, all things started happening. Things -- nuts and bolts got loosened on my car. Nuts and bolts got loosened on my tires of my car. I almost got killed going home one night. I pulled in the gas station because the wheel was so wobbly, and the gas station guy tightened up the nuts and everything, and said to me, "There's someone who doesn't like you." And I had like a carrying rack on top of the back of my car, that was all loose and everything. Somebody



had played with the nuts and bolts.
So I had told Jerry the next day what had happened to me. He said, "That happens with gravity. When you go on the highway, gravity does that to your car." I'm saying to myself these guys think I'm a moron. So my son-in-law ended up putting an alarm system in my vehicle, and I continued to work there, and Richard continued to make his little remarks, and every day I'd go up to Ed's office and tell Ed what he did or what he'd say, and Ed would say, "I'm going to take care of it. I'm going to take care of it." Nothing was done.
I went to Alicia Goody's office every single day to see if she had talked to Maureen or Lynore, and she'd say, "I'm busy right now. I'm going to take care of it. I'm going to take care of it." I went to Grant Keith. I went to him. I went to Royalynne. I went to everybody I could possibly go to in Human Resources to get help, and Grant Keith said to me, "I will keep you on a day-to-day basis with this." And I saw him the next day, and he, like, totally ignored me, like he didn't know me, and Richard continued to torture me.
I was down in the basement one night on the



phone, and he stood up in the hallway down -- I don't know if you're familiar with the basement at the gas company in the back, as you come down those stairs -- and I don't know if they've changed it, but the desk used to be right there at the wall, and your back would be facing like the back. Well, he came in one day and -- one night, and he's calling me. He's going, "Carol, Carol." I'm on the phone with my son-in-law. I says to him, "Don't hang up, because I'm down here by myself. Don't leave me on this phone," and he just walked away.
Then he came in one night, and he put his hand on my shoulder and said, "How are you feeling tonight," and he was just doing all kinds of things to me, and every day I'd go to someone and report it, and nothing would get done. I ended up leaving the building. I was petrified to be in that building with him.
Q. How long did he work in facility maintenance?
A. I think he was there maybe six or seven months. I'm not sure because I ended up going out. I couldn't work with him. I was afraid to be in that building with him.
Q. And when do you think that incident where he

brought in the liquor, the party --
A. That was New Year's Eve.
Q. And when do you think that was, what year?
A. I think it was probably '98.
MR. MCNAMARA: Okay.
A. '97, '98, I'm not sure. He didn't bring in the liquor. Jerry brought in the liquor.
Q. Okay. I don't have extras of this right now, but I'll show you -- this is a document similar to Exhibit A, but it's Richard Kala's document, and if you look at it, you'll see the date that he -- it appears from that he was in meter reading, but then he went into facility maintenance March 6 of '94, and then he went to fleet services on January 2 of '96.
THE WITNESS: Now, fleet services, is that the one that's on Allens Avenue?
MR. MCNAMARA: It's either Allens Avenue or Dexter Street.
A. I know -- see, he left here to go to -- he left the building because I wouldn't go back until he left, because I just couldn't work him. I went back once, and I had to leave again because I just couldn't work under those conditions with his threats and his remarks, and him following me



around the building. And he would fill the dumpster, and he wouldn't run the dumpster, and then when I would open the dumpster, the trash would all fall out. I just couldn't work under those conditions. So I think -- it was probably '95 then because that's when I told him I wouldn't come back until he left, and I think that's when he went to Allens Avenue for a short time. Then he went back to meter reading.
Q. Okay. So you think that the, quote/unquote, party you've been talking about when --
A. Was probably in '95, '95 going into '96.
Q. Okay. Are you aware -- well, strike that. You see where he went to fleet services where it's highlighted? His rate before he went in -- his last rate in facility maintenance was $19.79 an hour, but then he went to fleet services, which was $18.31.
A. He took a cut.
Q. He took a cut. Are you aware that he was transferred against his will because of your complaints?
A. Well, I was told that, but I didn't believe it.
Q. Why didn't you believe it?
A. I don't know because they never did anything to



the man. They let him get away with it all those months of doing what he did to me. In fact, they called and told -- because I ended up seeing a psychiatrist over this, because I just went totally to pieces, and they ended up calling -- Kathy Wall called the psychiatrist and told him that he had left the building, that I was able to go back, and I went back, and he was still there. So he hadn't left the building.
Q. But seeing his sheet right now which indicates that he left -- he went to fleet services on January 2, '96, and took a $1.48 per hour pay cut, do you understand -- strike that.
THE WITNESS: In other words, I should be gratitude because they did this for me after months and months of putting me through it.
Q. No, I'm just asking if you are aware that he was transferred at the pay cut against his will because of your complaint.
A. Well, I was told he took a job, and I was able to come back.
Q. Who told you that?
A. I was told by Ed that he did take a job down at Allens Avenue. That's why I believe that garage has to be Allens Avenue, but he did take a job



down at Allens Avenue, but he wasn't there long. He was only there a short time. I think he went back to meter reading.
Q. You mentioned a psychiatrist a minute ago?
A. Yes.
Q. Who was that?
A. Dr. Ruggiano.
MR. MCNAMARA: Are those the records that we've asked for, but you haven't been able to find?
MS. CLAPHAM: Yes.
MR. MCNAMARA: Is it clear now that there's no way we're going to get those records or --
MS. CLAPHAM: I got a letter from Butler Hospital the other day with a bill, and I'm trying to call them to see if there is really any medical records to go with that bill, and I've paid the bill, and I haven't gotten anything.
MR. MCNAMARA: Okay.
MS. CLAPHAM: The reason why I say that is because there's usually like a $15.00 retrieval fee at Butler --
MR. MCNAMARA: Right.
MS. CLAPHAM: -- and the bill was

like for $16.00, so I questioned whether there were any records that were going to come or if they were just charging me to search.
MR. MCNAMARA: Okay.
Q. So Mrs. Petrarca, you've told me about Mr. Domenicone, you told me about Mr. Ianniello, and you told me about Mr. Kala. Were there any other men who, while you worked at the gas company, made inappropriate comments to you or sexually suggestive comments to you or used vulgar language that you objected to?
A. Well, I don't know -- times when I went in to clean the men's room, I would be in the men's room cleaning, and men would come in and use the stall, and I would say, "There's a woman in here," and they'd go, "I don't have a problem with that if you don't," and I went to Ed on that situation, and nothing was done, and that happened to me twice.
Q. When was that? And where was that -- first, where was that? Was it Dexter Street?
A. Weybosset.
Q. Weybosset. And when was that?
A. About four years ago.
Q. You haven't been back at the company in six years,



so --
THE WITNESS: I've been out of the company six years?
Q. Well, the last time you worked there was October 15, 1999, and then you went out on leave because of your back, but you actually haven't worked at the company since October 15 of 1999. So it couldn't have been four years.
A. So probably -- I don't know. The years go by so fast. I'm saying '95.
Q. '99, October 15 of '99 --
A. Yes, I know. You're saying that's the last time I worked there.
MR. MCNAMARA: Right.
A. Okay. So I'm saying probably '94, '95.
Q. '94, '95 for the two bathroom incidents?
A. Yes.
Q. Okay. On those two occasions when men would use the facilities while you were cleaning the bathroom, did they expose themselves to you?
A. No, I wouldn't come out of the stall.
MR. MCNAMARA: Oh, okay.
A. I'd be in there cleaning, and I'd hear someone come in, and I would say, "There's a woman in here," and they'd say, "Well, I don't have a



problem if you don't have a problem." So I would just stay -- you know, stay locked in the stall. I'm not coming out while these men are going in the urinal, and I went to Ed on that, and suggested that would it be all right for me to do the two ladies' rooms, and let Jerry do the two men's rooms, so I wouldn't run into that incident, and he said no.
Q. Anything else you can think of in response to the question I asked before in terms of men making inappropriate comments, sexually suggestive comments, using vulgar language directed to you that you found objectionable?
A. Well, Roy Heaton, when I went into the maintenance department, he made a remark that I was taking a job from a family man who had to support a family, and that's not a place for a woman to be. He wasn't happy about me bidding on the job and receiving it.
And Bob Biber said to me, when I first -- when they first got the results on the test, which they took two weeks to get -- which I know didn't take two weeks to get those results -- when I went up to Ed's office, Bob Biber was there sitting with Ed, and he turned to me and said, "I don't



know how you passed that physical because I didn't even pass it."
MR. MCNAMARA: Sorry. Could you read the question and answer back?
(PREVIOUS QUESTION AND ANSWER READ)
Q. So what is it about the comment by Mr. Biber --
A. No, he said, "I can't believe you passed that physical because I didn't even pass it."
Q. So what is it about that that you found objectionable?
A. Well, they tried everything they could to keep me out of that department. They tried to discourage me. Like I said, things that they did to me, they did not do to men. They didn't take men down in the basement and make them lift 40, 50 pound boxes. Ed did it to me every single day. He'd come down the basement, and he'd say, "Carol, come over here. I want you to lift this box. Carol come over here. I want you to lift this box over here." He said, "Because these are the types of boxes you're going to be lifting, and if you can't lift them, you can't come into this department."
Q. And so how many times did he have you lift boxes like that?

A. He did it, I'd say, for a whole week straight every night.
Q. And that was when you were --
A. After I had gone for the physical, and he was waiting for the results to come in.
Q. So before you got the building maintenance position?
A. Yes.
Q. Now, did Mr. Bolduc ever say anything to you that was sexually suggestive, vulgar, anything like that, that you found objectionable?
A. No, he just liked to yell a lot.
Q. Did he yell at Jerry Porter, too?
A. No. Oh, no, Jerry would sit up in his office and drink coffee with him.
Q. What about anyone else in the department, did he yell at Mr. Ianniello?
A. No, it was just us women.
Q. He just yelled at women, never the men?
A. I never caught him or heard him yell at the men.
Q. Okay. Were you at the deposition of Ken Schiano?
A. I think I was. I can't remember.
Q. Do you remember Mr. Schiano testifying that Mr. Bolduc would regularly yell at him, treat him



badly?
A. Down at Dexter Street, yes.
MR. MCNAMARA: Right.
A. For some reason, he didn't like Kenny and Bill. I guess because they goofed off a lot. I guess they would leave early and everything. That's why -- what happened was when he went down to Dexter Street that day, I think he had it out with Kenny or Bill, and that's when he came back, and that was the day he flung our locker room door open; came in and just flung it open, and started screaming at me and Christine. He had a problem down at Dexter Street that day.
Q. Who flung the locker door open?
A. Ed. He just came in and pushed our locker door open. Now, he didn't know if we were changing or what. We were on our break.
Q. Oh, I'm sorry. When you said locker door, I thought you meant like a metal locker --
A. No, our locker room.
MR. MCNAMARA: Okay.
A. And he was really -- his face was red he was so angry, and just yelling. Now, he had just come from Dexter Street because I think he had had a problem with Kenny and Bill.



MR. MCNAMARA: You want to take a quick break?
MS. CLAPHAM: Of course.
(BRIEF RECESS)
Q. I want to go back to Mr. Kala for a minute, Mrs. Petrarca. As we discussed, he went to fleet services in January of '96. Did you and he ever work together again after that?
A. No.
Q. Okay. Did he ever work, to your knowledge, at Weybosset Street after that?
A. No.
MR. MCNAMARA: Okay.
A. But I would run into him at Dexter Street.
Q. Okay. When you worked with him -- well, strike that. When you ran into him at Dexter Street, did he say anything inappropriate or suggestive to you?
A. He would make remarks, and he would -- he was like leaving to go out for the day, and he had no right going through the kitchen area, but he knew I was there, and he'd more or less come through, and he'd smile at me and say, "How are you today," or "what's going on," and then he'd go out the door.



Q. Okay. Your last few years at Providence Gas after Mr. Domenicone retired, after Mr. Ianniello retired, after Mr. Kala left, other than Mr. Porter, were there any other men who worked at the facility maintenance at Weybosset Street?
A. No, there was just Jerry. In fact, I think that's the way it is now. It's still just Jerry, the maintenance man.
Q. Well, it's Jerry and Mrs. Stamp?
A. Yes, I know, but I mean as far as the men, Jerry, he's still the only man.
MR. MCNAMARA: I think you're right. That's my understanding as well.
(PAUSE)
Q. Mrs. Petrarca, there was a -- strike that. Do you remember filing a claim for Workers' Comp back in '92?
THE WITNESS: For an umbilical hernia?
MR. MCNAMARA: Broken toe.
A. Oh, the broken toe, okay.
Q. Do you remember that?
A. Yes.
Q. That went to Workers' Comp Court, and it was initially before a Judge Morin; do you remember

that?
A. Yes.
Q. Had you done housecleaning for Judge Morin?
A. Yes.
Q. So that case had to be transferred to another judge?
A. It was just dropped because he told them that I didn't clean when I broke the toe. I was not cleaning, but they wanted to subpoena his records. What happened was my daughter did his house while I was out with the broken toe, and I drove my daughter -- well, I didn't drive my daughter. I went with my daughter to show her how to get to his place, and I would sit there when my daughter was cleaning. He was home, but when we went into the court, and I saw that he was the judge, and he was the gentleman I cleaned for, the gas company was like -- you know, they were going to subpoena his records and everything to try to prove that I had been cleaning with a broken toe, which I hadn't.
Q. Well --
A. Because he paid me by check. I mean, when I first went to work with the gas company, they knew I cleaned houses. So I didn't hide anything.



MR. MCNAMARA: Right. Mark that as Exhibit B.
(DEFENDANTS' EXHIBIT B MARKED FOR IDENTIFICATION)
Q. Okay. Mrs. Petrarca, I'm showing you a document marked Exhibit B. It's three pages long. Was Attorney Bruzzese your attorney for that claim? I'm sorry --
A. It was --
Q. Mr. Howe?
A. Yes.
Q. Attorney Howe, he was your attorney?
A. Yes.
Q. I'm sorry. The gas company's attorney was Bruzzese at the time. And at the bottom, is that your signature Carol Wiberg at the time on the first page?
A. Yes.
Q. "I have read and understand the above stipulation"?
A. Yes.
Q. And it says at the top the petition is withdrawn and discontinued with prejudice. Did you understand what that meant at the time?
A. Not really, but I was told that the reason I



dropped it was my lawyer told me not to go any further with it because they would drag in the lawyer's bank statements, and it would show he had been paying me -- even though my daughter cleaned the house, it would show that the check was made out in my name, and I wasn't going to win, but -- even though the judge said that I wasn't the one who cleaned his house. I guess they went in the judge's chambers.
Q. But the attached letter indicates that this matter had been transferred from Judge Morin to Judge Arrigan, and that's whose signature is on the petition -- I mean, the withdrawal. I'm sorry. So Judge Arrigan was the one who signed the notice of withdrawal, not Judge Morin.
A. I didn't know that. My lawyer just told me, "Look, Carol, you're best not to pursue it. Let it go, and just walk away because you're not going to win." So I trusted him and listened to what he said.
(PAUSE)
MR. MCNAMARA: We're finished with that one now, Mrs. Petrarca.
Q. Why don't you tell me about the incident that you referred to earlier where Mr. Bolduc came into the



room where you and Mrs. Stamp were; what time of day was it?
A. I'd say it was probably around 2:30, quarter of 3:00, because we had taken our break.
Q. And what had you been doing prior to --
A. Christine had been painting up on the sixth floor.
Q. And what had you been doing?
A. I had been delivering the boxes, like I said, when we get all the boxes. I had been delivering the boxes because when usually there's two in the building, both can't be like out on the roof or whatever because you can't hear the phone or you can't hear like if there's jobs that need to be done, so always one has to stay near the phone or inside doing chores.
So I was inside that day, and he put Christine upstairs to paint, and I had just got done delivering the boxes, and I had come down, and I had gone into the room. I was late taking my break. I had just got in there, and Christine came in probably five minutes after me.
Q. How long had that room been used as a locker room?
A. All the years I had been there, since the day I started.

Page 70

Q. It was just used as a women's locker room?
A. Yes.
Q. What did you keep in there?
A. Kept our clothes, our pocketbooks. We were able to change in there, lunches -- you know, if it didn't have to go in the refrigerator, our lunches.
Q. When did you normally take your break?
A. In the morning. I think it was like 9:30, quarter of 10:00. See, I never took them on time because if I was doing something, I wouldn't stop. I'd continue working because a lot of times, I worked through my breaks. A lot of times, I worked through my lunch hour because if I was on a job, I wouldn't stop.
Q. Okay. But you would --
A. Our break was, I think, like 2:30 to quarter of 3:00, but like I said, we never -- it was never on time. Very few was taken on time.
Q. And your workday ended at that point at what time?
A. 4:00.
Q. So you worked 7:30 to 4:00?
A. Yes, and a half-hour for lunch.
Q. So you were both in the room, and you said it was about 2:30?

Page 71

A. It was about 20 minutes of 3:00.
Q. And what were you doing in the room?
A. We were just talking. She was telling me about the painting upstairs, and I was telling her how I just got done delivering the boxes, and she was, you know, tired and everything. She had put the paint away, and I guess she was going to do other chores in the building. She thought she was done painting.
And I guess when Ed came back, he went out on the roof and saw all the equipment had been put away, and he had just come from Dexter Street. So he came downstairs, and we were sitting there, and all of a sudden, boom. He flings the door open, and he starts screaming at us, and telling us we're not supposed to be on our break, and the two of us are supposed to be up there painting, and how dare us, you know, be sitting here.
I said, "Ed, I'm not painting. It's Christine that's painting. You know, I'm down here doing chores in the building," and he just went on and on, and then that's when Christine said, you know, "Don't talk to me like that. You got a problem with the guys down in Dexter Street, don't come back here and take it out on us," and

Page 72

he told her to get back up there and paint. He was very --
Q. How long was he in the room?
A. I'd say five, ten minutes, because he just was not going to leave. He just would not let up. He wanted us up and out of there.
Q. So what did you say to him other than what you've already said?
A. I just told him I had just come in. I was on my break. We were on, you know, break, and he said, "No, you're not on break. You're passed your break." I said, "Ed, I just got down here. I still have another five minutes." He said, "I heard you girls laughing and joking." I mean, if we were trying to hide and it wasn't our break time, we wouldn't be sitting there laughing and joking. That alone would tell you something.
Q. Was the door open or shut?
A. It was shut.
Q. Completely shut?
A. Yes.
Q. Okay. How do you remember that?
A. Because we both shut it, because we were sitting in the dark because I had a little bit of a headache, and that's why I was sitting in there

Page 73

in the dark, and like I said, then Christine came in, and I asked her to please shut it, because I had just taken an Advil because my head was hurting.
Q. So you had the door closed, and there's no windows in that room?
A. No.
Q. So it was completely dark?
A. Yes.
Q. Okay. So when Mr. Bolduc came in, did he turn the light on?
A. No, when he flung the door open, the light from the hallway --
MR. MCNAMARA: Okay.
A. -- you know, lightened it up. Like I was sitting in a chair, you know, like this, facing the door, and Christine was sitting like in a side chair, like this way, and like I said, we weren't hiding anything. She was just telling me the painting upstairs, it's like tacky and tiresome, and, you know, she quit for the day, and that's it. I mean, it was 2:30, quarter of 3:00 in the afternoon. We only really had only another hour left, you know, to work. So she figured she'd do extra jobs -- you know, do things downstairs that

Page 74

needed to get done.
Q. Did Mr. Bolduc use any vulgar language when he came into the room that afternoon?
A. I don't recall. I know he yelled a lot. I mean, he screamed.
Q. Okay. And then what happened after -- well, strike that. Were you both fully dressed at the time?
A. Luckily. Because a lot of times, sometimes I change my tops, you know, from different jobs. I keep a couple of shirts in there to change, and you know, Christine does, too, because sometimes I'll put on a clean shirt to go home or whatever. I mean, he's really lucky that neither one of us was changing.
Q. What happened after he left?
A. We just looked at one another and was like in shock. We just thought there's something wrong with him. I mean, we didn't get up and leave, because we still had like a few minutes left on our break.
Q. Had he ever come into that room like that before?
A. He's come and knocked on it, you know, and wanted to know what you're doing. You know, you tell him, you know, we're on our break. Like I

Page 75

said, if our break was at 2:30 and we're doing a job, sometimes we don't want to stop the job to go take our break. We want to like finish the job, and then take a break.
Like I said, if we're unloading boxes, and throwing them down the chute and everything, and it comes to be 12:00, and it's time for to us go to lunch, we don't want leave all those boxes packed outside up against the wall or whatever. So we finish it, and get them all downstairs, and then we go to lunch, and sometimes it's like 1:00.
MR. MCNAMARA: Right.
A. So, you know, I know we're supposed to take our breaks at certain times, but if you're doing a jobs -- and there's times I've worked right through my break because I have worked with Ed sometimes, and I had worked through my breaks, and he knows that. He knows I have not taken a break, because I'm there working with him; times that we've been upstairs on the Hitachi, and there's been a problem with them, and I stay up there with him. I don't go down and take a break.
Q. So prior to that day, which was in August of '99, he had come to that room, but he would knock before he came in?

Page 76

A. Yes.
Q. Okay. After that day, did he ever come to that room again and come in without knocking?
A. He never came down to the room.
Q. So that never happened again?
A. Not that I can recall, no.
Q. And did you complain to anybody about that?
A. We called our union president.
Q. Who was that?
A. I believe it was -- I think it was Ray Conroy, and we called Paul Cardin.
Q. And what happened with that?
A. They told us they would get back to us, and we called again, and they said the best they could do for us is to put a note in his file.
Q. Who said that?
A. Ray Conroy. The best we could do is put a note in his file, and we said that wasn't acceptable -- and maybe he would give us an apology, maybe.
Q. What did you want to be done?
A. What did I want to be done? I thought respect would be kind of nice, and the gentleman does not have respect. He feels as if he did absolutely nothing wrong, and to this day, I know he still thinks he did nothing wrong.

Page 77

Q. How do you know that?
A. I just know. I know Ed Bolduc.
Q. Did you ever get an apology from him?
A. We did not. It was pushed aside like everything else was. "We'll get back to you. We'll get back to you. We'll let you know." That's why we ended up writing a letter to Human Resources because I didn't want to let it go anymore. The treatment and what went on in that company with us women was unbelievable, and it just was -- it doesn't end. It's still going on down there.
MR. MCNAMARA: Move to strike.
THE WITNESS: I'm sorry.
Q. Mrs. Petrarca, to be honest, you have no idea what's going on down there either, you haven't worked there in six years?
A. I'm friends with some women.
Q. You have no personal knowledge?
A. No.
MS. CLAPHAM: Just wait for the questions. Let him ask his questions.
(DEFENDANTS' EXHIBIT C MARKED FOR IDENTIFICATION)
Q. Mrs. Petrarca, I'm showing you Exhibit C which is

a letter dated August 31, 1999. You mentioned earlier you complained to Human Resources. Is this your letter to Human Resources complaining about Mr. Bolduc walking into your dressing room?
A. Yes.
Q. And you cc'd the Steelworkers on that as well; is that correct?
THE WITNESS: Steelworkers? What do you mean?
MR. MCNAMARA: At the very bottom, your union.
A. Okay. Yes.
(DEFENDANTS' EXHIBIT D MARKED FOR IDENTIFICATION)
Q. Exhibit D is another letter from Henry Butler to you and Mrs. Stamp dated September 1, 1999. Do you remember receiving this letter?
A. Yes.
Q. Okay. And in that letter, Mr. Butler states, "Please be assured 'we have not forgotten about the incident'"; do you see that in the third paragraph?
A. Yes.
MR. MCNAMARA: Okay.
(DEFENDANTS' EXHIBIT E MARKED FOR



IDENTIFICATION)
Q. Exhibit E, Mrs. Petrarca, is another letter dated September 21, 1999, also from Mr. Butler to you and Mrs. Stamp. He states there, "As stated in my September 1, 1999, letter to you, I will schedule a meeting with you, Mrs. Petrarca and a union representative when you return to work." Do you remember getting that letter?
A. Yes.
Q. Okay. Was there ever a meeting that you had with Mr. Butler regarding this incident?
A. No, there wasn't.
Q. You never had a meeting with Mr. Butler?
A. What happened was Christine went out on stress, and I happened to go up into Ed's office for something. Ed called me up, and Bud Butler came up, and they told me if I wanted to talk about this, I could talk about it without Christine being there, and I refused, and that was the end of it, because I didn't feel as if -- it happened to the two of us, and I didn't want to discuss this situation without the two of us being there. In other words, they were telling me if I discussed this with them now, that's the end of it.



Q. How do you know they were saying that to you?
A. Well, that's the way they put it.
Q. What did they say exactly?
A. They said to me, "Do you want to discuss the incident with the -- what happened with Ed," and I said, "Not without Christine being there," and they said, "Well, we have no idea when she's going to come back," and I said, "Well, I'll wait until she comes back," and they said, "Well, then you can leave because we have nothing to say."
Q. Do you know when she came back?
A. I think she came back probably a month later. I'm not sure.
Q. A month after what?
A. After this happened.
Q. When you say "after this happened," are you referring to the letter?
A. No, after the sexual harassment -- after the door being pushed open on us.
Q. Okay. Did she come back before you went out on October 15, 1999?
A. I think she did. I think she came back, and then I ended up going out. Maybe we were both back together for a while. I can't recall.
(DEFENDANTS' EXHIBIT F MARKED FOR



IDENTIFICATION)
Q. Mrs. Petrarca, Exhibit F is a document -- there's no date on it, but it begins, "On August 20, 1999, at approximately 2:15 p.m., I stepped out onto the roof" -- it goes on from there. Have you seen this document before?
A. Yes, this is when Ed was looking for Christine to paint.
MR. MCNAMARA: Right.
A. This is before he came down to our locker room.
Q. Right. So you've seen this document before?
A. Yes.
Q. And at the end it says, "I offer my apology to each of you and state that in the future, I will knock on the door if I require your services."
A. I don't remember reading this.
Q. You already said you've seen this document before?
A. Yes, I did, but I don't remember reading that.
MR. MCNAMARA: Okay.
(DEFENDANTS' EXHIBIT G MARKED FOR IDENTIFICATION)
Q. Okay. Mrs. Petrarca, Exhibit G is a note dated December 13, 1999, to you and Mrs. Stamp from Mr. Bolduc. Have you seen this document before?
(PAUSE)

A. Well, I heard about it. I heard that he couldn't find her up there on the roof, and he was looking for her.
Q. I'll represent to you that I got this document from your attorney, Ms. Andrews, so it didn't come from the gas company. It came from either you or Mrs. Stamp.
A. I'm not saying that. I'm just saying --
Q. Okay. Do you deny that you ever received this at or about the time of December 13 --
A. To tell you the truth, I don't recall. I probably did. I don't recall.
MR. MCNAMARA: Okay.
A. I received a lot of documents, and I read a lot of documents, but it's been a few years, and --
MR. MCNAMARA: I understand.
A. And that's why I was studying up on some of the things that were given to you today to try to refresh my memory.
MR. MCNAMARA: I understand.
(DEFENDANTS' EXHIBIT H MARKED FOR IDENTIFICATION)
Q. Exhibit H is a letter dated December 15, 1999, to you and Mrs. Stamp from Mr. Bolduc. Have you ever seen this document before?



(PAUSE)
(NO ANSWER)
Q. If it helps, I'll represent to you, you may notice that some documents I have given you have numbers on the bottom, and some don't. The ones that don't have numbers on the bottom, that means that I got them from your attorney, Ms. Andrews. The ones that have numbers on the bottom are reference numbers we put on documents. So that may or may not refresh your memory or --
MS. CLAPHAM: Just because they have numbers on them from Ms. Andrews, she has documents from all sorts of sources, not necessarily from you. So you need to take the question as it is, and answer it based on your memory at this time.
MR. MCNAMARA: Absolutely. Right.
A. I can't recall this.
Q. Is it possible that you received this document?
A. Mailed to me or given to me at Pat Andrews' office? I don't recall seeing this.
Q. You don't recall seeing it when?
A. At her office or reading it.
MR. MCNAMARA: Okay.
(DEFENDANTS' EXHIBIT I MARKED FOR



IDENTIFICATION)
Q. Mrs. Petrarca, Exhibit I is a letter dated October 14, 1999, several pages long. If you look at the last page, is that your signature and Mrs. Stamp's signature?
A. Yes. Do you want me to read it?
Q. I just wanted you to look at it and be satisfied that this is a document that you signed and were aware of at the time that it was sent.
(PAUSE)
A. Yes, in fact, I read this last night.
Q. I'm sorry. What?
A. I read this last night.
Q. Okay. What was the purpose of this letter?
A. This letter was -- purpose to let them know what was going on between us women and Mr. X.
Q. Who's Mr. X?
A. Jerry Porter. We didn't mention his name at first. We called him Mr. X because we really did not want to get him in trouble. He would tell Mr. X jobs, and Mr. X would come down and tell us about the jobs. Like if there was going to be a fire drill, he would tell Mr. X there's going to be fire drill, prepare for it, and he would come down and tell us there's going to be fire drill,



you need to prepare. Ed would never do it. He would have Mr. X do it. If there were jobs, he would tell him what jobs we needed to do, and he would come down and tell us.
Q. And why did you object to that?
A. Because by right we were all supposed to meet in Ed's office in the morning. That's how it started, all going up in Ed's office, just like the night crew would go up in the office at night, the cleaning crew. Ed said, "Well, you don't need to go up to my office in the morning anymore. You guys got different jobs every day. You know what to do, so you're all right, so do them." But Mr. X still continued to go up to his office, and he continued to tell him certain jobs, to tell us what to do.
Q. I know it says Mr. X in the letter, but for the record --
A. Jerry Porter.
Q. -- it might be easier if you refer to Jerry Porter by name.
A. Jerry Porter.
Q. On the second page, there's several different items listed here. What caused you to list these particular items in the letter to the Commission

For Human Rights?
A. When I was told by Mr. Bolduc -- you want me to start there with the 1?
MR. MCNAMARA: You don't need to read it aloud.
THE WITNESS: No, but you want me to read it, and tell you why?
MR. MCNAMARA: Yes.
THE WITNESS: Okay.
(PAUSE)
A. All right. The calling on the overtime --
MR. MCNAMARA: Yes.
A. For some reason, Ed would not call me. He would call Jerry. He would forget to call me, and like I said, when I would go in the next day -- it always seemed that something would happen on a weekend, and when I would go in that Monday, Jerry would come in and say, "Where were you yesterday? I had to go in and do your job." And I said, "What are you talking about?" He said, "Well, Ed tried to get a hold of you, and he couldn't reach you." I said, "I have been home, and he did not call me." And I'd get mad and go up to Ed's office, and find out why he didn't call me.
A lot of times Ed would say he didn't realize



I was low on the overtime sheet. That was a mistake that -- you know, but when we used to leave work at night because we had -- what do you call it, come in from -- the security come in when we used to leave at midnight, a security guard come in.
MR. MCNAMARA: Yes.
A. And Ed would always -- Jerry would give the security guard his phone number, and tell the security guard if there was any problems, to call him not Ed.
Q. Okay. Now, before this letter was sent, did you read it?
THE WITNESS: Before it was sent?
MR. MCNAMARA: Yes.
A. Yes.
Q. Did you help write it?
A. Yes.
Q. Number 2 --
A. This is the thing when Ed came downstairs and put the personnel thing on the desk down in the basement, and told me I had a week to study it.
Q. That's Item Number 2 on Page 2 that says, "Ed told Carol that she had to study company personnel policy."



A. Yes, I called -- well, when Christine came down, I started studying it, and she said, "What are you doing?" I said, "Ed just came down and put this on the desk, and he told me I need to study it, and I need to know everything in it in a week." She's going, "What are you talking about?" I said, "Well, this is what he said to me." She said, "Did he give it to anybody else?" I said, "No." So she called the union and the union said no, I don't have to study it. I still got the book at home with his handwriting on it, telling me that I needed to study that book.
Q. And so why did you include Number 2 in this letter?
THE WITNESS: Why did I include it?
MR. MCNAMARA: Yes.
A. Because of him bringing a book and slamming it on the desk and only telling me that I needed to study this book when I didn't have to. It's just another thing he did to me, and if I hadn't have known better, I would have studied that book.
Q. Right. Okay. Number 3, why did you include that? Again, for the record, this is Number 3 on Page 2.
A. I'm reading it.
MR. MCNAMARA: I'm just doing this



for the record. I'm sorry.
THE WITNESS: Oh, okay.
(PAUSE)
A. Okay. On this here incident, it was true when Ed wanted someone to do the overtime, that was something new that he brought up, that he wanted Jerry there with one of the women. Two women couldn't be together, so he made sure it was Jerry and a woman working together, and that was something new, because it would only always be one person, but because I was low, he had this excuse where Jerry had to work with me.
Q. I'm sorry. Going back to Number 2 for a minute. Do you remember when that occurred, when Mr. Bolduc told you you had to study the company personnel policy?
THE WITNESS: Can I look back at the date on the --
MR. MCNAMARA: Sure.
A. October 14 -- I'd say it was probably the beginning of October, shortly after.
Q. Number 3 refers to New Year's Eve. What New Year's Eve?
A. When he said that he wanted two maintenance people to work downtown.

Q. What New Year's Eve are you referring to?
A. I think that was my last New Year's there, and I was the low one to work that New Year's Eve.
Q. Yes, but are you referring to New Year's Eve, December 31, 1998?
A. Yes.
Q. So a New Year's Eve in the past is what you're referring to?
A. The New Year's that he decided that he wanted two people on, which never happened before. It was always a one-person job.
Q. That was before you wrote this letter that that occurred?
A. Yes.
Q. So you think it was December 31, 1998?
A. Yes, that he had Jerry work with me, the two of us.
Q. But are you remembering now that you referred to a New Year's Eve a few years earlier where you and Mr. Porter and Mr. Kala were all working?
A. We were working because then our shift was cleaning until midnight.
MR. MCNAMARA: Okay.
A. We were all cleaning until midnight, so we ended up -- we figured we'd have a party before



the night guy came in. So we didn't actually wait until midnight to have this party.
MR. MCNAMARA: Right.
A. In other words, we had the party like on our break, say around 7:00, 8:00, our supper break, because the night guy was coming in to relieve us, the security guard, so we didn't have this party at midnight. We were gone out of the building before midnight.
MR. MCNAMARA: Okay.
A. So I probably should correct myself on that.
MR. MCNAMARA: That's fine.
A. But this here job working for the New Year's, we were there like until the next morning. We weren't there like right until New Year's and left. We worked right through until 7:00 the next morning. But the incident with the three of us being together, we were going home before midnight.
Q. Number 4 on Page 2, why did you include that in this letter?
A. When the night crew came in, which was the cleaning crew, we would meet them at 3:30 in the afternoon, because that's what Ed wanted. We would meet with them, and we would tell them if



there was any problems, you know, that we had had or whatever. And we would sit down in the basement with them for about 10 or 15 minutes and talk to the guys. And Ed just happened to come down one day, and, you know, we were joking and laughing, and he said that that needed to stop, that we needed to work right up to 4:00, couldn't happen, that that had to stop.
So as I'm coming through one day, there's Jerry and Ed sitting there talking at 3:30 and clowning and everything, but that was perfectly all right. And then another incident came through, again, Christine and I, and there's Jerry sitting there with the guys and with Ed talking and everything, but we weren't allowed to do that anymore. We had to work right through until 4:00.
Q. And you concluded that because you thought that showed men and women were being treated differently?
A. Yes.
Q. Number 5, why did you include that in this letter to the Human Rights Commission?
A. Because when I went into the maintenance job, my pay didn't start like the men's job. I started at the lowest rate where the men didn't.



Q. Okay. And then after these numbered paragraphs, you referred to the August 20 incident where Mr. Bolduc came into the locker room?
THE WITNESS: Where's that?
Q. And we've talked about that.
THE WITNESS: Sitting in the women's dressing locker room?
MR. MCNAMARA: Yes.
THE WITNESS: That's the next page; right?
Q. Right. And we talked about that, so you don't have to go over that, but what I'm saying is you also referenced that incident and the facts surrounding this incident to the Human Rights Commission. Why didn't you include anything in this letter about Mr. Domenicone?
A. Because I had gone to Ed on Mr. Domenicone, and it was already -- as far as I knew, was in the file. I didn't know it was just in his file, and no one else had seen it.
Q. But why didn't you want to let the Human Rights Commission know that Mr. Domenicone had done the things that you already testified about to you, and that you believe Mr. Bolduc didn't do anything about it?

A. That's one of the papers I had on me.
Q. Okay. That was my question.
A. Okay.
Q. Whose handwriting is this?
THE WITNESS: Whose handwriting is that?
MR. MCNAMARA: Yes.
A. It's Christine's.
Q. When did -- Christine Stamp, is that who you're referring to?
A. Yes.
Q. When did Mrs. Stamp give this to you?
A. I believe it was last week.
Q. Did she give it to you in person?
A. Yes.
Q. Was it just the two of you?
A. Yes.
Q. What did you discuss when she gave this to you?
A. No, we just discussed -- like I had notes that she was holding for me, that I have a bad habit of misplacing and everything, and just trying to help me refresh my memory on things. See, I had forgot about being a night watchman. I was a night watchman at the gas company, too, which I totally forgot. So when I saw this, you know, I realized



I had been a night watchman, too.
Q. So she -- Mrs. Stamp gave you this document, Exhibit K, last week, and how long did you meet with her when she gave this to you?
A. Oh, we only talked for a few minutes because I had a card for her and some palms for Easter.
Q. Okay. Did you discuss what was on this note when she gave it to you?
A. I just looked it over, and like I said to her, oh, good thing you wrote down night watchman because I totally forgot I was a night watchman.
Q. A couple things on this I want to ask you if you know what they mean. It says, "Parking in garage"; do you know what that's referring to?
A. Yes, me.
Q. What about it?
A. I would sometimes park in the garage before 5:00 in the evening. If I couldn't get a spot on the street, I would pull into the garage, because the guys did it. And this one night I pulled in the garage, and Ed came looking for me, and I happened to be up on the fourth floor, and the executives had just got done with a meeting, and they were all gathering there in the room, and he came up and started screaming at me like a raving



looney and telling me I better get down there now and get my car out of garage, and Joe and Jerry's car was in the garage.
Q. When was that?
A. It was at night. It was an evening shift. I don't know the date.
Q. Was it when you were building maintenance or --
A. I was building maintenance, but I was cleaning.
Q. But you don't know when it was?
A. No.
Q. "Pay - lowest" --
A. Yes, when I first went into the maintenance department, my pay was lower than the gentlemen when they started. I started at a lower rate than them.
Q. It says, "No light duty - men have"; what is that referring to?
THE WITNESS: Where is that?
(ATTORNEY MCNAMARA INDICATING)
A. The only thing I can think of is men don't have light duty. I'm not sure. Like I said, she just gave me this with a few things to remind me.
Q. A little further down, it says, "I cleaned, men maintenance"; do you know what that is referring to?



A. Some of the cleaning jobs that I was given in the men's -- in the maintenance department called for two people, and Ed made sure he gave it to just me, and there was always two people doing that job.
Q. What job?
A. Like a lot of times I had to do like the vents, the air condition vents, like up there and everything, up and down the ladder with the bucket of water and everything, and Ed never wanted one person to do that because he said it was dangerous. There should always be someone down below to get the bucket to change the water, so one person wouldn't have to be going up and down. In case they fell, there would be someone there with them. But he would give me those kinds of jobs on Saturday when I would be there by myself, me doing it.
Q. When was that?
A. That happened when I worked Saturdays.
Q. When did you work Saturdays?
A. The time when the incident came over the overtime. Remember I told you that Jerry got the overtime, and then they paid me for it.
MR. MCNAMARA: Right.

Page 106

A. And then it came up again. Well, that's when they refused to pay me, so Ed said I could come in on a Saturday and work all day. So he gave me that kind of job to do, that job cleaning the air condition vents, and another job he gave me was doing the kitchen floor when that was a two-person job, strip it and clean it all by myself.
Q. How do you know that he never had one person do that kind of job?
A. I was told by the men.
Q. Which men?
A. Jerry, Pat. He never did that. They never did it alone. There was always two men doing it at night.
Q. Did he ever -- to your knowledge, did he ever give that kind of a job to Lynore Horne?
A. I don't know, to tell you the truth.
Q. To your knowledge, did he ever give that kind of a job to Mrs. Stamp?
A. I can't answer. I really don't know.
Q. Okay. It says below that, "What is sexual harassment? Women treated differently"; what is that?
A. That was at -- do I know what, you know, sexual harassment means.

Page 107

Q. So this is Mrs. Stamp's writing about --
A. Asking me if I recall what -- you know, do I know what sexual harassment means.
Q. And it's her writing that says women treated differently and disrespect?
A. Yes, which I didn't need her to write that, but I -- you know.
(DEFENDANTS' EXHIBIT L MARKED FOR IDENTIFICATION)
Q. Okay. Have you talked to Mrs. Stamp about your deposition since she gave you that document?
A. No.
Q. Prior to her giving you that document, were there occasions when you talked to Mrs. Stamp about the case -- your case and her case?
A. No.
Q. Never?
A. We talk, but I mean, we don't get into details.
MR. MCNAMARA: Okay.
A. I mean, I talk to Christine almost every day, but we don't talk about the case. I don't know what's going on with her, and she really just knows bits and pieces about mine.
Q. But you had told her your deposition was coming up?

Page 108

A. Yes.
Q. And then she gave you that document, Exhibit K?
A. Yes, in fact, it was supposed to have been last week.
Q. Right. Exhibit L is another document that you gave me today. Whose handwriting is this?
A. That's mine, just asking questions that I thought you would be asking me.
Q. But at the top it says, "Carol, Questions they ask you."
A. Yes, I wrote that. What are you looking at me like --
Q. Didn't Lynore Horne give this to you?
A. To tell you the truth, I haven't seen Lynore since the day we walked out of Pat Andrews' office. I don't even know how to get in touch with her. I've never been that friendly with Lynore. I couldn't even tell you how to get in touch with her now.
Q. On the second page, it says, "Please try to remember - me trying to become night watchman - working first shift; boxes flying down chute - tough for Lynore."
A. This is when I was the night watchman, as I told you.

Page 109

Q. Why does this document say, "Tough for Lynore"?
A. Well, she was also complaining about how the men looked at her and treated her and everything. So I wrote down it was tough for Lynore.
Q. On the first page, on the top right, it says please do not show to Pat or take to deposition.
A. Because I've had this for a while. I've had this since Pat was my lawyer.
Q. Why did you write down, "Please do not show to Pat"?
A. Pat would get upset if we had any papers on us. So I've had this for quite a while. I probably should not have even taken these papers with me this morning. I was studying them on the way down here, and I studied them last night, and I studied them this morning.
Q. Where it says, "Carol, Questions they ask you, where born, siblings, names, where lived," why did you write those things down?
A. Well, because I figured you were going to ask me where I was born, siblings, names, where I lived.
Q. Why did you figure that?
A. I thought that's how it started off at.
Q. Why did you think that?

alley to the recycle buckets and empty the cardboard or the paper, whatever they had, and we would have to reach over the top of the recycle thing, and our shirts would come up, and men would be standing at the top of the stairs.
Q. When you say "we," who was that?
A. Sometimes it was me and Joe; sometimes it was me and Lynore, depended on what day the trash thing would come, in that who was working.
(PAUSE)
(DEFENDANTS' EXHIBIT M MARKED FOR IDENTIFICATION)
Q. This is Exhibit M, Mrs. Petrarca. It's another document you gave me today you said you reviewed. When did you create this document -- or let me back up. Did you create this document?
A. I've had this for a while.
Q. Is this a document that you created? Is it your writing or did somebody else create it?
A. No, it was created by someone else.
Q. By who?
A. I don't know if it Christine gave it to me or Pat. I'm not sure.
Q. It says, "I was originally hired as a fill-in cleaning lady."



A. Yes.
Q. So you're saying to me that you didn't prepare this?
A. No, I don't know if I told Pat about it, and she wrote it out.
Q. Okay. In any event, this information --
A. This information is for me.
MR. MCNAMARA: Okay. That's fine.
A. Yes.
Q. I looked through this during the lunch break, Mrs. Petrarca, and I didn't see any reference to Mr. Domenicone or Mr. Ianniello. Can you tell me why there's no reference to them? And when I say no reference to Mr. Ianniello, there's a reference there, but there's no reference to the comments there that you were complaining about with respect to him.
A. Because I just came out with those comments about Mr. Ianniello towards the end before he retired to Mr. Bolduc, two years before he retired.
Q. Right. But why isn't that in this document?
A. I don't know to tell you the truth. I don't know if it was because I was upset because of the incident with Richard Kala, that that was really



what was on my mind, that I wasn't thinking. Because I didn't say anything in here about Pat Domenicone either.
MR. MCNAMARA: Right.
A. And it happened with Pat Domenicone, because it is on file when I first went to work there.
Q. Okay. Just so we're clear on the record, and I want to make sure you're clear on this, Mrs. Petrarca, you -- am I correct that you believe that this is information provided by you that was then written up by Pat Andrews' office?
A. Yes, it is information for me. I know that.
MR. MCNAMARA: Okay. I understand that.
A. Because I spent a lot of hours in Pat's office, and she took a lot of writing, and I know she put a lot into the computer, because I was down there days by myself with her.
Q. And when do you think this was created?
A. I really don't know. It had to be last year.
Q. Okay. And is it your testimony that everything in here is accurate as you provided it to Ms. Andrews?
A. Yes.
Q. If you look on Page 3, this is under a heading



for -- on Page 1, there is a heading for Richard Kala, and it appears that information regarding him goes over a couple of pages. On Page 3, third paragraph from the top, it says, "The company did start having sexual harassment classes. I didn't want to go to the class, but the company insisted that I had to. Royalynne Hourihan taught the class that I attended." Now, Royalynne Hourihan, was she in charge of Human Resources at the gas company at that time?
A. She was one of them that I had gone to see.
Q. And when you say, "The company did start having sexual harassment classes," based on this document, can you tell me when -- to the best of your memory, when that was?
A. That was after the incident with Richard.
Q. Was it shortly after the incident with Richard?
A. Yes. And I did go to them, but I couldn't sit through them. I did go to the classes, but I couldn't sit through them. I was crying too bad. I ended up in the ladies' room?
Q. What do you remember from those classes?
A. It was just talking about sexual harassment, what it is, and, you know, how to know when you are being sexually harassed, like a man is not

allowed to put his hand on you or make sexual remarks towards you, and things like that.
Q. Is there anything else you remember about those class in terms of the information that was given?
A. I just started crying where I couldn't sit through this.
Q. And again, you believe this was in 1996 because we agreed that that was around the time that Mr. Kala -- well, January 2 of 1996 is when Mr. Kala left facility maintenance.
A. Yes. In fact, Royalynne was supposed to be one of the women that was going to work with me and help me because she came into the ladies' room after me.
Q. And what did she --
A. Because I was so hysterical.
Q. What did she say to you?
A. She told me she would help me, and she would look into it, and I never heard from her after that either. In fact, Lynore Horne came into the ladies' room and saw me crying in there.
Q. Was she in the same sexual harassment class?
A. Yes, I believe she was down at Dexter Street at the time. I don't know how come she was up there. Maybe she was working over in that building



because the sexual harassment meetings were on Allens Avenue, in a building over there on Allens Avenue. They weren't downtown in the City.
Q. When is the last time you spoke to Lynore?
A. The last time I saw Lynore Horne was at the deposition at Pat's office. I have not seen or talked to her.
Q. Well, you saw her in court, didn't you?
A. She didn't speak to me.
Q. Well, you saw her?
A. Yes, when Pat withdrew from my case. She didn't speak to me, and I didn't speak to her. In fact, Pat asked me if she spoke to me, and I said no.
Q. You mentioned a little while ago, you had seen a Dr. Ruggiano?
A. Yes.
Q. How long did you see him?
A. I think it was probably around six months.
Q. And when was that?
A. Right after the incident with Richard Kala.
Q. And what did you discuss with Dr. Ruggiano during your treatment?
A. What was going on in the workplace, and what was going on with Richard, and how the company was



not helping me, and how I couldn't get any kind of help from anyone, and it was continuing with him, and I would just go and see this one or that one, and everyone would say they would help me, and I'd see the person the next day, and they would just walk on by me like they didn't know me.
Q. How often did you see Dr. Ruggiano?
A. I think I was seeing him twice a week at the beginning.
Q. Okay. When you say at the beginning, what do you mean?
A. When I first went to see him.
Q. For how long did you see him twice a week?
A. Maybe a couple of months.
Q. Okay. Then after that, how often did you see him?
A. Once a week.
Q. Did he put you on any medication?
A. I believe he did, yes.
Q. Do you know what it was?
A. No, I don't.
Q. And you say you saw him for about six months. Why did you stop seeing him?
A. Well, I had gone back to work. Richard had left, and he retired, so I had no way of getting in touch with him. That's why I never got my



medical records or anything.
Q. He retired --
A. Shortly after.
Q. He didn't refer you to another doctor?
A. No.
Q. Did you ask for a referral to another doctor?
A. I didn't know he was retiring. I had called to go in and see him, and he had retired.
Q. He didn't notify you that he was retiring?
A. No, I never got a notification.
MS. CLAPHAM: I'll talk to you about that later. I have information regarding that.
MR. MCNAMARA: Okay.
Q. Did you ever go to see another -- strike that. Was Dr. Ruggiano a psychiatrist or a psychologist?
A. I believe he was a psychiatrist.
Q. Did you ever see another psychiatrist or psychologist after you saw Dr. Ruggiano?
A. No.
Q. Have you seen one since your car accident?
A. Yes, I'm still under the care.
Q. But that had to do with the car accident?
A. Yes.
Q. And when was your car accident again?
A. 2004.

MR. MCNAMARA: Okay.
(PAUSE)
(OFF THE RECORD)
Q. Now, on or about October 15, 1999, you had an accident at home, you fell down the stairs; is that accurate?
A. Yes.
(OFF THE RECORD)
Q. And you went out on TDI after that?
A. Yes.
Q. At some point, you got a letter from Mr. Butler at the gas company about -- strike that. In 1999, when you went out, you got TDI; correct?
A. Yes.
Q. And what happened with respect to your pay in 1999? Did you continue to be paid by the gas company after October 15, 1999?
A. Yes.
Q. And did you get Temporary Disability Insurance after October 15, 1999?
A. Yes.
Q. Did you -- were you at the time aware of the provision in the collective bargaining agreement that you were subject to, that if you were out sick and you were getting TDI, that the company



would pay you the difference between your regular salary and what you were getting from TDI?
A. Yes.
Q. Okay. When did you become aware of that collective bargaining agreement provision?
A. After it happened to me.
Q. You were not aware of that prior to that?
A. Yes.
Q. In March of 2000, did you get a letter from Mr. Butler?
A. Yes.
MR. MCNAMARA: Okay.
(PAUSE)
(DEFENDANTS' EXHIBIT N MARKED FOR IDENTIFICATION)
Q. Mrs. Petrarca, Exhibit N is a letter dated March 3, 2000, from Henry Butler to you regarding TDI. Is that the letter --
A. Yes.
Q. Okay. When did you first get that letter?
A. March 3.
Q. Okay. Did you respond to that letter?
A. I called his office.
Q. And what happened?
A. I left a message for him to call me.



Q. Okay. And did you then hear from Mr. Butler after that?
A. No, he did not call me back.
Q. Did you ever get a letter from him again?
A. I believe I got several letters from him.
MR. MCNAMARA: Okay.
A. Telling me that I needed to contact him.
(DEFENDANTS' EXHIBIT O MARKED FOR IDENTIFICATION)
Q. Exhibit O is a letter dated April 13, 2000, from Mr. Butler to you. Is that the next letter that you got from Mr. Butler?
A. Yes, and he left a message for me to call him. I called his office and left a message.
Q. So that is the next letter -- the April 13 letter is the next letter you got?
A. Yes.
Q. And what happened after that?
A. I called him on both letters.
MR. MCNAMARA: Okay.
A. And left a message on his extension to call me. In fact, I called one day from my daughter's, and left a message that I would be at my daughter's, and left my daughter's phone number to call me.
Q. Okay. When you got these first two letters, did



you -- in addition to Mr. Butler, did you call anybody else?
A. I think I called human resources.
Q. Who did you call there?
A. Oh, God, I forgot who was working there at the time. I called someone in human resources, and said that I was trying to get in touch with Mr. Butler, and they gave me his extension again, and I said I've left several messages on his extension.
Q. Did you ever call anybody from the union?
A. I think I called -- oh, God, not Ray Conroy, the union steward.
Q. Was it Paul Cardin?
A. Paul Cardin, I believe I called him.
Q. Did you speak with Paul Cardin?
A. Yes, I did.
Q. What did you tell him?
A. I told him the situation, and he said just leave a message on Mr. Butler's machine, and I said I have done that.
Q. Did he say anything else other than telling you to leave a message on Mr. Butler's machine?
A. No.
Q. Did he say anything to you about the collective

bargaining agreement and being paid the difference between your full salary and what TDI paid?
A. What I understood was when I started collecting TDI, I thought they automatically notified the gas company and let them know. That's the way it was always done. So I thought that the gas company knew about this. So when I got this letter and was trying to get in touch with Bud Butler, I figured when he got my message of telling him to please call me back on this incident, that he would realize what I was calling him for.
Q. Okay. After you got a couple of letters from him, and you spoke to Mr. Cardin, did Mr. Cardin say anything to you about what the practice was at the company or what the requirements of the collective bargaining agreement were?
A. No, I don't believe he did.
MR. MCNAMARA: Okay.
(DEFENDANT'S EXHIBIT P MARKED FOR IDENTIFICATION)
Q. Exhibit P is a letter dated April 24 from Mr. Butler to you, and do you remember receiving this letter?
A. Yes.
Q. And what did you do after you got this letter?



A. I called Ed.
Q. Called who?
A. I called Mr. Bolduc.
Q. And --
A. And told Mr. Bolduc that I had been trying to reach Bud Butler, and I was leaving messages, and that's when Ed got a hold of Bud Butler, and the three of us were on the phone together, three-way phone conversation.
Q. So you and Mr. Bolduc and Mr. --
A. Butler.
Q. -- Butler were on the phone together, and that was right after the April 24 letter?
A. Yes, that I spoke to him.
Q. What happened in that conversation?
A. Well, he wanted to know why I hadn't returned his calls, and I told him I had returned his calls, and I had left several messages for him to call me, and that's why I was calling Ed, and that's when Ed had me hold on, and we were on a three-way conversation.
Q. What else happened in that phone call?
A. That's when they told me that I was in trouble because of collecting the checks and everything, and I told them I had checks that I hadn't even



cashed, TDI checks that I hadn't even cashed, and the next thing I know, the union got involved, and we were going to meetings and everything. I went to a meeting downtown.
Q. Well, what else -- strike that. Did Mr. Butler say anything else in that conversation once you told him that you had uncashed TDI checks?
A. No, he didn't even want to see them. We just set up a meeting for me to go down the city with Ray Conroy, Paul Cardin, and we met that day, and they just determined that I was lying, and I knew this was going on, and I ignored it.
Q. Do you remember when that meeting was?
A. I know it was shortly after all this happened. We went in human resources, and we met Ray Conroy, Paul Cardin, and Ed Bolduc and Bud Butler. It was the four of us -- five of us, whatever.
(DEFENDANTS' EXHIBIT Q MARKED FOR IDENTIFICATION)
Q. Exhibit Q is a May 17 letter from Mr. Butler to you. Do you recall receiving this letter?
(PAUSE)
(NO ANSWER)
Q. Do you remember getting that letter?
A. Yes.



Q. Now, was this letter before or after the meeting that you just described?
A. I think the letter was before the meeting.
Q. Okay. So was your telephone conversation with Mr. Bolduc and Mr. Butler before or after the May 17 letter?
A. I think it was before this letter.
Q. Okay. Now, what -- strike that. Did you have any discussions with any attorneys about the situation, the TDI situation in 2000?
THE WITNESS: Any discussion?
MR. MCNAMARA: Yes, let's say before the meeting that you just described with Mr. Bolduc and Mr. Butler and --
A. No.
Q. What about Mr. Van Deusen, did you ever discuss the situation with -- strike that. Do you know an attorney named Van Deusen?
A. Yes.
Q. Who is he?
A. He's been my attorney off and on for years and years.
Q. Did you discuss the TDI situation with Mr. Van Deusen?
A. If you have it on file, then I must have. I

don't recall, but I must have.
Q. What I have and what's been produced to your attorneys is a memo from Mr. Butler saying that he received a call from Mr. Van Deusen, and then relating what Mr. Van Deusen said in the call.
A. Well, then I must have called Mr. Van Deusen.
Q. Okay. Do you remember now having done that? Does that refresh your memory?
A. No, I don't. Like I said, if it's in your files, then I must have did it. I can't even tell you what I said to him.
Q. Okay. You said earlier that you had unopened checks?
A. Yes.
Q. Did you suggest at any point in April, May, June 2000 that you would simply -- you know, give the money back?
A. I did bring it back to TDI. Because they were outdated, they couldn't be cashed.
MR. MCNAMARA: Okay.
A. And I showed them to Bob Savage, who was my attorney who represented me at my hearing for the gas company at Days Inn.
Q. Okay. And you had a preexisting relationship with Mr. Savage, you went to him a few years earlier?



A. Yes.
Q. Did you hire Mr. Savage?
A. No, I did not. The union did.
Q. Okay. Why did you go to Mr. Savage in 1996? I know it was because of Mr. Kala.
A. Yes.
Q. Why did you --
A. I mean, I didn't know him. I just picked him out of the phone book. I went to him in 1996 because of Richard Kala.
Q. And you picked him out of the phone book then?
A. Yes, he was on Jefferson Boulevard.
Q. And he represented you with respect to the TDI situation in 2000?
A. Yes, but I didn't hire him. The union hired him. When I first went to see him, he was on Post Road. So I didn't connect who he was, but when I walked in his office, he recognized me, and I recognized him.
Q. Did you have any objection to him representing you?
A. No, because, you know, I didn't have a problem with him in the past or anything, and that's who the company send me to. He was the union lawyer.
Q. You mean the union sent you to him?



A. I mean, the union sent me to him. He was the union lawyer.
Q. Okay. The meeting that you mentioned a little while ago, the one with Mr. Conroy, Mr. Cardin, you, and Mr. Butler and Mr. Bolduc --
A. Yes.
Q. -- at that meeting, did Mr. Cardin say that he had told you in a conversation that you couldn't collect full TDI and full salary at the same time?
A. I don't know. He probably did. I don't recall.
Q. And do you remember him --
A. He's the one that set up the meeting, Paul Cardin, for us all to get together to try to work out something to pay it back, and the company didn't want to hear it.
Q. Okay. When you say the company didn't want to hear it, what did Mr. Butler say at that meeting?
A. They just said that they would get back to me on it, on what they were going to do, on what their decision would be.
Q. So at that meeting, did you or Mr. Cardin propose that you give the money back?
A. Yes.
Q. How long did the meeting last?



A. Not too long. It was about 15, 20 minutes.
Q. Did you say anything at the meeting?
A. I just said that I would, you know, pay the money back.
MR. MCNAMARA: Okay.
A. That I did have unopened checks, and I did not know that I was overpaid, and I also said when Bud Butler called me, I did return his calls, and he would not call me back. That's what I said when I called Ed Bolduc and told Ed I was trying to reach Bud.
Q. Did you ever tell Mr. Conroy in connection with the TDI situation in or about June of 2000 that you didn't have the money to give back because you had spent it on your grandchildren?
MS. CLAPHAM: Objection. You can answer.
A. I don't believe I said that. No, I don't believe I said that.
Q. Had you spent any of the money on your grandchildren?
A. If I had, I wouldn't have told him that, but no, I did not, sir. Because I'm sure it's very easy --
MS. CLAPHAM: Just wait for the

him I was going to call International, go to International, because I wasn't going to let this go.
Q. When did you tell him that?
A. I told him when I was talking to him on the phone.
Q. On Friday?
A. Yes.
Q. So when did you call --
A. Because I told him I don't believe I did anything wrong.
Q. When did you -- strike that. And you say you called the International the following week, so the week of June 12?
A. Yes, I probably called them that day. I probably called them over the weekend. I know I called them as soon as possible, International, to find out what my rights were.
Q. Was it Friday? Were they in over the weekend? When did you call?
A. I probably called them Friday.
Q. A minute ago you said you called them the next week?
A. Well, it probably was Friday. Like I said, I don't remember seeing this.



Q. When did you learn that the local had filed a grievance on your behalf?
A. I thought it was done because of me going to the International. That's what I thought.
Q. My question was when did you learn.
A. I don't recall to tell you the truth.
Q. Okay. When did you go see Mr. Savage?
A. I saw Mr. Savage in August.
Q. Okay. What happened after you saw Mr. Savage?
THE WITNESS: When I went in to see him?
Q. Well, it's attorney/client, so I don't want you to tell me what he said and you said, but I'm just asking, what were the events that followed that? You said you went to see him in August of 2000. How many times did you meet with Mr. Savage about this issue?
A. Once.
Q. Once?
A. No, I'm sorry, twice.
Q. Okay. At some point after August 2000, you applied to retire from the gas company; is that correct?
A. Well, I really didn't apply. I was told I had to.



Q. Who told you that?
A. I was told that they would hire me back, and I was to immediately retire after they hired me back.
Q. Who told you that?
A. Bob Savage. That was in the agreement.
Q. In what agreement?
A. In the package that the gas company had given him to offer me.
Q. So let's back up. What package did they give him, that the gas company gave Mr. Savage?
A. Mr. Savage had papers there that I had to look over, and if I didn't agree to retire, then they would not hire me back. They hired me back on the condition I was to retire right on the spot. Signs the papers to hire me back, and then sign the papers to retire me. Everything was done right then and there that morning. It was not a week later, two weeks later, or nothing.
Q. When was this?
A. This was in August or September. I went to see Savage in August. I don't know if it was done in August or done in September.
(DEFENDANTS' EXHIBIT T MARKED FOR IDENTIFICATION)



Q. Mrs. Petrarca, Exhibit T is a letter from you dated September 13, 2000, to Brian Rhymard at Providence Gas, and the first line says, "This letter constitutes my application to retire from my position with ProvGas effective September 30, 2000."
A. Yes, this was the letter that was represented to me that I had to sign from Bob Savage.
Q. So your understanding was that you would be hired back, and then immediately you could retire?
A. Yes, that was the only condition.
Q. Why did you choose to do that?
A. That was the only condition that Bob Savage told me that -- that was it. That's all they had to offer me, and I had to take it. I was told by Bob Savage that they would hire me back, and then retire me. They did not want me back.
Q. Okay. Now, there was a grievance arbitration scheduled. So was it your understanding that you could either retire or see what happened at the arbitration?
A. Well, Bob Savage -- I went by Bob Savage. He was my attorney, and he told me this was the best way to go. So I did what he told me to do. He was representing me, so I listened to him.

Page 142

MR. MCNAMARA: Okay.
A. When your attorney tells you what to do, you figure you got to trust your attorney.
Q. Did you ask Mr. Savage any questions at that point?
MS. CLAPHAM: Objection.
A. I told him that I did not want to retire, and he told me, "Carol, this is the best thing. Go this way." And as far as the medical coverage, they had taken my medical coverage from me. I had no medical coverage, which they didn't know at the time. They ran around like chickens with their heads cut off trying to get my coverage back. So that took longer than signing the retirement papers, getting my coverage back. I did not want to retire at my age. I did not want to leave the gas company.
Q. Then why did you sign the letter of application to retire?
A. Because Bob Savage told me --
MS. CLAPHAM: Objection.
A. -- to do it.
Q. Okay. So are you telling me you did not voluntarily retire?
A. No, I did not.

Page 143

Q. But you did it on the advice of your attorney?
A. Yes.
Q. Did anybody at the company coerce you into retiring?
MS. CLAPHAM: Objection.
A. Well, let's put it this way. If I'm told by my attorney that the gas company says the only way they'll hire me back is for me to retire, what does that tell you? They don't want me back, but they'll take me back to retire.
Q. So you retired on advice of counsel?
A. Yes.
Q. Okay. And did you object to the advice of your counsel at that time?
MS. CLAPHAM: Objection.
A. No, I didn't. I told the counselor -- I told my lawyer that this isn't what I wanted --
MS. CLAPHAM: Objection.
A. -- in his office, and he told me this is the best thing, to go this way.
Q. Okay. And this is your signature on the letter dated September 13?
A. Yes, it is.
Q. Okay. Was it your understanding that there was an arbitration scheduled with regard to the grievance

Page 144

that had been filed about your termination?
A. I went to the lawyer's office. From the lawyer's office, we went down to Days Inn where we were supposed to have a meeting on this, on the retirement thing, because I said to him -- they had taken my medical coverage from me, and I said to him I'm not going to sign these papers --
MS. CLAPHAM: Objection as to what your attorney said. You can testify, and then we'll deal with it later.
A. Well, I had no medical coverage, and I did not want to sign these papers without having my medical coverage reinstated. So they agreed to give me back my coverage.
Q. Okay. And was it your understanding that at the Days Inn, there was going to be an arbitration?
A. No one said anything about an arbitration. We were going down there to sign these papers to retire me. We had no arbitration at Days Inn.
Q. Did your attorney ever tell you that there was going to be an arbitration?
MS. CLAPHAM: Objection.
A. No, he did not.
MS. CLAPHAM: Just for the record, we're getting into what is technically privileged

Page 145

attorney/client communications, but I'm new on this case, and my initial gut is that we're going to waive that because it's my understanding that Mr. Savage is a witness to the unopened checks. So at some point, we'll probably call him as a witness, but I just wanted to preserve that for the record, but let her testify as to the communications at the same time. So we don't have to do it again.
MR. MCNAMARA: I understand your objection. I think it's waived at this point. I certainly understand you making the objection as to the attorney/client privilege. I even told her she didn't have to tell me anything that Mr. Savage told her.
MS. CLAPHAM: I understand that, but I believe we're going to waive that.
MR. MCNAMARA: I understand you're preserving the objection.
MS. CLAPHAM: The record stands, so whatever it is, it is.
THE WITNESS: The reason I'm answering is because you seem to have a problem with them --
MS. CLAPHAM: Don't --

STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS

PROVIDENCE, SC SUPERIOR COURT

CHRISTINE STAMP :
:
VS. : C.A. NO.: 04-4592
:
SOUTHERN UNION COMPANY AND :
NEW ENGLAND GAS COMPANY :

DEPOSITION OF KENNETH SCHIANO, a Witness in the above-entitled cause, taken on behalf of the Defendant, before Barbara Warner, Notary Public in and for the State of Rhode Island, at the offices of Patricia E. Andrews, 170 Westminster Street, Suite 601, Providence, RI, on November 9, 2005 at 10:00 A.M.

PRESENT:

FOR THE PLAINTIFF............. LAW OFFICE OF PATRICIA E. ANDREWS
BY: PATRICIA E. ANDREWS, ESQUIRE

FOR THE DEFENDANT............. HOLLAND & KNIGHT, LLP
BY: NEAL J. MCNAMARA, ESQUIRE

ALLIED COURT REPORTERS
115 PHENIX AVENUE
CRANSTON, RI 02920

INDEX


WITNESS PAGE
KENNETH SCHIANO
EXAMINATION BY MS. ANDREWS.............. 3


EXHIBITS

NO EXHIBITS OFFERED



(DEPOSITION COMMENCED AT 10:00 A.M.)

KENNETH SCHIANO

Being duly sworn, deposes and testifies as follows:

THE REPORTER: Would you state your name and spell your last name for the record.

THE WITNESS: Kenneth Schiano, S-C-H-I-A-N-O.

EXAMINATION BY MS. ANDREWS

Q. My name is Pat Andrews. I represent Christine Stamp, but I should tell you I also represent Carol Petrarca and Lynor Horn, who are also suing the company. I am going to be referring to the company as Providence Gas sometimes, New England Gas, Southern Union, but you understand I mean the company for which you currently worked and the company for which you worked for 29 1/2 years. I will use those names interchangeably, okay?
A. Yes.
Q. Have you ever been deposed before?
A. No.
Q. You never sat in on a deposition like this



before?
A. No.
Q. Let me just tell you a little bit about the procedure. I am going to ask you a bunch of questions. And what you should do is let me finish my entire question before you start answering. Even if you can anticipate the rest of the question, try to not answer it because the court reporter is going to take my questions down and your answers and it makes for a much clearer record if we have the entire question and then the entire answer. So I will try to not interrupt you in your answers as well. If you don't understand any question that I ask, let me know and I will try to rephrase the question or try to explain to you what I meant. If you answer the questions, I am going to assume you understood them.
A. Okay.
Q. You cannot nod your head in response to a question. You have to actually speak words, so you cannot nod your head?
A. Understood.
Q. I think you are probably going to hear



Mr. McNamara after I ask my question sometimes put something on the record. You are to go ahead and pause a little to let him say what he wants to say. Unless he tells you you cannot answer this question, then after he talks you can go ahead and answer it. If you don't remember any question or anything like that, we can have the reporter read it back, so you can let us know that. Do you have any questions?
A. No.
Q. Are you represented by a lawyer here?
A. No.

MR. MCNAMARA: He is an employee of New England Gas and Southern Union and as such he is being represented by me during the course of the deposition.

MS. ANDREWS: You are taking the position that he is your client?

MR. MCNAMARA: Yes.

Q. Mr. Schiano, did you do anything to prepare for this deposition?
A. Myself?
Q. Yes.
A. Or with counsel?

Bolduc?
A. Years ago we had department meetings, yes.
Q. Ed Bolduc was deposed here like you, Ed Bolduc came for a deposition here.
A. I didn't know that.
Q. I am going to represent to you that on Page 45 through 46 he said that he would have on an annual basis a meeting with the department at which he would talk about sexual harassment?
A. That is not true. To my knowledge, that is not true.
Q. How did you like working with Ed Bolduc?
MR. MCNAMARA: Objection.
A. Give me a minute. I didn't care working for him. I have to be honest.
Q. Why didn't you like working with him?
A. Well, he was a nasty and vindictive guy.
Q. Why do you say that?
A. Well, it was the way he sometimes talked to people and the way he treated people. If he didn't get his way or you didn't do it his way, he would be on you



all the time. He would constantly be on you.
Q. Did you see him constantly be on any people?
A. Yes.
Q. Can you identify them?
A. Lynor Horn.
Q. Can you identify anyone else he was constantly on?
MR. MCNAMARA: Objection.
Q. Using your term.
A. Well, no. I would have to say she was the only one.
Q. What did you see?
A. We were, I was called downtown a few years back when they were redoing, this is when it was Providence Gas, not New England Gas. I was called downtown to do maintenance work with Jerry Porter. And the main room, as you walk in the building where they paid the bills, the main lobby, they were putting all new windows in. And me and Jerry were doing the maintenance in the place. We painted the walls and this and that. Lynor was down there helping us.



She was asked to paint long pieces of wood that we used for a border. The kid is a girl. She is a nice kid. She is fun, she laughs and jokes. She tries to cut the ice, she whistles and sings. I have seen him tell her stop singing and stop whistling. As she painted the wood with the brush, we had got down to the scaffolding and Ed walked in and he is looking at her painting the long pieces of wood. He was upset for whatever reason. And he went up to her and said, let me show you how to do this. He said, the way you are going you will never get done with the job. Instead of her painting with the brush, he showed her how to paint with the roller. He was going up one side of her and down the other. She got so nervous she started to cry. I said, why are you treating the girl like that. The kid is doing the best she can, leave her alone. She is a girl. He says, these girls are nothing but pains in the ass. I said, Eddy, leave her alone. Let her do the job. The wood will get done. Don't treat her



like that. It does not have to be put up right now. That is what I remember about him.
Q. And he said, these girls are pains in the ass?
A. He said, girls are nothing but pains in the ass.
Q. Did you understand him to mean girl employees?
MR. MCNAMARA: Objection.
A. Yes.
Q. That is what you understood?
A. Yes. When you say girl employees, that does not mean --
Q. Tell me how he said it?
A. That is how he said it. When I told him, why don't you leave the girl alone, I said, you got her crying. She is doing the best she can. He said, girls, this girl or girls, are just pains in the ass.
Q. These girls?
A. Yes, or girls. I don't know if it was these or girls, but that is what he said.
Q. But it was plural, more than one?
A. Yes.

RHODE ISLAND REHABILITATION INSTITUTE, P.C.
1140 RESERVOIR AVENUE
CRANSTON, RHODE ISLAND 02920
(401) 946-4250

Pre-Placement Screening for Job Change within the Company

RE: Carol Wiberg Date: June 27, 1991
Employer: Providence Gas Company

Age: 50 yr. Height: 64 inches Weight: 143 lbs.
Previous Employment: Currently employed by Providence Gas
Job Related Injuries: None reported
Past Surgery/Systemic Disorders: Hysterectomy 9/90
Exercises? Does not perform

Ms. Wiberg is a 50 year old employee of the Providence Gas Company who has been doing the job of female building cleaner in the maintainance department. She has recently bid on the job of Building Maintainance Person (Job Description enclosed).

Past medical history is significant for abdominal surgery in September of 1990 (hysterectomy).

Body fat measurement is considered an important factor in assessing nutritional status and level of general fitness. The following data has been generated from a Digital Skyndex Skin Fold Caliper apparatus.

% Body Fat: 27.4%. This is considered to be in the fair category.

Manual Musculoskeletal Prescreening:
Postural Analysis:
Standing:
Cervical Lordosis: _X_Normal __Increased __Decreased
Thoracic Kyphosis: _X_Normal __ Hypo __ Hyper
Lumbar Lordosis: _X_Normal __ Hypo __ Hyper
*There is snapping of the left shoulder during internal and external rotation. External rotation range of motion is decreased 10%.

Lateral Shifts
Shoulders: __ Left __ Right X__ None
Pelvic Base: __ Left __ Right _X_ None

Scoliosis? __ Yes X__ No __ None

Leg Length Check: _Even_______________________________

Vertebral Segmental Mobility with side bending:
_X_ Mildly limited X__ Right X__ Left
__ Moderately limited __ Right __ Left
__ Severely limited __ Right __ Left

Carol Wiberg

Neck Motion: Good.
Repetitive Forward and Backward Bending: Good
Repetitive Squatting Ability: Above average
Repetitive Upper Arm Strength Capability: Above average
Repetitive Lower and Upper Abdominal Strengthening: Above average
Trunk Rotation: Good
Lower Trunk Rotation: Good
Back Flexion: Good; able to touch fingertips to toes.
Flexibility:
Straight Leg Raise Measurement in Supine Lying: 90 degrees Right 90 degrees Left
Back Extension Flexibility: Fair; iliac crest is 3 inches off the floor.
Manual Back Strengthening Activity: Fair-able to assume the required position but unable to maintain it.
Hip Function: Good

Dynamic Lifting:
Lifting and Carrying: Repetitive lifting over 10 minutes of up to 80 lbs. over 30 ft. Shoulder high lift capability to 40 lbs.
Pushing and Pulling: Maximum capability of 90 lbs. pulling, 70 lbs. pushing over 10 feet. This represents a capability for handling and maneuvering hand truck.
Instructed in proper lifting techniques and body mechanics.

Cardiovascular and musculoskeletal endurance for lower extremities using the Stairobic apparatus:
Resting BP: 128/90 Resting H.R.: 60 Resting R.R.: 16
Time performed: 10 minutes Calories Used: 82
Distance: .8 miles Speed: 9.9 min/mile Sub Max HR: 132
Immediately post exercise: BP: 144/86 H.R. 80 R.R. 20
Results: Average; able to perform the test staying 10 bpm below the designated submaximal heart rate for her age. Work simulation for climbing demonstrates adequate ability.

Static Lifting: Values represent the average over 3 tries
Torso: 121 lbs.
Leg Pull: 147 lbs.
Arm: 53 lbs.
These values are below average for the industrial population.

Computerized Back Test:
Range of Motion: Good
Strength for Back Flexion and Extension:
Average Trunk Flexion: 60 deg/sec/62 ft-lbs.; 30 deg/sec/70 ft-lbs.
Average Trunk Extension: 60 deg/sec/65 ft-lbs.; 30 deg/sec/104 ft-lbs.
Fatigue: Fair
Interpretation: These values would suggest consistency with repetitive lifting of a maximum of 40-50 lbs.

Carol Wiberg

Summary: Job functions involving the relocation of desks, the moving of filled file cabinets (2 person activity with handling in excess of 200 lbs.) and storage cabinets, the handling of 100-200 40 lbs. cartons of paper, climbing of ladders would suggest that this job may fall into the heavy category of work which calls for a lifting capability of 100 lbs. infrequently and 50 lbs. frequently. (Please refer to work demand characteristics enclosed with this report)

Although, the overall physical, musculoskeletal condition of this Providence Gas employee is good, there is concern that 1) she does not meet the heavy demand category because she could not lift the required 100 lbs. of weight or push 100- 120 lbs.

( Should the job duties not fall into a heavy category and no more than 50 lbs. of weight or force handling is anticipated, than she may be considered a marginal candidate for a job change.)

There is concern when making comparisons with other industrial applicants that she is at a minimum 100 % below average values for the male population but within average values for the female population. For example, average static leg strength is 280 lbs., average torso strength is 270 lbs. and average arm strength is 85 lbs. Similarly, for the LidoBack test values are normally in the range of 150 lbs. for back strength for persons of similar weight but who are of the male gender. She falls into an average category for females in her weight class.

Given the inexact nature of estimating weights of file cabinets, etc., and the fact that she is a marginal candidate in the medium or medium to heavy category, it would be my opinion to err on the side of caution and advise against this change. She is not accustomed to doing work in the heavy category and may be more prone to fatigue over an 8 hour day versus today's 1.5 hour testing process which may make her susceptible to musculoskeletal injury. Consideration may be given to an observation period of 30-90 days.

Thank you for allowing R.I. Rehab. the opportunity to perform this preplacement physical capacity assessment. Feel free to call on me for suggestions, concerns, or clarificatios.

Very truly yours,

Henry Sisun, RPh, MSPT

cc: Robert Beiber-Providence Gas Co.

encl.: Physical Demand Characteristics of Work
Back Test

DATE: 6-27-1991

# LIDO ISOKINETIC TEST RESULT(S)

TIME: 14:58:31

NAME: WIBERG, carol
ID#1: ID#2:
PHYSICIAN: providence gas
THERAPIST:
PATHOLOGY:
DIAG/SURG:
COMMENTS: pre-employment-screen

BACK
WEIGHT (lb): 143
HEIGHT (in): 64
AGE: 59
SEX: F

rep # 1 to 5




| BACK (standing) | flex | ext |
|---|---|---|
| average peak torque ( ft-lbs ) | 62 | 70 |
| peak torque ( ft-lbs ) | 68 | 82 |
| joint angle at peak torque ( degrees ) | 31° | 66° |
| range of motion ( degrees ) | 117° | 117° |
| fatigue index ( % ) | 102% | 91% |
| total work done ( ft-lbs ) | 592 | 695 |

TORQUE = ▬▬▬
POSITION = ———
uncompensated

LOREDAN
Davis, Calif.

DATE: 6-27-1991 **LIDO ISOKINETIC TEST RESULT(S)** TIME: 14:59:[illegible]

NAME: WIBERG, carol
ID#1: ID#2:
PHYSICIAN: providence gas
THERAPIST:
PATHOLOGY:
DIAG/SURG:
COMMENTS: pre-employment-screen

BACK
WEIGHT (lb): 143
HEIGHT (in): 64
AGE: 50
SEX: F

rep # 1 to 6




60 deg/sec
uncompensated

LOREDAN
Davis, Calif.

DATE: 6-27-1991

# LIDO ISOKINETIC TEST RESULT(S)

TIME: 14:58:31

NAME: WIBERG, carol
ID#1: ID#2:
PHYSICIAN: providence gas
THERAPIST:
PATHOLOGY:
DIAG/SURG:
COMMENTS: pre-employment-screen

BACK
WEIGHT (lb): 143
HEIGHT (in): 64
AGE: 50
SEX: F

rep # 1 to 3

200 ft/lbs 30 deg/sec WIBERG, CAROL 6-27-1991 31.7 seconds




| BACK (standing) | flex | ext |
|---|---|---|
| average peak torque ( ft-lbs ) | 65 | 104 |
| peak torque ( ft-lbs ) | 66 | 107 |
| joint angle at peak torque ( degrees ) | 52° | 70° |
| range of motion ( degrees ) | 100° | 109° |
| fatigue index ( % ) | 104% | 97% |
| total work done ( ft-lbs ) | 312 | 478 |

TORQUE = ▬▬▬
POSITION = ———
uncompensated

LOREDAN
Davis, Calif.

DATE: 6-27-1991 **LIDO ISOKINETIC TEST RESULT(S)** TIME: 14:58:01

NAME: WIBERG, carol
ID#1: ID#2:
PHYSICIAN: providence gas
THERAPIST:
PATHOLOGY:
DIAG/SURG:
COMMENTS: pre-employment-screen

BACK
WEIGHT (lb): 145
HEIGHT (in): 64
AGE: 50
SEX: F

rep # 1 to 3




30 deg/sec
uncompensated

**LOREDAN**
Davis, Calif.

REHABILITATION INSTITUTE OF SOUTHERN CALIFORNIA

# PHYSICAL DEMAND CHARACTERISTICS OF WORK

| LEVEL | WEIGHT LIFTED | FREQUENCY OF LIFT | WALKING/CARRYING | TYPICAL ENERGY REQUIRED |
|---|---|---|---|---|
| SEDENTARY | 10 LBS. OR LESS | INFREQUENTLY | NONE | 1.5 METS |
| SEDENTARY-LIGHT | 15 LBS.<br>10 LBS. OR LESS | INFREQUENTLY<br>FREQUENTLY | INTERMITTENT SELF-PACED, NO LOAD | 2.0 METS |
| LIGHT * | 20 LBS.<br>10 LBS. OR LESS | INFREQUENTLY<br>FREQUENTLY | 2.5 MPH. NO GRADE OR SLOWER SPEED WITH 10 LBS. OR LESS | 2.5 METS |
| LIGHT-MEDIUM | 35 LBS.<br>20 - LBS. OR LESS | INFREQUENTLY<br>FREQUENTLY | 3.0 MPH. NO GRADE OR SLOWER SPEED WITH 20 LBS. OR LESS | 3.0 METS |
| MEDIUM | 50 LBS.<br>25 LBS. OR LESS | INFREQUENTLY<br>FREQUENTLY | 3.5 MPH. NO GRADE OR SLOWER SPEED WITH 25 LBS. OR LESS | 3.5 METS |
| MEDIUM-HEAVY | 75 LBS.<br>35 LBS. OR LESS | INFREQUENTLY<br>FREQUENTLY | 3.5 MPH. NO GRADE WITH 35 LBS. LOAD OR 115 LBS. WHEELBARROW 2.5 MPH. NO GRADE | 4.5 METS |
| HEAVY | 100 LBS.<br>50 LBS. OR LESS | INFREQUENTLY<br>FREQUENTLY | 3.5 MPH. WITH 50 LBS. OR LESS LOAD | 6.0 METS |
| VERY HEAVY | IN EXCESS OF 100 LBS.<br>50 LBS. TO 100 LBS. | INFREQUENTLY<br>FREQUENTLY | 3.5 MPH. WITH 50 LBS. OR MORE LOAD | 7.5 - 12.0 METS |

* EVEN THOUGH THE WEIGHT LIFTED MAY BE NEGLIGIBLE, A JOB IS CONSIDERED LIGHT IF IT REQUIRES A SIGNIFICANT AMOUNT OF WALKING OR STANDING OR FREQUENT USE OF ARM AND/OR LEG CONTROLS

Copyright, 1980, Rehabilitation Institute of Southern California

000204

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

CAROL PETRARCA :
:
VS. : C.A. NO.: 04-310S
:
SOUTHERN UNION CO. & :
NEW ENGLAND GAS COMPANY :

DEPOSITION OF RICHARD KALA, a Witness in the above-entitled cause, taken on behalf of the Plaintiff, before Barbara Warner, Notary Public in and for the State of Rhode Island, at the offices of Stephen M. Robinson, 155 South Main Street, Providence, RI, on May 24, 2006 at 10:00 A.M.

PRESENT:
FOR THE PLAINTIFF............. LAW OFFICE OF NOELLE CLAPHAM
BY: NOELLE CLAPHAM, ESQUIRE

FOR THE DEFENDANT............. NIXON PEABODY, LLP
BY: NEAL J. MCNAMARA, ESQUIRE

ALLIED COURT REPORTERS
115 PHENIX AVENUE
CRANSTON, RI 02920
401-946-5500

INDEX

WITNESS PAGE
RICHARD KALA
EXAMINATION BY MS. CLAPHAM.............. 3

EXHIBITS

NO EXHIBITS OFFERED



(DEPOSITION COMMENCED AT 10:10 A.M.)
RICHARD KALA
Being duly sworn, deposes and testifies as follows:
THE REPORTER: Would you state your name and spell your last name for the record.
THE WITNESS: Richard Kala, K-A-L-A.
EXAMINATION BY MS. CLAPHAM
Q. Mr. Kala, my name is Noelle Clapham and I represent Carol Petrarca in this litigation. Have you taken any medication today that would impair your ability to testify truthfully?
A. No. Blood pressure medication.
Q. But that will not impair your ability to recall events or testify truthfully, will it?
A. No.
Q. I just want to go over a few rules in terms of the deposition so that we can have a smooth deposition here and the stenographer can take down everything that we both say. I need you to answer orally, verbally, so



that the stenographer can take it down. Do not nod your head or make gestures because the record cannot pick that up.
A. Okay.
Q. One person talks at a time because the stenographer cannot take down two people.
A. Okay.
Q. If you do not understand a question, ask me to clarify. If you cannot hear me, be sure to let me know.
A. Okay.
Q. If you need a break at any time, please feel free to do so. The only thing I ask you with respect to breaks is while there is a question pending, please answer the question that has been asked first.
A. Okay.
Q. Now, I am going to be referring to the gas company in this deposition, but I want you to understand when I use that term I am referring to Southern Union Oil Company and New England Gas Company when I use that term, the defendant in this litigation, okay?
A. Yes.



Q. Are you represented by legal counsel at this deposition?
A. Mr. McNamara.
Q. And is he representing you personally?
MR. MCNAMARA: I am representing him in his capacity as an employee of the gas company with respect to the incidents that are relevant here.
Q. Without disclosing any of your actual communications, how many times did you meet with Mr. McNamara to prepare for this deposition?
A. Twice.
Q. Prior to this deposition, how many times did you meet with Mr. McNamara for preparation?
A. Never.
Q. Did you meet with him at any time to discuss what happened, the events leading up to this deposition?
A. Yes.
Q. When did you meet?
A. Last week, Friday.
Q. So last week, either Thursday or Friday of last week?

Page 14

A. Meter reading.
Q. And you said you started working there in 1989?
A. Yes.
Q. How long did you work in meter reading?
A. I don't remember the exact date. I would say probably four or five years.
Q. After meter reading, where did you work?
A. From meter reading, I went to facilities maintenance.
Q. Do you recall the year you started working in facilities maintenance?
A. No, I don't.
Q. Why did you transfer to facilities maintenance?
A. It was more money. It was a little bit easier instead of out walking all the time reading meters.
Q. Did you have any dealings with any customers while you were in meter reading?
A. Every day.
Q. Did you have any problems or complaints from any customers?
A. No, I didn't.
Q. And in facilities maintenance you did not

Page 15

have any customers there, did you?
A. No.
Q. How long did you work in facilities maintenance?
A. Again, I don't know the exact time period. I would say four or five years. Four years maybe. It could have been three, I am not sure of that.
Q. Do you recall what month you started working there?
A. No, I don't.
Q. Do you recall the people you worked with in facilities maintenance when you started?
A. Yes.
Q. Who was there?
A. Jerry Porter, Maureen Morancy and myself were on the same shift, the night shift, the second shift.
Q. Did you know Anna Collins, was she your co-worker?
A. Yes, I did. She was on days. She was also at Dexter Street. I guess they moved back and forth. I don't remember exactly. She was on days, she would fill in. If someone was on vacation on the second

Page 16

shift, she would fill in. Whoever was low by overtime would fill in.
Q. Did you know Carol Petrarca?
A. I worked with her. She was on the first shift.
Q. Did you have any overlapping shifts with her?
A. No overlap. Like I said, if she filled in, was covering if somebody was out sick, or if someone was on vacation, and that was done by low overtime.
Q. When you first went to facilities maintenance, who trained you?
A. Jerry trained me. And I understand that Carol said she trained me, but I don't recall her training me.
Q. Is it possible she trained you and you don't remember, or are you saying she did not?
A. I would say that is possible. You know, you don't recall, you're working. How much training do you need to clean bathrooms and vacuum rugs and empty trash cans.
Q. We were talking about training and you said

Page 17

Jerry Porter gave you some training?
A. Yes.
Q. What did he show you, if you remember? What did he tell you?
A. Clean the bathrooms, vacuum the rugs. Each one was assigned, I believe it was two floors in the building. And vacuum the rugs, mop the floors, wash the mirrors down, everything that encompassed cleaning the building. On occasion we had to do carpentry work, maintenance. If somebody called up, we had to change a light bulb. If you saw a light bulb was out, you had to change it.
Q. Did you think this job was physically strenuous at all?
A. Honestly, I didn't like the job. I mean, I never, I can do just about anything. I always felt that way. Be a good provider and you had to work for a living. But I didn't like being a building cleaner. When it came to the maintenance part, carpentry or repairs, I enjoyed that, working with my hands.
Q. How much would you say was the most weight

you ever had to lift working in facilities maintenance?
A. I don't recall them ever saying you had to lift this amount of weight. It was never an issue. It never came up. You have to lift up the vacuum cleaner and the trash buckets. I don't remember anyone saying, if they got a delivery of, for instance, coffee paper, you had to, they would be delivered down the shoot and you stacked it. Or you may take a two-wheel dolly, hand cart. It was never an issue. I never really thought about it. I don't think it was a job requirement.
Q. What was the most amount of weight, what is the heaviest thing you think you ever lifted there?
A. I don't recall. I never thought about it.
Q. Were you ever given any test for your physical abilities by anyone there?
A. Pre-employment.
Q. What pre-employment tests were you given?
A. Full examine, full medical examine, hearing, eyesight, drug screening, drug and



alcohol screening. I believe that is it.
Q. Were you ever asked to lift any weights or to prove that you could lift any amount of weight?
A. Was I ever asked to prove I could lift weight?
Q. Yes.
A. Not that I can recall.
Q. The full medical examine you were given, was that given to you at the start of your employment before you started in meter reading?
A. Prior to employment.
Q. Before you started any job with the gas company?
A. That's correct.
Q. Did you have to take any other type of physical exam before you switched from meter reading to facilities maintenance?
A. I may have, but I don't remember. I don't recall.
Q. Do you remember going to any facility outside of the gas company to take any sort of physical exam?
A. Urine analysis screening. That is a



random thing. That is done. It is a corporate organization at St. Joseph's Hospital, I believe.
Q. Anything else like that where you had to leave the building and go for any sort of testing?
A. Nothing that I recall.
Q. Other than what you just described to me, can you think of any other job duties or requirements that you had to perform?
A. At facilities maintenance?
Q. Yes.
A. Occasional carpentry and maintenance. Changing the bulbs. Shoveling snow in the winter on the walks outside.
Q. That is about it?
A. That is all I can recall.
Q. Okay. That is fine. If you think of anything else at any time, just feel free to jump in and say, I remember this.
A. Okay.
Q. When you started in facilities maintenance, were you put on a probationary period?
A. No
Q. Were just a regular employee?



A. It is not a probationary period. As a union employee, you have 90 days to either keep that posting or go back to your old job. That's part of the contract, I believe. But it is not, I don't know if they refer to that as a probationary period or not. Perhaps they do, I don't know.
Q. That is all right. We are here today for your understanding. So let me just ask you, what is your understanding of the 90-day period when you first switched jobs?
A. 90 days to see if you like the job. If you don't, you can go back to your old job. That's my understanding.
Q. Have you ever heard of anybody having that 90 days extended for any reason?
A. Not that I recall.
Q. Did you ever have the 90 days extended against you for any reason?
A. No.
Q. Now, we talked about overtime before. You mentioned overtime and people filling in and who was low for overtime. Can you explain to me your understanding on how overtime worked within facilities

maintenance?
A. They keep track of how much overtime you work. At the beginning of the year, it starts off by seniority. Let's say it is January 1. The highest seniority can turn it down or accept it. If they decline it, it goes to the next senior person in line. After you have accumulated X amount of hours, then they go by low overtime. The lowest gets asked first. So if you have a lot of overtime, it gives everyone a fair and equal shot at the overtime.
Q. Did you ever have any gripes or concerns about not being offered overtime?
A. No, because the company is very rigid about that. The union would jump all over them. If they superseded someone, if they skipped you, you are going to scream, you skipped me. And as I understand, when that has occurred by accident, let's say if dispatch has to call people at home, if they did skip one, it was grieved by the union and the company would have to pay extra, pay that person as well. So they were careful. I believe they were careful.



Q. And you personally never had any complaints about being skipped for overtime?
A. No. I turned it down.
Q. And you thought it was distributed fairly?
A. Yes, it was distributed fairly. I turned it down. I just assume be at home with my family.
Q. I wanted to get back to training again. We mentioned that Jerry Porter provided you with training?
A. Yes.
Q. Did anyone else provide you with any other training?
A. Ed Bolduc.
Q. What did Ed show you?
A. I don't know if it was more of a show and tell occasionally. This is where we are going to stack the paper, the boxes. Every evening before we started the shift we would go over everything with special attention. Or if you did not do something well, you need to work on that. Or how come that was not cleaned.
Q. Do you think he spoke to you in a fair manner?



MR. MCNAMARA: Objection.
A. Always. Ed was very on top of everything. He wanted that building clean. If you did a good job, if you did your job, you did not have a problem. If he saw you did not clean what you are supposed to, he let you know about it.
Q. And he would personally come and communicate that to you?
A. Yes. Like dusting, if you had to dust the desk. Say I vacuum the rug and dump the trash, but I did not dust the desk, he would tell me. I didn't like dusting, either.
Q. Would you say you had a good working relationship with Ed?
A. I would say I had a professional working relationship. He did not play favorites. And he made sure everyone knew what was expected of them. And every night in the meeting prior to your shift, it was that time. Okay, we are on the clock now, up we went to his office.
Q. When you say up we went, who is we?
A. His office was upstairs.



Q. You would go up to his office every night before you started?
A. Not by myself, everyone together.
Q. Who is everyone?
A. Whoever is on the shift. In this case it would be Jerry, Maureen and myself.
Q. Did that ever change, did there ever come a time --
A. Sorry, Joe Ianello. He did a little training, too. He turned down overtime a lot, too. I remember him being up there in the office. I can remember him sitting there, just sitting there, okay, Ed. I got a mental picture of him, a flashback.
Q. Maureen Morancy, did she go up to the office, too?
A. Yes.
Q. Did there ever come a time when you were in facilities maintenance that Ed stopped having everyone come to his office?
A. No. Unless he was on vacation.
Q. I just want to get back to the jobs you had within the gas company for a minute. So you were in facilities maintenance. At some point you left there?

A. Yes.
Q. Where did you go from facilities maintenance?
A. They called the job a gaser. It was also on the second shift.
Q. The gaser?
A. It is called the gaser.
Q. What did you do in that job?
A. Refuel the trucks and it required some maintenance. We were required to help out with maintenance.
Q. How long did you stay on that job?
A. I believe a little more than two years. Between two and three years. It was a welcome change to cleaning. And that was through the bidding process that I got that job. It was by seniority. They went down the list. Whoever wanted the job signed for it. And it would take a long time to go through the list. They would go through the list, and I started the job in 1989. I was always on the bottom of everything senioritywise.
Q. Where was the actual physical location of where you were working as a gaser?



A. Dexter Street, Providence, Rhode Island.
Q. What was the pay difference between facilities maintenance and being a gaser?
A. The pay was actually higher.
Q. To be a gaser?
A. Yes. But the starting pay, in other words, when you start the job, you start at the bottom of the pay scale. And after six months you go to the next level and so forth. I started out at less than what I was making, but if I put in six months or a year, whatever it is based on that posting, how it reads, you go to the top pay.
Q. I think you said you were a gaser for two or three years?
A. Yes.
Q. Then where did you go?
A. I went to customer service as a general service person.
Q. How long did you work there?
A. Five years or more, maybe six.
Q. Can you explain to me what a general service person does?
A. Yes. The company, they want more



flexible with the work force. Working within the framework of the contract, job descriptions, your job is this job, but yet from a difference like a summer to the winter, they needed more people in one department and they would be short in another department. So they created a general service person and I bid on it. In the winter I would be in customer service when the work load was the heaviest, no heat, things like that. In the summer, I would be working in the street department, which was fine with me. I liked that. I was back with the boys and getting dirty and working hard.
Q. Did that have a higher pay associated with it?
A. Yes, it did, but not initially.
Q. So the idea was you were taking better and better jobs?
MR. MCNAMARA: Objection.
A. No. I would not always say better. I would also want to say jobs that I was happier with as well.
Q. So from customer service, did you transfer



to another department from there?
A. From customer service, I went to, it was called line walker. They call it a facility locator. What a line walker does is work within the framework of Dig Safe. If you are having construction done on your property, or say there is a water leak in the street in front of your property, they would call for a Dig Safe and the line walker. The job I took is a facility locator and that was so they could take you in the winter and they needed you on street and they moved you there. In the summer the line walkers are busiest. When people are having construction done, the gas lines are marked out. You go out and mark the gas lines so people could dig. I took the job because I figured I would like it and I did. I took the job of another individual who had a grievance with the company. And if he lost the grievance, I would have kept the job. Not that I would wish ill. He won the grievance, so I had to go back to my old job, and that was the understanding when I took the job as well. That was

Q. And to your knowledge, he never made any complaints about you?
A. No.
Q. Did you ever make any complaints about him?
A. No, I didn't.
Q. Were you aware of any drinking problem that Jerry Porter had?
MR. MCNAMARA: Objection. You can answer.
A. I heard.
Q. What did you hear?
A. I heard that he had a drinking problem.
Q. How did you hear that?
A. The rumor mill.
Q. Did you ever personally observe Jerry Porter to drink on the job?
A. Yes.
Q. About how many times did you observe this?
A. Once.
Q. When was that?
A. I don't recall exactly when.
Q. Can you tell me everything that you do recall about that, about when you saw him drinking on the job?
A. Having a beer.



Q. What was he doing at the time?
A. Taking a cigarette break.
Q. Was this during the day or at night?
A. After our work, just a few minutes before after work.
Q. Was it at quitting time basically?
A. Yes, near quitting time. Perhaps it could have been after quitting time. Like I said, I don't remember exactly.
Q. You had a pretty physically strenuous job, you were cleaning and moving and doing --
A. I worked.
Q. So you are saying it is not physically strenuous?
A. We stayed busy. We stayed busy. You are vacuuming a rug. It is work. You can be tired at the end of the day, but it is not, I am not trying to make little of that kind of work, but it is not, I would not consider it strenuous.
Q. So you were not breaking out a sweat?
A. No.
Q. At the end of the day did you have a pattern of sort of gathering up with the rest of your crew mates and talking about



the night's work and then leaving; what was your regular routine at the end of your shift?
MR. MCNAMARA: Objection.
A. I don't recall any pattern. I don't understand your question, pattern.
Q. I am asking you, did you have any --
A. We never had any pattern. If you are working, you may not necessarily get done before me and vice versa.
Q. Where were you when you saw Jerry Porter having a beer?
A. In the garage.
Q. When you went into the garage, was he already there or did he come in after you?
A. I don't recall. We parked in the garage. That is where we kept our cars while he worked. We were getting ready to leave. That is why I said it was probably just at the end of the day. We were going out to our cars to leave.
Q. Do you have any other knowledge of Jerry Porter drinking on the job?
A. Not to my knowledge.
Q. Only other things that you heard?



A. You hear stories, rumors. I have no personal knowledge.
Q. When you were working as a gaser, did you ever know of anyone to steal gas?
A. I heard a rumor that one individual, and as I understand as the story goes, he did not steal it. He was short of money and he asked the supervisor if he could get some gas. I guess the supervisor gave him permission. That is how I understand the story. That is all I know. There was a question as to whether he did it more than once. Like I said, that was rumors and I have no personal firsthand knowledge. That is how I know.
Q. Who was that person?
A. John.
Q. Do you recall John's last name?
A. I am trying to think of it. It will come to me. I can't recall it.
Q. Sure. Did you know Carol Petrarca before you started working in facilities maintenance?
A. No.
Q. You had not seen her around the company or

anything like that?
A. No.
Q. So you met her for the first time there?
A. That's right.
Q. What was your impression when you first met her?
MR. MCNAMARA: Objection.
A. I don't know. Her hair was like bleached blond, spiked like a crew cut. And I don't know. Just like an older woman trying to look younger, perhaps.
Q. When you first started working there, was your relationship with Carol Petrarca, your working relationship, okay or was it rocky from the beginning?
MR. MCNAMARA: Objection.
A. I would say not initially.
Q. Tell me what you remember from your initial contact with Carol?
A. She had a job to do and on the occasions when I seen her, she was filling in, so I never really gave it much thought.
Q. But did you ever argue with her about anything?
A. No.



Q. Did you ever have any conflicts with her about anything, any job-related disputes?
A. I would say it wasn't a dispute directly with her. In the course of picking up the trash in the building, it housed a lot of people in the day there and they drank a lot of soda. I inquired from Jerry and Maureen, I said, what do you do with all of the cans. They said, we leave them for Carol, because they are all deposit return cans. I said, you don't share. And they said no. I said, why don't we. This wasn't infringing upon what she did on her day shift. If those people chose that is what they want to do, give them to Carol. I said, we are on the night shift. Why don't we collect them and return them for deposit and divide it up fairly. And that idea was well received and that is what we did. It was not well received by Carol. I think it was, like, you know, I don't think she cared much for me after that.
Q. Can you tell me what you recall of what she said to you and what you said to her with



respect to the cans?
A. I never really had any conversation with her about that. On one occasion she wanted to know what happened to some cans she put in the closet. I said, I don't know. Other than that, that was it.
Q. You never directly had a fight about it?
A. No.
Q. Did you ever socialize with Carol after hours or after work?
A. No, I didn't.
Q. Did you ever socialize with anyone from facilities and maintenance after work or after hours?
A. No, I didn't.
Q. Did Ed Bolduc ever talk to you about Jerry Porter's drinking?
A. No, he did not.
Q. Within the gas company, was there ever any vulgar language used by the people that worked there?
MR. MCNAMARA: Objection.
A. I don't understand the question.
Q. Did the people that worked for the gas company, to your knowledge, swear while



they were working?
MR. MCNAMARA: Objection.
A. You know, if there was, I don't recall. I think if there was any swearing, I believe it was matter of fact to the point where it was not an issue. I certainly did not swear.
Q. So did you not swear. And you did not perceive there to be any problem with swearing?
A. No. As I can recall, I never heard any conversation where it was heated. You were told or I was told stories that this one did not get along with this one, or this one did this or this one did that. It went in one ear and out the other. And if there was any, I was never there. If there was any screaming, it would be like, it was slightly, if that is a good word to use. It was not an issue, as far as I know. I can't recall anybody swearing, but I think in the gas company, there is lots of conversation where people swear. No one really pays attention to it. It is the context in which it was going on. Someone

says, I had a miserable damn day, like that, that kind of thing.
Q. Did anybody ever tell off-colored jokes?
A. Tell what?
Q. Off-colored jokes, dirty jokes, at the gas company?
MR. MCNAMARA: Objection.
A. I don't remember anybody telling off-colored jokes. I think out of the people I worked with nobody was a good joke-teller, anyway.
Q. Did anyone complain to you they were unhappy with the work environment at the gas company because of swearing or because of off-colored jokes?
MR. MCNAMARA: Objection.
You can answer.
A. Not that I recall.
Q. Did Ed Bolduc ever yell at you?
A. Did he ever yell at me. Not really yell, but like sternly, you have to pay attention on the fourth floor. You have to do a better job cleaning that desk, dusting. Not really yelling, but get with the program. He was stern. A lot of the



desks had everything in the world on them. Pictures, computers, keyboard, the monitor, paperwork. Some people cleaned their desk off at the end of the day and some people left it covered with their work. Ed did not want to hear it. If they left a paper, you still had to clean it or work around it or whatever. He did not really ever yell, but he got the message across. You have to do a better job cleaning the desk.
Q. Did Ed Bolduc ever give you a personnel policy book and tell you you had to learn the contents of that book and he was going to test you on it?
A. I think it was a general distribution by the company, not just Ed Bolduc. I think it was the company had this material and every department had to distribute it to all employees. He did hand out the book, but I think it was companywide.
Q. You remember getting some sort of policy book from him?
A. Yes.
Q. Did you write anything on your book, a note



or anything like that?
A. No.
Q. Did he tell you he was going to test you on the contents of the book?
A. Test me on the contents, no.
Q. What was your understanding of what was in that book?
A. All of the policies.
Q. Of the company?
A. Of the company. Grooming, attendance, vacation policy, sexual harassment and harassment. Every policy there is, it is in there.
Q. Had you ever gotten a book like that from the gas company before?
A. Like I said, the book you are referring to is the one I am talking about. It was a general distribution by the company to everyone.
Q. Prior to that, had you ever gotten one before?
A. I don't remember when it was distributed, but I remember receiving it.
Q. Had you ever been to any sort of training or seminar for sexual harassment prior to



the distribution of that book?
A. Yes, I did.
Q. When do you recall the first time you went --
A. I don't recall the exact date.
Q. Did you go when you were in meter reading?
A. I don't recall when I went. I don't recall the exact date or what department I was in.
Q. What do you recall about those seminars?
A. They were very informative.
Q. Where did you attend them?
A. They have done them more than once. They have done them more than once. I know the last one was done in Cumberland.
Q. When was the last one?
A. I don't recall the exact date.
Q. Give me an approximation, was it this year?
A. No.
Q. Was it last summer?
A. I know you are trying to jog my memory, but I can't recall the exact date.
Q. Was it while you were in the job that you are presently in?
A. No.

these different things. I can't remember the specifics because to me it was nonsense. I try to block it out. I am sure I had, like, maybe she felt I didn't like her. I don't know. It is beyond me. I don't understand it.
Q. Did you ever see Carol having an affair with Joe Ianello or sleeping with him on company time?
A. No, I didn't.
Q. Did you ever apologize to Carol for any sort of conflict the two of you had in any context?
A. No.
Q. Do you have any sort of habit or are you in the habit of folding hundred dollar bills?
A. Do I have a habit of folding?
Q. Yes.
A. I don't have a lot of hundred dollar bills. And if I do, it will be gaining interest.
Q. Is the answer no?
A. No.
Q. And you have no habit of carrying hundred dollar bills?



A. No, I don't. I work at the gas company. I don't have a lot of hundred dollar bills.
Q. Were you ever, let me ask you another way. When is the first time that you heard about these allegations that Carol Petrarca was making against you?
A. I don't remember the exact date.
Q. How did you hear about them?
A. Ed Bolduc said that would I go up to see Alicia Goody on the fourth floor. I think it is the sixth floor. She was the corporate attorney. She told me the story, which it flawed me. This totally flawed me.
Q. Did you respond to her verbally?
A. I told her it was crazy.
Q. Do you remember anything else you said to her?
A. She asked me what I thought it stemmed from, and I cited all of the different things as we have just discussed. And I told her, I said, it is crazy. She investigated it. I met with her again after that.



Q. How long did it take for her to investigate?
A. I don't recall.
Q. You have no idea the amount of time that passed between your first meeting and the second?
A. I don't recall exactly how long it was.
Q. Do you remember what time of year, whether it was hot or cold?
A. No, I don't.
Q. But you met with her again?
A. I can remember the allegation vividly. You can ask me if it was snowing or raining outside and I can't tell you. I don't know.
Q. What did she tell you at the end of that first meeting?
A. They were going to investigate further.
Q. How did you know to go to a second meeting with her?
A. I asked to see her. I wanted to know what was going on.
Q. So you initiated the second meeting?
A. Yes.
Q. About how long did you wait before you



initiated it?
A. I don't recall. You said how long was it between the first and second, I don't know.
Q. Sorry, I forgot. So you met with her again and then what did she tell you, or what did you ask her and what did she tell you?
A. That, I can't remember her exact words. I believe she said words to the effect that, well, I would not worry too much about it. Nothing clear-cut saying, okay, you did or you did not. We found this or that. It was like, she said-you said, and there is no other evidence to the contrary.
Q. Did she tell you what was going to happen from there with respect to it?
A. Not really.
Q. What did you leave there thinking?
A. That it was horrible and it was a no-win situation. Here is someone who tried to ruin my life and I can't do anything about it. It is just one person's word against another's, and that is pretty lousy. That is how I felt, to be honest with you.

thing and do a thorough job. They are not going to say we are done. They are going to investigate it or do whatever they have to do.
Q. Did you ever hear any of the outcomes of any of these investigations?
A. No. What could they say.
Q. And you kept working in your job until you bid out?
A. That's right.
Q. And no one forced you to bid out, you did that voluntarily?
A. There was a letter of agreement that I would stay as a GSP in the street at my same rate of pay.
Q. That is with respect to your GSP job, not with respect to facilities maintenance?
A. I went to GSP after that. I went from facilities maintenance to the gaser job and from the gaser job to the GSP.
Q. Are you saying your transferred from facilities maintenance --
A. The transfer was not because of what Carol said. I bid out of the department because I wanted to do something different.



Q. But nobody forced you to do that?
A. I signed that posting for the gaser job long before she made the allegation.
Q. So you don't perceive a transfer out of facilities maintenance as any sort of punishment or reprimand against you by the company?
MR. MCNAMARA: Objection. You can answer.
A. No. If the posting did not get down to me by seniority, I would not have had any place to go. I would not be, in other words, everything is by bidding process. It is a closed union shop. The company just cannot say we are going to take you and put you in that job. It does not work that way. It is by seniority. You can sign for a job. If it gets to you, you can accept the job and that is it. You don't have a choice. It is not an option the company can use and say because you had something happen, we can move you. It does not work that way.
Q. Were there ever any customer complaints lodged against you, to your knowledge?



A. That's right. And that is what I mentioned, there was a letter of agreement.
Q. The letter of agreement was not to do with Carol, it was to do with a customer complaint?
A. That's right.
Q. What was the customer complaint made against you?
A. I went to this house on a leak investigation. And in the course of investigating the leak, this woman with five children, two of them in diapers, I am conducting the investigation and she is having a conversation and I would answer her questions and talk back and forth. And I felt bad for her. She divulged her entire life story to me. Her husband left her. She had a boyfriend. The boyfriend wanted to marry her, but she did not want to get married. She said she was on welfare. And it was just back and forth. I said, I have kids and I have grandchildren. I sympathized with her. We are having a friendly conversation. And so I completed the leak investigation. I



found the leak on the internals on the stove. I had to leave the stove off. I instructed her she had to contact the landlord and he had to repair it or replace it. A number of days later the supervisor called, she did not call. She said her boyfriend called up and complained that I was being friendly and things of that nature. Specifically what he said, but it was her boyfriend that called up. The union and the company did an investigation. And they said okay, fine. She said, okay. We are going to suspend you until we complete the investigation. I think that stemmed because of this incident with Carol. Had I not had the incident with Carol prior to this, they probably would have said it is a complaint. They investigate and suspend me for a week. I come back and I said, no, we will go further with this, whether I have to get a lawyer. I didn't have to, as it turned out. They agreed to reinstate me as GSP in the street with my pay. They said, you have to stay in this job and down the road

Page 82

and you had to lift it up and position it onto the peg.
Q. Who gave you this sort of proficiency test for the street department?
A. One of the street supervisors.
Q. And you never took any tests like that for facilities maintenance, right?
A. No. You asked me that question and it was anything heavy. I can't think of anything that was that heavy. The heaviest thing was a box of how many reams of paper, maybe, how many reams in a box of copier paper, like that. I don't know. I think that was the heaviest thing we ever had to lift. We did have a session on ergonomics, how you lift and you had to keep your back erect and do not bend over to try to lift it. And I think Ed was there, and he had someone come in to conduct the class for everyone. They did that. I think everyone -- there were people with carpal tunnel and how to lift.
Q. About how many people worked in the street department?
A. Sixty, seventy at the peak. I think it

Page 83

is down to 50-something.
Q. In terms of line walkers, how many women did you know that were line walkers?
A. Seven or eight.
Q. And about how many total employees were line walkers?
A. Seven or eight.
Q. Seven or eight total employees?
A. Yes, not counting the employees.
Q. How many of those were women?
A. One.
Q. Do you remember her name?
A. She is there now. That is, you mentioned her name.
Q. Sue Green?
A. No.
Q. Miriam?
A. No.
Q. Barbara?
A. Barbara.
Q. With respect to the job you are in now, about how many total employees in that job?
A. Twelve maybe.
Q. And how many women that you know of?
A. None, except I think the office.

Page 84

Q. When you were in facilities maintenance, who made the determination as to who would get called for overtime? I understand the process you explained already, but what was your understanding of who actually did the process and decided who was low overtime and who would be called?
A. If something occurred after hours, it would go through dispatch. If it was a scheduling thing, like to cover vacation, it would be Ed Bolduc, I believe. I don't know, I think that how it was set up.
Q. How was your time tracked while you were working; did you use a time card or punch a time clock in facilities maintenance?
A. The time clock was, there was no time clock, but you had to show up in Ed's office and physically be there on time. You could not leave until the guard showed up at night. You just cannot leave the building empty and walk out. There was no time clock, per se.
MS. CLAPHAM: I have nothing further. Thank you.
MR. MCNAMARA: I have no

Page 85

questions.
(CLOSED AT 12:20 p.m.)

7/2 Spoke to Henry Sesin w/ Bud Butler
— although Carol "passed" test Henry S. concerned —
— I mentioned our concerns but limitations aswell
& asked for written report ASAP before talking w/Carol

7/3 Hoyt & I met w/ Carol
— I explained test results & our concerns about her injuring herself —
— she'd determined but promised me she'd admit it if got too much for her

R Bibe 7/3/91

STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS

PROVIDENCE, SC. SUPERIOR COURT

CHRISTINE STAMP :
:
VS. : C.A. NO. 04-4592
:
SOUTHERN UNION COMPANY :
and NEW ENGLAND GAS CO. :

DEPOSITION of ED BOLDUC, a witness in the above-entitled cause, taken on behalf of the Plaintiff before Melanie M. Chace, RPR, Notary Public, in and for the State of Rhode Island, at the Law Office of Patricia E. Andrews, 170 Westminster Street, 6th Floor, Providence, Rhode Island on November 14, 2005 at 11:00 a.m.

PRESENT:

FOR THE PLAINTIFF: ..... LAW OFFICE OF PATRICIA E. ANDREWS
BY: PATRICIA E. ANDREWS, ESQ.

FOR THE DEFENDANTS: .... HOLLAND & KNIGHT, LLP
BY: NEAL McNAMARA, ESQ.

ALSO PRESENT: CHRISTINE STAMP, CAROL PETRARCA, LYNORE HORN, D'ANNA SOEHNGE

INDEX


WITNESS PAGE
EDWARD BOLDUC
EXAMINATION BY MS. ANDREWS .................. 3


PLAINTIFF'S EXHIBITS FOR ID


| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| 1 | PHOTOCOPY OF NOTICE OF VACANCY, FACILITY MAINTENANCE PERSON (2pp) | 74 |
| 2 | PHOTOCOPY OF NOTICE OF VACANCY, MAINTENANCE REPAIR HELPER (1pg) | 74 |
| 3 | PHOTOCOPY OF RATE SCHEDULE, EFFECTIVE 1/21/96 (26pp) | 74 |
| 4 | PHOTOCOPY OF BURNS SECURITY INCIDENT REPORT (1pg) | 159 |
| 5 | PHOTOCOPY OF HANDWRITTEN NOTES DATED 5/24/90 (1pg) | 164 |




(DEPOSITION COMMENCED AT 11:10 A.M.)
EDWARD BOLDUC
Being duly sworn, deposes and testifies as follows:
THE REPORTER: Would you state your full name for the record, please.
THE WITNESS: Edward Bolduc.
EXAMINATION BY MS. ANDREWS
Q. Mr. Bolduc, you will recall from the last deposition in the Horn case that I represent Christine Stamp, Lynore Horn and Carol Petrarca. I'm going to go over the instructions again with you just to make sure that we're on the same page. As I told you before, you're going to have to verbalize your responses when I ask you a question, so there can't be any head nodding or shaking of the head, because the court reporter is going to be taking everything down and she can't take down nonverbal responses, obviously. I'm going to be asking you a number of questions and you should wait until I complete my entire question before you start answering, even if you can anticipate the end of my question, because it's going to make for a much better record and we can't have interruptions. So wait until I complete my entire question and then you may even want to pause a moment to allow your attorney to put whatever he wants on the record, and then, unless he



instructs you not to answer, you go ahead and answer the question. Do you understand that?
A. Yes, I do.
Q. I will try to do that for you, too, while you're answering, I'll try not to interrupt you. One of the most important things is if you don't understand anything that I ask you, you should be sure to let me know that, because to the extent you go ahead and answer a question, I'm going to assume that you understood what I was asking you. But I would ask that if you are confused, that you explain that to me to give me an opportunity to explain to you further what it is that I'm looking for. Do you understand that?
A. I understand.
Q. Since we last met have you talked to any person about Christine Stamp?
MR. McNAMARA: Objection.
A. Yes.
Q. Can you identify the persons?
A. Neal McNamara.
Q. Anyone else?
A. No.
Q. Have you received any written communication from any person since we last met about Christine Stamp?



A. I received a copy of the last deposition that was done here.
Q. Your deposition?
A. My deposition, yes.
Q. You reviewed that?
A. That's correct.
Q. You reviewed that in anticipation of your coming here?
MR. McNAMARA: Objection.
Q. To testify in the Stamp case?
A. I reviewed it based upon the instructions.
MR. McNAMARA: Objection. He reviewed it in the regular course of reviewing a deposition for --
MS. ANDREWS: You can't -- you can instruct him not to answer, but you can't testify for him.
MR. McNAMARA: Don't answer anything with respect to instructions that I gave you with regard to the deposition.
Q. Did you review that deposition transcript to help you prepare for this deposition?
A. No.
Q. Did you read that deposition?
A. Yes, I did.
Q. When did you read it?
A. I don't remember the date, shortly after I

A. I don't remember exactly. I know I gave it probably four or five times, I'm guessing, at the time to different people who were initially coming into the department. I believe I gave it to Sue Greene, I think I did give it to Lynore Horn.
Q. Anyone else?
A. I remember those two, that's all I can remember.
Q. How about Carol Petrarca?
A. I don't remember giving her the test.
Q. Was this a standard test that you gave to everyone?
A. The new people coming into the department, because when we initially made the transition from the various positions in the company, or in the department, those people that were already there weren't required to take the test. In fact, I think I developed the test after that, anyway.
Q. You believe that you gave Sue Greene that test, you believe you gave Lynore Horn, you don't remember one way or the other if you gave it to Carol Petrarca?
A. That's correct.
Q. Can you think of any reason why you would not have given it to her?
A. Again, I don't remember the time frame she came into the department, so I don't remember if she was there when the transition took place. So if she was



there when the transition took place from all the various positions, then she would not have had to take the test.
Q. So you're saying when you switched -- strike that. When the position of facility maintenance person was created, if she was already a building cleaner she would not have had to take the test?
A. I believe that is what I remember, yes.
Q. So you're saying that as of the time that you switched over to facility maintenance, any person who was already a building cleaner would not have had to take this test that you've just described?
A. That's what I recall, yes.
Q. It would only be someone who was hired from the outside; correct?
A. That's correct.
Q. And someone who had not worked as a building cleaner or building maintenance person?
A. That's correct.
Q. What test did you have -- strike that. Did you have any other test that you administered other than what you just described?
A. No.
Q. What about any physical tests?
A. Well that was part of that test, working well from



a stepladder.
Q. What about a doctor's physical?
A. Not that I recall.
Q. Do you remember anyone having to take a doctor's physical?
A. To get into the department?
Q. Yes.
A. Not that I recall.
Q. To do facility maintenance work?
A. Not that I recall.
Q. You don't remember Carol Petrarca having to do that?
A. No, I don't.
Q. Are you aware of anyone who had to undergo a physical exam by a doctor?
A. For what purpose?
Q. To go into your department?
A. Not that I recall.
Q. Can you think of any reason why someone would have to undergo a physical exam by a doctor to get into facility maintenance?
A. No.
MR. McNAMARA: Objection.
Q. It wasn't something you required?
A. Not something I required, no.
Q. The test that you administered in which you said,



among other things that they would have to use a saw, do you remember that?
A. Yes.
Q. Did Jerry Porter have to take that?
A. Again, I don't remember the time frame, but I'm thinking that he was in the department when that transition took place.
Q. If he was not in the department -- strike that. You're saying that he would have been in the maintenance department or the facility maintenance department?
A. That's correct.
Q. So he would have been doing -- he would have either been a building cleaner as of the time that the transition took place; correct?
A. He could have been, yes.
Q. What other position could he have been as of that time?
A. He could have been a maintenance person.
Q. If he were not, were there any other positions that he could have held other than maintenance person or building cleaner at that time?
A. There was a watchman classification, as well.
Q. Any other?
A. There was a cleaner leader watchman.

Page 42

Q. Any other?
A. No.
Q. So what you're saying is that as of the time that you switched over to facility maintenance, that Jerry Porter would have had to take this test that you just described, unless he was already at that time a building cleaner, a maintenance person, a watchman or a cleaner leader watchman?
A. He would have had to take the test unless it was showed that -- it wasn't just him, it would have been anybody that displayed proof of doing mechanical type of work at another place, another department or another company prior to coming to facility maintenance.
Q. Do you know if Jerry Porter had that experience prior to coming?
A. My understanding, he was, prior to coming to the gas company, he worked on automobiles and heavy truck servicing.
Q. Is it your testimony that for that reason he didn't have to take the test?
MR. McNAMARA: Objection.
A. If he didn't take the test, that may have been the reason.
Q. Do you know whether he took the test or not?

Page 43

A. I don't recall.
Q. Can you think of any other reason that he would not have taken that test?
MR. McNAMARA: Objection.
A. No, I can't.
Q. Did you ever have -- strike that. As part of that test did employees have to lift boxes?
A. I don't recall it being part of that test.
Q. I asked -- was it part of any other test?
A. Not that I recall.
Q. Can you think of any reason why someone would have to lift boxes to take the position of, in order to qualify for the position of facility maintenance person?
MR. McNAMARA: Objection.
A. That was one of the functions of the people in the facility maintenance department, moving boxes. We bring in boxes, truckloads of boxes at the office building.
Q. Was that part of any test that was administered?
A. I don't recall that being part of the test.
Q. Can you think of any reason why someone would have to do that to qualify for the position of facility maintenance person?
MR. McNAMARA: Objection.

Page 44

A. I don't recall, no.
Q. You don't recall any reason why?
A. I don't recall any reason why, that is correct.
Q. Did Stamp bid into your department?
A. If I recall, she bid into my department from meter reading, that is my recollection.
Q. What about Stamp?
A. I'm sorry?
Q. I'm sorry. What about Petrarca?
A. My recollection is that she started out as a building cleaner.
Q. And you're saying that if she were a building cleaner as of the time, that to switch over to facility maintenance that she would have automatically become a facility maintenance person?
MR. McNAMARA: Objection.
Q. Is that your testimony?
A. If that was the case at the time. Again, I don't have the recollection as to how -- I think she was a building cleaner. I think -- I know she was a building cleaner.
Q. My question to you is, at some point building cleaners became facility maintenance persons; correct?
A. Correct.
Q. We've already talked about that in your last

Page 45

deposition. Is it the case that as of the time that that transition took place, that anyone who was a building cleaner at the time would automatically become a facility maintenance person?
A. That is what I remember.
Q. That person would not have had to bid into your department?
A. That's what I remember, correct.
Q. Would that person be subject to -- strike that. Was there a probationary period for employees who became facility maintenance persons?
MR. McNAMARA: Objection.
A. Yes.
Q. Even for those individuals who had been working as building cleaners?
A. Initially, yes.
Q. Did that change?
A. Yes.
Q. When did that change?
A. I believe that that was right around the same time frame that a new contract was being negotiated between the union and Providence Gas, the gas company, and that was one of the proposals put forth by the union, that that temporary probationary period be done away with. I believe the decision was that, yes, they at

Page 78

MR. McNAMARA: Objection.
A. I don't remember the position I took at that time. Again, I remember that there was a stipulation, or phrase in there saying similar work outside the company.
Q. But my question to you is, if that language were missing, would you have taken the position that you could nonetheless increase rates of pay based on experience outside of the company?
MR. McNAMARA: Objection.
A. I don't remember my position at that time based on that.
MS. ANDREWS: Neal, I would ask that you not point out to the witness. You can have your opportunity when you cross.
MR. McNAMARA: Okay.
Q. Taking a look at this Plaintiff's Exhibit 3, Page 62.
A. You said 62?
Q. Yes, it's the third page.
A. I have it.
Q. Have you ever seen this document before, the whole document?
A. I probably have, I don't remember specifically looking at this document.
Q. Say that again, sir?

Page 79

A. I said I probably have, I don't remember specifically. I'm saying yes, I remember this document, but, in my experience at the gas company and being head of the department, I probably did.
Q. It's part of the union book?
A. Yes.
Q. Under facility maintenance, under maintenance helper you see that there are rates of pay and then there are asterisks?
A. Where does it say maintenance helper?
Q. At the top, the third page, right under facility maintenance?
A. Okay, I see it, yes.
Q. You see a few lines down under rates of pay, there are some asterisks?
A. Yes.
Q. You'll agree with me that that relates to the language at the bottom which states, "Applicable only to employee with approximately six months company experience in related work"?
A. Yes.
Q. What does that mean, that language?
MR. McNAMARA: Objection.
Q. Do you know?
A. The asterisk explains that these rates are

Page 80

applicable only to employees with six months related work.
Q. You understood that to mean if someone had six months company experience in related work, you could give that rate of pay?
A. I would agree with that, yes.
Q. Would you agree with me that to the extent -- strike that. Take a look at a few pages over on 64, facility maintenance person?
A. Yes.
Q. Can you tell me whether there is similar language in there allowing to you deviate from these rates of pay based on experience in or outside of the company?
A. No.
Q. But it's your testimony that you did deviate based on experience outside of the company?
MR. McNAMARA: Objection.
A. Based on what I said earlier, yes.
Q. You can't remember anyone that you increased the rate of pay for?
A. No.
Q. Tell me, sir, employees, your employees could take breaks, correct, during the day or the night?
A. They had established breaks that they were allowed to take, yes.

Page 81

Q. Tell me what those breaks were?
A. Coffee break in the morning, a lunch break and a coffee break in the afternoon.
Q. Were they required to go at a particular time?
A. No, I guess they weren't.
Q. Were they required to take a particular, a specific amount of time?
A. Yes. And to qualify the other response, a lunch time was specific.
Q. When was the lunch time?
A. Twelve to one.
Q. What about if you were working a different shift?
A. I don't remember when they took their lunch.
Q. So you didn't require people to take the same time every day?
MR. McNAMARA: Objection.
A. It was approximately the same time every day.
Q. Give or take how long?
A. Minutes, I don't know.
Q. How long were they supposed to take for break?
A. Ten minutes.
Q. Was that something you instituted or was that company policy?
A. That was a union agreed policy.
Q. Where was that written?

A. In the contract, I would think.
Q. Do you know that?
A. No.
Q. Tell me, are you aware of any persons -- strike that. If someone was -- strike that. Do you recall around what time they were supposed to take their morning and afternoon break?
MR. McNAMARA: Objection.
A. Around 9:30.
Q. What about in the afternoon?
A. Around two or 2:30.
Q. Which one is it?
A. Somewhere.
Q. You could go anywhere from two to 2:30?
A. It was in that time frame, yeah, two to 2:30.
Q. That would have been okay if someone decided to take a break at 2:25?
A. I would assume, yes.
Q. What did you tell your employees about taking breaks, if anything?
MR. McNAMARA: Objection.
A. I don't remember telling them anything.
Q. Did they have to let you know when they were going on break?
A. No.



Q. Did they have to let you know when they were coming off break?
A. No.
Q. If an employee at, let's say 2:30, was still working on a project that was going to take them another ten minutes, did they have the discretion to finish that project and then go on break?
A. Yes.
Q. You let them know that?
A. I believe yes, because they were aware of it.
Q. Pardon?
A. I believe yes, because they were aware of it, that if they were working on a project, finish the project, if it was in relative -- five, ten minutes, or whatever it took, take a break, yes.
Q. How would you know if people were taking the requisite amount of time?
A. I guess on an everyday basis I probably didn't.
Q. Did you seek to find that out on a daily basis?
A. Did I seek it find out if they were taking ten minutes every day?
Q. If they were taking the requisite amount of time?
A. It was common knowledge that no one took a ten-minute break, that it was always a bit longer, and the company -- I say the company, the supervisors, to



my knowledge, allowed that, you know, a ten-minute break became a 15-minute break.
Q. Did it become longer?
MR. McNAMARA: Objection.
Q. Were there any people who took longer breaks?
MR. McNAMARA: Objection.
A. Not to my knowledge.
Q. What is the point past which you would say something? What amount of time would someone have to take a break that would cause you to say something?
MR. McNAMARA: Objection.
Q. Do you understand the question?
A. I do. I don't know how to answer it. I don't know what amount of time is too long.
Q. Is there any amount of time that is too long, in your mind?
MR. McNAMARA: Objection.
A. Yeah, beyond 15 minutes would have been too long.
Q. Would that have caused you to say something to someone?
MR. McNAMARA: Objection.
Q. If you found that out?
A. Yes.
Q. Have you had occasion to say something to someone because they had taken more than 15 minutes?



A. Yes.
Q. Can you identify who?
A. I don't recall specifically names, but I can remember, vaguely remember instances at Dexter Street where coffee breaks were extended for too long a period and I did talk to the personnel involved.
Q. Who was the person?
A. I don't remember the names.
Q. Was it a male or female?
A. I don't remember that, either. It was males.
Q. They were males?
A. Yes, they were.
Q. More than one?
A. Yes.
Q. They were your subordinates?
A. Yes.
Q. Who were the cast of characters, who could they have been?
A. Ken Schiano, Bill Johnson.
Q. You believe that they were -- strike that. You learned that they were taking more than 15 minutes?
A. That's correct.
Q. When was that?
A. I don't recall.
Q. Tell me the circumstances under which you found that

Page 90

Q. Is that your testimony?
A. Yes.
Q. Did you come to find out after the second time that they continued to take long breaks?
A. I don't recall that.
Q. You don't recall finding that out?
A. I don't recall that, no.
Q. Did you monitor them?
MR. McNAMARA: Objection.
A. No, I don't think I did.
Q. Why didn't you monitor them?
A. It was probably one of the things that was not -- it was important, but it wasn't. I was dealing with other things that may have been higher on the priority list at that time.
Q. Like what?
A. I don't remember.
Q. Is that an assumption on your part, that you were dealing with more important things?
A. Yes.
Q. Did you ever take any disciplinary action against Bill Johnson and/or Ken Schiano for that reason?
MR. McNAMARA: Objection.
Q. Do you understand the question?
A. I do. I vaguely remember having the steward in

Page 91

with the two of them and it was more for leaving work early, leaving the work site early than that infraction. But my guess, my guess, I would have probably brought that up because it really was the same type of problem, leaving the work site early, extending the coffee break beyond its limits.
Q. So they were getting paid for time that they weren't working?
A. That's correct.
Q. Like Carol Petrarca, like you claim --
MR. McNAMARA: Objection.
Q. Like you claim that Carol Petrarca did?
MR. McNAMARA: Objection.
Q. Isn't that what they did? Wasn't it the same?
A. I disciplined them based upon that infraction, leaving the work site early and extending coffee breaks, yes.
Q. So they were not working and getting paid for that; correct?
MR. McNAMARA: Objection.
A. That's correct.
Q. Stealing from the company?
MR. McNAMARA: Objection.
Q. Correct?
A. They were not at their work site and getting paid

Page 92

for it, correct.
Q. Stealing from the company?
MR. McNAMARA: Objection, asked and answered.
A. I think I answered your question.
Q. Would you consider that stealing --
MR. McNAMARA: Objection.
Q. -- from the company?
A. They were brought in front of myself and a steward and disciplined for the infraction that I stated, leaving the work site early and extending the coffee breaks.
Q. I thought you said that -- I thought you said you weren't sure that you took any action regarding the extended breaks?
A. I'll rephrase. That would have been part -- probably part of that disciplinary action, because it was one and the same, leaving the work site early, extending the coffee breaks.
Q. Who is that union steward?
A. I don't remember.
Q. Give me the list of characters who it could have been?
A. I don't remember that, either.
MR. McNAMARA: Objection.
Q. Paul Cardin?

Page 93

A. He was a steward there.
Q. Was it Paul Cardin?
A. It could have been.
Q. Tell me about them leaving work early. When did you first find out that they were doing that?
A. I don't remember the time frame that I found it out. I remember going down there one day and seeing their vehicles gone before the shift was terminated, the end of their shift. And going into the workplace and not finding them there, I don't know what the time frame of that was. That is when I began to learn that that was taking place.
Q. As of the time that you first went there and saw their vehicles missing, did you suspect that they might be leaving early, did you already suspect that?
A. I guess I did, yes.
Q. What did you know as of the time that you went and saw the vehicle missing the first time?
A. What did I know?
Q. Yes. You said you suspected that they were doing this?
A. So I went down there.
Q. What information did you have that led you to suspect?
A. Rumor, if you will, no specific incident or report, if you will. Rumor.

Page 94

Q. Who did you hear that from?
A. I don't remember.
Q. When you heard rumors in the workplace, would you act on them?
MR. McNAMARA: Objection.
A. Would I what?
Q. When you heard rumors in the workplace, would that cause you to conduct some kind of investigation or inquiry?
MR. McNAMARA: Objection.
A. No, not really.
Q. Would you hear rumors and you wouldn't act on them?
MR. McNAMARA: Objection.
A. I heard that rumor. I guess I had suspected it even before I heard the rumor, if you will, because there were situations that I did go down there and not find them in the workplace. Not looking for their vehicle, just not finding them. Maybe I gave them the benefit of the doubt that I didn't find them, they were there, but I didn't know where they were.
Q. So even before you heard any rumors, you had heard that they might be leaving work early?
A. No, before I heard the rumors, I went down there and found -- or, didn't find them in the work site in the facility.

Page 95

Q. How long did you go there and not find them, on how many occasions?
A. I don't remember.
Q. In addition to that, you began to hear rumors about this?
A. That's correct.
Q. So, in response to those rumors, you started checking up on them?
A. That's correct.
Q. Ultimately, you spoke to them the first time?
A. That's correct.
Q. How long from the time that you first began to suspect, because you went there and you didn't find them there, until the time that you spoke to them the first time, how long was that?
A. I don't remember that, either.
Q. Pardon?
A. I don't remember. I don't remember the time frame.
Q. Could it have been a year?
MR. McNAMARA: Objection.
A. I don't remember.
Q. Is it possible that it was a year, sir?
MR. McNAMARA: Objection.
A. It could have been less.

Page 96

Q. It could have been more?
MR. McNAMARA: Objection.
A. I don't remember.
Q. Can't remember one way or the other?
A. That's correct.
Q. Then that is when you warned them?
A. Please?
Q. That is when you warned them?
A. That's correct.
Q. That it would lead to disciplinary action?
A. That's correct.
Q. Then a period of time went by and you discovered that they were doing that again?
A. That's correct.
Q. At what point during this scenario did you begin to suspect that they were also leaving work early?
MR. McNAMARA: Objection.
A. I'm confused by your question. I thought that is what we were discussing, their leaving work early.
Q. Okay, I thought -- I'm sorry. This had to do, you had two issues going on, you had their extended breaks?
A. Yes.
Q. And then you had them leaving early?
A. Correct.
Q. You learned about them leaving early when you went

Page 97

there and found their vehicles gone?
A. Correct.
Q. When was it in relation to your first finding their vehicle gone that you also learned that they were taking extended breaks? Was it the same period of time?
A. I don't remember that, it was two different issues, but when I did the disciplinary action concerning the leaving work, and, I'm guessing that I probably would have brought that issue up as well, the coffee break.
Q. What happened to them?
MR. McNAMARA: Objection.
A. It was, I guess they called it the first step, it was a verbal warning.
Q. So for them leaving work early and taking extended breaks, you believe that they got a verbal warning?
A. That would have been step one in the disciplinary action process, yes.
Q. Did they get a verbal warning?
A. From me, yes.
Q. Was that grieved?
A. I don't remember.
Q. Was that verbal warning in writing?
A. It's a verbal warning, it's a verbal warning to

Page 98

the employees.
Q. Did you put it in writing?
A. I probably made documentation of it for my files, or their file, if you will, in my office, yes.
Q. At what point -- strike that. When you first noticed that their cars were missing, you considered that to be a serious infraction; correct?
MR. McNAMARA: Objection.
A. It was an infraction of the rules and the union contract agreement, so, yes, it was serious enough at the time for me to take action.
Q. You didn't take action the first time?
A. Okay, yes.
Q. Did you document and place in their personnel file the fact that you went to Dexter Street and discovered that their cars were missing?
A. I may have for my own personnel folders. I don't remember that, but it's possible.
Q. What is your best recollection sitting here today. You had a serious infraction, you found that two employees were missing from the workplace at a time when they should have been working. Did you or did you not include a notation in your file that you kept?
A. I don't recall.
Q. You don't recall doing that?

Page 99

A. No. I probably did, but, specifically recall doing it?
Q. Did you talk to Bob Ringman about this, what you were finding out about Bill Johnson and Ken Schiano?
A. I don't recall a specific discussion on that with him, no.
Q. You said that earlier when there were serious infractions you would have told Bob Ringman about that. Why didn't you tell Bob Ringman about this?
MR. McNAMARA: Objection.
A. I'm saying -- I'm not saying I didn't tell him, I don't recall whether I told him or not.
Q. What is your best recollection, that you did tell him?
MR. McNAMARA: Objection.
A. I don't recall.
Q. Was Bob Ringman working at Dexter Street?
A. Yes.
Q. Do you know whether he was aware of what was going on with --
A. I don't know that.
Q. Were you aware of anyone else who was leaving work early?
MR. McNAMARA: Objection.
A. I don't recall.
Q. You don't recall one way or the other?

Page 100

A. I know I was responsible for my personnel, so I was doing my job, if you will, in supervising them. So, I didn't look at what other departments, other personnel were doing down there.
Q. What about your personnel, did you have occasion to suspect that any other of your subordinates were leaving work early?
A. Not to my knowledge.
Q. Did you hear that from any source?
MR. McNAMARA: Objection.
A. Not that I recall.
Q. Is it possible you did?
MR. McNAMARA: Objection.
A. It's possible, I don't recall it.
Q. What about taking extended breaks, did any of your other personnel take extended breaks?
A. They probably did.
Q. Why do you say that?
A. Because there were no time clocks in the facility, in the company, and it was very easy to extend a break beyond ten or 15 minutes, people talking, eating, drinking, it was very easy for coffee break to go 20 minutes.
Q. Did you know that people were doing that?
A. I was probably aware of it.

Page 101

Q. Who was doing it?
A. I don't know specifically who was.
Q. Was Jerry Porter doing it?
A. I don't know who was doing it. It happened.
Q. Did it happen with Jerry Porter?
MR. McNAMARA: Objection.
A. It happened to all of them, I would think.
Q. Do you know that, sir?
A. That it happened to all of them?
Q. That it happened to Jerry Porter? Right now we're talking about Jerry Porter. Did it happen with Jerry Porter?
A. Probably.
Q. Did it happen with Lynore Horn?
A. Probably.
Q. Do you know that for sure?
A. As sure as I am about Jerry Porter.
Q. Did you ever catch Lynore Horn taking an extended break?
A. Not that I recall, sitting here.
Q. Did you ever catch Jerry Porter taking an extended break?
A. Same response, I don't recall sitting here any specific time that I walked in and he was on a longer break than normal.

anything?
A. I can't remember any specific incident, no.
Q. What about Carol Petrarca?
A. I don't recall any specific incident of disciplinary action.
Q. What about Lynore Horn?
A. Same response, I don't recall any specific incident.
Q. So, I take it when you discovered Christine Stamp and, as you put it, Carol Petrarca, taking a longer break than they were allowed to, you didn't consider what you said to them to be disciplinary in nature; correct?
MR. McNAMARA: Objection.
A. I guess the fact that a steward was not present that that could not -- would not have been interpreted as a verbal warning.
Q. Did you consider it to be a verbal warning?
MR. McNAMARA: Objection.
A. More of a corrective step.
Q. If it was just a corrective step, then why did you put it in their personnel file? I thought you said you only put serious infractions in their personnel files?
A. I considered it to be serious enough to document, but the action that I took was of a corrective nature



by informing them of their negligent work, if you will, and not being where they should have been.
Q. Where were they?
A. I discovered them in the ladies' locker room.
Q. What do you mean, ladies' locker room?
A. That is where the ladies went, they had lockers in there for their personal items.
Q. Did you ever take the position that that was not the ladies' locker room?
A. No.
Q. You never told anyone -- strike that. As of the time that you went in there looking for them, did you know that was a ladies' locker room?
A. Yes.
Q. Did you ever tell any person that you did not know that that was the ladies' locker room?
MR. McNAMARA: Objection.
A. That I didn't know it?
Q. Yes.
A. No.
Q. Had you ever had occasion to look for them before this incident that we're talking about?
MR. McNAMARA: Objection.
Q. The one involving -- had you ever had occasion to look for any female in that ladies' locker room before the



day that you claimed you discovered Carol and Christine off the roof?
A. Not that I recall, no.
Q. How did you know it was used as a ladies' locker room?
A. Because I had it established as that when we started having ladies coming into the department. That they needed a space for their lockers and a place to change clothes.
Q. Was there any designation that this was a ladies' locker room?
A. I don't recall if there was a sign on the door. It was a locker room space.
Q. We're going to come back to that. How did you know that Carol and Christine were in that locker room the day that they were working on the roof?
A. When I initially went looking for them, I didn't know they were in there. I looked on the roof and then I went to the basement to see if they were down there. Walking around the basement, through the old or the former boiler room and not seeing them, went down the corridor, there is the mail room at the end of the corridor, so I thought perhaps they might have been down there talking with somebody in the mail room. As I walked past the ladies' locker room, the door was ajar and I could hear them talking. There is



a vent on the door and the door was ajar, about a foot, and I could hear them talking.
Q. What did you do when you got to the door?
A. I just sort of pushed it open and they were sitting there.
Q. You didn't knock?
A. I don't recall knocking.
Q. What is your -- you didn't knock?
A. I don't recall knocking.
Q. Is it possible you knocked?
MR. McNAMARA: Objection.
A. I don't recall.
Q. You don't recall doing that?
A. I don't recall knocking.
Q. Did you call out their names?
A. It was one and the same action, pushing the door open, because you could see the light was on, the door was open, and pushing the door and saying, Lynore. And when the door opened, they were sitting there.
Q. You knew this was a locker room and you went in without announcing yourself?
A. I pushed the door and they were sitting down.
Q. You went in knowing that was a locker room?
MR. McNAMARA: Objection.
A. Hearing them talking, laughing, yes, I pushed the

employee from facility maintenance, there was no light duty in that department, but there was opportunity for light duty for that facility maintenance person in other departments?
A. I believe that was the situation, yes.
Q. Is that by contract?
A. I would think, yes, I would think it would be.
Q. Are you aware of anyone who worked light duty?
A. In my department?
Q. Yes.
A. I vaguely remember somebody, but I don't remember who it was that went to Dexter Street and did something on light duty. I don't remember the incident or the person.
Q. Do you remember what they did at Dexter Street?
A. I don't. It would have had to have been someone in clerical.
Q. Did you ever see Jerry Porter taking cigarette breaks?
A. Taking what?
Q. Cigarette breaks?
A. Yes.
Q. He was a smoker?
A. Yes, that is why he took cigarette breaks.
Q. Okay. He could have been a druggy, I guess.
A. I don't know.



Q. Tell me, do you know how many packs of cigarettes he smoked during a shift?
A. I have no idea.
MR. McNAMARA: Objection.
Q. Do you know how many breaks he took during his shift to smoke cigarettes?
A. I have no idea.
Q. But you did have occasion to see him taking a cigarette break?
A. Yes.
Q. And I take it that was outside?
A. That's correct.
Q. Was that on the scheduled morning and afternoon break when you saw that?
A. I don't know.
MR. McNAMARA: Objection.
A. I don't remember. I saw him out there, you know, that was the place. That was a nonsmoking facility, so everybody in the building who smoked, they went outside to that site on Orange Street and smoked. So, I don't know, I saw him out there.
Q. How often did you see him out there?
A. I saw him often, I don't know, you know, often during the day, if you will, during the week.
Q. You saw him often during the day and during the week



smoking cigarettes outside?
A. I saw him out there often, yes.
Q. Was he supposed to be out there when you saw him?
A. When you say supposed to be, I don't know that the company had a policy on how many cigarettes a person could have a day. So, he was out there smoking, you know.
Q. And you saw him doing that?
A. Smoking, yes.
Q. Did you ever tell him that he was supposed to be inside working?
A. I don't recall.
Q. You don't recall doing that?
A. I don't recall doing that.
Q. Why wouldn't you if he was supposed to be working?
A. I don't recall doing it.
Q. My question to you is, can you think of any reason why you would not have told him that he should be inside working, as opposed to smoking outside?
MR. McNAMARA: Objection.
A. He was probably following the same agenda, if you will, as everyone else in the building, because there was no written policy as to how many times you could have a cigarette. So as long as it was at the discretion of the supervisor that it wasn't being



abused -- and I'm not sure what abused is, how many cigarettes you have before you're abusing it, but that was the situation at the time.
Q. So you felt that he wasn't abusing it?
A. I didn't think he was abusing it, no.
Q. What do you base that on?
A. The person, the work that he did, the quality of work. His work was done and, again, I don't know the number of times I saw him out there. I saw him out there and he was smoking. I don't know what that number was.
Q. Did you ever warn him about being outside smoking when he should have been working?
A. I don't recall.
Q. You don't recall doing that?
A. No.
Q. Did you ever hear that Jerry Porter left the building when he should have been working?
MR. McNAMARA: Objection.
A. I don't recall that.
Q. Other than smoking?
A. Other than smoking.
Q. You don't recall that?
A. I don't recall that happening, no. Let me rephrase that, if I may, or reanswer it. I believe it

TO: BOB BIBER

FROM: ROY HEATON

DATE: OCTOBER 11,1991

SUBJECT: CAROL WIBERG'S PROBATION

This memo is to confirm our conversation concerning Carol Wiberg's probation extension. I feel that Carol needs more time and training on the job. She is able to handle the physical end of the position, but needs more training in the mechanical portion of the job. This is due to several circumstances that have deprived her of proper training time.

I spoke to Ray Conroy as you suggested. I explained the situation to him and he is in agreement with the extension of thirty days for Carol.

Carol,s thiry day extension will end on November 11,1991.

If you have any questions, please give me a call.

Roy Heaton

Sexual harassment Complaint

Wednesday May 23, 1990. Carol Wisley informed me she is being harrassed by some fellow employees. Pat Domenicone showing her nude pictures in a magazine. Also he makes remarks to her concerning her relationship with another male employee.

Miriam Cormeau making remarks to her concerning her (Carol) friendly relationship with the department supervisor. Carol states other similar remarks are being made by Miriam.

Carl Bolduc 5/24/90

I will be having a meeting today to reexplain the sexual harassment policy to the Building Cleaners.
I will have similar meetings with the rest of the department in the very near future.

TO: All employees

FROM: Bruce G. Wilde, Vice President

DATE: June 14, 1989

SUBJECT: Sexual Harassment Policy

Purpose

The purposes of the attached policy are to ensure every employee of a working environment free from sexual harassment, and to inform every employee of their rights and responsibilities related to sexual harassment.

Communication of this policy

Every employee will receive a copy of this policy statement. You will also see this policy posted on all bulletin boards.

Training

Your management team will be attending training sessions to ensure that this policy is both understood and followed.

If you have any questions concerning this policy, I encourage you to call your Human Resource Department.

Attachment

Providence
Energy Corporation

100 Weybosset Street, Providence, Rhode Island 02903
Telephone (401) 272-9191

June 2, 1989

## POLICY
## SEXUAL HARASSEMENT

### PURPOSE

The Federal Government affirmed that sexual harassment in the workplace is a violation of Title VII of the Civil Rights Act of 1964. Under the Government's interpretation the Corporation will be considered responsible for the acts of its employees unless it can be shown that the Corporation took immediate and appropriate corrective action when informed ~~of the~~ facts.

### POLICY

Providence Energy Corporation does not condone and will not tolerate sexual harassment of its employees by anyone (another employee, vendor or customer). Conduct determined to be of a sexual harassment nature, whether physical, verbal, written or pictorial, may result in disciplinary action up to and including dismissal.

### SEXUAL HARASSMENT DEFINED

Sexual harassment is unwelcome verbal or physical conduct of a sexual nature. There are two types of sexual harassment:

1. Quid pro quo (something given for something else)

   Occurs when submission to verbal or physical conduct of a sexual nature, unwelcome sexual advances, or requests for sexual favors is made either explicitly or implicitly a term or condition of employment.

2. Environmental sexual harassment

   Occurs when the unwelcome conduct unreasonably interferes with an individual's job performance or creates an intimidating, hostile or offensive environment, even if it does not lead to any tangible or economic job consequences.

### MANAGEMENT'S RESPONSIBILITIES

Every member of management is responsible for maintaining a working environment free from sexual harassment by taking immediate and appropriate action including but not limited to the following:

- communicate this policy to your employees
- encourage employees to report any/all sexual harassment conduct
- communicate to your employees that each complaint will be handled promptly, fairly and privately

- report all sexual harassment complaints to the V.P. of Human Resources
- reassure each employee that any conduct they view as "retaliation" for reporting sexual harassment conduct will not be tolerated and will also be subject to disciplinary action.

EVERYONE'S RESPONSIBILITY

Any employee who believes he/she is being subjected to sexual harassment is encouraged to immediately take any one or more of the following steps

either:

confront whomever is doing the harassing and ask that person(s) to stop;

and/or:

discuss the matter with your next level of authority;

and/or:

discuss the matter with the Human Resource Department by contacting either Judith Garbett, Mgr. Employment & Benefits, or Robert Biber, Mgr. Training and Development.

IMPORTANT

If the preceding steps fail to produce appropriate and satisfactory changes in the offensive conduct, notify the Vice President of Human Resources immediately.

ACTION TO BE TAKEN

All complaints of sexual harassment will be promptly and thoroughly investigated. Whenever possible, the identity of the complaining party and the accused will be kept confidential.

If the investigation affirms the allegation of sexual harassment, the Corporation will take the necessary corrective action to eliminate this conduct.

In some cases, the sexual harasser may be judged personally liable in civil suits filed by the harassed person.

Louis R. Hampton
Chairman, President & C.E.O.

```
TDM110                              T D I                         10/26/05
                           CLAIMANT MEDICAL DATA                Screen 1 of 2
                                  INQUIRE      Mst Total Wks 20  Rem Wks 01
-------------------------------------------------------------------------------
    SSN/BYE                         Claimant Name            Rec: I   Pay: T
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-95-2  CAROL A                                 PETRARCA
Physician's Code : R053  Name   DR JOHN            RUGGIANO
MD Flag :                                                   Extensions: 01
Morbidity Code:   300    MD Duration:    10.0   TDI Duration:    10.0
Diagnosis:   ANXIETY
Denial Reason:                    D A T E S          Patient No:
                       Sent       Returned
1st MD Exam          : 060995                   Injury / Illness    :
Latest MD Exam       : 062695                   Disability Begins   : 060495
TDI-3D Mailing       : 061995                   Duration Beg/End    : 060495 081295
1st Mailing TDI-3    : 061995      071095       W.C. Illness/Injury: N
2nd Mailing TDI-3    : 070395                   Continued 3 Date    :
Impartial Exam       :
Results          : AFTER ENTERING GIVE TO DOMENIC
Comments         : S TO DOMENIC
     Date :    071195      Time :   11 : 18      By :   CAP
            F1 to commit work  --  F3 to escape back to previous menu
PAGE-DOWN FOR MEDICAL RECS - ENTER FOR EXT RECORDS - F3 TO EXIT
```

```
TDM110                             T D I                              10/26/05
                         CLAIMANT MEDICAL EXTENSIONS              Screen 2 of 2
                                  INQUIRE      Mst Total Wks 20  Rem Wks 01
------------------------------------------------------------------------------
    SSN/BYE                               Claimant Name
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-95-2  CAROL A                                  PETRARCA

Physician's Code : R053 Rec. # 01 Name: DR JOHN         RUGGIANO
Morbidity Code:    300   MD Duration:   10.0   TDI Duration:   10.0
Denial Reason:
                                     D A T E S
                       Sent          Returned
1st Mailing TDI-3C  : 080495        081595     Disability Begins  081295
2nd Mailing TDI-3C  :                          Duration Beg/End   081395   102195
Latest MD Exam      : 080795

Comments :

        Date :    081595      Time : 13 : 59       By :    CAP

           F1 to commit work   --   F3 to escape back to previous menu

PAGE-DOWN OR PAGE-UP FOR EXT REC - ENTER FOR MORE MEDICAL RECS - F3 TO EXIT
```

```
TDM110                                T D I                                10/26/05
                             CLAIMANT MEDICAL DATA                     Screen 1 of 2
                                    INQUIRE      Mst Total Wks 13  Rem Wks 00
------------------------------------------------------------------------------
    SSN/BYE                                Claimant Name           Rec: I   Pay: T
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-96-1  CAROL A                                    PETRARCA
Physician's Code : R053  Name   DR JOHN            RUGGIANO
MD Flag :                                                          Extensions: 02
Morbidity Code:    309    MD Duration:    10.0   TDI Duration:    10.0
Diagnosis:   DEPRESSION
Denial Reason:                         D A T E S          Patient No:
                       Sent         Returned
1st MD Exam          : 110695                        Injury / Illness     :
Latest MD Exam       : 110695                        Disability Begins    : 102295
TDI-3D Mailing       : 110395                        Duration Beg/End     : 102295 123095
1st Mailing TDI-3    : 110395       111095           W.C. Illness/Injury: N
2nd Mailing TDI-3    :                               Continued 3 Date     :
Impartial Exam       :
Results         :
Comments        : IN VIEW OF DIAGNOSIS WAIVE TIMELY EXAM   REVIEWED, MB 1-10
     Date :    031296       Time :   12 : 56       By :    DFF
           F1 to commit work   --   F3 to escape back to previous menu
PAGE-DOWN FOR MEDICAL RECS - ENTER FOR EXT RECORDS - F3 TO EXIT
```

RECEIVED
JUN 14 2001
R.I.C.H.R.

# AGREEMENT

BY AND BETWEEN

# PROVIDENCE GAS COMPANY

AND

# UNITED STEELWORKERS OF AMERICA

(AFL-CIO-CLC)

IN BEHALF OF

# LOCAL 12431

# 1996 - 2001

# TABLE OF CONTENTS


| ARTICLE | | PAGE |
|---|---|---|
| | Preamble | 1 |
| Article | | |
| I | Recognition | 2 |
| II | Union Security | 2 |
| III | Union/Management Committee | 4 |
| IV | New Employees and Discharges | 6 |
| V | Hours of Work and Overtime | 9 |
| VI | Safety and Health | 15 |
| VII | Vacations, Holidays, Leave with Pay | 17 |
| VIII | Seniority | 24 |
| IX | Posting of Notices | 31 |
| X | Sick Benefits | 31 |
| | Blue Cross and Blue Shield | 35 |
| | Group Life Insurance | 36 |
| XI | Notice of Vacancies | 38 |
| XII | Wage Rates | 43 |
| XIII | Employees in Service of United States | 44 |
| XIV | Lockouts and Strikes | 44 |
| XV | Union Representatives | 45 |
| XVI | Rights of Management | 46 |
| XVII | Cadet Engineers | 47 |
| XVIII | Grievance Procedure and Adjustments | 47 |
| XIX | Retirement Plan | 51 |
| XX | Letters of Agreement | 51 |
| XXI | Miscellaneous Provisions | 52 |
| XXII | Termination Clause | 57 |

# TABLE OF CONTENTS

PAGE

## RATE SCHEDULE

Dept./Office .......................... 61
Facilities Maintenance ............... 62
Materials Management ............... 65
Garage ................................ 66
Customer Service ...................... 68
Construction and Maintenance ....... 74
Engineering ........................... 78
Technical Services ..................... 78
Gas Control ............................ 79
Gas Supply ............................ 82
Meter Reading ......................... 83
General Services ...................... 84

# AGREEMENT

THIS AGREEMENT, entered into as of the 21st day of January, 1996, by and between THE PROVIDENCE GAS COMPANY of Providence, Rhode Island, and/or its successors, hereinafter referred to as the Company, and the UNITED STEELWORKERS OF AMERICA (AFL-CIO-CLC), on behalf of the UNITED STEELWORKERS OF AMERICA, LOCAL 12431, hereinafter referred to as the Union. WITNESSETH:

**WHEREAS** it is the purpose of the parties hereto to promote and insure harmonious relations between them, to protect the safety of the employees and the welfare of both, to stabilize employment, and to recognize the fact that both are engaged in public service with all the attendant obligations and duties to the public involved therein; and

**WHEREAS** it is the further purpose of the parties to insure true collective bargaining with respect to rates of pay, wages, hours of employment and other conditions of employment, and both parties pledge considerate and courteous treatment toward each other, and the Union pledges the loyal and efficient services of its members to the Company;

**IT IS MUTUALLY AGREED** between the parties as follows:

# ARTICLE I

## Recognition

The Company recognizes the Union as the sole collective bargaining agent with respect to rates of pay, wages, hours of employment, and other conditions of employment for the production plant, distribution department, meter readers (including collectors), customer service, and main office building maintenance employees, but excluding executives, supervisors (assistant foremen and up), retired employees, confidential clerks, and, until otherwise determined by election and certification, chemists, home-service employees, central office clerks, and sales personnel.

# ARTICLE II

## Union Security

Section 1. **Union Membership.** All employees who, on the date of execution of this Agreement, are members of the Union in good standing in accordance with the Constitution and By-Laws of the Union, and those eligible employees who may thereafter become members, shall, as a condition of employment, remain members of the Union in good standing during the life of the Agreement. The Union will furnish to the Company a copy of its Constitution and By-Laws. All employees hired or returned to the Bargaining

Unit on or after January 28, 1971, shall, as a condition of employment, become and remain members of the Union during the term of this Agreement.

The foregoing sentence shall apply to each new employee on completion of the probationary period, to each seasonal employee upon becoming a regular employee, and to each employee returning to a Bargaining Unit job from a supervisory position on the thirtieth day following the return to the Bargaining Unit; but in no event shall the sentence apply to any employee prior to the thirtieth day following the date of execution of this Agreement.

Section 2. **List of Members.** The Union will furnish a duly authenticated list of its members in good standing on request by the Company.

Section 3. **Payroll Deduction.** The Company agrees to deduct from earned wages, and to remit to the International Secretary-Treasurer, an initiation fee not to exceed Ten Dollars ($10.00) and monthly dues in an amount equal to 1.3% of said member's total earnings, during an appropriate reference period, payable in the month to which said dues apply, provided that monthly dues shall not be less than Five Dollars ($5.00) for those employees who are members of the Union and not exempt from the provisions of this Agreement and who individually authorize such a deduction in a manner and on a form approved by the Company and the Union; further provided that

monthly dues shall not be more than 2.5 hours multiplied by said member's average hourly earnings.

The dues shall be computed based upon the USWA formula.

## ARTICLE III

### Union-Management Committee

The Company and the Union recognize that greater flexibility in collective bargaining is necessary to keep pace with the evolving industry, market, and workplace environment and to take advantage of opportunities that would benefit the Company, the Union, and the employees. Therefore, it is agreed to create a Joint Union-Management Committee.

The Joint Union-Management Committee will meet a minimum of six (6) times per year. The membership of this Committee will be set at nine (9) Union Negotiations/Grievance Committee members and nine (9) Company representatives. Additional people who may be beneficial to resolving issues at hand may be invited to attend the meetings. Prior notice of invited guests will be given to all Committee members. The Joint Union-Management Committee is fully empowered to discuss any topic that would otherwise be a permissible subject of bargaining. By way of example only, such could include:

— issues identified but not resolved during previous formal contract negotiations;

— issues that need to be addressed on a more timely basis than waiting for the next scheduled contract negotiation;

— establishment of joint task forces, as needed, to develop mutually satisfactory solutions;

— implementation and review of trial agreements instituted by agreement of the parties;

— joint learning and exploration of improved collective bargaining processes;

— development of the job evaluation process.

The parties affirm that the Joint Union-Management Committee will conduct its meetings in a joint problem-solving mode that will satisfy the mutual interests of all stakeholders and will promote improved collective bargaining. Either party may request that a mutually agreed to mediator be solicited to encourage mutual agreement. It is the express intent of the parties to find solutions that are mutually agreed upon. In the absence of reaching an agreement, the parties may submit disputes that are covered by Article XVIII, Grievance Procedure and Adjustment, to resolution thereunder. Discussions between the parties will not be used to prejudice the cases presented in arbitration. With respect to disputes that are not covered by Article XVIII, the Company retains the right to resolve such disputes at its discretion.

# ARTICLE IV

## New Employees and Discharges

Section 1. **Trial Period.** The first three (3) months of employment (except, in the Job Classification of Meter Reader, the first 6 months) for all new employees shall be considered a probationary period within which the Company may discharge or discipline or suspend any of said new employees at its sole discretion.

If a new employee is transferred to another job classification at that employee's own request before completing the probationary period, the employee shall serve a probationary period of three (3) months in the new classification as though the employee were a new employee there.

Section 2. **Discharge, Discipline, Suspension.** Discharge, discipline, or suspension of present employees and of all new employees who have worked beyond their trial period shall be made by the Company only for cause. No employee shall be discharged, however, without first being suspended. During the first three (3) days of such suspension, the Company will discuss the matter if requested by the Union. If, as a result of discussion, the Company determines that no discipline is warranted, the employee shall be reinstated with full pay for all time lost. If, however, discipline is imposed, any employee aggrieved thereby may have the grievance processed

in accordance with the Grievance Procedure hereinafter provided, beginning with Step 3 thereof. Any such grievance shall be presented in writing to the Company within five (5) working days of the date the Union is informed of the Company's final decision.

Section 3. **Seasonal Employees.** It is the intention of the Company to maintain a full-time workforce throughout the year. When the Company recognizes and/or foresees the need for additional manpower to respond to workload peaks or that the work exceeds the current workforce capability, the Company will notify the Union. If internal flexibility assignments cannot be agreed to between the Company and Union, the Company may hire seasonal employees. Seasonal employees will be employed with the distinct understanding that their term of employment with the Company will not extend beyond the end of the seasonal period except as provided for in the second following paragraph.

The seasonal period for any work shall not exceed six (6) months after the time of hiring the first seasonal employees for this work unless otherwise mutually agreed. During this seasonal period, the Company may discharge or discipline any of the seasonal employees at its sole discretion. If, at the end of a seasonal period, a seasonal employee becomes a regular employee in the same department, that employee's period of employment as a seasonal employee shall be credited

toward the three (3) month probationary period as defined in Article IV, Section 1.

The Company agrees that seasonal employees with ninety (90) days of continuous service may apply for vacancies in progression jobs and that they will be given every consideration when such opportunities occur, provided that they are duly qualified for such positions. The Company's decision on selection will be final and relative length of service as between seasonal employees will be disregarded. Any seasonal employee so selected who fails to qualify during the probation period of the progression job will have no rights to continued employment or to the Grievance Procedure. Seasonal employees who are to be retained in regular employment in the C & M Department will be notified a week or more in advance of December in each year.

Seasonal employees are defined as those temporarily hired because of an extra personnel requirement of limited duration that cannot be covered by the normal work force.

It is not the intention of the Company to, in effect, provide continuous employment for any employee while calling that employee a seasonal employee for successive seasonal periods.

No employee will be employed for more than one period of seasonal employment in a calendar year except by mutual agreement between the parties. The

Company may employ or transfer an employee for an additional temporary work period but will immediately notify the Union President and continue the employee in seasonal employment only if agreed to by the Union.

Section 4. **Non-Discrimination.** Neither the Company nor the Union will discriminate against any individual because of race, color, religion, disability, veteran status, age, national origin, or sex.

## ARTICLE V

## Hours of Work and Overtime

Section 1*. **Normal Hours of Work.** For the purpose of determining overtime, the basic work week shall consist of an eight (8) hour day and a forty (40) hour week.

Whenever possible, with due regard for operating efficiency, work days shall be scheduled to run consecutively.

Section 2*. **Overtime.**

1. Time and one-half shall be paid for all hours worked in excess of eight (8) hours in any one (1) day.

*Certain exceptions to the provisions of Sections 1&2 of this Article are set forth in a Letter of Agreement dated June 4, 1990.

a. For the purpose of computing overtime, a day is defined as the twenty-four (24) hours from starting time of a normal working day or from the starting time of a regularly scheduled shift or working period of eight (8) hours.

If, under this rule, overtime is paid for hours worked on the next payroll day following the start of a twenty-four (24) hour period, then the starting time for the purposes of computing overtime on the second payroll day shall be the end of the first twenty-four (24) hour period.

b. A continuous work period extending from one day into the next day shall be considered as part of one day for computing overtime if that portion of the first day is not already on an overtime basis under 1a. A continuous work period is understood to mean total hours worked continuously, without regard to type of work.

2. Double time shall be paid for all hours worked on a holiday in excess of eight (8) hours or outside of an employee's regular working period if the employee receives a holiday allowance. However, if an employee works more than one (1) shift on a holiday, that employee will be paid time and one-half for each additional shift plus the holiday allowance of eight (8) hours that would be paid to anyone working that shift.

3. Time and one-half shall be paid for all hours worked in excess of forty (40) hours in any one (1) week for which overtime has not already been paid under (a) or (b). However, overtime for hours worked in excess of eight (8) hours in any consecutive twenty-four (24) hours made up of separated periods of work in successive payroll days shall not offset overtime due for work in excess of forty (40) hours in the week. All holidays and holiday allowances will be credited as time worked for the purpose of computing overtime.

   The premium pay of one and one-half times straight time pay for the first eight (8) hours worked, or for each shift of eight (8) hours worked, paid to any employee who works on the holiday, in addition to this holiday allowance, shall not be counted as overtime already paid to offset overtime due for work in excess of forty (40) hours in any one (1) week.

4. **Employees Called In or Sent Home.** An employee who reports for work at the request of a responsible authority of the Company shall receive compensation of not less than four (4) hours' pay. The employee shall receive such pay even if subsequently notified not to report, unless such notice is given prior to 5 p.m. of the day preceding the day upon which that employee was initially told to report.

An employee called to work shall receive compensation of not less than four (4) hours' pay for each call-in. No employee called in shall be required to perform any work which, consistent with safe, efficient operation and the rendering of adequate service, can be performed during normal working hours on the following business day.

Any employee called in to fill a vacancy on a regular shift, provided the employee reports for work within two (2) hours of the starting time of the shift, shall receive compensation for the entire shift. This compensation for the entire shift shall be considered as payment for time worked in any computation of overtime due under paragraphs 1 or 3.

Filling of any shift vacancies as a result of vacations, sickness, employee's own request for time off, long-term illnesses, etc., will be filled at the discretion of Management.

Section 3. **Distribution of Overtime.** The Company will make every reasonable effort to provide for an equitable distribution of necessary overtime work within a department among employees performing similar work.

A record of such overtime work will be posted.

Employees working overtime will not be required to take time off from their regularly scheduled work to offset such overtime.

Section 4. **Changes in Conditions.** The Company must inform the Union and must discuss with the Union contemplated changes in the present working conditions, subject to the provisions of Article XVI.

In addition, the Company must notify members of the Union Grievance Committee in the Division concerned at least two (2) weeks in advance of the effective date of any change expected to continue for more than a month which may affect the schedule of hours or days of work on a regular classification or which may result in a reduction in the working force due to lack of work or change in Company policy, and representatives of the Company must discuss the change with the Union Grievance Committee if the Committee deems it necessary.

It is understood and agreed that where any such change which has been discussed may otherwise be an appropriate matter for the filing of a grievance under any provision of the Agreement other than this Section 4, and such a grievance is filed, the first two Steps of the Grievance procedure set forth in Article XVIII shall be waived and the matter will be taken up initially in the third Step.

The Company will inform the various members of the supervisory force and the employees involved of such changes.

Because of the nature of the business of a Gas Utility, however, it may be necessary, in case of emergency

or circumstance beyond the Company's control, to make sudden, temporary changes in normal working conditions in order to protect Company property or maintain service to consumers.

Section 5. **Contractor Work.** The Company agrees to employ C&M and Customer Service Department work forces which can be efficiently utilized on a year-round basis. The Company further agrees that no work ordinarily and customarily performed by C&M and Customer Service employees will be contracted if such contracting would result in layoffs of the C&M or Customer Service forces, as defined above, or in the reduction of their scheduled hours below the normal work week of the Company. The Company will not employ contractors to construct services or distribution mains on Saturday or Sunday unless employees who normally perform construction work on services or on distribution mains of the diameters being constructed by the contractor are offered work in number equal to the number of employees used by the contractor in this work, either on that day or one of the next two following Saturdays or Sundays. The Company will not employ contractors to work on "live gas" in the C&M Department. "Live gas" conditions are defined as the tapping of gas mains, the tieing in and gassing of mains and services, and service cut-offs, but shall not include bell joint sealing.

It is understood that this provision does not apply to Seasonal or Probationary employees nor to work which, because of its magnitude, complexity, or time or equipment requirements, is not ordinarily performed, or cannot be performed, by the Company.

## ARTICLE VI

### Safety and Health

The Company and the Union shall cooperate in the objective of eliminating accidents and health hazards. The Company shall make all reasonable provisions for the safety and health of its employees during the hours of their employment, and each employee shall comply with all the occupational safety and health standards and all rules, regulations, and orders which are applicable to the employee's own actions and conduct.

It is the intention of the parties that no employee shall be required to work under conditions which are unsafe or unhealthy beyond the normal hazards inherent in the operation of the job in question.

There shall be a Safety and Health Committee consisting of six (6) Union (including the Vice President of the Local) and six (6) Company employees (including Manager of Safety). The Union shall designate its chairperson. The Manager of Safety, who shall preside at all meetings, shall serve as the

Company's chairperson. The two chairpersons shall constitute the Board of Inquiry and Inspection.

The Board of Inquiry and Inspection shall be convened by the Manager of Safety to investigate all accidents involving fatalities or such other situations as merit investigation in the opinion of both the Company and the Union.

The Board of Inquiry and Inspection shall make on the spot investigations, hear witnesses, and examine records as required in the opinion of the Safety and Health Committee to determine the cause of the accident and any remedial or preventive action.

The Board of Inquiry and Inspection shall meet as soon as possible but not later than ten (10) working days after the incident or accident occurs.

The Board of Inquiry and Inspection shall semiannually inspect the Allens Avenue Gas Supply Facility, Dexter Street Distribution Building, and Exeter Facility and make such recommendations as deemed necessary.

A written report of all inspections and investigations by the Board of Inquiry and Inspection shall be compiled by the Company. One (1) copy will be given to the Safety and Health Committee members and two (2) copies to the Local Union President.

The Company shall inform the Safety and Health Committee of all hazardous chemicals, solvents and

compounds (if any) in use and of the precautions which have been taken by the Company, and should be taken by employees, with respect to the handling of same.

The Safety and Health Committee shall be given copies of all Governmental Agency Safety Inspections or Tests.

Minutes of all Safety and Health meetings between the Company and the Union shall be prepared and typed by the Company and copies shall be delivered to all members of the Safety and Health Committee.

While in the performance of their duties, Union members of the Safety Committee will be paid their normal wages.

The Company's present practices with respect to wearing apparel and eyeglasses shall be continued.

## ARTICLE VII*

## Vacations, Holidays, Leave with Pay

### Section 1. Vacation.

1. **Vacation Period.** The vacation period shall be defined as the period beginning with the first Sunday of a payroll year and commencing with the Saturday of the last full week in a calendar year, subject to the following provisions:

*Certain exceptions to the provisions of this Article are set forth in a Letter of Agreement dated June 4, 1990.

a. Two (2) weeks' vacation may be taken consecutively whenever possible, but any third, fourth or fifth weeks may have to be taken separately.

b. An employee becoming eligible for a first week or for any additional week of vacation shall be allowed the vacation following the eligibility date.

c. For employees with more than three (3) weeks of vacation eligibility, one (1) week may be taken in days under the following conditions:

(1) Only employees on the day schedule are eligible.

(2) All primary weeks must be selected prior to the selection of individual days, and a senior employee may not displace a junior employee who has selected a primary week.

(3) An employee must give at least two (2) weeks' notice of the desired date(s), and if an employee's selections are not made prior to December 1 of each year, the days will be assigned by Management.

(4) The Company retains the exclusive right to determine the number of employees on vacation at any time and may deny days due to operational conditions.

2. **Holiday during Vacation.** If a holiday, as defined in Article VII, occurs during an employee's vacation, the employee shall have the option of taking another day off or taking a day's pay for the holiday. If the employee prefers to take another day off, this must be arranged for when a replacement will be readily available and, in some cases, this day cannot follow immediately after the vacation.

3. **Separation from Company.** If an employee dies or separates from the Company, for any reason, during the vacation period, the employee or the employee's estate shall be paid for the vacation if the employee had not already taken it at the time of separation from the Company.

4. **Vacation Pay.** A week's vacation pay shall be the normal pay of the employee but shall not exceed pay for forty (40) hours for any week of vacation.

   Subject to the provisions of paragraphs 1 and 4 of this Section, employees who are in the continuous employ of the Company at the beginning of the vacation period in accordance with the following table will receive vacations with pay as shown:

| | |
|---|---|
| 1 year | 2 weeks |
| 5 years | 3 weeks |
| 10 years | 4 weeks |
| 20 years | 5 weeks |

After January 20, 1975, layoffs of less than six (6) months shall be disregarded for purposes of determining vacation eligibility.

Layoffs of more than six (6) months but less than one (1) year shall be deducted from the period of "continuous employ" referred to above.

To be eligible for any vacation, the employee must have worked in the twelve (12) months immediately preceding the start of the employee's vacation period, or eligibility date, in accordance with the following schedule:

| Years in Service | Calendar Weeks Worked |
|---|---|
| 1-10 | 35 |
| 11-20 | 30 |
| 21-30 | 25 |
| 31-40 | 20 |
| 41-50 | 15 |

For vacation purposes, absence due to an accident or illness for an employee on Worker's Compensation will be credited as time worked, but only in vacation years in which some work is actually performed. Absence caused by sickness of up to fifteen (15) weeks will be considered as time worked.

In a calendar year, if any employee is unable, because of personal illness or because of a request by the Company, to take all or any part of a vacation for

which the employee is eligible, the employee will be allowed:

a. to carry such vacation to the following year (in addition to vacation for that year) at a time when operating conditions permit or at the employee's option;

b. to be paid, at year end, an allowance in lieu of such vacation.

Section 2. **Holidays.** On twelve (12) guaranteed holidays — New Year's Day, Presidents' Day, Memorial Day, Independence Day, Victory Day, Labor Day, Columbus Day, Veteran's Day, Thanksgiving, Christmas, the Employee's Birthday and a Personal Floating Holiday (to be scheduled at the mutual convenience of the Company and the employee; provided, however, that if an employee does not select any unused holidays by December 1 of any year, the days will be assigned by Management) employees will be paid in accordance with the following schedule:

Employees who would ordinarily work on the day observed as a holiday but do not work because of the holiday will receive a holiday allowance of eight (8) hours' pay at the established rate for the job on which they would work if the holiday were not observed.

An employee will be paid a holiday allowance if scheduled not to work on a holiday which occurs on

a week day, Monday through Friday, because that employee is scheduled to work on Saturday or Sunday in the week in which the holiday occurs.

Employees who work on the holiday according to a regular schedule, or because of some special requirement, will be paid a holiday allowance of eight (8) hours plus time and one-half for the first eight (8) hours of work. If an employee works an additional shift (8 hours) on a holiday, that employee is entitled to another holiday allowance (maximum 8 hours) plus double time for the second eight (8) hours of work.

An employee who has previously taken a day off for a holiday and then worked the holiday shall be paid straight time pay for the first eight (8) hours unless the day worked is in excess of forty (40) hours. In the event that an employee works a second eight (8) hour shift on a holiday after having taken a day off for that holiday, the employee will be entitled to an additional holiday allowance of time and one-half for the eight (8) hour shift.

An employee who is scheduled on an afternoon or evening shift shall have the option of working or taking the day for the birthday unless the birthday falls concurrently on one of the remaining eleven (11) guaranteed holidays. In that case, the employee will work the holiday and receive pay in accordance with the provisions of this Article. Also, the employee will be entitled, at the employee's option, to either be paid

for the holiday or to take a day off at a mutually agreeable time.

If any of the above holidays occur on a Saturday, or if the employee's birthday occurs on a Saturday, Sunday, or holiday, it shall be paid in the following manner:

a. An employee, otherwise eligible, who does not work on the holiday, shall receive a day's pay or, at the employee's option, a day off with pay at a mutually agreeable time. In computing overtime, such day off shall be considered as time worked in excess of forty (40) hours for the week in which the day is taken.

Employees on leave of absence, or who do not work when regularly scheduled, shall not receive the holiday allowance; however, an employee who is an obligated member of the National Guard or the Reserve Military Forces of the United States will receive a holiday allowance for any holiday which occurs during the required two-week annual training period.

For the purposes of computing holiday pay, a holiday is defined as the twenty-four (24) hours from the starting time of a normal working day or, for shift workers, from the starting time of the day shift.

Section 3. **Leave of Absence with Pay.** In the event of the death of an employee's spouse, parent, brother, sister, child (including "step" relationships), mother-

in-law or father-in-law, the employee will be allowed leave with pay through the day of the funeral, but not to exceed (3) scheduled work days. In the event of the death of an employee's grandparent, son's wife or daughter's husband, the employee will be allowed leave with pay for the day of the funeral if such day is a scheduled work day.

Section 4. **Jury Duty.** When an employee is absent from work because of compulsory jury duty or because employee has received a subpoena to appear as a witness in court, the employee shall be paid the difference between jury pay or the subpoena fee and normal straight time pay for the scheduled work days so served.

## ARTICLE VIII

### Seniority

Section 1. **General Application.**

1. Seniority will be based on length of continuous service with the Company.
2. Seniority will apply to the selection of applicants to fill vacancies in accordance with Article XI, layoffs, and reemployment of employees laid off. In the event of equal seniority, consideration will be given to the ability and fitness of an employee.
3. Subject to present limitations and such future considerations as may be required by efficient

operation, choice of vacations and choice of assignments will be determined by seniority.

Section 2. **Layoffs.**

1. Any employee laid off from a department will be given the choice of jobs for which that employee has sufficient seniority and the minimum qualifications, provided no such choice shall be exercised so as to result in the eventual layoff of other than the junior employee in the Company when an alternate arrangement would not so result. Any junior employee so replaced will have a similar choice under the same conditions as above. Any resulting layoffs from the Company will be in accordance with seniority.

2. The provisions of Paragraph 1, above, may be modified with respect to long service employees or, in special circumstances, by specific agreement between the Company and the Union Grievance Committee.

3. An employee transferred to another job classification because of lack of work in the employee's own job classification will receive the rate of pay corresponding to the new classification according to the following schedule:

   a. Employee's rate of pay will be reduced by 25% of the difference between the old rate and the new rate upon transfer and in each year

following until the employee's hourly rate of pay equals the hourly rate of the new classification, except that no employee with fifteen (15) or more years of continuous service will suffer any reduction in rate of pay as a result of such transfer.

4. If an employee is transferred from a job classification because of lack of work, the employee will be given the option to be restored to that job classification when there is an increase in work or a vacancy in a position of similar nature and pay as the employee's former position. However, if the employee declines the opportunity to return to the former position, the employee will accept the rate of pay for the current classification if employee is not already earning that rate.

   Notice will not be posted for any vacancy, in accordance with Article XI, Sections 1, 2 and 4, that would not have been posted if such an employee had remained in the department from which employee was transferred.

5. Notwithstanding the foregoing provisions of this Section, during the life of this Agreement, employees with six (6) or more years of continuous service will not be laid off because of lack of work.

6. A laid-off employee shall have recall rights to any open and available job that employee is capable of performing for a period of time equal to that

employee's accredited seniority at the time of layoff, subject to a maximum limitation of thirty-six (36) months. A laid off employee shall not be covered beyond the end of the month in which the layoff occurs (except as to benefits already accrued) by the Company's sick benefit, group life insurance, Blue Cross, Blue Shield, Major Medical, Holiday, vacation or similar plans, but shall remain a member of the Company Pension Plan.

Section 3. **Disability Retrogression Pay.**

1. An employee unable to perform the duties of that employee's regular classification because of physical impairment of an apparently permanent nature will be permitted one (1) bid to lower-rated classification and shall receive the pay rate corresponding to such new classification, except that:

   a. An employee with fifteen (15) or more years of continuous service at the time of transfer shall not suffer a reduction of pay rate as a result of such transfer.

   b. An employee with from five (5) to fourteen (14) years of continuous service at the time of transfer shall receive the pay rate of the new classification plus an additional amount equal to five percent (5%) (to the nearest 1 cent per hour) of the difference between the rates of the former classification and the new classification for each

whole year of continuous service. This additional amount shall be reduced at each six (6) month interval following the date of transfer by five cents ($.05) per hour until the pay rate of the new classification is reached. Upon subsequent transfer to another classification lower rated than the original classification during the period when this additional amount is payable, the employee shall receive the pay rate of the classification to which the employee is transferred plus an additional amount calculated as if that employee had been transferred to this classification initially.

Section 4. **Miscellaneous.**

1. **Loss of Seniority.** Seniority standing is forfeited if an employee resigns, separates from the Company, fails to report for five (5) working days, or is discharged for cause.

2. **Military Service and Leave of Absence.** Seniority standing is not forfeited and continues to accumulate when an employee has a leave of absence granted in writing by an officer of the Company or when the employee is absent in the service of the Armed Forces of the United States and is entitled to re-employment upon employee's return in accordance with Article XIII.

3. **Probationary Period.** Seniority standing will not begin until a new employee satisfactorily fulfills

the three (3) months' probationary period (6 months for a Meter Reader), after which seniority will date from employee's date of employment.

4. **Seasonal Employees.** Seasonal employees will not accumulate seniority during periods of seasonal employment, except that if they become regular employees at the end of their seasonal period, seniority standing reverts to the start of employment in that particular seasonal period.

<u>Section 5.</u> **Seniority after Layoff.**

1. In determining the length of service for the purpose of seniority, layoffs from the Company's service for less than six (6) months shall be disregarded; absence for more than six (6) months but less than one (1) year shall be deducted from length of service, and absence of more than one (1) year shall forfeit all seniority previously established. In exceptional circumstances these periods may be extended, by mutual agreement between the Company and the Union, for employees with long service records with the Company.

2. A laid-off employee who fails to report for work within five (5) working days of being notified, at the last address known to the Company, will forfeit any and all seniority rights. Notice from the Company shall be given by registered mail.

Section 6. **Foremen.**

1. The determination of the Company as to the qualifications necessary for foremen and others in supervisory capacities shall be conclusive.

2. If an employee selected for a supervisory position fails to meet the requirements of the job after a reasonable trial, that employee will be restored to the former job.

3. A foreman or other supervisor who has been, or may be, promoted from a job now in the Bargaining Unit or demoted for lack of work or for other reasons at the discretion of the Company shall take seniority standing in accordance with the employee's length of continuous service, provided such demotion occurs within one (1) year of promotion. That employee shall not displace a junior employee from a job but shall have the right to apply for a vacancy and to be selected, if qualified, in accordance with Article XI, Section 2, except that current salaried employees who were promoted from the Bargaining Unit will be able to return to the Bargaining Unit and retain seniority until one (1) year after signing the Agreement.

4. Except in cases of emergency or for purposes of training, no supervisor shall perform work so as to displace a Bargaining Unit employee, eliminate a Bargaining Unit job or reduce working hours.

Section 7. **Seniority List.** A seniority list shall be furnished to the Union by the Company and shall be revised from time to time.

## ARTICLE IX

## Posting of Notices

The Union shall have the right to post notices relating to date, time and place of meetings in proper places throughout the Divisions, said places to be mutually agreed upon between the parties. The Union may also post in the same places announcements to its members that have the approval of the Company, and such approval shall not be unreasonably withheld.

## ARTICLE X*

## Sick Benefits, Blue Cross and Blue Shield, Group Life Insurance

Section 1. **Sick Benefits.** The Plan applies to all actively engaged employees of the Company who are represented by Local 12431, USWA, and who have completed one (1) or more years of active and continuous service. The purpose of the Plan is to provide wage replacement for employees who are genuinely sick or disabled.

*Certain exceptions to the provisions of this Article are set forth in a Letter of Agreement dated June 4, 1990.

Benefit allowances are not payable during holidays, vacations or leaves-of-absence (including service in the military), or to an employee receiving a pension or its equivalent.

Employees are obliged to notify the Company of absence due to sickness or disability before the start of the employee's scheduled work period.

Before benefit allowances can be paid:

1. for sickness or disability which extends three (3) or more working days, a Certificate of Disability (on forms to be provided by the Company) shall be completed and submitted to the Company.
2. for sickness or disability which extends five (5) or more working days, a Physician's Certificate of Disability shall be submitted to the Company. Doctor's certificates may be required for shorter periods of sickness or disability.

The Company reserves the right to have a representative visit each sick or disabled employee and may, at its expense, require an employee to be examined by a physician of its choice.

Benefit allowances shall begin on the first day (including partial days) of sickness or disability. A benefit day shall be the regularly scheduled work day, not to exceed eight (8) hours.

Benefit allowances shall be 100% of basic hourly earnings (maximum 40 hours per payroll week), less

Rhode Island Temporary Disability Insurance (RITDI) benefits, Worker's Compensation benefits, or any other benefits enacted through Federal or State law. Benefit allowances may be refused to a sick or disabled employee who neglects to make reasonable efforts to correct employee's illness.

Benefit allowances shall be paid for a maximum of one hundred thirty (130) regularly scheduled work days. The maximum allowance shall not be repeated for the same, recurring disability. Benefit allowances may be paid for recurring sickness or disability up to the maximum. Benefit allowance maximums may be repeated for different types of sickness or disability.

The Long Term Disability Plan will provide continuing benefits if the employee remains sick or disabled for longer than one hundred eighty (180) calendar days and qualifies in accordance with the Plan.

The administrative system designed to control absences shall be based on an absence standard against which each employee's absence history will be measured.

The absence standard for a calendar year will be:

1. the average number of days lost due to non-occupational sickness or disability in the previous calendar year. AND

[illegible] 12/12/97

2. the average number of incidents of lost time associated with those days.

In no case shall the absence standard go below the average lost days per employee as calculated by the American Gas Association Absenteeism Survey, plus three (3) incidents.

Employees who exceed the absence standard for days (without regard to legitimacy) and incidents (rounded to the next highest integer) in a calendar year shall be subject to progressive disciplinary steps (minimum of four) which are designed to reduce the employee's absence to an acceptable level. Once an employee has received a written warning, the employee will be subject to further discipline for a twelve (12) month period without regard to the beginning of a new calendar year. Nothing shall preclude the Company from discussing an absence record with an employee at any time; however the official disciplinary steps shall not begin until the absence standard has been exceeded. Such factors as severity of illness, length of service, prior absence history, and an employee's efforts at solving his/her medical problems shall all be given weight in the discipline process. The Company recognizes the Union's right to grieve the disciplinary action taken.

Any benefits occurring under the Plan shall be terminated when the employee is no longer employed by the Company.

Benefits under the Plan shall not be subject to assignment.

Section 2. **Blue Cross and Blue Shield.** The Company will purchase individual or family memberships, administered under the Enhanced Managed Benefits Program, in R.I. Blue Cross (Semi-Private Plan with full Maternity), R.I. Blue Shield (Plan "100" with full obstetrical and JU#2 outpatient diagnostic rider), R.I. Blue Cross-Blue Shield Major Medical $1,000,000 Lifetime Benefit Plan, R.I. Blue Cross-Blue Shield Vision Care Program, Modified Hospital Emergency Room Coverage, Prescription Drug Rider and Chiropractic Rider for employees who have completed three months of service.

Each eligible employee shall have an annual option, in lieu of the foregoing coverage, to enroll in a Rhode Island qualified Health Maintenance Organization (HMO). In the event premium rates for such HMO are in excess of the rates prevailing from time to time for the Company's basic Blue Cross-Blue Shield Major Medical Plan, the Company shall pay such excess to a maximum of Two and 50/100 Dollars ($2.50) per month in the case of an individual plan and Five Dollars ($5.00) per month in the case of a family plan. Thereafter, employees enrolled in such HMO shall pay the difference by way of payroll deduction.

During the term of this Agreement the Company will continue to reimburse employees who retire prior

to January 22, 1993, at or after their normal retirement date for the cost of the following medical insurance coverages:

1. Blue Cross Plan 65 for the retiree and his/her spouse during the retiree's lifetime only (if they were married at the time of the retiree's retirement); for employees retiring after January 21, 1993, at or after their normal retirement date, reimbursement will be subject to the following maximums:

   a. For Blue Cross Plan 65, S90 per month for the retiree and/or his/her spouse, and

   b. For Medicare Part B, $42 per month

   In the event that either of the above plans is no longer available, the Company will have the right to select an alternative.

   Effective January 21, 1981, Medicare "B" shall be paid for all employees (but not their spouses) retiring at or after the normal retirement date; and

   Reimbursement for this coverage will be quarterly.

Section 3. **Group Life Insurance, Accidental Death and Dismemberment.** Group Life Insurance will be made available to employees in accordance with the following schedule, provided each employee applies for such insurance within thirty (30) days of the date employee becomes eligible.

**Life Insurance for Active Employees.** After three (3) months of continuous employment - $2,000. After one (1) year of continuous employment - $50,000.

For active employees over age 65, Life Insurance coverage shall be reduced in accordance with applicable law.

**Life Insurance for Retired Employees.** Upon retirement, Life Insurance coverage shall be reduced to $5,000. For employees retiring after January 10, 1998, Life Insurance coverage shall be increased to $7,000.

**Accidental Death and Dismemberment.** Life Insurance for active employees under age 65 shall include an Accidental Death and Dismemberment rider.

Section 4. **Delta Dental.** The Company will purchase individual or family memberships in Delta Dental (Levels I, II, III and IV) for employees who have completed three (3) months of service.

Section 5. **Long Term Disability.** Employees covered by this Agreement who have completed one year of continuous service will be covered by a Long Term Disability insurance plan, the terms of which are set forth in a separate memorandum of agreement between the parties dated May 3, 1991.

# ARTICLE XI

## Notice of Vacancies

**General.** Notices shall be posted of all vacancies in the Company to be filled by employees, except those for foremen, assistant foremen and laborers.

If the vacancy is for a job excluded from the Bargaining Unit, as defined in Article I, the notice shall call attention to that fact and that Sections 2 and 4 of Article XI do not apply to the selection of the employee to fill the job.

In exceptional circumstances the application of Article XI, Section 2, "Filling a Vacancy," may be modified by specific agreement between the Vice President (or someone designated by the Company) and the Grievance Committee of the Union.

Section 1. **Posting of Notices.** In the event of a vacancy, the Company shall post notices describing it on bulletin boards throughout the Company. This notice shall include a statement of the requirements of the job and the minimum qualifications for trial. Copies of the notice will be sent to the members of the Grievance Committee representing the Division in which the vacancy occurs at the time the notice is posted.

Employees desiring to fill such a vacancy shall apply in writing within five (5) calendar days to the person designated in the notice to receive applications. An

application will be accepted for an employee absent during the period of posting if it is signed by a Steward.

Section 2. **Filling a Vacancy.** A vacancy shall be filled by the selection of the senior applicant, as determined by the seniority provisions of this Agreement, who has the minimum qualifications for trial.

Any senior applicant not considered to have the minimum qualifications for trial will be so notified at the time of selection of the successful applicant, and an explanation will be given to the employee as to why that employee is not considered qualified.

Any new employee who enters employment in other than the C&M Department shall, during the next calendar year after becoming a regular employee, be entitled to transfer to the C & M Department as a Laborer Class B by December 1 of the year following that employee's employment or an earlier date at the Company's option; provided, however, that the Company has a requirement for additional laborers in that year. Any employee who elects to transfer, but is not given the opportunity as stated above, will be given the opportunity before any new employees are hired as laborers.

If the applicant selected fails to meet the requirements of the job after a reasonable trial, the employee will be restored to the employee's former job, and the next senior applicant with the minimum quali-

fications for trial will be selected. If an applicant selected for trial on a progression job fails to demonstrate, within six (6) months, an aptitude for the work and evidence of ability to advance on the appropriate schedule to Class B, that employee will be restored to the former job.

Section 3. **Temporary Vacancies.** Temporary vacancies will be filled by employees available at the time the vacancy occurs, either by promotion within a department or by transfer of employees from other departments within the Division. This does not apply to choice of jobs at the same rate of pay when the temporary vacancy is not expected to exist for a full calendar week. Length of continuous service in the Division or Office Building department concerned will be recognized in temporary assignments with due regard to the safe and efficient operation of the group concerned.

Except in cases of emergency, temporary transfers for the convenience of the Company shall be effected only after the Union has been given at least two (2) weeks' prior notice and an opportunity to discuss the same. The Company pledges that it will seriously consider any suggestions made by the Union before making such transfers. Among employees capable of performing the work, all temporary transfers shall be made in accordance with seniority.

An employee who fills a temporary vacancy on any job for which there is an established rate and for which a notice would be posted in the event of a regular vacancy will receive the established rate for the job or the employee's own regular payroll rate, whichever is higher. If there is a rate range for the job, the employee will receive the rate within that range which corresponds to that employee's experience and ability by comparison with others in that classification.

If an employee is temporarily transferred for the convenience of the Company to another department or division, the employee shall, during this temporary period, be paid the regular rate, unless the job to which that employee is transferred carries a higher rate, in which case the employee shall be paid the higher rate.

In general, the Company proposes to use Trainees (or spare operators on jobs not covered by the Training Program), when they are available, for temporary vacancies in operating jobs that must be filled when that will result in a forty (40) hour week for all concerned.

If the use of a spare operator or trainee would cause extreme inconvenience or undue hardship for the employee, or if it would result in overtime for that employee, an operator in the group where the temporary vacancy occurs will be used to fill it on an overtime basis.

Section 4. **Qualifications.** If a senior applicant for a vacancy is not considered qualified for a trial in it, that applicant may have his or her qualifications passed upon jointly at a meeting between representatives of the Company and the Grievance Committee of the Union.

Section 5. **Reclassification.** Promotion by reclassification within a group where several rates are in effect for employees engaged in the same type of work shall not be considered as filling a vacancy, and notice will not be posted when such changes are proposed. The Company will notify the Union of any such reclassifications.

Section 6. **Training for Temporary Assignments.** If the Company considers there should be more employees available with proper experience and qualifications to fill temporary requirements in certain agreed upon jobs, they will be selected in accordance with the following procedure:

1. When a regular vacancy in a Trainee job occurs, it will be posted company-wide and filled in accordance with Article XI, Sections 1 and 2, of the Union Agreement, exactly as any regular vacancy. The successful applicant will be trained and report for work.
2. Opportunities for training will be posted in the division concerned, and the successful bidder will be trained on the job and will fill temporary

vacancies in it. It is understood that the employee will have no claim to a regular vacancy, when it occurs, unless the employee is selected under a regular posting as set forth in (1) above.

3. If a qualified employee does not apply for a vacancy for Trainee, a junior qualified employee will be given the assignment.

4. It is not the intention of the Company to avoid filling its regular requirements for classified employees by the extended assignment of spare employees.

5. The above provisions are not related in any way to progression jobs.

## ARTICLE XII

### Wage Rates

All job classifications and wage rates for members of the Bargaining Unit are set forth in the "Rate Schedule" which is included at the end of this Agreement. Employees may be paid on a biweekly salary basis with their salaries calculated by multiplying the rates set forth in the Rate Schedule by 80; provided, however, that employees shall not be paid for time not worked except as otherwise provided in this agreement.

If the duties and requirements of any job classification shall be substantially increased during the term

of this Agreement, the wage rate for such job classification shall, at the request of either party, be a matter subject to negotiation. Similarly, wage rates for job classifications not listed in said "Rate Schedule" shall be negotiable.

## ARTICLE XIII

### Employees in the Armed Forces of United States

**Reemployment.** Employees who enter the Armed Forces of the United States will be entitled to reemployment rights and other benefits in accordance with the provisions of law.

## ARTICLE XIV

### Lockouts and Strikes

Section 1. **Lockouts.** The Company agrees that while this Agreement is in effect, there shall be no lockout of the employees of The Providence Gas Company.

Section 2. **Strikes.** The Union agrees that while this Agreement is in effect, its members will not cause, directly or indirectly, or participate in, any strike, sympathetic or otherwise, slow down, or stoppage of work of The Providence Gas Company. It is the mutual desire of both parties hereto to provide for uninterrupted and continuous service. Nothing herein is intended, however, to prevent the resignation or

discharge of individuals, the discharge being subject to review under the conditions and in the manner hereinafter provided.

Section 3. Neither party shall bring, or cause to be brought, any lawsuit against the other for violation of this Article until said violation shall have been brought to the attention of the other in writing, in the case of the Company, to the attention of its Vice President, and in the case of the Union, to the attention of the President of Local 12431, and unless such party fails to take steps as soon as possible to correct the cause or circumstances giving rise to such violation.

## ARTICLE XV

### Union Representatives

Section 1. **Field Representatives.** The Field Representative, or other fully accredited Union representatives, shall have access to the Company's premises at reasonable times for the purpose of conducting official Union business, provided that they shall first secure permission from the appropriate Company representative (which permission will not be unreasonably withheld) and that there shall be no interference with the conduct of the Company's business.

Section 2. **Leave of Absence.** The Company agrees that any employee selected for a full-time position with the Union (limited, however, to two (2) employees

at any one time) shall be granted a leave of absence without pay for a period of one (1) year, during which time his seniority with the Company shall continue to accrue. Such leave of absence may be extended for additional one-year periods by agreement of the parties. An employee on leave of absence under this paragraph shall not be covered beyond the end of the month in which the leave commences (except as to benefits already accrued) by the Company's sick benefit, group life insurance, Blue Cross, Blue Shield, Major Medical, holiday, vacation or similar plans, but shall remain members in the Company's pension plan.

If a leave of absence for more than two (2) weeks is contemplated, the Company will be given a reasonable advance notice.

Employees granted a leave-of-absence under the provisions of this paragraph may be replaced by temporary employees who shall not be considered members of the Bargaining Unit during their period of temporary employment.

## ARTICLE XVI

## Rights of Management

Save as expressly modified herein under Grievance Procedure and other Articles, nothing contained in this Agreement shall be construed as limiting the Company in any way in the exercise of the regular

designated by the Union. The President of the Union shall have the right to participate in any step of the grievance procedure, but it is understood that this right shall not be abused. The aggrieved employee shall have the right to be present and the Company or Union shall have the right to require the aggrieved employee's presence in Steps 1, 2, and 3 of the Grievance Procedure. If the presence of the grievant(s) would cause hardship upon the Company operation, the Grievance Meeting may have to be scheduled at a time other than during normal working hours.

Section 2. **Procedure.** Whenever any dispute shall arise as to the meaning or application of the provisions of this Agreement, the same shall be settled in the following manner, except in the case of a grievance raised by the Company or a general grievance raised by the Union in which case all discussion with respect thereto shall originate under Step 2 or Step 3 below, whichever is applicable.

Step 1. Between the aggrieved employee, a Union Steward or a Union Officer and a Foreman. If a satisfactory settlement is not reached within two (2) working days, then

Step 2. Between a Union Steward or a Union Officer and the Department Head, with or without the aggrieved employee, and with such other representatives as may be mutually agreed upon from time to time. All differences submitted

at this stage shall be in writing and shall be countersigned by the aggrieved employee. The Company shall arrange a meeting within four (4) days from the time a grievance is referred to this Step and shall give the Union its answer, in writing, within forty-eight (48) hours after such meeting. If the matter is not satisfactorily settled, then

Step 3. Between the representatives of the Company, the Grievance Committee, with or without the aggrieved employee, and an International Representative of the Union. The Company shall arrange a meeting within seven (7) days from the time a grievance is referred to this Step and shall give the Union its answer, in writing, within seven (7) days after such meeting. If the matter is not satisfactorily settled, then

Step 4. The dispute shall be referred, at the request of either party, to an arbitrator selected pursuant to the rules of the American Arbitration Association. Any arbitration hearing which may take place under this Step shall, in the absence of mutual agreement to the contrary, be conducted in accordance with certain rules agreed to and signed by the parties. It is agreed that an arbitrator shall not have the power to change or modify any provision of this Agreement.

Section 3. **Adjustments.** No adjustment resulting from a grievance processed through this procedure shall be retroactive to a date preceding the date on which the action or matter referred to in the grievance last occurred previous to the presentation of the grievance in Step 1, or in writing, if a general grievance. Nor shall any adjustment resulting from a subsequent grievance concerning a similar action or matter be retroactive to a date preceding the effective date of an adjustment for the first grievance.

Section 4. **Settlement of Dispute.** It is agreed that the settlement of any dispute at any stage of the foregoing procedure or the decision of an arbitrator on any such dispute shall be final and binding upon all parties concerned.

Section 5. **Submission.** If any dispute shall not be submitted in writing within fifteen (15) days after the right to present same shall have arisen, or the matter shall have become known to the aggrieved employee, it shall be deemed to have been waived. If any grievance shall not be referred to Steps 2 and 3 of the Grievance Procedure outlined above within fifteen (15) days, or to Step 4 within thirty-five (35) days from the date of the Company's answer in the preceding Step, such grievance shall be deemed to have been waived.

Section 6. **Arbitration Expense.** Each party shall bear its own arbitration expenses, but the fee of any arbitrator shall be paid equally by the parties.

# ARTICLE XIX

## Retirement Plan

The Pension Plan of The Providence Gas Company For its Bargaining Unit Employees, as heretofore amended or hereafter amended to conform to law or otherwise, shall remain in full force and effect for the term of this Agreement and be deemed a part hereof.

The Company will match one-half of the employee's contributions that do not exceed six percent (6%) of the employee's covered pay to the 401(K) Plan. The specific terms of such Plan are determined by the Company.

# ARTICLE XX

## Letters of Agreement

All agreements of current import set forth in letters heretofore exchanged between the Company and the Union which do not contravene the provisions of this Agreement and which have not previously been incorporated in this Agreement or the Rate Schedule shall become, by reference, a part of this Agreement, and any violation of the same may be the subject matter of a grievance under the provisions of Article XVIII.

# ARTICLE XXI

## Miscellaneous Provisions

1. **Meal Allowance.** A meal or meal allowance of $7.00 will be provided under the following conditions:

   a. Two (2) hours after the completion of any regularly scheduled work day or shift and each five (5) continuous hours thereafter.

   b. For ten (10) continuous hours if called in ahead of regularly scheduled work day or shift and each five (5) continuous hours thereafter.

   c. For five (5) continuous hours if called out after the regularly scheduled work day or shift and each five (5) continuous hours thereafter which are outside of the regularly scheduled work day or shift.

   d. For purposes of this paragraph only, a call-in is defined as eight (8) hours prior to the start of an employee's regular shift, and a call-out is defined as eight (8) hours following the completion of an employee's regular shift.

   e. Effective January 19,1997, the meal allowance will be increased by Twenty-five Cents ($.25).

      Effective January 18, 1998, the meal allowance will be increased by Twenty-five Cents ($.25).

2. **Shift Differential.**

   a. 7% of an employee's straight time hourly rate multiplied by each hour worked on any shift schedule that begins between 12 noon and 5 a.m.

3. **Coffee Break.** The Company will allow a coffee break of ten (10) minutes in the morning and afternoon for all employees. It is understood that employees will make their own purchases and that emergency situations will take precedence.

4. **Wash-Up Time.**

   a. Fifteen (15) minutes at the end of each regular work period for employees doing work that requires a shower and change of clothes.

   b. Five (5) minutes prior to noon lunch period.

5. **Union-Management Meetings.** The policy of the Company with respect to paying Union representatives for time spent in meetings with Management will be continued for the term of this Agreement.

6. **Sunday Premium.** A premium of Two and 35/100 Dollars ($2.35) per hour shall be paid for straight time worked on Sunday.

   a. A premium of Two and 60/100 Dollars ($2.60) per hour shall be paid for straight time worked on Sunday during the period January 19, 1997, through January 17, 1998.

b. A premium of Two and 85/100 Dollars ($2.85) will be paid for straight time worked on Sunday from January 18, 1998, and thereafter.

An employee entitled to overtime pay for Sunday shall not be entitled to the Sunday premium, but the premium will be paid in addition to an applicable shift differential. For the purpose of computing premium pay, Sunday is defined as the twenty-four (24) hours from the starting time of a normal working day or, for shift workers, from the starting time of the day shift.

7. **Rest Period.** In any twenty-four (24) hour period, an employee who has worked continuously for sixteen (16) hours or more shall, except in case of interruption to service and emergencies, be entitled to eight (8) hours' rest before reassignment. Also, when the sixteenth hour occurs during an employee's scheduled work day, that employee shall be released at the end of the sixteenth hour, provided no emergency exists. Where the rest period overlaps the employee's scheduled work day, the employee shall suffer no loss in pay for the time involved.

An employee called in four (4) or more hours before that employee's regular starting time will be allowed one (1) hour off his or her next scheduled work period, with pay, for each hour worked between

midnight and such regular starting time, provided no emergency exists and, provided further, that upon satisfying the call-in job, the employee would otherwise have less than eight (8) hours off.

If the call-in job is satisfied prior to the employee's regular starting time, the employee shall receive the rest period before reporting. If the call-in job is satisfied following the employee's scheduled starting time, the employee shall receive the rest period at that time, calculated by deducting the number of hours worked between midnight and the employee's scheduled starting time from the ending time of the employee's scheduled shift.

When an employee works into a rest period which overlaps the employee's regularly scheduled work day, that employee shall be paid time and one-half for the time which overlaps the rest period in addition to the regular rest period entitlement.

This provision shall not apply to scheduled overtime, including the filling of full, eight (8) hour shift vacancies.

8. **Inclement Weather.** For Gas Supply, C & M, and Meter Reading Department personnel who may be affected by exposure to the elements (rain, snow and, except for Meter Readers, temperature extremes of 10 degrees F or lower and 95 degrees F or higher, as reported by the U.S. Weather Bureau for Providence and vicinity), Supervisors

will attempt whenever possible, and if no emergency exists, to arrange schedules or assignments to avoid unreasonable exposure.

If weather conditions deteriorate during a shift to such an extent that, in the opinion of the Meter Reader, continuance of work is impractical, the Meter Reader should call the supervisor for further instructions.

9. **Joint Training Committee.** The Company and Union agree to establish a Joint Training Committee comprised of an equal number of Union and Company members. The purpose of the Training Committee will be to make recommendations to Management concerning:

a. training needs of employees and classifications to enhance job performance and safety;

b. cost-effective delivery of training to include, by way of example, classroom, hands-on, and personalized use of in-house "experts," etc.;

c. identification and implementation of cost-effective scheduling methodologies to ensure training is scheduled;

d. development of performance measures of training programs and routine reporting of progress to measures.

10. **Paychecks.** Provided employees have received a minimum of forty (40) hours' pay, adjustments to paychecks of One Hundred Dollars ($100.00) or less shall be reflected in the next succeeding pay period.

# ARTICLE XXII

## Termination Clause

Section 1. This Agreement shall remain in full force and effect from the date of its execution until the 21st day of January, 2001, and thereafter for successive one-year periods, unless one of the parties hereto on or before the sixtieth (60th) day next preceding any anniversary date shall notify the other party hereto in writing of its intent to terminate the same.

Section 2. If, instead of terminating, either of the parties desires to modify the Agreement for the next succeeding year, notice shall be given on or before the sixtieth (60th) day next preceding the anniversary date. During modification negotiations, the Agreement shall remain in full force and effect unless either party gives sixty (60) days' notification of its desire to terminate the Agreement.

Section 3. Notwithstanding the foregoing provisions of this Article XXII, either party may terminate this Agreement effective on January 21, 1999, or January 21, 2000, by notifying the other party in writing on or before the sixtieth (60th) day next preceding the applicable termination date.

**IN WITNESS WHEREOF,** the parties hereto set their hands and seals as of the day and year first above written.

| PROVIDENCE GAS COMPANY | UNITED STEELWORKERS OF AMERICA, AFL-CIO-CLC |
|---|---|
| By ______________________ | By ______________________ |
| Witness: ______________________ | Witness: ______________________ |
| Witness: ______________________ | Witness: ______________________ |
| Witness: ______________________ | Witness: ______________________ |
| Witness: ______________________ | Witness: ______________________ |
| Witness: ______________________ | Witness: ______________________ |
| Witness: ______________________ | Witness: ______________________ |
| | Witness: ______________________ |
| | Witness: ______________________ |
| | Witness: ______________________ |

# PROVIDENCE GAS COMPANY

## Rate Schedule

## effective January 21, 1996

## For Jobs in Bargaining Unit

## LOCAL 12431

## UNITED STEELWORKERS

## OF

## AMERICA,
## AFL-CIO-CLC

January 21, 1996

# MEMORANDUM

In connection with the use of the code numbers on the job classification schedule, kindly use the following additional symbols, preceding the job code number, in any case where they may apply:

- J— Demoted from classification because of decreased work requirements
- E— Student
- T— Serving the probationary period
- H— Seasonal
- HC—Seasonal employee serving probationary period of progression job
- X— Temporary - Regular employee with a temporary job classification
- Y— Temporary employee
- K— Temporary - Filling vacancy caused by regular employee entering Military Service

# OFFICE

| OFFICE CLERK | | Effective 21-Jan-96 | Effective 19-Jan-97 | Effective 18-Jan-98 | Effective 24-Jan-99 | Effective 23-Jan-00 |
|---|---|---|---|---|---|---|
| (Must qualify in each grade to advance) | | | | | | |
| (1) Minimum | D128 | 19.70 | 20.34 | 21.00 | 21.68 | 22.38 |
| After 6 mos. as D128, | D127 | 20.23 | 20.89 | 21.57 | 22.27 | 23.00 |
| (3) After 6 mos. as D127, | D126 | 20.66 | 21.33 | 22.02 | 22.72 | 23.48 |
| (4) After 6 mos. as D126, | D125 | 21.11 | 21.80 | 22.51 | 23.24 | 24.00 |
| **OFFICE CLERK*** (Must qualify in each grade to advance) | | | | | | |
| (1) Minimum | D133 | 15.42 | 15.92 | 16.44 | 16.97 | 17.53 |
| (2) After 6 mos. as D133, | D132 | 15.81 | 16.33 | 16.86 | 17.41 | 17.97 |
| (3) After 6 mos. as D132, | D131 | 16.20 | 16.72 | 17.27 | 17.83 | 18.41 |
| (4) After 6 mos. as D131, | D130 | 17.82 | 18.40 | 19.00 | 19.62 | 20.26 |
| **MESSENGER** | D135 | 19.58 | 20.22 | 20.88 | 21.55 | 22.25 |
| **MESSENGER**** | D136 | 14.32 | 14.79 | 15.27 | 15.77 | 16.28 |

*For employees entering after 1/21/83
**For employees entering after 1/21/84

## FACILITIES MAINTENANCE

**Maintenance Helpers**

To fill requirements for, and to apply only to employees capable of independent work under general supervision with less than normal experience and training.

**(Must prove satisfactory in each grade to advance)**

| | | Effective 21-Jan-96 | Effective 19-Jan-97 | Effective 18-Jan-98 | Effective 24-Jan-99 | Effective 23-Jan-00 |
|---|---|---|---|---|---|---|
| (1) No experience-starting rate (begins normal probationary period) | D190 | 18.69 | 19.30 | 19.93 | 20.57 | 21.24 |
| (2) After 6 mos. as D190 (begins 3 month accelerated probation period) | D180 | 19.41** | 20.04** | 20.69** | 21.36** | 22.05** |
| (3) After 3 mos. as D180 Adv. Helper | D175 | 19.68 | 20.31 | 20.98 | 21.66 | 22.36 |
| (4) After 6 mos. as D175 Adv. Helper | D170 | 19.91 | 20.56 | 21.23 | 21.92 | 22.63 |
| (5) After 6 mos. as D170 Cl.C | D165 | 20.31 | 20.97 | 21.65 | 22.35 | 23.08 |

**Applicable only to employee with approximately six (6) months' Company experience in related work.

## FACILITIES MAINTENANCE (cont'd.)

**Notes:**

(A) Through completion of D180, employee receives intensive training, but works only as Helper to higher-classified employee.

(B) Employees entering progression with no experience, who do not fulfill the requirements of the three-month probation period (as D180), will not be retained as Helpers in the normal progression, but will return to former classification.

| | | Effective 21-Jan-96 | Effective 19-Jan-97 | Effective 18-Jan-98 | Effective 24-Jan-99 | Effective 23-Jan-00 |
|---|---|---|---|---|---|---|
| **Maintenance Repair, Cl.B** (After 15 mos as Cl.C, D165 if qualified) | D160 | 20.86 | 21.53 | 22.23 | 22.96 | 23.70 |
| **Maintenance Repair, Cl.A** (After 15 mos as Cl.B, D160 if qualified) | D155 | 21.49 | 22.18 | 22.91 | 23.65 | 24.42 |

**Facilities Maintenance Person*** **(Must prove satisfactory in each grade to advance)**

| | | Effective 21-Jan-96 | Effective 19-Jan-97 | Effective 18-Jan-98 | Effective 24-Jan-99 | Effective 23-Jan-00 |
|---|---|---|---|---|---|---|
| (1) Starting Rate | D147 | 17.35 | 17.91 | 18.49 | 19.23 | 19.91 |
| (2) After 6 mos. as D147 | D146 | 17.88 | 18.51 | 19.16 | 19.09 | 19.71 |
| (3) After 6 mos. as D146 | D145 | 18.43 | 19.03 | 19.65 | 20.29 | 20.95 |
| (4) After 6 mos. as D145 Cl.C | D144 | 19.04 | 19.66 | 20.30 | 20.96 | 21.64 |
| (5) After 6 mos. as D144 Cl.B | D143 | 19.68 | 20.31 | 20.98 | 21.66 | 22.36 |
| (6) After 6 mos. as D143 Cl.A | D142 | 20.48 | 21.15 | 21.84 | 22.55 | 23.28 |

*For employees entering after 1/21/83

# MATERIALS MANAGEMENT

**Stock Material Clerk**
**Starting Progression**

(Must prove satisfactory in each grade to advance)

| | | Effective 21-Jan-96 | Effective 19-Jan-97 | Effective 18-Jan-98 | Effective 24-Jan-99 | Effective 23-Jan-00 |
|---|---|---|---|---|---|---|
| (1) No experience - Starting Rate (Probationary Period) | D245 | 18.69 | 19.30 | 19.93 | 20.57 | 21.24 |
| (2) After 6 mos. as D245 | D240 | 18.95** | 19.57** | 20.20** | 20.86** | 21.54** |
| (3) After 6 mos. as D240 | D235 | 19.61** | 20.25** | 20.91** | 21.59** | 22.29** |
| (4) After 6 mos. as D235 Cl.A | D230 | 20.28 | 20.93 | 21.61 | 22.32 | 23.04 |

**Employee experienced in similar work starts progression as D240 or D235 depending on such experience.

# GARAGE

**Repair Person Assistant Progression Rate Schedule**

| | | Effective 21-Jan-96 | Effective 19-Jan-97 | Effective 18-Jan-98 | Effective 24-Jan-99 | Effective 23-Jan-00 |
|---|---|---|---|---|---|---|
| | | (Must prove satisfactory in each grade to advance) | | | | |
| **Assistant*** | | | | | | |
| (1) No experience - Starting Rate (Probationary Period) | D345 | 18.69 | 19.30 | 19.93 | 20.57 | 21.24 |
| (2) After 6 mos. as D345 | D340 | 18.95** | 19.57** | 20.20** | 20.86** | 21.54** |
| (3) After 6 mos. as D340 | D335 | 19.41** | 20.04** | 20.69** | 21.36** | 22.05** |
| (4) After 6 mos. as D335 | D320 | 20.31 | 20.97 | 21.65 | 22.35 | 23.08 |
| **Repair Person** | | (Must qualify in each grade to advance) | | | | |
| (5) After 6 mos. as D320 | D315 | 20.86*** | 21.53*** | 22.23*** | 22.96*** | 23.70*** |
| (6) After 6 mos. as D315 | D310 | 21.25 | 21.94 | 22.65 | 23.39 | 24.15 |
| (7) After 9 mos. as D310 | D305 | 21.49 | 22.18 | 22.91 | 23.65 | 24.42 |

*Employee must attain D320 Grade.

**Employee experienced in similar work starts progression as D340 or D335, depending on such experience.

***Employee with two (2) years experience as an automotive repair person in a recognized repair garage starts progression as D315.

# GARAGE

**Helper***
**Progression Rate Schedule**

(Must prove satisfactory in each grade to advance)

| | | Effective 21-Jan-96 | Effective 19-Jan-97 | Effective 18-Jan-98 | Effective 24-Jan-99 | Effective 23-Jan-00 |
|---|---|---|---|---|---|---|
| (1) No experience- Starting Rate (Probationary Period) | D350 | 18.69 | 19.30 | 19.93 | 20.57 | 21.24 |
| (2) After 6 mos. as D345 | D360 | 18.95* | 19.57* | 20.20* | 20.86* | 21.54* |
| (3) After 6 mos. as D340 | D370 | 19.41* | 20.04* | 20.69* | 21.36* | 22.05* |

*Employee experienced in similar work starts progression as D360 or D370, depending on such experience.

# CUSTOMER SERVICE

## Dispatch

**Assistant Dispatcher** (Must qualify in each grade to advance)

| | | Effective 21-Jan-96 | Effective 19-Jan-97 | Effective 18-Jan-98 | Effective 24-Jan-99 | Effective 23-Jan-00 |
|---|---|---|---|---|---|---|
| (1) Minimum | D120 | 20.36 | 21.02 | 21.70 | 22.41 | 23.14 |
| (2) After 6 mos. as D120 | D119 | 20.71 | 21.38 | 22.08 | 22.80 | 23.54 |
| (3) After 6 mos. as D119 | D118 | 21.27* | 21.96* | 22.67* | 23.41* | 24.17* |
| (4) After 6 mos. as D118 | D117 | 21.87* | 22.58* | 23.31* | 24.07* | 24.85* |
| (5) After 6 mos. as D117 Dispatcher | D115 | 23.39 | 24.15 | 24.94 | 25.75 | 26.58 |

*Employee previously classified as Customer Service Cl.B (D405) starts progression as D118, and employee previously classified as Fitter, Cl.A (D404), Customer Service Cl.A (D402) or Cl.AA (D401) starts progression as D117.

## CUSTOMER SERVICE (cont'd.)

### Customer Service Field Force

Employee entering the progression will be expected to advance to Customer Service, Cl.A, or leave the Progression. During the initial six-month Probationary Period, employees failing to demonstrate qualifications, or desiring to withdraw, will be restored to their former job. An employee failing to complete the requirements of any step after the Probation Period through Cl.B, will be reclassified as C&M Laborer. If a Customer Service person initially fails the "A" test, that employee shall have the option of returning to Customer Service Class B (D405), or Customer Service Class M-C (D407), or C&M Laborer, Cl.A (D670). If the option chosen is Customer Service Class B, the employee will be allowed to retake the "A" test a second time within the next 24 months with no option to retake the "A" test a third time and with no further school training. If the employee scored 75 or higher on the first written test but failed the board test, the written test does not have to be retaken.

Three months' additional time may be allowed to an employee who fails to pass the Class C test, and six months' additional time may be allowed to an employee who fails to pass the Class B test. After these times, the employee will be allowed only a second attempt to pass either the "C" or "B" test with no further school training. Any employee in the Customer Service progression who fails to progress to the next higher rate and/or voluntarily leaves the department before attaining Class A and completes the probationary period for his next assignment, shall not be eligible to sign a Notice of Vacancy for Customer Service Helpers or Class M-C for five years from the date of reclassification.

## CUSTOMER SERVICE (cont'd.)

**Customer Service Helpers**

**(Must qualify in each step to advance)**

To fill requirements for, and to apply only to employees capable of independent work under general supervision with less than normal experience and training.

| | | Effective 21-Jan-96 | Effective 19-Jan-97 | Effective 18-Jan-98 | Effective 24-Jan-99 | Effective 23-Jan-00 |
|---|---|---|---|---|---|---|
| (1) No experience-Starting Rate (Begins Normal Probationary Period) | D412 | 18.69* | 19.30* | 19.93* | 20.57* | 21.24* |
| (2) After 6 mos. as D412 (Begins 3 mos. Accelerated Probation Period) | D410 | 19.41 | 20.04 | 20.69 | 21.36 | 22.05 |
| (3) After 3 mos. as D410 Adv. Helper | D409 | 19.68 | 20.31 | 20.98 | 21.66 | 22.36 |
| (4) After 6 mos. as D409 Adv. Helper | D408 | 19.91 | 20.56 | 21.23 | 21.92 | 22.63 |
| (5) After 6 mos. as D408 Cl.C | D406 | 20.31 | 20.97 | 21.65 | 22.35 | 23.08 |

*Employee with approximately six (6) months' Company experience in similar work starts progression at D412, but at the rate equivalent to D410. Similar work is understood to include experience in the C&M Department as C&M Fitter Helper, D629, or higher C&M Fitter classification.

## CUSTOMER SERVICE (cont'd.)

Through completion of D410, employee receives intensive training, but works only as Helper to higher-classified employee.

During nine (9) months as Advanced Helper, employee receives training for further advancement, part of which will be any work for which the employee may be qualified, including independent work under general supervision.

| | | Effective 21-Jan-96 | Effective 19-Jan-97 | Effective 18-Jan-98 | Effective 24-Jan-99 | Effective 23-Jan-00 |
|---|---|---|---|---|---|---|
| (1) Customer Service Class C | D406 | 20.31 | 20.97 | 21.65 | 22.35 | 23.08 |
| (2) Customer Service Class B (After 15 mos. As D406) | D405 | 20.86 | 21.53 | 22.23 | 22.96 | 23.70 |
| (3) Customer Service Class A (After 15 mos. As D405) | D402 | 22.28 | 23.01 | 23.76 | 24.53 | 25.32 |
| **Customer Service, Class AA** After 12 mos. as Customer Service Class A, if qualified and required | D401 | 23.90 | 24.67 | 25.48 | 26.30 | 27.16 |

# CUSTOMER SERVICE (cont'd.)

**Customer Service Helpers-Meter Work** **(Must qualify in each step to advance)**

To fill requirements for, and to apply only to, employees capable of independent work under general supervision with less than normal experience and training.

| | | Effective 21-Jan-96 | Effective 19-Jan-97 | Effective 18-Jan-98 | Effective 24-Jan-99 | Effective 23-Jan-00 |
|---|---|---|---|---|---|---|
| (1) No experience-Starting Rate (Begins Normal Probationary Period) | MD412 | 18.69* | 19.30* | 19.93* | 20.57* | 21.24* |
| (2) After 6 mos as MD412 (Begins 3 mos Accelerated Probation Period) | MD410 | 19.41 | 20.04 | 20.69 | 21.36 | 22.05 |
| (3) After 3 mos as MD410 Adv. Helper | MD409 | 19.68** | 20.31** | 20.98** | 21.66** | 22.36** |
| (4) After 6 mos as MD409 Adv. Helper | MD408 | 19.91 | 20.56 | 21.23 | 21.92 | 22.63 |
| (5) After 6 mos as MD408 Cl.M-C | D407 | 20.31 | 20.97 | 21.65 | 22.35 | 23.08 |

*Employee with approximately six (6) months Company experience in similar work starts progression at MD412, but at the rate equivalent to MD410. Similar work is understood to include experience in the C&M Department as C&M Fitter Helper, D629, or higher C&M Fitter classification.

**Employee with nine (9) months or more experience as Customer Service Helper starts at this rate.

# CUSTOMER SERVICE (cont.)

| Meter Shop | | Effective 21-Jan-96 | Effective 19-Jan-97 | Effective 18-Jan-98 | Effective 24-Jan-99 | Effective 23-Jan-00 |
|---|---|---|---|---|---|---|
| **AMR Repair & Meter Tester** | D515 | 21.01 | 21.69 | 22.40 | 23.13 | 23.88 |
| **Meter Repair** | | | | | | |
| (1) No experience - Starting Rate or Applicant's existing rate to rate of D506 maximum** | D510 | 18.69 | 19.30 | 19.93 | 20.57 | 21.24 |
| (2) After 3 mos as D510 | D508 | 20.03 | 20.68 | 21.35 | 22.04 | 22.76 |
| (3) After 3 mos as D508 | D506 | 21.00 | 21.68 | 22.39 | 23.11 | 23.87 |
| (4) After 12 mos as D506# Cl.B | D504 | 22.43 | 23.16 | 23.91 | 24.69 | 25.49 |
| (5) After 12 mos as D504## Cl.A | D503 | 23.27 | 24.02 | 24.80 | 25.61 | 26.44 |

**Except that an employee classified as Customer Service, Cl.A (D402) or Cl.AA (D401) when entering the classification will enter at D510, but at the rate equivalent to D506

**NOTE:** An employee failing to qualify during the three-month Probationary Period will be restored to the former job. An employee failing to complete the requirements of any step after the Probationary Period will be reclassified to the C&M Department as a Laborer.

#D506 - Small Meter Repair - to become positive displacement meter repair
##D504 - Large Meter & Instrument Repair - to become rotary meter and turbine meter repair and instrument repair

## CONSTRUCTION AND MAINTENANCE

**Laborer*** (Must qualify in each grade to advance)

| | | Effective 21-Jan-96 | Effective 19-Jan-97 | Effective 18-Jan-98 | Effective 24-Jan-99 | Effective 23-Jan-00 |
|---|---|---|---|---|---|---|
| (1) Laborer, Cl.B (Starting Rate) | D675 | 13.54 | 13.98 | 14.43 | 14.90 | 15.39 |
| (2) After 6 months or completion of seasonal, temporary or probationary period, whichever is later** | | 13.68 | 14.13 | 14.59 | 15.06 | 15.55 |
| (3) After 12 months | | 13.68 | 14.13 | 14.59 | 15.06 | 15.55 |
| (4) After 18 mos. as D675, Laborer, Class A | D670 | 14.95 | 15.43 | 15.93 | 16.45 | 16.99 |

*For employees entering after 1/21/83

**Starting rate for employees who are members of Local 12431 and transfer into this classification

| | | | | | | |
|---|---|---|---|---|---|---|
| **Laborer, Class A** | D670 | 18.69 | 19.30 | 19.93 | 20.57 | 21.24 |

**Utility** (Must qualify in each grade to advance)

| | | | | | | |
|---|---|---|---|---|---|---|
| (1) Minimum | D667 | 19.58 | 20.22 | 20.88 | 21.55 | 22.25 |
| (2) After 12 mos as D667 | D665 | 19.91 | 20.61 | 21.33 | 22.08 | 22.85 |

## CONSTRUCTION AND MAINTENANCE (cont'd.)

| | | Effective 21-Jan-96 | Effective 19-Jan-97 | Effective 18-Jan-98 | Effective 24-Jan-99 | Effective 23-Jan-00 |
|---|---|---|---|---|---|---|
| **Manhole Inspector** | D660 | 19.70 | 20.34 | 21.00 | 21.68 | 22.38 |
| **Backhoe Operator*** ** | D635 | 21.52 | 22.22 | 22.94 | 23.68 | 24.45 |
| | D635 | 21.93 | 22.64 | 23.38 | 24.14 | 24.92 |

***Maximum rate only after 90 days' satisfactory actual operation of backhoe.

**C&M Fitter Helper** **(Must prove satisfactory in each grade to advance)**

| | | | | | | |
|---|---|---|---|---|---|---|
| (1) No experience-Starting Rate | D633 | 18.95 | 19.57 | 20.20 | 20.86 | 21.54 |
| (2) After 6 mos. as D633 | D631 | 19.40 | 20.03 | 20.68 | 21.35 | 22.04 |
| (3) After 6 mos. as D631 | D629 | 19.68 | 20.31 | 20.98 | 21.66 | 22.36 |

*Employee experienced in similar work starts progression at D631 rate. Only C&M Department work will count.

**C&M Fitter**

| | | | | | | |
|---|---|---|---|---|---|---|
| (4) After 6 mos. as D629, Cl.C | D625 | 19.91* | 20.56* | 21.23* | 21.92* | 22.63* |
| (5) After 6 mos. as D625, Cl.B | D623 | 20.31* | 20.97* | 21.65* | 22.35* | 23.08* |
| (6) After 12 mos. as D623, Cl.A | D621 | 21.25* | 21.94* | 22.65* | 23.39* | 24.15* |

*Applicant will be tested at each step for advancement. Failure to complete any step will result in reclassification to Laborer, and employee will not qualify for reconsideration for a period of one year. Three (3) months' additional training may be allowed at each step if the employee shows promise of success.

# CONSTRUCTION AND MAINTENANCE (cont'd.)

**Welder*****

**(Must prove satisfactory in each grade to advance)**

| | | Effective 21-Jan-96 | Effective 19-Jan-97 | Effective 18-Jan-98 | Effective 24-Jan-99 | Effective 23-Jan-00 |
|---|---|---|---|---|---|---|
| (1) Starting rate | D616 | 19.68 | 20.31 | 20.98 | 21.66 | 22.36 |
| (2) Welder Helper (After 3 mos. as D616 and Qualified) | D615 | 19.91 | 20.56 | 21.23 | 21.92 | 22.63 |
| (3) Welder Helper** (After 12 mos. as D615 and Qualified) | D614 | 20.31 | 20.97 | 21.65 | 22.35 | 23.08 |
| (4) Welder (After 12 mos.* as D614 and Qualified) | D613 | 21.25 | 21.94 | 22.65 | 23.39 | 24.15 |
| (5) Welder (After 15 mos. as D616 and Qualified) | D609 | 22.24 | 22.97 | 23.71 | 24.48 | 25.28 |

*Employee previously classified as Cl.A C&M Fitter or Cl.B Welder, or higher, may start at D613.

**Employee previously classified as Cl.B Customer Service, or higher, Cl.A Garage Repair, or Cl.A Gas Control Maintenance Repair may start at D614.

***Applicant will be tested for advancement at each of the Welder and Welder Helper steps. Failure to complete any step will result in reclassification to Laborer; however, if applicant is qualified as D613, the reclassification would be to Cl.A C&M Fitter. Three months' additional training may be allowed at each step if the employee shows promise of success.

## CONSTRUCTION AND MAINTENANCE (cont.)

| | | Effective 21-Jan-96 | Effective 19-Jan-97 | Effective 18-Jan-98 | Effective 24-Jan-99 | Effective 23-Jan-00 |
|---|---|---|---|---|---|---|
| C&M Crew Leader | D605 | 24.65 | 25.45 | 26.28 | 27.14 | 28.02 |
| Construction Inspector | D603 | 22.36 | 23.08 | 23.83 | 24.61 | 25.41 |
| Lead Linewalker | D604 | 22.36 | 23.08 | 23.83 | 24.61 | 25.41 |
| Linewalker Helper | D671 | 18.69 | 19.30 | 19.93 | 20.57 | 21.24 |
| **Tool Crib Operator & Repair** | | | | | | |
| (1) Starting Rate | D602 | 20.86 | 21.53 | 22.23 | 22.96 | 23.70 |
| (2) After 12 mos. as D602 | D601 | 21.49 | 22.18 | 22.91 | 23.65 | 24.42 |
| **C & M Dispatcher** | | | | | | |
| (1) Minimum | D690 | 20.36 | 21.02 | 21.70 | 22.41 | 23.14 |
| (2) After 6 mos. as D690 | D689 | 20.71** | 21.38** | 22.08** | 22.80** | 23.54** |
| (3) After 6 mos. as D689 | D688 | 21.27 | 21.96 | 22.67 | 23.41 | 24.17 |
| (4) After 6 mos. as D688 | D687 | 21.87 | 22.58 | 23.31 | 24.07 | 24.85 |

**Employee previously classified as C&M Fitter Cl.B, C&M Fitter Cl.A, C&M Welder, Cl.A, Customer Service Cl.B, or higher, Customer Service Assistant Dispatcher or higher, Office Clerk or Draftsman may start progression as D689.

## ENGINEERING

### Drafter

(Must qualify in each grade to advance)

| | | Effective 21-Jan-96 | Effective 19-Jan-97 | Effective 18-Jan-98 | Effective 24-Jan-99 | Effective 23-Jan-00 |
|---|---|---|---|---|---|---|
| (1) Minimum | D109 | 20.03 | 20.68 | 21.35 | 22.04 | 22.76 |
| (2) After 6 mos. as D109 | D108 | 20.42 | 21.08 | 21.77 | 22.48 | 23.21 |
| (3) After 6 mos. as D108 | D107 | 20.82 | 21.50 | 22.20 | 22.92 | 23.67 |
| (4) After 6 mos. as D107 | D106 | 21.25 | 21.94 | 22.65 | 23.39 | 24.15 |

## TECHNICAL SERVICES

| | | | | | | |
|---|---|---|---|---|---|---|
| **Distribution Helper** | D120 | 17.53 | 18.10 | 18.69 | 19.30 | 19.93 |
| After 6 mos. as D120 | D121 | 18.69 | 19.30 | 19.93 | 20.57 | 21.24 |
| After 6 mos. as D121 | D122 | 20.31 | 20.97 | 21.65 | 22.35 | 23.08 |

### Corrosion Control

(Must qualify in each grade to advance)

| | | | | | | |
|---|---|---|---|---|---|---|
| (1) No experience - Starting Rate | D680 | 21.28 | 21.97 | 22.69 | 23.42 | 24.18 |
| (2) After 6 mos. as D680 | D679 | 21.65* | 22.36* | 23.08* | 23.83* | 24.61* |
| (3) After 6 mos. as D679 | D678 | 22.00* | 22.72* | 23.46* | 24.22* | 25.01* |
| (4) After 6 mos. as D678 | D677 | 22.30 | 23.03 | 23.78 | 24.55 | 25.35 |

*Employee experienced in similar work starts progression as D679 or D678, depending on such experience.

## GAS CONTROL

| | | Effective 21-Jan-96 | Effective 19-Jan-97 | Effective 18-Jan-98 | Effective 24-Jan-99 | Effective 23-Jan-00 |
|---|---|---|---|---|---|---|
| **Regulator Repair Leader** | | | | | | |
| (1) Starting Rate | D700 | 20.22 | 20.88 | 21.56 | 22.26 | 22.98 |
| (2) After 3 mos. as D700 Cl.B | D701 | 21.10 | 21.79 | 22.50 | 23.23 | 23.98 |
| (3) After 12 mos. as D701 Cl.A | D702 | 22.28 | 23.01 | 23.76 | 24.53 | 25.32 |
| **Chart Drips** | D650 | 20.31 | 20.97 | 21.65 | 22.35 | 23.08 |

**NOTE:** Any employee in the progression not qualifying at any step will be reclassified to C&M Laborer.

## RATES FOR OCCASIONAL ASSIGNMENTS

| | | | | | | |
|---|---|---|---|---|---|---|
| **Crane Operator** | | 21.52 | 22.22 | 22.94 | 23.68 | 24.45 |

**Maintenance Repair Force Helpers** **(Must prove satisfactory in each grade to advance)**

To fill requirements for, and to apply only to, employees capable of independent work under general supervision with less than normal experience and training.

| | | | | | | |
|---|---|---|---|---|---|---|
| (1) No Experience-Starting Rate (Begins Normal Probation Period) | M398 | 18.69 | 19.30 | 19.93 | 20.57 | 21.24 |

## GAS CONTROL (cont'd)

| | | Effective 21-Jan-96 | Effective 19-Jan-97 | Effective 18-Jan-98 | Effective 24-Jan-99 | Effective 23-Jan-00 |
|---|---|---|---|---|---|---|
| (2) After 6 mos. as M398, (Begins 3 mos. Accelerated Probation Period) | M396 | 19.41* | 20.04* | 20.69* | 21.36* | 22.05* |
| (3) After 3 mos. as M396, Adv. Helper | M394 | 19.91 | 20.56 | 21.23 | 21.92 | 22.63 |
| (4) After 6 mos. as M394, Cl.C | M393 | 20.31 | 20.97 | 21.65 | 22.35 | 23.08 |

*Applicable only to employee with approximately six (6) months Company experience in related work.

<u>Note:</u> (A) Through completion of M396, employee receives intensive training but works only as Helper to higher-classified employee.

(B) Employees entering proression with no experience and who do not fulfill the requirements of the three-month probation period (as M396) will return to their former classification.

| | | | | | | |
|---|---|---|---|---|---|---|
| (5) Repair, CL.B (After 12 mos. as CL.C, M393, if qualified) | M392 | 20.86 | 21.53 | 22.23 | 22.96 | 23.70 |
| (6) Repair, CL.A (After 12 mos. as CL.B, M392, if qualified) | M391* | 21.98 | 22.70 | 23.44 | 24.20 | 24.98 |

*See agreement dated April 7, 1992.

## GAS CONTROL (cont'd.)

### Repair Force Electrical

(Must prove satisfactory in each grade to advance)

| | | Effective 21-Jan-96 | Effective 19-Jan-97 | Effective 18-Jan-98 | Effective 24-Jan-99 | Effective 23-Jan-00 |
|---|---|---|---|---|---|---|
| (1) Repair, Cl.C | M493 | 20.86 | 21.53 | 22.23 | 22.96 | 23.70 |
| (2) Repair, Cl.B (After 15 mos. as M493, if qualified) | M492 | 21.28 | 21.97 | 22.69 | 23.42 | 24.18 |
| (3) Repair, Cl.A (After 15 mos. as M492, if qualified) | M491 | 21.74 | 22.44 | 23.17 | 23.92 | 24.70 |
| (4) Repair - Journeyman* (After 6 mos. as M491, if qualified) | M490 | 23.27 | 24.02 | 24.80 | 25.61 | 26.44 |

*To attain this classification, an employee must be licensed by the State of Rhode Island.

### Instrument Technician Telemeter & SCADA

(Must prove satisfactory in each grade to advance)

| | | | | | | |
|---|---|---|---|---|---|---|
| | M500 | 21.00 | 21.68 | 22.39 | 23.11 | 23.87 |
| After 6 mos. as M500 | M501 | 22.43 | 23.16 | 23.91 | 24.69 | 25.49 |
| After 6 mos. as M501 | M502 | 23.27 | 24.02 | 24.80 | 25.61 | 26.44 |

| Instrument Calibration Person | (Must prove satisfactory in each grade to advance) | | | | | |
|---|---|---|---|---|---|---|
| | | Effective 21-Jan-96 | Effective 19-Jan-97 | Effective 18-Jan-98 | Effective 24-Jan-99 | Effective 23-Jan-00 |
| | M600 | 20.18 | 20.84 | 21.52 | 22.22 | 22.94 |
| After 6 mos. as M600 | M601 | 20.86 | 21.53 | 22.23 | 22.96 | 23.70 |
| After 6 mos. as M601 | M602 | 21.49 | 22.18 | 22.91 | 23.65 | 24.42 |

GAS SUPPLY

| BOOSTER OPERATOR | (Must prove satisfactory in each grade to advance) | | | | | |
|---|---|---|---|---|---|---|
| (1) Starting | M213 | 20.16 | 20.81 | 21.49 | 22.19 | 22.91 |
| (2) After 3 mos. as M213 | M214 | 21.28 | 21.97 | 22.68 | 23.42 | 24.18 |
| (3) After 9 mos. as M214 | M215 | 21.98 | 22.70 | 23.44 | 24.20 | 24.98 |
| **UTTILITY OPERATOR** | | | | | | |
| (1) Starting | M218 | 20.16 | 20.81 | 21.49 | 22.19 | 22.91 |
| (2) After 3 mos. as M218 | M219 | 21.28 | 21.97 | 22.60 | 23.42 | 24.18 |
| (3) After 9 mos. as M219 | M220 | 21.98 | 22.70 | 23.44 | 24.20 | 24.98 |

# METER READING

## Meter Reader

| | | Effective 21-Jan-96 | Effective 19-Jan-97 | Effective 18-Jan-98 | Effective 24-Jan-99 | Effective 23-Jan-00 |
|---|---|---|---|---|---|---|
| (1) Start | R3 | 13.54 | 13.98 | 14.43 | 14.90 | 15.39 |
| (2) After 6 months or at the completion of seasonal, temporary or probationary period, whichever is later | | 15.33* | 15.83* | 16.34* | 16.87* | 17.42* |
| (3) After 6 months | R2 | 17.10 | 17.65 | 18.23 | 18.82 | 19.43 |
| (4) After 6 months | R1 | 20.66 | 21.33 | 22.02 | 22.74 | 23.48 |

*Starting rate for employees who are members of Local 12431 and who transfer into this classification.

| | | | | | | |
|---|---|---|---|---|---|---|
| **Collector** | R4 | 21.54 | 22.24 | 22.96 | 23.71 | 24.48 |
| **Field Collector** | R5 | 21.87 | 22.58 | 23.31 | 24.07 | 24.85 |

# GENERAL SERVICES

**General Service Persons** **(Must qualify in each step to advance)**

To fill requirements for, and to apply only to employees capable of independent work under general supervision with less than normal experience and training.

| | | Effective 21-Jan-96 | Effective 19-Jan-97 | Effective 18-Jan-98 | Effective 24-Jan-99 | Effective 23-Jan-00 |
|---|---|---|---|---|---|---|
| (1) No experience - Starting Rate (Begins Normal Probationary Period) Helper | D801 | 18.69* | 19.30* | 19.93* | 20.57* | 21.24* |
| (2) After 6 mos. as D801 (Begins 3 mos. Accelerated Probation Period) | D802 | 19.41 | 20.04 | 20.69 | 21.36 | 22.05 |
| (3) After 3 mos. as D802 Adv. Helper | D803 | 19.68 | 20.31 | 20.98 | 21.66 | 22.36 |
| (4) After 6 mos. as D803 | D804 | 19.91 | 20.56 | 21.23 | 21.92 | 22.63 |
| (5) After 6 mos. as D804 GSP | D805 | 20.31 | 20.97 | 21.65 | 22.35 | 23.08 |

*Employee with approximately six (6) months' Company experience in similar work starts progression at D801, but at the rate equivalent to D802.

**South County**

Rates negotiated for employees located at South County who became members of Local 12431 during 1995 are reflected in a memorandum to the Union entitled, "South County Increase Schedule."

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

CAROL PETRARCA :
:
VS. : C.A. NO.: 04-310S
:
SOUTHERN UNION CO. & :
NEW ENGLAND GAS COMPANY :

DEPOSITION OF ROBERT SAVAGE, a Witness in the above-entitled cause, taken on behalf of the Defendant, before Barbara Warner, Notary Public in and for the State of Rhode Island, at the offices of Nixon Peabody, LLP, One Citizens Plaza, Providence, RI, on May 9, 2006 at 10:00 A.M.

PRESENT:

FOR THE PLAINTIFF............. LAW OFFICE OF NOELLE CLAPHAM
BY: NOELLE CLAPHAM, ESQUIRE

FOR THE DEFENDANT............. NIXON PEABODY, LLP
BY: NEAL J. MCNAMARA, ESQUIRE

ALLIED COURT REPORTERS
115 PHENIX AVENUE
CRANSTON, RI 02920
401-946-5500

attorney's for both side and I am asking did anybody do research about attorney/client privilege regarding an attorney's representation of the union, how it applies to a grievant. I would like not to come back here again.

MS. CLAPHAM: I am going to let Mr. Savage testify to whatever advice it was that he gave to Ms. Petrarca and whatever conversations he had with her regarding that advice. But with respect to any other matters, I don't believe that they are relevant or waived. If it is with respect to the advice he gave her or conversations surrounding or regarding that advice, that was waived and she testified to that in her deposition on Pages 142, 143 and 144. Just because she testified to that, does not mean that she has waived all of her privileged communications with Attorney Savage, according to the von Bulow case.

MR. MCNAMARA: That is what I am asking about. What I understand right now is there was a conversation where they



met prior to the arbitration at the Days Inn. That is what Ms. Petrarca testified to. That is what I understand Mr. Savage is talking about.

Q. I want to know in that conversation prior to the arbitration, what did you say and what did she say?

A. First of all, when we are talking about prior to, if it says ten o'clock, I don't remember when the arbitration took place. What I remember took place is we used some of that time in negotiations. And that is what was prior to the arbitration. We mean prior to the actual arbitration taking place. We used some of that time to negotiate because the arbitration never took place. The negotiation is what took place.

Q. Why don't I change the questions to September 13 on the day of the arbitration?

A. The day of the arbitration, because I don't remember when it took place.

Q. Okay.

A. Can you ask me the question again?

Q. During that conversation or conversations



with Ms. Petrarca the day of the arbitration, what did she say and what did you say?

A. The first thing is Ray Conroy made a big deal that, I remember that it was her decision whether to go to arbitration or not. It was our recommendation that she not go, but he was ready to go to arbitration if she wanted to. We were not preventing her. The union was not stepping in and telling her that it would not represent her. It was not a situation where the union said that we have done the research in this case and we have determined you don't have a chance, so we decline to represent you in this arbitration. If she wanted to go forward with the arbitration, the union was ready to go forward and give her the arbitration if she wanted it. It is easy for me to remember what advice I gave her rather than what she said in response, but I will do the best I can. It has been a long time. I don't have the pension plan in front of me or whatever we looked through at the



time. I remember with Ray and Mr. Butler, but I think that what the problem was this was an issue of she was being accused of taking money because she took TDI and got a full pay and it could have resulted in her not getting a pension. Included in that pension at the time was health care benefits. So it was a huge risk. I think, if I remember correctly, my recommendation was I don't think the risk is worth it. You have a good chance of losing the arbitration, and if you lose the arbitration it is just cause you lost and it could affect your pension and future medical benefits. I recommend that you take the settlement. She would be allowed to resign and get her pension and her health care benefits.

Q. Do you remember who suggested resignation and retirement as an option for resolving the grievance?

A. No.

Q. You testified earlier --

A. You know, they were not too consolatory, Providence Gas, from what I

remember. It was not really too many options. By the time that arbitration came up, it was either she was going to be fired. We at least wanted to preserve something out of it if she was not going to get a just cause dismissal. Something we discussed with her, and we got Providence Gas to agree to, I can't remember, I don't think Providence Gas is the first one to bring that up, but I can't remember.

Q. You testified earlier that Mr. Conroy made a point of telling Ms. Petrarca it was her decision as to whether to accept the negotiated resolution and if she chose not to that the union would go ahead and represent her with respect to the arbitration of the grievance?

A. Yes. I didn't think that was a good option.

Q. You mean going forward with the arbitration?

A. Yes. If she got a just cause dismissal, she may not have gotten a pension and health care benefits. I can't remember what her illness or disability was



at the time, but that was significant. It was not recommendation she chance that because her defense, in terms of and it wasn't justice cause, was that she was a really bad bookkeeper and it was unintentional. There was no disagreement that she did receive the TDI checks, that she did receive the checks and the full pay. If was just whether it was intentional or not intentional. I thought it was a huge risk for her to go forward with the arbitration from the little bit that I remember of it.

Q. So you were concerned as to whether her defense would hold up in the arbitration?

A. Not so much that, but the other possibility, it wasn't just that. The other possibility would be that they could reduce the penalty to a suspension. If my memory is correct, I thought Ray Conroy tried that negotiation and Providence Gas said no. So that would had to have come through from the arbitration. I don't think we had any arbitration cases to compare that to where somebody did a



similar thing. I think that there was one person who took gas one time and got a six-month suspension but that was something the union was not involved in. That is what the company gave him for a suspension. I thought that was the only case we could compare it to.

Q. On the day of the arbitration, what was your understanding as to what Ms. Petrarca's options were?

A. That she could go through with the arbitration. By the time we were done with negotiations or before?

Q. Let's take that step by step. Before negotiations, what was your understanding as to what her options were?

A. By the time arbitration came through, I didn't think Providence Gas was flexible at the time. I thought they wanted to terminate her. As part of the negotiations, we got them to agree to allow her to resign and not get a disability pension but regular pension and that included health care. That was part of the negotiations, that was not something they



offered before we went in there.

Q. Did Ms. Petrarca tell you that day she did not want to retire?

A. I can't remember.

Q. Do you remember anything that she said in response to your advice to her that she take this negotiated resolution of resignation and retirement?

A. I remember she agreed to it and I think I gave her the option she could go through with the arbitration, but the risk was if it is a just cause dismissal she could lose the pension and health care benefits. I thought there was a good chance that she would lose the arbitration.

Q. Was it your belief in talking to her that she understood the risks of going through an arbitration?

A. Yes.

Q. What is the basis of your saying that?

A. Because I told her.

Q. Did she discuss those risks with you?

A. Yes. I told her that there was a good chance she could lose the arbitration.

Q. And she seemed to understand what you were

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

CAROL PETRARCA,

Plaintiff,

v.

SOUTHERN UNION COMPANY, et al,

Defendants.

C.A. No. 04-310S

**DEFENDANTS' SUPPLEMENTAL ANSWERS TO PLAINTIFF'S FIRST SET OF INTERROGATORIES**

**INTERROGATORY NO. 1**. Please identify all persons, by name, title, and current, or last known, business and home address, who have knowledge about the allegations which form the basis of plaintiff's Complaint or which relate to the information contained in your Answer to the instant Complaint including, but not limited to, those individuals who provided information which was used in the preparation of your Answer to the Complaint, any individuals involved in any investigations relating to plaintiff, each and every individual who has knowledge about what was done to respond to plaintiff's request for production of documents, any individual who has knowledge about what files and departments were searched in response to plaintiff's request for production of documents, any individuals who, directly or indirectly, provided information to the Rhode Island Commission for Human Rights, and any individuals who provided information to you which assisted in the preparation of these answers to these interrogatories; and, for each person identified, state what he or she knows.

**OBJECTION AND RESPONSE:** Defendants object to this Interrogatory on the grounds that it is vague and ambiguous, overbroad, and unduly burdensome. Subject to and without waiver of the foregoing objections: Defendants are currently aware of the following: Henry A. Butler, former Director of Labor Relations, has knowledge regarding plaintiff's employment history, her complaint about the storage closet incident and the company's response, and the circumstances surrounding plaintiff's separation from the company. Ed Bolduc,

plaintiff's former supervisor, has knowledge regarding plaintiff's employment history, job performance, and the storage room incident.

**Supplemental Response:** Mr. Butler's home address is 3 Laurel Lane, Lincoln, RI, and Mr. Bolduc's home address is 76 Norman Avenue, Pawtucket. Other individuals who may have knowledge regarding plaintiff's allegations are Frank Devlin, Ray Conroy and Paul Cardin. They have information regarding complaints plaintiff made regarding work issues, as well as information regarding the end of her employment with the company. In addition, Christine Stamp has information regarding the storage room incident involving Mr. Bolduc. In addition, defendants refer plaintiff to her response to Defendants' Interrogatory No. 3, in which she identified all the individuals identified by defendants, plus an additional sixteen individuals. In addition, plaintiff incorporated in her response her Initial Disclosure in which she identified additional individuals. Defendants are not aware of any individuals with knowledge beyond the names they have provided, or beyond the names that plaintiff has provided.

Butler provided information that was used in the response to the complaint, and is aware of what areas were searched for documents responsive to plaintiff's request for production.

**INTERROGATORY NO. 5.** For the period five years before and after plaintiff was employed by the defendants and during the time that plaintiff was employed by defendants, has any current or former employee (including plaintiff) or any applicant for employment ever alleged, insinuated, suggested, implied, stated or complained, whether or not in a lawsuit or charge of discrimination, that he or she was harassed, discriminated against, disciplined, penalized, treated unfairly, differently, or adversely based upon his or her sex? If the answer is yes, please set forth each instance in which this has happened. Your answer should include, but not limited to, the identity of all persons involved including any supervisors, managers and/or officers who have knowledge of each claim, allegation, insinuation, suggestion, implication, statements, complaints, charges, and/or lawsuits, the date, substance, status, and/or disposition of each allegation, claim, insinuation, suggestion, implication, statement, complaint, charge and/or lawsuit, the names of all complainants, respondents, plaintiffs and defendants, and where any such complaints were made, filed or are pending.

**OBJECTION AND RESPONSE:** Defendants object to this Interrogatory on the grounds that it is vague and ambiguous, overbroad, unduly burdensome, and not calculated to lead to the discovery of admissible evidence. Subject to and without waiver of the foregoing objections, Lynore Horn, Christine Stamp, Roberta Faria and Wendy Smith have made claims regarding sex discrimination/harassment.

**Supplemental Response:** Defendants have not withheld names based on any objections, but have identified additional individuals. In addition, Brenda Shanley, an employee in Information Technology, sued for sex discrimination in or about 2000. Her attorney was Patricia Andrews, counsel for plaintiff here. That matter was the subject of litigation and was settled. In 2004, Stephen Ferrante filed an action against defendants in Providence County Superior Court alleging sex discrimination, i.e., that he was terminated while women were being promoted, and violation of the Rhode Island Parental and Medical Leave Act. That action was settled in May 2005.

In addition, an internal complaint was filed by Alycia Goody regarding comments made by Gary Gilheeney. The company hired an outside investigator. Defendants cannot locate the records of that investigation, and have been unable to establish, by asking Alycia Goody and Bruce Wilde, the Vice President of Human Resources at the time, the identity of the investigator.

Carol Petrarca made an internal complaint regarding Richard Kala in 1995. That complaint was investigated by Bud Butler and, as a result, Kala was transferred on January 2, 1996 from Facilities Maintenance to Fleet Services, and his hourly pay rate was reduced from $19.79 to $18.31. Defendants have been unable to locate the records of that investigation, which had been in the possession of Alycia Goody while she was employed at Providence Gas. The

company has asked Ms. Goody where she kept those records, but they were not in the location that she specified.

**INTERROGATORY NO. 6.** For the period five years before and after plaintiff ceased working for defendants and during the time that plaintiff was employed by defendants, please identify (by name, current or last known business and home address and telephone number, gender, title or position, employment history with defendants and persons to whom he or she reported) all employees who have (or allegedly have): wrongfully, improperly, mistakenly, fraudulently, and/or negligently received sick leave benefits, been overpaid by defendant for any reason, owed money to defendant for any reason, wrongfully, improperly, mistakenly, fraudulently, and/or negligently received any benefits in excess of that to which he or she was entitled, received money from defendant under improper, false, and/or mistaken circumstances or pretenses, had to repay money, or make restitution, to defendant, stolen any money or property from defendant, and/or defrauded defendant in any way. Your answer should include, but not limited to, any person who was caught stealing gas.

**OBJECTION AND RESPONSE:** Defendants object to this Interrogatory on the grounds that it is vague and ambiguous, overbroad, unduly burdensome, and not calculated to lead to the discovery of admissible evidence. Subject to and without waving the foregoing objections, in addition to plaintiff, Kenneth Mace, a service technician, was terminated in 1983 for theft of natural gas (he turned his residential gas meter backwards). The company reinstated him the day of the arbitration without back pay for the six months he was out of work. He has retired.

**Supplemental Response:** In addition to Mr. Mace, another employee, Caesar Macchione, was terminated for engaging in private work on company time. Mr. Macchione owned a popcorn machine, and would sell the popcorn from the machine for profit during company time. His termination was the result of a grievance. The matter was about to go to arbitration when Macchione asked if the company would allow him to retire as a way of resolving the arbitration. The company agreed. It was because of that situation that, when plaintiff's attorney requested that plaintiff be allowed to resign her position at the company rather

than go through an arbitration, Butler suggested that plaintiff would be better off financially if she retired. The company allowed her to do so, and in that way treated her in the same way that it treated Macchione.

**INTERROGATORY NO. 7.** For each person identified in your answer to interrogatory 6, please:

(a) identify all persons who have knowledge about you answer;
(b) for each person identified in your answer to 7(a), set forth what he or she knows;
(c) describe the circumstances of each incident including whether any discipline was imposed.

**OBJECTION:** See Objection to Interrogatory 6.

**Supplemental Response:** Bud Butler, see Supplemental Response to Interrogatory 6.

**INTERROGATORY NO. 8.** During the period in which the plaintiff was employed and up until the present time, please set forth everything which defendant has done to prevent or alleviate sexual harassment in the workplace. Your answer should include, but not limited to, the date and substance of any communications to employees about sexual harassment, the date and substance of any training on sexual harassment, and/or the promulgation and dissemination of any sexual harassment policies or procedures.

**RESPONSE:** Defendants' sexual harassment policy, which has been in place since the 1980s, prohibits sexual harassment, explains what an employee should do if s/he believed they were being subject to sexual harassment, and provides multiple avenues of complaint. In addition to the distribution of written policies, the company's anti-discrimination and harassment policies and procedures are currently available on the intranet to all employees. Managers were charged with distributing the sexual harassment policy to their employees, and making them aware of its contents. Posters containing a comprehensive overview of labor and employment laws, including provisions on sexual harassment have been, and continue to be, displayed at each worksite.

In or about 1998, Grant Keith, the then Director of Organizational Development for Providence Gas, brought in an outside consultant to do harassment training for all supervisors, managers, and executives. Similarly, in or about 2000, Susann Mark, the then General Counsel of Providence Gas, brought in an outside consultant to do harassment training for all supervisors, managers, and executives.

Defendants conducted company wide diversity training beginning in the Fall of 2002, which included training on sexual harassment. These classes were approximately 3-4 hours in length and were conducted primarily in small group workshop format. The company's policies and procedures were discussed and the written policies were distributed to attendees.

In the Fall of 2004, the company conducted sexual harassment training for all employees. The company's policies were distributed to attendees at these sessions.

All supervisors and managers are required to complete a comprehensive training program which includes a module on sexual harassment.

Finally, as the prevention and alleviation of sexual harassment in the workplace is an ongoing process that requires the participation of all employees, it is impossible for the company to list each and every action taken in that regard.

**Supplemental Response**: In the 1990's, Grant Keith and Mary Cimini, Providence Gas employees, provided harassment training to non-managerial employees. Defendants are unable to specify the dates of those training sessions.

**INTERROGATORY NO. 10.** Has defendant and/or any of its current or former agents, employees and/or representatives ever spoken to any male employee about the way that he was treating plaintiff, ever spoken to any person to determine if plaintiff was being sexually harassed or discriminated against, and/or ever spoken to any person to determine if plaintiff was being treated unfairly or adversely by any of defendant's employees? If the answer is yes, please:

(a) identify all persons who have knowledge about your answer;

(b) for each person identified in your answer to 10(a), set forth everything which he or she knows.

**OBJECTION AND RESPONSE**: Defendants object to this Interrogatory on the grounds that it is vague and ambiguous, overbroad, unduly burdensome, and not calculated to lead to the discovery of admissible evidence. Subject to and without waiver of the foregoing objections, Henry Butler spoke with Ed Bolduc in response to plaintiff's complaint about the storage room incident. In addition, Ed Bolduc called a department meeting in 1990 to discuss the policy against sexual harassment in response to a complaint by plaintiff.

**Supplemental Response:** With respect to the storage room incident, the matter was investigated, and a grievance was filed. The grievance documents are being produced. Bolduc wrote a letter of apology to plaintiff and Christine Stamp, and indicated that he would knock in the future prior to entering the storage room. Plaintiff never complained about Bolduc again, and defendants believed that the matter was resolved to the satisfaction of Petrarca and Stamp.

With respect to the 1990 incident, Petrarca complained to Bolduc that Pat Domenicone showed her nude pictures in a magazine, and made remarks to her about her relationship with another male employee. She also complained that Miriam Comeau was making remarks to her about Petrarca's friendly relationship with her department supervisor. In response, Bolduc spoke to his employees to re-explain the sexual harassment policy. See Bates doc. 807.

Finally, Petrarca also complained to Bud Butler about harassment by Richard Kala. Petrarca alleged that Kala propositioned her. Although Kala denied the allegation, Butler found Petrarca to be credible, and thus transferred Kala from Facilities Maintenance to Fleet Services, with a reduction in his hourly pay rate. Kala was demoted to laborer after he was found to have made inappropriate comments to a customer, and subsequently received a Last Chance Agreement based on the Petrarca and customer complaints. The documents related to Kala's

grievance regarding the demotion to laborer are being produced. Defendants have been unable to locate any grievance regarding the transfer to Fleet Services, because there is one binder containing grievances for the period 1996-98 that defendants have been unable to locate.

**INTERROGATORY NO. 13.** During the time that plaintiff was employed by the defendant and up until the present time, please identify (by name, current and/or former business and home address, telephone number, and title or position) all persons who were involved when an employee filed for temporary disability insurance benefits ("TDI"); and, for each person identified, set forth what his or her role was.

**OBJECTION AND RESPONSE**: Defendants object to this Interrogatory on the grounds that it is vague and ambiguous, overbroad, unduly burdensome, and not calculated to lead to the discovery of admiss evidence.

Subject to and without waiver of the foregoing objections, the following people have been involved with the TDI process at New England Gas Company: Karen Hall, Lorraine Cipriano, Richard Muto, Lynne Linden, and Amanda Allan.

All of the above have been or are HR assistants. Prior to the time when Richard Muto handled TDI, beginning in September of 2000, the TDI form (Verification Reports) was sent directly to Payroll. Payroll clerks provided the last date worked and sent the form to HR to be signed and returned to TDI. Payroll clerks at this time were Mary Paquet, Lisa Pimental, and Joanne Zito. At some point after 9/2000, the HR assistant received and completed the verification reports. The names of people sent by RI TDI and the amounts reported as being received were then provided to Payroll. After Lynne Linden began handling the TDI process, RI TDI ceased to provide forms for the company to give to the employee and the employee was required to contact RI TDI directly. Beginning in 2002, Amanda Allen and Lynne Linden have sent the letter mentioned in the above Interrogatory to employees receiving TDI.

Kathy Wall (Safety & Health Supervisor) or Natalie Pereira (Safety & Health Assistant) send a letter from Health and Safety to any employee out ill for more than three days. This letter directs the employee to contact TDI and indicates the consequence of failing to provide a copy of the determination letter to HR.

Current Payroll Clerks Mary Paquet, Juanita Dubuc, Paula Moretti and Deanna Perry receive the names of people receiving TDI and deduct the maximum amount until provided with the TDI benefit information from HR.

**Supplemental Response:** All above-referenced employees are current employees, with the exception of Richard Muto, 62 Westhill Avenue, Cranston, RI 02920, and Karen Hall, 1748 Sara Court, Conyers, GA (last known address).

**INTERROGATORY NO. 16.** During the time that plaintiff was employed by defendant and up until the present time, has defendant ever had occasion to delay, suspend, seek reimbursement for, and/or refuse to pay sick benefits for any employee? If the answer is yes, please describe each instance in which this happened. Your answer should include, but not limited to, the identity of all persons involved including the decision-makers and the employee whose sick benefits were affected, the reasons why such action was taken, and the reasons why any discipline was imposed or not imposed.

**OBJECTION AND RESPONSE**: Defendants object to this Interrogatory on the grounds that it is vague and ambiguous, overbroad, unduly burdensome, not calculated to lead to the discovery of admissible evidence, and constitutes an invasion of the privacy of third parties. Subject to and without waiver of the foregoing objections, Keith Cotnoir and Carol Petrarca.

**Supplemental Response:** For further information regarding Keith Cotnoir, please see response to Interrogatory 12. Plaintiff is aware of additional information regarding her own case.

**INTERROGATORY NO. 21.** Does defendant claim that it exercised reasonable care to prevent and promptly correct acts of sexual harassment in its workplace and that plaintiff failed to take advantage of any preventative and corrective opportunities provided by defendant or to

otherwise avoid harm at any time during her employment? If so, please set forth, in as much detail as possible, all facts in support of this claim.

**RESPONSE**: Yes. The defendants' policies provided multiple avenues of complaint. Plaintiff complained to Edward Bolduc of sexual harassment in 1990, which complaint was resolved at the supervisory level. She complained of sexual harassment again in 1999 with respect to Mr. Bolduc's entry into a room she occupied with Christine Stamp. That complaint was investigated and resolved. Defendants are unaware of any other complaint by plaintiff of sexual harassment.

**Supplemental Response:** See Supplemental Response to Interrogatory 10.

**VERIFICATION**

D'Anna Soehnge, affirms that I am the Vice President of Human Resources of New England Gas Company, a division of Southern Union Company; that those answers in the Responses of Defendants to Plaintiff's First Set of Interrogatories of which I have personal knowledge are true; that all of the matters stated therein are not within my personal knowledge and that those matters that are not within my personal knowledge have been assembled by authorized employees, agents, and representatives of Defendant, and I am informed that those facts are true. I verify under penalty of perjury that the foregoing is true and correct. Executed on ____ day of October, 2005. Providence, Rhode Island.

D'Anna Soehnge
D'Anna Soehnge

AS TO OBJECTIONS:
DEFENDANTS,
SOUTHERN UNION COMPANY AND
NEW ENGLAND GAS COMPANY,
By its attorneys,

HOLLAND & KNIGHT LLP

Neal J. McNamara #4249
Robert J. Crohan Jr. #6516
One Financial Plaza – Suite 1800
Providence, RI 02903
Tel. (401) 751-8500
Fax. (401) 553-6850

CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 30 day of ~~October,~~ Novem 2005 a copy of the foregoing was mailed to:

Patricia E. Andrews, Esq.
Carly B. Iafrate, Esq.
170 Westminster Street, Suite 601
Providence, RI 02903

# 3247230_v1

On August 20, 1999 at appox. 2:15 PM I ~~~~ stepped out onto the roof to see how Christine Stamp was progessing with the painting of the pipes. She was not there. At appox. 2:45 PM I looked out on the roof to see if Christine had returned. She had not. I proceded to the basement to find her. She was not in the former boiler room. I started to walk towards the mail room and as I passed the ladies locker room I heard Christine's and Carol Partridge's voices. The door to this room was open appox. ten inches and I proceeded ~~~~~~~~~ to opened the door the remainder of the way. Christine was sitting on a chair doing a crossword puzzle and Carol was sitting on a chair talking to Christine. I informed them that they had exceeded their break time and it was time to go back to work. I asked Christine if the paint and tools were on the roof and she replied she had put everything away because her arm was tired from painting because she is not accustomed to painting for long periods of time.

I informed her that 7:15 PM is too early to stop work for the day. She replied that I should go to Easter Street if I wanted to see people goofing off. That "she" is a good worker and I don't need to be watching her.

~~The facts as I have described them~~

~~These are the facts concerning the ~~ ~~incident~~ ~~the allegation~~

Statement

After talking to several people and giving a lot of thought concerning my actions of that day, I would like to make the following statement. The fact that the locker room door was partially open, the proper action from me should have been to knock on the door to alert you of my presence. I did not and therefore, I offer you my apology. ~~for my action~~

TO: CHRISTINE STAMP & CAROL PETRARCA

FROM: ED BOLDUC

**DATE: DECEMBER 13, 1999**

After giving some serious thought and having discussion with Bud Butler concerning the incident that occurred on August 20, 1999 I would like to make the following statement.

My reason for going to the basement in search of Christine Stamp was that I did not see her on the roof (painting pipes) for some length of time. After deciding that she should have returned by now, I proceeded to search for her. With no success after looking in the former boiler room, I started towards the Mail Room. As I passed the room where Christine and Carol take their breaks, I heard their voices. The door to this room was open approximately one (1) foot. I proceeded to open the door the remainder of the way to find Christine doing a crossword puzzle and Carol sitting on a chair talking to Christine. In retrospect, it would have been appropriate for me to knock on the door before entering. I offer my apology to you for my action and in the future I will knock.

On August 20th, 1999 at approximately 2:15 PM I stepped out onto the roof to see how Christine Stamp was progressing with the painting of the pipes. She was not there. At approximately 2:45 PM I looked out on the roof to see if Christine has returned. She had not returned. I proceeded to the basement to see if she was there. I looked in the former boiler room but she was not there. I started to walk towards the Mail Room and as I passsed the ladies locker room I heard Christine's and Carol Patrarca's voices. The door to the locker room was open approximately ten inches. I proceeded to open the door the remainder of the way. Christine Stamp was sitting on a chair doing a crossword puzzle and Carol Patrarca was sitting on another chair talking to Christine. I informed them that they had exceeded their break time and it was time to go back to work.

I asked Christine if the paint and the tools were still on the roof and she replied that she had put everything away because her arm was tired from painting. She said she is not accustomed to painting for long periods of time. I informed her that 2:15 PM is too early to stop work for the day. She replied that I should go to Dexter Street if I wanted to see people goofing off. That "she" is a good worker and I don't need to be watching her. I instructed her to get her tools and return to the roof and continue with the painting. I then returned to my office. Earlier in the day I instructed Jerry and Carol to bring a large piece of equipment to the third floor of the garage for storage. Christine did not return to the roof but I think she worked with them to bring this equipment to the garage. I have no problem with that.

STATEMENT

After discussing the issue of the ladies locker room door with some Directors and giving the subject some serious thought concerning my ~~action on that day~~, I would like to make the following statement. When I found the locker room door partially open, the proper thing for me to do should have been to knock on the door and announce my precence. I did not and therefor I offer my apology to each of you and state that in the future I will knock on the door if I require your services.

August 31, 1999
Certified Mail Z 090 344 221

Royalynne Hourihan
Vice President, Human Resources
Providence Gas Company

Dear Ms. Hourihan,

We are writing to notify you that we feel we are being harassed by the company. On 8/20/99, Mr. Bolduc, our supervisor, barged into our locker, dressing room. The door to the room was closed and Mr. Bolduc entered without knocking.

At the time that he entered, we were both on our break. He proceeded to cross examine us in regard to what we currently were working on.

We feel that at numerous times in the past he has harassed the two of us by making unnecessary comments about our job performance whereas he has never made these remarks to our male counterpart.

We are both very upset about this invasion. What if we had been undressing at the time?

On the same day, I contacted a union stewart about this incident. No one from Human Resources has spoken to us so far. We are under the impression that everyone has forgotten all about the incident.

Sincerely,

Carol Petrarca
Christine Stamp

cc: United Steelworkers Of America Local 12431

ProvGas
A ProvEnergy Company

September 1, 1999

Carol A. Petrarca
592 Pippin Orchard Rd.
Cranston, R I 02921-3603

Christine A. Stamp
51 Silverwood Lane
West Warwick, R I 02893

Dear Ms. Petrarca and Ms. Stamp:

We are in receipt of your letter dated August 31, 1999 notifying us that you feel the company has harassed you.

On August 20, 1999 Frank Devlin, Vice President of Local 12431, USWA advised me of the incident referred to in your letter. I told Mr. Devlin that I would speak with Mr. Bolduc the following week to determine the facts from his perspective. I had another conversation with Frank on Thursday, August 26, 1999 and advised him that it was apparent the parties disagreed on some of the relevant facts surrounding the incident. Frank advised me he would be on vacation the week of August 30, 1999; therefore I made the decision to pursue this matter when he returns Monday, September 6, 1999.

Please be assured " we have not forgotten about the incident." You initially reported the incident to your union representative(s); therefore I thought it appropriate to initially meet with them in an attempt to resolve the matter. I will be meeting with your union representative(s) next week and we will schedule a meeting with both of you when Ms. Stamp returns from sick leave.

If you have any questions pertaining to this matter, please call me at ext. 2226.

Sincerely,

Henry A. Butler
Director of Labor Relations

CC: Royalynne Hourihan, Vice President Human Resources
Raymond Conroy, President Local 12431, USWA
Frank Devlin, Vice President Local 12431, USWA

ProvGas
A ProvEnergy Company

September 21, 1999

Christine A. Stamp
51 Silverwood Lane
West Warwick, R.I. 02893

Carol A. Petrarca
592 Pippin Orchard Rd.
Cranston, R.I. 02921-3603

Dear Ms. Stamp:

I am in receipt of your message requesting a meeting this week to discuss your harassment complaint.

As stated in my September 1, 1999 letter to you, I will schedule a meeting with you, Ms. Petrarca and a union representative when you return to work.

Sincerely,

Henry A. Butler
Director of Labor Relations

CC: Royalynne Hourihan
Raymond Conroy
Frank Devlin

000710

Number

GRIEVANCE REPORT

U.S.W.A., District 1, Local 12431

PROVIDENCE GAS COMPANY

Name C. STAMP - C. PETRARCA Date 12-6-99

Department FACILITY MAINTENANCE Division DOWNTOWN

Nature of Grievance

ON AUGUST 20, 1999 Ed Boldue WALKED INTO A CHANGING/LOCKER ROOM WITHOUT KNOCKING TO MAKE CERTAIN THE GRIEVANTS WERE NOT CHANGING. THIS ACTION WAS INAPPROPRIATE AND THE UNION DEMANDS A LETTER OF APOLOGY BE WRITTEN TO THE GRIEVANTS. THE UNION ALSO REQUESTS AN INTERNAL INVESTIGATION BE PERFORMED AND THE WRITTEN RESULTS BE GIVEN TO THE GRIEVANTS

Employee Signature

Noted by Steward R. Conroy

Company Copy

**ProvGas**
A ProvEnergy Company

December 15, 1999

To: Raymond Conroy, President Local 12431, USWA

From: Bud Butler

Re: Response to 12/6/99 Grievance (C. Stamp/C. Petrarca)

When management received the written complaint on September 1, 1999 an internal investigation commenced immediately. The management was unable to speak directly with Ms. Stamp due to her being on sick leave; Ms. Petrarca would not speak to us without Ms. Stamp being present.

Ms. Stamp returned to work from sick leave on Wednesday, December 1, 1999. On Monday, December 13, 1999 I requested a meeting with Ms. Stamp and her union steward so that we may continue our internal investigation. On Tuesday, December 14, 1999 the union steward informed me that Ms. Stamp would not meet with management to discuss the incident; therefore management considers the matter closed.

The management did perform an internal investigation to the best of its ability under the circumstances stated above. Upon conclusion of the investigation management has determined that an apology is not warranted.



Providence Gas Company 100 Weybosset Street, Providence, RI 02903 tel 401 272-5040

ONSITE

4/23/01

Christine Stamp v The Providence Gas Company
RICHR # 00 ESE 151-40/06

Carol Petrarca v Providence Gas Company
RICHR # 00 ESE 158-02/06

This investigator conducted an onsite at 100 Weybossett Street. The Providence Gas Company facility where the above Complainants charge that they were discriminated against based on their sex in that their supervisor barged in to their ladies locker room with out knocking ad berated them. Respondent claims that it was not designated a ladies locker room. I entered and observed 2 locker rooms next to each other. The locker room on the left had a sign stating it was the ladies locker room. (See photo 1) The locker room to the right had no sign. Mr. Butler denied that he had any knowledge that either of these rooms were designated locker rooms. (See Respondent's position paper) The ladies locker room had lockers in it.

See witness statement from Miriam A. Comeau. She states that since her employment in 1989, the room in question was designated the ladies locker room.

Tina McClintock
4/23/01


KEEP OUT
MAINTENANCE
PERSONNEL
ONLY!
WOMEN'S
LOCKER ROOM
DO NOT ENTER
WOMEN ONLY





4/23/01

TILLINGHAST LICHT PERKINS SMITH & COHEN, LLP

FEB 5 - 2001

Lori Caron Silveira
Direct Dial: (401) 456-1263
E-Mail: lsilveira@tlslaw.com

*Attorneys At Law*
TEN WEYBOSSET STREET
PROVIDENCE, RI 02903-2818
401.456.1200 FAX 401.456.1210
www.tlslaw.com

February 2, 2001

Tina Marie Christy
Senior Compliance Officer
Rhode Island Commission for Human Rights
10 Abbott Place Park
Providence RI 02903-3768

RE: Carol Petrarca v. Providence Gas Company
RICHR #00 ESE 158-02/06
EEOC No. 16JA00078

Dear Ms. Christy:

Please accept this letter as the Statement of Position of the Respondent, Providence Gas Company ("Providence Gas") in response to the allegations of gender discrimination contained in the above-referenced complaint filed by Carol Petrarca ("Complainant"), a former employee.

First, Providence Gas submits that Complainant's vague allegations regarding "harassment", as well as "favoritism" of males in unspecified privileges of employment, fail to even establish a *prima facie* case of gender discrimination. Among other things, she fails to articulate any facts demonstrating that she was treated less favorably in the material terms and conditions of her employment than similarly-situated male employees and that sufficient evidence exists from which a causal connection between gender and the alleged acts of Respondent can be found. Finally, the Company denies Complainant's allegations.

Further, while Complainant does not identify her alleged attempts to resolve "the matter" with Providence Gas management, assuming she is referring to an internal complaint that she made in August 1999 regarding her supervisor, Ed Bolduc, Providence Gas responds as follows:

By way of overview, Complainant was employed in the Facilities Maintenance Department at the Company's Weybosset Street facility in Providence. In that facility, a room on the basement level was, at times, used by Complainant and Christine Stamp, a female co-worker, for unclear purposes. No such room was utilized by the male



ONE BEACON STREET
BOSTON, MA 02108-3106

1001 PENNSYLVANIA AVENUE, N.W., SUITE 450N
WASHINGTON, DC 20004
202.789.8787 FAX 202.789.4242

TILLINGHAST LICHT PERKINS SMITH & COHEN, LLP



employee with whom they worked in the department. Rather, other areas including a large restroom--which could be locked from the inside--and a break area, were available for all Facilities Maintenance personnel.

Nevertheless, Complainant and Ms. Stamp's internal complaint in August 1999 to their union representative, and then Human Resources personnel, essentially alleged that Mr. Bolduc had "barged" into their "locker" room on August 20, 1999, while they were on break, and made unspecified "unnecessary comments" about their job performance that were allegedly not made to the male Facilities Maintenance employee. A subsequent investigation by management, including Henry A. Butler, Director of Labor Relations, revealed that Mr. Bolduc had been unable to locate Ms. Stamp, who was assigned to a particular project on the roof, for a significant time and beyond her break period. Upon passing the subject room, Mr. Bolduc heard the voices of Ms. Stamp and Complainant. As the door was ajar, he entered and observed Ms. Stamp doing a crossword puzzle and Complainant talking to her. Accordingly, he simply told them both that they had exceeded their break time and to return to work.

Moreover, while the room in question was not designed to be a "locker" room for the female maintenance employees (nor needed as such), management subsequently allowed Complainant and Ms. Stamp to so designate it. Further, no subsequent complaints were made to management regarding this room or Mr. Bolduc.

Similarly, no additional or specific information has been provided by Complainant regarding the alleged "unnecessary comments" about her job performance. Indeed, she refused to provide any additional details at all. Further, even assuming, *arguendo*, that any comments about work performance were made, mere comments on such issues alone obviously do not rise to the level of an adverse employment action. More importantly, in her complaint, Complainant has provided nothing but conclusory allegations and speculation regarding any alleged actions, none of which create any inference whatsoever of gender discrimination.

Finally, in October 1999, Complainant began a leave due to a non-work related accident. During that leave, management became aware that she was wrongfully receiving sick leave benefits in excess of that to which she was entitled under the applicable Collective Bargaining Agreement ("CBA"), which required that any such benefits be reduced by Rhode Island Temporary Disability Insurance ("TDI") benefits. (See Sick Benefits clause attached as composite Exhibit "A"). This excess was the result of Complainant's re-approval for TDI benefits in February 2000, and failure to respond to management's repeated inquiries regarding the status of that claim. (Complainant had

advised management that her TDI benefits were exhausted in November 1999). When Complainant finally did respond to management's requests, her own documentation indicated that she had been receiving both TDI and full sick benefits (100% of hourly earnings) under the CBA for several months. Thus, after completing its investigation, including interviewing Complainant, management terminated her for cause. (See 6/8/00 termination letter attached as Exhibit "B"). Complainant subsequently elected to retire, and the Company accepted her retirement and substituted retirement for termination in its records.

For the foregoing reasons, Providence Gas respectfully requests that Complainant's complaint be dismissed. Please contact me at 456-1263 if you would like to discuss this matter further or need additional information to conclude your investigation.

Thank you.

Very truly yours,

Lori Caron Silveira

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

CAROL PETRARCA,

Plaintiff,

v.

SOUTHERN UNION COMPANY, et al,

Defendants.

C.A. No. 04-310S

**DEFENDANTS' ANSWERS TO PLAINTIFF'S FIRST SET OF INTERROGATORIES**

**INTERROGATORY NO. 1.** Please identify all persons, by name, title, and current, or last known, business and home address, who have knowledge about the allegations which form the basis of plaintiff's Complaint or which relate to the information contained in your Answer to the instant Complaint including, but not limited to, those individuals who provided information which was used in the preparation of your Answer to the Complaint, any individuals involved in any investigations relating to plaintiff, each and every individual who has knowledge about what was done to respond to plaintiff's request for production of documents, any individual who has knowledge about what files and departments were searched in response to plaintiff's request for production of documents, any individuals who, directly or indirectly, provided information to the Rhode Island Commission for Human Rights, and any individuals who provided information to you which assisted in the preparation of these answers to these interrogatories; and, for each person identified, state what he or she knows.

**OBJECTION AND RESPONSE:** Defendants object to this Interrogatory on the grounds that it is vague and ambiguous, overbroad, and unduly burdensome. Subject to and without waiver of the foregoing objections: Defendants are currently aware of the following: Henry A. Butler, former Director of Labor Relations, has knowledge regarding plaintiff's employment history, her complaint about the storage closet incident and the company's response, and the circumstances surrounding plaintiff's separation from the company. Ed Bolduc,

plaintiff's former supervisor, has knowledge regarding plaintiff's employment history, job performance, and the storage room incident.

**INTERROGATORY NO. 2.** Please set forth the date and substance of all oral and/or written communications which relate to this lawsuit and/or which relate to defendants' answer to Plaintiff's Complaint including defendants' affirmative defenses. Your answer should include, but not be limited to, any communications to, from or about plaintiff, any communications between or among defendants, any communications between defendant any persons affiliated with or working for, a union, any communications between defendants and any person from a state or federal agency, and any communications between defendant and any health care provider.

**OBJECTION AND RESPONSE:** Defendants object to this Interrogatory on the grounds that it is vague and ambiguous, overbroad, unduly burdensome, and to the extent it seeks discovery of information protected from disclosure by the work product doctrine and attorney client privilege. Subject to and without waiver of the foregoing objections, Henry Butler spoke with the plaintiff, Christine Stamp, and Ed Bolduc regarding the storage room incident. He also spoke with the investigator for the RICHR regarding plaintiff's complaint. Mr. Butler also spoke to plaintiff, her attorney, and union representatives regarding her separation from the company.

**INTERROGATORY NO. 4.** Identify each person whom you expect to call as an expert witness at trial, and for each, state the subject matter on which said expert is expected to testify, the substance of the facts and opinions to which the expert is expected to testify, and a summary of the grounds for each opinion. In addition, please identify all reports or other documents prepared by said expert.

**RESPONSE:** Defendants have not decided whether to retain an expert at this time. Defendants reserve the right to supplement their response to this Interrogatory at a later date.

**INTERROGATORY NO. 5.** For the period five years before and after plaintiff was employed by the defendants and during the time that plaintiff was employed by defendants, has any current or former employee (including plaintiff) or any applicant for employment ever alleged, insinuated, suggested, implied, stated or complained, whether or not in a lawsuit or charge of discrimination, that he or she was harassed, discriminated against, disciplined, penalized, treated unfairly, differently, or adversely based upon his or her sex? If the answer is yes, please set forth each instance in which this has happened. Your answer should include, but not limited to, the identity of all persons involved including any supervisors, managers and/or officers who have knowledge of each claim, allegation, insinuation, suggestion, implication, statements, complaints, charges, and/or lawsuits, the date, substance, status, and/or disposition of each allegation, claim, insinuation, suggestion, implication, statement, complaint, charge and/or lawsuit, the names of all complainants, respondents, plaintiffs and defendants, and where any such complaints were made, filed or are pending.

**OBJECTION AND RESPONSE:** Defendants object to this Interrogatory on the grounds that it is vague and ambiguous, overbroad, unduly burdensome, and not calculated to lead to the discovery of admissible evidence. Subject to and without waiver of the foregoing objections, Lynore Horn, Christine Stamp, Roberta Faria and Wendy Smith have made claims regarding sex discrimination/harassment.

**INTERROGATORY NO. 6.** For the period five years before and after plaintiff ceased working for defendants and during the time that plaintiff was employed by defendants, please identify (by name, current or last known business and home address and telephone number, gender, title or position, employment history with defendants and persons to whom he or she reported) all employees who have (or allegedly have): wrongfully, improperly, mistakenly, fraudulently, and/or negligently received sick leave benefits, been overpaid by defendant for any reason, owed money to defendant for any reason, wrongfully, improperly, mistakenly, fraudulently, and/or negligently received any benefits in excess of that to which he or she was entitled, received money from defendant under improper, false, and/or mistaken circumstances or pretenses, had to repay money, or make restitution, to defendant, stolen any money or property from defendant, and/or defrauded defendant in any way. Your answer should include, but not limited to, any person who was caught stealing gas.

**OBJECTION AND RESPONSE:** Defendants object to this Interrogatory on the grounds that it is vague and ambiguous, overbroad, unduly burdensome, and not calculated to lead to the discovery of admissible evidence. Subject to and without waving the foregoing objections, in addition to plaintiff, Kenneth Mace, a service technician, was terminated in 1983

for theft of natural gas (he turned his residential gas meter backwards). The company reinstated him the day of the arbitration without back pay for the six months he was out of work. He has retired.

**INTERROGATORY NO. 8.** During the period in which the plaintiff was employed and up until the present time, please set forth everything which defendant has done to prevent or alleviate sexual harassment in the workplace. Your answer should include, but not limited to, the date and substance of any communications to employees about sexual harassment, the date and substance of any training on sexual harassment, and/or the promulgation and dissemination of any sexual harassment policies or procedures.

**RESPONSE:** Defendants' sexual harassment policy, which has been in place since the 1980s, prohibits sexual harassment, explains what an employee should do if s/he believed they were being subject to sexual harassment, and provides multiple avenues of complaint. In addition to the distribution of written policies, the company's anti-discrimination and harassment policies and procedures are currently available on the intranet to all employees. Managers were charged with distributing the sexual harassment policy to their employees, and making them aware of its contents. Posters containing a comprehensive overview of labor and employment laws, including provisions on sexual harassment have been, and continue to be, displayed at each worksite.

In or about 1998, Grant Keith, the then Director of Organizational Development for Providence Gas, brought in an outside consultant to do harassment training for all supervisors, managers, and executives. Similarly, in or about 2000, Susann Mark, the then General Counsel of Providence Gas, brought in an outside consultant to do harassment training for all supervisors, managers, and executives.

Defendants conducted company wide diversity training beginning in the Fall of 2002, which included training on sexual harassment. These classes were approximately 3-4 hours in

length and were conducted primarily in small group workshop format. The company's policies and procedures were discussed and the written policies were distributed to attendees.

In the Fall of 2004, the company conducted sexual harassment training for all employees. The company's policies were distributed to attendees at these sessions.

All supervisors and managers are required to complete a comprehensive training program which includes a module on sexual harassment.

Finally, as the prevention and alleviation of sexual harassment in the workplace is an ongoing process that requires the participation of all employees, it is impossible for the company to list each and every action taken in that regard.

**INTERROGATORY NO. 9.** Did plaintiff ever speak to defendant and/or any of its current or former employees, agents and/or representatives about the manner in which she was being treated by males on the job, that she was being subjected to sexual harassment and/or discrimination, that she was having problems with any of her supervisors, that she was having problems with a co-worker and/or that she was being treated unfairly or differently on the job? If the answer is yes, please:

(a) identify all persons who have knowledge about your answer;
(b) for each person identified in your answer to 9(a), set forth everything which he or she knows.

**OBJECTION AND RESPONSE**: Defendants object to this Interrogatory on the grounds that it is vague and ambiguous, overbroad, unduly burdensome, and not calculated to lead to the discovery of admissible evidence. Subject to and without waving the foregoing objections, defendants are currently aware that those who are aware of such complaints include Ed Bolduc, Ray Conroy, Frank Devlin, Henry Butler, and Paul Cardin.

**INTERROGATORY NO. 10.** Has defendant and/or any of its current or former agents, employees and/or representatives ever spoken to any male employee about the way that he was

treating plaintiff, ever spoken to any person to determine if plaintiff was being sexually harassed or discriminated against, and/or ever spoken to any person to determine if plaintiff was being treated unfairly or adversely by any of defendant's employees? If the answer is yes, please:

(a) identify all persons who have knowledge about your answer;
(b) for each person identified in your answer to 10(a), set forth everything which he or she knows.

**OBJECTION AND RESPONSE**: Defendants object to this Interrogatory on the grounds that it is vague and ambiguous, overbroad, unduly burdensome, and not calculated to lead to the discovery of admissible evidence. Subject to and without waiver of the foregoing objections, Henry Butler spoke with Ed Bolduc in response to plaintiff's complaint about the storage room incident. In addition, Ed Bolduc called a department meeting in 1990 to discuss the policy against sexual harassment in response to a complaint by plaintiff.

**INTERROGATORY NO. 11.** During the period during which plaintiff was employed by defendant and up until the present time, has any employee failed to inform defendant that he or she was receiving temporary disability insurance ("TDI") benefits, has received an overpayment of any kind, and/or was receiving workers' compensation benefits? If the answer is yes, please:

(a) identify each person who has failed to do so;
(b) describe what happened in each instance including how the incident arose and what defendant did when it learned of each instance including whether any discipline was imposed;
(c) identify all persons who have knowledge about your answer.

**OBJECTION AND RESPONSE**: Defendants object to this Interrogatory on the grounds that it is vague and ambiguous, overbroad, unduly burdensome, and not calculated to lead to the discovery of admissible evidence. Subject to and without waiver of the foregoing objections, the only such person that defendants are aware of, other than plaintiff, is Keith Cotnoir.

**INTERROGATORY NO.12.** This interrogatory relates to a document dated August 20, 2004 from Lynne Linden, Human Resources Specialist, to Christine Stamp which reads: "In an effort to insure that New England Gas Company correctly pays each employee, it is now our policy that employees send in a copy of their TDI benefit statement. Failure to contact the HR Department when filing RI TDI or failure to provide a copy of the RI TDI determination letter may result in the delay or loss of your company paid sick benefits." Please identify all persons who have knowledge about the contents of this letter including, but not limited to, why this policy was implemented including whether there had been overpayments in the past, who was involved implementing this policy, the date and substance of any previous policies relating to these issues, and what information had been given to employees in the past about any of these issues.

**OBJECTION AND RESPONSE**: Defendants object to this Interrogatory on the grounds that it is vague and ambiguous, overbroad, unduly burdensome, and not calculated to lead to the discovery of admissible evidence.

Subject to and without waiver of the foregoing objections, the following people would have knowledge of the mentioned letter and why it was created: Lynne Linden, Henry Butler, Joan Chaffee, and D'Anna Soehnge. Since at least 1991, the governing collective bargaining agreements have required that employees inform the employer when they are receiving TDI payments, and further provide that the employee will receive the difference between their regular pay and the TDI payments. When RITDI sent an employment verification report indicating that an employee had filed for TDI, Human Resources would notify payroll and the maximum TDI benefit would be deducted from an employee's pay. Prior to July 1, 2002, the amount allowed for dependents was not added into the maximum TDI amount. Adjustments would be made when an employee provided the TDI benefit statement or copies of the TDI checks. One employee, Keith Cotnoir, failed to provide the TDI statement for a prolonged period of time. (See TDI verification statement for him dated 6/25/02). Bud Butler sent an e-mail to Joan Chaffee, D'Anna Soehnge and Lynne Linden as a follow-up to a conversation on June 24, 2002 regarding this issue. Joan Chaffee sent Mr. Cotnoir a letter on 9/3/02 indicating that verification

was required for payment of correct make-up pay. (See copy of the e-mail Joan sent to Lynne Linden on 9/3/03 regarding deducting the full amount of possible TDI payments from Mr. Cotnoir's pay if the proof of TDI amount was not sent. ) Therefore, the policy reflected in the August 20, 2004 letter was in place since 2002.

**INTERROGATORY NO. 13.** During the time that plaintiff was employed by the defendant and up until the present time, please identify (by name, current and/or former business and home address, telephone number, and title or position) all persons who were involved when an employee filed for temporary disability insurance benefits ("TDI"); and, for each person identified, set forth what his or her role was.

**OBJECTION AND RESPONSE**: Defendants object to this Interrogatory on the grounds that it is vague and ambiguous, overbroad, unduly burdensome, and not calculated to lead to the discovery of admissi evidence.

Subject to and without waiver of the foregoing objections, the following people have been involved with the TDI process at New England Gas Company: Karen Hall, Lorraine Cipriano, Richard Muto, Lynne Linden, and Amanda Allan.

All of the above have been or are HR assistants. Prior to the time when Richard Muto handled TDI, beginning in September of 2000, the TDI form (Verification Reports) was sent directly to Payroll. Payroll clerks provided the last date worked and sent the form to HR to be signed and returned to TDI. Payroll clerks at this time were Mary Paquet, Lisa Pimental, and Joanne Zito. At some point after 9/2000, the HR assistant received and completed the verification reports. The names of people sent by RI TDI and the amounts reported as being received were then provided to Payroll. After Lynne Linden began handling the TDI process, RI TDI ceased to provide forms for the company to give to the employee and the employee was required to contact RI TDI directly. Beginning in 2002,

Amanda Allen and Lynne Linden have sent the letter mentioned in the above Interrogatory to employees receiving TDI.

Kathy Wall (Safety & Health Supervisor) or Natalie Pereira (Safety & Health Assistant) send a letter from Health and Safety to any employee out ill for more than three days. This letter directs the employee to contact TDI and indicates the consequence of failing to provide a copy of the determination letter to HR.

Current Payroll Clerks Mary Paquet, Juanita Dubuc, Paula Moretti and Deanna Perry receive the names of people receiving TDI and deduct the maximum amount until provided with the TDI benefit information from HR.

**INTERROGATORY NO. 14.** During the time that plaintiff was employed by defendant and up until the present time, when an employee applied for temporary disability insurance benefits ("TDI") and/or workers' compensation benefits, please identify all oral and/or written communications which defendant had with any agency or other entity responsible for processing such benefits. Your answer should include, but not be limited to, any documents defendant sent to, and/or received from, any agency or entity and any information which defendant had to provide to any such agency or entity.

**OBJECTION AND RESPONSE**: Defendants object to this Interrogatory on the grounds that it is vague and ambiguous, overbroad, unduly burdensome, and not calculated to lead to the discovery of admissible evidence. Subject to and without waiver of the foregoing objections, please see Objection and Response to Interrogatory 13. In addition, with respect to workers' compensation, a first report of injury is filed. The company's Safety Department receives medical information to check that the employee's injury is work-related and that the applicant is disabled from working. The Safety Department deals with the workers' compensation carrier.

**INTERROGATORY NO. 15.** During the time that plaintiff was employed by defendant and up until the present time, set forth the date and substance of any oral or written communications which defendant has with any of its employees (including plaintiff) about what their obligations were when applying for temporary disability insurance benefits ("TDI") and/or workers' compensation benefits. Your answer should include, but not be limited to, any communications relating to what would happen in the case of overpayments.

**OBJECTION AND RESPONSE**: Defendants object to this Interrogatory on the grounds that it is vague and ambiguous, overbroad, unduly burdensome, and not calculated to lead to the discovery of admissible evidence. Subject to that Objection, please see Objection and Response to Interrogatory 13. In addition, with respect to workers' compensation, a first report of injury is filed. The company's Safety Department receives medical information to check that the employee's injury is work-related and that the applicant is disabled from working. The Safety Department deals with the workers' compensation carrier.

**INTERROGATORY NO. 16.** During the time that plaintiff was employed by defendant and up until the present time, has defendant ever had occasion to delay, suspend, seek reimbursement for, and/or refuse to pay sick benefits for any employee? If the answer is yes, please describe each instance in which this happened. Your answer should include, but not limited to, the identity of all persons involved including the decision-makers and the employee whose sick benefits were affected, the reasons why such action was taken, and the reasons why any discipline was imposed or not imposed.

**OBJECTION AND RESPONSE**: Defendants object to this Interrogatory on the grounds that it is vague and ambiguous, overbroad, unduly burdensome, not calculated to lead to the discovery of admissible evidence, and constitutes an invasion of the privacy of third parties. Subject to and without waiver of the foregoing objections, Keith Cotnoir and Carol Petrarca.

**INTERROGATORY NO. 17.** The interrogatory relates to a letter dated June 8, 2000 from Henry A. Butler to plaintiff and the sentence on the first page which reads: "On approximately March 3, 2000, the Company received information that you had reapplied for RITDI benefits, and I sent you a certified letter requesting that you provide me with documentation showing that status of your claim." Please set forth, in as much detail as possible, how defendant learned that plaintiff has re-applied for RITDI benefits.

**RESPONSE:** Henry Butler cannot recall how he received this information. However, there is an employment verification report from RI TDI sent 2/10/00 that was returned on 2/16/00 by fax. The report requested verification that Carol's last day of work was 10/14/99. This report followed a letter dated 11/22/99 from RI TDI stating that plaintiff's TDI claim had been terminated as of 11/20/99. There is a note attached to the report of 2/10/00 indicating that Lorraine Cipriano called TDI on 2/23/00 and was told by a clerk that plaintiff would have received benefit information on 2/10/00 stating if she was eligible to collect. The clerk at TDI would not reveal the status of her most recent filing.

**INTERROGATORY NO. 18.** This interrogatory also relates to a letter referred to in paragraph 17 and the language which reads: "As a result of an investigation, an interview with you and review of available documents, the Company has decided that you knew or should have known that you were improperly receiving sick leave benefits in excess of those to which you were entitled under the Collective Bargaining Agreement. Your actions in this matter are just cause to terminate your employment effectively." Please set forth:

(a) what the "investigation" entailed including all persons involved, interviewed, and what each person said or did;
(b) what documents were reviewed and/or relied upon;
(c) what facts defendant had to support the allegation that plaintiff "knew or should have known" that she was improperly receiving sick leave benefits.

**RESPONSE:** Henry Butler called the plaintiff in to meet with him. The plaintiff may have been accompanied by a union representative. The parties reviewed documents at the meeting, including payroll stubs, which verified that plaintiff had been receiving both TDI and 100 percent of her pay from the company. The CBA provides that the company will pay the difference between what TDI pays and the employee's regular pay such that the employee will receive 100 percent of their pay while out of work on TDI. It does not allow for an employee to receive TDI benefits while also receiving 100 percent of her regular pay. Mr. Butler questioned the plaintiff about the matter. The plaintiff claimed she did not know she could not receive both

TDI benefits and 100 percent of her pay from the company. The company concluded that the plaintiff knew or should have known of the CBA provision providing for supplementation, not duplication, because it was in the CBA and because she had made a claim under the provision when her TDI claim was initially denied.

**INTERROGATORY NO. 19.** This interrogatory also relates to the letter referred to in paragraph 17. Please explain why defendant decided to terminate plaintiff as opposed to some other form of lesser discipline and why defendant could not have simply asked for restitution from plaintiff.

**RESPONSE:** The company concluded that the plaintiff knowingly took from the company money to which she was not entitled. The company believed termination was the appropriate discipline for this serious misconduct. The company sought restitution, but plaintiff stated that she no longer had the money, and could not repay.

**INTERROGATORY NO. 20.** Please identify, by name, gender, current and/or last known business and home address and telephone number, each person whose employment with defendant ceased for the same or similar reasons that plaintiff's employment ceased.

**OBJECTION AND RESPONSE**: Defendants object to this Interrogatory on the ground that it is overbroad, and is not calculated to lead to the discovery of admissible evidence. Subject to and without waiver of the foregoing objections, the company is aware of no employee whose employment terminated for the same reasons that plaintiff's employment ceased. Nor is the company aware of any employee who engaged in the same conduct as plaintiff.

**INTERROGATORY NO. 21.** Does defendant claim that it exercised reasonable care to prevent and promptly correct acts of sexual harassment in its workplace and that plaintiff failed to take advantage of any preventative and corrective opportunities provided by defendant or to

otherwise avoid harm at any time during her employment? If so, please set forth, in as much detail as possible, all facts in support of this claim.

**RESPONSE**: Yes. The defendants' policies provided multiple avenues of complaint. Plaintiff complained to Edward Bolduc of sexual harassment in 1990, which complaint was resolved at the supervisory level. She complained of sexual harassment again in 1999 with respect to Mr. Bolduc's entry into a room she occupied with Christine Stamp. That complaint was investigated and resolved. Defendants are unaware of any other complaint by plaintiff of sexual harassment.

**VERIFICATION**

D'Anna Soehnge, affirms that I am the Vice President of Human Resources of New England Gas Company, a division of Southern Union Company; that those answers in the Responses of Defendants to Plaintiff's First Set of Interrogatories of which I have personal knowledge are true; that all of the matters stated therein are not within my personal knowledge and that those matters that are not within my personal knowledge have been assembled by authorized employees, agents, and representatives of Defendant, and I am informed that those facts are true. I verify under penalty of perjury that the foregoing is true and correct. Executed on 16 day of August, 2005. Providence, Rhode Island.

D'Anna Soehnge

DEFENDANTS,

SOUTHERN UNION COMPANY AND
NEW ENGLAND GAS COMPANY,
By its attorneys,

HOLLAND & KNIGHT LLP

Neal J. McNamara #4249
Robert J. Crohan Jr. #6516
One Financial Plaza – Suite 1800
Providence, RI 02903
Tel. (401) 751-8500
Fax. (401) 553-6850

CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 16th day of August, 2005 a copy of the foregoing was mailed to:

Patricia E. Andrews, Esq.
Carly B. Iafrate, Esq.
170 Westminster Street, Suite 601
Providence, RI 02903

# 2981583_v1

TDI-121C (Rev.7/98)

RHODE ISLAND DEPARTMENT OF LABOR AND TRAINING

TEMPORARY DISABILITY INSURANCE DIVISION

P.O. Box 1028 Providence, RI 02901-1028

TELEPHONE (401)222-3625 HEARING IMPAIRED (401)222-1203

11/22/99

CAROL A PETRARCA
592 PIPPIN ORCHARD
RD
CRANSTON, RI 02921

SSN: 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-00-2

# NOTICE OF TERMINATION OF BENEFITS

Your TDI claim has been terminated as of 11/20/99 because you have received the maximum entitled amount of benefits $ 9093 allowed on your claim. The benefit year on this claim ends 01/01/00 .

If you have not returned to work and have not recovered as of 01/02/00 , you should file another claim on that date or as soon as possible after that date. We will then be able to determine whether you have enough earnings to qualify for a new benefit year.

Answers to any questions you might have concerning this notice may be found in your blue pamphlet entitled "YOUR BENEFIT RIGHTS" that came with your TDI APPLICATION, or you may call our information line at (401)222-3625.

Providing you with prompt, efficient and courteous service is very important to us. We hope that we have helped you during your period of disability. If you have comments regarding the service you received or suggestions for improvement, please send them to:

CUSTOMER RELATIONS
TEMPORARY DISABILITY INSURANCE
P.O. BOX 1028
PROVIDENCE, RI 02901-1028

IF YOU WISH TO APPEAL THIS TERMINATION, YOU MUST DO SO WITHIN 15 DAYS OF THE MAILING DATE SHOWN ABOVE. YOUR APPEAL SHOULD BE IN WRITING AND MAILED TO THE ADDRESS SHOWN AT THE TOP OF THIS LETTER. BE SURE TO INCLUDE YOUR NAME, SOCIAL SECURITY NUMBER, AND THE REASON FOR YOUR APPEAL.

RHODE ISLAND DEPARTMENT OF LABOR AND TRAINING

# TEMPORARY DISABILITY INSURANCE DIVISION

P.O. Box 1028 Providence, RI 02901-1028

TELEPHONE (401)222-3639 FAX (401)222-1203

# EMPLOYMENT VERIFICATION REPORT

PROVIDENCE GAS
ATTN: PAYROLL
100 WEYBOSSET
PROVIDENCE, RI 02903

Date: 02/10/00

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-01-1
CAROL A PETRARCA

**The person named above has filed a claim for Temporary Disability Insurance benefits. Please provide the information requested and return this form within seven work days. The law provides for a $25 penalty for late response.**

1. The claimant has informed us that his/her last day of work was: 10/14/99
   If your records agree with date provided by claimant, please check here: ☒
   If your records show a different last day of work, please give your date: ____________
2. If the claimant stopped working for any reason other than illness or injury, please tell us the reason (for example: on layoff, discharged, quit, retired, etc.)
   ____________
   ____________
3. If claimant returned to work following this period of disability, give return date: ____________
4. If claimant has alleged to you that his/her disability might be work related, please give the name and address of your Workers' Compensation insurance carrier:
   ____________
   ____________

If you have any questions concerning the completion of this form, please call: (401)222-3639.

| Joanne Cipriani | HR Asst | 272-5040 X3448 | 2-16-00 |
|---|---|---|---|
| NAME (print or write clearly) | TITLE | TEL# (incl Ext.) | DATE |

*** YOU MAY RETURN THIS FORM BY FAX (401)222-1203 OR BY MAIL ***

Called TDI 2/23 @ 3:30pm

Clerk said Carol would have received benefit info on 2/10/00 stating whether or not she is eligible to Allied.

TDI will not reveal the status of her misd record filing

Spoke w/ Bird. How chance we hardly

# EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

PERSON FILING CHARGE
Petrarca, Carol A

THIS PERSON (check one)
[X] CLAIMS TO BE AGGRIEVED
[ ] IS FILING ON BEHALF OF ANOTHER

DATE OF ALLEGED VIOLATION
*Earliest* 08/20/1999 *Most Recent* 08/20/1999

PLACE OF ALLEGED VIOLATION
Providence, RI

EEOC CHARGE NUMBER
16JA00078

FEPA CHARGE NUMBER
00ESE158-02/06

Mr. James Dodge
President
The Providence Gas Company
100 Weyboseet Street
Providence, RI 02903

## NOTICE OF CHARGE OF DISCRIMINATION IN JURISDICTIONS WHERE A FEP AGENCY WILL INITIALLY PROCESS

*(See attached information sheet for additional information)*

YOU ARE HEREBY NOTIFIED THAT A CHARGE OF EMPLOYMENT DISCRIMINATION UNDER

[X] Title VII of the Civil Rights Act of 1964
[ ] The Age Discrimination in Employment Act of 1967 (ADEA)
[ ] The Americans with Disabilities Act

HAS BEEN RECEIVED BY

[ ] The EEOC and sent for initial processing to ______________ *(FEP Agency)*

[X] The R I Commission For Human Rights *(FEP Agency)* and sent to the EEOC for dual filing purposes.

While EEOC has jurisdiction (upon the expiration of any deferral requirement if this is a Title VII or ADA charge) to investigate this charge, EEOC may refrain from beginning an investigation and await the issuance of the Agency's final findings and orders. These final findings and orders will be given weight by EEOC in making its own determination as to whether or not reasonable cause exists to believe that the allegations made in the charge are true.

You are therefore encouraged to cooperate fully with the Agency. All facts and evidence provided by you to the Agency in the course of its proceedings will be considered by the Commission when it reviews the Agency's final findings and orders. In many instances the Commission will take no further action, thereby avoiding the necessity of an investigation by both the Agency and the Commission. This likelihood is increased by your active cooperation with the Agency.

[X] As a party to the charge, you may request that EEOC review the final decision and order of the above named Agency. For such a request to be honored, you must notify the Commission in writing within 15 days of your receipt of the Agency's final decision and order. If the Agency terminates its proceedings without issuing a final finding and order, you will be contacted further by the Commission. Regardless of whether the Agency or the Commission processes the charge, the Recordkeeping and Non-Retaliation provisions of Title VII and the ADEA as explained in the "EEOC Rules and Regulations" apply.

For further correspondence on this matter, please use the charge number(s) shown.

[ ] An Equal Pay Act investigation (29 U.S.C. 206(d)) will be conducted by the Commission concurrently with the Agency's investigation of the charge.

[X] Enclosure: Copy of Charge

BASIS OF DISCRIMINATION
[ ] RACE [ ] COLOR [X] SEX [ ] RELIGION [ ] NAT. ORIGIN [ ] AGE [ ] DISABILITY [ ] RETALIATION [ ] OTHER

CIRCUMSTANCES OF ALLEGED VIOLATION

See enclosed Form 5, Charge of Discrimination.

| DATE | TYPED NAME/TITLE OF AUTHORIZED EEOC OFFICIAL | SIGNATURE |
|---|---|---|
| 03/01/2000 | Robert L. Sanders<br>Director | |

EEOC FORM 131-A (Rev. 06/92)

RESPONDENT'S COPY

This form is affected by the Privacy Act of 1974; See Privacy Act Statement before completing this form.

[X] FEPA 00 ESE 158-02/06
[ ] EEOC 16JA00078

R I Commission For Human Rights and EEOC
*State or local Agency, if any*

| | | |
|---|---|---|
| NAME *(Indicate Mr., Ms., Mrs.)* Ms. Carol A. Petrarca | | HOME TELEPHONE *(Include Area Code)* (401) 943-4702 |
| STREET ADDRESS 592 Pippin Orchard Road, | CITY, STATE AND ZIP CODE Cranston, RI 02921 | DATE OF BIRTH 05/18/1941 |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME *(If more than one list below.)*

| | | |
|---|---|---|
| NAME The Providence Gas Company | NUMBER OF EMPLOYEES, MEMBERS Cat D (501 +) | TELEPHONE *(Include Area Code)* (401) 272-5040 |
| STREET ADDRESS 100 Weybosset Street, | CITY, STATE AND ZIP CODE Providence, RI 02903 | COUNTY 007 |
| NAME | | TELEPHONE NUMBER *(Include Area Code)* |
| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |

CAUSE OF DISCRIMINATION BASED ON *(Check appropriate box(es))*

[ ] RACE [ ] COLOR [X] SEX [ ] RELIGION [ ] NATIONAL ORIGIN
[ ] RETALIATION [ ] AGE [ ] DISABILITY [ ] OTHER *(Specify)*

DATE DISCRIMINATION TOOK PLACE
*EARLIEST* 08/20/1999 *LATEST*
[X] CONTINUING ACTION

THE PARTICULARS ARE *(If additional space is needed, attach extra sheet(s))*:

1. I am being subjected to discriminatory terms and conditions of employment, including harassment, by my employer, The Providence Gas Company. I have been employed for approximately ten (10) years and currently hold the position of maintenance person.

2. Respondent has offered no reason for the discriminatory treated I am forced to endure.

3. I believe I am being discriminated against on the basis of my sex (female) in that my employer has demonstrated a pattern of treating its male employees in a more favable manner than its female employees. I am continually harassed because of my sex and not allowed the same privileges as my male coworkers. My attempts to resolve the matter with management have been unsuccessful. These actions are in violation of Title VII of the Civil Rights Act of 1964, as amended and applicable state law.

RECEIVED
FEB 25 2000
R.I.C.H.R.

I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or telephone number and cooperate fully with them in the processing of my charge in accordance with their procedures.

NOTARY - (When necessary for State and Local Requirements)

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.

I declare under penalty of perjury that the foregoing is true and correct.

SIGNATURE OF COMPLAINANT
X Carol A. Petrarca

SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (Month, day and year) 2/23/2000
Eileen Grosick

Date X 2-23-00 X Carol A. Petrarca
Charging Party (Signature)

Notary: Eileen Grosick
MY COMMISSION EXPIRES 1/28/01

EEOC FORM 5 (Rev. 07/99)

ProvGas
A ProvEnergy Company

March 8, 2000

Joanne L. Goulet
EEOC Project Director
State of Rhode Island
Commission for Human Rights
Ten Abbott Park Place
Providence, Rhode Island 02903-3768

Re: RICHR # 00 ESE 158-02/06 EEOC No. 16JA00078
Carol A. Petrarca v. The Providence Gas Company

Dear Ms. Goulet:

Set forth below is The Providence Gas Company's ("Respondent") answer to the charge in the above-referenced matter:

1. Admit that Petitioner has been employed approximately ten (10) years in a full time capacity; current position is Facility Maintenance Person, Class A. Respondent denies knowledge or information sufficient to form a belief as to the truth of the other allegations contained in Paragraph 1 of the Charge.
2. Respondent denies knowledge or information sufficient to form a belief as to the truth of the other allegations contained in Paragraph 2 of the Charge.
3. Respondent denies knowledge or information sufficient to form a belief as to the truth of the other allegations contained in Paragraph 3 of the Charge.

The Respondent declines to file a position statement at this time and reserves the right to file a statement at a later date.

Very truly yours,

Susann G. Mark
Vice President, General Counsel
and Corporate Secretary

SGM:ac
cc: C. Petrarca
**BY CERTIFIED MAIL P 224 431 577,**
**RETURN RECEIPT REQUESTED**

\\PROVGAS\VOL1\USERS\SHARED\LEGAL\WP\SGM\Employment Matters\Ltr-RICHR re C. Petrarca.doc



**Providence Gas Company** 100 Weybosset Street. Providence. RI 02903 tel 401 272-5040

**ProvGas**
A ProvEnergy Company

March 3, 2000

CERTIFIED MAIL P 224 431 411
RETURN RECEIPT REQUESTED

Carol Petrarca
592 Pippin Orchard Road
Cranston, RI 02921-3603

RE: TEMPORARY DISABILITY INSURANCE

Dear Carol:

Our Payroll Department informed Human Resources that your temporary disability insurance benefits expired as of November 20, 1999. You have been receiving your gross pay since this date.

Human Resources has been notified by Temporary Disability that on February 10, 2000, you filed a subsequent claim due to a new benefit year. Could you please provide Human Resources with documentation showing the status of your most recent claim.

If you should have questions, please contact me at 272-5040, extension 2226. Thank you for your assistance.

Very truly yours,

Henry A. Butler
Director of Labor Relations

LC

ProvGas
A ProvEnergy Company

April 13, 2000

Ms. Carol A. Petrarca
592 Pippin Orchard Road
Cranston, R I 02921-3603

Dear Ms. Petrarca:

You have been absent from work since October 15, 1999 due to a non-work related disability. In accordance with Article X Sec 1 of the Basic Agreement you have received a benefit allowance of 100% of your basic hourly earnings (maximum 40 hours) due to the fact you were ineligible to receive RITDI. The Basic Agreement states that benefit allowances shall be paid for a maximum of one hundred thirty (130) regularly scheduled work days; therefore your benefits will cease to be paid effective Tuesday, April 18, 2000.

Also, several weeks ago we received information indicating you had re-applied for RITDI benefits. We sent you a written request asking for verification of this information and you have not responded. Please advise ASAP as to the status of your re-application for RITDI. Please provide us with documentation indicating the status of your claim. If your application was approved please be sure the documentation you provide indicates the date benefits became effective.

Please continue to provide us with status reports from your treating physician so that we may continue to assess your disability status.

If you have any questions please call me at 272.5040, ext. 2226.

Sincerely,

Henry A. Butler
Director of Labor Relations

000107

ProvGas
A ProvEnergy Company

CERTIFIED MAIL Z 087 816 295

April 24, 2000

Ms. Carol A. Petrarca
592 Pippin Orchard Road
Cranston, R I 02921-3603

Dear Ms. Petrarca:

On April 13, 2000 I sent you a letter advising that your sick benefit allowance was being terminated, in accordance with the Basic Agreement, as of Tuesday, April 18, 2000. Also, I requested from you an update with regard to your re-application several weeks ago for RITDI benefits. As of this date I have not had a response.

This is the third request for you to provide me with written documentation indicating if your application for RITDI benefits was approved and if so the effective date they commenced. Should you continue to fail to respond I will refer the matter to our legal department for appropriate disposition of the matter.

Sincerely,

Henry A. Butler
Director of Labor Relations

ProvGas
A ProvEnergy Company

May 17, 2000

Carol A. Petrarca
592 Pippin Orchard Road
Cranston, R I 02921-3603

Dear Ms. Petrarca:

On approximately November 23, 1999 you provided the company with documentation from R I Department of Labor and Training indicating that your TDI claim had been terminated effective November 20, 1999. You also inquired as to whether you would receive your 100% basic hourly earnings, in accordance with the contract, as a result of the termination of your TDI benefits. The answer to your question was yes you would.

On March 3, 2000 I sent you a letter requesting you provide Human Resources with documentation indicating the status of a claim for benefits you made with RITDI on February 10, 2000. You did not provide the requested documentation and another written request was sent to you on April 13, 2000, again you did not provide the documentation. A third letter was sent on April 24, 2000, again asking for documentation with a warning that failure to respond would result in the matter being forwarded to our legal department.

On May 10, 2000 I received the requested documentation indicating your claim of February 10, 2000 had been approved. The records provided indicate that you received your first check dated 03/08/00 in the amount of $1461.00. The record would appear to indicate that you received TDI benefit payments in the amount of $487.00 per week from RITDI from February 14, 2000 through April 15, 2000, which is the date your sick benefits from ProvGas terminated due to you receiving the allowed maximum. You should have known in accordance with the contract your sick benefits from ProvGas during the period February 14th through April 15th should have been 100% of your basic hourly earnings <u>less</u> the RITDI benefits you were eligible for and subsequently received.

It would appear that you intentionally failed to inform the company when you were notified your claim had been approved and you subsequently began receiving RITDI benefits when also receiving full sick benefits in the amount equal to 100% of your basic hourly earnings from the company.

The known facts in this matter are very disturbing and require further investigation. At this time your employment status with Providence Gas is being listed as <u>suspended</u> with further discipline possible, up to and including discharge, upon completion of our investigation.

If you have any questions with regard to this matter I suggest you speak with your union representatives or call me at 272-5040, ext. 2226.

Sincerely,

Henry A. Butler
Director of Labor Relations

CC: Raymond Conroy, President Local 12431, USWA
Personnel File

May 23, 2000

Memo to File/ 5:00 pm

Prepared by Bud Butler

Received a call from Mr. Van Deusen on Monday, May 22, 2000 stating he was representing Ms. Petrarca and requesting I return his call. I called him at approximately 4:15 pm on May 22, 2000 and left a message.

Mr. Van Deusen returned my call on May 23, 2000 in the am again requesting I return his call.

I called Mr. Van Deusen at approximately 4:10 pm on Tuesday, May 23, 2000. Mr. Van Deusen stated to me that he has represented Ms. Petrarca for about 15 years and he was representing her in this matter. He stated it was his understanding " his client had double –dipped and what did she need to do to resolve it." He continued " his client would be willing to make restitution for the double-dipping to have the problem go away." I suggested we could make it go away by her resigning. He laughed and said, " that's a great rejoinder." I then stated that I didn't think that was the answer he expected and he agreed. He continued to suggest restitution as a resolution and again made the statement he understood she "double-dipped" by receiving her full pay plus TDI payments. I then stated we were continuing our investigation and would make a final determination when it was completed. I explained to him the facts, as I knew them beginning in October of 1999 through April 15, 2000, he did not refute the facts as stated.

I advised Mr. Van Deusen that a union represented Ms. Petrarca and he should be coordinating his activities with Ray Conroy. I also advised him we would like to speak to his client and hear her version of the events as a part of our investigation. I told him we would not take further action until we had completed the investigation.

June 6, 2000

Met with Ray Conroy, Paul Cardin, Carol Petrarca, Ed Bolduc and Royalynne Hourihan to discuss the suspension of Carol Petrarca.

Carol did not deny that she contacted the company in November of 1999 to inquire about receiving 100% of her basic earnings due to the fact her RITDI had been exhausted. She did not deny that she sent a copy of the RITDI termination notice to the company and immediately began receiving 100% of her basic earnings.

Carol did not deny that in February of 2000 she did re-apply for RITDI and received approval on or about February 10, 2000. She did claim that she thought RITDI would notify the company that her claim had been approved and the company would automatically reduce her pay.

Carol stated that she did not know she was receiving her full pay as well as RITDI. She claimed that she did not review the direct deposit payroll statement sent to her each week. She claimed she did not balance her checkbook nor did she reconcile her bank statement. She claimed that she kept the numbers in her head.

Carol did not deny receiving the March 3, 2000 letter from me that requested documentation as to the status of her most recent claim. She did claim that she called me twice and left messages in response to the letter; I responded that I called her three times to no avail.

When asked why she did not call another management employee (HR or Payroll) she claimed that she called Paul Cardin, her union steward. I asked Paul Cardin if this was true and he affirmed it was. When asked what he told Carol his reply was " I told her you can't collect TDI and your full pay."

Ms. Petrarca continued to maintain that she didn't know she was receiving her full pay and that she had attempted to call me without success. She acknowledged receiving two more letters and discussing it with Ray Conroy who contacted me to discuss the matter. On approximately May 9, 2000 the documents were provided.

**Butler, Bud**

**From:** Butler, Bud
**Sent:** Thursday, September 14, 2000 6:16 PM
**To:** Paquet, Mary; Zito, Joanne; Pimental, Lisa; Chaffee, Joan
**Subject:** Carol Petrarca

Please be advised that Carol Petrarca will not be entitled to her accrued vacation pay. Carol owes ProvGas $4383. for overpayment of sick benefits this year. According to our records she is entitled to 184 hours of vacation and holiday pay which amounts to $4303 which means she owes the company an additional $80.

Carol will be requesting retirement and will not be an active employee, therefore, when closing out her file DO NOT pay her vacation and holiday allowance per an agreement we have with the union.

If you have any questions, please call me at ext. 2226.

ProvGas
A ProvEnergy Company

June 8, 2000

Certified Mail Z 087 816 301

Ms. Carol A. Petrarca
592 Pippin Orchard Road
Cranston, R I 02921-3603

Dear Ms. Petrarca:

On Tuesday, June 6, 2000, I met with you and your union representatives to discuss a very serious matter that came to the attention of the Company on March 1, 2000.

On approximately October 15, 2000, you became disabled from work due to a non-work related injury, and the Company commenced paying you a sick benefit allowance in accordance with the Collective Bargaining Agreement. This benefit was less than your basic earnings because you were also receiving RITDI. On approximately November 23, 1999, you notified the Company that your RITDI benefits had been exhausted and, in accordance with the Collective Bargaining Agreement, the Company commenced paying you 100% of your basic earnings. On approximately March 3, 2000, the Company received information that you had re-applied for RITDI benefits, and I sent you a certified letter requesting that you provide me with documentation showing the status of your claim. If your new claim for RITDI were approved, the Collective Bargaining Agreement clearly states that your sick benefit allowance would be reduced by the amount of the RITDI benefit.

Due to the fact you failed to provide the documentation requested in the letter dated March 3, 2000 and in a second letter dated April 13, 2000, the Company paid you a sick benefit allowance of 100% of your basic earnings until they were exhausted on April 15, 2000, an amount substantially in excess of what you were entitled to receive under the Collective Bargaining Agreement. On April 24, 2000 I sent you a third letter requesting the same documentation. You eventually provided the documentation to me on May 9, 2000.

The records you sent to me on May 9, 2000 and other information from RITDI indicate that you were notified in writing of approval of your claim on February 10, 2000, and that your RITDI benefits in the amount of $487.00 per week commenced on February 14, 2000 and continue as of this date.

As a result of an investigation, an interview with you and review of available documents, the Company has decided that you knew or should have known that you were improperly receiving sick leave benefits in excess of those to which you were entitled under the Collective Bargaining agreement. Your actions in this matter are just cause to terminate your employment effective immediately.

Sincerely,

Henry A. Butler
Director of Labor Relations

CC: Raymond Conroy, President Local 12431, USWA
Paul Cardin
Royalynn Hourihan, V P Human Resources
Harry Bishop
Ed Bolduc
✓ Personnel File

Number

# GRIEVANCE REPORT

**U.S.W.A., District 1, Local 12431**

PROVIDENCE GAS COMPANY

Name CAROL PETRARCA Date 6-12-00

Department FACILITIES MAINTENANCE Division DOWNTOWN

*Nature of Grievance*

The company has discharged Carol Petrarca without just cause. The union demands her immediate re-instatement.

Employee Signature

Noted by Steward R. Conroy

Company Copy

ProvGas
ProvEnergy Company

September 22, 2000

Sent by Certified Mail No. 7099 3400 0005 6336 3307

Ms. Carol A. Petrarca
592 Pippin Orchard Rd.
Cranston, R I 02921

Re: Retirement Request

Dear Ms. Petrarca:

We are in receipt of your letter applying for retirement from Providence Gas Company effective September 30, 2000.

Please be advised under the terms of the Collective Bargaining Agreement you will receive health care benefits but not dental care benefits. Also, when a retired employee reaches the age of 65 they are enrolled in the United Health Care Medicare Complete Plan with reimbursement to the employee subject to a maximum of $90.00 per month. In the event this plan is no longer available when you reach age 65, the Company reserves the right to select an alternative.

The Company is agreeing to your request to retire under the terms stated above as part of an agreement to resolve a grievance and to cancel a scheduled arbitration hearing to determine if just cause exist for termination of your employment due to misconduct.

Sincerely

Henry A. Butler
Director of Labor Relations

CC: Robert E. Savage
Patrick Egan

**AFFIDAVIT OF CARL SACCOCCIO**

I, Carl Saccoccio, being under oath, do hereby depose and say:

1. I have been employed by the Defendants and their predecessors (hereinafter, "Gas Company") for about seventeen years, currently serving as Customer Service Representative.

2. I am a male.

3. In or about December 15, 2005, I was injured on the job, causing me to have to take time out of work until about May, 2006.

4. I received Worker's Compensation benefits as a result of said injury.

5. I also received "sick pay benefits" pursuant to the Gas Company's agreement with my Union. The Gas Company's "sick pay benefits" permitted an employee out of work due to an illness or injury (whether work-related or not) to receive his or her full wages, less any amounts received by Worker's Compensation or Temporary Disability Insurance.

6. During the period I was out of work due to my injury, the Gas Company paid me my full wage, but did not deduct any sums for Worker's Compensation for a period of time, resulting in an overpayment to me of approximately $4,000.00 to $5000.00.

7. The Gas Company deducted said overpayments from my wages when I returned to work.

8. I was not disciplined as a result of having received the overpayment of "sick pay benefits."

9. I am not being represented by any attorney in this matter, including Neal McNamara, Matthew Frankel, or any other attorney from Nixon & Peabody.

________________________

Subscribed and sworn to before me this 12th day of August 2006.

________________________

Notary Public
My Commission Expires: 2/2/07

Number ~~1~~-029

GRIEVANCE REPORT

U.S.W.A., District 1, Local 12431 PROVIDENCE GAS COMPANY

Name DAN FORD Date 12-3-02

Department Customer Field Service Division PROV

Nature of Grievance

On 11/23 Dan Ford was suspended without pay for three days for falsification of his time sheet. The union feels noting Dans good past History, and years of service that this suspension is to severe.

Employee Signature [signature]

Noted by Steward [signature]

Company Copy

1. Grievance Report given to Foreman Date 12/4/02 Time

Foreman should give answer as soon as possible, but in any case within 48 hours.

Answer of Foreman

THE COMPANY CANNOT DISCRIMINATE WHEN DISCIPLINARY ACTION IS INVOLVED. POLICY DEFINES THE REQUIRED DISCIPLINE TO BE ADMINISTERED IN THIS MATTER.

Signature of ~~Foreman~~ MANAGER R.A. Tardie Date 12/9/02 Time 13:00

Satisfactory Yes ___ No ___ Employee ___ Shop Steward ___

2. Meeting with Department Head

Consideration requested by ___ Date ___ Time ___

Department Head should arrange meeting as soon as possible, but in any case within 4 days after request for meeting.

Date of Meeting ___ Time ___

Department Head should give answer as soon as possible, but in any case not later than 48 hours after meeting is held

Answer of Department Head

Signature of Department Head ___ Date ___ Time ___

Satisfactory Yes ___ No ___ Employee ___ Shop Steward ___

3. Management-Grievance Committee Meeting Date 3/05/03 Time 2:30

THE COMPANY WILL REDUCE THE SUSPENSION TO ONE DAY WITHOUT PAY. THE LETTER + SUSPENSION WILL BE REMOVED FROM THE FILE IF THERE ARE NO FURTHER INCIDENTS FOR ONE YEAR FROM THE TIME OF THE INCIDENT.

Company Representative Bud Butler

Union Representative ___

**ProvGas**
A ProvEnergy Company

January 5, 2000

Mr. John McHugh
25 Sweet Meadow Drive
North Kingstown, RI 02852

Dear Mr. McHugh:

This letter is to confirm my meeting today with you, your Union steward, Henry Butler, Brian Hunt, and Frank Devlin.

On Tuesday, January 4, 2000, you falsified your timesheet by logging in one hour of overtime that you did not work. Falsifying a timesheet is a form of theft.

As a result of your actions, you will receive a three-day suspension, beginning on Thursday, January 6, 2000. You will return to work on Tuesday, January 11.

Any future incidents of this nature will be subject to further disciplinary action up to and including termination.

Very truly yours,

R F Maloney

Robert F. Maloney
Director
Customer Field Services

Cc: R. Owens
Human Resources

ProvGas

A wholly-owned subsidiary
of Providence Energy Corporation

July 30, 1997

Mr. Gerald Porter
121 Manning Street
Warwick, R I 02886

Dear Gerry:

Since March of this year you have been absent from work without authorization on several occasions. Each time you have been absent, I have discussed the seriousness of the situation with you and have received your assurance that you would take corrective action.

On Thursday and Friday of last week you were absent without authorization. On Monday, July 28, 1997 I met with you and Bud Butler to discuss the reason for your absence. Once again you assured us that you will take corrective action to resolve the problem causing your last minute unauthorized absence(s).

This letter will serve as a written warning that unauthorized absences will not be tolerated and future unauthorized absence(s) will result in disciplinary action up to and including discharge.

If you have any questions in regard to this matter please see Bud Butler or myself.

Sincerely,

Ed Bolduc
Facilities Manager

cc: Raymond Conroy
Leslie Wortman
File

001419

**AGREEMENT REGARDING JERRY PORTER**
between
Providence Gas Company and Local 12431, USWA

A meeting was held on Wednesday, November 5, 1997 with Ray Conroy, John Doyle, Henry Butler, Leslie Wortman and Jerry Porter in attendance.
The purpose of the meeting was to discuss the suspension of your employment with Providence Gas Company from October 31, 1997 thrrough November 5, 1997 and a review of your work record and attendance record over the previous eleven (11) months. It was agreed that based on your agreement to the following terms, you will be permitted to return to work:

1. Documented and verifiable certification that you are successfully attending a Drug and Alcohol Treatment Program under the direction of **Counseling and Intervention of Work.**

2. Documented and verifiable follow-up program administered by an Employee Assistance Program counselor. The counselor to be appointed by **Counseling and Intervention of Work.**

3. A signed authorization allowing medical practitioners and employee assistance counselors to release information to the company.

4. Nine (9) months perfect attendance, beginning with your return to work. Verifiable and documented illness will not be considered a violation of this provision unless such illness is the result of drug and alcohol use.

5. All vacation or Holiday requests must be made with a minimum of 48 hours notice. Notice may be waived by Department Supervision in the event of verifiable and documented emergency the employee must attend to.

Finally, your failure to agree to any one (1) of the above terms will result in the suspension of your employment with Providence Gas Company with the probability of discharge.

Jerry, we wish you every success with your Drug and Alcohol treatment program and continuing as a productive employee of Providence Gas Company. We look forward to hearing from you.

Agree:

Raymond P. Conroy
Ray Conroy
Local 12431, USWA

Leslie F. Wortman
Leslie F. Wortman
Providence Gas Company

Gerald F. Porter
Jerry Porter

Witnesses: John Doyle Henry H. Butler

Date: 4/8/98
To: File
From: Grant Keith
Re: Incident with Gerry Porter

This morning Ed Bolduc came into my office and stated that Gerry Porter was asleep in the small utility room in the cafeteria. Ed informed me that Gerry was under written warning about alcohol abuse on the job, per a signed document in his file.

Ed Bolduc attempted to contact Counseling and Intervention of Work. He was informed that information regarding Gerry could only be released to Leslie Wortman.
After consulting with Leslie Wortman on what should be done, I contacted Kathy Wall to make arrangements for Gerry to be seen at a hospital ( St. Joseph's) to test his blood alcohol level.

Ed woke Gerry up and instructed him to get dressed and meet him in my office. Gerry and Ed came into my office. I asked Gerry what happened and why was he asleep in the utility room. Gerry replied that he had gotten drunk last night. He said his wife had thrown him out of the house when she drove him to work yesterday afternoon.
Gerry said that around 9:00 p.m., after he had completed his work, but before his shift was ended, he left the building and went drinking in the downtown area. He said that the guard knew where he was. He said he let himself back into the building around 1:00 am and went into the utility room and went to sleep.

Ed and I informed Gerry that he was suspended pending further action. We told him we wanted to take him to the hospital to get a record of his blood alcohol level. When asked if he had a place to go Gerry replied that he could go home, that his wife was at work. Ed stated that he would drive Gerry home after he took him to St. Joseph's hospital for the test. I informed Gerry that we would contact him after we received the test results and had a chance to determine what the appropriate next steps would be.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

CAROL PETRARCA
VS.
SOUTHERN UNION COMPANY and
NEW ENGLAND GAS COMPANY

C.A. NO.:04-310(S)

DEPOSITION OF D'ANNA SOEHNGE, witness in the above-entitled cause, taken on behalf of the Plaintiff, pursuant to notice, before Sally Brassard, CSR, a Notary Public in and for the State of Rhode Island and Providence Plantations, at the Law Offices of Stephen M. Robinson, 155 South Main Street, Providence, Rhode Island, on June 15, 2006, at 2:30 p.m.

APPEARANCES:

FOR THE PLAINTIFF: LAW OFFICES OF STEPHEN M. ROBINSON
BY: STEPHEN M. ROBINSON, ESQUIRE
VICKI J. BEJMA, ESQUIRE

FOR THE DEFENDANTS: NIXON PEABODY, LLP
BY: NEAL J. McNAMARA, ESQUIRE

ALLIED COURT REPORTERS
115 PHENIX AVENUE
CRANSTON, RI 02920
(401) 946-5500

Saccoccia?

A. No.

Q. Okay. All right. By the way, of your own knowledge, and I will ask you what you might have found out from other people after, but of your own knowledge, have other people been allowed to repay overpayments made in salary or in some other function and not terminated, of your own knowledge?

A. I know people who have been overpaid because of a company error, overpaid on overtime or overpaid on vacation, where when the error is discovered it is deducted from the check, whether it's a company error or it's a mistake.

Q. Okay.

A. They can go both directions. It can be that the company -- that the employee is underpaid as well and they can correct that as well.

Q. Okay. So, it would be in their benefit then that you would make up whatever you didn't pay them?

A. Either way.

Q. Either way. And how frequently in your tenure at New England Gas has that occurred? I guess we're talking about the last five years.

A. Seldom.

Q. Seldom. Okay. Generally speaking, payroll does a good job?
A. Yes, they do.
Q. And when you reviewed -- you didn't personally review the files, you had Ms. Chaffee review files when answering the interrogatories?
A. Joan Chaffee and Bud Butler.
Q. And Bud Butler. Okay. So, when answering a lot of these, they were actually before your time there so you would be relying on Mr. Butler or Ms. Chaffee in their research and their history to advise you how to answer the interrogatories; is that correct?
A. Yes.
Q. Okay. All right. Did you discuss with them whether anyone else during -- let's take it back to 1990 -- during that time if anyone else had been allowed to repay overpayments or things of that sort? Was that question posed to either of those individuals?
A. Yes.
Q. And what did they tell you?
A. Whatever is in the document is what they were able to ascertain.
Q. Okay. Did you ask them if anyone else had been

terminated for receiving an overpayment from 1990 to the present?
A. I did not ask them.
Q. Are you aware of anyone else being terminated for receiving overpayments from 1990 to the present?
A. There's a name in the interrogatory, Keith Cotnoir (C-o-t-n-o-i-r), who received an overpayment and it was deducted from his payroll.
Q. And he was not terminated, he was allowed to pay it back; correct?
A. He was willing to pay it back and did right away.
Q. If Carol Petrarca had been willing to pay the money back, would she have been terminated, if you know?
MR. McNAMARA: Objection.
A. I don't know.
Q. Did you discuss that with Bud Butler?
A. No.
Q. Okay. In your -- by the way, are you responsible for -- do you have any responsibility for the administration of the Collective Bargaining Agreement or agreements in effect at the Gas Company, at New England Gas?
A. Yes.

Q. What is your responsibility there?
A. Labor Relations reports to me.
Q. So, while Mr. Butler may have the day-to-day, he would then report to you as to what is going on?
A. Yes.
Q. Okay. And from your own knowledge, do you know if the collective bargaining agreement has what's called a just cause for discipline clause in it?
A. There are several collective bargaining agreements and at least one of them has a just cause.
Q. Okay. So, with Carol Petrarca, do you recall what agreements would have governed her employment?
A. I don't know.
Q. And do you know if that agreement would have included a just cause for discipline?
A. I do not know.
Q. Okay. Are you familiar with the seven tests for termination of an employee at labor law?
A. No.
MR. McNAMARA: Objection.
Q. Okay. Are you familiar with the term, progressive discipline?
A. Yes.
Q. And what does that mean, in your mind?

MR. McNAMARA: Objection.
Q. Was there a concern within the company about not having him out meeting with the public?
A. You mean at the time that I was talking to Richard?
Q. Yes.
A. I don't know.
Q. Did you talk to anyone about this, Mr. Butler or anyone else?
A. I did. I talked to Bud Butler.
Q. Could you tell me what your conversation was with Mr. Butler on that?
A. I just asked if there was any reason that Richard was going to be -- had we made an agreement -- was there a letter that was not going to allow him to transfer at this point in time after it had been this many years.
Q. What did he tell you?
A. He said he didn't believe there was anything that was going to keep him from it. The contract said that he could based on his seniority.
Q. Did Mr. Butler advise you about these complaints that had occurred, I guess, in '99?
A. I don't recall if we had discussed them at that time.

Q. So, based upon your conversation with Mr. Butler and your conversation with Mr. Kala, you had no objection to his bidding on any position within the company he was qualified for?

A. No.

MR. ROBINSON: Okay. Mark this, please.

(Plaintiff's Exhibit 19 marked for ID.)

Q. I'm going to show you Exhibit 19 and ask if you have seen that document?

A. I don't recall.

Q. Okay. Were you apprised of the -- in the upper left-hand corner -- or, it says from Bud Butler. Do you recall if Mr. Butler or someone else apprised you of the settlement of Mr. Kala's grievance?

A. They would not have. It was in 1999. It was before I got there.

Q. But you indicated last month or a couple of months ago you had a discussion with Mr. Kala. Did this settlement of his grievance come up in any way?

A. It was a number of months ago, longer than two months, but, no, it did not. This did not come up.

MR. ROBINSON: Okay. Mark this, please.

(Plaintiff's Exhibit 20 marked for ID.)

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

CAROL PETRARCA
VS. C.A. NO.:04-310(S)
SOUTHERN UNION COMPANY and VOLUME II
NEW ENGLAND GAS COMPANY

CONTINUED DEPOSITION OF D'ANNA SOEHNGE, witness in the above-entitled cause, taken on behalf of the Plaintiff, pursuant to notice, before Sally Brassard, CSR, a Notary Public in and for the State of Rhode Island and Providence Plantations, at the Law Offices of Stephen M. Robinson, 155 South Main Street, Providence, Rhode Island, on June 19, 2006, at 2:00 p.m.

APPEARANCES:

FOR THE PLAINTIFF: LAW OFFICES OF STEPHEN M. ROBINSON
BY: STEPHEN M. ROBINSON, ESQUIRE
VICKI J. BEJMA, ESQUIRE

FOR THE DEFENDANTS: NIXON PEABODY, LLP
BY: NEAL J. McNAMARA, ESQUIRE

ALSO PRESENT: Noelle Clapham

ALLIED COURT REPORTERS
115 PHENIX AVENUE
CRANSTON, RI 02920
(401) 946-5500

responsibility as vice-president of Human Resources, are you familiar with long-term disability as a term?

A. Yes.

Q. What do you understand that to be?

A. When we have an employee today at New England Gas -- if we have an employee -- and I believe now all of our New England Gas employees have long-term disability, union and non-union. Once an employee has been off work continually for six months, then they become eligible for long-term disability or eligible to apply for long-term disability. That means that they can -- if they're disabled from work, can't perform the essential functions of their regular job, then they can collect long-term disability until they're able to return.

Q. Do you know what effect, if any, a termination of an employee would have on their ability to collect long-term disability?

A. If they're -- if they have qualified for long-term disability before their termination, then there's no effect. However, they have to be a current employee in order to collect -- in order to qualify to initiate it.

Q. So, if a person is terminated but has some disability that might qualify them otherwise for long-term disability, would they still be eligible for it after they had been terminated?
MR. McNAMARA: Objection.
Q. If you know.
A. You mean, eligible to apply?
Q. Correct.
A. You have to be an employee of the company to apply for long-term disability.
Q. Okay. So, if someone were terminated, that would cut off their ability to receive long-term disability; is that a fair statement?
MR. McNAMARA: Objection.
A. Not if they were already qualified. Not if they were already receiving it. If we have an employee who is receiving long-term disability and during the time they're receiving long-term disability the employment relationship is discontinued, that does not affect the LTD.
Q. Okay. Let's assume for a moment they have some disability but they haven't received any benefits, they haven't been qualified or any of that sort and they're terminated, do you know what impact that would have on their ability to receive

Q. And with Carol Petrarca, the communications came from Mr. Butler; is that correct?
A. I don't know that those were the only communications, the ones that came from Mr. Butler.
Q. By the way, do you know if Mr. Cotnoir ultimately was fired?
MR. McNAMARA: Objection. Asked and answered.
A. I still don't know.
Q. You still don't know, okay.
MR. ROBINSON: Mark this, please.
(Plaintiff's Exhibit 49 marked for ID.)
Q. I'm going to show you Exhibit 49 and ask if you have seen that document?
A. Excuse me.
Q. Yes.
A. I do know whether or not he was ultimately fired.
Q. Okay.
A. He ultimately stayed at work because he paid the money back, it came right back out of his check. So that was the ultimate decision.
Q. So, before we go on, I'd like to ask you a couple more on that one. Mr. Cotnoir was overpaid by the

long-term disability?

MR. McNAMARA: Objection.

A. In general terms it would disqualify them.

Q. Okay. Now, we're going to get in now to the issue of long-term disability. Excuse me, the temporary disability and the issue for which Carol was terminated.

A. Okay.

MR. ROBINSON: Mark this, please.

(Plaintiff's Exhibit 38 marked for ID.)

Q. I'm going to show you Exhibit 38 and I will take back 37 and 36 and 34. I'm going to show you a document and ask if you have seen this document before, Exhibit 38?

A. I don't recall.

Q. If you take just a moment and look at it, would you agree that it's a document that appears to be sent to Providence Gas at 100 Weybosset Street?

A. Yes.

Q. And it indicates that Carol Petrarca in October of '99 has filed a claim for TDI?

A. Yes.

Q. Okay. Can you read the person's name at the lower right-hand corner of that document?

A. Okay.

DATE: October 6, 1999

TO: Walter Zamoida

At approximately 9:35 a.m., Karen Casey transferred a call to me from the Phone Center

Donna Cabral of 19 Woonasquatucket Avenue, Providence, was calling to complain about a service tech. Her boyfriend had called previously and spoken to a supervisor in the Phone Center (she mentioned Millie Archer's name) to make a complaint about this service tech.

(I checked with Joyce Cacicia. Their procedure is that if someone wants to complain about a service tech, they try to give the call to Walter first, then Lisi or Venditelli, then Maloney.) Karen had tried to reach Walter but assumed that Dispatch was so busy no one could answer at that time. Not wanting to "dismiss" the caller, she transferred to me and asked me to see that Walter received the information.

This service tech evidently responded to a leak call at Ms. Cabral's address last week. She didn't give details but said she felt very uncomfortable and asked her boyfriend to call and request that this service tech not be allowed to return to her home. She lives alone with her five children and does not have a phone.

She claims that yesterday this service tech came to her home just to see how she was doing. Now she is really nervous. She does not want anyone to lose their job, but she definitely wants this tech spoken to. If she has business with ProvGas in the future, she would prefer either a woman or a supervisor.

She has my name and extension. She will probably call back in a few days to follow up.

K. Gudaitis

BEFORE FOUR ... TIME

ProvGas
A ProvEnergy Company

October 26, 1999

Mr. Richard Kala
12 Thurston Street
Riverside, R I 02915

Dear Mr. Kala:

This letter will confirm the fact you have been suspended for one week from 10/18/99 to 10/22/99 without pay. Also, you have been transferred to the C & M department and reclassified as a Class A laborer effective 10/25/99.

At a meeting on Monday, October 18, 1999 with your Union representative present, you were advised that a customer filed a complaint alleging you exhibited inappropriate behavior on two occasions when conducting your duties as a GSP for Providence Gas Company.

After speaking with you and the customer about the alleged incident(s) and examining other relevant information, the company has determined that the disciplinary action imposed is justified.

Sincerely,

Henry A. Butler
Director of Labor Relations

CC: Raymond Conroy, President Local 12431
Robert Maloney, Director Customer Service Field Forces
Personnel File

ProvGas
A ProvEnergy Company

## SETTLEMENT AGREEMENT

Providence Gas Company and The United Steelworkers of America, Local 12431, hereby agree to settle the grievance filed on behalf of Richard Kala on the following mutually dependent terms:

1. The union shall withdraw the grievance on behalf of Richard Kala dated October 18, 1999 with prejudice.

2. The one-week suspension without pay and the transfer of Kala to laborer shall stand.

3. Kala is ineligible to bid for any Customer Service department position posted.

4. Effective December 5, 1999, Kala shall be paid at his former GSP rate of pay (22.41 an hour). However, he shall be ineligible for a wage rate increase until the rate of pay he would be paid as a laborer or other position into which he may have successfully bid exceeds his former GSP rate of pay. In that event, Kala shall be paid at the rate of pay for the position he holds and he shall be eligible for a wage rate increase.

5. Kala must bid for every posted position for which he may be eligible which provides a wage rate range which includes a rate of pay equal to or greater than Kala's former GSP rate of pay until he is the successful bidder. In the event Kala fails to bid for such a position, his rate of pay shall be reduced to that which it would be in the position he holds considering his years of service with Providence Gas Company.

6. Kala shall not disclose the terms of this agreement to any person except his spouse. The union shall not disclose the terms of this agreement to any persons except those on the union grievance committee. Kala and the union shall tell other persons only that the matter has been satisfactorily resolved.

7. Paragraphs 1, 2 and 3 of this agreement shall be precedent setting, but paragraphs 4, 5 and 6 shall not be precedent setting.

Henry H. [signature]
Providence Gas Company

12/22/99
Dated

Raymond P. Conroy
USWA, Local 12431

12-22-99
Dated

# LAST CHANCE AGREEMENT

This Agreement is entered into this 15th day of June 2004 by and between Richard Kala ("Kala"), United Steelworkers of America Local 12431-01 (the "Union"), and New England Gas Company (the "Company").

Kala acknowledges that, as the result of a 1999 complaint alleging unprofessional conduct on his part, and the existence of a similar previous complaint, he served a one-week unpaid disciplinary suspension. Kala further acknowledges that on October 18, 1999, the Union filed a grievance on his behalf that ultimately was withdrawn pursuant to a Settlement Agreement between the Company and the Union dated December 22, 1999 (Copy attached). The Settlement Agreement provided, among other things, for Kala's transfer from his Serviceman's position in Customer Field Services to a C & M Laborer's position, and further provided that Kala would thereafter be ineligible to bid for any Customer Field Services position.

Kala has performed adequately under the Settlement Agreement for nearly five years without any disciplinary incidents, and now seeks an MC position within Customer Field Services for which his seniority makes him the successful bidder. In view of Kala's performance under the Settlement Agreement, the Company is willing to terminate the Settlement Agreement dated 12/22/99 and replace it with this Last Chance Agreement.

By executing this Last Chance Agreement, Kala and the Union agree to the following Terms and Conditions:

- Any future violations by Kala of the Company's Rules of Conduct (C-139), Harassment Policy and Procedures (C-107), or Code of Ethics Policy (Copies attached), or any acts of insubordination, will result in the immediate termination of Kala's employment without further disciplinary action.
- Intentional violations of other Company policies will result in discipline up to and including immediate termination.
- Any credible complaint by a customer, fellow employee, or member of the public alleging harassment, intimidation, or unprofessional conduct in the course of Kala's employment shall result in the immediate termination of Kala's employment without further disciplinary action. The Company's determination of the credibility of any such complaint shall be conclusive, but shall be subject to the third step grievance and arbitration process.
- Kala and the Union agree that any termination of employment under this Last Chance Agreement will be for just cause, so long as the underlying facts are established by clear and convincing evidence.
- The 12/22/99 Settlement Agreement shall terminate and be of no further force or effect, but shall be placed in Kala's personnel file to memorialize the previous discipline.

- Kala's bidding rights shall hereafter be unrestricted. subject only to the continuing obligations of this Last Chance Agreement and the Collective Bargaining Agreement between the Company and the Union as amended from time to time.
- The Company shall retain the right to introduce the 12/22/99 Settlement Agreement as evidence in any grievance arbitration whether arising out of this agreement or not.

**By his signature below, Kala acknowledges that he has read, understands, and accepts the terms of this Agreement. By signing below, the Union accepts the terms of this Agreement and affirms that the continuing disciplinary restrictions set forth herein are for just cause.**

EMPLOYEE

Richard Kala

NEW ENGLAND GAS COMPANY

Henry Butler – Director,
Employee and Labor Relations

USWA LOCAL 12431-01

Ray Lang - President

LEGAL APPROVED AS TO FORM



001389

ProvGas
A ProvEnergy Company

SETTLEMENT AGREEMENT

Providence Gas Company and The United Steelworkers of America, Local 12431, hereby agree to settle the grievance filed on behalf of Richard Kala on the following mutually dependent terms:

1. The union shall withdraw the grievance on behalf of Richard Kala dated October 18, 1999 with prejudice.

2. The one-week suspension without pay and the transfer of Kala to laborer shall stand.

3. Kala is ineligible to bid for any Customer Service department position posted.

4. Effective December 5, 1999, Kala shall be paid at his former GSP rate of pay (22.41 an hour). However, he shall be ineligible for a wage rate increase until the rate of pay he would be paid as a laborer or other position into which he may have successfully bid exceeds his former GSP rate of pay. In that event, Kala shall be paid at the rate of pay for the position he holds and he shall be eligible for a wage rate increase.

5. Kala must bid for every posted position for which he may be eligible which provides a wage rate range which includes a rate of pay equal to or greater than Kala's former GSP rate of pay until he is the successful bidder. In the event Kala fails to bid for such a position, his rate of pay shall be reduced to that which it would be in the position he holds considering his years of service with Providence Gas Company.

6. Kala shall not disclose the terms of this agreement to any person except his spouse. The union shall not disclose the terms of this agreement to any persons except those on the union grievance committee. Kala and the union shall tell other persons only that the matter has been satisfactorily resolved.

7. Paragraphs 1, 2 and 3 of this agreement shall be precedent setting, but paragraphs 4, 5 and 6 shall not be precedent setting.

Henry H. Puttt [signature]
Providence Gas Company

12/22/99
Dated

Raymond P. Conroy [signature]
USWA, Local 12431

12-22-99
Dated

Soehnge 4

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| CAROL PETRARCA,<br>Plaintiff,<br>v.<br>SOUTHERN UNION COMPANY, et al,<br>Defendants. | C.A. No. 04-310S |

**DEFENDANTS' SECOND SUPPLEMENTAL ANSWERS TO PLAINTIFF'S FIRST SET OF INTERROGATORIES**

Defendants hereby provide their second supplemental answers to Plaintiff's First Set of Interrogatories.

**INTERROGATORY NO. 1.**

Please identify all persons, by name, title, and current, or last known, business and home address, who have knowledge about the allegations which form the basis of plaintiff's Complaint or which relate to the information contained in your Answer to the instant Complaint including, but not limited to, those individuals who provided information which was used in the preparation of your Answer to the Complaint, any individuals involved in any investigations relating to plaintiff, each and every individual who has knowledge about what was done to respond to plaintiff's request for production of documents, any individual who has knowledge about what files and departments were searched in response to plaintiff's request for production of documents, any individuals who, directly or indirectly, provided information to the Rhode Island Commission for Human Rights, and any individuals who provided information to you which assisted in the preparation of these answers to these interrogatories; and, for each person identified, state what he or she knows.

**Supplemental Response:** Defendants do not have knowledge of what is known by the 16 individuals identified by the plaintiff and referenced in Defendants' previous answers. Defendants identified these persons because plaintiff identified them as persons with relevant knowledge.

P133107.2

**Further Supplemental Response:** Subject to and without waiver of the previously asserted objections, Defendants respond as follows: Defendants have already responded with respect to Butler, Bolduc, Devlin, Cardin, and Christine Stamp. With respect to the remaining individuals identified in Plaintiff's Response to Interrogatory No. 3, defendants do not know what information Steve Stamp, Richard Biber, Henry Sisson, Ken Mace, Robert Grant, Miriam Comeau, or Barbara Alderman may have with respect to the allegations in plaintiff's complaint. Lynore Horn, Gerry Porter and Maureen Morancy were co-workers of plaintiffs and would have information regarding the working conditions in Facilities Maintenance. Roy Heaton was a supervisor in Facilities Maintenance and would have information regarding working conditions there. Royalynne Hourihan was Vice President of Human Relations of Providence Gas, and may have information regarding any complaints that plaintiff may have made to Human Relations. Pat Diminocone was a co-worker of plaintiff's in maintenance, and plaintiff alleges that he showed her inappropriate pictures in the early 1990's. Alicia Goody was in house counsel for Providence Gas at times during the 1990's and would have information regarding any complaints that plaintiff may have brought to her. She is currently employed at BTU Ventures, 1000 Winter Street, 4th floor, Waltham, MA. Joseph Ianello was a co-worker of plaintiff's, and she alleges that he used vulgar language and was generally nasty towards her. Richard Kala was a co-worker of plaintiff's in maintenance. Plaintiff claims that he made inappropriate advances to her and used inappropriate language towards her.

**INTERROGATORY NO. 2**

Please set forth the date and substance of all oral and/or written communications which relate to this lawsuit and/or which relate to defendants' answer to Plaintiff's Complaint including defendants' affirmative defenses. Your answer should include, but not be limited to, any communications to, from or about plaintiff, any communications between or among defendants, any communications between defendants and any persons affiliated with, or work for, a union, any



05/19/06 16:32 FAX 4543030 NIXON PEABODY LLP 004

communications between defendants and any person from a state or federal agency, and any communications between defendant and any healthcare provider.

**Supplemental Response:** Subject to and without waiver of the previously asserted objections, Defendants respond as follows: Defendants have produced all responsive non-privileged written communications.

**Further Supplemental Response:** Defendants are unable to locate any additional responsive information.

**INTERROGATORY NO. 3**

Are defendants, or any of their current or former agents, employees and/or representatives, aware of plaintiff doing or saying anything which directly or indirectly calls into question the validity, merit, and/or sincerity of the allegations in plaintiff's Complaint and/or aware of plaintiff saying or doing anything which directly or indirectly supports any of defendants' affirmative defenses? If the answer is yes, please:

a) Identify each person who has such information;
b) For each person identified in your answer, state what information he or she has.

**Supplemental Response:** Subject to and without waiver of the previously asserted objections, Defendants respond as follows: Upon information and belief, Defendants state that plaintiff informed Henry Butler that she engaged in consensual sexual relations with Joseph Iannello while employed at the Gas Company.

**INTERROGATORY NO. 5.**

For the period five years before and after plaintiff was employed by the defendants and during the time that plaintiff was employed by defendants, has any current or former employee (including plaintiff) or any applicant for employment ever alleged, insinuated, suggested, implied, stated or complained, whether or not in a lawsuit or charge of discrimination, that he or she was harassed, discriminated against, disciplined, penalized, treated unfairly, differently, or adversely based upon his or her sex? If the answer is yes, please set forth each instance in which this has happened. Your answer should include, but not limited to, the identity of all persons involved including any supervisors, managers and/or officers who have knowledge of each claim, allegation, insinuation, suggestion, implication, statements, complaints, charges, and/or lawsuits, the date, substance, status, and/or disposition of each allegation, claim, insinuation,

suggestion, implication, statement, complaint, charge and/or lawsuit, the names of all complainants, respondents, plaintiffs and defendants, and where any such complaints were made, filed or are pending.

**Supplemental Response:** Subject to and without waiver of the previously asserted objections, Defendants respond as follows: Further information regarding the complaints made by Wendy Smith, Roberta Faria, Brenda Shanley, and Lynore Horn can be ascertained from the documents being produced in connection with Defendants' second supplemental responses to plaintiff's first request for production, bates numbers 1824 – 1904, 1995-96. Information regarding the complaint by Christine Stamp, who is represented by the same counsel as Carol Petrarca, is being produced in the Stamp litigation.

**Further Supplemental Response:** Wendy Smith and Roberta Faria both complained that they did not receive a particular job, in collections, due to sex discrimination. Neither had the requisite experience for the position. They each filed grievances and complaints with the Rhode Island Commission for Human Rights, which each subsequently withdrew. Both received trial periods as a Field Collector. Faria voluntarily returned to her former position as meter reader after one week. Brenda Shanley complained of sex discrimination. She filed an action, which was resolved.

**INTERROGATORY NO. 9.**

Did plaintiff ever speak to defendant and/or any of its current or former employees, agents and/or representatives about the manner in which she was being treated by males on the job, that she was being subjected to sexual harassment and/or discrimination, that she was having problems with any of her supervisors, that she was having problems with a co-worker and/or that she was being treated unfairly or differently on the job? If the answer is yes, please:

(a) identify all persons who have knowledge about your answer;
(b) for each person identified in your answer to 9(a), set forth everything which he or she knows.

**Supplemental Response:** Subject to and without waiver of the previously asserted objections, Defendants respond as follows: Plaintiff complained about Ed Bolduc storage room incident. Henry Butler spoke with Mr. Bolduc about the incident. Mr. Bolduc wrote a letter of apology to plaintiff and Christine Stamp, and indicated that he would knock in the future prior to entering the storage room. Plaintiff never complained about Bolduc again, and defendants believed that the matter was resolved to the satisfaction of Petrarca and Stamp.

In 1990, Petrarca complained to Mr. Bolduc that Pat Domenicone showed her nude pictures in a magazine, and made remarks to her about her relationship with another male employee. She also complained that Miriam Comeau was making remarks to her about Petrarca's friendly relationship with her department supervisor. In response, Mr. Bolduc spoke to his employees to re-explain the sexual harassment policy.

Petrarca also complained to Bud Butler about harassment by Richard Kala. Petrarca alleged that Kala propositioned her. Although Kala denied the allegation, Butler found Petrarca to be credible, and thus transferred Kala from Facilities Maintenance to Fleet Services, with a reduction in his hourly pay rate. Kala was demoted to laborer after he was found to have made inappropriate comments to a customer, and subsequently received a Last Chance Agreement based on the Petrarca and customer complaints.

**INTERROGATORY NO. 11.**

During the period during which plaintiff was employed by defendant and up until the present time, has any employee failed to inform defendant that he or she was receiving temporary disability insurance ("TDI") benefits, has received an overpayment of any kind, and/or was receiving workers' compensation benefits? If the answer is yes, please:

(a) identify each person who has failed to do so;
(b) describe what happened in each instance including how the incident arose and what defendant did when it learned of each instance including whether any discipline was imposed;

(c) identify all persons who have knowledge about your answer.

**Supplemental Response:** Subject to and without waiver of the previously asserted objections, Defendants respond as follows: Keith Cotnoir failed to provide the TDI statements for a prolonged period of time. (See previously produced TDI verification statement for him dated June 25, 2002). Bud Butler sent an e-mail to Joan Chaffee, D'Anna Soehnge, and Lynne Linden as a follow-up to a conversation on June 24, 2004 regarding this issue. Joan Chaffee sent Mr. Cotnoir a letter on September 3, 2002 indicating that verification was required to payment of correct make-up pay. (See previously produced copy of e-mail from Joan Chaffee to Lynne Linden on September 3, 2003 regarding deducting the full amount of possible TDI payments from Mr. Cotnoir's pay if the proof of TDI amount was not sent).

## INTERROGATORY NO. 20.

Please identify, by name, gender, current and/or last known business and home address and telephone number, each person whose employment with defendant ceased for the same or similar reasons that plaintiff's employment ceased.

**Supplemental Response:** Subject to and without waiver of the previously asserted objections, Defendants respond as follows: Caesar Macchioni was terminated in 1997 for falsifying time sheets and leakage survey documents. Like plaintiff, a grievance was filed with respect to the termination, and Macchioni was subsequently allowed to retire.

## INTERROGATORY NO. 22.

Has defendant (or any of its current or former agents, employees and/or representatives) ever disciplined, reprimanded, counseled, and/or spoken to any of the defendant's employees (i) because he or she swore, (ii) because he or she used language or engaged in conduct which was crude, inappropriate or offensive, and/or (iii) because of the language he or she used. If the answer is yes, please identify, by name, gender and current and/or last known business or home

address, each person who was reprimanded, counseled, disciplined and/or spoken to and set forth, in as much detail as possible, what each person did which caused them to be disciplines, reprimanded, counseled and/or spoken to.

**Supplemental Response:** Subject to and without waiver of the previously asserted objections, Defendants respond as follows: Plaintiff and Christine Stamp complained about Ed Bolduc storage room incident. Henry Butler spoke with Mr. Bolduc about the incident. Mr. Bolduc wrote a letter of apology to plaintiff and Christine Stamp, and indicated that he would knock in the future prior to entering the storage room. Plaintiff never complained about Bolduc again, and defendants believed that the matter was resolved to the satisfaction of Petrarca and Stamp.

In 1990, Petrarca complained to Mr. Bolduc that Pat Domenicone showed her nude pictures in a magazine, and made remarks to her about her relationship with another male employee. She also complained that Miriam Comeau was making remarks to her about Petrarca's friendly relationship with her department supervisor. In response, Mr. Bolduc spoke to his employees to re-explain the sexual harassment policy.

Petrarca also complained to Bud Butler about harassment by Richard Kala. Petrarca alleged that Kala propositioned her. Although Kala denied the allegation, Butler found Petrarca to be credible, and thus transferred Kala from Facilities Maintenance to Fleet Services, with a reduction in his hourly pay rate. Kala was demoted to laborer after he was found to have made inappropriate comments to a customer, and subsequently received a Last Chance Agreement based on the Petrarca and customer complaints.

In addition to the foregoing, employees may have been counseled or spoken to by their supervisors regarding such conduct without the matter being reported to higher management or human resources.

INTERROGATORY NO. 23.

Does defendant have any evidence that Ed Bolduc treated male and female employees the same? If the answer is yes, please explain your answer in as much detail as possible.

**Response:** Subject to and without waiver of the previously asserted objections, Defendants respond as follows: Defendants are not aware of facts showing that Ed Bolduc treated female employees differently than he treated male employees. To Defendants' knowledge, Mr. Bolduc made employment decisions based on legitimate non-discriminatory reasons.

INTERROGATORY NO. 24.

Has any male employee ever complained about the manner he was being treated by Ed Bolduc? If the answer is yeas, please:

(a) identify (by name, position, current and/or former business and home address, and telephone number) each person who has complained and/or has information about your answer;
(b) for each person identified, set forth the date and substance of his complaint and/or what he or she knows.

**Supplemental Response:** Subject to and without waiver of the previously asserted objections, Defendants provide the following supplemental response: Defendants are aware of no complaints made against Mr. Bolduc by male employees. However, at his deposition, employee Kenneth Schiano complained of the way that he was treated by Mr. Bolduc.

INTERROGATORY NO. 25.

Please identify (by name, position, gender, age, current and/or former business and home address, and telephone number) all persons who have applied for a cleaning and/or maintenance job and had to take a physical examination.

**Response:** Subject to and without waiver of the previously asserted objections, Defendants provide the following supplemental response: The company discontinued the requirement of pre-employment physicals sometime in early May 2002. Prior to that date, every person selected for any position, including cleaning or maintenance positions, was required to take and pass a pre-employment physical and drug screening.

**VERIFICATION**

D'Anna Soehnge, affirms that I am the Vice President of Human Resources of New England Gas Company, a division of Southern Union Company; that those answers in the Responses of Defendants to Plaintiff's First Set of Interrogatories of which I have personal knowledge are true; that all of the matters stated therein are not within my personal knowledge and that those matters that are not within my personal knowledge have been assembled by authorized employees, agents, and representatives of Defendant, and I am informed that those facts are true. I verify under penalty of perjury that the foregoing is true and correct. Executed on 19th day of May, 2006.

D'Anna Soehnge

AS TO OBJECTIONS:
DEFENDANTS,
SOUTHERN UNION COMPANY and
NEW ENGLAND GAS COMPANY,
By their attorneys,
NIXON PEABODY LLP

Neal J. McNamara #4249
Matthew J. Frankel #7293
One Citizens Plaza, 5th floor
Providence, RI 02903
Tel: 401-454-1000
Fax: 401-454-1030

P153107.2

CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 19th day of May, 2006 a copy of the foregoing was faxed and sent by regular mail to: Stephen Robinson, Vicki Bejma, Law Offices of Stephen Robinson, 155 South Main Street, Ste. 402, Providence, RI 02903 and sent to Noelle Clapham, Esq., 24 Salt Pond Road, Suite 8-A, South Kingstown, RI 02879 via regular mail, postage prepaid.

Marilyn Lowely

P133107.2

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

LYNORE HORN :
:
VS : C.A. NO: 04-4345
:
SOUTHERN UNION COMPANY :
and NEW ENGLAND GAS :
COMPANY :

DEPOSITION OF EDWARD BOLDUC, a witness in the above-entitled cause, taken on behalf of the Plaintiff, before Paula J. Campagna, a Notary Public in and for the State of Rhode Island, at the Law Office of Patricia E. Andrews, 170 Westminster Street, Providence, Rhode Island, on 08/12/2005, at 11:00 A.M.

PRESENT:

FOR THE PLAINTIFF.........LAW OFFICE OF
PATRICIA E. ANDREWS
BY: PATRICIA E. ANDREWS, ESQUIRE

FOR THE DEFENDANTS......HOLLAND & KNIGHT
BY: NEAL MCNAMARA, ESQUIRE

Also Present: Diana Sinergey

COURT ORIGINAL

ALLIED COURT REPORTERS, INC.
115 PHENIX AVENUE
CRANSTON, RI 02920
(401) 946-5500
www.alliedcourtreporters.com

Q. No maintenance duties?

A. The reason I'm pausing is, because at Dexter Street it's the time frame, the overlapping time frame that's confusing me, because we had a female worker at Dexter Street. I don't know how to answer that, because the time frame is confusing as to, you asked, who was the first female to do maintenance work. And I'm not sure if it was Sue Green at Dexter Street, or did they all become facility maintenance persons at the same time.

Q. So what you're saying is that at some point females were doing cleaning?

A. Correct.

Q. And they became facility maintenance persons?

A. That's correct.

Q. And you're saying that prior to that time, Sue Green may have been performing the duties of a facility maintenance person as well?

A. It would not have been called facility maintenance person at that time when she came. It would have been maintenance person.

Q. So in the maintenance department you had the position of cleaners?

A. That's correct.

Q. And that was filled by all females?
A. That's correct.
Q. Then you had maintenance persons; correct?
A. That's correct.
Q. Were they called maintenance persons?
A. Building maintenance, I think was the position.
Q. Were those jobs all held by males?
A. Yes.
Q. And so at some point, the building maintenance job was changed to facility maintenance?
A. Facility maintenance person.
Q. And at that point the females who were doing just cleaning also became facility maintenance persons?
A. That's correct.
Q. Tell me, when there was just the position of building maintenance, do you know why no females were performing in that position?
A. No.
Q. Were you aware of any females who sought to become building maintenance persons?
A. No.
Q. You're not aware of any who applied to be building maintenance persons?

December 15,1999

To: File

From: Bud Butler

Re: Stamp/Petrarca Harassment Complaint

Ms. Stamp returned to work from sick leave on Wednesday, December 1, 1999. Ms. Petrarca has been on sick leave since October 15, 1999 and continues to be as of this date. In September Ms. Petrarca advised me in the presence of her union steward that she would not discuss nor answer questions with regard to this matter without Ms. Stamp being present.

On Monday, December 6, 1999 I received a grievance from the President of Local 12431, USWA. The grievance requested the company investigate the complaint filed by the two aggrieved employees. On Monday, December 13, 1999 I requested Paul Cardin,union steward, to contact Ms. Stamp and advise her that I wanted to meet and discuss the complaint filed with HR on August 31, 1999. Mr. Cardin advised me that Ms. Stamp was reluctant to meet without Ms. Petrarca present but she would think about it overnight and make a decision on Tuesday, December 14, 1999.

On Tuesday, December 14, 1999, Mr. Cardin informed me that Ms. Stamp would not agree to meet with management. He stated that she told him she went to the people she needed to see to get this issue resolved. It was his opinion that she had filed a complaint with the appropriate government agencies.

On December 15, 1999 I answered the grievance.

UNITED STATES DISTRICT COURT

DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| CAROL PETRARCA | : | |
| | : | |
| VS. | : | C.A. NO.: 04-310S |
| | : | |
| SOUTHERN UNION CO. & | : | |
| NEW ENGLAND GAS COMPANY | : | |

DEPOSITION OF MAUREEN MORANCY, a Witness in the above-entitled cause, taken on behalf of the plaintiff, before Barbara Warner, Notary Public in and for the State of Rhode Island, at the offices of Stephen M. Robinson, 155 South Main Street, Providence, RI, on May 24, 2006 at 2:00 P.M.

PRESENT:

FOR THE PLAINTIFF............ LAW OFFICE OF NOELLE CLAPHAM
BY: NOELLE CLAPHAM, ESQUIRE

FOR THE DEFENDANT............ NIXON PEABODY, LLP
BY: NEAL J. MCNAMARA, ESQUIRE

ALLIED COURT REPORTERS
115 PHENIX AVENUE
CRANSTON, RI 02920
401-946-5500

INDEX


WITNESS PAGE

MAUREEN MORANCY

EXAMINATION BY MS. CLAPHAM.............. 3


EXHIBITS

NO EXHIBITS OFFERED



(DEPOSITION COMMENCED AT 2:00 P.M.)

MAUREEN MORANCY

Being duly sworn, deposes and testifies as follows:

THE REPORTER: Would you state your name and spell your last name for the record.

THE WITNESS: Maureen Morancy, M-O-R-A-N-C-Y.

EXAMINATION BY MS. CLAPHAM

Q. I am Noelle Clapham and I represent Carol Petrarca in a litigation that she has brought against the gas company. When I say the term gas company, I am referring to Southern Union Oil Company and New England Gas Company.
A. Okay.
Q. Have you ever had your deposition taken before?
A. No.
Q. I will go over a few things so that we can get out of here quickly.
A. Okay.
Q. If just one of us can talk at a time so the court reporter can take down everything we



are saying, and if you could answer verbally so that she can take down what you say because she cannot take down a nod or a gesture?
A. Okay.
Q. If you need a break, let me know. We can take a break at any time. The only thing I do ask is if you can answer any question pending before you take a break. Any time you need something or you need a break, feel free.
A. Okay.
Q. Have you taken any medication today that would impair your ability to testify truthfully?
A. No.
Q. Are you represented by counsel at this deposition?
A. Yes.
Q. Is that counsel Neal McNamara?
A. Yes, it is.
Q. And is he representing you personally in this litigation?
A. Yes.
Q. Without disclosing your actual



communications with Mr. McNamara, did you meet to prepare for this deposition with him?
A. Yes.
Q. How many times did you meet?
A. Twice.
Q. When did you meet?
A. Yesterday and maybe a week ago. I don't know the date.
Q. And about how long did you meet each time?
A. I think for an hour.
Q. Other than preparing for this deposition, had you ever met with Mr. McNamara at any other time regarding any allegations made by Carol Petrarca?
A. No.
Q. Had you ever met with any other attorneys for the gas company regarding any allegations made by Carol Petrarca?
A. No.
Q. Have you ever been a party to any other lawsuit, whether a plaintiff, the person bringing the suit, or a defendant, the person defending against the suit?
A. No.

Q. In preparation for today's deposition, did you review any documents?
A. I was given a document to review about what depositions are all about.
Q. Other than that, have you ever reviewed the complaint in this case?
A. No.
Q. Carol Petrarca's interrogatory answers?
A. No.
Q. The interrogatory answers of the gas company?
A. No.
Q. Have you ever reviewed Carol Petrarca's deposition testimony?
A. No.
Q. Do you have any knowledge of what Richard Kala testified to earlier today?
A. To me?
Q. No. Richard Kala gave a deposition earlier today. Do you have any knowledge of what he testified to in that deposition?
A. No, not offhand. But I know why he is here.
Q. I just wanted to limit it to what knowledge you had of his deposition earlier today?



A. I can't answer that. I don't know.
Q. Has anyone told you what Richard Kala said in his deposition earlier today?
A. Brief things. My lawyer did.
Q. About how long was that conversation with your lawyer?
A. A few minutes on the way down.
Q. Did you make any notes for yourself to prepare for this deposition?
A. No.
Q. Were you given any notes by any other person?
A. No.
Q. Has anyone at the gas company discussed this litigation with you?
A. No.
Q. What is your present job with the gas company?
A. Customer service.
Q. How long have you been in that job?
A. Ten years.
Q. And at some point did you work in facilities maintenance?
A. Yes. Seven years.
Q. When did you work in facilities



maintenance?
A. I started in January of 1988 part time.
Q. When did you leave?
A. When I went into customer service.
Q. Do you know when that was?
A. Ten years ago today. Not today. I think I started in April. Ten years ago April.
Q. So you left in April?
A. Yes.
Q. During your employment in facilities maintenance, did you know Carol Petrarca?
A. Yes.
Q. Did you start working there before her or did she start before you?
A. I was before her.
Q. You were already there?
A. Exactly.
Q. Did you both work at the same building at that time?
A. Yes.
Q. At Weybosset Street?
A. Yes.
Q. Did you both work the same shift?
A. Yes.



Q. Were you working first or second shift at the time?
A. Second.
Q. Do you recall when Richard Kala started his employment in facilities maintenance?
A. I don't know the year, no.
Q. But do you remember him coming and transferring into facilities maintenance?
A. Yes.
Q. Did you have any problems working with Richard Kala at all?
MR. MCNAMARA: Objection.
A. No.
Q. Did you have any conflicts with Richard Kala at all?
MR. MCNAMARA: Objection.
A. No.
Q. Did Richard Kala ever sexually proposition you or come on to you in any way?
A. Once.
Q. Can you tell me everything that you remember about that?
A. He asked me if I would have sex with him.
Q. When did that happen?

A. At work.
Q. Do you remember about how long Richard had been working there when he asked you that?
A. No.
Q. Do you remember where you were at work, where were you when he asked you that?
A. In the building downtown.
Q. Do you remember what room or what location?
A. Not offhand, no.
Q. Can you remember the exact words that he used?
A. No.
Q. But you do, you are certain that he asked you if you would have sex with him?
A. Yes.
Q. What did you tell him?
A. No.
Q. Did you report this to anyone?
A. No.
Q. Did you tell anyone else about it?
A. Carol and Lenore.
Q. Why did you tell Carol and Lenore?
A. Because they brought up a situation to me.
Q. What was the situation they brought up to you?
A. They said they were asked also.
Q. And they approached you and told you?
A. Exactly.
Q. Do you remember when that was?
A. No.
Q. Let's start with Carol. Do you remember what Carol said to you?
A. No.
Q. Do you remember what you said back to her?
A. No.
Q. Do you recall if you had already been asked for sex by Richard before Carol told you that she was?
A. Yes.
Q. What about with respect to Lenore, did Carol and Lenore come to you together or separately?
A. I don't know.
Q. When Lenore told you that Richard Kala had also asked her to have sex with him, had Richard Kala already asked you the same thing?
MR. MCNAMARA: Objection.
A. No. I don't know.





Q. Do you not understand the question?
A. Right.
Q. If you do not understand me, just say that because it means that I am not doing my job and I need to make the questions more clear?
A. Please make it clear.
Q. I will. You testified that Richard Kala asked if you would have sex with him and that you then had a conversation with Lenore Horn afterwards in which you told her that and she also told you he had asked her the same thing?
A. Yes.
Q. When she approached you and told you that Richard Kala asked her to have sex with him, was that before or after he asked you to have sex with him?
A. After.
Q. At any time did Carol Petrarca ask you to lie in any manner regarding Richard Kala propositioning you or her or anyone else?
A. No.
Q. At any time did Lenore Horn ask you to lie with respect to Richard Kala propositioning you or her or anyone else?
A. No.
Q. Did you ever speak with Richard Kala regarding Carol Petrarca's allegations of harassment?
A. I don't remember.
Q. Would there ever have been any situation at all in which you would tell Richard Kala that Carol Petrarca pressured you to lie about him propositioning her?
MR. MCNAMARA: Objection.
A. I don't know.
Q. Do you not understand the question?
A. Maybe you can rephrase it again.
Q. Sure. At any time did Carol Petrarca pressure you in any way to lie about Richard Kala propositioning her?
MR. MCNAMARA: Objection.
A. No.
Q. Were you ever interviewed by anyone at the gas company with respect to Carol Petrarca's claim of harassment by Richard Kala?
A. Yes.
Q. Who were you interviewed by?

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

CAROL PETRARCA :
:
VS. : C.A. NO.: 04-310S
:
SOUTHERN UNION CO. & :
NEW ENGLAND GAS COMPANY :

DEPOSITION OF ALYCIA GOODY, a Witness in the above-entitled cause, taken on behalf of the Plaintiff, before Barbara Warner, Notary Public in and for the State of Rhode Island, at the offices of Stephen M. Robinson, 155 South Main Street, Providence, RI, on July 14, 2006 at 1:30 P.M.

PRESENT:

FOR THE PLAINTIFF............. LAW OFFICES OF STEPHEN M. ROBINSON
BY: STEPHEN M. ROBINSON, ESQUIRE

FOR THE DEFENDANT............. NIXON PEABODY, LLP
BY: NEAL J. MCNAMARA, ESQUIRE

ALLIED COURT REPORTERS
115 PHENIX AVENUE
CRANSTON, RI 02920
401-946-5500

Page 6

A. I recall -- I don't recall receiving a notice of that deposition. I recall, I believe, discussing it with Mr. McNamara.
Q. Do you recall how frequently you have talked to Mr. McNamara?
A. Infrequently.
Q. When did you become aware this litigation was pending against Southern Union and New England Gas Company?
A. I don't recall the exact date.
Q. Do you recall the year?
A. No. It may have been 2005.
Q. If I asked you this, I am sorry, but I forget things. June 22, do you recall if you had any conflict on that day of this year?
A. Yes. I do recall.
Q. What was that conflict?
A. I was getting married.
Q. Congratulations.
A. Thank you.
Q. And we have learned through your counsel's representations that you subsequently were out of the country?
A. That's correct.

Page 7

Q. When were you out of the country from and to?
A. From June 26 through July 7. Prior to that, I was also out of the country for two weeks.
Q. Sorry?
A. Prior to that, I was also out of the country for two weeks.
Q. Ms. Goody, could you go through your educational background, please?
A. Yes.
Q. Starting with college.
A. I graduated from Trinity College in Washington, DC in 1974. And from Suffolk Law School in 1977.
Q. Do you hold any professional certificates?
A. Member of the Bar in the State of Massachusetts and also in Rhode Island.
Q. Do you currently practice law?
A. Yes. I am in-house counsel for a company called BTU Ventures in Waltham, Massachusetts.
Q. I know there have been several incarnations of the Gas Company; how long did you work there?

Page 8

A. Roughly ten years.
Q. When was that from and to?
A. From June of 1989 to April of 1999.
Q. Did you continue in any capacity with them after April of 1999?
A. No.
Q. Prior to working for -- could you tell me the entities you worked for, because there were probably a couple of different ones during that period?
A. You mean within Providence Gas?
Q. Yes.
A. Providence Energy and Providence Gas Company. Providence Gas was a wholly-owned subsidiary of Providence Energy. There was another subsidiary, North Attleboro Gas Company as well.
Q. During that ten-year period, you were in-house counsel for the Gas Company?
A. Correct.
Q. Prior to working for the Gas Company, what was your employment history?
A. Prior to that, immediately prior to the Gas Company I was an assistant attorney general for the State of Massachusetts.

Page 9

Prior to that, I was in-house counsel for a couple of years for Adams Rustle Cable company in Waltham. And then immediately prior to that, I was assistant general counsel and staff counsel and hearing officer at the Massachusetts Department of Public Utilities.
Q. As in-house counsel to the Gas Company, what were your responsibilities?
A. Primarily regulatory in nature. I was responsible for rate case filings and regulatory compliance filings. I also served as corporate secretary for North Attleboro Gas Company and Providence Gas Company and Providence Energy Corporation.
Q. What were your responsibilities as corporate secretary?
A. To send out the agenda, take minutes, make sure that the minutes were put together. And then work in conjunction with Hinckley Allen on 10Ks and 10Xs and the finance people that put those together.
Q. When you say agenda, would that be the agenda of the Board of Directors?
A. That's correct.

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| CAROL PETRARCA,<br>Plaintiff,<br>v.<br>SOUTHERN UNION COMPANY, et al,<br>Defendants. | C.A. No. 04-310S |

**DEFENDANTS' THIRD SUPPLEMENTAL ANSWERS TO PLAINTIFF'S FIRST SET OF INTERROGATORIES NOS. 9 AND 22**

Defendants hereby provide their third supplemental answers to Plaintiff's First Set of Interrogatories Numbers 9 and 22:

**INTERROGATORY NO. 9.**

Did plaintiff ever speak to defendant and/or any of its current or former employees, agents and/or representatives about the manner in which she was being treated by males on the job, that she was being subjected to sexual harassment and/or discrimination, that she was having problems with any of her supervisors, that she was having problems with a co-worker and/or that she was being treated unfairly or differently on the job? If the answer is yes, please:

(a) identify all persons who have knowledge about your answer;
(b) for each person identified in your answer to 9(a), set forth everything which he or she knows.

**Supplemental Response:** Subject to and without waiver of the previously asserted objections, Defendants respond as follows: Plaintiff complained about Ed Bolduc storage room incident. Henry Butler spoke with Mr. Bolduc about the incident. Mr. Bolduc wrote a letter of apology to plaintiff and Christine Stamp, and indicated that he would knock in the future prior to

entering the storage room. Plaintiff never complained about Bolduc again, and defendants believed that the matter was resolved to the satisfaction of Petrarca and Stamp.

In 1990, Petrarca complained to Mr. Bolduc that Pat Domenicone showed her nude pictures in a magazine, and made remarks to her about her relationship with another male employee. She also complained that Miriam Comeau was making remarks to her about Petrarca's friendly relationship with her department supervisor. In response, Mr. Bolduc spoke to his employees to re-explain the sexual harassment policy.

Petrarca also complained to Bud Butler about harassment by Richard Kala. Petrarca alleged that Kala propositioned her. Although Kala denied the allegation, Butler found Petrarca to be credible, and thus transferred Kala from Facilities Maintenance to Fleet Services, with a reduction in his hourly pay rate. Kala was demoted to laborer after he was found to have made inappropriate comments to a customer, and subsequently received a Last Chance Agreement based on the Petrarca and customer complaints.

**Further Supplemental Response**: With respect to the information provided regarding Richard Kala above, defendants amend and revise the above response as follows: In or about 1995, Petrarca complained to Alycia Goody and Bud Butler regarding alleged harassment by Richard Kala. Goody and Butler conducted an investigation into the complaint. Although Kala denied the allegation, it was determined that Kala should be separated from Petrarca. Upon information and belief, Kala had already signed a posting to be transferred to the position of Garage Helper at Dexter Street, a different facility from the one where Petrarca worked. Kala signed the posting on September 28, 1995. Upon further information and belief, Kala was the only employee to sign the posting. Kala had indeed signed a number of job postings during his tenure in Facilities Maintenance. Kala had joined Facilities Maintenance on March 6, 1994. He

left Facilities Maintenance on January 2, 1996. Kala's transfer separated Kala from Petrarca. Kala's final rate of pay in Facilities Maintenance was $19.79 per hour, and his initial rate of pay as a Garage Helper was $18.31 per hour. He did not achieve a rate of pay in excess of his final rate at Facilities Maintenance until January 1997.

Subsequently, in 1999, a customer complained that Kala made inappropriate comments to her while he was on a job for the defendants at her home. Defendants investigated. As a result of the investigation, Kala was suspended for one week, and was notified that he would have to transfer to the position of laborer in the C&M department. In that position, Kala would have no contact with customers, and was unlikely to have any contact with female employees. The transfer entailed a reduction in pay rate from $22.41 per hour to $16.49 per hour. Plaintiff's union filed a grievance on Kala's behalf with respect to the transfer and pay rate. A settlement was agreed upon pursuant to which Kala remained as a laborer in the C&M department, but his rate of pay was returned to his rate of $22.41 per hour.

The defendants have received no further complaints regarding Kala. Attached are the 1995 posting signed by Kala, and Kala's Employment Record, bates numbers 1997-2000.

**INTERROGATORY NO. 22.**

Has defendant (or any of its current or former agents, employees and/or representatives) ever disciplined, reprimanded, counseled, and/or spoken to any of the defendant's employees (i) because he or she swore, (ii) because he or she used language or engaged in conduct which was crude, inappropriate or offensive, and/or (iii) because of the language he or she used. If the answer is yes, please identify, by name, gender and current and/or last known business or home address, each person who was reprimanded, counseled, disciplined and/or spoken to and set forth, in as much detail as possible, what each person did which caused them to be disciplines, reprimanded, counseled and/or spoken to.

**Supplemental Response:** Subject to and without waiver of the previously asserted objections, Defendants respond as follows: Plaintiff and Christine Stamp complained about Ed

Bolduc storage room incident. Henry Butler spoke with Mr. Bolduc about the incident. Mr. Bolduc wrote a letter of apology to plaintiff and Christine Stamp, and indicated that he would knock in the future prior to entering the storage room. Plaintiff never complained about Bolduc again, and defendants believed that the matter was resolved to the satisfaction of Petrarca and Stamp.

In 1990, Petrarca complained to Mr. Bolduc that Pat Domenicone showed her nude pictures in a magazine, and made remarks to her about her relationship with another male employee. She also complained that Miriam Comeau was making remarks to her about Petrarca's friendly relationship with her department supervisor. In response, Mr. Bolduc spoke to his employees to re-explain the sexual harassment policy.

Petrarca also complained to Bud Butler about harassment by Richard Kala. Petrarca alleged that Kala propositioned her. Although Kala denied the allegation, Butler found Petrarca to be credible, and thus transferred Kala from Facilities Maintenance to Fleet Services, with a reduction in his hourly pay rate. Kala was demoted to laborer after he was found to have made inappropriate comments to a customer, and subsequently received a Last Chance Agreement based on the Petrarca and customer complaints.

In addition to the foregoing, employees may have been counseled or spoken to by their supervisors regarding such conduct without the matter being reported to higher management or human resources.

**Further Supplemental Response**: With respect to the information provided regarding Richard Kala above, defendants amend and revise the above response as follows: In or about 1995, Petrarca complained to Alycia Goody and Bud Butler regarding alleged harassment by Richard Kala. Goody and Butler conducted an investigation into the complaint. Although Kala

denied the allegation, it was determined that Kala should be separated from Petrarca. Upon information and belief, Kala had already signed a posting to be transferred to the position of Garage Helper at Dexter Street, a different facility from the one where Petrarca worked. Kala signed the posting on September 28, 1995. Upon further information and belief, Kala was the only employee to sign the posting. Kala had indeed signed a number of job postings during his tenure in Facilities Maintenance. Kala had joined Facilities Maintenance on March 6, 1994. He left Facilities Maintenance on January 2, 1996. Kala's transfer separated Kala from Petrarca. Kala's final rate of pay in Facilities Maintenance was $19.79 per hour, and his initial rate of pay as a Garage Helper was $18.31 per hour. He did not achieve a rate of pay in excess of his final rate at Facilities Maintenance until January 1997.

Subsequently, in 1999, a customer complained that Kala made inappropriate comments to her while he was on a job for the defendants at her home. Defendants investigated. As a result of the investigation, Kala was suspended for one week, and was notified that he would have to transfer to the position of laborer in the C&M department. In that position, Kala would have no contact with customers, and was unlikely to have any contact with female employees. The transfer entailed a reduction in pay rate from $22.41 per hour to $16.49 per hour. Plaintiff's union filed a grievance on Kala's behalf with respect to the transfer and pay rate. A settlement was agreed upon pursuant to which Kala remained as a laborer in the C&M department, but his rate of pay was returned to his rate of $22.41 per hour.

The defendants have received no further complaints regarding Kala. Attached are the 1995 posting signed by Kala, and Kala's Employment Record, bates numbers 1997-2000.

## VERIFICATION

D'Anna Soehnge, affirms that I am the Vice President of Human Resources of New England Gas Company, a division of Southern Union Company; that those answers in the Responses of Defendants to Plaintiff's First Set of Interrogatories of which I have personal knowledge are true; that all of the matters stated therein are not within my personal knowledge and that those matters that are not within my personal knowledge have been assembled by authorized employees, agents, and representatives of Defendant, and I am informed that those facts are true. I verify under penalty of perjury that the foregoing is true and correct. Executed on 26th day of May, 2006.

D Soehnge 5-26-06
D'Anna Soehnge

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 26th day of May, 2006 a copy of the foregoing was sent by regular mail to: Stephen Robinson, Vicki Bejma, Law Offices of Stephen Robinson, 155 South Main Street, Ste. 402, Providence, RI 02903 and sent to Noelle Clapham, Esq., 24 Salt Pond Road, Suite 8-A, South Kingstown, RI 02879 via regular mail, postage prepaid.

Marilyn Lonely

KALA RICHARD 0

| DATE | DEPT. | OCCUPATION | CODE | RATE | AUTH. NO. | SEN. DATE | |
|---|---|---|---|---|---|---|---|
| 1/19/97 | C. Service | GSP Helper | D801 | 19.30 | | | GWI |
| 1/26/97 | " | " " | D802 | 20.04 | 33,839 | | |
| 4/27/97 | " | " Adv. Helper | D803 | 20.31 | 33,870 | | |
| 0/26/97 | " | GSP ADV. HELPER | D804 | 20.56 | 33,932 | | |
| /18/98 | " | " | D804 | 21.23 | 34,002 | 6/1/89 | GWI |
| -26-98 | " | " " | D805 | 21.65 | 34,070 | | |
| 1/24/99 | " | " " | D805 | 22.41 | 35,126 | " | GWI |
| 10/24/99 | C&M | Laborer | D672 | 16.49 | 35,292 | | |
| 2/5/99 | " | " | " | 22.41 | 35,377 | | Settlement of Grievance (redline rat |
| 1/23/00 | " | " | D672 | 23.19 | 35,395 | " | GWI |
| 1/21/01 | " | " | " | 24.00 | 35,582 | " | GWI |
| 9-29-02 | CFS/Leak Survey | Survey TEch | D851 | 24.00 | 35,844 | | |
| 10-17-02 | C&M | Laborer | D672 | 24.00 | 35,862 | | |
| 4/19/04 | Credit &Col | Field Collector | D842 | $25.00 | 36,055 | | Fill vacancy |
| 4/21/04 | C&M | Laborer | D672 | $24.00 | 36,058 | | Return to former position |
| 5/23/04 | " | " " | " | 24.72 | 36,076 | | GWI |
| 9/19/04 | Eng GIS/Drafting | Facility Locator | D860 | $22.75 | 36,140 | | Vacancy due to term. of Arthur Whalen |

PRIOR CLASSIFICATIONS

## LOST TIME RECORD

| YEAR | WORKING DAYS LOST: Un-exp. | Own Req. | Sick | W.C. | Lv. Abs. | * Misc. | Total | SICK BENEFIT: Days Paid | Amount Paid | WORKMEN'S COMP.: Days Paid | Amount Paid | REMARKS *J. D.=Jury Duty M.D.=Mil. Duty D.=Discp. Note Below |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | |

MISCELLANEOUS

001999

KALA RICHARD

| DATE | HOME ADDRESS |
| --- | --- |
| 6/1/89 | 12 Thurston Street, Riverside, RI 02915 |

DATE BORN 4/8/44
CITIZEN 1st PAPERS NO.
ELIGIBLE RET. PLAN:
RET. PLAN NO.
NORMAL RET.

MILITARY SERVICE RECORD

## EMPLOYMENT RECORD

| ENTERED | ENT. NO. | LEFT | SEP. NO. | R. | L.O. | D. | REASON |
| --- | --- | --- | --- | --- | --- | --- | --- |
| 6/1/89 | 5198 | | | | | | |

## OCCUPATIONAL CLASSIFICATION RECORD

| DATE | DEPT. | OCCUPATION | CODE | RATE | AUTH. NO. | SEN. DATE | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| 11/7/04 | C&M | Laborer | D672 | $24.72 | 36.167 | 6/1/89 | Returned to former position |
| 3/20/05 | Gas Control | Reg. Repair Tech/Utility | M700 | $24.62 | | " | Reclass to replace H. Bestwick |
| ~~6/19/05~~ | ~~" "~~ | ~~" " "~~ | ~~M701~~ | ~~$26.46~~ | ~~36.785~~ | ~~"~~ | ~~progression~~ |
| 5/29/05 | Gas Control | Reg. Repair Tech/Utility | M700 | $25.36 | 36.591 | | GWI |
| 6/19/05 | " " | " " " | M701 | $26.46 | 36.785 | | progression |

002000

200

GARAGE HELPER
SEPT. 22, 1995

9/28/95 [signature]

CLOSED OCT. 2, 1995

KALA RICHARD

| DATE | HOME ADDRESS |
|---|---|
| 6-1-89 | 12 THURSTON ST., RIVERSIDE, RI 02915 |

DATE BORN 4-8-44
CITIZEN YES 1st PAPERS NO.
ELIGIBLE RET. PLAN:
RET. PLAN NO.
NORMAL RET.

MILITARY SERVICE RECORD

## EMPLOYMENT RECORD

| ENTERED | ENT. NO. | LEFT | SEP. NO. | R. | L.O. | D. | REASON |
|---|---|---|---|---|---|---|---|
| 6-1-89 | -5198 | | | | | | |

## OCCUPATIONAL CLASSIFICATION RECORD

| DATE | DEPT. | OCCUPATION | CODE | RATE | AUTH. NO. | SEN. DATE | |
|---|---|---|---|---|---|---|---|
| | | | R1-H | 10.17 | -- | | |
| 6-1-89 | Meter Rdg. | Meter Reader | R1 | 10.17 | 30,914 | 6-1-89 | |
| 11-19-89 | " " | " " | " | 11.51 | 30,928 | " | |
| 12-3-89 | " " | " " | " | 12.14 | 31,020 | " | |
| 1-21-90 | " " | " " | " | 13.54 | 31,204 | " | |
| 6-3-90 | " " | " " | " | 14.94 | 31,507 | " | |
| 1-13-91 | " " | " " | " | 17.10 | 31,522 | " | |
| 1-21-91 | " " | " " | " | 17.87 | 31,922 | " | |
| 1-21-92 | " " | " " | | 18.50 | 32,362 | | GWI |
| 1/23/93 | " " | " " | | | | | (GWI incl. (main office bldg.) ) |
| 3-6-94 | FAC. MAINT. | FAC MAINT. PERSON | D145 | 17.13 | 32,822 | | |
| 9/4/94 | " " | " " | D144 | 17.70 | 33,001 | | |
| 1-21-95 | " | " " | " | 18.40 | 33,120 | | GWI |
| 3-5-95 | " " | " " Cl. B" | D143 | 19.01 | 33,155 | | |
| 9-3-95 | " " | " " C. A | D142 | 19.79 | 33,358 | | |
| | | | D340 | 18.31 | 33,517 | | |
| 1-2-96 | Fleet Svs. | Garage Helper-Gasser | D360 | 18.95 | 33,570 | | GWI |
| 1/21/96 | " | GARAGE HELPER | | | | | |
| 7-28-96 | C&M | GSP Helper | D801 | 18.69 | 33,724 | | |

001998

# AFFIDAVIT OF CAROL PETRARCA

I, Carol Petrarca, being under oath, do hereby depose and say:

1. In or about the period of 1989-91, Roy Heaton walked into the ladies' room while I was using it. The door was shut when he entered. He called out to me. Mr. Heaton was one of my supervisors at the time, working under Mr. Bolduc.

2. On several occasions during my employment, at some point after I received the Building Maintenance position in 1991, but before the Maintenance and cleaning positions were merged in 1992, Mr. Bolduc and Mr. Heaton made comments to me such as, "you are big chested" and "your breasts are going to get even bigger lifting those boxes," or indicate that my breasts were getting in the way of my doing things.

3. From the period that I received the Building Maintenance position in 1991 and up until Joseph Ianiello's retirement in 1998, Mr. Bolduc would sometimes direct me to get a tool, such as a wrench or a Phillips head screwdriver. He would then ask me if I knew what each such tool was. These remarks were made in front of Gerald Porter and/or Joseph Ianiello. This took place at least twice a month before Mr. Ianiello retired.

4. After I received the Building Maintenance position in 1991, Mr. Bolduc would make comments such as "this is a man's job," or "a man would be able to do this job alone" or "you should be home; this is a man's job."

5. On several occasions in 1997- until I went out on sick leave in October, 1999, I worked overtime to fill in for Gerald Porter, a male employee, when he failed to arrive at work. This would happen about once or twice a week. On several occasions, I saw his time sheets for those same periods, and he had recorded as hours worked those hours that I had had to fill in for him. Additionally, Mr. Porter would ask me to relay to Mr. Bolduc that he was not coming in, which I did. Mr. Bolduc always required that I report directly to him when I was going to be out.

6. Beginning from the start of my employment until I went out on sick leave in 1999, Mr. Bolduc would repeatedly ask me what job I was working on and/or complain that I had taken too long to complete it. Mr. Bolduc would set time limits on certain jobs and reprimand me if I went over that time limit. I never witnessed Mr. Bolduc doing this with male employees. Mr. Bolduc would do this at least twice a week.

7. Beginning in or about 1996, after I had complained about Mr. Kala, up until I went out on sick leave in 1999, Mr. Bolduc would sneak up from behind me and demand to know what I was doing. This was frightening to me, especially when the office was empty. I never saw him doing this to male employees. This occurred at least once a day.

8. On a daily basis, from the time I began my employment until I went out on sick leave in 1999, Mr. Bolduc would check the areas that I had cleaned, and reprimand me if he felt something was wrong. Mr. Bolduc would never check Mr. Porter's areas or Mr. Kala's areas. On numerous occasions, Mr. Porter left cleaning tasks undone, but I never saw Mr. Bolduc

reprimand Mr. Porter. For example, Mr. Porter would not change light bulbs in the ladies' room, and would not refill the sanitary napkin and tampon machines or toilet tissue. Mr. Bolduc would direct me to do these things when he got complaints about them.

9. On other occasions, when I filled in for Mr. Porter, Mr. Bolduc would reprimand me for the condition of Mr. Porter's area when he knew or should have known that these were problems that Mr. Porter should have addressed before. This would happen many times during 1997-1999.

10. On other occasions, even when I was not filling in for Mr. Porter, Mr. Bolduc would order me to do perform work in Mr. Porter's areas of responsibility. This would happen at least once a week. One such occasion, I was directed to change light bulbs that Mr. Porter had left unchanged for two days. Mr. Bolduc also scolded me for having permitted it to stay unchanged for two days. Another thing that Mr. Porter would fail to do in his area of responsibility was change light bulbs in the ladies' room, or restock the sanitary napkin machines or toilet tissue. Mr. Bolduc required me to do these tasks.

11. On several occasions during my employment, I was out on sick leave for several weeks or months. This included periods in 1996, 1997, and 1998. During those periods, Mr. Porter would fill in for my floor. On my return, Mr. Bolduc reprimanded me for the condition that my floor was in, despite the fact that he knew Mr. Porter had been responsible for the area.

12. On one occasion in the spring of 1999, I was filling in at the Dexter Street facility. Shortly after I arrived, Mr. Bolduc and Ray Conroy screamed and yelled at me in front of others because of the condition of the area. Mr. Bolduc continued to scream and yell at me even though the problems with that room had been created by the person for whom I was filling in, and I had only just arrived and had not had time to deal with them. I was so upset by this I ended up crying.

13. On numerous occasions between 1997-through the time that I went out on sick leave in October, 1999, I would observe Gerald Porter, a male worker in the Facilities Maintenance Department, arriving at work visibly intoxicated. On these occasions, Mr. Porter smelled strongly of alcohol, slurred his speech, and staggered. Mr. Bolduc was present on a number of those occasions, and also would have been able to perceive that Mr. Porter was intoxicated. Mr. Bolduc took no action against Mr. Porter that I was aware of on these occasions.

14. On numerous occasions throughout my employment, from the beginning until the time I went out on sick leave in October, 1999, Mr. Bolduc would assign me more difficult tasks than male employees. For example, I would be required to climb a ladder and scrub something high like a fixture, while Mr. Porter would do the vacuuming or emptying the baskets.

15. During the last two years of employment, that is, during the period of 1997-1999, I would be assigned to the task of placing recycled paper in the dumpster. When I was assigned to the task with a female employee, Lynore Horn, the dumpster would be closed so that we had to throw the trash bags up. This meant that we had to work harder, and also our shirts would ride up. Males would be watching us out the window and make remarks. When I was assigned to

this task with male employees, the dumpster would be open. Mr. Bolduc was supposed to tell the people who delivered the dumpster to leave it open. I complained to Mr. Bolduc about this situation, but every single time that I was working on this job with another woman the dumpster would be still be left closed. Ms. Horn and I would try to open the dumpster ourselves but could not.

16. In or about 1989, I was assigned the third floor to clean, which nobody else wanted because there was a lot more furniture and it was harder to move the vacuum cleaner around. Mr. Porter was always assigned an easier floor. Furthermore, in or about 1990, when I started using one of the smaller vacuum cleaners to make it easier to maneuver, Mr. Bolduc took it from me and would not let me use it even when I explained to him that the smaller vacuum made the job easier and faster.

17. On at least 10 to 20 times during my employment, Mr. Bolduc would fail to offer me overtime and instead give it to Mr. Porter. This includes two occasions in 1998, and another occasion in 1994. On several occasions, I saw Mr. Porter calling Mr. Bolduc and asking him if he wanted Mr. Porter to work overtime. Even though Mr. Bolduc knew or should have known that I was next on the list, which was published, he would give the overtime to Mr. Porter.

18. Beginning in or about 1997 through the time I went out on sick leave in October, 1999, I observed Mr. Porter telling building security to call him if there was a problem in the building overnight. This would give him overtime opportunities ahead of me and my female co-worker, Christine Stamp. I reported this to Mr. Bolduc, but he never took any action against Mr. Porter that I was aware of.

19. After I had reported that Richard Kala was harassing me, Mr. Bolduc came to me and told me that there were discipline notes in my file and that if I got one more I would be fired. Until that time, I had not been aware of any such disciplines.

20. I sometimes filled in at Dexter Street after Richard Kala was there. I reported to Mr. Bolduc those occasions on which Kala would approach me in the kitchen, but I never heard that Mr. Bolduc did anything.

21. From the beginning of my employment until I went out on sick leave in October, 1999, at the Weybosset Street facility, the men's locker room had a calendar with naked women. The door to the men's locker room was often left open so this calendar was visible. Men would frequently come out of the shower with only their towels wrapped around them, and never shut the locker room door. They would exit the bathroom zipping their pants. I would be required to clean the locker room while it was in use, so I would observe this frequently, on an almost daily basis. I complained about this to Mr. Bolduc frequently, but nothing was done.

22. At the Dexter Street facility, where I frequently filled in, there was one calendar with a naked woman in the gym, and another in the garage. I was required to work in both rooms. On occasions when I had to work in the maintenance department at Dexter, the men there would use crude language, and would make comments about my chest. I complained about this to Mr.

Bolduc frequently, but nothing was done.

23. At some point between September 1999-October 15, 1999, I was called to Mr. Bolduc's office. Mr. Butler was there, and began to question me in front of Mr. Bolduc about the "locker room incident" of August 20, 1999. No union representative was present at the time.

24. In or about October, 1999, Mr. Bolduc informed me that I would have to study the company policy manual, and be tested upon it.

25. On several occasions during my employment, I went out on sick leave and received sick pay from the Gas Company. Under the Union contract, the Gas Company would pay you your full salary, minus any TDI. At no point had I ever been required to notify the Gas Company that I was receiving TDI.

Subscribed and sworn to before me this 15th day of August 2006.

Notary Public
My Commission Expires: 2/2/07

Number

GRIEVANCE REPORT

U.S.W.A., District 1, Local 12431

PROVIDENCE GAS COMPANY

Name CAROL PETRACCA Date 12-14-94

Department FACILITIES MAINTENANCE Division DOWNTOWN

Nature of Grievance

OVER TIME

CAROL RETURNED TO WORK 12-7-94.
She worked overtime 12-7 AND 12-9.
ON 12-10-94 There WAS Scheduled over-
Time. She WAS NOT ASKED. ALSO ON SUNDAY
12-11-94 There WAS A Call in for overtime
She AGAIN WAS NOT CALLED.

Employee Signature C. A. Petracca

Noted by Steward W. J. Mc[illegible]

Company Copy

December 15, 1994

To: Ed Bolduc

From: Bud Butler

Re: 1st Step Grievance Answer
Carol Petraca Grievance

Bill McCormick put this grievance on my desk this morning. The grievance must be answered within 48 hours of receipt. I am providing you with an answer you can use or you can write your own.

" Due to mitigating circumstances, Carol was not asked to work overtime on 12-10 or 12-11-94. Due to the circumstances of this particular case, the company will pay Carol for the overtime which she would have worked on these dates. This action will not set a precedent nor should it be construed that in the future the company will pay employees in similar circumstances."

**Vicki Bejma**

**From:** "CLAPHAMLAW" <CLAPHAMLAW@VERIZON.NET>
**To:** "Vicki Bejma" <vbejma@smrobinsonlaw.com>
**Sent:** Friday, June 09, 2006 11:06 AM
**Subject:** Fw: Goody and Hourihan

----- Original Message -----
**From:** McNamara, Neal
**To:** Noelle Clapham
**Sent:** Tuesday, June 06, 2006 4:31 PM
**Subject:** RE: Goody and Hourihan

Ms. Hourihan just called me and asked that I tell you that all communications with her should go through me.
Thanks.

-----Original Message-----
**From:** Noelle Clapham [mailto:claphamlaw@verizon.net]
**Sent:** Tuesday, June 06, 2006 4:53 PM
**To:** McNamara, Neal
**Subject:** Goody and Hourihan

Neal, I am assuming that you have been in touch with Goody and Hourihan about the motions with respect to their depositions and the fact that the depositions scheduled for tomorrow are off. If you need me to call them to let them know about the scheduling changes please forward their telephone numbers to me and I will make the calls. I will wait until the end of the week to get dates from you before rescheduling. Noelle

Page 1 of 1

**Pat Andrews**

---

**From:** neal.mcnamara@hklaw.com
**Sent:** Thursday, November 10, 2005 10:26 AM
**To:** peandrews@verizon.net
**Subject:** RE:

I am in touch with Alycia Goody. She has asked that I represent her for purposes of the deposition. The date of 12/13 is not good for her deposition because of the preliminary injunction hearing in Pittsburgh that I mentioned to you.

---

**From:** Pat Andrews [mailto:peandrews@verizon.net]
**Sent:** Thursday, November 10, 2005 9:36 AM
**To:** neal.mcnamara@hklaw.com
**Subject:**

Please let me know if you control Alycia Goody and if you will make her available. If I don't hear back by Monday, I will assume you DON'T.

Pat

# AFFIDAVIT OF CHRISTINE STAMP

I, Christine Stamp, being under oath, do hereby depose and say:

1. I have been employed by the Defendants and their predecessors (hereinafter, "Gas Company") from about 1983 to the present, currently serving as a Dispatcher

2. At various points from the years 1996 to the present, I worked in the Gas Company's Facilities Maintenance Department.

3. During the occasions I worked in Facilities Maintenance, I reported directly to Edward Bolduc until his retirement in 2001. For a period of time just before Mr. Bolduc's retirement, I also reported to Mr. Sunday. Once Mr. Bolduc retired, I reported to Mr. Sunday alone.

4. On numerous occasions from 1996 to 2000, I would observe Gerald Porter, a male worker in the Facilities Maintenance Department, arriving at work visibly intoxicated. On these occasions, Mr. Porter smelled strongly of alcohol, slurred his speech, and staggered. Mr. Bolduc was present on a number of those occasions, and also would have been able to perceive that Mr. Porter was intoxicated. Mr. Bolduc took no action against Mr. Porter that I was aware of on these occasions.

5. When I was assigned to the day shift, Mr. Bolduc consistently instructed Carol Petrarca, Mr. Porter, and myself not to sit and talk to the second shift workers who were just arriving to work. Nevertheless, on several occasions, including September 24, 1999, Mr. Porter, who also worked the day shift, was engaging in that behavior. Mr. Bolduc was present, but said nothing. Mr. Bolduc similarly ignored this behavior on December 7, 1999.

6. On or about September 19, 1999, I called Mr. Henry "Bud" Butler, and offered to come in on my sick leave to discuss the August 20, 1999 incident when Mr. Bolduc entered the women's locker room.

7. I never received an apology from Mr. Bolduc or any official of the Company regarding Mr. Bolduc's August 20, 1999 entry into the ladies' locker room.

8. In or about October 1999, Mr. Bolduc announced that he would have the two most senior people to work overtime on New Year's Eve. The contract called for two people who were lowest in overtime to be asked to work overtime. Under Mr. Bolduc's new rule, Mr. Porter and I would be working, and Ms. Petrarca would not have had an opportunity for the New Year's Eve overtime regardless of her position on the overtime list.

9. The standard policy and procedure for overtime distribution required that departments maintain a list of employees and the number of overtime hours that they had worked. The person who had worked the least number of hours would be the first person offered overtime. If the lowest person refused, the person with the second least would be asked next, and so on.

10. On or about February 25, 2000, I learned that a male employee that was higher than me on the overtime list had been given overtime. I had not been asked. When I asked Mr. Bolduc about this on Monday, February 28, 2000. Bolduc said he "forgot to ask" me.

11. On or about March 6, 2000, I had to leave 2.5 hours early for doctor's appointment on March 6, 2000. There was overtime the next Saturday. I asked how I would be paid if I came to work that day. Mr. Bolduc said he'd have to talk to Mr. Butler. Mr. Bolduc later told me that 2.5 of the hours would be compensated at straight time, and the remainder at time and a half. On April 5, 2000, Mr. Porter, a male employee, left work early 9:45 and did not get back until 11:45 a.m. He told me that he was going to see the doctor, and that Mr. Bolduc was letting him take a company car. I observed that Mr. Porter had in fact signed out a company car. Mr. Porter left again at 3:15. He told me he had gone for x-rays. Mr. Porter worked overtime that Saturday. Eight hours were added to the overtime list.

12. On or about July 24, 2000, Mr. Bolduc bypassed me for overtime again in favor of a male employee. When I asked him about it, he claimed that he did not have the new overtime list until Friday. The overtime lists were routinely issued on Wednesday. In any case, I was low on the old list as well.

13. In the years 1999 through 2000, an employee had the accumulated holiday and vacation pay had the option of collecting pay for those days, or carrying them over. This policy was included in the union contract.

14. In or about May 2001, I was assigned to scraping paint with a male co-worker, Tony Cesario. Mr. Bolduc did not inform me that it was lead paint. Mr. Cesario informed me that Mr. Bolduc had told him that it was lead paint.

15. In or about May 2001, Mr. Bolduc required me to leave my assignment at Dexter Street to report to Weybosset Street to clean up paint spills left by a male employee, Tony Cesario. He did not require Mr. Porter, who was assigned to Weybosset Street, to clean up the paint. I was later given a written warning for having spilled the paint when I had not worked in the area of the paint spills. Mr. Cesario, who had spilled the paint, told me that he did not get a written warning.

Christine A. Stamp

Subscribed and sworn to before me this 17th day of August 2006.

Notary Public
My Commission Expires: 2/2/07