UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| CAROL PETRARCA, Plaintiff | : | |
| v. | : | C.A. No. 04-310S |
| SOUTHERN UNION CO. & NEW ENGLAND GAS CO., Defendants. | : | |

**DEFENDANTS' REPLY MEMORANDUM**
**TO PLAINTIFF'S OBJECTION TO MOTION FOR SUMMARY JUDGMENT**

Defendants Southern Union Co. and New England Gas Co. submit this memorandum in reply to Plaintiff's objection to Defendants' motion for summary judgment.[1]

A. PLAINTIFF'S HOSTILE ENVIRONMENT CLAIM LACKS SUPPORTING EVIDENCE, IS TIME-BARRED, AND IS OTHERWISE INSUFFICIENT AS A MATTER OF LAW TO DEFEAT SUMMARY JUDGMENT.

It is evident that Plaintiff has settled upon a strategy of using self-serving and unsupported affidavit assertions and distorted deposition testimony to fling as much mud on the wall as possible in the hope that enough will stick to avoid summary judgment. Plaintiff's efforts to create fact issues where none exist, by inventing and otherwise misrepresenting the evidence in this case, should be rejected.

It is important to note what Plaintiff does not dispute. Plaintiff does not dispute that her problems with Domenicone occurred prior to his retirement on January 31, 1991. See Defs.' Stmt. ¶¶ 16-18; Pl.'s Stmt. ¶¶ 16-18. Plaintiff admits that Kala's alleged

[1] For ease of citation, Plaintiff's Memorandum in Support of Her Objection to Defendants' Motion for Summary Judgment is cited herein as "Pl.'s Mem." Defendants' initial Memorandum in Support of Summary Judgment is cited herein as "Defs.'Mem." Defendants' Statement of Undisputed Facts is cited herein as "Defs.'Stmt." Plaintiff's Response to Defendants' Statement of Undisputed Facts is cited herein as "Pl.'s Stmt."

sexually harassing behavior ended with his transfer out of facilities maintenance in January 1996. See Defs.' Stmt. ¶¶ 35, 36; Pl.'s Stmt. ¶¶ 35, 36.[2]

Thus, any claim of hostile environment extending from the end of the alleged Kala episode into the limitations period, i.e., on or beyond April 26, 1999, must be premised on Bolduc's alleged conduct.[3] Yet the record evidence in this case shows that there was, simply, a dearth of alleged harassing behavior during the interval spanning from Kala's departure to Plaintiff's departure for leave in October 1999.

Plaintiff's entire hostile environment claim rests upon the tenuous theory that Bolduc subjected her to stricter scrutiny and rules than her male co-employees. There is simply no substance to Plaintiff's theory. As a primary matter, Plaintiff's affidavit is rife with the type of conclusory and unsupported assertions that courts routinely reject in determining summary judgment motions. See Slowiak v. Land O'Lakes, 987 F.2d 1293, 1295 (7th Cir. 1993) ("Self-serving affidavits without factual support in the record will not defeat a motion for summary judgment."); Tomaso v. Ritz Camera Ctrs., Inc., 2003 WL 22682053, at *3 (Mass. App. Ct. Nov. 13, 2003) (court entitled to disregard affidavit containing "generalized factual averments . . . asserted in a transparent attempt to halt the procedural mechanism of summary judgment). Indeed, Plaintiff has no evidence – beyond her own say-so – that Bolduc actually did subject her to stricter scrutiny and rules than her male co-employees. Moreover, Plaintiff impermissibly attempts to turn a few, sparse instances over a several year period where Bolduc allegedly criticized or

---

[2] Although Plaintiff's response to Defs.' Stmt. ¶ 35 is somewhat ambiguous, see Pl.'s Stmt. ¶ 35, Plaintiff plainly testified that she no longer worked with Kala after January 2, 1996, and that her occasional and brief run-ins with him at the other facility did not involve any harassment. See Defs.' Ex. B, Pl.'s Dep. at 64:5 – 65:8. Plaintiff does not allege anywhere in her papers that she complained about Kala after he left facilities maintenance.

[3] Again, Plaintiff does not dispute that her only other co-worker during this time, Porter,

reprimanded her into an actionable hostile working environment that materially changed her terms and conditions of employment. For these reasons, Plaintiff's hostile environment claim must fail.

1. PLAINTIFF HAS ADDUCED NO EVIDENCE THAT BOLDUC ACTUALLY SUBJECTED HER TO STRICTER RULES AND SCRUTINY THAN HER MALE CO-EMPLOYEES OR ROUTINELY DENIED HER OVERTIME WORK.

The gravamen of Plaintiff's hostile environment claim is that the hostile environment that allegedly existed until Mr. Kala's transfer in January 1996 was, due to Bolduc's actions, sustained and continuous through and beyond April 26, 1999. In support of this theory, Plaintiff alleges that Bolduc (1) subjected Plaintiff to "more arduous rules, supervision, and discipline" than her male co-employees and (2) denied Plaintiff overtime work to which she was entitled. Defendants address these contentions, and Plaintiff's proffered evidence for each, in turn.

a. <u>Plaintiff's Conclusory Allegations That She Was Subjected to Stricter Rules and Scrutiny Cannot Be Credited And Otherwise Lack Factual Support in the Record.</u>

Plaintiff makes various allegations that Bolduc subjected her – but not males – to stricter rules and scrutiny throughout her memorandum. Defendants address each allegation, and Plaintiff's corresponding citations to the record, seriatim.

(1) Plaintiff alleges that "male employees left work early on repeated occasions without immediate censure . . . ." Pl.'s Mem. at 24.

This allegations is unsupported by the record. Plaintiff cites to Bolduc's testimony about his discovery that two male supervisees, Bill Johnson and Ken Schiano, were leaving work early and taking extended breaks. <u>See</u> Pl.'s Ex. 6, Bolduc Dep. at 91-99. Yet, Bolduc plainly testified that he did, in fact, call for a meeting involving the

union steward and issue a verbal warning. See id. at 90:21 – 91:6, 91:15-17, 97:20 – 98:1 ("I disciplined them based upon that infraction, leaving the worksite early and extending coffee breaks, yes."). Plaintiff's emphasis on whether this discipline was "immediate" – and Defendants note the lack of clear testimony on the issue – is immaterial to the basic premise that this episode in no way constitutes credible evidence that Bolduc was more lenient toward males than he was toward Plaintiff.

(2) Plaintiff alleges that Porter "took cigarette breaks whenever [he] liked." Pl.'s Mem. at 24.

Even if true, this allegation provides no support for Plaintiff's hostile environment claim. Bolduc testified clearly that "there was no written policy as to how many times you could have a cigarette. So long as it was at the discretion of the supervisor that it wasn't being abused . . . ." Pl.'s Ex. 6, Bolduc Dep. at 176:21 – 177:3. As an initial matter, Plaintiff offers no evidence that Porter did, in fact, abuse his cigarette breaks. More importantly, Plaintiff does not allege, or put forth any evidence, that *she* was denied cigarette breaks that Porter received. In short, the alleged fact that Porter "took cigarette breaks whenever he liked" does not support Plaintiff's hostile environment claim.

(3) Plaintiff alleges that Bolduc "tolerated shirking and subordination on the part of Joseph Ianiello," Plaintiff's co-worker. Pl.'s Mem. at 24-25.

