UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| CAROL PETRARCA | : | |
| | : | |
| v. | : | C.A. No. 04-310S |
| | : | |
| SOUTHERN UNION CO. and | : | |
| NEW ENGLAND GAS CO. | : | |

## REPORT AND RECOMMENDATION

Lincoln D. Almond, United States Magistrate Judge

### Background

Before this Court is Defendants' Motion for Summary Judgment (Document No. 109) pursuant to Fed. R. Civ. P. 56. In this action, Plaintiff Carol Petrarca ("Plaintiff" or "Petrarca") alleges three statutory counts of employment discrimination, harassment and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. Defendants' Rule 56 Motion is directed at all three counts of Plaintiff's Complaint.

Defendants filed their Motion for Summary Judgment and Memorandum of Law (Document No. 109) on July 21, 2006. Plaintiff objected to Defendants' Motion and filed her Memorandum of Law in Opposition (Document No. 114) on August 18, 2006. Defendants filed a reply (Document No. 118) on September 15, 2006. This matter has been referred to me for preliminary review, findings and recommended disposition. 28 U.S.C. § 636(b)(1)(B); LR Cv 72(a). A hearing was held on September 28, 2006. After reviewing the Memoranda submitted, listening to the arguments of counsel and conducting my own independent research, I recommend that Defendants' Motion for Summary Judgment (Document No. 109) be GRANTED in limited part as to Count II and otherwise DENIED as specified herein.

**Statement of Facts**[1]

Plaintiff is a female who was a Rhode Island resident at all times relevant to this litigation. Defendant Southern Union Co. is a Delaware corporation with its principal place of business in Pennsylvania. Defendant New England Gas Co. is a d/b/a of Southern Union Co. Defendants Southern Union Co. and New England Gas Co. are the corporate successors to Providence Gas Co. ("Providence Gas") (collectively the "Gas Company"). Defendants acquired Providence Gas effective March 1, 2001. At all times relevant to this litigation, Defendants were in the business of selling natural gas for home heating and other purposes within the State of Rhode Island.

During the relevant time frame, the Gas Company operated several facilities in Providence, Rhode Island in connection with their business. Among these facilities were buildings on Dexter Street and Weybosset Street. Local 12431 of the United Steelworkers of America (the "Union") was Plaintiff's collective bargaining representative in connection with her employment with the Gas Company. On February 25, 2000, Plaintiff filed a charge of discrimination with the Rhode Island Commission for Human Rights (the "RICHR") and the Equal Employment Opportunity Commission (the "EEOC") alleging that Defendants violated Title VII by treating Plaintiff unfairly and otherwise harassing her because of her sex. The RICHR notified the Gas Company of the charge of discrimination in a letter dated March 3, 2000. See Defs.' Ex. W. On July 22, 2004, Plaintiff initiated this action under Title VII.

Plaintiff began her employment with the Gas Company in April 1988 as a spare building cleaner. See Defs.' Ex. A. Her duties included "vacuuming and dusting, and cleaning the

---

[1] These facts are gleaned from the parties' Local Rule Cv 56(a) statements. In several instances, Plaintiff's Responsive Statement denies a fact identified as undisputed by Defendants but she fails, as required by LR Cv 56(a)(4) and Fed. R. Civ. P. 56(e), to provide evidentiary support for the denials. See, e.g., Document No. 115 at ¶¶ 40, 41, 44, 45, 46, 51, 56, 60 and 62.

bathrooms." See Defs.' Ex. B at pp. 17-18. At her deposition, Plaintiff testified that when she began her employment, she was only expected to work "two or three days a week" on a call-in basis. Id. at p. 23. Plaintiff testified, however, that she basically worked full-time, putting in approximately forty hours over five or six days each week. Id. at pp. 18, 23. Plaintiff worked as a spare building cleaner from 4:00 p.m. to 10:00 p.m. during the week, and several hours each Saturday morning and early afternoon. Id. at p. 18. As a spare building cleaner, Plaintiff was entitled to regular pay, but not fringe benefits or accrued seniority. Id. at p. 23. On or about January 8, 1989, Plaintiff was hired for a full-time building cleaner position, and she became entitled to receive fringe benefits and to accrue seniority. Defs.' Exs. A and B at p. 24.

As spare building cleaner and building cleaner, Plaintiff worked at the Weybosset Street office building. Occasionally she would fill in at Dexter Street if the Dexter Street cleaning person was absent. Defs.' Ex. B at p. 19. During the period between April 1988 and July 1989 when Plaintiff worked as either a spare building cleaner or building cleaner, Ed Bolduc was her direct supervisor. Defs.' Ex. B at p. 24. When asked at her deposition how she would characterize Bolduc as a boss, Plaintiff stated, "Very i[m]patient....He had a tendency to yell at the women. I don't know. He just had no patience with the women. He didn't want women in the department. He made that perfectly clear." Defs.' Ex. B at pp. 25-26. Plaintiff also stated that Bolduc said that "if he had his way, there would not be any women in the department," and that "women are just troublemakers." Id. at p. 26. Plaintiff stated that while she worked in building cleaning, Bolduc said this "probably more than a couple of times." Id. at pp. 26-27. Plaintiff could not recall any other such statements made by Bolduc between April 1988 and July 1991. Id. at pp. 29-30.

Plaintiff complained about Gas Company night watchman Pasquale "Pat" Domenicone's behavior during the period when she was a building cleaner. Plaintiff alleges that Domenicone followed her through the building for "two or three months," showing her pictures from Playboy magazine and making inappropriate comments about "big boobs, and big behinds." Defs.' Ex. B at pp. 38-39. Plaintiff stated at her deposition that she complained at various times about Domenicone to Bolduc, who "evidently put it down and wrote it in [Domenicone's] file and everything, but it didn't leave the sixth floor." Id. at pp. 39-40, 42. Plaintiff testified that after she complained to Bolduc, Domenicone's behavior "continued, but not as bad." Id. at p. 40. Plaintiff cited Domenicone's alleged comment, "[I]f you come and clean my house for a year, I'll get you your job. I can go and speak to Ed and get you in here ahead of everybody else." Id. Domenicone retired on January 31, 1991. Defs.' Ex. JJ.

In July 1991, the Gas Company put up a job posting for an opening in the maintenance department, and Plaintiff applied for the position. Defs.' Ex. B at pp. 20-21. Prior to joining the maintenance department, Plaintiff underwent a physical examination by a doctor on Reservoir Avenue. Id. at p. 28. At her deposition, Plaintiff testified that her co-worker Bob Biber stated, "I can't believe you passed that physical because I didn't even pass it." Id. at p. 61. Plaintiff alleges that building maintenance employee Roy Heaton and Bolduc tried to keep her out of the maintenance department. Plaintiff stated at her deposition, "things that they did to me, they did not do to men." Id. at p. 61. Plaintiff stated that prior to joining building maintenance, Bolduc had her lift boxes in the basement every evening for a week. Id. at pp. 61-62. Plaintiff testified that Bolduc said, "Because these are the types of boxes you're going to be lifting, and if you can't lift them, you can't come into this department." Id. at p. 61. Plaintiff also stated at her deposition that she

believed Heaton did not want her in the maintenance department. She stated that Heaton "made a remark that I was taking a job from a family man who had to support a family, and that's not a place for a woman to be." Id. at p. 60. Plaintiff was hired for the building maintenance job. Id. at p. 27.

On or about July 15, 1991, Plaintiff started her new position in building maintenance and she was given a substantial raise in pay. Defs.' Ex. A. Plaintiff switched to a day shift, Monday through Friday from 7:30 a.m. to 4:00 p.m., and continued to work at Weybosset Street under Bolduc's supervision. Defs.' Ex. B at p. 30. The department was renamed "facilities maintenance" in 1992. Defs.' Ex. A. As part of her job duties in facilities maintenance, Plaintiff testified that she had to deliver "tons of boxes...every day to the stations," i.e., to various departments and people throughout the facility. Defs.' Ex. B at p. 32. Plaintiff also testified, "[W]e were unloading...trucks of 250 boxes, and throwing them down the chute, and so someone had to be down there to catch them, and then when you got done throwing these 250 boxes, whoever was upstairs would have to go down now and help...stack them on the shelves. That was like an all day job...." Id. at p. 33.

