**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **CAROL PETRARCA** | : | |
| | : | |
| **v.** | : | **C.A. No: 04-310(S)** |
| | : | |
| **SOUTHERN UNION COMPANY and** | : | |
| **NEWENGLAND GAS COMPANY** | : | |

**PLAINTIFF'S RESPONSE TO DEFENDANTS' OBJECTION TO REPORT & RECOMMENDATION ON MOTION FOR SUMMARY JUDGMENT**

Pursuant to Fed. R. Civ. P. 72(b) and Local Rule cv. 72(d)(3), Plaintiff files this Response to Defendants' Objection to Report & Recommendation of the Magistrate Judge, dated January 3, 2007 ("R&R"), regarding Defendants' Motion for Summary Judgment filed on July 21, 2006. Plaintiff submits the attached memorandum of law in support of her Response.

Respectfully submitted,
Plaintiff,
By her attorney,

/s/Vicki J. Bejma
Stephen M. Robinson #2103
The Law Offices of Stephen M. Robinson
155 South Main Street, Suite 402
Providence, RI 02903
(401) 331-6565
(fax) 331-7888
February 1, 2007
vbejma@smrobinsonlaw.com

**CERTIFICATE OF SERVICE**

I hereby certify that on the 1st day of February, 2007, a true and complete copy of the foregoing was electronically filed with counsel of record for the Defendants: Neal J. McNamara, Esquire and Matthew J. Frankel, Esquire, Nixon Peabody LLP, One Citizens Plaza, Suite 500, Providence, RI 02903.

/s/ Vicki J. Bejma

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **CAROL PETRARCA** | : | |
| | : | |
| **v.** | : | **C.A. No: 04-310(S)** |
| | : | |
| **SOUTHERN UNION COMPANY and** | : | |
| **NEWENGLAND GAS COMPANY** | : | |

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF HER RESPONSE TO DEFENDANTS' OBJECTION TO REPORT & RECOMMENDATION ON MOTION FOR SUMMARY JUDGMENT**

## I. INTRODUCTION

This matter originally came before this Honorable Court on Plaintiff's Complaint alleging that over the course of her employment by the Defendants, she had been subjected to discrimination based upon her gender. Count I of her complaint alleged that she had been subjected to a hostile working environment. Count II had alleged that she had been subjected to disparate treatment based upon her gender. Finally, Count III alleged that she had been subjected to retaliation for having objected to sexually harassing and discriminatory behaviors. On or about July 21, 2006, Defendants filed their Motion for Summary Judgment on all three Counts. The Magistrate Judge's Report & Recommendation dated January 3, 2007 denied Defendants' Motion for Summary Judgment, except for a limited portion of the claims supporting Count II, insofar as they related to claims that Plaintiff had suffered disparate treatment in that she had been denied overtime opportunities based upon her gender.

The Defendants have explicitly indicated that they are not contesting the Magistrate Judge's Report & Recommendation, insofar as it relates to Counts II and III, alleging disparate treatment and retaliation. (Defendants' Memorandum, p.1, n.1.) Instead, Defendants only

contest the Magistrate Judge's Report & Recommendation insofar as it denied their Motion for Summary Judgment for Count I, wherein Plaintiff alleged that she had been subjected to a hostile work environment. The Defendants argued that much of the conduct complained of fell outside of the 300-day limitations period imposed by Title VII, which in this case began on April 26, 1999. Defendants argued that there was only one incident that came within that period, the so-called "locker room incident." Defendants argued that this incident did not create a hostile working environment based upon Plaintiff's gender. The Defendants also argued that the other incidents complained of did not create a hostile working environment.

Plaintiff countered that the "locker room incident" was not the only incident contributing to the creation of a hostile environment during the limitations period. The Plaintiff also produced extensive evidence supporting a claim that the post-limitation behaviors were part of an ongoing campaign of gender-based harassment stretching back since the beginning of her employment. Accordingly, the Plaintiff argued, the import of the "locker room incident" and the other post-April 26, 1999 conduct must be judged within the context of those events. Furthermore, the "continuing violation" doctrine applied to her situation, rendering the post-April 26, 1999 conduct the anchoring violations that would allow Plaintiff to recover for both the pre-and-post April, 1999.

The Magistrate Judge agreed with Plaintiff's argument that the "continuing violation" doctrine should apply to this situation. In particular, the Magistrate Judge relied on the extensive evidence produced by the Plaintiff in support of the allegation that she had been subjected to a hostile work environment throughout her employment. (Report & Recommendation, p. 37-38.) Therefore, the Magistrate Judge permitted Count I to stand in its entirety. Because the

Magistrate Judge's conclusions are legally correct, they should be permitted to stand as the decision of this Court.

## II. FACTS

Plaintiff began her employment with the Defendants (hereinafter, "Gas Company" or "Defendants") on or about April 15, 1988, in the capacity of Spare Building Cleaner. (Def. Ex. A.) As Spare Building Cleaner, Plaintiff was expected to work part-time to fill in for other cleaners. However, as Plaintiff explained at her deposition, she filled in so frequently for others to the extent that she essentially worked full time, but received no seniority or benefits. (Ex. 1, 23:19-25.[1]) On or about January 8, 1989, Plaintiff officially became a full-time employee of the Gas Company when she took the position of Building Cleaner. (Ex. 1, 24:5-15.) At all times during her employment by Defendants, Plaintiff's supervisor was Edward Bolduc. (Ex. 1, 24:20-24.) At all times during her employment, Plaintiff's primary assignment was at Defendants' Weybosset Street facility, although she occasionally filled in at the Dexter Street facility. (Ex. 1, 19:11-24.) Although Plaintiff initially worked evenings, and did not have much contact with Mr. Bolduc initially, Plaintiff began working days at various points from about 1991, when she took the Building Maintenance position. (Ex. 1, 19:25-20:2.)

From the beginning of her employment, Plaintiff experienced discriminatory behaviors from her supervisor and her co-workers. As Plaintiff testified, on several occasions during Plaintiff's employment, both before and after she ultimately proceeded to the Building Maintenance position in July, 1991, Edward Bolduc remarked to co-workers that if he had his way, there would be no women in his department. (Ex. 1, 26:5-27:8) Mr. Bolduc also remarked to co-workers that women were "troublemakers," and that he "couldn't wait for women to get out

of the department," and that women were "more [trouble] than what they're worth." (Ex. 1, 29:1-8.) Plaintiff's testimony regarding Bolduc's remarks was corroborated by Kenneth Schiano, another maintenance employee. Mr. Schiano has testified that he had heard Edward Bolduc remark of female employees: "These girls are nothing but pains in the ass." (Ex. 2, 44:22-45:25.)[2]

Mr. Bolduc's resentment at being saddled with female employees was echoed and reinforced by other supervisory employees when Plaintiff attempted to obtain a higher-paying Building Maintenance position in or about 1991. At the time, Building Maintenance and Cleaners were separate departments. (Ex. 1, 20:9-15, 27:25-28:4.) Even more significantly, Mr. Bolduc testified himself that females were Cleaners, while Building Maintenance employees were male. (Ex. 52, 27:23-28:9.) Plaintiff did ultimately obtain this traditionally "male" position, but not until she had run a gamut of hostile and discriminatory treatment. Mr. Roy Heaton, another supervisory employee, indicated to Plaintiff that she was taking the position from a family man who had to support a family, and that maintenance was "not a place for a woman to be." (Ex. 1, 60:14-19.) Plaintiff was also required to undergo a so-called "fitness for duty" evaluation that tested her ability to lift 100 pounds or more.[3] (Ex. 3, 3.) However, as former Building Maintenance employee Richard Kala testified, he had not been required to lift 100 pounds on a regular basis when he worked in Building Maintenance, and that his regular duties in Building Maintenance were not physically strenuous. (Ex. 4, 18:3-14; 35:15-20.) Kala testified that the heaviest thing that he had to lift on that job was a box of copier paper. (Ex. 4, 82:8-15.)