First, Bolduc's treatment of Ianiello is utterly irrelevant to whether *Plaintiff* experienced a hostile work environment. Second, Plaintiff testified that she complained to Bolduc about Ianiello only "about three or four times" over a several year period between 1991 and 1995. See Pl.'s Ex. 1, Pl.'s Dep. at 36:20 – 37:20. Plaintiff further testified that at least two of these complaints were based upon Ianiello's use of vulgar

language, rather than his failure to report to work assignments with Plaintiff. See id. at 35:15-20. Thus, at best, Plaintiff's evidence shows that Ianiello shirked his duties on two occasions, without consequence, over a five-year period. This meager showing cannot be construed to support Plaintiff's allegation that was subjected to stricter scrutiny to the point of experiencing a hostile work environment. Third, it is undisputed that Plaintiff's complaints about Ianiello occurred before or during 1995, and that by 1996, she was no longer working alongside him. See Defs.' Stmt. ¶¶ 28, 36; Pl.'s Stmt. ¶¶ 28, 36. Thus, even if Bolduc's alleged treatment of Ianiello could constitute evidence supporting Plaintiff's meta hostile environment claim, it is not evidence supporting the *continuation* of that hostile environment from January 1996 into the limitations period. Thus, Plaintiff's allegations with respect to Ianiello do not create any triable issue with respect to her hostile environment claim.

(4) Plaintiff alleges that Bolduc "ordered" her "not to talk to the incoming second-shift workers, while saying nothing to Porter for doing the same thing." Pl.'s Mem. at 25, 30.

First, as discussed in Defendants' Memorandum in Support of Motion for Summary Judgment at 19-20, Bolduc's single reprimand of Plaintiff for admittedly "joking and laughing" on the job cannot, as a matter of law, support her hostile environment claim. Plaintiff does not allege that this incident had any repercussions whatsoever in terms of discipline or other tangible changes in her working environment.

More importantly, for the purposes of Defendants' statute of limitations argument, Plaintiff offers no evidence that Bolduc's alleged reprimand occurred on or after April 26, 1999. Thus, even if this alleged incident could be considered as contributing to Plaintiff's hostile environment claim, the lack of any evidence as to its approximate date

prevents Plaintiff from relying on it to defeat summary judgment on statute of limitations grounds. See Azimi v. Jordan's Meats, Inc., 2004 U.S. Dist. LEXIS 20137, at *20 (D. Me. Oct. 7, 2004) (refusing to infer that at least one incident took place within limitations period where plaintiff adduced no cognizable evidence of precise dates of alleged incidents).

Aware of this evidentiary problem, Plaintiff points to one alleged instance where Bolduc did not reprimand Porter for engaging in similar behavior. Plaintiff speciously argues that this alleged lack of action by Bolduc occurred within the limitations period, and thus is an "act" which renders timely Plaintiff's hostile environment claim. See Pl.'s Mem. at 30. Yet, under no conception of Title VII can Plaintiff point to a ***lack of managerial action with respect to another employee*** as "an act contributing to" the hostile environment allegedly ***experienced by Plaintiff***. See Crowley v. L.L. Bean, Inc., 303 F.3d 387, 395 (1st Cir. 2002) (quoting National R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 117 (2002)). Plaintiff identifies – and Defendants are aware of – no case adopting such an expansive view of the type of "act" that can anchor an otherwise untimely hostile environment claim. Thus, this allegation presents no triable issue of fact to defeat summary judgment.

(5) Plaintiff points to Porter's alleged problems with alcohol in an attempt to support her hostile environment claim. See Pl.'s Mem. at 25, 29.

Plaintiff alleges that Bolduc failed to "intervene" when Porter arrived at work "obviously drunk." Id. at 25. Defendants reiterate that Plaintiff had absolutely no problem with Porter while in Defendants' employ. See Defs.' Stmt. ¶ 26; Pl.'s Stmt. ¶ 26. In addition to being unwarranted and, frankly, unseemly, Plaintiff's focus on Porter's alleged alcohol problem does nothing to support her hostile environment claim. First,

despite Plaintiff's claims to the contrary, see Pl.'s Mem. at 25, 29, Plaintiff's own exhibits establish that Defendants – including Bolduc personally – did, in fact, take action with respect to Porter's work-related problems. See Pl.'s Exs. 43-45. Second, as discussed supra at 6, regardless of what actions Defendants did or did not take with respect to Porter, Plaintiff cannot point to Defendants' treatment of Porter as evidence that ***Plaintiff*** was subjected to a hostile environment. Thus, Plaintiff's allegations with respect to Porter do not create any triable issue of fact relating to her hostile environment claim.

(6) Plaintiff alleges that Bolduc subjected her to "arbitrary time limits on her work, [and] inspections of her work areas, even going to the extent of repeatedly sneaking up behind her in an empty office building." Pl.'s Mem. at 25.

In support of these allegations, Plaintiff simply cites to conclusory assertions in her affidavit that are otherwise unsupported by the record. See id. (citing Pl.'s Ex. 57, Pl.'s Aff. ¶¶ 6-8). Plaintiff's allegations in paragraphs 6 through 8 of her affidavit boil down to (1) Bolduc would often ask her what job she was doing; (2) Bolduc would assign her tasks to be completed in a certain amount of time; (3) Bolduc would complain or reprimand Plaintiff when she took longer than the designated amount of time; (4) Bolduc would check Plaintiff's assigned areas and reprimand her if something was wrong. See Pl.'s Ex. 57, Pl.'s Aff. ¶¶ 6-8.[4] If these alleged actions on the part of Bolduc amount to a

[4] Although Plaintiff alleges that she was "reprimand[ed]" by Bolduc, she does not allege that she was every formally disciplined or censured in a way that affected her day-to-day employment. Additionally, Plaintiff's allegation that Bolduc "would sneak up behind me" is a vague and loaded assertion that carries no import for summary judgment purposes given that Plaintiff does not allege that Bolduc ever physically touched or threatened her, and testified unequivocally that Bolduc never said anything to her that was sexually suggestive or vulgar. See Pl.'s Ex. 1, Pl.'s Dep. at 62:9-12. The mere alleged fact that Plaintiff may not have seen Bolduc approach on an ambiguous number of occasions does not support Plaintiff's hostile environment claim.

hostile environment, virtually every supervisor in America would run afoul of Title VII by doing his or her job.

Perhaps cognizant of her exceedingly weak hostile environment claim, Plaintiff is forced to allege that she "never saw" or "never witnessed" Bolduc similarly scrutinizing the work of male employees. See id. Yet, at all times relevant to this litigation, Bolduc supervised at least ten employees at any given time, most of whom worked completely outside of Plaintiff's presence. Plaintiff has no personal knowledge – and certainly has not adduced any other evidence – that male employees were not similarly scrutinized. See Dudley v. Wal-Mart Stores, Inc., 931 F. Supp. 773, 813-16 (M.D. Ala. 1996) (granting employer summary judgment on race-based hostile environment claim where supervisor spent time in other departments and plaintiff did "not know how [supervisor] treated employees in other areas of the store"). Plaintiff's assertions consist, simply, of pure conjecture, and are therefore insufficient to defeat summary judgment. See Slowiak, 987 F.2d at 1295 ("[A] plaintiff's speculation is not a sufficient defense to a summary judgment motion.") (quotes and citations omitted).

(7) Plaintiff's alleges that Bolduc "would reprimand her for not having completed tasks that had been assigned to her male counterparts." Pl.'s Mem. at 25 (citing Pl.'s Ex. 57, Pl.'s Aff. ¶¶ 10-12).

Plaintiff's allegations consist of two basic complaints: (1) that Bolduc assigned her tasks that she believed were Porter's responsibility and (2) that Bolduc reprimanded her for problems that she believed were attributable to others. See Pl.'s Ex. 57, Pl.'s Aff. ¶¶ 10-12. Again, Plaintiff does not allege that these alleged reprimands resulted in any formal discipline or material change in her day-to-day employment. And Plaintiff does not allege that the assigned tasks were unreasonable or outside of her job description. At

best, Plaintiff has shown that she disagreed with Bolduc over her job responsibilities and assignments. Such disagreement is insufficient to defeat summary judgment. See Bishop v. Bell Atl. Corp., 299 F.3d 53, 59 (1st Cir. 2002) (mere fact that an employee is displeased by an employer's act has no legal effect); Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985) ("[C]ourts must refrain from intruding into an employer's policy apparatus or second-guessing a business's decisionmaking process.").