At her deposition, Plaintiff stated that before she was in building maintenance, i.e., prior to July 15, 1991, Bolduc indicated "probably more than a couple of times" that if he had his way, there would not be women in the department. Id. at p. 26-27. Plaintiff alleges that Bolduc "liked to yell a lot...just [at] us women," id. at p. 62, but admitted that Bolduc "didn't like" male subordinates Kenny Schiano and Bill Johnson, and "had a problem" with them. Id. at pp. 62-63. When she started in building maintenance, Plaintiff worked with two other individuals, Jerry Porter and Joe Ianiello. Plaintiff testified that she had "no problem with [Porter]," that he never made inappropriate comments, and that he "was a very nice person." Id. at pp. 33-34.

At her deposition, Plaintiff stated that she had "problems with" Ianiello. Defs.' Ex. B at p. 34. Plaintiff stated that Ianiello was "nasty and controlling," would scream at her, "would disappear in the building," and would direct profanity at her. Id. at pp. 34-36. Plaintiff testified that Ianiello never physically assaulted her or touched her in any threatening way, id. at p. 38, and she had no recollection of Ianiello saying anything sexually inappropriate to her. Id. at p. 35. Plaintiff stated at her deposition that she complained to Bolduc about Ianiello "about three or four times" because she was "quite upset." Id. at pp. 34-35. Plaintiff stated that Bolduc would "say just go off somewhere, and he'll cool off." Id. Plaintiff testified that these incidents occurred in 1994 or 1995. Id. at p. 37.

Also in 1994 and 1995, Plaintiff allegedly had problems with her coworker, Richard Kala. At her deposition, Plaintiff stated that Kala inappropriately asked Plaintiff, on more than one occasion, if she wanted to have an affair. Defs.' Ex. B at pp. 46-49. In or about 1995, Plaintiff complained to Bolduc about Kala's behavior. Plaintiff and Bolduc, in turn, met with Director of Labor Relations Henry "Bud" Butler. Plaintiff also met with Alycia Goody, in-house attorney for Providence Gas, regarding the alleged harassment by Kala. Id. at p. 50. Plaintiff alleges that after meeting with Goody, Kala said to her, "You better drop the charges....I'm warning you. If you don't drop them, you're going to be sorry, because this is going to be in my files for the rest of my life....You better go up there and tell Al[y]cia you made a mistake." Id. at p. 51. Plaintiff's deposition testimony continued, "And then all of a sudden, all things started happening." Id. Plaintiff alleges that her car was tampered with, and that Kala "continued to make his little remarks," that he said "Carol, Carol" while Plaintiff was on the phone with her son-in-law in the basement of the building, and that he put his hand on her shoulder and asked "How are you feeling tonight?".

Id. at p. 51-53. Plaintiff also asserts that Bolduc advised her at some point after her complaint against Kala that "there were discipline notes in [her] file and that if [she] got one more [she] would be fired." Aff. of Plaintiff, ¶ 19. Prior to that time, Plaintiff asserts that she was not "aware of any such disciplines." Id.

The Gas Company contends that Goody and Butler conducted an investigation into Plaintiff's Complaint. It asserts that, although Kala denied the allegation, it was determined that Kala should be separated from Petrarca. Plaintiff disputes these facts. Kala had, on September 28, 1995, already signed a posting to be transferred to the position of Garage Helper at Dexter Street, within Fleet Services, a different facility from the one where Plaintiff worked. Kala had joined the facilities maintenance department on March 6, 1994, and he left the department permanently on January 2, 1996. After Kala's transfer, he and Plaintiff never worked together thereafter. Defs.' Ex. B at p. 64. After the transfer, Plaintiff testified that she would occasionally run into Kala at Dexter Street, where "he'd more or less come through, and he'd smile at me and say, 'How are you today,' or 'what's going on,' and then he'd go out the door." Id. at p. 64. Once Kala left facilities maintenance in January 1996, Jerry Porter was Plaintiff's only male coworker at Weybosset Street. Id. at p. 65.

In 1994 or 1995, Plaintiff took exception to two alleged instances where men entered the men's room to use the urinal while she was doing cleaning work in one of the stalls. Id. at pp. 58-60. Plaintiff alleges that on two occasions in 1998, she was denied the opportunity for overtime work to which she was entitled. Id. at p. 45. Plaintiff stated at her deposition that Bolduc called in Porter for overtime rather than Plaintiff, even though she was "low" on the overtime list. On one such occasion, Plaintiff lodged a grievance and was eventually paid for the alleged missed time. Id.

at p. 44. On the other occasion, Plaintiff was given alternative overtime work in lieu of the alleged missed time. Id. Plaintiff testified that when she approached Bolduc about the overtime, Bolduc stated that "he didn't realize [she] was low on the overtime sheet." Id. at p. 86-87.

Plaintiff also testified that Porter was called in rather than Plaintiff because Bolduc would give Porter's phone number to the nighttime security guard, with instructions to call Porter if any problems occurred in the maintenance department. Id. at p. 87.

Plaintiff alleges that Bolduc told his subordinates, "Well, you don't need to go up to my office in the morning anymore. You guys got different jobs every day. You know what to do, so you're all right, so do them." Id. at pp. 84-85. Plaintiff also alleges that Bolduc reprimanded her on one occasion for "joking and laughing" with the night crew during the last half-hour of Plaintiff's shift, but did not do the same when Porter was allegedly engaged in similar behavior. Id. at pp. 91-93. Porter was senior to Plaintiff, Defs.' Ex. KK, and Bolduc testified that he believed Porter was a better worker than Plaintiff. See Defs.' Ex. D at p. 39.

Although Plaintiff normally took her break at 9:30 or 9:45 a.m., she would sometimes work through her normal break period and take one at a different time. Defs.' Ex. B at p. 70. Plaintiff would often take her break in a room in the basement, where Plaintiff and other women would sometimes keep a change of clothes, their pocketbooks, and their lunches. Id. at pp. 69-70, 73. On August 20, 1999, Plaintiff and her coworker, Christine Stamp, were taking a break in that room at around 2:30 to 2:40 p.m. Id. at pp. 70-75. Just prior to their break, Plaintiff had been delivering boxes, and Stamp had been painting on the roof. Stamp was tired from painting and had put all the materials away before taking her break. Id. at p. 71. Plaintiff testified that she thought Bolduc "had had a problem with Kenny [Schiano] and Bill [Johnson]" at Dexter Street just prior to returning to

Weybosset Street on that day. Id. at p. 63. She also believed that after Bolduc returned to Weybosset Street, he "went out on the roof and saw all the equipment had been put away...." Id. at p. 71. Bolduc became angry and looked for Stamp. He heard Plaintiff's and Stamp's voices from outside of the basement room where they were taking their break. Id. at p. 72. According to Plaintiff, Bolduc "flings the door open, and he starts screaming at us, and telling us we're not supposed to be on our break...and how dare us, you know, be sitting here." Id. at p. 71.

That same day, August 20, 1999, Plaintiff and Stamp complained about the incident to Union President Ray Conroy and Union Steward Paul Cardin. Id. at p. 76. Also that same day, Union Vice President Frank Devlin informed Butler of Plaintiff's complaint. See id. at p. 78 and Defs.' Ex. E. On August 31, 1999, Plaintiff and Stamp also wrote a letter complaining about the incident to Royalynne Hourihan, the Gas Company's Vice President of Human Resources. Defs.' Ex. F. On September 1, 1999, Butler sent a letter to Plaintiff and Stamp in connection with their complaint. Butler's letter stated that the Gas Company was investigating the matter and that it had not "forgotten about the incident." Defs.' Ex. E.

Stamp went out on medical leave in early September 1999, and did not return until December 1, 1999. Butler and Bolduc attempted to meet with Plaintiff to discuss her complaint in September 1999, but she refused to meet without Stamp being present. Defs.' Exs. B at pp. 79-80, T and V. Plaintiff went out on leave because of a bad back on October 15, 1999, and no meeting took place. On December 6, 1999, Plaintiff's Union filed a grievance regarding the August 20, 1999 incident on behalf of Plaintiff and Stamp. The Union demanded an investigation and an apology. See Defs.' Ex. U.

On December 13, 1999, Bolduc issued a memorandum to Plaintiff and Stamp in which he recounted his version of the incident and then stated: "In retrospect, it would have been appropriate for me to knock on the door before entering. I offer my apology to you for my action and in the future I will knock." See Defs.' Ex. G. The memorandum was sent to Plaintiff, who testified that she could not recall receiving it, but "probably did." Defs.' Ex. B at p. 82. Plaintiff also testified that she had seen an undated, unaddressed "statement" from Bolduc in which he wrote, "[T]he proper thing for me to do should have been to knock on the door and announce my presence. I did not and therefor[e] I offer my apology to each of you and state that in the future I will knock on the door if I require your services." See Defs.' Ex. H. Bolduc reiterated these sentiments in a formal letter to Plaintiff and Stamp dated December 15, 1999. See Defs.' Ex. I.