---

[1] References to Exhibits pertain to those appended to the original Motion and Objection memoranda.
[2] Defendants complain that the Magistrate Judge relied upon Schiano's testimony about Bolduc's remarks. This argument must fail. Although Plaintiff herself did not hear those remarks, it is certainly relevant that Bolduc expressed a blatant animus towards women.
[3] Plaintiff, during the course of her employment, was also known as Carol Wiberg.

Even though Plaintiff passed the physical examination (albeit "with reservations") Mr. Biber, one of the maintenance employees, along with Mr. Heaton, still attempted to dissuade Plaintiff from taking the position. They approached Plaintiff and indicated their belief that the test results showed she might injure herself. (Ex. 5.) In fact, it would appear that the test was administered with the expectation that Plaintiff would not pass, as Mr. Biber remarked: "I don't know how you passed that physical because I didn't even pass it." (Ex. 1, 60:20-61:8)

Requiring a physical examination of Plaintiff itself was a deviation from typical procedures. Richard Kala testified that he did not recall having to take a physical examination when he transferred into Building Maintenance. Even when he first began working for the company and took a pre-employment physical, he did not have to demonstrate that he could lift weights. (Ex. 4, 19:2-21.) Mr. Bolduc, through his deposition testimony, would corroborate Kala's testimony when he admitted that he knew of nobody who had had to take a physical examination to transfer into the maintenance department. (Ex. 6, 39:4-24.) Nevertheless, Mr. Bolduc developed his own "test" of Plaintiff's ability to serve in Building Maintenance -- by requiring her to meet him in the basement every night for a week to lift boxes. (Ex. 1, 61:11-62:2) It is certainly significant that in his deposition testimony, Bolduc would acknowledge that he could not recall that anybody had had to lift boxes in order to qualify for a maintenance position, and could not even think of a reason why that would be part of any test. (Ex. 6, 43:6-44:3.)

Mr. Bolduc's discriminatory animus continued even after Plaintiff received the Building Maintenance position. When Plaintiff first received the position, Mr. Bolduc openly commented that the job was for men. (Ex. 57, ¶ 4.) Between the time that Plaintiff received the position and 1992, when the Cleaning and Maintenance departments were merged, Mr. Bolduc and Mr.

Heaton would make comments to the Plaintiff regarding her breast size, indicating that her breasts would get even bigger as a result of lifting boxes, or that her breasts would get in the way of her doing things. (Ex. 57, ¶ 2.) Furthermore, when Plaintiff received the maintenance position, she was to receive a 90-day probationary period, during which she was to be trained. (Ex. 1, 30:24-32:3.) Because Plaintiff did not receive this training, her 90-day probationary period was extended 30 days. (Ex. 7.) Although several employees were assigned to the Weybosset Street facility and would have been in the position to provide said training, Mr. Bolduc apparently failed to assign anybody to the task. (Ex. 1, 33:1-7.) Additionally, from the time that Plaintiff began the Building Maintenance job until about 1998, Mr. Bolduc would belittle the Plaintiff's mechanical abilities at least twice a month in front of her male co-workers, asking if she knew what a wrench or a Phillips-head screwdriver were – tools that a child of seven could identify. (Ex. 57, ¶ 3.) Upon discovering that the Plaintiff could fulfill her tasks faster and more easily using a smaller vacuum cleaner, he took it from her. (Ex. 57, ¶ 16.)

Mr. Bolduc openly offered males in his department more favorable treatment than females. Mr. Bolduc consistently followed a pattern and practice of bypassing female employees when it was their turn for overtime, and giving it to a male employee. The established procedure required that the individual who had worked the lowest amount of overtime would receive the "first right of refusal" for available overtime. (Ex. 1, 89:11-12; Ex. 4, 22:2-12; Ex. 62, ¶ 9.) Pursuant to the collective bargaining agreement, lists of overtime were maintained. (Ex. 11, p. 12.) However, on numerous occasions, Plaintiff would learn that she had missed an overtime opportunity that instead went to a male employee. When confronted, Mr. Bolduc would indicate that he "didn't realize" that Plaintiff was low on the overtime sheet. (Ex. 1, 43:20-45:14; 86:25-87:2) Another female employee, Christine Stamp, similarly missed overtime opportunities in favor of a male

employee under Mr. Bolduc's administration, with Mr. Bolduc making the same threadbare excuses. (Ex. 62, ¶ 8, 9, 10, 12.)

Plaintiff suffered this type of disparate treatment at least 10-20 times over the course of her employment, including two occasions in 1998, and once in 1994. (Ex. 57, ¶ 17; Ex. 58-59.). On one of the 1998 occasions, Edward Bolduc had called Gerald Porter, a male, for overtime instead of Plaintiff. (Ex. 1, 45:15-17.) Plaintiff was paid for the missed overtime on that occasion. Shortly thereafter, Edward Bolduc again bypassed Plaintiff in favor of Mr. Porter. On this occasion, Defendants refused to pay Plaintiff for the missed overtime. Mr. Bolduc instead offered her the opportunity to come in and clean the cafeteria floor all by herself. Typically, the cafeteria floor was a two-person job. (Ex. 1, 44:5-20.) Also in lieu of missed overtime, Bolduc also offered Plaintiff the assignment of cleaning air conditioning vents on a Saturday, when she would be alone in the building. Bolduc would typically assign two men to the same task on the grounds that it was too dangerous to clean the vents alone. (Ex. 1, 105:7-106:8.)

On other occasions, Mr. Bolduc changed the overtime distribution rules outright. Roughly around New Year's Eve, 1998, Bolduc made a rule that the two most senior people would work overtime. (Ex. 1, 89:4-12.) The effect of this rule was to deprive a female of an overtime opportunity in favor of their male co-worker. (Ex. 1, 89:4-12, Ex. 62, ¶ 8-9.) Bolduc also permitted Mr. Porter to tell building security to call him if there was a problem in the building overnight. This had the effect of giving Mr. Porter the first opportunity at overtime, rather than the female next on the list. (Ex. 57, ¶ 18.)

Bolduc also subjected the females to a more stringent set of rules and harsher treatment than he did the other male employees. For example, in or about October, 1999, Mr. Bolduc ordered Plaintiff to study the Defendants' personnel policy, and told her there would be a test.

(Ex. 1, 87:20-88:12; Ex. 57, ¶ 24.) Plaintiff later discovered that there was no required "test" on the contents of the policy manual. (Ex. 1, 88:1-12.) At his deposition on April 24, 2006, Kala testified that he had not been required to study the Defendants' personnel policy and be tested on it. (Ex. 4, 44:3-5.) Similarly, Mr. Bolduc would shout at the Plaintiff for parking in the garage before 5:00, but did not shout at male employees Joseph Ianiello and Gerald Porter for doing the same. (Ex. 1, 103:17-104:3.) For another example, Mr. Bolduc had ordered Plaintiff and Christine Stamp not to talk to second-shift employees when they arrived at 3:30, a half-hour before Plaintiff and Christine Stamp's shift ended. (Ex. 1, 91:22-92:16; Ex. 62, ¶ 5.) On or about September 24, 1999, Bolduc entered a room where Mr. Porter was talking to the second-shift employees, as Plaintiff and Stamp had been forbidden to do, but said nothing to Porter. (Ex. 1, 91:22-92:16; Ex. 62, ¶ 5) For yet another example, during 1997 through the time that Plaintiff left, Mr. Bolduc required her to report to him directly when she was to be out sick. Plaintiff's male co-worker, on the other hand, was repeatedly permitted to relay his "call-ins" to Mr. Bolduc through other employees. (Ex. 57, ¶ 5.) Mr. Bolduc also shouted at female employees far more than he did male employees. (Ex. 1, 25:25-26:3.) Mr. Bolduc also consistently gave Plaintiff more difficult tasks than her male co-workers. (Ex. 57, ¶ 14, 16.) Mr. Bolduc also isolated himself from the female employees by meeting only with Mr. Porter, and having him give Plaintiff and her female co-workers instructions. (Ex. 1, 84:20-85:16.)