> (8) Plaintiff alleges that Bolduc gave her "more difficult tasks than her male co-workers on a routine basis." Pl.'s Mem. at 25 (citing Pl.'s Ex. 57, Pl.'s Aff. ¶¶ 14, 16).

Plaintiff provides no evidence, only conclusory affidavit allegations, to support this contention. The only details Plaintiff relays are that (1) she had to climb a ladder to clean a fixture, while Porter did not; (2) that she had a clean the third floor, which was considered a more difficult job, while Porter was assigned easier floors. See Pl.'s Ex. 57, Pl.'s Aff. ¶¶ 14, 16.[5] Plaintiff has no evidence beyond her own say-so that male employees were never assigned unfavorable tasks. Nor, again, does she allege that the assigned tasks were unreasonable or outside of her job description. Simply put, these allegations are insufficient to defeat summary judgment. Cowan v. Prudential Ins. Co. of Am., 141 F.3d 751, 759 (7th Cir. 1998) (hostile environment claim failed where plaintiff alleged that men were treated better than females did not adequately support her allegations with specificity); Worlds v. Flashfold Carton, Inc., 1999 U.S. Dist. LEXIS 7048, at *28 (N.D. Ind. Apr. 2, 1999) (plaintiff could not establish race-based hostile environment claim by alleging that "minority employees were required to work on the

[5] Even if the allegations in paragraph 16 of Plaintiff's affidavit could be deemed to contribute to a hostile environment, Plaintiff states that the alleged incidents occurred in 1989-90, and therefore they could not possibly be deemed to played a part in a continuing hostile environment that lasted into the limitations period.

more difficult machines, were subject to harsher criticism and more scrutiny from [the supervisor], and were required to do menial jobs during down times").

(9) Plaintiff alleges that Bolduc "shouted at female employees far more than he did male employees." Pl.'s Mem. at 25.

Plaintiff provides no evidence beyond a few inconclusive anecdotes to support this contention. Plaintiff cites to pages 84 and 85 of her deposition, but nothing on those pages can be read to support the notion that Bolduc yelled at women more than men. See Pl.'s Ex. 1, Pl.'s Dep. at 84-85. At her deposition, just moments after conclusorily asserting that Bolduc yelled at "just at us women," Plaintiff admitted that co-worker Kenneth Schiano testified that Bolduc would regularly yell at him at the Dexter St. facility. See id. at 62:9 – 63:2. In any event, Plaintiff's allegation that Bolduc yelled at her on a few different occasions over a nearly ten-year period cannot constitute a hostile work environment. See Vore v. Indiana Bell Tel. Co., 32 F.3d 1161, 1162 (7th Cir. 1994) ("Title VII does not guarantee a utopian workplace, or even a pleasant one."); Paquin v. MBNA Marketing Sys., Inc., 233 F. Supp. 2d 58, 64 (D. Me. 2002) (although perhaps creating an unpleasant working environment, five instances of inappropriate conduct falls "well short of the frequency required to amount to an abusive working environment").

(10) Plaintiff alleges that Bolduc reprimanded her for "parking in the company garage before 5:00 p.m., while ignoring male employees who did so." Pl.'s Mem. at 25 (citing Pl.'s Ex. 1, Pl.'s Dep. at 103:17 – 104:3).

Plaintiff's deposition testimony does not support this broad allegation. Plaintiff testified that she "sometimes" parked in the garage when she was unable to get a spot on the street, see Pl.'s Ex. 1, Pl.'s Dep. at 103:17-20, and that on *one occasion*, during a meeting of company executives, Bolduc reprimanded her for doing so. Id. at 103:24 – 104:2. Plaintiff insinuates that men's cars were in the garage that night, but provides no

supporting evidence. Plaintiff also provides no evidence that Bolduc did not, in fact, reprimand others whose cars were allegedly in the garage that night. In short, this allegation is utterly unsupported by evidence and therefore cannot be credited for the purposes of summary judgment.

(11) Plaintiff complains that Bolduc told her to study a company personnel policy handbook. See Pl.'s Mem. at 25 (citing Pl.'s Ex. 1, Pl.'s Dep. at 87:20 – 88:12).

Plaintiff alleges that Bolduc told here there would be a test, see id., but does not allege that she was ***actually tested***. Nor does Plaintiff allege that (1) other women were told to study the policy or that there would be a test or (2) no men were told to study the policy. In short, Plaintiff has adduced evidence that her supervisor gave her a personnel handbook and told her to study the policies. Again, if such evidence can contribute to a hostile environment claim, supervisors across the country would be at risk of violating Title VII on a regular basis. This allegation is immaterial to resolution of summary judgment.

(12) Plaintiff alleges that Bolduc "isolated" himself from her. Pl.'s Mem. at 25 (citing Pl.'s Ex. 1, Pl.'s Dep. at 87:20 -88:12).

As Defendants have discussed previously in some detail, see Defs.' Mem. at 18-19, cannot, as a matter of law, be deemed to contribute to her alleged hostile environment claim. Plaintiff does not dispute that Bolduc, in allegedly putting an end to daily meetings, told her, "You guys got different jobs every day. You know what to do, so you're all right, so do them." See Defs.' Stmt. ¶ 40 (quoting Defs. Ex. B, Pl.'s Dep. at 85:10-13). Plaintiff has no evidence beyond conclusory assertions that Bolduc's alleged decision was part of a nefarious sexist plot, nor does she have evidence that this decision affected her day-to-day ability to do her job. Even if Bolduc's isolation was unfair or

rude, or did amount to a *de facto* elevation of Porter to "leadman," see Pl.'s Mem. at 29, it cannot support Plaintiff's hostile environment claim. See Defs.' Mem. at 18-19 (collecting cases).

(13) Plaintiff alleges that Bolduc "failed to remediate the conditions around the men's locker room at Weybosset . . . and at the Dexter St. facility." See Pl.'s Mem. at 26, 30.[6]

Plaintiff alleges the existence of calendars with "naked women" in the men's locker room at the Weybosset St. facility and at a couple of locations at Dexter St. where Plaintiff occasionally filled in. See Pl.'s Ex. 57, Pl.'s Aff. ¶¶ 21-22. Plaintiff's opposition to summary judgment was the first time that Defendants were apprised of this particular allegation, despite Plaintiff's ample opportunity to lodge it at her deposition.

With respect to her Dexter St.-related allegations, see id. ¶ 22, Plaintiff testified that she was never assigned to Dexter St., but would occasionally "fill in." See Pl.'s Ex. 1, Pl.'s Dep. at 19:11-21. Thus, even if true, her allegations cannot establish the repeated and pervasive behavior necessary to support a hostile environment, and do nothing to advance her theory that it was Bolduc's yelling and reprimands that created the hostile day-to-day working environment..

[6] Plaintiff also alleges that Bolduc "failed to respond to complaints that male employees would use the bathroom facilities while she was attempting to clean them." Pl.'s Mem. at 26. Yet Plaintiff unequivocally testified that this happened twice, probably in 1994 or 1995. See Defs.' Stmt. ¶ 37; Pl.'s Stmt. ¶ 37. Thus, this allegations provides no support for Plaintiff's theory that the alleged hostile environment continued beyond January 1996 and into the limitations period. Plaintiff also alleges, incredibly, that Bolduc purposefully made sure a dumpster was closed when Plaintiff was supposed to dump recyclables into it. Pl.'s Mem. at 26 (citing Pl.'s Ex. 57, Pl.'s Aff. ¶ [15]). Although Plaintiff asserts that Mr. Bolduc was "supposed to tell the people who delivered the dumpster to leave it open," she has no evidence that Bolduc knew, or could otherwise have intervened, every time the dumpster was closed when it should have been opened. Nor is there any evidence beyond Plaintiff's bald assertions that men never encountered a closed dumpster. Plaintiff apparently believes that Bolduc possessed Jedi-like powers which allowed him to open and close a dumpster from afar depending on who was taking out the recyclables. It should go without saying that this allegation does not support Plaintiff's hostile environment claim.