Plaintiff fell down the stairs at her home on October 15, 1999 and immediately went out on medical leave. Defs.' Ex. B at p. 122. Under the collective bargaining agreement ("CBA") between the Union and the Gas Company in effect at the time, Plaintiff, while on medical leave, was entitled to receive the difference between her regular salary and any benefits received from Rhode Island Temporary Disability Insurance ("TDI") program. To the extent that Plaintiff was ineligible for TDI, she was entitled, under the CBA, to receive her gross pay for a maximum of 130 regularly scheduled workdays. See Defs.' Ex. X. The provisions of the 1996-99 CBA were extended until 2002 by a Memorandum of Understanding dated April 20, 1998. See Defs.' Ex. Y.

After commencing her medical leave, Plaintiff received Rhode Island TDI payments, which were initially exhausted on or about November 20, 1999. Defs.' Ex. CC. On November 23, 1999 Plaintiff informed the Gas Company that her TDI had been exhausted. From that date, the Gas Company paid Plaintiff her full sick pay benefits. See Exs. J, K and L. By notice dated February

10, 2000, the Rhode Island TDI Division notified the Gas Company that Plaintiff had again applied for TDI benefits. See Defs.' Ex. DD. The Gas Company received that notice on or about February 16, 2000. Plaintiff received weekly TDI payments of $487.00 for the period effective from January 8, 2000 through July 15, 2000. Defs.' Ex. CC.

By letter dated March 3, 2000, Butler notified Plaintiff that TDI had informed the Gas Company that Plaintiff had reapplied for TDI benefits in February 2000 due to the start of the new benefit year. Butler's March 3, 2000 letter requested that Plaintiff "provide Human Resources with documentation" showing the status of her TDI application. Defs.' Ex. J. By letter dated April 13, 2000, Butler notified Plaintiff that her sick pay allowance under the CBA would expire effective April 18, 2000. Therefore, Plaintiff received no pay from Defendants from that date forward. Butler's April 13, 2000 letter, noting that Plaintiff had not responded to the March 3, 2000 request, again requested that Plaintiff "provide...documentation indicating the status of your [TDI] claim." Defs.' Ex. K. The Gas Company paid Plaintiff a total of $11,944.08 in sick pay for the period from January 1, 2000 through April 15, 2000, and no offset was made for any TDI payments received by Plaintiff in that period. See Defs.' Ex. LL.

By letter dated April 24, 2000, Butler notified Plaintiff once again that she had not responded to his requests for TDI documentation. Butler's April 24, 2000 letter stated, "Should you continue to fail to respond I will refer the matter to our legal department for appropriate disposition of the matter." Defs.' Ex. M. Plaintiff disputes that she failed to communicate with Butler in response to his letter and testified that she left multiple telephone messages for Butler in response to his letters. Pl.'s Ex. 1 at pp. 123-125, and Ex. 36. By letter dated May 17, 2000, Butler notified Plaintiff that the Gas Company had received documentation indicating that Plaintiff had been receiving TDI

benefits since February 14, 2000, despite collecting full sick benefits from the Gas Company from February 14, 2000 to April 18, 2000. Butler's May 17, 2000 letter further stated: "It would appear that you intentionally failed to inform the company when you were notified your claim had been approved and you subsequently began receiving RITDI benefits when also receiving full sick benefits in the amount equal to 100% of your basic hourly earnings from the company." Butler further informed Plaintiff that her employment was suspended pending completion of an investigation into the matter. Defs.' Ex. L. Plaintiff disputes Butler's characterization of her conduct as "intentional" but does not dispute that she was overpaid. Defs.' Ex. B at pp. 132-133.

Butler, Bolduc, Union President Conroy, Union Steward Cardin, and Plaintiff met on June 6, 2000 to discuss the matter. Id. at p. 128. Thereafter, by letter dated June 8, 2000, Butler wrote to Plaintiff: "As a result of an investigation, an interview with you and review of available documents, the Company has decided that you knew or should have known that you were improperly receiving sick leave benefits in excess of those to which you were entitled under the [CBA]. Your actions in this matter are just cause to terminate your employment effective immediately." See Defs.' Ex. N. (emphasis in original). Plaintiff's Union filed a grievance on June 12, 2000, protesting the decision of the Gas Company and demanding Plaintiff's immediate reinstatement. See Defs.' Ex. O. The Gas Company denied the grievance and, pursuant to the CBA, a date was set for arbitration on or about September 13, 2000. See Defs.' Ex. P. The Union hired Attorney Robert Savage to represent Plaintiff with respect to her grievance arbitration. See Defs.' Ex. Q. Plaintiff spoke or met with Savage in August 2000 prior to the arbitration. Defs.' Ex. B at p. 139. Plaintiff did not object to Savage representing her, and indeed had consulted him previously on another matter. Id. at p. 131. Plaintiff and Savage met again on the date of the arbitration. Id.

at p. 143. Savage represented Plaintiff in the negotiation session prior to the scheduled arbitration. Defs.' Ex. Q at pp. 27-28.

When describing the advice he had given Plaintiff in connection with the negotiation/ mediation session, Savage testified that he told Plaintiff that losing the arbitration

> could have resulted in her not getting a pension. Included in the pension at that time was health care benefits. So it was a huge risk. I think...my recommendation was I don't think the risk is worth it. You have a good chance of losing the arbitration, and if you lose the arbitration...it could affect your pension and future medical benefits. I recommend that you take the settlement. She would be allowed to [retire] and get her pension and her health care benefits.

Id. at p. 33. Plaintiff agreed to settle the grievance. Id. at p. 37. She was reinstated on the condition that she tender her application for retirement. Defs.' Ex. B at p. 140. The settlement allowed Plaintiff to retain her pension and retiree health benefits. Defs.' Ex. Q at p. 36.

By letter dated September 13, 2000, Plaintiff tendered her retirement from the Gas Company effective September 30, 2000. Plaintiff acknowledged in her letter that her health care and dental benefits were reinstated retroactive to July 1, 2000. See Defs.' Ex. R. Defendants withheld Plaintiffs accrued vacation and holiday pay of 184 hours at the time of her retirement. Defendants withheld that amount, $4,303.00, in order to repay the $4,383.00 overpayment of sick benefits Plaintiff had received earlier in the year. See Defs.' Ex. FF. On November 15, 2000, Plaintiff submitted an application for retirement benefits. See Defs.' Ex. GG. That application was approved. She has received a monthly pension check in the amount of $429.00 since that time. Defs.' Ex. B at pp. 153-154. Plaintiff also applied for Long Term Disability Benefits from UNUM Life Insurance pursuant to a group policy held by Providence Gas because she was disabled from working. Her application was approved. Her disability commenced on October 15, 1999, the date

that she originally went out on medical leave. See Defs.' Ex. HH. Plaintiff also applied for Social Security Disability Insurance (SSDI) benefits because she was disabled from working; this application was approved. Plaintiff commenced receiving SSDI benefits effective April 1, 2000. See Defs.' Ex. II.

Plaintiff alleges that she has been subjected to gender discrimination, a hostile work environment, unwarranted discipline and other forms of retaliation because she complained and later filed a charge of discrimination challenging what she reasonably believed to be unlawful workplace conduct. Plaintiff alleges that this unlawful behavior by Defendants dates back to the commencement of her employment in 1988. Complaint, ¶¶ 11 and 12.

On February 25, 2000, Plaintiff filed a charge sex discrimination against Defendants with the RICHR and the EEOC. In her administrative charge, Plaintiff alleged continuing discrimination commencing on August 20,1999 at the "earliest."

In their Motion, Defendants claim entitlement to summary judgment on all three counts of Plaintiff's Complaint. Defendants assert that Plaintiff cannot withstand summary judgment on Count I because (a) most of Plaintiff's allegations constituting her hostile work environment claim are time-barred based on the 300-day deferral-state limitations period under Title VII; and (b) the one allegation that is within the limitations period was not actionable sexual harassment. They also argue that Plaintiff cannot withstand summary judgment on Count II because (a) Plaintiff's disparate treatment claims predating April 26, 1999 are time-barred; (b) Plaintiff suffered no actionable adverse employment action within the limitations period; and (c) even if she did, she cannot show that Defendants' stated, legitimate reason for its action is pretextual. Lastly, they argue Plaintiff cannot withstand summary judgment on Count III, her retaliation claim, because (a) she suffered no

adverse employment action; (b) even if she did, Plaintiff has adduced no evidence connecting the alleged adverse action with the exercise of her rights under Title VII; and (c) she has no evidence of pretext.