Mr. Bolduc continually harangued the Plaintiff about the quantity and quality of her work to a far greater extent than her male counterparts. (Ex. 57, ¶ 6-12.) Mr. Bolduc would scrutinize Plaintiff's work areas on a daily basis, while never doing the same on Mr. Porter or Mr. Kala's. (Ex. 57, ¶ 8.) Mr. Bolduc would repeatedly ask Plaintiff what she was working on, or complain that she was taking too long to complete the task, or set an explicit time limit on completing the

task. (Ex. 57, ¶ 6.) On at least a daily basis, Plaintiff would find Mr. Bolduc sneaking up behind her and demanding to know what she was doing. (Ex. 57, ¶ 7.) Plaintiff never witnessed this treatment of male employees. (Ex. 57, ¶ 8.)

While Mr. Bolduc closely scrutinized Plaintiff, Mr. Bolduc tolerated a great deal of slacking on the part of Plaintiff's male employees. Mr. Bolduc admitted to knowing that Billy Johnson and Kenneth Schiano, male employees who worked over at the Dexter Street facility, were leaving work early without permission. Mr. Bolduc also admitted that he took no immediate action against Mr. Johnson and Mr. Schiano, despite repeatedly finding them missing from the work site. (Ex. 6, 91:21-98:24.) Similarly, when Mr. Bolduc gave the Plaintiff and Joseph Ianiello a task to perform together, Mr. Ianiello would routinely disappear. Mr. Bolduc did nothing about this. (Ex. 1, 34:12-24.) Mr. Bolduc even ignored the visible intoxication of Plaintiff's male co-worker, Gerald Porter. (Ex. 57, ¶ 13; Ex. 62, ¶ 4.) Mr. Bolduc also permitted Mr. Porter to take cigarette breaks *ad lib*.[4] (Ex. 6, 174:18-177:16) While ignoring all this conduct on the part of the male employees, Mr. Bolduc not only subjected Plaintiff to greater scrutiny, but would even berate Plaintiff for having failed to do tasks that her male co-workers ought to have done. (Ex. 57, ¶ 9-11.)

In addition to dishing out discriminatory treatment himself, Mr. Bolduc also tolerated sexually harassing behaviors by Plaintiff's co-workers. From the time that Plaintiff began working for Defendants as Spare Building Cleaner, Pasquale "Pat" Domenicone, a male co-worker, followed Plaintiff through the building showing her pictures of nude women and making sexual remarks. (Ex. 1, 38:24-39:4.) Domenicone engaged in unwanted sexual behaviors towards the

---

[4] At his deposition, Mr. Bolduc claimed that there was no policy on when employees were permitted to go outside for cigarette breaks; it was discretionary with the supervisor. (Ex. 6, 176:21-177:3.) This claim is hardly

Plaintiff as referenced above on an almost nightly basis. (Ex. 1, 42:16.) During the time that Plaintiff worked as a Spare Building Cleaner, Domenicone also indicated to Plaintiff that he could get her a full-time position with Defendants if she would come and clean his house for a year. (Ex. 1, 40:11-15.)

Plaintiff reported Domenicone's unwanted sexual behaviors to Edward Bolduc on approximately four or five occasions. (Ex. 1, 42:10) Nevertheless, Bolduc conducted no investigation into the matter. (Ex. 1, 40:1-42:19.) Mr. Bolduc instead limited his actions to indicating that he would “reexplain” the sexual harassment policy to the staff. (Ex. 8.) Mr. Bolduc took this passive approach despite the fact that the Defendants’ policies specifically required that such complaints be investigated. (Ex. 9, p. 3.) Domenicone continued his unwanted sexual behaviors towards the Plaintiff until such time as he retired on or about January 31, 1991. (Ex. 1, 40:11-17; Def. Ex. JJ, p. 2.)

Mr. Bolduc also refused to remediate other offensive behaviors and conditions that Plaintiff encountered in her day-to-day work. On two occasions in or about 1994 or 1995, when Plaintiff was assigned to clean the men's room, men would enter and use the facilities, and fail to leave because a woman was present. (Ex. 1, 58:12-19; 59:16-17.) Plaintiff would remain in a stall on those occasions. (Ex. 1, 58:12-19.) Plaintiff complained about this situation to Mr. Bolduc, but was never told that anything was done. (Ex. 1, 58:12-19) At the time in 1994 or 1995 when Plaintiff was assigned to clean the men’s room, Gerald Porter was assigned to clean the ladies’ room. Plaintiff requested that she be permitted to switch assignments with Gerald Porter, so that she would be cleaning the ladies’ room and he would be cleaning the men’s room, and there would be no further problems with men using the men’s room while Plaintiff was

consistent with his testimony given when the conversation turned to the Plaintiff and Ms. Stamp’s break times.

cleaning it. Plaintiff was denied permission to switch assignments with Porter. (Ex. 1, 59:23-60:8.)

Plaintiff encountered other problems of a similar nature throughout her employment. Throughout her employment, the Weybosset Street facility's men's locker room had a calendar with naked women. The door to the men's locker room was left open quite often so that this calendar was visible. Men would exit the shower room with only their towels wrapped around them, and not shut the door. Plaintiff would also be required to clean the locker room while it was in use, so she was subjected to these behaviors on a daily basis. When Plaintiff occasionally filled in at Dexter Street, there were also calendars containing pictures of naked women, one in the gym and one in the garage. Plaintiff was required to work in both rooms. Furthermore, when Plaintiff was required to work in the maintenance department at Dexter Street, the men would use crude language and make remarks about her chest. Plaintiff complained to Mr. Bolduc about these conditions, but nothing was done. (Ex. 57, ¶ 21-22.)

Also, during the period of 1997-1999, Plaintiff would be assigned to the task of putting recycled paper in the dumpster. When she was assigned to this task with a male employee, the dumpster was left open. When she was assigned to this task with a female employee, the dumpster would be kept closed so that Plaintiff and her female co-worker had to throw the trash bags up. This was harder work, and would cause the women's shirts to ride up. Male employees would gather around the windows making remarks. The Plaintiff and her female co-worker were unable to open the dumpster themselves. Mr. Bolduc was responsible for telling the people who delivered the dumpster to leave it open, but repeatedly failed to follow through despite Plaintiff's complaints. (Ex. 57, ¶ 15.)

---

Then, he testified that employees had established breaks of ten minutes. (Ex. 6, 80:22-81:21.)

Mr. Bolduc's condonation of sexually harassing behaviors was also mirrored and reinforced by upper-level management. On or about March 6, 1994, Richard Kala began his maintenance position at the Defendants' Weybosset Street facility. (Ex. 1, 46:4-6, Def. Ex. C, p. 1.) Plaintiff was required to provide Kala with training for his maintenance position for three nights. (Ex. 1, 46:6.) On Kala's first night of training with Plaintiff, Kala began to make unwanted sexual advances towards the Plaintiff. (Ex. 1, 46:9-24.) On Kala's first night of training with Plaintiff, Kala asked Plaintiff if they could have an affair, and said that nobody would know about it. (Ex. 1, 46:9-24.) Plaintiff initially laughed off Kala's remarks. (Ex. 1, 46:9-24.) When Kala continued to press Plaintiff, she expressly indicated that she was not interested, and that she was seeing somebody. Plaintiff then left Kala with an area to work on by himself and then left the area to complete other tasks. (Ex. 1, 46:9-24.)

On the second evening on which Kala was to train with the Plaintiff, when Plaintiff arrived at work and went to the cafeteria to put her lunch in the refrigerator, Kala asked how she was doing. Plaintiff said to Kala that she was not talking to him. When Kala asked why, Plaintiff indicated that Kala had spoken to her inappropriately the night before, and that Kala owed her an apology. Kala apologized, and said that he would not speak to her that way again. (Ex. 1, 46:25-47:15.) Later that evening, after the conversation in the cafeteria, Kala resumed making unwanted advances to her again that night. Once again, Plaintiff dealt with Kala's unwanted advances by giving Kala jobs to do on his own while she went to work in another area of the building. (Ex. 1, 47:16.)