With respect to her Weybosset St.-related allegations, Plaintiff does not allege that any males ever exposed themselves to her; the mere allegation that some wore towels or zipped their pants (in a locker room, no less) is simply not credible evidence that Bolduc created a hostile work environment for Plaintiff that continued into the limitations period. Further, Plaintiff's allegations are confusing. She alleges that she could see a "calendar with naked women" because the door to the locker room was usually open. See id. ¶ 21. Yet, in the next breath, Plaintiff alleges that she "observed this" because she had to "clean the locker room." Id. It is difficult to imagine why Plaintiff would allege that she could see the allegedly offensive calendar through an open door if she had to be physically present inside the locker room to clean it. The obvious answer is that this allegation is just another conclusory allegation without factual support meant to stave off summary judgment on the hostile environment claim.

b. Plaintiff's Unsupported and Vague Claims of Overtime Denials in Her Affidavit Are Not Sufficient to Defeat Summary Judgment.

Plaintiff alleges that she was denied overtime work in favor of male employees "at least 10-20 times over the course of her employment." Pl.'s Mem. at 6. Plaintiff has absolutely no record evidence of all but three of these alleged denials; she merely self-servingly asserts that they occurred. See Pl.'s Aff. ¶ 17.[7] Having asserted, without evidence, the existence of "at least 10-20" overtime denials, Plaintiff argues that the allegations support both her hostile environment claim and her disparate treatment claim. See Pl.'s Mem. at 25-26, 50.

[7] Defendants acknowledge only that Plaintiff has adduced evidence that she grieved alleged denials of overtime opportunities in 1994 and 1998. See Defs.' Stmt. ¶ 38; Pl.'s Mem. at 6 (citing Pl.'s Exs. 58-59).

This Court cannot, as a matter of law, credit Plaintiff's assertions regarding overtime for the purposes of summary judgment. See Slowiak, 987 F.2d at 1295 ("Self-serving affidavits without factual support in the record will not defeat a motion for summary judgment."). As a primary matter, Plaintiff does not – and reasonably cannot – dispute that for the purposes of recovery, each alleged denial of overtime is a "discrete act" constituting a separate and distinct disparate treatment claim. See, e.g., Kaplan v. City of Chicago, 2004 U.S. Dist. LEXIS 22339, at *21 (N.D. Ill. Nov. 2, 2004); Shaw v. Potter, 2002 U.S. Dist. LEXIS 21057, at *10 (S.D. Ind. Oct. 24, 2002); see also Defs.' Mem. at 25-26. It is a well settled principle of summary judgment jurisprudence that courts cannot rely upon specific claims first raised in an affidavit opposing summary judgment. See, e.g., Church v. Maryland, 180 F. Supp. 2d 708, 732 (D. Md. 2002); Brown v. Commonwealth Edison Co., 1998 U.S. Dist. LEXIS 3609, at *51 (N.D. Ill. Mar. 20, 1998); Deghand v. Wal-Mart Stores, 926 F. Supp. 1002, 1015 (D. Kan. 1996).

Because each missed overtime claim constitutes a discrete act of alleged discrimination as a matter of law, Plaintiff's prior failure to raise these claims with any reasonable specificity – e.g., approximate dates, actors involved, tasks at issue, complaints made, or remedies sought – precludes her from doing so now. There is no competent evidence (1) that the alleged overtime opportunities that Plaintiff was allegedly denied even existed; (2) that, if they did exist, Plaintiff was entitled to them; (3) that, if they did exist and Plaintiff was entitled to them, that they were actually given to men; and (4) that even if all of the above were true, that such amounted to a pattern of discrimination *on account of sex*. See Cardona v. Aramark Servs., 9 F. Supp. 2d 92, 99 (D.P.R. 1998) (citing Oncale, 523 U.S. at 79) (noting that the law only prohibits

harassment that is "motivated by sex-based discrimination"). Plaintiff has, via her affidavit opposing summary judgment, simply offered self-serving, conclusory assertions and rank speculation that (1) through (4) above are true.

Tellingly, Plaintiff has failed to offer what would be the strongest evidence that she was discriminated against with respect to overtime: *actual overtime records* showing that she recorded fewer such hours than similarly situated males. Cf. Joens v. John Morrell & Co., 243 F. Supp. 2d 920, 949 (N.D. Iowa 2003). In Joens, the plaintiff's suit was based, in part, on allegations that she had complained to supervisors that she was receiving fewer overtime hours but that the supervisors had done nothing. The court granted summary judgment for the defendant *even though* the plaintiff had established a "prima facie case of a[n overtime] disparity with a similarly situated male." Id. Here, Plaintiff's showing with respect to overtime falls far short of the "very weak" showing made in Joens. Id. The plain fact that Plaintiff has offered no overtime records to support the bare allegations in her affidavit underscores the legal principles that counsel strongly against crediting them.

Defendants would also be prejudiced if Plaintiff's sweeping claims of repeated overtime denials are credited, as Defendants would be deprived of any meaningful opportunity to investigate those claims to determine their accuracy or to establish nondiscriminatory explanations on the part of the alleged actors. For these reasons, Plaintiff's self-serving allegations that she was wrongfully denied overtime, with the

exception of those instances in 1994 and 1998 supported by record evidence, cannot be credited for the purposes of summary judgment.[8]

Even if Plaintiff's unsupported and vague assertions regarding overtime are not precluded as a matter of law, they do not provide any support for her hostile environment claim. Defendants contend that Plaintiff's hostile environment claim is time-barred under the Morgan continuing violation doctrine because Plaintiff has no evidence that "an act contributing to the [alleged hostile environment] claim" occurred within the limitations period. See Defs.' Mem. at 15-25; Crowley, 303 F.3d at 395 (quoting Morgan, 536 U.S. at 117). Even if Plaintiff is correct that the alleged denials of overtime can contribute to a hostile environment, see Pl.'s Mem. at 25-26, Plaintiff has no evidence that any such denial occurred within the limitations period, i.e., on or after April 26, 1999. Thus, her conclusory and unspecific allegations that acts contributing hostile environment – here, denials of overtime – occurred within the limitations period are insufficient as a matter of law to withstand summary judgment. See Mahgoub v. Miami Dade Cmty. College, 2006 U.S. App. LEXIS 9291, at *3 (11th Cir. Apr. 13, 2006) (plaintiff cannot avoid summary judgment on timeliness grounds by simply asserting in conclusory fashion that harassing conduct occurred within the limitations period); Lucas v. Chicago Transit Auth., 367 F.3d 714, 726 (7th Cir. 2004) ("We repeatedly have held that conclusory statements, not grounded in specific facts, are not sufficient to avoid summary judgment . . . . Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter, rather it requires affidavits that cite *specific concrete facts* establishing the existence of truth of the matter asserted.") (emphasis added); Azimi v. Jordan's

[8] It practically goes without saying that the similarly unsupported and conclusory allegations of missed overtime offered by nonparty Christine Stamp in her affidavit, see Pl.'s Mem. at 6 (citing Pl.'s Ex. 62), cannot be credited for the purposes of summary judgment.

Meats, Inc., 2004 U.S. Dist. LEXIS 20137, at *20 (D. Me. Oct. 7, 2004) (refusing to infer that at least one incident took place within limitations period where plaintiff adduced no cognizable evidence of precise dates of alleged incidents).

That no denials of overtime occurred within the limitations period is further buttressed by the fact that Plaintiff filed a grievance in 1998 relating to two alleged missed overtime opportunities. The 1998 grievance alleged that Porter was improperly called in for overtime instead of Plaintiff. Defs.' Stmt. ¶ 38. That grievance conclusively establishes that by 1998 Plaintiff "realize[d] what was [allegedly] happening" – that she believed she was being denied overtime in favor of male employees. See Pl.'s Mem. at 50. The undisputed fact that she filed no grievances in 1999 provides further support for the conclusion that no overtime denials occurred within the limitations period.