**Summary Judgment Standard**

A party shall be entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). When deciding a motion for summary judgment, the Court must review the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in the nonmoving party's favor. Cadle Co. v. Hayes, 116 F.3d 957, 959 (1st Cir. 1997).

Summary judgment involves shifting burdens between the moving and the nonmoving parties. Initially, the burden requires the moving party to aver "an absence of evidence to support the nonmoving party's case." Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir. 1990) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S. Ct. 2548, 2554, 91 L. Ed. 2d 265 (1986)). Once the moving party meets this burden, the burden falls upon the nonmoving party, who must oppose the motion by presenting facts that show a genuine "trialworthy issue remains." Cadle, 116 F.3d at 960 (citing Nat'l Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 735 (1st Cir. 1995); Maldonado-Denis v. Castillo-Rodriguez, 23 F.3d 576, 581 (1st Cir. 1994)). An issue of fact is "genuine" if it "may reasonably be resolved in favor of either party." Id. (citing Maldonado-Denis, 23 F.3d at 581).

To oppose the motion successfully, the nonmoving party must present affirmative evidence to rebut the motion. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256-57, 106 S. Ct. 2505,

2514-2515, 91 L. Ed. 2d 202, (1986). "Even in cases where elusive concepts such as motive or intent are at issue, summary judgment may be appropriate if the nonmoving party rests merely upon conclusory allegations, improbable inferences, [or] unsupported speculation." Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990). Moreover, the "evidence illustrating the factual controversy cannot be conjectural or problematic; it must have substance in the sense that it limns differing versions of the truth which a factfinder must resolve." Id. (quoting Mack v. Great Atl. & Pac. Tea Co., 871 F.2d 179, 181 (1st Cir. 1989)). Therefore, to defeat a properly supported motion for summary judgment, the nonmoving party must establish a trialworthy issue by presenting "enough competent evidence to enable a finding favorable to the nonmoving party." Goldman v. First Nat'l Bank of Boston, 985 F.2d 1113, 1116 (1st Cir. 1993) (citing Anderson v. Liberty Lobby, 477 U.S. at 249).

## Analysis

### A. Retaliation

Plaintiff alleges in Count III that she suffered retaliation for having complained of discrimination in violation of Title VII. Title VII's anti-retaliation provision provides:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees...because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a). "To establish a prima facie case of retaliation, [a plaintiff] must prove by a preponderance of evidence that '(1) she engaged in protected conduct under Title VII; (2) she suffered an adverse employment action; and (3) the adverse action is causally connected to the

protected activity.'" Dressler v. Daniel, 315 F.3d 75, 78 (1st Cir. 2003) (quoting White v. New Hampshire Dep't of Corr., 221 F.3d 254, 262 (1st Cir. 2000)).

Defendants do not dispute that Plaintiff engaged in protected conduct. They contend, however, that Plaintiff's retaliation claim fails as a matter of law because she cannot establish the second or third prongs of her prima facie case. In particular, Defendants contend that Plaintiff suffered no adverse employment action and that there is no evidence establishing a causal connection between her protected activity and her employment termination.

**1. Adverse Employment Action**

It is undisputed that Plaintiff's employment with the Gas Company was terminated on June 8, 2000 – approximately three months after she co-filed a charge of discrimination against the Gas Company with the RICHR and the EEOC. Defendants contend that this termination was not an adverse employment action because Plaintiff was on unpaid disability leave at the time of her termination (and has remained disabled to date), her termination was ultimately rescinded pursuant to a grievance settlement, her fringe benefits reinstated retroactive to July 1, 2000 and she retired effective September 30, 2000. In essence, Defendant argues "no harm, no foul." Since Plaintiff suffered no material economic harm from the "temporary termination," Defendants argue that it cannot, as a matter of law, constitute an adverse employment action. This Court disagrees viewing the particular facts present here in the light most favorable to Plaintiff as required by Rule 56.

In Burlington Northern and Santa Fe Railway Co. v. White, 126 S. Ct. 2405 (2006), the Supreme Court addressed the issue of what constitutes an adverse action for the purposes of a Title VII retaliation claim. It stated that "[t]he anti-retaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm." Id. at 2414. "[A] plaintiff must

show that a reasonable employee would have found the challenged action materially adverse," specifically that it would dissuade "a reasonable worker from making or supporting a charge of discrimination." Id. at 2415; see also Carmona-Rivera v. Puerto Rico, 464 F.3d 14, 19-20 (1st Cir. 2006). Title VII's anti-retaliation provision prohibits "employer actions that are likely to deter victims of discrimination from complaining to the EEOC, the courts, and their employers." White, 126 S. Ct. at 2415 (citation omitted).

Defendants argue that Plaintiff did not suffer an adverse employment action because, in the end, it unscrambled the eggs. In other words, Plaintiff ultimately suffered no harm because her termination was rescinded and her fringe benefits retroactively restored. Defendants proposed analysis is much too narrow. It fails to take into consideration the context of the termination rescission. Also, it fails to examine Defendants' intent at the time of the termination without the benefit of hindsight as to Plaintiff's ongoing disability.

Initially, this was not a case where Plaintiff's employment was unconditionally reinstated. In addition to giving up her grievance, Plaintiff agreed to retire as part of a settlement. Plaintiff was represented by an able and experienced labor attorney during the grievance/arbitration process and thus does not contend that her decision to settle the grievance and retire was not knowing and voluntary. There was, however, an element of economic coercion. Plaintiff was advised by her labor attorney that if her grievance was not sustained by the arbitrator, she risked losing her pension and retiree health care. He advised that this was a "huge risk" and not one worth taking. Defs.' Ex. Q at p. 33. Plaintiff apparently agreed and settled the grievance. The settlement benefitted Defendants because it guaranteed Plaintiff would not be returning to work. It benefitted Plaintiff because it protected her pension and retiree health benefits. But, the price to Plaintiff was that she

retire and give up her job and the grievance challenging Defendants' decision to terminate her employment.

Defendants further contend that the termination was not materially adverse to Plaintiff because, at that time, she was out of work due to disability and had exhausted her paid sick leave benefits. Defendants describe Plaintiff's disability as "permanent" and continuing to date. While it may be true that Plaintiff presently suffers a permanent disability, this Court must judge the potential and intended harm at the time the challenged decision was made by Defendants. Plaintiff's employment and fringe benefits were terminated effective June 8, 2000. There is no indication in the record that Plaintiff had informed Defendants at that time that she was "permanently" disabled and would never be returning to work, or that Defendants otherwise had such information. Plaintiff had been on medical leave for nearly eight months at the time her employment was terminated. Plaintiff presumably had reemployment rights at that time as she characterized her employment with the Gas Company as current in her February 25, 2000 discrimination charge. Further, the Gas Company notified Plaintiff in May 2000 that her "employment status" was "being listed as suspended." Defs.' Ex. L. Then, in June 2000, her employment was terminated and the Union filed a grievance demanding Plaintiff's "immediate reinstatement." Def.' Ex. O. Thus, despite being on unpaid medical leave, it is apparent that both sides understood that Plaintiff maintained employment rights with the Gas Company at the time of her termination.

Even if you assume for sake of argument that Plaintiff knew in June 2000 that she would not or could not ever return to work, a termination for cause apparently could have had an adverse impact on Plaintiff's pension and retiree health benefits. It is undisputed that Plaintiff's labor attorney advised her that losing the discharge arbitration "could have resulted in her not getting a

pension. Included in the pension at that time was health care benefits. So it was a huge risk." Defs.' Ex. Q at p. 33. Plaintiff apparently accepted this legal advice, settled the grievance and agreed to retire.