Plaintiff dealt with Kala largely by avoiding him as much as possible. (Ex. 1, 48:13-21.) However, on or about December 31, 1994, Plaintiff was scheduled to work at the Weybosset Street facility with Kala and Gerald Porter. (Ex. 1, 47:19-25.) Plaintiff, Kala, and Porter had

agreed to bring in refreshments to work for the evening of December 31, 1994. (Ex. 1, 47:23.) When Plaintiff, Kala, and Porter were in the basement of the Weybosset Street facility, taking their refreshments, Plaintiff discovered that Porter had brought a cooler containing alcoholic beverages. Plaintiff grew uncomfortable about being in the basement with two men and liquor, particularly considering what Kala had said to her in the past, so she went upstairs to the cafeteria. (Ex. 1, 49:1-5.) Kala followed Plaintiff to the cafeteria and once again asked if they could have an affair. Plaintiff indicated to Kala that she was seeing somebody, that Kala was married, and that she did not like that kind of talk. Kala then took out his wallet and began taking out one hundred dollar bills and throwing them on the table. He told Plaintiff that money was no object, and he would pay whatever she wanted. Plaintiff became upset and left the building. (Ex. 1, 49:5-24.)

In short, Plaintiff was solicited for prostitution by a co-employee, in an office building at night, on a holiday. This conduct was blatantly harassing, intimidating, and even criminal. Defendants appear to have been completely nonplussed, and once again failed to take appropriate remedial action. Plaintiff called Mr. Bolduc on the next Monday morning after December 31, 1994, and told him of the incident with Kala on New Year's Eve. She was so upset that she began crying during the telephone conversation. (Ex. 1, 50:3-6.) Bolduc told Plaintiff to report to his office when she came to work on that Monday after December 31, 1994. (Ex. 1, 50:7.) When Plaintiff reported to Bolduc, he took her to Henry Butler. (Ex. 1, 50:10) Plaintiff reported Kala's unwanted sexual advances behavior to Henry Butler. (Ex. 1, 50:12-13) Henry Butler took Plaintiff to Alicia Goody, Defendants' in-house counsel. (Ex. 1, 50:15.) Plaintiff informed Alicia Goody of Kala's behavior. (Ex. 1, 50:15-20) Alicia Goody told Plaintiff that there would be a

note in Kala's file, and that she would talk to him and this would not happen again. (Ex. 1, 50:17.)

For all of Ms. Goody's assurances, there was no follow-through. Kala continued to harass Plaintiff after she had spoken to Alicia Goody. (Ex. 1, 52:9, 24.) Kala's conduct even became threatening. Shortly after Plaintiff spoke to Alicia Goody, Kala approached Plaintiff and told her to drop the charges. When Plaintiff refused, Kala told her that if she did not drop the charges, she would be "sorry." Kala ordered Plaintiff to go to Alicia Goody and tell her that Plaintiff had been mistaken. Plaintiff once again told Kala that she would not drop the charges. (Ex. 1, 51:2-15.) On several occasions after Plaintiff told Kala that she would not drop the charges, Plaintiff found that her car had been vandalized, apparently while parked in the company garage. This vandalism included the loosening of various nuts and bolts, and could have caused a serious accident. (Ex. 1, 51:16-52:13.)

Plaintiff repeated her entreaties for assistance, but to no avail. Plaintiff went to Mr. Bolduc about Kala's continued harassment on a daily basis, but Mr. Bolduc did nothing, and the harassment continued. (Ex. 1, 52:7-13.) In fact, Mr. Bolduc would choose this time to tell Plaintiff that there were discipline notes in her file, and that if she received one more, she would be fired. Up until this time, Plaintiff had been made aware of no such notices. (Ex. 57, ¶ 19.) Plaintiff had also discovered that Kala had made unwanted advances to Maureen Morancey and Lynore Horne. (Ex. 1, 50:20-21.) Plaintiff approached Alicia Goody on a daily basis regarding Kala's behavior, and to see if Goody had spoken to Maureen Morancey or Lynore Horne. (Ex. 1, 52:14-17.) On each such occasion, Goody told Plaintiff that she was "busy" and she was going to take care of it. (Ex. 1, 52:16-17.) Plaintiff discussed Kala's behavior with Grant Keith, a Human Resources official. (Ex. 1, 52:19-24.) Grant Keith indicated to the Plaintiff that he would address

the situation, but did nothing. In fact, when Plaintiff saw Mr. Keith the next day, he "totally ignored" Plaintiff. (Ex. 1, 52:22-23.) Plaintiff discussed Kala's behavior with Royalynne Hourihan. Royalynne Hourihan was Defendants' Vice-President of Human Resources. During the sexual harassment training session arranged by Hourihan, Plaintiff began to cry and left the room. (Ex. 1, 117:12-20.) Royalynne Hourihan followed Plaintiff into the ladies room. Plaintiff told her of the troubles that she was having with Kala, and Hourihan promised that she would help. (Ex. 1, 118:11-20.)

Apparently, Hourihan took no action, because Kala still continued his remarks after Plaintiff spoke to Keith and Hourihan. (Ex. 1, 52:24.) Kala also continued to intimidate the Plaintiff. On one occasion, when Plaintiff was alone in the basement of the Weybosset Street building, talking to her son-in-law on the phone, Kala kept calling out to her. (Ex. 1, 52:25-53:12:.) On another occasion, Kala put his hand on Plaintiff's shoulder and asked him how she was feeling. (Ex. 1, 53:13-19.) On other occasions, Kala followed Plaintiff around the building. (Ex. 1, 54:25-55:1.) Kala even engaged in workplace sabotage, filling the dumpster but not running it, so that trash would fall out when Plaintiff opened it. (Ex. 1, 55:1-4.)

Kala's conduct took a serious toll on Plaintiff's well-being. Plaintiff began to see a psychiatrist, John Ruggiano, due to Kala's behavior. (Ex. 1, 56:26, 119:21-120:22.) For a period extending from on or about June 19, 1995 through January, 1996, under the direction of Dr. Ruggiano, Plaintiff went on sick leave due to anxiety caused by Kala's conduct. (Ex. 1, 55:5-7; Ex. 10.) This fact appeared to have not encouraged Defendants to act. On one occasion, Defendants' employee told Dr. Ruggiano's office that Kala had been transferred to Allens Avenue and that Plaintiff could therefore return to work, but Plaintiff later discovered that Kala was still at Weybosset Street. (Ex. 1, 56:6:9.) Although Kala eventually did transfer to Dexter Street,

Plaintiff would encounter Kala when she filled in there. Kala would come into the kitchen to see Plaintiff and ask how she was doing or what was going on. (Ex. 1, 64:19-25.) Kala had no work-related reason to be in the kitchen on the occasions. (Ex. 1, 64:20-21.) Plaintiff complained of these episodes to Mr. Bolduc, but, again, no action was taken. (Ex. 57, ¶ 20.)

It is significant that the Defendants themselves have given highly incoherent and inconsistent accounts of their actions in this matter. In their First Supplemental Answers to Interrogatories, filed on or about November 3, 2005, Defendants give the following account:

> Carol Petrarca made an internal complaint regarding Richard Kala in 1995. That complaint was investigated by Bud Butler and, as a result, Kala was transferred on January 2, 1996 from Facilities Maintenance to Fleet Services, and his hourly pay rate was reduced from $19.79 to $18.31. . . . (Ex. 13.)

Later, in their Second Supplemental Answers to Interrogatories, filed on or about May 19, 1996, Defendants gave another account:

> Petrarca also complained to Bud Butler about harassment by Kala. Petrarca alleged that Kala propositioned her. Although Kala denied the allegation, Butler found Petrarca to be credible, and thus transferred Kala from Facilities Maintenance to Fleet Services, with a reduction in his hourly pay rate. Kala was demoted to laborer after he was found to have made inappropriate comments to a customer, and subsequently received a Last Chance Agreement based on the Petrarca and customer complaints. (Ex. 51.)