Plaintiff's unsupported claim that overtime denials occurred within the limitations period – despite the lack of any memorializing grievance – is further undermined by the undisputed fact that Plaintiff's 1998 grievance was resolved favorably to her. For one alleged missed overtime opportunity, Plaintiff was fully compensated. For the other, Plaintiff was offered alternative overtime work.[9] Defs. Stmt. ¶ 38. Additionally, Plaintiff does not allege that she was subjected to any retaliation as a result of her grievance. These undisputed facts point strongly toward the conclusion that had Plaintiff truly been denied overtime during the limitations period, she would have filed a grievance, just as she did in 1998. The fact that she did not, along with the utter absence of any evidence of

[9] Defendants realize that Plaintiff takes issue with the particular tasks that Plaintiff was offered in lieu of the alleged missed overtime opportunity. See Pl.'s Mem. at 6. But there is no evidence that the offered tasks were outside the parameters of Plaintiff's job description or unreasonably difficult. Nor is there any evidence beyond Plaintiff's bare and conclusory assertions that the offered tasks were dangerous. In any event, as discussed supra at 8-9, the mere fact that Plaintiff may have been displeased by the offered tasks is not material to resolution of summary judgment. See Bishop, 299 F.3d at 59; Meiri, 759 F.2d at 998.

an overtime denial on or after April 26, 1999, means that she cannot rely on bare allegations of missed overtime to save her untimely hostile environment claim.

2. IN THE AGGREGATE, PLAINTIFF'S ALLEGATIONS THAT ARE SUPPORTED BY CREDIBLE EVIDENCE FALL SHORT OF ESTABLISHING A HOSTILE ENVIRONMENT.

In similar cases, courts have uniformly held that plaintiffs failed to allege a hostile work environment. For example, in Lewis v. Potter, 114 Fed. Appx. 262, 264 (8th Cir. 2004), the plaintiff alleged the following: "(1) being closely monitored by her supervisors during breaks and while she worked on numerous occasions; (2) two instances where she was told to stop talking by her supervisors; (3) one instance where she believes she was followed by her supervisor; (4) two occasions where a supervisor asked her to perform work she believed to be outside her medical restrictions; (5) one instance when she was not paid for eight hours of work after she swiped her time card at the wrong location." Id. The court, however, held that these allegations fell "short of establishing a claim for hostile work environment." Id.

Likewise, in Osier v. Broome County, 47 F. Supp. 2d 311, 323-24 (N.D.N.Y. 1999), the court examined "allegations that (1) plaintiff was required to use a bathroom also used by numerous other males . . . ; (2) plaintiff's work performance was more closely scrutinized than male employees . . . ; (3) [plaintiff's supervisor] tore up paper, threw it on the ground, and made plaintiff pick up the pieces . . . ; (4) [the supervisor] told [a co-worker] to fire plaintiff . . . ; (5) [the supervisor] entered a bathroom while plaintiff was using it . . . ; and (6) plaintiff received numerous, unjustified disciplinary charges . . . ." Id. at 323. The court stated that it was "difficult to discern how any of these instances, even in the aggregate, unreasonably interfered with plaintiff's job performance." Id. at

324. It held that "no fair minded jury could reasonably conclude" that plaintiff was subjected to a hostile work environment. Id.

Similarly, in Rayl v. Decision One Mortgage Co., 2003 U.S. Dist. LEXIS 14556, at *14-17 (S.D. Ind. Aug. 19, 2003), the plaintiff alleged (1) that she "suffered numerous instances" of her supervisor "verbally abusing female employees, including calling them 'stupid' and having 'tantrums' in the office;" (2) that her supervisor "'continuously' belittled and berated" her "in front of other employees;" and (3) that female employees, including the plaintiff, "were reprimanded in view of other employees while males were disciplined behind closed doors." Id. at *14-15. In granting summary judgment, the court noted that

> [Plaintiff] Rayl does not allege the [supervisor] Jenkins touched her inappropriately, nor does she allege that an of Jenkins' alleged "verbal abuse" was of a sexual nature. At most, she can show only that Jenkins was an overly bullish boss that directed his wrath at all of his employees, regardless of gender. In short, Rayl's allegations do not rise to the level of being sufficient severe or pervasive [to establish a hostile environment claim].

Id. at *17. Here, Plaintiff likewise does not allege that Bolduc ever physically touched or threatened her, and she plainly admitted that his alleged "verbal abuse" was not sexually suggestive or vulgar. See Pl.'s Ex. 1, Pl.'s Dep. at 62:9-12. Further, it is undisputed that Bolduc yelled at male employees, as well. See id. at 62:22 – 63:2. For the same reasons noted by the Rayl court, Plaintiff's hostile environment claim is insufficient to defeat summary judgment.[10]

---

[10] Similarly, the court in Hewlett v. Waffle House, Inc., 2006 U.S. Dist. LEXIS 36269, at *28-29 (M.D. Ga. June, 5, 2006), in rejecting a hostile environment claim, noted:

> Although performance nitpicking and a cold relationship with a supervisor might cause an employee to lose some self-esteem, the federal employment laws are not a general civility code, and they do not make actionable the ordinary tribulations of the workplace.

Additionally, in disposing of the plaintiff's hostile environment claim, the Rayl court also addressed the plaintiff's proffered affidavit evidence:

> As evidence of the "numerous" instances of abuse and her "continuous" belittlement, Rayl produces as evidence nothing more than conclusory statements. For example, Rayl cites to her own affidavit which states in conclusory fashion, "that Jenkins continuously berated, belittled, and harassed Rayl during her tenure with [Defendant] Decision One. . . . Rayl provides no specifics regarding the dates or times of those incidents, or any other information to establish that this alleged harassment was "continuous." Under our precedent, these conclusory statements, unsupported by the evidence of record, are insufficient to avoid summary judgment.

Id. at *15, n.5 (internal quotes and citations omitted). Here, Plaintiff attempts to use the exact same impermissible tactic to avoid summary judgment. Plaintiff simply alleges, without any "specifics regarding the dates or times . . . or any other information," see id., various objectionable behaviors on the part of Bolduc. See, e.g., Pl.'s Ex. 57, Pl.'s Aff. ¶¶ 6-11, 13-14, 17-18, 21-22. Plaintiff's clearly self-serving assertions that certain incidents happened "at least twice a week," id. ¶ 6, "at least once a day," id. ¶ 7, "[o]n a daily basis," id. ¶ 8, "[o]n other occasions," id. ¶¶ 9-10, "[o]n several occasions," id. ¶ 11, "[o]n numerous occasions," id. ¶¶ 13-14, etc., cannot be deemed sufficient to avoid summary judgment in the absence of more specific allegations. For these reasons, Defendants are entitled to summary judgment on Plaintiff's hostile environment claim.

---

> . . . Moreover, unwelcome day-to-day critiques and assertedly unjustified negative evaluations are generally not enough to meet the adverse employment action requirement.

Id. (citing Davis v. Town of Lake Park, Fla., 245 F.3d 1232, 1242 (11th Cir. 2001)).

### 3. EVEN IF A HOSTILE ENVIRONMENT CONTINUED BEYOND JANUARY 1996, PLAINTIFF FAILS TO ESTABLISH THE EXISTENCE OF AN ANCHORING ACT THAT WOULD RENDER HER CLAIM TIMELY.

Plaintiff misconstrues Defendants' arguments with respect to Morgan's continuing violation doctrine. 536 U.S. at 116-18. Defendants acknowledge – despite Plaintiff's lengthy exposition on Crowley v. L.L. Bean, Inc., 303 F.3d 387, 395-96 (1st Cir. 2002), and her contention to the contrary, see Pl.'s Mem. at 31-33 – that an alleged harassing act need not be actionable in and of itself to constitute an "anchoring act" for the purposes of the Morgan analysis. Defendants simply argue that none of the Plaintiff's allegations within the limitations period can, as a matter of law, constitute "an act contributing to the [alleged hostile environment] claim." See Crowley, 303 F.3d at 395 (quoting Morgan, 536 U.S. at 117).