In its brief, the Gas Company cites several cases in support of its position that Plaintiff suffered no tangible harm due to the brief effective period of her employment termination. See Document No. 38 at pp. 27-28. However, all of the cases cited by the Gas Company are factually distinguishable. In all of them, the challenged termination decision was promptly reversed and the individual reinstated to his/her former position with back pay. See Keeton v. Flying J, Inc., 429 F.3d 259, 263-264 (6th Cir. 2005) (no adverse action when challenged termination reversed after "only hours" and plaintiff reinstated); Pennington v. City of Huntsville, 261 F.3d 1262, 1267 (11th Cir. 2001) (no adverse action when challenged denial of promotion "quickly reversed"); Godoy v. Habersham County, No. 2:04-CV-211-RWS, 2006 WL 739369 (N.D. Ga. March 21, 2006) (no adverse action when plaintiff reinstated with back pay in a "little over a month" as a result of grievance); Tatum v. City of Berkeley, 408 F.3d 543 (8th Cir. 2005) (no adverse action where civil service board reversed termination and reinstated plaintiff without any loss of pay or rank); Powell v. Consolidated Edison Co., No. 97 CIV 2439 (GEL), 2001 WL 262583 (S.D.N.Y. Mar. 13, 2001) (no adverse action where termination reversed and plaintiff reinstated); Sarko v. Henderson, No. 2:03-CV-03473-LDD, 2004 WL 2440202 (E.D. Pa. Oct. 29, 2004) (no adverse action where plaintiff reinstated with back pay following arbitration); and Baxter v. Federal Express Corp., No. 3:04-CV-941 (RNC), 2006 WL 798935 (D. Conn. Mar. 29, 2006) (no adverse action where termination overturned and plaintiff reinstated to former position with back pay).

In this case, Plaintiff was not unconditionally reinstated as part of a make-whole remedy. Plaintiff's employment status and benefits were reinstated (approximately ninety days after her termination) on the conditions that she give up her grievance and retire. Apparently, in order to protect her pension and retiree health benefits, Plaintiff gave up her job and any chance of returning to that job in the future if her health permitted it. This Court concludes that a reasonable person would have found this course of events to be materially adverse and one that could dissuade a reasonable employee from making or supporting a discrimination charge. See Burlington Northern, 126 S. Ct. at 2417-2418 ("an indefinite suspension without pay could well act as a deterrent, even if the suspended employee eventually received backpay"). Thus, Defendants have not shown that Plaintiff cannot, as a matter of law, establish the first element of a prima facie case of Title VII retaliation.

**2. Causal Connection**

Defendants also argue that Plaintiff's retaliation claim fails because she cannot, as a matter of law, establish a causal connection between the June 2000 termination and her protected activity. This Court disagrees, as there are disputed issues of material fact which preclude the entry of summary judgment on this issue.

Defendants argue that Plaintiff's retaliation claim fails because the Gas Company began its inquiry into Plaintiff's TDI documentation prior to receiving notice of her RICHR/EEOC charge of discrimination. This argument fails for two reasons. First, protected conduct under Title VII's anti-retaliation provision is not limited to filing an administrative charge of discrimination. It expressly prohibits retaliation for "oppos[ing] any practice made an unlawful practice" by Title VII. 42 U.S.C. § 2000e-3(a). See also Lambert v. Genesee Hosp., 10 F.3d 46, 55 (2nd Cir. 1993), cert. denied, 511

U.S. 1052 (1994); Kunzler v. Canon, USA, Inc., 257 F. Supp. 2d 574, 579 (E.D.N.Y. 2003) ("This provision forbids an employer from retaliating against an employee for voicing his opposition to an unlawful employment practice."); and Russell v. Enter. Rent-A-Car Co., 160 F. Supp. 2d 239, 264 (D.R.I. 2001) (plaintiff's expression in the workplace of "concern and displeasure" about a hostile work environment sufficient to meet protected conduct element of Title VII retaliation claim).

In this case, Plaintiff alleges that, "to no avail, [she] complained to supervisors and management about the [discrimination and harassment] to which she was subjected." Complaint, ¶ 13. Reading Plaintiff's Complaint broadly and drawing all reasonable inferences in her favor, it is apparent that her claim of protected conduct is not limited to her RICHR/EEOC charge. It is undisputed that, following the August 20, 1999 "locker room" incident, Plaintiff and her female coworker, Stamp, submitted a written harassment complaint to the Gas Company's Vice President of Human Resources. Defs.' Ex. F. This written complaint also alleges disparate treatment in the form of unnecessary comments about job performance directed by Bolduc at Plaintiff and Stamp but not at their male counterpart. Id. In response, Butler wrote that "[w]e are in receipt of your letter dated August 31, 1999 notifying us that you feel the company has harassed you." Defs.' Ex. E.[2] Further, the Union grieved the incident on Plaintiff's behalf. Defs.' Ex. U. Plaintiff has adduced sufficient evidence of protected conduct.

Second, even if Plaintiff was relying solely on her RICHR/EEOC charge as evidence of protected conduct, summary judgment would also not be warranted. Although it is undisputed that the Gas Company initiated its TDI inquiry prior to being served with Plaintiff's discrimination

---

[2] Butler also authored a file memorandum dated December 15, 1999 regarding the "Stamp/Petrarca Harassment Complaint." It notes that a union steward offered his opinion to Butler that Stamp had "filed a complaint with the appropriate government agencies." Pl.'s Ex. 55. Thus, it is clear that the Gas Company was aware that the August Complaint alleged unlawful working conditions and could lead to discrimination charges.

charge, see Defs.' Exs. J and W, the actual termination decision was not made until several weeks later on June 8, 2000. See Defs.' Ex. N. In addition, the initial March 3, 2000 TDI letter was not disciplinary or investigatory in nature. Defs.' Ex. J. The letter simply asked Plaintiff to provide documentation regarding the status of her most recent TDI claim. Id. Plaintiff's ultimate termination was based, at least in part, on Plaintiff's alleged failure to comply with the March 3, 2000 letter.

Finally, the Gas Company argues that Plaintiff's "likely reliance on merely the temporal proximity" between the filing of her RICHR/EEOC charge and her termination is insufficient to withstand summary judgment on the element of causation. Plaintiff makes clear in her opposition that she is not relying solely on temporal proximity. As discussed in Section A(3) below, Plaintiff has adduced sufficient competent evidence from which a reasonable factfinder could make a finding of disparate treatment and/or pretext. Thus, it is not necessary to determine if the timing of Plaintiff's termination would be sufficient by itself to meet the causation element of a prima facie retaliation claim.

However, even if Plaintiff was relying solely on timing, summary judgment would not be appropriate. The First Circuit has noted that "the prima facie burden in this context is not an onerous one." Calero-Cerezo v. U.S. Dep't of Justice, 355 F.3d 6, 26 (1st Cir. 2004) (citing Fennell v. First Step Designs, Ltd., 83 F.3d 526, 535-36 (1st Cir. 1996). "An inference of retaliation arises when the plaintiff establishes an adverse action soon after the plaintiff engages in the protected activity." Russell, 160 F. Supp. 2d at 264. While the First Circuit has noted that "[t]hree and four month periods have been held insufficient to establish a causal connection based on temporal

proximity," Calero-Cerezo, 355 F.3d at 25 (citations omitted), there is no bright-line test, and each case must be assessed on its own particular facts.

In this case, Plaintiff's suspension occurred approximately two and one-half months after she filed her RICHR/EEOC charge, and her termination came approximately three weeks later. However, this case is somewhat unique as Plaintiff was not actively working during this entire time period. If the Gas Company had a retaliatory motive, it could not take any adverse action based on Plaintiff's job performance since she was on sick leave. Thus, the only potential for adverse action was related to Plaintiff's sick leave, and that is what occurred. After receiving notice from the Rhode Island TDI Division in mid-February that Plaintiff filed another claim for TDI benefits, the Gas Company promptly issued a series of letters to Plaintiff seeking TDI documentation which ultimately resulted in Plaintiff's suspension in mid-May and her termination in early June. See Defs.' Exs. DD and J through N.

As noted above, there is a factual dispute about whether Plaintiff in fact responded to any of these letters. The Gas Company asserts that Plaintiff did not respond. Plaintiff counters that she left multiple telephone messages in response which were not answered. Pl.'s Ex. 1 at pp. 123-125, and Ex. 36. Since the Gas Company was communicating with Plaintiff by letter, there was an inherent lag due to delivery time and allowing Plaintiff a reasonable time to respond. In addition, Plaintiff was represented by a union and thus entitled to union representation which had to be arranged for the investigatory meeting held on June 6, 2000. See N.L.R.B. v. J. Weingarten, Inc., 420 U.S. 251 (1975). Thus, given the unique circumstances of this case and applying the principles applicable under Rule 56, the two and one-half to three-month span between Plaintiff's

RICHR/EEOC charge and her suspension and termination is close enough in time to satisfy the third element of Plaintiff's prima facie case of retaliation for summary judgment purposes.