On or about May 24, 2006, Plaintiff deposed Mr. Kala, who denied ever having harassed the Plaintiff or Ms. Morancey, or having any conflicts with Plaintiff except for a dispute about who ought to be able to collect soda cans discarded by other employees and obtain the deposits. (Ex. 4, 39:1-23; 52:16-24.) Mr. Kala also testified that Ms. Goody told him after a meeting that Mr. Kala "should not worry too much" about Plaintiff's allegation. (Ex. 4, 57:8-15.) On the other hand, during her deposition, taken directly after Kala's deposition on the same day, Ms. Morancey indicated that Kala had made harassing remarks to her. (Ex. 54, 9:18-10:19.) Also,

Kala also denied having received a transfer as the result of having harassed Plaintiff, or having been forced to bid out. (Ex. 4, 62:8-9.) Kala testified that he had disliked the maintenance position. (Ex. 4, 17:17-24.)

Two days later, on May 26, 2006, the Defendants filed their Third Supplemental Answers to Interrogatories, which gave yet another edition of what had taken place:

> In or about 1995, Petrarca complained to Alycia Goody and Bud Butler regarding harassment by Richard Kala. Goody and Butler conducted an investigation into the complaint. Although Kala denied the allegation, it was determined that Kala should be separated from Petrarca. *Upon information and belief, Kala had already signed a posting to be transferred to the position of Garage Helper at Dexter Street, a different facility from the one where Petrarca worked.* Kala signed the posting on September 28, 1995. Upon further information and belief, Kala was the only employee to sign the posting. Kala had indeed signed a number of job postings during his tenure in Facilities Maintenance. Kala had joined Facilities Maintenance on March 6, 1994. He left Facilities Maintenance on January 2, 1996. Kala's transfer separated Kala from Petrarca. Kala's final rate of pay in Facilities Maintenance was $19.79 per hour, and his initial rate of pay as a Garage Helper was $18.31 per hour. He did not achieve a rate of pay in excess of his final rate at Facilities Maintenance until January 1997. (Exhibit 56.) (Emphasis added.)

In the progression from one interrogatory answer to another, the Defendants changed their stories as to whether they had ever made a determination as to Plaintiff's credibility. They also retreated from their story as to whether Kala had received a disciplinary transfer, or went to the Garage Helper position voluntarily. For that matter, they even change their story as to whether Kala ultimately suffered financial loss, as the transfer to the Garage Helper position made him eligible for a higher rate of pay. This change came after Kala testified that the chance to attain a higher rate of pay had been a motivating factor for his applying for the Garage Helper position. (Ex. 4, 27:7-15.)

The "last straw" for the Plaintiff took place on or about August 20, 1999, with the so-called "locker room" incident. On or about August 20, 1999, at approximately 2:30-2:45 p.m.,

Bolduc entered the women's locker room, located in the basement of Weybosset Street without knocking, while Christine Stamp and Plaintiff were in said room. (Ex. 1, 68:24:69:4.) Mr. Bolduc flung the door open and began shouting at Christine Stamp and Plaintiff for not painting. (Ex. 1, 72:12-18.) Plaintiff was in the basement room on break, because she had worked through it earlier. (Ex. 1, 69:20-21.) When Plaintiff attempted to inform Bolduc that she had worked through her break and was taking it at the time Bolduc entered the basement room, and in any case had not even been assigned to painting, Bolduc insisted that she had exceeded her break. (Ex. 1, 71:19-22; 72:9-12.) Mr. Bolduc persisted in this position even though he would testify at his deposition that it was a common and accepted practice for employees to work through a scheduled break in order to complete a task, and take the break once they had finished. (Ex. 6, 83:4-15.) Mr. Bolduc remained in the women's locker room for five to ten minutes, and continued his tirade. (Ex. 1, 72:4-6.)

There is no question that Mr. Bolduc knowingly entered the women's locker room, and knowingly entered it when Plaintiff and Christine Stamp were present. Prior to August 20, 1999, Bolduc had always knocked before entering said locker room. (Ex. 1, 75:23-76:1.) In his deposition testimony, Mr. Bolduc himself referred to the room in question as a women's locker room, and that acknowledged he knew it was being used to change clothes. (Ex. 6, 111:4-112:8.) Mr. Bolduc also authored several written statements wherein he acknowledged that the room in question was a women's locker room. (Ex. 14; Ex. 15; Ex. 16.) Furthermore, during the exchange in the locker room itself, Bolduc said that he had heard Plaintiff and Christine Stamp laughing and talking in that room, and therefore knew that it was occupied. (Ex. 1, 72:13-14.)

It is also beyond cavil that Mr. Bolduc had no legitimate reason for bursting into the women's locker room. Defendants have attempted to characterize the incident wherein a

supervisor was justifiably piqued at goldbricking employees. This characterization is not borne out by Mr. Bolduc's testimony, wherein he admitted that it was an entirely common and acceptable practice for employees to be on break at that particular hour, especially if they worked through their break to complete a task. (Ex. 6, 83:4-15.) In any case, knocking is always a far more acceptable alternative to intruding on a dressing and changing room utilized by persons of the opposite sex in the workplace.

Plaintiff and Christine Stamp promptly reported the locker room incident August 20, 1999 to officials of their union. Ray Conroy, a union official, told Plaintiff and Christine Stamp that the best that could be done in response to their complaints about the August 20, 1999 incident was a note in Bolduc's file. (Ex. 1, 76:8-19.) Plaintiff and Christine Stamp felt that a note in Bolduc's file was not a sufficient response to the August 20, 1999 incident, and that an apology was in order. (Ex. 1, 76:18-19.) By August 31, 1999, neither Plaintiff nor Stamp had been informed of any action by Human Resources, and therefore wrote to Royalynne Hourihan. (Ex. 17.) Not only did the letter address Mr. Bolduc's barging into the women's locker room, but also raised the issue of Bolduc's harassing and discriminatory treatment on other occasions.

Defendants, chiefly through Mr. Butler, appear to have gone to great pains to avoid dealing with the matter. The August 31, 1999 letter did produce a response from Mr. Butler on September 1, 2000. (Ex. 18.) However, for whatever reason, Mr. Butler chose to delay an investigation in this matter until one Union representative, Mr. Devlin, had returned from vacation. Mr. Butler offered no explanation as to why Mr. Conroy or other union officials could not deal with this matter. By September 21, 2000, no investigation had yet been performed. Mr. Butler wrote that he was waiting for Ms. Stamp to return to work from sick leave. (Ex. 19.) However, on September 19, 2000, Ms. Stamp had offered to come in from sick leave to be

interviewed. (Ex. 62, ¶ 6.) Mr. Butler later attempted to question Plaintiff about the incident in front of Mr. Bolduc, with no Union representative present. (Ex. 57, ¶ 23.)

Finally, Plaintiff and Ms. Stamp filed a formal grievance through their Union. (Ex. 20.) Defendants give an entirely incorrect account of the results of this grievance. Mr. Butler appears to have completely whitewashed Mr. Bolduc's behavior. As we mentioned, Mr. Bolduc authored several statements indicating that he had knowingly entered the women's locker room, and heard Plaintiff and Ms. Stamp inside. (Ex. 14, 15, and 16.) Despite Bolduc's manifestly inappropriate behavior, Butler took the position that no apology was in order. (Ex. 21.) Later, Defendants even denied that the room was a locker room at all. (Ex. 22; Ex. 23, p. 2.) Most tellingly, Mr. Butler's own notes indicate that he had been told that a Human Rights Commission complaint was in the offing. (Ex. 53.) As described in greater detail in Plaintiff's Memorandum in Support of her Objection, Plaintiff was terminated shortly thereafter.

## III. LEGAL ARGUMENT

By now, it is well-established that the standard for summary judgment is high. Defendants must demonstrate that ". . . the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The reviewing court does not make factual determinations itself, or decide which edition of the facts to accept; it merely determines whether ". . . a fair-minded jury could return a verdict for the plaintiff on the case presented." ***See*** Lipsett v. University of Puerto Rico, 864 F.2d 881, 895 (1st Cir. 1988). The record is reviewed in the light most favorable to the non-moving party. ***See*** Rossy v. Roche Products, Inc., 880 F.2d 621, 623 (1st Cir. 1989). All factual inferences must be drawn in favor of the non-moving party. ***See*** Rossy at 623. Defendants' burden is particularly

onerous in discrimination cases such as this. The First Circuit has counseled caution and restraint when deciding a summary judgment motion in a discrimination action because motive and intent play such a prominent role. *See* Oliver v. Digital Equipment Corp., 846 F.2d 103, 109 (1st Cir. 1988). Such questions of motive and intent are considered the realm of the jury. *See* Rossy, at 624.