On pages 30 and 31 of her Memorandum in Opposition to Motion for Summary Judgment, Plaintiff lists a number of allegations that she posits constitute anchoring acts to render timely her hostile environment claim. Defendants dealt with Plaintiff's main allegation – the locker room incident – in great detail in their initial brief in support of summary judgment, and do not wish to rehash those arguments here in full. See Defs.' Mem. at 20-22.

Defendants reiterate, however, that the locker room incident cannot, as a matter of law, be deemed an act contributing to the hostile environment claim. See id. Plaintiff admitted that Bolduc had never so entered the locker room previously; and that after the incident, he never did so again. See Defs.' Stmt. ¶ 51 (citing Defs.' Ex. B, Pl.'s Dep. at

75:23 – 76:6).[11] Nor, contrary to Plaintiff's assertion, see Pl.'s Mem. at 33, did this incident relate to Bolduc's earlier alleged conduct of subjecting Plaintiff to stricter scrutiny of her performance and work rules. Plaintiff does not allege, and has no evidence beyond this one incident, that Bolduc closely monitored her breaks or otherwise denied her breaks to which she was entitled. Given the dearth of other legally cognizable allegations of hostile environment harassment on the part of Bolduc continuing into the limitations period, the locker room incident cannot constitute an act contributing to Plaintiff's hostile environment claim.

Plaintiff alleges that other complained-of conduct on the part of Bolduc can establish an anchoring act for the purposes of the statute of limitations analysis. See id. at 30-31. Because most of these allegations have been discussed at length above, Defendants address them only briefly, seriatim.

- The so-called "fool's errand" of studying the policy handbook. As discussed supra at 11, under no conception of Title VII could a supervisor directing a supervisee to study a handbook be considered a harassing act contributing to a hostile environment. Moreover, there is no dispute that Plaintiff was not, in fact, tested, and Plaintiff has no evidence that women in general were required to study the handbook while men were not. Thus, this allegation cannot constitute Plaintiff's anchoring act.
- The "rule" against talking with second-shift employees was not enforced against Porter. As discussed supra at 6, a lack of managerial action with

[11] Plaintiff's "denial" of this undisputed fact, see Pl.'s Stmt. ¶ 51, borders on frivolous; Plaintiff's cited deposition testimony speaks for itself. The issue, for the purposes of this case, is whether Bolduc ever flung open the locker room door on Plaintiff on any other occasion. The record is clear that he did not.

respect to another employee cannot be a harassing act contributing to a hostile environment ***experienced by Plaintiff***. Thus, this allegation cannot constitute Plaintiff's anchoring act.

- Bolduc invented a new rule for overtime distribution in the fall of 1999. First, Plaintiff's characterization that Bolduc "invented" a "rule" is not supported by the record. At best, Plaintiff has evidence that on *one occasion*, December 31, 1998, Bolduc insisted that Porter join Plaintiff for overtime duty on New Year's Eve. See Pl.'s Ex. 1, Pl.'s Dep. at 89:4 – 90:17. There is no evidence that this practice was repeated at any other time, and Plaintiff's testimony is clear that she was not denied any overtime opportunity on that date. Second, Plaintiff's assertion that this occurred in the fall of 1999, see Pl.'s Mem. at 30, is directly contradicted by her deposition testimony, in which Plaintiff unequivocally stated that this occurred on December 31, 1998. See Pl.'s Ex. 1, Pl.'s Dep. at 90:4-6.

- Mr. Bolduc's "isolation" from female employees was "ongoing." As discussed supra at 11-12, a supervisor's isolation cannot, as a matter of law, constitute an act of harassment contributing to a hostile environment. Nor can conclusory claims that an objectionable behavior was "ongoing" into the limitations period save an otherwise untimely claim. Mahgoub, 2006 U.S. App. LEXIS 9291, at *3. Thus, this allegation cannot constitute Plaintiff's anchoring act.

- Conditions at Weybosset St. and Dexter St. continued until the end of Plaintiff's employment. Likewise, this type of generalized and vague

allegation is insufficient as a matter of law to overcome summary judgment on statute of limitations grounds. See id. Plaintiff does not allege with any specificity – dates, times, or details – what "act" by Bolduc would constitute the anchor for her hostile environment claim. Except in the most general and conclusory manner, Plaintiff has not even alleged that she complained to Bolduc to no avail during the limitations period. Thus, this allegation cannot constitute Plaintiff's anchoring act.

- The disparities in supervision and work assignments continued until the end of Plaintiff's employment. As discussed at some length supra at 3-13, Plaintiff has no evidence of disparities in supervision and work assignments beyond her self-serving and conclusory allegations. These allegations, without any supporting evidence, cannot be credited for the purposes of summary judgment. Thus, this allegation cannot constitute Plaintiff's anchoring act.

As Plaintiff has adduced no evidence of any other act contributing to her hostile environment claim that occurred on or after April 26, 1999, Defendant is entitled to summary judgment thereon.

### B. PLAINTIFF CANNOT ESTABLISH A DISPARATE TREATMENT CLAIM WITH RESPECT TO HER TEMPORARY PERIOD OF TERMINATION OR THE ALLEGED DENIALS OF OVERTIME.

Plaintiff makes two disparate treatment claims based on (1) her ultimately rescinded termination and (2) alleged denials of overtime to which she was entitled.

1. NO REASONABLE JURY COULD FIND THAT PLAINTIFF SUFFERED AN ADVERSE EMPLOYMENT ACTION SINCE SHE WAS NOT WORKING AT THE TIME OF TERMINATION AND ULTIMATELY RECEIVED ALL BENEFITS TO WHICH SHE WAS ENTITLED.

Plaintiff's disparate treatment claim based on her termination fails as a matter of law because the adverse employment action of which she complains – her termination – was ultimately rescinded, and Plaintiff was retroactively restored to every benefit to which she was entitled. As Defendants have discussed in detail, under these circumstances Plaintiff cannot establish a prima facie case of disparate treatment. See Defs.' Mem at 27-29. Defendants have cited cases from the U.S. Circuit Courts of Appeal from the Sixth, Eighth, and Eleventh Circuits, as well as U.S. District Courts from the Second and Third Circuits, in support of this proposition. See id. (collecting cases).

Plaintiff "urges" this Court to adopt the minority position, espoused by the Seventh Circuit in Ezell v. Potter, 400 F.3d 1041, 1049 (7th Cir. 2005) and the Ninth Circuit in Fonseca v. Sysco Food Svcs. of Ariz., Inc., 374 F.3d 840, 848 (9th Cir. 2004), that reversal of an otherwise adverse action does not *per se* defeat a prima facie case of disparate treatment. These cases, however, can be easily distinguished. In Ezell, the plaintiff postal worker was, in fact, working at the time he was issued a Removal Letter notifying him of his termination. See 400 F.d3 at 1043. Here, Plaintiff was not working or due any payments at the time of the alleged adverse action.[12] See Defs.' Stmt. ¶¶ 52,

[12] Indeed, the instant case more closely resembles Weathers v. Illinois State Police, 2006 U.S. Dist. LEXIS 36756, at *4-6 (N.D. Ill. June 6, 2006), in which the court distinguished Ezell and held that the plaintiff was not subjected to an adverse employment action where such action was later reversed. The court in Weathers noted that "only tangible employment actions that ***cause a significant change in employment status*** constitute actionable adverse actions." Id. at *5 (emphasis added). It also noted that there was no evidence that the complained-of suspension "would have marked the end of her career had it not been reversed." Id. at *6. Here, the temporary period of termination could not have

58. In Fonseca, where repeated denials of overtime were grieved and ultimately reversed, the court specifically pointed out that (1) the plaintiff had "filed five successful grievances . . . . [and] had to spend a significant amount of extra time" doing so; (2) the "grievances brought [the plaintiff] to his supervisors' attention in a negative light;" and (3) the plaintiff was deterred by management from filing overtime grievances on up to six other occasions. 374 F.3d at 848. The court stated that the plaintiff was "simply denied compensation" on such occasions, thus implying that the complained-of adverse action was not, in effect, fully remedied. See id. Here, unlike Fonseca, Plaintiff (1) only filed one grievance, which was pursued and eventually settled while Plaintiff remained disabled and out-of-work; (2) did not suffer any negative consequences vis-à-vis her supervisors since she was not, in fact, working; and (3) ultimately received all benefits to which she was entitled. Thus, none of the factors that the court in Fonseca relied upon in finding an adverse action are present here.