### 3. Pretext

Defendants' final wave of attack on Plaintiff's retaliation claim is that "she has adduced no evidence that Defendants' legitimate, non-discriminatory reason for her discharge is pretextual." See Document No. 109 at p. 35. This wave also fails as Plaintiff has identified sufficient issues of fact precluding the entry of summary judgment.

Once a prima facie case has been presented, an inference of retaliation arises and the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the action. See Che v. Mass. Bay Transp. Auth., 342 F.3d 31, 39 (1st Cir. 2003). In this case, the Gas Company asserts that Plaintiff was terminated for "improperly receiving sick leave benefits in excess of those to which [she was] entitled under the [CBA]." Defs.' Ex. N. The Gas Company also describes the reason as Plaintiff's "simultaneous receipt of full sick pay benefits and TDI benefits." Document No. 109 at p. 34. Since the Gas Company has articulated a non-discriminatory basis for discharge, the issue becomes whether Plaintiff has adduced sufficient evidence to establish a "trialworthy issue" as to pretext. Che, 342 F.3d at 39. Plaintiff has done so.

In response to Plaintiff's Interrogatory No. 19, the Gas company responded that Plaintiff's termination was warranted because it "concluded that [she] knowingly took from the company money to which she was not entitled" and that this was "serious misconduct." Pl.'s Ex. 25 at p. 12. The Gas Company further answered that it "sought restitution, but plaintiff stated that she no longer had the money, and could not repay." Id. This response appears to conflict with a file memorandum prepared by Butler on May 23, 2000 regarding a phone call he had that day with a lawyer

representing Plaintiff. Pl.'s Ex. 35. Butler indicates that the lawyer offered restitution on Plaintiff's behalf to "have the problem go away," and Butler "suggested" in response that "we could make it go away by her resigning." Id. This conversation took place shortly after Plaintiff's suspension pending "completion of [the Gas Company's] investigation," Defs.' Ex. L, and before Butler had the chance to hear Plaintiff's side of the story at the June 6, 2000 investigatory meeting. A reasonable factfinder could conclude from this evidence that Butler had already made up his mind and that his ultimate goal was Plaintiff's departure whether that came by resignation, by termination or, as ultimately occurred, by retirement.

According to Butler's notes from the June 6, 2000 meeting, Plaintiff stated that "she thought RI TDI would notify the Company that her claim had been approved and the Company would automatically reduce her pay." Pl.'s Ex. 36. This was not a classic case of surreptitious embezzlement. The Gas Company knew it was paying sick leave benefits to Plaintiff and received notice from the TDI Division that she had reapplied for benefits. The Gas Company was also well aware that its employees contributed to TDI because it is a mandatory payroll deduction. See R.I. Gen. Laws § 28-40-3.

The Gas Company also concedes that "the record is muddled" regarding its usual practice regarding TDI deduction and whether it deviated from that practice in Plaintiff's case. Document No. 118 at p. 29. The record is, at best, muddled on this issue. As noted above, Plaintiff indicated at the investigatory meeting that she thought TDI would notify the Gas Company that her claim was approved and that the Gas Company would "automatically" reduce her pay. Pl.'s Ex. 36. Similarly, in her Affidavit, Plaintiff testifies that she had collected sick pay from the Gas Company on past

occasions but "[a]t no point had [she] ever been required to notify the Gas Company that [she] was receiving TDI." Pl.'s Ex. 59 at ¶ 25.

In response to Plaintiff's Interrogatory No. 12, the Gas Company indicates that its CBAs with Plaintiff's Union "have required that employees will inform the employer when they are receiving TDI payments, and further provide that the employee will receive the difference between their regular pay and the TDI payments." Pl.'s Ex. 25 at pp. 7-8. While the latter point is undisputed, the former is disputed, and the Gas Company has not pointed to any applicable provision in the CBA or other supporting evidence. Further, the Interrogatory Response supports Plaintiff's "defense" that TDI deduction was automatic, as it states: "When RITDI sent an employment verification report indicating that an employee had filed for TDI, Human Resources would notify payroll and the maximum TDI benefit would be deducted from an employee's pay....Adjustments would be made when an employee provided the TDI benefit statement or copies of the TDI checks." Id. at p. 7 (emphasis added). It is unclear why the Gas Company did not simply deduct the maximum TDI benefit from Plaintiff's sick pay after receiving notice in February of her renewed TDI claim and then make any necessary "adjustments" after the fact. This "muddled" record makes it impossible for this Court to determine what the TDI offset policy or practice was at the time of Plaintiff's termination and to conclude that there are no material facts in dispute as to pretext.

Plaintiff has also presented sufficient evidence of a "trialworthy" issue regarding disparate treatment. The Gas Company terminated Plaintiff after over ten years of employment based on a single incident of what it essentially describes as employee theft. See Defendants' Response to Interrogatory 19 (Pl.'s Ex. 25 at p. 12). The Gas Company does not contend that this was an instance of progressive discipline and that this incident was the "last straw." Rather, it asserts that

Plaintiff engaged in "serious misconduct" warranting summary discharge. Id. Plaintiff argues, however, that the Gas Company has disciplined others less severely for engaging in similar behavior which presents an issue of fact as to disparate treatment and pretext. This Court agrees that Plaintiff has made a sufficient showing to preclude the entry of summary judgment.

For instance, Plaintiff contends that two male employees, Keith Cotnoir and Carl Saccoccio, received sick leave overpayments under similar circumstances but were allowed to repay the amounts and were not disciplined. The Gas Company disputes that these situations are comparable. As to Cotnoir, it contends that there was no evidence that his failure to produce TDI documentation was willful. However, in its Response to Interrogatory No. 12, the Gas Company indicates that Cotnoir "failed to provide the TDI statement for a prolonged period of time" and a letter was sent to him "indicating that verification was required for payment of correct make-up pay." Pl.'s Ex. 25 at pp. 7-8. Further, Plaintiff points to deposition testimony from a representative of the Gas Company that Cotnoir "ultimately stayed at work because he paid the money back, it came right back out of his check." Pl.'s Ex. 48 at p. 88. As to Saccoccio, the Gas Company asserts that it was the workers' compensation insurer and not Saccoccio who was delinquent in producing documentation that resulted in the overpayment. Plaintiff submitted Saccoccio's affidavit indicating that he received a sick pay overpayment of approximately $4,000.00 to $5,000.00 which he paid back and he was not disciplined. Pl.'s Ex. 41. The Gas Company may ultimately be correct that the Cotnoir and Saccoccio situations are distinguishable. However, this Court is unable to reach that conclusion as the record on this issue is limited and to do so would require the Court to weigh the evidence and improperly draw inferences in favor of the moving party, i.e., the Gas Company.

Although the record may be thin on this point, Plaintiff has adduced sufficient evidence to preclude the entry of summary judgment.

In addition, Plaintiff identifies several other male employees who she claims engaged in various forms of employee dishonesty and were not terminated. See Document No. 114 at pp. 44-46. These examples including leaving work early while "on the clock," taking unauthorized breaks, falsifying time sheets, and tampering with a residential gas meter. Id. The Gas Company also disputes that these incidents are comparable. However, as noted above, the Gas Company terminated Plaintiff for "serious misconduct" essentially amounting to employee theft, i.e., she "knowingly took from the Company money to which she was not entitled." Pl.'s Ex. 25 at p. 12. The instances identified by Plaintiff are sufficiently similar to a claim of employee theft to present a "trialworthy issue" as to disparate treatment and pretext. Again, the Gas Company is asking this Court to weigh and interpret disputed evidence in its favor which is not appropriate in the Rule 56 context.

**B. Disparate Treatment**

Plaintiff alleges disparate treatment in Count II. Plaintiff primarily bases her disparate treatment claim on the Gas Company's termination action. However, she also attempts to use a "continuing violation" theory to challenge certain claimed overtime denials.

As to the termination claim, the Gas Company makes the same arguments that it made as to the retaliation claim, i.e., no adverse employment action and no evidence of pretext. For the same reasons noted above, the Gas Company has not established the absence of a genuine "trialworthy" issue on Plaintiff's disparate treatment claim as it relates to her termination.