**A. PLAINTIFF MAY RECOVER FOR THE PRE-APRIL 26, 1999 CONDUCT ON A "CONTINUING VIOLATION" DOCTRINE.**

The Defendants attack Plaintiff's hostile environment claims largely by invoking statutes of limitations on Title VII claims. As to the statute of limitations issue, it is true that in general, a plaintiff employee's recovery pursuant to Title VII is limited to the 300-day period. However, recovery may be had for incidents arising prior to the 300-day filing period under the "continuing violation" theory. *See* Provencher v. CVS Pharmacy, 145 F.3d 5, 14 (1st 1998). Under the "continuing violation" theory, if one component act of the hostile work environment falls within the statutory time period, the entire time period of the hostile environment may be considered by a court for the purposes of liability. *See* National Railroad Passenger Corp. v. Morgan, 536 U.S. 101, 118 122 S.Ct. 2061, 2064 (2002).

A "continuing violation" may either be serial or systemic in nature. *See id*. A systemic violation is one which ". . . has its roots in a discriminatory policy or practice; so long as the policy or practice continues into the limitations period, a challenger may be deemed to have filed a timely complaint." *See id.*, *citing* Sabree v. United Bhd. Of Carpenters and Joiners Local No. 33, 921 F.2d 396, 400, n.7. A "serial violation" arises where there have been a number of discriminatory actions arising from the same discriminatory animus. The acts constituting a "serial violation" must have a substantial relationship to one another, that is, they must be sufficiently

similar to one another. The acts must not be isolated and discrete, but must occur with frequency or repetitively or continuously.[5] *See* O'Rourke, 235 F.3d at 731. The Plaintiff has presented sufficient evidence to support a jury finding that such a "continuing violation" existed throughout her employment.

**1. The Post-April 26, 1999 Acts Need Not Be Independently Actionable in Order to Support a "Continuing Violation."**

The Defendants apparently continue in their earlier attempt to defeat the operation of the "continuing violation" doctrine by alleging that the "anchoring violation" must in and of itself be sufficient to create a hostile environment. (Defendants' Response, p. 3.) The Magistrate Judge correctly refused to take this position. This position was explicitly contradicted by the case of *Morgan*, which overturned the First Circuit's former holdings that required that the one act taking place within the 300-day limitation period in and of itself be sufficient to establish a hostile work environment; all that is required is that the act have contributed to that hostile environment. *See id.* at 2068.

That the "anchoring act" need not be actionable in and of itself was more fully explicated by the First Circuit in the recent case of Crowley v. L.L. Bean, Inc., 303 F.3d 387 (1st Cir. 2002). In the *Crowley* case, the plaintiff employee alleged that from a period beginning in 1996, her male co-worker had engaged in a pattern of stalking and harassing her. Although the plaintiff employee repeatedly reported this behavior to her superiors, her situation was not remediated by her employer until July, 1998, after the plaintiff employee obtained a restraining order against the offending employee. *Id.* at 392. The plaintiff employee did not file a complaint with the

---

[5] We note here that the test of sufficiency of a serial continuing violation claim formerly included an inquiry into whether the acts were "of sufficient permanence that they should trigger an awareness of the need to assert one's rights." *See* O'Rourke, at 731. In the recent case of *Morgan*, the U.S. Supreme Court specifically jettisoned this test. *Id.* at 117-118.

appropriate administrative agency until December 21, 1998, alleging that she had been subjected to a hostile work environment. After trial, the jury concluded that the plaintiff's employer had engaged in sexual discrimination against her through acts occurring on or after February 24, 1998, that is, 300 days before she filed her charge. *See id*. at 392-93. The employer appealed, claiming that the plaintiff employee had failed to present sufficient evidence to support her finding. *See id.* at 394. In particular, the employer argued that the jury's verdict could only be supported by acts taking place after February 24, 1998. *See id*. at 395. The employer also argued that the encounters taking place after February 24, 1998 were not "severe and pervasive" enough to create a hostile work environment. *See id*. at 397. Those incidents consisted of the offending employee's giving the plaintiff employee a book, coming to the wrong building where she was working on three occasions, operating his machine in her vicinity, and coming out of a tunnel dancing. Accordingly, the employer argued that because these incidents did not, of themselves, rise to the level of creating a hostile claim, the plaintiff's claim must fail. *See id*. at 395.

The *Crowley* Court specifically rejected the proposition that the plaintiff employee's claim of hostile environment could only be judged by what had taken place after February 24, 1998:

> The Supreme Court's recent decision in *National Railroad Passenger Corp. v. Morgan,* 536 U.S. 101, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002), severely undermines L.L. Bean's argument. In *Morgan,* the Court held that "consideration of the entire scope of a hostile work environment claim, including behavior alleged outside the statutory time period, is permissible for the purposes of assessing liability, so long as any act contributing to that hostile environment takes place within the statutory time period." *Id.* 122 S.Ct. at 2068. The Court explained that a "hostile work environment claim is comprised of a series of separate acts that collectively constitute one 'unlawful employment practice.' " *Id.* 122 S.Ct. at 2074. Thus, "[p]rovided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by the court for the purposes of determining liability." *Id.*
>
> Therefore, in the wake of *Morgan,* the jury not only could consider Juhl's conduct prior to February 24, 1998, as "relevant background evidence," *United Air Lines,*

> *Inc. v. Evans,* 431 U.S. 553, 558, 97 S.Ct. 1885, 1889, 52 L.Ed.2d 571 (1977), but also could hold L.L. Bean liable for the alleged acts of harassment that fell outside the 300-day period for filing an EEOC charge of sexual discrimination provided that it found that there was an act ***contributing*** to the hostile environment within the 300-day filing period. Notwithstanding the thrust of L.L. Bean's argument that Crowley's allegations of harassment included only "a few brief encounters" between her and Juhl that were "scarcely threatening," Br. of Appellant at 24, 31, Crowley offered evidence at trial establishing that Juhl's harassment began in the fall of 1996 and continued into July 1998, and thus L.L. Bean's argument is flawed. Consequently, we must review all such evidence offered at trial when determining whether the jury verdict is supported by the evidence.

*Id.* at 395-96. (Emphasis added.)

In short, the ***entire*** course of conduct – not just that which occurred within the 300-day limitation period – was relevant to determining whether there was a continuing violation of plaintiff's rights in the form of a hostile work environment. The *Crowley* Court even amplified this point later in its opinion:

> . . . *Morgan* fatally undermines this argument, for Crowley's allegations do not merely include eight incidents, but involve alleged acts of harassment and stalking that spanned nearly one and a half years. Accordingly, we will review evidence relating to all of Crowley's allegations – not just those of acts that occurred between February 24, 1998, and June 22, 1998 – to determine whether Juhl's conduct was sufficiently "severe or pervasive" to constitute actionable harassment.

*Id.* at 397. The Court then reviewed the litany of "stalking" behaviors that plaintiff employee had endured prior to February 24, 1998, and concluded that the Plaintiff had presented sufficient evidence to support her hostile work environment claim. *See id.* at 400-01.

In short, *Crowley* stands for the proposition that the final, "anchoring" acts creating a hostile work environment need not be actionable in and of themselves. Instead, the proper approach is to examine the ***entire*** course of conduct. ***See also*** Marrero v. Goya of Puerto Rico, Inc., 304 F.3d 7, 18 (1st Cir. 2002) (". . . the statute of limitations is satisfied as long as the plaintiff files a charge within 300 days of one of the many acts that, ***taken together***, created the

hostile work environment." [Emphasis added.]); Martin v. Nannie and the Newborns, 3 F.3d 1410, 1415, n.5 (10th Cir. 1993). For that reason, it is irrelevant whether the post-April 26, 1999 conduct was or was not independently actionable as a "hostile environment" claim; instead, those incidents can be used as the "anchoring act" within the limitations period that supports a claim of serial violations stretching back to the beginning of her employment by the Defendants. All that is required is that it was sufficiently related to and reinforced the pre-April 26, 1999 conduct. As we will describe in greater detail later, the post-April 26, 1999 bears that type of close relationship to the conduct that came before it.