Plaintiff makes a half-hearted attempt to argue that the circumstances of her departure from the Defendants' employ created a "cloud" that could "hinder her ability to find another job." Pl.'s Mem. at 50. Plaintiff presents no evidence to support this claim. In order to bolster this questionable claim, Plaintiff apparently takes exception to Defendants' pointing out the undisputed fact that she is "permanently disabled," arguing, without evidence, that her "condition could possibly improve." Id. However, this assertion is plainly contradicted by Plaintiff's own argument, lodged earlier in her brief, that she "is physically incapable of earning . . . income." Id. at 48. None of Plaintiff's unfounded assertions change the basic undisputed fact that as of settlement of her

---

materially affected Plaintiff, as her career with Defendants had ended long before when she went out on permanent disability in October 1999.

grievance in the fall of 2000, and continuing to this day, Plaintiff is the exact same position she would have been in had she never been terminated at all.

For these reasons, as well as those advanced by Defendants in their Memorandum in Support of Motion for Summary Judgment at 26-30, Plaintiff cannot establish a key element of her prima facie case of disparate treatment based on her termination. Defendants are entitled to summary judgment on this claim.

2. PLAINTIFF'S ATTEMPT TO ESTABLISH A "SYSTEMIC TYPE OF CONTINUING VIOLATION" WITH RESPECT TO ALLEGED DENIALS OF OVERTIME HAS NO BASIS IN LAW AND SHOULD BE REJECTED.

Plaintiff urges this Court to recognize a new cause of action for a "systemic type of continuing violation" regarding Plaintiff's allegation that Defendants denied her overtime opportunities on account of gender. Pl.'s Mem. at 50. Plaintiff cites no authority to support her theory. See id.

Defendants have clearly shown that each alleged denial of overtime is a "discrete act" for the purposes of the statute of limitations. See Defs.' Mem. at 25-26. Plaintiff offers no citation to the contrary. Additionally, Defendants have argued in great detail why this Court cannot credit Plaintiff's conclusory and otherwise unsupported affidavit allegations of overtime denials allegedly occurring on or after April 26, 1999. See supra at 13-18. Simply put, there is no cognizable evidence of any overtime denials beyond those for which grievances were lodged in 1994 and 1998, nor is there evidence that those alleged denials were the result of gender-based discrimination. These few, sparse allegations are insufficient, as a matter of law, to establish a case of systemic disparate treatment. See International Bhd. of Teamsters v. United States, 431 U.S. 324, 336 (1977) (plaintiff must "establish by a preponderance of the evidence that [sex]

discrimination was the company's standard operating procedure – the regular rather than the unusual practice").

Moreover, the First Circuit's decision in Crowley v. L.L. Bean, Inc. forecloses Plaintiff's systemic disparate treatment claim in the absence of any evidence that a denial of overtime occurred during the limitations period. See 303 F.3d at 406. In Crowley, 303 F.3d at 406, the court held that the U.S. Supreme Court's decision in Morgan supplanted traditional systemic violation jurisprudence, which required only that a plaintiff show that a "policy or practice itself continues into the limitations period" in order "to have filed a timely complaint." See, e.g., Provencher v. CVS Pharmacy, 145 F.3d 5, 14 (1st Cir. 1998). The Crowley court held that post-Morgan, a plaintiff must show that one act – in this case, a denial of overtime based on sex – occurred within the limitations period in order for the alleged systemic violation claim to be deemed timely. See 303 F.3d at 406. As Plaintiff has no cognizable evidence that this is the case, her dubious theory – even if legally viable – still fails. Defendants are entitled to summary judgment on this claim, as well.

C. PLAINTIFF'S RETALIATORY TERMINATION CLAIM FAILS BECAUSE SHE CANNOT SHOW PRETEXT OR DISPARATE TREATMENT.

Plaintiff argues that her retaliation claim is viable, inter alia, because (1) Defendants' deviated from their normal TDI-deduction policies, and thus a reasonable jury could find that Plaintiff was "set up" and (2) Defendants did not similarly discipline other male employees for allegedly similar infractions.[13] Neither claim holds water.

[13] Defendants continue to rely on, but do not address here, their arguments with respect to Plaintiff's failure to establish a prima facie case of retaliatory discharge, based on (a) her inability to show an adverse employment action under Burlington Northern & Santa Fe Railway Co. v. White, 126 S. Ct. 2405, 2414-18 (2006) (cited in Defs.' Mem. as slip opinion), given the unique circumstances of this case;

1. DEFENDANTS' METHODS FOR TDI DEDUCTION ARE IMMATERIAL TO WHETHER THEIR STATED LEGITIMATE REASON FOR PLAINTIFF'S TERMINATION IS TRUE.

Even if Plaintiff is correct that Defendants "made a significant deviation from [their] usual practice" of TDI deduction in Plaintiff's case – and Defendants acknowledge that the record is muddled on this point – that fact is immaterial to whether Defendants' explanation for Plaintiff's termination is pretextual. The undisputed facts are as follows: Defendants requested Plaintiff's TDI documentation on at least three occasions over a two month period. During this time, Plaintiff never provided Defendants with the requested information. Defs.' Stmt ¶¶ 57-59; Pl.'s Stmt. ¶¶ 57-59 (not alleging that Plaintiff provided the sought-after information). Defendants, after interviewing Plaintiff with union representation present, determined that Plaintiff had been deliberately unforthcoming with respect to her TDI documentation and terminated her. See Defs.' Stmt. ¶ 62; Pl.'s Stmt. ¶ 62 (denying factual basis of Defendants' conclusion, but *not* denying that Defendants did, in fact, conclude as much). It is also undisputed that Plaintiff eventually chose, on the advice of her attorney, to settle her subsequent grievance prior to arbitration. See Defs.' Stmt. ¶ 71, 73; Pl.'s Stmt. ¶ 71, 73.[14] Attorney Savage, who represented Plaintiff at the pre-arbitration negotiations, testified that he told Plaintiff that she had a "good chance of losing the arbitration" of the grievance. See Defs.' Stmt. ¶ 70; Pl.'s Stmt. ¶ 70. These facts are undisputed.

---

and (b) her inability to show a causal connection between her protected conduct and the alleged adverse action. See Defs.' Mem. at 30-35.

[14] Plaintiff's denial of Defendants' "characterization of Plaintiff's reasons for retiring," Pl.'s Stmt. ¶ 73, should not be credited, as Plaintiff's clearly testified that she retired on the advice of her attorney. See Pl.'s Ex. 1, Pl.'s Dep. at 143:11-12 ("Q. So you retired on advice of counsel? A. Yes.").

Although Plaintiff alleges that she did, in fact, attempt to contact Butler about the documentation requests, see Pl.'s Mem. at 40, she has not produced one shred of documentary evidence to support her claim. Her evidence consists merely of her own self-serving assertions. She has produced no written correspondence or telephone records, omissions all the more glaring when one considers that all Plaintiff had to do was *send Defendants her TDI documentation.* It is undisputed that she did not do so, and Plaintiff presents no evidence as to why she was unable simply to put that piece of paper in the mail.