As to the overtime denial claims, the Gas Company argues that they are time barred. This Court agrees. It is undisputed that the statute of limitations cut-off date in this case is on or about April 26, 1999 and that the challenged overtime denials occurred in 1998. In Nat'l Railroad Pass. Corp. v. Morgan, 536 U.S. 101, 113 (2002), the Supreme Court held that when an employee seeks redress for "discrete acts" of discrimination or retaliation, then the continuing violation doctrine may not be invoked to allow for recovery for acts that occurred outside the filing period. See also Miller v. New Hampshire Dep't of Corr., 296 F.3d 18, 22 (1st Cir. 2000). Thus, if the denial of overtime constitutes a "discrete act," then Plaintiff cannot, as a matter of law, utilize a continuing violation theory to resurrect these otherwise time-barred claims. This Court concludes that a denial of overtime is a discrete act. See Benjamin v. Brookhaven Science Assocs., LLC, 387 F. Supp. 2d 146, 154 (E.D.N.Y. 2005) ("[I]t is well-settled in the Second Circuit that alleged failures to compensate adequately...are discrete acts and, if untimely, cannot form the basis of a continuing violation claim."); and Bond v. Potter, 348 F. Supp. 2d 525, 529 n.5 (M.D.N.C. 2004) (holding that a denial of overtime pay is a discrete act of discrimination for limitations purposes). Accordingly, Plaintiff's disparate treatment claim as it relates to her pre-April 26, 1999 overtime denials is time-barred[3] and Defendants' Motion for Summary Judgment as to Count II is partially granted as to those claims but denied as to the termination claim.

**C. Hostile Work Environment**

Plaintiff alleges in Count I that she was subjected to a hostile work environment based upon her sex. Defendants move for summary judgment on Count I arguing that (1) most of Plaintiff's hostile environment claims pre-date April 26, 1999 and are time-barred; and (2) the one timely

[3] Plaintiff does not allege any post-April 26, 1999 discriminatory overtime denials.

allegation regarding the "locker room" incident was not actionable sexual harassment. Plaintiff counters that this case presents a "continuing violation" and is not time-barred, and that the "locker room" and other "timely" incidents contributed to a long-standing hostile environment.

Title VII of the Civil Rights Act of 1964 makes it "an unlawful employment practice for an employer...to discriminate against any individual with respect to his...employment, because of...race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). In order for work conditions "to be actionable under the statute,...[the] objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." Faragher v. City of Boca Raton, 524 U.S. 775, 787, 118 S. Ct. 2275, 2283, 141 L. Ed. 2d 662 (1998). Under this standard, Defendants argue that Plaintiff was not subject to a hostile work environment as a matter of law.

There is no "mathematically precise test" for determining when conduct in the workplace moves beyond the "merely offensive" and enters the realm of unlawful discrimination. Harris v. Forklift Sys., Inc., 510 U.S. 17, 21, 114 S. Ct. 367, 370, 126 L. Ed. 2d 295 (1993). Rather, "all the circumstances" must be examined to determine whether an environment is "hostile" or "abusive," including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Landrau-Romero v. Banco Popular De Puerto Rico, 212 F.3d 607, 613 (1st Cir. 2000) (quoting Harris, 510 U.S. at 23). "Subject to some policing at the outer bounds," the jury should weigh the factors and decide whether the harassment was of a kind that would have affected the conditions of employment for a reasonable person. Marrero v. Goya of Puerto Rico, Inc., 304 F.3d 7, 19 (1st Cir. 2002) (quoting Gorski v. New Hampshire Dep't of Corr.,

290 F.3d 466, 474 (1st Cir. 2002)). However, "teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." Faragher, 524 U.S. at 788. (citations omitted).

### 1. Continuing Violation

With respect to her hostile environment claim, Plaintiff asserts "[t]hat violation of [her] rights persisted from the day she began her employment, to the date that she ended it" and "[t]herefore, the 'continuing violation' theory should apply." Document No. 114 at p. 37. It is undisputed that Plaintiff began her employment with the Gas Company in April 1988 and retired in September 2000. Thus, Plaintiff seeks a jury trial covering the entirety of her career with the Gas Company spanning in excess of twelve years and dozens of alleged incidents of harassment/discrimination.

Anti-discrimination statutes such as Title VII typically contain short limitations periods to "protect employers from the burden of defending claims arising from employment decisions that are long past." Delaware State Coll. v. Ricks, 449 U.S. 250, 256-257 (1980); see also Muniz-Cabero v. Ruiz, 23 F.3d 607, 611 n.6 (1st Cir. 1994) ("[s]tatute of limitations are designed to keep stale claims out of court."). In this case, the parties agree that Plaintiff's claims are governed by Title VII's 300-day deferral state limitations period and that the applicable limitations period goes back until April 26, 1999. "Th[is] relatively brief limitations period, common to anti-discrimination statutes, protects the accused by guaranteeing that they receive sufficient notice of the alleged violations to adequately investigate the claims while those claims are still reasonably susceptible to investigation." Place v. California Webbing Indus., Inc., 249 F. Supp. 2d 157, 161 (D.R.I. 2003) (citations omitted). In addition, this "procedural safeguard" is "'designed to provide [defendants]

with adequate time for...gathering and compiling evidence of the alleged violations before witnesses' memories of the incidents become too obscure.'" Rathbun v. Autozone, Inc., 253 F. Supp. 2d 226, 232 (D.R.I. 2003) (quoting Ferguson Perforating and Wire Co. v. Rhode Island Comm'n for Human Rights, 415 A.2d 1055, 1056 (R.I. 1980).

"The continuing violation doctrine is an equitable exception that allows an employee to seek damages for otherwise time-barred allegations if they are deemed part of an ongoing series of discriminatory acts...." O'Rourke v. City of Providence, 235 F.3d 713, 730 (1st Cir. 2001). In Morgan, the Supreme Court distinguished between hostile environment claims and discrimination or retaliation claims arising out of "[d]iscrete acts such as termination, failure to promote, denial of transfer, or refusal to hire." 536 U.S. at 114-115. It held that the continuing violation doctrine only applied to the former because "[a] hostile work environment claim is composed of a series of separate acts that collectively constitute one 'unlawful employment practice.'" Id. at 117 (quoting 42 U.S.C. § 2000e-5(e)(1)). Thus, "a plaintiff's untimely allegations may be considered for the purposes of determining liability only if an act contributing to the hostile environment claim occurs within the filing period." Paquin v. MBNA Mktg. Sys., Inc., 233 F. Supp. 2d 58, 63 (D. Me. 2002) (emphasis in original). The Supreme Court stated that the "court's task is to determine whether the acts about which an employee complains are part of the same actionable hostile work environment practice, and if so, whether any act falls within the statutory time period." Morgan, 536 U.S. at 120. (emphasis added). In this case, this task must be performed in the context of a motion for summary judgment requiring that all evidence be viewed in the light most favorable to Plaintiff and all reasonable inferences drawn in her favor. See O'Rourke, 235 F.3d at 732 ("while...these issues may be resolved as a matter of law, they are often better resolved by juries....").

In their reply brief, Defendants argue that Plaintiff "misconstrues" their legal argument as to Morgan's continuing violation doctrine, and that they acknowledge that "an alleged harassing act need not be actionable in and of itself to constitute an 'anchoring act' for the purposes of the Morgan analysis." Document No. 118 at p. 21. However, a close review of the arguments in Defendants' primary brief supports Plaintiff's position. For instance, after discussing Plaintiff's complaints within the limitations period, Defendants argue that, "[s]imply put, these allegations do not come close to establishing a hostile environment as a matter of law." Document No. 109 at p. 18. Defendants later argue that "[t]aken together, Plaintiff's post-April 25, 2006 [sic] allegations are completely insufficient to establish" a hostile work environment and that "[t]herefore, Plaintiff cannot establish that a hostile environment existed within the limitations period." Document No. 109 at p. 22. As noted above, for continuing violation purposes, Plaintiff is not required under Morgan to establish a hostile environment claim itself within the limitations period but only that an act "contributing to" a hostile environment occurred within the period.

**2. Number and Severity of Incidents**

Defendants argue that the alleged incidents, if true, are not sufficiently "severe or pervasive" to rise to the level of a hostile work environment as a matter of law. However, "while a plaintiff must show 'more than a few isolated incidents of [discriminatory] enmity,' there is no 'absolute numerical standard' by which to determine whether harassment has created a hostile environment." Danco, Inc. v. Wal-Mart Stores, Inc., 178 F.3d 8, 16 (1st Cir. 1999) (quoting Snell v. Suffolk County, 782 F.2d 1094, 1103 (2nd Cir. 1986); Vance v. Southern Bell Tel. & Tel. Co., 863 F.2d 1503, 1511 (11th Cir. 1989)); see also Richardson v. New York State Dep't of Corr. Serv., 180 F.3d 427, 437 (2nd Cir. 1999) ("[T]here is neither a threshold 'magic number' of harassing incidents that gives rise,

without more, to liability as a matter of law, nor a number of incidents below which a plaintiff fails as a matter of law to state a claim.") (citation omitted). In fact, "even a single episode of harassment, if severe enough, can establish a hostile work environment." Richardson, 180 F.3d at 437 (quoting Torres v. Pisano, 116 F.3d 625, 631 (2nd Cir. 1997)). "Perhaps no single act can more quickly alter the conditions of employment and create an abusive working environment than the use of an unambiguously [discriminatory] epithet...by a supervisor in the presence of his subordinates." Richardson, 180 F.3d at 439. (citation omitted).