**2. The Hostile Environment Continued Unabated Through 1996-April 26, 1999.**

Interestingly enough, the Defendants themselves concede for the purposes of this Motion that the Plaintiff had established a triable issue as to whether she was subject to a hostile work environment for the period ending with Richard Kala's January 1996 transfer out of the facilities maintenance department. (Defendants' Objection, p. 7.) By this time, as we described above, Plaintiff had endured numerous incidents of overtly discriminatory behavior, chiefly at the hands of Mr. Bolduc. These included, but certainly were not limited to, Mr. Bolduc's attempts to discourage and block her from obtaining the maintenance job and then failing to train her for said job once she persisted and obtained it; Mr. Bolduc's remarks and those of Mr. Heaton regarding her breast; Mr. Bolduc's belittling comments about her knowledge of tools and the general inability of women to do a man's job; and Mr. Bolduc's subjecting Plaintiff to a higher level of scrutiny than her male counterparts. (Ex. 1, 33:1-7, 61:11-62:2; Ex. 6, 43:6-44:3; Ex. 7; Ex. 57, ¶ 2-4, 6-11)

It must be said that Mr. Bolduc, through his continued contempt towards female employees, also created an atmosphere poisonous towards women that virtually gave Plaintiff's

male co-workers license to engage in abusive conduct towards women as well. Not only did Bolduc express animus towards women himself, and act upon that animus, but fostered such behaviors in others. Most notably, Bolduc largely ignored the pre-1996 Domenicone and Kala situations, even when Plaintiff was being physically threatened. (Ex. 1, 40:1-42:19, 52:7-13; Ex. 8) When Plaintiff complained about the Kala episode to upper management, she was met with indifference. She was even met with retaliatory behavior by Bolduc, who informed her after her complaints about Kala that she was on the verge of being fired – due to disciplinary notes in her file that she had never seen before. (Ex. 57, ¶ 19) It was after Plaintiff's complaints about Kala that Bolduc began his course of sneaking up behind her and demanding to know what she was doing. (Ex. 57, ¶ 7) This behavior plainly reinforced the message that Bolduc had been giving Plaintiff from the first day of her employment – that gender-based discrimination was a condition of employment in the maintenance department.

Under these circumstances, there can be no serious argument that there is a triable issue as to whether Plaintiff was subjected to a hostile working environment prior to January, 1996, and the Defendants apparently do not even attempt to persuade us otherwise. What Defendants appear to argue is that there was a "break" between 1996 and 1999 incidents that would work to keep the pre-1996 incidents from being linked to the post-April, 1999 episodes such as to create a "continuing violation" throughout Plaintiff's employment. We believe that this position is insupportable based upon the evidence -- despite Defendants' desperate attempts to have a great deal of that evidence removed from consideration, or minimize the impact of that evidence.

First, the Defendants attempt to eliminate some of the conduct complained of by declaring that the allegations contained in Plaintiff's affidavit are not worthy of consideration in that they are not based upon Plaintiff's personal knowledge. In particular, the Defendants attack Plaintiff's

allegations that she was being singled out for harsher discipline and closer supervision than that dealt out to her male counterparts. Defendants allege that the Plaintiff's allegations regarding the closer scrutiny of her work performance could not be based upon her personal knowledge, and therefore are not worthy of consideration.

Defendants, however, omit a great deal of the facts supporting Plaintiff's knowledge that she was being subjected to disparate treatment from her male co-workers. Plaintiff could certainly know from her personal knowledge that Bolduc permitted Plaintiff's male co-worker to get away with leaving his work undone. As outlined in her Affidavit, her knowledge was not based only on the fact that she had not seen that co-worker being reprimanded – but also on the fact that she herself was ordered by Bolduc to do that work which the male co-worker had been assigned but left undone, and/or that Bolduc scolded her because the work had been left undone, even though he knew or should have known that it was the male co-workers' responsibility. (Ex. 57, ¶ 8-11) Plaintiff could also certainly be in the position to directly observe that her male co-worker was being assigned less difficult tasks. (Ex. 57, ¶ 14) Plaintiff could also directly observe that she had complained to Mr. Bolduc when Joseph Ianiello put in a disappearance when Plaintiff and Ianiello were both assigned to a particular task – but that Bolduc did nothing about it. (Ex. 1, 34:12-24.) Plaintiff could directly observe that she was being given tasks to do alone that two men were normally assigned to – even where safety considerations had dictated that two men be assigned to the task, as in the case of the vent-cleaning job. (Ex. 1, 44:5-20; 105:7-106:8) Plaintiff was also in the position to directly observe that her male co-worker was going unreprimanded when reporting to work visibly intoxicated (Ex. 57, ¶ 13) – while Mr. Bolduc "white gloved" her work area. With respect to the incident about using the parking garage,

Plaintiff's deposition firmly suggests that the other men's cars were in the garage – a fact that she could have seen for herself when she was getting her own car out.[6] (Ex. 1, 103:24-104:2.)

For that matter, Plaintiff's claims about disparate treatment are also supported by the testimony of Mr. Bolduc himself. During a deposition, Mr. Bolduc admitted to not taking immediate action when he repeatedly discovered Plaintiff's male co-workers at Dexter Street missing from their work sites. (Ex. 6, 91:21-98:24) Mr. Bolduc also admitted to permitting Plaintiff's male co-worker to take cigarette breaks whenever he liked. (Ex. 6, 174:18-177:16) This leniency certainly stands in sharp contrast to that given to Plaintiff and her female co-worker. In their case, as we have described, Mr. Bolduc's zeal for policing breaks and working hours caused him to launch an expeditionary force into the women's locker room. Plaintiff's claims about disparate treatment were also supported by her female co-worker, Christine Stamp, who experienced similar treatment at Bolduc's hands. (Ex. 62.)

The Defendant also attempts to persuade this Court an improperly fragmented view of the evidence regarding the years 1996 through 1998. The Defendants appear to be asking this Court to look at each one of the incidents complained of by the Plaintiff in isolation from all of the others, and declare that that incident, in and of itself, does not rise to the level of creating a hostile work environment and/or were not motivated by the Plaintiff's gender. However, that is not the appropriate approach. Instead, one examines the *entire* course of conduct and determine whether that course of conduct, in its totality, creates a hostile environment. *See* O'Rourke v. City of Providence, 235 F.3d 713, 728-29 (1st Cir. 2001), *citing* Meritor Sav. Bank, FSB v. Vinson, 477

[6] Defendants incorrectly identify this incident as taking place post-April 26, 1999. However, given that Plaintiff identified Joseph Ianiello as one of the men whose cars had been parked in the garage, and Mr. Ianiello retired in 1998 (Pl. Ex. 57, ¶ 2), the incident must have taken place prior to April 26, 1999.

U.S. 57, 69, 106 S.Ct. 2399 (1986). This is so even though the conduct involved does or does not contain sexually explicit overtones. 235 F.3d at 731.

Defendant asks us to take precisely this type of fragmented view when dealing with the 1996-April, 26, 1999 behavior. This is apparent when the Defendant tries to explain away Bolduc's disparate scrutiny of Plaintiff vis-à-vis her male co-worker, and his inequitable manner of dealing out job assignments, overtime opportunities, and imposing "call-in" rules. Defendants would have this court believe that these matters should simply be chalked up to a disagreement about work assignments, or simply do not create a hostile environment. Defendants would also have this Court forget the evidence demonstrating that Bolduc had expressed his anti-female animus in the past, and had acted upon it in various ways, not only through his own remarks, but in his condonation of sexually harassing behaviors by others. Bolduc's past behavior and expressed attitudes certainly are relevant as to whether Bolduc had acted with discriminatory intent with respect to the 1996-April 26, 1999 episodes. ***See*** O'Rourke, 235 F.3d at 726. More importantly, the Defendants apparently would have this Court forget that there is evidence that male employees ***were*** being treated differently between 1996-1999 in terms of scrutiny and supervision. Differences in the level of supervision and scrutiny have been identified in the past as the types of discriminatory treatment that can serve as evidence of a hostile work environment. The ***O'Rourke*** Court clearly identified this type of behavior as that which can contribute to a hostile environment. ***Id***. at 729, n.4.