Plaintiff's attempt to focus on Defendants' TDI-deduction procedures is unavailing because those procedures are immaterial to the three basic questions regarding the legitimacy of Defendants' decision to terminate her: (1) Was Plaintiff obligated to provide documentation of her TDI benefits at Defendants' request?; (2) Did she fail to do so?; and (3) Did Defendants believe that she knew or should have known that she was receiving payments to which she was not entitled?

Based on the undisputed facts of this case, all three questions can only be answered in the affirmative. Plaintiff does not allege that the Defendants had no right to ask for, or no interest in receiving, her TDI documentation. Further, Plaintiff provides no evidence that she was asked for TDI documentation because of her decision to engage in protected conduct. In fact, the record is clear that males who had not engaged in protected conduct were also asked to produce such documentation. See Pl.'s Ex. 24, Defs. Answers to Pl.'s First Set of Interrogs. at 7-8 (discussing Keith Cotnoir). And there is no dispute that Plaintiff was not entitled to the overpayments she received. See Defs.' Stmt. ¶ 61; Pl.'s Stmt. ¶ 61. Plaintiff simply has not created an issue of material fact with

respect to whether Defendants' stated legitimate reason for terminating her is pretextual.[15]

2. PLAINTIFF FAILS TO PRESENT ADEQUATE COMPARATOR EVIDENCE, AS THOSE SHE ALLEGES WERE TREATED MORE FAVORABLY WERE NOT SIMILARLY SITUATED IN ALL RELEVANT RESPECTS.

Plaintiff alleges that she was treated less favorably than other similarly situated employees, thus raising a triable issue of fact as to whether her termination was retaliatory. See Pl.'s Mem. at 41-44. As an initial matter, the bulk of Plaintiff's comparator evidence is invalid on its face. As the court in Conward v. Cambridge Sch. Comm., 171 F.3d 12, 20 (1st Cir. 1999) – the very case cited by Plaintiff, see Pl.'s Mem. at 43 – noted:

> [A plaintiff] must provide a suitable provenance for the evidence by showing that others similarly situated to him in all relevant respects were treated differently by the employer. See Perkins, 78 F.3d at 751. Reasonableness is the touchstone: while the plaintiff's case and the comparison cases that he advances need not be perfect replicas, they must closely resemble one another in respect to relevant facts and circumstances.

Id. Here, Plaintiff points to a veritable cornucopia of alleged transgressors who, as Plaintiff herself describes, engaged in conduct that is nothing like the conduct in which Plaintiff was found to have engaged. Thus, allegations that (1) Kenneth Mace "turned his residential gas meter backwards"; (2) Kenneth Schiano and Bill Johnson "were leaving work early"; (3) Jerry Porter took "unauthorized breaks"; (4) John McHugh and Dan Ford were "falsifying their time sheets"; (5) Jerry Porter "reported to work intoxicated";

---

[15] Indeed, under Plaintiff's theory of this case, an employer (1) that reasonably and legitimately asks for certain documentation from an employee (2) that directly affects the employer's financial disbursements to that employee, (3) could be exposed to Title VII liability for terminating that employee, even when the employee (a) does not allege that she provided the requested documentation, (b) does not allege that she did not have the requested documentation, and (c) provides no evidence as to why she was unable to provide the requested documentation.

and (6) Richard Kala allegedly engaged in harassment, see Pl.'s Mem. at 41-44, cannot possibly be deemed to "closely resemble" the conduct in which Plaintiff engaged: refusing to produce requested documentation while accepting overpayments to which she was not entitled. See Conward, 171 F.3d at 20. Plaintiff simply has not shown, as she must, that her purported comparators were "similarly situated with respect to performance, qualifications, or conduct." See Weathers, 2006 U.S. Dist. LEXIS 36756, at *6-7 (quoting Peele v. Country Mut. Ins. Co., 288 F.3d 319, 330 (7th Cir. 2002)).

Plaintiff's more specific evidence with respect to Defendants' treatment of Keith Cotnoir and Carl Saccoccio is also inadequate to defeat summary judgment. In Saccoccio's case, Defendants aver that the reason for the overpayments was not that *Saccoccio* was derelict in producing certain documentation, but, rather, that the *insurer* responsible for paying worker's compensation benefits had failed to produce the needed documentation. In his affidavit, Saccoccio's plainly does not aver that he failed, over a period of more than two months, to produce documents in response to repeated requests from his employer. Nor does Saccoccio aver that Defendants determined, after investigation, that *he* knew or should have known that he was not entitled to certain payments, yet decided to accept those payments anyway. In short, Saccoccio's affidavit falls far short of establishing that his "conduct" and the surrounding circumstances "closely resemble[d]" Plaintiff's. Conward, 171 F.3d at 20; Weathers, 2006 U.S. Dist. LEXIS 36756, at *6-7.

Evidence relating to Cotnoir suffers from similar defects. Plaintiff seizes on one line in Defendants' Responses to Plaintiff's First Set of Interrogatories, Pl.'s Ex. 24 at 7, which states: "One employee, Keith Cotnoir, failed to provide the TDI statement for a

prolonged period of time." Plaintiff alleges that this statement, in conjunction with Defendants' former Human Resources Director's testimony that Cotnoir was not terminated, is sufficient to show that Plaintiff was the victim of differential treatment and, hence, retaliation. See Pl.'s Mem. at 41.

This evidence, however, simply is not creditable comparator evidence. First, Plaintiff has produced no evidence showing that Cotnoir, like Plaintiff, was repeatedly asked, yet failed, to provide such documentation over a two month period. Plaintiff also has no evidence that Defendants determined – as they did in Plaintiff's case – that Cotnoir's failure to produce documentation was willful, or that he "knew or should have known" that he was being overpaid.[16] These findings were the key drivers behind Defendants' decision to terminate Plaintiff. Plaintiff's failure to present comparator evidence with respect to these key issues is fatal to her claim of differential treatment and, hence, retaliation.

In the absence of any competent comparator evidence, Plaintiff's mere belief that her termination was unwarranted, and that a lesser level of discipline was appropriate, is insufficient to defeat summary judgment. See Guerrero v. Connecticut Dep't of Children & Families, 315 F. Supp. 2d 202, 211 (D. Conn. 2004) ("This court will not ascribe discriminatory intent to an employer's choice of disciplinary methods based solely on the fact that there were less severe methods of discipline available."). For these reasons, along with those previously advanced by Defendants, see Defs.' Mem. at 31-37, Defendants are entitled to summary judgment on Plaintiff's retaliatory termination claim.

[16] An email from Defendants' Human Resources Generalist Joan Chaffee dated September 3, 2002 (produced to Plaintiff as Bates numbered document 001425) suggests that Cotnoir was, in fact, responsive to Defendants' request for documentation and may explain his failure to provide it in a timely fashion. The email stated that Chaffee had spoken to Cotnoir, who had informed that he was "in a dispute with TDI regarding his payments" and that "he [would] send proof to [her] attention."

Respectfully submitted,
DEFENDANTS SOUTHERN UNION CO.
& NEW ENGLAND GAS CO.

By their attorneys,

NIXON PEABODY LLP

/s/Neal J. McNamara
/s/Matthew J. Frankel
Neal J. McNamara (#4249)
Matthew J. Frankel (#7293)
One Citizens Plaza, Suite 500
Providence, RI 02903
Tel: (401) 454-1000
Fax: (401) 454-1030
nmcnamara@nixonpeabody.com
mfrankel@nixonpeabody.com

Dated: September 15, 2006

CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that I sent a true and accurate copy of the within Defendants' Reply Memorandum via regular mail, postage prepaid to the following persons this 15th day of September, 2006.

Noelle K. Clapham, Esq.
24 Salt Pond Road, Suite A8,
South Kingstown, RI 02879

Stephen M. Robinson, Esq.
Vicki J. Bejma, Esq.
Law Offices of Stephen M. Robinson
155 South Main Street
Providence, RI 02903

/s/ Neal J. McNamara