Both parties have submitted lengthy sets of exhibits, including deposition testimony and affidavits, in support of their respective positions. In particular, Plaintiff's opposition includes her own sworn affidavit and a sworn affidavit of Stamp which focus on the actions and statements of their supervisor, Bolduc. See Pl.'s Exs. 59 and 64. Defendants contend that these self-serving affidavits are not sufficiently specific to avoid summary judgment. Defendants rely on Rayl v. Decision One Mortgage Co., No. IP 01-0337-C-K/H, 2003 WL 21989992 at *5 n.5 (S.D. Ind. Aug. 19, 2003).

Rule 56(e), Fed. R. Civ. P., provides that "[s]upporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence and shall show affirmatively that the affiant is competent to testify to the matters stated therein." "The law regarding this dispute is clear...that [if] affidavits submitted in opposition to a motion for summary judgment merely reiterate allegations made in the complaint, without providing specific factual information made on the basis of personal knowledge, they are insufficient." Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 53 (1st Cir. 2000). "Evidence that is inadmissible at

trial, such as inadmissible hearsay, may not be considered on summary judgment." Vazquez v. Lopez-Rosario, 134 F.3d 28, 33 (1st Cir. 1998).

Plaintiff's Affidavit and Stamp's corroborating Affidavit contain more than just a reiteration of the conclusory claims set forth in Plaintiff's Complaint. For the most part, they provide specific facts based on personal knowledge. Thus, Defendants' reliance on the Rayl case is misplaced as that case is distinguishable. In Rayl, the pro se plaintiff in a Title VII hostile environment case submitted an affidavit which "state[d] in conclusory fashion, '[t]hat [her supervisor] continuously berated, belittled and harassed [plaintiff] during her [employment] tenure...." Rayl, 2003 WL 21989992 at *5 n.5. In the absence of any "specifics," the Court in Rayl determined that the affidavit was insufficient to avoid summary judgment. Contrary to Rayl, the Affidavits submitted by Plaintiff in this case, for the most part, contain specifics as to time range, conduct and statements made.

Moreover, for the most part, the Affidavits are based on personal knowledge. For example, Plaintiff testifies in her Affidavit that Bolduc and Heaton, a male supervisor working under Bolduc, made comments directly to her at some point between July 1991 and April 1992 such as "you are big chested," "your breasts are going to get even bigger lifting those boxes," that your "breasts were getting in the way." Aff. of Plaintiff, ¶ 2; see also Defs.' Ex. A. She also testified that, after she moved to building maintenance in 1991, Bolduc made comments to her such as "this is a man's job," "a man would be able to do this job alone," or "you should be home; this is a man's job." Aff. of Plaintiff, ¶ 4. Further, Plaintiff testified at her deposition that Bolduc told her on more than one occasion that "if he had his way, there would not be any women in the [maintenance] department," and that "women are just troublemakers." Defs.' Ex. B at pp. 25-29.

Naturally, the parties view Plaintiff's hostile environment claims on a much different horizon. Plaintiff takes a longitudinal view of her working environment and primarily points to Bolduc as the constant. Defendants, on the other hand, take a narrower view and attempt to look at the individual allegations in isolation. For instance, with respect to the "locker room" incident, Defendants argue that Plaintiff has presented no evidence that Bolduc's entry into the locker room and yelling, "even if hostile, was based on her gender." Document No. 109 at p. 21. They state that "Plaintiff does not allege that anything Bolduc said during the 'locker room incident' concerned, or even alluded to, Plaintiff's gender." Id. While Defendants may be correct as to the "locker room" incident, Plaintiff has, as noted above, alleged that Bolduc made a number of statements directly to her at other times evidencing gender animus. Further, Plaintiff points to the deposition of Kenneth Schiano, a male maintenance employee, who testified about an incident he witnessed where Bolduc went "up one side...and down the other" of one of Plaintiff's female coworkers regarding her painting method until "she got so nervous she started to cry." Pl.'s Ex. 3 at p. 44. When Schiano questioned Bolduc's behavior, Schiano testified that Bolduc told him that "these girls are nothing but pains in the ass." Id. at p. 44. Schiano's testimony corroborates Plaintiff's testimony that Bolduc "had a tendency to yell at the women," "had no patience with the women," and "didn't want women in the department." Defs.' Ex. B at pp. 25-26. Thus, Plaintiff has adduced sufficient evidence to establish a "trialworthy issue" as to whether Bolduc's behavior during the "locker room" incident was motivated by gender. Cf. Jackson v. Quanex Corp., 191 F.3d 647, 662 (6th Cir. 1999) ("[E]ven though a certain action may not have been specifically racial in nature, it may contribute to the plaintiff's proof of a hostile work environment if it would not have occurred but for the fact that the plaintiff was African American. Indeed, a showing of the use of racial epithets in a work

environment may create an inference that racial animus motivated other conduct as well.") (citations omitted).

This Court has thoroughly reviewed all of the arguments made in the 100-plus pages of briefs filed regarding this Motion and also the several hundred pages of exhibits presented by the parties. Based on this review (reviewing the evidence in the light most favorable to Plaintiff and drawing all reasonable inferences in her favor as required), this Court concludes that Defendants have not met their Rule 56(c) burden of establishing that no genuine issues of material fact exist regarding Plaintiff's continuing violation and hostile environment claims. Thus, Defendants are also not entitled to summary judgment as to Count I.

In short, the record contains numerous factual disputes regarding issues which, if Plaintiff's version is believed and all reasonable inferences are drawn in her favor, could reasonably lead a jury to believe that Plaintiff was subject to a hostile environment which continued into the limitations period. Defendants are essentially asking this Court to try this case on the papers and make factual findings in their favor. This is not the proper use of Rule 56. For example, as noted above, Plaintiff has presented evidence that Bolduc had an animus or resentment towards women entering the maintenance department, and evidence of disparate treatment and retaliation regarding her termination. While Defendants may ultimately prevail after trial, they have not met their burden of showing that Plaintiff's hostile environment claims are not "trialworthy."

Plaintiff has also produced evidence that she was "tested" as to her box lifting skills and that inappropriate comments were made regarding her breast size and the box lifting. Pl.'s Ex. 2 at pp. 61-62; Aff. of Plaintiff, ¶ 2. She alleges that she was denied proper training when she started in maintenance and that Bolduc belittled her qualifications by asking her in front of male coworkers

if she knew what a wrench or Phillips head screwdriver was. Aff. of Plaintiff, ¶ 3. Plaintiff further asserts several instances of harsher treatment or more stringent work requirements than her male counterparts. Pl.'s Ex. 2 at pp. 87-88, 91-92, 103-104; Aff. of Plaintiff, ¶¶ 5, 6-12, 14, 16, 24; and Aff. of Stamp, ¶ 5. Finally, Plaintiff identified several instances where she alleges that Bolduc did not effectively address her complaints of sexually harassing behavior by her male coworkers. Pl.'s Ex. 2 at pp. 39-42, 50-52; Aff. of Plaintiff, ¶¶ 19, 21-22. While Defendants dispute most of these assertions and again may very well prevail at trial, Plaintiff has sufficiently supported them with competent evidence to avert the entry of summary judgment on Count I.

**Conclusion**

For the reasons stated, I recommend that the District Court GRANT Defendants' Motion for Summary Judgment (Document No. 109) in limited part as specified above regarding Count II and otherwise DENY the Motion. Any objection to this Report and Recommendation must be specific and must be filed with the Clerk of the Court within ten (10) days of its receipt. Fed. R. Civ. P. 72(b); LR Cv 72(d). Failure to file specific objections in a timely manner constitutes a waiver of the right to review by the District Court and the right to appeal the District Court's decision. United States v. Valencia-Copete, 792 F.2d 4 (1st Cir. 1990).

/s/ Lincoln D. Almond
LINCOLN D. ALMOND
United States Magistrate Judge
January 3, 2007