Finally, the 1996-April 26, 1999 conduct was very similar to and reinforced the conduct that had gone before it. In some respects, the 1996-April 26, 1999 was identical to that which had gone before it. The belittling questions as to whether the Plaintiff could identify basic tools continued through 1998. (Ex. 57, ¶ 3) The disparate treatment in terms of supervision and

discipline had begun from the time Plaintiff began her employment. (Ex. 57, ¶ 7-11, 13-14) The bypassing for overtime opportunities in 1998 were a repeat of those that took place in 1994. (Ex. 57, ¶ 17-18) During the 1996-1998 period, Bolduc even added a new type of disparate treatment, that is, in relaxing "call-in" standards for the male co-worker. (Ex. 57, ¶ 5) Furthermore, Plaintiff was still being required on a daily basis to work in a locker room containing pictures of naked women, and was required to work in said locker room while it was being used by male employees, despite repeated complaints to Bolduc.[7] (Ex. 57, ¶ 21)

When one rejects the Defendants' flawed approach towards assessing the evidence presented in response to their Motion for Summary Judgment, it is clear even during the period 1996-April 26, 1999, the pattern of demeaning and humiliating treatment had continued unabated, and was similar to and reinforced the patterns of behavior that had taken place before 1996. Accordingly, the Defendants cannot establish that there was a "break" between 1996 and April, 1999 that would prevent the pre-1996 incidents from being considered as part of a "continuing violation."

**3. <u>The Post-April, 1999 Conduct Was Similar to and Reinforced the Pre-April, 1999 Conduct.</u>**

Finally, the harassing behaviors dealt out to Plaintiff subsequent to April 26, 1999 – the anchoring violations – were sufficiently similar to and reinforced the conduct which had gone before. Most notably, Mr. Bolduc figured in every single one of the post April 26, 1999 incidents – as he had in virtually all of those taking place before. The "fool's errand" of studying the policy manual took place in October, 1999. (Ex. 1, 89:20-22, Ex. 57, ¶ 24.) Additionally, one specific incident in which Mr. Bolduc did not hold Mr. Porter to the "rule" against sitting and talking to

[7] Defendants complain that the Plaintiff had not discussed this matter in her original deposition. However, Plaintiff was given few if any open-ended questions, but generally was only asked only about specific incidents.

the incoming second-shift employees took place in September, 1999. (Ex. 1, 91:22-92:16) Mr. Bolduc invented his new rule for overtime distribution in or about the fall of 1999. (Ex. 1, 89:4-12; Ex. 62, ¶ 8-9.) Mr. Bolduc's pattern of isolating himself from the female employees was ongoing at this time at the latest. (Ex. 85:6-16.) Furthermore, the conditions at Weybosset Street and the Dexter Street facility continued to the end of the Plaintiff's employment. (Ex. 57, ¶ 21-22.) Additionally, the disparities in supervision continued to the end of Plaintiff's employment, as did the disparities in work assignments. (Ex. 57, ¶ 6-8, 12, 14.) All of these conditions and incidents, taken together, support a finding of a hostile work environment continuing through the 300 day period – even without the "locker room incident"

Defendants attempt to deal with these post-April 26, 1999 incidents much as they did with the 1996-1999 incidents, by asking this Court to deal with them in isolation or otherwise minimizing them. For example, the Defendants would apparently have this Court disregard the "fool's errand" of studying the policy manual. Given Mr. Bolduc's prior conduct, it is at least inferable that Mr. Bolduc's motive in demanding that Plaintiff engage in the futile task of studying the manual was designed to annoy the Plaintiff – regardless of whether he actually tested her or not. With respect to the incidents the reprimand for laughing and joking with other employees, and the different call-in rules, Defendants would again have us ignore the fact that a male co-worker was being treated differently.

Finally, the Defendants fail to notice that the "locker room incident" incident itself bore strong similarities to the other episodes of harassing behavior, and reinforced them. Mr. Bolduc's locker room invasion was a continuation of his established practice of subjecting female employees to closer supervision than male employees. Additionally, it took on strong sexual

---

Defendants certainly had the opportunity to follow up with an interrogatory, but failed to do so.

overtones – much like the conduct that Bolduc had condoned in the past. Certainly, fewer situations can be more sexually charged than bursting into a changing area occupied by members of the opposite sex. For that matter, the response of Mr. Bolduc's superiors to this event – that is, to completely whitewash it – certainly was similar to and reinforced the previous incidents wherein Plaintiff's complaints of sexual harassment regarding Kala were ignored.

Accordingly, then, the Defendants cannot avoid accountability for the pre-April 26, 1999 hostile environment based upon its allegation that the "locker room incident" was insufficient to create a hostile environment in and of itself. The locker room incident – and the other episodes taking place after April 26, 1999 – were part and parcel of a continuing pattern that created a toxic environment for the Plaintiff and every other woman that worked in the Defendants' facilities maintenance department.

**B. THE POST-APRIL 26, 1999 CONDUCT WAS INDEPENDENTLY ACTIONABLE AS A HOSTILE ENVIRONMENT CLAIM.**

Plaintiff also wishes to point out that the Defendants' post-April 26, 1999 conduct in and of itself could be actionable as a hostile environment claim. As we noted above, on a daily basis, during the post-April 26, 1999 period, Plaintiff was, on a daily basis, subjected to a higher level of scrutiny and discipline than her male counterpart; required to work in a men's locker room containing sexually explicit materials, while said locker room was in use, sent on a "fool's errand" of studying the policy manual,[8] and deprived of overtime opportunities. Finally, on August 20, 1999, Mr. Bolduc burst in on her while she was in the locker room with her female co-worker, Christine Stamp. (Ex. 1, 68:24-69:4)

For that matter, even the "locker room" incident itself was independently actionable. We believe that the circumstances of this matter do create at least a triable issue of whether such a hostile environment was created by the locker room incident. We must remember that Mr. Bolduc was a supervisor, and was ostensibly acting in that capacity when he invaded the locker room to berate Plaintiff and Ms. Stamp. His intrusion in the locker room could certainly be construed as a statement that women under his command were to give up their entirely reasonable expectation of privacy in dressing areas. Mr. Butler's nonresponse to this situation made it clear that the Company itself believed that this was acceptable practice, and could be repeated in the future. Under these circumstances, a reasonable jury could find that a hostile and threatening working environment existed after April 26, 1999, even if that claim rested only upon the "locker room incident."

## IV. CONCLUSION

For the above-referenced reasons, Defendants' Objection to the Decision on the Defendants' Motion for Summary Judgment has no merit. Instead, the Magistrate Judge's Decision should be allowed to stand.

Respectfully submitted,
Plaintiff,
By her attorneys,

/s/Vicki J. Bejma
Stephen M. Robinson #2103
The Law Offices of Stephen M. Robinson
155 South Main Street, Suite 402
Providence, RI 02903
(401) 331-6565
(fax) 331-7888
February 1, 2007
vbejma@smrobinsonlaw.com

**CERTIFICATE OF SERVICE**

I hereby certify that on the 1st day of February, 2007, a true and complete copy of the foregoing was electronically filed with counsel of record for the Defendants: Neal J. McNamara, Esquire and Matthew J. Frankel, Esquire, Nixon Peabody LLP, One Citizens Plaza, Suite 500, Providence, RI 02903.

/s/ Vicki J. Bejma

[8] Defendant ignores the fact that Richard Kala, during his deposition, was specifically asked if he had been required to study the policy manual, and answered that he had not. (Ex. 4, 44:3-5.) Defendant is therefore incorrect in claiming that there is no evidence that male employees were not required to study the policy manual.